Glenn D. Pomerantz (State Bar No. 112503)
   glenn.pomerantz@mto.com
Kuruvilla J. Olasa (State Bar No. 281509)
   kuruvilla.olasa@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Justin P. Raphael (State Bar No. 292380)
   justin.raphael@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

McGregor Scott (State Bar No. 142413)
   mscott@kslaw.com
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone:  (916) 321-4800

*Attorneys for Plaintiff DIRECTV, LLC*

*Attorney Information Continued on Page 2*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| DIRECTV, LLC,<br><br>            Plaintiff,<br><br>       vs.<br><br>Nexstar Media Group, Inc.; and TEGNA Inc.,<br><br>            Defendants. | Case No. 2:26−cv−00976−TLN−CKD<br><br>**PLAINTIFF DIRECTV, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

Robert E. Bowen (State Bar No. 335932)
    robert.bowen@mto.com
Liam Gennari (State Bar No. 350177)
    liam.gennari@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Carson J. Scott (State Bar No. 339868)
    carson.scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

Xiaonan April Hu (State Bar No. 321354)
    april.hu@mto.com
Brandon H. Thomas (State Bar No. 334240)
    brandon.thomas@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300

*Attorneys for Plaintiff DIRECTV, LLC*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................. 2

        A.      Local Broadcast Stations ......................................................................... 2

        B.      Retransmission Consent Fees .................................................................. 3

        C.      Local News ............................................................................................... 4

        D.      Federal Agency Review .......................................................................... 5

        E.      The Transaction's Immediate Consequences .......................................... 6

III.    LEGAL STANDARD ........................................................................................... 6

IV.     ARGUMENT ........................................................................................................ 7

        A.      DIRECTV Is Likely to Succeed on the Merits ....................................... 7

                1.      Legal Framework ......................................................................... 8

                2.      The Merger Is Presumptively Unlawful ...................................... 9

                        (a)     The Merger Massively Increases Concentration of Big Four Station Ownership in Local DMAs ..................................... 9

                        (b)     The Relevant Markets Are for Retransmission Consent Licenses for Big-Four-Affiliated Broadcast Stations in DMAs ..................................................................... 10

                3.      Evidence Confirms the Merger Will Have Anticompetitive Effects .......... 13

                        (a)     The Transaction Will Lead to Higher Prices for DIRECTV and Its Subscribers ......................................... 14

                        (b)     The Transaction Will Harm Competition for Local News, Reducing the Quality of Content DIRECTV Licenses ................... 15

                4.      Defendants Cannot Rebut the Presumption That This Merger Is Illegal .......... 16

        B.      DIRECTV Will Be Irreparably Harmed Absent A Hold-Separate Order ................ 17

        C.      The Public Interest Favors A Hold-Separate Order ............................... 19

        D.      The Balance of the Equities Tips Sharply in DIRECTV's Favor ........... 20

V.      CONCLUSION ................................................................................................... 20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*,
  901 F.3d 1166 (9th Cir. 2018)................................................................................................7

*Amazon.com, Inc. v. Powers*,
  2012 WL 6726538 (W.D. Wash. Dec. 27, 2012)...................................................................19

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016)..................................................................................... 7, passim

*Brady v. Nat'l Football League*,
  640 F.3d 785 (8th Cir. 2011)..................................................................................................18

*Brown Shoe Co. Inc. v. United States*,
  370 U.S. 294 (1962) ...............................................................................................................7, 8

*California v. Am. Stores Co.*,
  492 U.S. 1301 (1989) .............................................................................................................17

*California v. Am. Stores Co.*,
  495 U.S. 271 (1990) .............................................................................................................1, 7

*California v. Am. Stores Co.*,
  872 F.2d 837 (9th Cir. 1989) .................................................................................................17

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) .........................................................................................10, 16

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022)................................................................................................8, 10

*FTC v. Kroger Co.*,
  2024 WL 5053016 (D. Or. Dec. 10, 2024) .......................................................................8, 9, 10

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016)................................................................................................8, 17

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967) ...............................................................................................................16

*FTC v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) .......................................................................................19

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ...............................................................................10, 13, 16

*FTC v. Tapestry, Inc.*,
  755 F. Supp. 3d 386 (S.D.N.Y. 2024)......................................................................................9

-ii-

*FTC v. Warner Commc'ns Inc.*,
  742 F.2d 1156 (9th Cir. 1984)................................................................................7, 13

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004).........................................................................................10

*Havens v. Mobex Network Services, LLC*,
  2011 WL 6826104 (D.N.J. Dec. 22, 2011) ..................................................................7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000).......................................................................................20

*In re Los Angeles Dodgers LLC*,
  465 B.R. 18 (D. Del. 2011) ..........................................................................................18

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ................................................................................................7, 15

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014)....................................................................................8, 10

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991).......................................................................................19

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990).........................................................................................18

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015)................................................................................ 7, passim

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021)................................................................................1, 2, 10

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001).....................................................................................6, 18

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
  695 F.3d 676 (7th Cir. 2012).......................................................................................19

*Tasty Baking Co. v. Ralston Purina, Inc.*,
  653 F.Supp.1250 (E.D. Pa. 1987) .................................................................6, 17, 18, 19

*Teradata Corp. v. SAP SE*,
  124 F.4th 555 (9th Cir. 2024)......................................................................................13

*United States v. Acorn Eng'g Co.*,
  1981 WL 2112 (N.D. Cal. June 18, 1981) ..................................................6, 18, 19, 20

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ................................................................................11

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ......................................................................................8

-iii-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ........................................................................................................11

*United States v. Gray Television, Inc.*,
   No. 1:18-cv-02951 (D.D.C. June 5, 2019) ...........................................................11, 13

*United States v. Gray Television, Inc.*,
   No. 1:21-cv-02041 (D.D.C. July 28, 2021)....................................................................11

*United States v. H & R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ................................................................10, 11, 13, 14

*United States v. Ivaco, Inc.*,
   704 F. Supp. 1409 (W.D. Mich. 1989)...........................................................................20

*United States v. Nexstar Broad. Grp., Inc.*,
   No. 1:16-cv-01772 (D.D.C. Nov. 16, 2016) ...........................................................11, 20

*United States v. Nexstar Broadcasting Group, Inc.*,
   No. 1:14-cv-02007 (D.D.C. Nov. 26, 2014) ..................................................................20

*United States v. Nexstar Media Grp., Inc.*,
   No. 1:19-cv-02295 (Feb. 10, 2020).................................................................11, 13, 20

*United States v. Pabst Brewing Co.*,
   384 U.S. 546 (1966) ........................................................................................................15

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) .............................................................................................8, 9, 13

*United States v. Radio Corp. of Am.*,
   358 U.S. 334 (1959) ..........................................................................................................2

*United States v. Tribune Publ'g Co.*,
   2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ..............................................................19

*Washington v. Franciscan Health Sys.*,
   388 F. Supp. 3d 1296 (W.D. Wash. 2019) ....................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...............................................................................................................6

**FEDERAL STATUTES**

15 U.S.C. § 18 ...........................................................................................................................7

15 U.S.C. § 18a(i)(1) .................................................................................................................7

15 U.S.C. § 26 ...........................................................................................................................7

17 U.S.C. § 111 .......................................................................................................................12

17 U.S.C. § 122 .......................................................................................................................12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER

**FEDERAL REGULATIONS**

47 C.F.R. §§ 76.92–76.130 ...............................................................................................12

**OTHER AUTHORITIES**

Fed. Communications Comm'n, *FCC Empowers Local Broadcast TV Station* (Mar. 19, 2026), https://www.fcc.gov/document/fcc-empowers-local-broadcast-tv-stations........................................................................................................................6

Gray/Quincy Competitive Impact Statement, https://www.justice.gov/atr/case-document/file/1418276/dl .........................................................................................11

Nexstar Media Grp., Inc., *Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc.* (Mar. 19, 2026), https://www.nexstar.tv/nexstar-media-group-inc-closes-acquisition-of-tegna-inc ............................................................................6

Josh Sisco, Bloomberg, *Nexstar's $3.5 Billion Tegna Deal Cleared by Justice Department* (Mar. 19, 2026), https://www.bloomberg.com/news/articles/2026-03-19/nexstar-s-3-5-billion-tegna-deal-cleared-by-justice-department ......................................6

https://truthsocial.com/@realDonaldTrump/posts/ 11603004194845928 ........................................5

U.S. Department of Justice and Federal Trade Commission's 2023 *Merger Guidelines*...................................................................................................................9

https://x.com/BrendanCarrFCC/status/2020216093445444054 ........................................5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

## I.   INTRODUCTION

On March 19, 2026, Nexstar Media Group, Inc. ("Nexstar")—the largest owner of local broadcast television stations in the country—announced that it had closed a transaction to acquire TEGNA Inc. ("TEGNA"), the next-largest station owner.  This massive consolidation will give Nexstar control of additional "Big Four" local stations (ABC, CBS, FOX, or NBC affiliates) in 31 local markets where it already owns at least one station.  It will also increase concentration in those markets by amounts considered *presumptively unlawful*.  DIRECTV and its subscribers, along with millions of Americans and other television distributors, will bear the brunt of this merger's anticompetitive effects.  By consolidating control over multiple Big Four stations, Nexstar will have more leverage to extract higher prices from DIRECTV and other distributors, which will raise prices for tens of millions of Americans to access television services.  Nexstar has also signaled that it will run a single news operation for multiple stations in these overlapping markets, reducing the amount, variety, and quality of local news and forcing DIRECTV and its subscribers to pay more for less.

The law is clear that this Court has the power to prevent these harms to competition and consumers by issuing a final judgment requiring Nexstar to divest TEGNA, and that such relief is available to DIRECTV.  *See California v. Am. Stores Co.*, 495 U.S. 271, 285 (1990) (holding that the Clayton Act "authorize[s] a private divestiture remedy"); *accord Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703 (4th Cir. 2021) ("The Clayton Act . . . authorizes divestiture in private suits[.]").  But if Nexstar integrates TEGNA while the case proceeds, then it will be difficult for this Court to order meaningful divestiture.  Absent an order from this Court, Nexstar will begin consolidating station operations with TEGNA by, among other things, shutting down newsrooms in dozens of local areas.  Nexstar is also poised to dismantle TEGNA's existing leadership structure and gain immediate access to TEGNA's competitively sensitive information, which it can leverage to demand higher prices from DIRECTV in all future negotiations.

These actions would be extremely difficult to undo and would result in immediate irreparable harm to competition, DIRECTV, and its subscribers.  Accordingly, this Court should issue a "hold-separate" order now to keep TEGNA operating as an independent competitor while the Court

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

adjudicates whether the antitrust laws permit Nexstar to acquire TEGNA, as courts confronted with similar circumstances have done before.

Nexstar's actions over the last 36 hours make clear that it will take every opportunity to thwart a hearing on its transaction. On Wednesday evening, DIRECTV asked Nexstar and TEGNA to wait to close their merger until this Court can adjudicate the merits of this case and issue a final judgment. DIRECTV asked for a response by 2 p.m. Pacific time yesterday (Thursday) so that it could seek relief from this Court. Nexstar and TEGNA *simply did not respond*. Instead, they rushed to close their acquisition late yesterday afternoon.

Until just two days ago, DIRECTV was engaged with the Department of Justice ("DOJ") and the Federal Communications Commission ("FCC") that purported to be evaluating this merger. A meeting with DOJ attorneys investigating the transaction was scheduled for yesterday, March 19. On Wednesday, the day before the meeting, the DOJ abruptly cancelled that meeting without any explanation. DIRECTV filed its Complaint that very same evening. The next day, after the close of business hours in Washington, D.C., both DOJ and FCC cleared the transaction. Just minutes later, Nexstar announced that it had closed the transaction.

This Court has an independent obligation to enforce the antitrust laws. Neither the DOJ's nor the FCC's policy decisions deprive this Court of that authority, give Nexstar immunity under the antitrust laws, or prevent a private party like DIRECTV from enforcing those laws. *See United States v. Radio Corp. of Am.*, 358 U.S. 334, 346 (1959) ("[T]he [FCC] was not given the power to decide antitrust issues as such, and that [FCC] action was not intended to prevent enforcement of the antitrust laws in federal courts."); *Steves*, 988 F.3d at 714 ("The [DOJ]'s decision not to pursue the matter isn't probative as to the merger's legality[.]") (affirming divestiture of consummated merger in challenge by private party). This Court should issue a hold-separate TRO to protect its independent authority to remedy violations of the antitrust laws.

## II.    FACTUAL BACKGROUND

### A.    Local Broadcast Stations

Almost every community has four local television stations that are affiliates of one of the "Big Four" national television networks: ABC, CBS, FOX, and NBC. Thun Affidavit ¶¶ 2–3.

-2-

When separately owned, Big Four stations compete to provide the most entertaining, timely, and diverse content, including local news. *Id*. ¶¶ 4, 8. Each also offers the live sports, national news, and prime-time entertainment programming provided by its affiliated national network. *Id*. ¶¶ 2–3.

Nexstar is already the largest owner of local broadcast stations in the United States. It owns 164 local broadcast stations in more than 100 Designated Market Areas ("DMAs")—geographic regions used by the FCC to regulate broadcast licenses. Raphael Decl. ¶ 2, Ex. 1 at 8–11. In 14 DMAs, Nexstar owns two or three of the Big Four affiliates—referred to in the broadcast industry as Big Four "duopolies" or "triopolies." Bowen Decl. ¶ 2. Nexstar has annual revenues of approximately $5.4 billion. Raphael Decl. ¶ 2, Ex. 1 at 5. TEGNA is the second-largest owner of English-language broadcast stations in the country by percent of U.S. households reached. *Id.* ¶ 4, Ex. 3 at 5. It owns 64 broadcast stations in 51 DMAs. *Id.* ¶ 3, Ex. 2 at 3. TEGNA has a market capitalization over $3 billion and similar annual revenues. *Id.* Nexstar and TEGNA's expansive reach extended to roughly 70% and 40% of U.S. households in 2025, respectively. Raphael Decl. ¶ 4, Ex. 3 at 5. Together, they will reach 80%. Raphael Decl. ¶ 14, Ex. 13 at 3.

The acquisition would give Nexstar control of additional Big Four stations in 31 local markets where it already owns one or more such stations, including 27 new duopolies and 3 new triopolies.[1] Shapiro Decl. ¶ 74, Table 1. Those DMAs include San Diego, CA; Sacramento, CA; Denver-Aurora, CO; Charlotte, NC; St. Louis, MO; and Portland, OR. *Id*.

### B.   Retransmission Consent Fees

Most consumers watch local broadcast stations through cable or satellite services like DIRECTV, called "multi-channel video programming distributors" or "MVPDs." Local broadcasters like Nexstar and TEGNA charge MVPDs per-subscriber "retransmission consent fees" for the right to retransmit their signals. Thun Affidavit ¶¶ 4–5. MVPDs generally negotiate one agreement for all stations owned by the same company. *Id*. ¶ 5. Thus, when one firm owns multiple broadcast stations, including in the same DMA, the same negotiation covers all of those stations.

---

[1] In the 31st DMA—Grand Rapids-Kalamazoo-Battle Creek, MI—Nexstar would add a second ABC affiliate, TEGNA's WZZM [ABC], to the duopoly it already owns of WOTV [ABC] and WOOD-TV [NBC], increasing consolidation, but not creating a *new* duopoly or triopoly.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

*Id.* From 2010 to 2025, retransmission consent fees increased by more than ***2,000 percent*** on a per-subscriber basis—from \$1.04/month to \$23.21/month. Raphael Decl. ¶ 5, Ex. 4.

In negotiations with MVPDs, a significant source of broadcast station owners' leverage is the ability to "black out" programming if the MVPD will not agree to the station owner's demands. Thun Affidavit ¶ 16. A blackout leaves DIRECTV's customers without access to the live sports, local news, and other content offered by the broadcaster. *Id.* This often causes DIRECTV's customers to switch to another MVPD (*e.g.*, Comcast) that is not blacked out or an Internet-based "virtual" MVPD ("vMVPD") like YouTube TV. *Id.* Since December 2015, Nexstar's retransmission consent negotiations have resulted in at least nine blackouts. *Id.* ¶ 22. TEGNA has engaged in similar conduct, with at least ten blackouts over the same period. *Id.* ¶ 23. Throughout, both have continued to significantly raise retransmission fees. *Id.*

Owning duopolies (or triopolies) of Big Four networks in more DMAs would increase Nexstar's leverage in license negotiations by further raising the cost of a blackout to DIRECTV. *Id.* ¶¶ 15–16, 19–20. When Nexstar has a Big Four duopoly or triopoly in a DMA, it can threaten to black out *two or three* sources of live sports and local news, potentially leaving consumers unable to watch any NFL games on Sunday afternoon, for example. Subscribers losing two or three stations are more likely to switch to another distributor. *Id.* ¶ 20. And the more Big Four duopolies and triopolies Nexstar owns, the more subscribers will be potentially affected by blackouts. *Id.*

### C.    Local News

Local stations compete to offer original, high-quality local news coverage. They compete to hire the best on-air talent, from news anchors and meteorologists to reporters and correspondents. *Id.* ¶ 7. They compete to offer the most compelling editorial perspective, selecting which news stories to cover and how to cover them. *Id.* And they compete to be the first to break stories that will matter to their viewers, from local political corruption to public safety. *Id.*

When Nexstar or TEGNA creates a Big Four duopoly or triopoly, this competition is eliminated. In DMAs where Nexstar or TEGNA has a Big Four duopoly, it is common practice for both stations to have a single news director, share news talent and journalist teams, operate a single news website, and "simulcast" the same programming. Bowen Decl. ¶¶ 3–16, 18–19. This is

-4-

Nexstar's strategy.  Nexstar has admitted that after buying TEGNA it will "[o]perate multiple stations with one infrastructure," *i.e.*, turn two newsrooms into one in the overlap markets, which it can do at any time now that the transaction has closed.  Raphael Decl. ¶ 4, Ex. 3 at 22.

### D.     Federal Agency Review

Defendants could not close this transaction without DOJ and FCC approval.  As explained further below, DOJ had previously filed lawsuits alleging that Nexstar's acquisitions of duopolies would violate the antitrust laws.  But Nexstar's CEO knew that "President Trump and his policies toward deregulation" had "created a window of opportunity" for Nexstar, which "wouldn't be contemplating this transaction" otherwise.  Raphael Decl. ¶ 6, Ex. 5 at 3.  On February 7, 2026, President Trump urged: "GET THAT DEAL DONE!"[2]  That same day, FCC Chairman Brendan Carr posted on X: "President Trump is exactly right" and implored "[l]et's get it done."[3]

A broad spectrum of participants in the television industry opposed the merger at the FCC, including customers of the merging parties, such as DIRECTV, DISH, and Optimum; consortiums of customers and consumer advocates, such as the American Television Alliance; and numerous unions representing industry workers.  Raphael Decl. ¶ 15.  DIRECTV actively participated in discussions with both the FCC and the DOJ, which were continuing to assess the transaction as of earlier this week.  DIRECTV had a meeting with the DOJ set for yesterday, Thursday, March 19, but on Wednesday, the day before the meeting, the DOJ abruptly cancelled without explanation.  Antoine Decl. ¶¶ 2–3.  DIRECTV filed its complaint that same night—shortly after eight attorneys general filed their lawsuit.  *See* No. 2:26-cv-978-TLN-CKD (E.D. Cal. Mar. 18, 2026).  DIRECTV asked Nexstar and TEGNA to agree not to close the transaction until 10 days after a final judgment.  Pomerantz Affidavit ¶ 4.  DIRECTV asked for a response by 2 p.m. on Thursday to enable it to seek relief from this Court.  Nexstar and TEGNA never responded.

---

[2] The President wrote: "We need more competition against THE ENEMY, the Fake News National TV Networks. Letting Good Deals get done like Nexstar - Tegna will help knock out the Fake News because there will be more competition, and at a higher and more sophisticated level. Those that are opposed don't fully understand how good the concept of this Deal is for them, but they will in the future.  GET THAT DEAL DONE!"  https://truthsocial.com/@realDonaldTrump/posts/116030041948459285.

[3] https://x.com/BrendanCarrFCC/status/2020216093445444054.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

On Thursday afternoon—just after the deadline DIRECTV gave for a response and after the close of business in Washington, D.C.—the DOJ terminated its antitrust review and the FCC approved Defendants' application for broadcast license transfers—not through a full, public Commission vote, but through its Media Bureau which acts under the FCC Chairman's discretion.[4] Nexstar announced just minutes later that it had closed the transaction.[5]

### E.    The Transaction's Immediate Consequences

Effective immediately, Nexstar has acquired TEGNA and its assets and has the power to exercise control over them.  This includes, but is not limited to: (i) consolidating operations, such as closing newsrooms and laying off reporters in any market where it now owns two or more Big Four stations because of the merger; (ii) accessing TEGNA's competitively sensitive information and using that information to inform its negotiation and pricing strategy for retransmission consent fees; and (iii) terminating TEGNA's senior leadership.  Once undertaken, these actions would be extremely difficult to undo.  To prevent that result, courts have issued "hold-separate" orders that require an acquirer to "maintain the integrity and distinctness" of the acquired company's assets, *United States v. Acorn Eng'g Co.*, 1981 WL 2112, at *1 (N.D. Cal. June 18, 1981), to preserve the competition that "existed before defendants' acquisition" and ensure that divestiture remains a viable remedy.  *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp.1250, 1277 (E.D. Pa. 1987).

## III.    LEGAL STANDARD

The standard for a TRO is generally the same as for a preliminary injunction.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  Accordingly, the Court may exercise its discretion to grant a TRO if DIRECTV shows that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat.*

---

[4] *See* FCC, Fed. Communications Comm'n, *FCC Empowers Local Broadcast TV Station* (Mar. 19, 2026), https://www.fcc.gov/document/fcc-empowers-local-broadcast-tv-stations    (FCC);    Josh    Sisco, Bloomberg, *Nexstar's $3.5 Billion Tegna Deal Cleared by Justice Department* (Mar. 19, 2026), https://www.bloomberg.com/news/articles/2026-03-19/nexstar-s-3-5-billion-tegna-deal-cleared-by-justice-department.

[5] Nexstar Media Grp., Inc., *Nexstar Media Group, Inc., Closes Acquisition of TEGNA Inc.* (Mar. 19, 2026), https://www.nexstar.tv/nexstar-media-group-inc-closes-acquisition-of-tegna-inc.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[6]

## IV.    ARGUMENT

### A.    DIRECTV Is Likely to Succeed on the Merits

DIRECTV is likely to prevail on its claim that the merger violates Section 7 of the Clayton Act, which prohibits mergers whose "effect . . . *may be* substantially to lessen competition" in "any line of commerce or in any activity affecting commerce in any section of the country."  15 U.S.C. § 18 (emphasis added).  DIRECTV is entitled to seek judicial relief to enforce Section 7, *id.* § 26, "including an order of divestiture." *Am. Stores Co.*, 495 U.S. at 283.  "Private enforcement" of the statute "was an integral part of the congressional plan for protecting competition."  *Id.* at 284.  The DOJ and FCC's decisions to clear the merger do not affect this Court's obligation to determine whether it violates Section 7.  *See* 15 U.S.C. § 18a(i)(1) ("[A]ny failure of" DOJ "to take any action under this section shall not bar any proceeding or any action with respect to such acquisition."); *Havens v. Mobex Network Services, LLC*, 2011 WL 6826104, at *10 (D.N.J. Dec. 22, 2011) (FCC's decisions do not "preclude the operation of independent antitrust statutes.").

Federal law recognizes an "expansive definition of antitrust liability." *Id.*  The Clayton Act "was intended to arrest anticompetitive tendencies in their incipiency," *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015), and Congress's "concern was with probabilities, not certainties." *Brown Shoe Co. Inc. v. United States*, 370 U.S. 294, 323 (1962).  To prevail, DIRECTV need only demonstrate that the merger creates a "*reasonable probability* of anticompetitive effect." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (citation omitted and emphasis added); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).  Anticompetitive effects include "reduced output, increased prices, or decreased quality." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).

Here, the anticompetitive effects of the merger are far more than reasonably probable.  They are presumed and obvious.  The law is clear that mergers that increase market concentration past a

---

[6] DIRECTV may also obtain a preliminary injunction by raising "serious questions" going to the merits of its claims and showing that the balance of hardships tips "sharply" in DIRECTV's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018).

certain threshold are presumed to be anticompetitive. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963). This merger "bl[ows] through those barriers in spectacular fashion." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014). And overwhelming evidence confirms what the law presumes: this merger will lead to higher prices and lower quality.

### 1.    Legal Framework

Under the Clayton Act, the effect of a merger is evaluated in one or more "relevant market[s]," which are the "area[s] of effective competition" between the parties that may be affected by the merger. *Brown Shoe*, 370 U.S. at 324. Proof that a merger is reasonably likely to have an anticompetitive effect in *any* market suffices to prove a violation of Section 7. *FTC v. Kroger Co.*, 2024 WL 5053016, at *17 (D. Or. Dec. 10, 2024). To determine whether a plaintiff has shown that a merger may substantially lessen competition in a market, courts apply the three-step burden shifting framework that the Supreme Court recognized in *Philadelphia National Bank*, 374 U.S. at 366–72. *See also, e.g.*, *St. Alphonsus*, 778 F.3d at 783 (applying framework).

***First***, a plaintiff can establish a **presumption of illegality** by showing that the combined entity will "control[] an undue percentage share of the relevant market" and the merger will result "in a significant increase in the concentration of firms in that market." *Phila. Nat'l Bank*, 374 U.S. at 363; *accord St. Alphonsus*, 778 F.3d at 785. A merger that triggers this presumption "*must* be enjoined in the absence of evidence *clearly* showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363 (emphases added).

***Second***, once a plaintiff has made a prima facie showing of illegality, the burden shifts to the defendants to rebut the presumption. *St. Alphonsus*, 778 F.3d at 785; *ProMedica*, 749 F.3d at 568–70. "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990).

***Third***, if and only if the defendants can successfully rebut the presumption (which they cannot here), then "the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337–38 (3d Cir. 2016) (quoting *St. Alphonsus*, 778 F.3d at 783). Federal courts regularly apply this framework to preliminarily enjoin mergers. *See, e.g.*, *Boardman*, 822 F.3d at 1021–25; *FTC v. Hackensack*

-8-

*Meridian Health, Inc.*, 30 F.4th 160, 166–79 (3d Cir. 2022); *Kroger Co.*, 2024 WL 5053016, at *2, *15–30; *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 408–09, 456–495 (S.D.N.Y. 2024).

### 2. The Merger Is Presumptively Unlawful

#### (a) The Merger Massively Increases Concentration of Big Four Station Ownership in Local DMAs

Courts rely on two metrics to assess whether the plaintiff is entitled to a presumption of illegality. Both show that Nexstar's acquisition of TEGNA is presumptively unlawful.

***First***, courts assess the combined firm's market share. A merger that creates a firm with a market share of 30% or more is presumed likely to violate the antitrust laws. *See Phila. Nat'l Bank*, 374 U.S. at 364. That standard is easily met here. As explained in the attached Declaration of Dr. Carl Shapiro, Professor of Economics at UC Berkeley and former Deputy Assistant Attorney General for Economics at DOJ, the merger gives Nexstar a 30% market share or greater in 31 local markets. Shapiro Decl. ¶ 78, Table 2. In 16 of these 31 local markets, Nexstar's post-merger market share exceeds 50%. *Id.* DIRECTV's "prima facie case can be established simply by showing" that such "a high market share would result from the proposed merger." *Boardman*, 822 F.3d at 1021.

***Second***, courts examine the Herfindahl-Hirschman Index ("HHI"), a standard tool for measuring market concentration discussed in the U.S. Department of Justice and Federal Trade Commission's 2023 *Merger Guidelines*.[7] The HHI of a particular relevant market is calculated by summing the squares of each individual firm's market share. Shapiro Decl. ¶ 76. So, for example, a market consisting of four firms with shares of 30%, 30%, 20%, and 20% would have an HHI of 2,600 (900 + 900 + 400 + 400 = 2,600).

A market is "highly concentrated" if its pre-merger HHI exceeds 1,800. *Kroger Co.*, 2024 WL 5053016, at *16 (citing Merger Guidelines § 2.1). Generally, an increase in HHI of "more than 100 points" in a "highly concentrated market" creates a presumption of illegality. *Tapestry, Inc.*, 755 F. Supp. 3d at 458–59; *Kroger Co.*, 2024 WL 5053016, at *16. Where the concentration levels

---

[7] "Although the Merger Guidelines are not binding on the courts, they are often used as persuasive authority." *St. Alphonsus*, 778 F.3d at 784 n.9 (citations omitted). The 2023 Merger Guidelines superseded the 2010 Horizontal Merger Guidelines and have been accepted by multiple courts in merger challenges. *See Tapestry, Inc.*, 755 F. Supp. 3d at 458; *Kroger Co.*, 2024 WL 5053016, at *16.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

caused by a merger do not just exceed these levels but "bl[ow] through [them] in spectacular fashion," *ProMedica*, 749 F.3d at 568, the presumption of illegality is especially strong. *See Steves & Sons*, 988 F.3d at 715 (defendant required to overcome an "overwhelming presumption" where merger caused a 1,200-point HHI increase).

This is just such a merger. In more than a dozen already highly concentrated markets, the merger increases market concentration by more than *1,000 points*, 10 times the level required for a presumption of illegality. Shapiro Decl. ¶ 80, Table 2. Courts routinely find such mergers unlawful when they increase market concentration by far smaller amounts. *See, e.g.*, *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (HHI increase of ~400 points); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) (HHI increase of 510 points); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022) (HHI increase of 841 points).

**(b)    The Relevant Markets Are for Retransmission Consent Licenses for Big-Four-Affiliated Broadcast Stations in DMAs**

The overwhelming market share and concentration numbers are calculated based on an accepted and well-supported definition of the relevant markets. A "relevant market" is comprised of both a "'relevant product market,' [which] identifies the product[s] and services with which the defendants' products compete," and a "relevant geographic market," which "identifies the geographic area in which the defendant competes in marketing its products or service." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 24 (D.D.C. 2015). In this case, the relevant product market is retransmission consent for Big Four broadcasting stations, and the relevant geographic markets are DMAs, which federal law uses to regulate broadcast stations. DOJ consistently uses these markets to evaluate mergers in this industry. Economic analysis and evidence support doing the same.

**Product Market.** "In plain terms, the relevant market consists of what customers consider to be reasonable substitutes for a company's products." *Kroger Co.*, 2024 WL 5053016, at *6. "The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Because a buyer's ability "to switch to a substitute restrains a firm's ability to raise prices above the competitive level," *id.*, a relevant

-10-

product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Thus, a relevant product market should include the set of "'sufficiently close substitutes' such that substitution to one could 'constrain any anticompetitive . . . pricing' in the other." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (quoting *H & R Block, Inc.*, 833 F. Supp. 2d at 54).

In the relevant product market for retransmission consent for Big Four stations, the sellers are owners of broadcast stations like Nexstar and TEGNA that have licenses to transmit Big Four broadcast signals. The customers are MVPDs like DIRECTV, which negotiate for retransmission consent licenses, in order to distribute programming to subscribers.

Licenses to retransmit Big Four broadcast content are not reasonably interchangeable with licenses to any other stations because MVPDs cannot obtain the combination of local news and live sports that their customers demand anywhere else. As DOJ has noted in defining this same product market, "Big Four stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly-ranked primetime programs."[8] These offerings give "Big Four broadcast content" a "special appeal to television viewers."[9] Nexstar itself has said that "broadcast television has the most watched content" and MVPDs "need to carry broadcast stations because they carry the sports and local news content viewers demand." Raphael Decl. ¶ 4, Ex. 3 at 30. Thus, in the event of a blackout of a Big Four station in a particular DMA, consumers are far more likely to switch to another Big Four station for live sports and local news than to a non-Big Four broadcast station or to cable programming.

This is why the extent to which a station group "possesses *Big Four* Duopolies" is among

---

[8] Gray/Quincy Competitive Impact Statement at 4, https://www.justice.gov/atr/case-document/file/1418276/dl. The DOJ Antitrust Division has used this market definition for years. In evaluating four separate transactions dating back to 2016, the DOJ has maintained that the market for retransmission consent licenses for broadcast stations affiliated with the Big Four networks is the relevant product market for assessing harm to competition. *See United States v. Gray Television, Inc.*, No. 1:21-cv-02041 (D.D.C. July 28, 2021); *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (Feb. 10, 2020); *United States v. Gray Television, Inc.*, No. 1:18-cv-02951 (D.D.C. June 5, 2019); *United States v. Nexstar Broad. Grp., Inc.*, No. 1:16-cv-01772 (D.D.C. Nov. 16, 2016).

[9] *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

"the most important" variables that DIRECTV considers in estimating the upper bound of prices it will pay.  Thun Affidavit ¶ 18 (emphasis added).  For example, when DIRECTV renegotiated a retransmission fee agreement with the owner of a Big Four duopoly or triopoly in eight DMAs, DIRECTV concluded that a blackout "would have caused so much churn (loss of subscribers) that DIRECTV was better off accepting a large increase in Retransmission Fees."  Shapiro Decl. ¶ 51.  More broadly, "[t]he magnitude" of retransmission fees paid for Big Four stations "implies that MVPDs," like DIRECTV, "believe they would lose a significant number of subscribers if they were not able to provide their subscribers with access to the Big Four broadcast stations."  *Id.* ¶ 22.

Nexstar has suggested that it faces competition from streaming services like Netflix and Apple TV, but streaming services compete with MVPDs for subscribers.  They do not meaningfully compete with broadcasters to sell programming to MVPDs.  If they did, then it is implausible that broadcasters would have been able to raise prices for retransmission consent licenses by more than 2,000% between 2010 and 2025, *supra* Section II.B, when streaming services rapidly expanded.[10]

**Geographic Market.**  "The relevant geographic market is the area of effective competition where buyers can turn for alternate sources of supply."  *St. Alphonsus*, 778 F.3d at 784.  Here, the relevant geographic markets are DMAs because MVPDs cannot turn to stations outside of a DMA to replace blacked out stations.  FCC regulations, federal law, and network-affiliate agreements largely prohibit MVPDs from distributing broadcast stations outside of the local DMA where that station is licensed.  *See* 17 U.S.C. § 122 (limiting license to in-market carriage); *see also* 47 C.F.R. §§ 76.92–76.130; 17 U.S.C. § 111.  This means that if Big Four stations in one DMA are blacked out, MVPDs cannot replace them with Big Four stations elsewhere.  Moreover, Nexstar's SEC filings describe DMAs as "markets."  Raphael Decl. ¶ 2, Ex. 1 at 7.  The National Association of Broadcasters has said that competition between broadcast stations takes place in a "DMA-based marketplace," because "[l]ocal stations compete locally" and "[b]roadcast viewers choose locally."  Raphael Decl. ¶ 11, Ex. 9 at 2.  And the DOJ has adopted this market definition in multiple prior

---

[10] In some limited instances, DIRECTV is able to purchase access to streaming services offered by the Big Four networks (for example, NBC's Peacock service), but it must do so on onerous terms that (among other things) require DIRECTV to license the Big Four's affiliates.  Thun Affidavit ¶ 11.

-12-

broadcast merger cases. *See generally*, *e.g.*, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (Feb. 10, 2020); *United States v. Gray Television, Inc.*, No. 1:18-cv-02951 (D.D.C. June 5, 2019).

Licenses for Big Four-affiliated broadcast stations in local DMAs also satisfy the "hypothetical monopolist test" ("HMT"), a tool courts use to evaluate whether relevant markets are properly defined. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 565 (9th Cir. 2024); *see, e.g.*, *Sysco*, 113 F. Supp. 3d at 33. Under the HMT, if "a hypothetical monopolist could impose a 'small but significant non-transitory increase in price' ('SSNIP') in the proposed market," then it is a properly defined relevant antitrust market. *St. Alphonsus*, 778 F.3d at 784.

The market for licenses to retransmit Big Four-affiliated broadcast stations in each of the DMAs passes the HMT. Empirical analysis shows that when a broadcaster controls two Big Four affiliates in a DMA, the price of a retransmission consent license is significantly higher on average compared to controlling just one Big Four station. Shapiro Decl. ¶ 54. This price increase, which does not require owning all four stations, is already greater than the 5% threshold commonly used as the SSNIP in the HMT. *See Teradata*, 124 F.4th at 566. It follows that a single firm controlling all four Big Four affiliates in a DMA—the "hypothetical monopolist"—would be able to increase prices by far more than 5%, easily satisfying the HMT. Shapiro Decl. ¶ 55.

### 3. Evidence Confirms the Merger Will Have Anticompetitive Effects

When, as here, the presumption of illegality is established, a plaintiff need not make a separate showing of anticompetitive effects. *See Phila. Nat'l Bank*, 374 U.S. at 363 (the presumption of illegality "dispens[es]" with "elaborate proof of market structure, market behavior, or probable anticompetitive effects"). Nevertheless, evidence of anticompetitive effects confirms that Nexstar's merger with TEGNA is likely to substantially reduce competition.

To assess whether a merger is likely to have anticompetitive effects, courts consider whether there is a "reasonable probability," *Warner Commc'ns*, 742 F.2d at 1160, that "the acquiring firm will have the incentive to raise prices or reduce quality." *H & R Block*, 833 F. Supp. 2d at 81; *see also Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1299 (W.D. Wash. 2019) ("Explicit or implicit evidence that the merging parties intend to raise prices, reduce output or

-13-

capacity, reduce product quality or variety can be highly informative in evaluating the likely effects of a merger."). The evidence here shows that the merger will enable Nexstar to do both. First, the merger will give Nexstar greater leverage in retransmission consent negotiations, enabling it to raise prices on DIRECTV (which, in turn, will result in higher prices for DIRECTV's customers). Second, the merger will also result in Nexstar consolidating local newsrooms, thereby reducing the quantity, variety, and quality of the local broadcast news DIRECTV licenses.

> **(a)    The Transaction Will Lead to Higher Prices for DIRECTV and Its Subscribers**

The merger is likely to have anticompetitive effects because it will give Nexstar "the incentive to raise prices" for retransmission consent fees. *H & R Block*, 833 F. Supp. 2d at 81. By giving Nexstar additional Big Four networks in 31 DMAs in which it already has at least one Big Four network, the transaction will increase Nexstar's bargaining leverage to impose higher fees. Shapiro Decl. ¶ 89; *see St. Alphonsus*, 778 F.3d at 786–87 (affirming finding that merger would likely have anticompetitive effects where it would increase the merging parties' bargaining leverage). In negotiating with Nexstar, DIRECTV and other MVPDs already face a difficult choice: pay the higher retransmission consent fees Nexstar demands, or face a blackout. After the merger, that choice will become even more painful because Nexstar will be able to black out two or three local broadcast channels in 31 DMAs. A blackout affecting multiple local broadcast channels in a DMA will be more disruptive and affect more DIRECTV subscribers, significantly increasing the number of DIRECTV subscribers that would switch to another MVPD. Thun Affidavit ¶¶ 18–20.

This is not theoretical. Nexstar currently owns 14 Big Four duopolies. Bowen Decl. ¶ 2. As Nexstar has amassed Big Four duopolies, it has been "increasingly aggressive about using [its] increased leverage," *i.e.*, blackouts, to secure huge increases in retransmission fees from DIRECTV. Thun Affidavit ¶ 22. Indeed, the higher the proportion of DIRECTV subscribers located in DMAs where a broadcast station owner controls more than one network, the higher the retransmission fees that DIRECTV pays to that station owner, even controlling for other factors. Shapiro Decl. ¶ 54.

Nexstar understands the leverage that duopolies and triopolies provide, and has deliberately pursued deals—like this merger—that create new ones. Nexstar touts its existing duopolies to

-14-

investors, and acknowledges that it "[b]enefit[s] from leverage" when it acquires other stations. Raphael Decl. ¶ 4, Ex. 3 at 7, 22. In announcing this merger, Nexstar highlighted the creation of dozens of new duopolies, boasting of "Enhanced Local Presence" because of TEGNA's "overlap with Nexstar DMAs." Raphael Decl. ¶ 7, Ex. 6 at 6.

Nexstar's ability to force MVPDs to pay higher retransmission consent fees will hurt DIRECTV and other MVPDs (and, in turn, harm tens of millions of MVPD *subscribers* as well). As Mr. Thun explains: "DIRECTV's retail pricing reflects its input costs," so when broadcast groups like Nexstar "raise retransmission fees, DIRECTV in turn is forced to increase the subscription prices that it charges to customers." Thun Affidavit ¶ 12. This is consistent with economic theory. Shapiro Decl. ¶ 90. Both DIRECTV and its millions of customers will be stuck paying more, facing more harmful blackouts, or both. DIRECTV will lose hard-won business goodwill with its customers, some of whom, frustrated by the blackouts, will switch to other MVPDs or vMVPDs like YouTube TV. Such harms to DIRECTV and other MVPDs—the buyers in this market—follow from the anticompetitive effects this merger will have on retransmission fees.

Those harms will be compounded because this merger will set off a waterfall of consolidation, which also constitutes anticompetitive harm. *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 552–53 (1966). Gray Media's CEO has stated that if the Nexstar/TEGNA merger closes, "it may put a little impetus on our company to get larger." Raphael Decl. ¶ 9, Ex. 7 at 8. Sinclair's CFO was even more direct: "[W]e are looking at an end state in the sector where you have maybe 2 large super groups." Raphael Decl. ¶ 9, Ex. 8 at 15.

**(b)    The Transaction Will Harm Competition for Local News, Reducing the Quality of Content DIRECTV Licenses**

MVPDs like DIRECTV and their subscribers will not only pay more, they will also get less because the transaction will reduce the output, variety, and quality of local broadcast news that is licensed. "[R]educed output," or "decreased quality in the relevant market," is "proof of actual detrimental effects on competition." *Am. Express*, 585 U.S. at 542. Before the merger, Nexstar and TEGNA owned and operated local news broadcasts that competed head-to-head for viewers in 31 DMAs across the country. Millions of American consumers in those areas could choose between a

-15-

local news broadcast on a Nexstar-owned station and on a TEGNA-owned station.  Now, following the merger, those two local news broadcasts will become one.

On this point, past is prologue.  In the 16 DMAs in which Nexstar or TEGNA currently has a Big Four duopoly or triopoly, they generally appoint a single news director to oversee a single newsroom, and use the same on-air talent for all Big Four channels they own in the DMA.  Bowen Decl. ¶¶ 3–16, 18–19.  The same will be true in the Big Four duopolies and triopolies created by the merger.  Nexstar's CFO told investors, "the synergy playbook [in the TEGNA transaction] is really the same," as in "[Nexstar's] past deals," Raphael Decl. ¶ 11, Ex. 10 at 6, and that where Nexstar and TEGNA stations "overlap" (*i.e.*, compete) is "where we can really operate 2 stations off of [] 1 infrastructure."  Raphael Decl. ¶ 6, Ex. 5 at 6 (statement of Lee Ann Gliha, Nexstar CFO).

This means that DIRECTV not only will pay higher prices for retransmission consent licenses, but will also receive less in return: one source of local news content, rather than two, and one set of investigative reports, rather than two.  That is a stark reduction in the quality of the product that DIRECTV buys in the relevant market, which is another likely anticompetitive effect of the merger.  This, in turn, will reduce the quality of the programming that DIRECTV can offer its subscribers, leaving them paying more for less and harming DIRECTV's goodwill.

#### 4.    Defendants Cannot Rebut the Presumption That This Merger Is Illegal

Because DIRECTV has met its prima facie burden, this transaction is presumptively unlawful and the burden shifts to the Defendants to rebut the presumption.  They cannot.

The Supreme Court has stated that "[p]ossible economies cannot be used as a defense to illegality," *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967), so courts typically look askance at attempts to justify an anticompetitive merger based on anticipated "efficiencies," *see St. Alphonsus*, 778 F.3d at 788–90 (expressing skepticism).  Even assuming *arguendo* that an efficiencies defense is available to Defendants, they cannot rely on it here for at least two reasons.

*First*, courts have generally required defendants to show "proof of extraordinary efficiencies," *Heinz*, 246 F.3d at 720, that "would benefit consumers"—here, DIRECTV and other MVPDs.  *Sysco*, 113 F. Supp. 3d at 81–82.  As Dr. Shapiro explains, Defendants will not be able to show that any purported efficiencies will counteract the anticompetitive harm of the merger by

-16-

lowering retransmission fees. Shapiro Decl. ¶¶ 95–99. Quite the opposite. Nexstar has *already admitted* that the merger will *raise* retransmission fees. Raphael Decl. ¶ 6, Ex. 5 at 6.

*Second*, Nexstar cannot claim efficiencies from combining local news operations. Reducing two news teams to one is an anticompetitive harm, not a procompetitive benefit. *See Penn State Hershey Med. Ctr.*, 838 F.3d at 349 ("[E]fficiencies . . . must not rise from any anticompetitive reduction in output or service."). Nexstar's efficiencies claims are also wrong on the facts. Nexstar may repeat its argument to the FCC that "local television broadcasting needs immediate life support." Raphael Decl. ¶ 12, Ex. 11 at 2. Yet Nexstar recently told its investors that broadcast television is "the most profitable segment of the media ecosystem," that the "Future TV Ecosystem will Favor Broadcast Television," and that its financial performance is "in the top 10% of S&P 400 companies." Raphael Decl. ¶ 13, Ex. 12; ¶ 4, Ex. 3 at 4, 30.

\*          \*          \*

DIRECTV has demonstrated that it is likely to succeed on the merits of its antitrust claims, or—at a minimum—that there are substantial questions going to the merits of its claims.

**B.          DIRECTV Will Be Irreparably Harmed Absent A Hold-Separate Order**

The Ninth Circuit has long recognized, including in antitrust cases brought by private plaintiffs, that a "lessening of competition constitutes an irreparable injury." *Boardman*, 822 F.3d at 1023; *see also California v. Am. Stores Co.*, 872 F.2d 837, 844 (9th Cir. 1989) ("[T]he lessening of competition . . . is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent"), *rev'd on other grounds*, 495 U.S. 271 (1990). Because DIRECTV has established that the merger will substantially lessen competition in markets in which it participates, *see supra* Section IV.A, it has shown irreparable harm for a TRO. *See California v. Am. Stores Co.*, 492 U.S. 1301, 1307 (1989) (O'Connor, J., in chambers) (granting stay where applicant demonstrated "substantial lessening of competition in the relevant market"); *Boardman*, 822 F.3d at 1023 (affirming "finding that Plaintiffs adequately demonstrated a threatened irreparable injury" by showing that merger lessened competition); *Tasty Baking Co.*, 653 F. Supp. at 1277 (concluding plaintiffs had shown irreparable harm where threatened damage due to loss of competition "almost certainly will occur before a completed plenary hearing").

-17-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

A hold-separate order is appropriate here.  Courts have issued hold-separate orders after a merger has closed to preserve the competition "that existed before defendants' acquisition" and to ensure that defendants will not "bleed" the acquired entity of "substantial assets and restructure" it in such as a way as to thwart a divestiture order at the end of a trial on the merits.  *Tasty Baking Co.*, 653 F.Supp. at 1277; *see also Acorn Eng'g Co.*, 1981 WL 2112, at *2 (issuing hold-separate order to "ensure the efficacy of possible permanent relief," *i.e.*, divestiture, "after trial").   Both considerations are present here and warrant the issuance of a hold-separate order.

**Pre-Merger Competition.**  Absent a hold-separate order, Nexstar will fully absorb TEGNA and eliminate the companies' head-to-head competition in the 31 overlap markets.  DIRECTV will suffer irreparable harm from significantly diminished bargaining power vis-a-vis Nexstar in retransmission consent negotiations.  DIRECTV will soon find itself negotiating for access to highly sought after content, including Big Four sports and local news broadcasts, *see* Thun Affidavit ¶ 8, with a merged firm that intends to threaten blackouts doubling, or even *tripling*, their present danger. *See supra* Section IV.A.3(a).  Courts have recognized that "negotiating with respect to a unique asset with decreased leverage constitutes irreparable harm."  *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 35 (D. Del. 2011); *see Brady v. Nat'l Football League*, 640 F.3d 785, 793–94 (8th Cir. 2011) (concluding party was likely to "suffer some degree of irreparable harm" due to lost "leverage" and recognizing the "impossibility" of "recreating a negotiating environment" that would otherwise have existed).  And Nexstar will increase its "unfair advantage" in negotiations, *Tasty Baking Co.*, 653 F.Supp. at 1277, by helping itself to TEGNA's competitively sensitive data.

DIRECTV will also suffer irreparable harm from losing customer goodwill it has spent decades establishing.  *See* Thun Affidavit ¶¶ 28–29; *Stuhlbarg*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").  When Nexstar blacks out broadcasts and forces DIRECTV to raise its prices, that harms DIRECTV's brand for high-quality, reliable programming and drives subscribers to other distributors.  *See* Thun Affidavit ¶ 29; *cf. Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (Reuters's decision to stop providing photos to wire service would cause irreparable harm to "good will" because "news and pictures are the lifeblood of the wire service industry so that

-18-

interrupting the flow of pictures even briefly threatens a wire service company's continued viability"); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (affirming injunction where threatened change in business relationship would make it "difficult" for the plaintiff "to reestablish its previous business model without a loss of goodwill and reputation").

Moreover, the likely permanent loss of revenue from subscribers leaving DIRECTV will be difficult to measure with the kind of precision that money damages require. *See Amazon.com, Inc. v. Powers*, 2012 WL 6726538, at *12 (W.D. Wash. Dec. 27, 2012) ("The monetary damage from loss of a customer is difficult to quantify[.]"). Harm that is "difficult to valuate" can be irreparable. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see Tasty Baking Co.*, 653 F.Supp. at 1277 ("[P]laintiffs will be irreparably harmed by any of defendants' possible predatory practices during the next few months, because any lost business cannot be reestablished easily and money damages cannot be calculated readily.").

**Efficacy of Divestiture.** A hold-separate order is also necessary to preserve the efficacy of any divestiture remedy in the event DIRECTV prevails at trial. Nexstar has signaled that it intends to operate its Big Four stations and TEGNA's acquired Big Four stations "with one infrastructure." Raphael Decl. ¶ 6, Ex. 5. That means closing down newsrooms and firing personnel in dozens of markets to make way for one, uniform local news operation. It also means terminating TEGNA's senior leadership, as companies often do post-merger, to eliminate perceived redundancies and to fully integrate TEGNA into Nexstar's operations. These changes would significantly complicate an order requiring divestiture and reconstitution of TEGNA as its own entity to restore the loss of competition, should the Court ultimately conclude that the merger is unlawful. *See Acorn Eng'g Co.*, 1981 WL 2112, at *2–3. That "would leave defendants free to swallow up a competitor, to digest it in part and, upon a court order, to regurgitate insubstantial remains. No such result is acceptable." *Tasty Baking Co.*, 653 F. Supp. at 1277.

**C.    The Public Interest Favors A Hold-Separate Order**

"By enacting Section 7, Congress declared that the preservation of competition is always in the public interest." *United States v. Tribune Publ'g Co.*, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016); *see also FTC v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("There is a

-19-

strong public interest in effective enforcement of the antitrust laws[.]"); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("It is competition . . . that [the antitrust laws] recognize as vital to the public interest."); *Boardman*, 822 F.3d at 1023–24 (affirming injunction was in the public interest where merger "could substantially lessen competition").  Because the merger of Nexstar and TEGNA is likely to result in significant anticompetitive effects in local markets across the country, and because "the public interest in preserving the possibility of a successful divestiture is quite strong," the public interest sharply favors a hold-separate order. *Acorn Eng'g Co.*, 1981 2112, at *3.

### D.    The Balance of the Equities Tips Sharply in DIRECTV's Favor

This motion seeks to preserve the competitive status quo and ensure the efficacy of any divestiture remedy by requiring that Nexstar and TEGNA continue to compete while this Court evaluates the transaction.  Whatever private, anticompetitive benefits Nexstar could obtain by freely exercising control over TEGNA are easily outweighed by the irreparable harm to DIRECTV and by the public interest in maintaining robust competition.  *See Acorn Eng'g*, 1981 WL 2112, at *3; *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1430 (W.D. Mich. 1989) ("This private, financial harm must, however, yield to the public interest in maintaining effective competition.").  Moreover, Nexstar is no stranger to hold-separate orders.  As part of its prior acquisitions in 2014, 2016, and 2019, Nexstar agreed to hold-separate agreements containing terms similar to those requested by DIRECTV in order to maintain competition with the stations that it was required to divest.[11] Nexstar's experience reinforces that such orders are an effective and workable means of preserving the competitive status quo pending a decision on the merits.

## V.    CONCLUSION

For the foregoing reasons, DIRECTV respectfully requests that the Court issue a temporary restraining order enjoining Nexstar and TEGNA from combining operations.

---

[11] Hold Separate Stipulation and Order, *United States v. Nexstar Media Group, Inc.*, No. 1:19-cv-02295 (D.D.C. July 31, 2019); Hold Separate Stipulation and Order, *United States v. Nexstar Broadcasting Group, Inc.*, No. 1:16-cv-01772 (D.D.C. Sept. 14, 2016); Hold Separate Stipulation and Order, *United States v. Nexstar Broadcasting Group, Inc.*, No. 1:14-cv-02007 (D.D.C. Nov. 26, 2014).

-20-

DATED:  March 20, 2026                    MUNGER, TOLLES & OLSON LLP


By:  */s/ Glenn D. Pomerantz*
     GLENN D. POMERANTZ
     *Attorneys for Plaintiff DIRECTV, LLC*

-21-