Contains Highly Confidential Information

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| DIRECTV, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> Nexstar Media Group, Inc.; and TEGNA Inc., <br><br> Defendants. | Case No. 2:26-cv-00976-TLN-CKD |

## DECLARATION OF PROFESSOR CARL SHAPIRO IN SUPPORT OF DIRECTV'S MOTION FOR TEMPORARY RESTRAINING ORDER

Contains Highly Confidential Information

# Table of Contents

1.  **Qualifications and Assignment**.......................................................................1

2.  **Summary of Opinions** ................................................................................1

3.  **Industry Background** ................................................................................3

4.  **Economic Analysis of Horizontal Mergers**.......................................................6

5.  **Big Four Retransmission Consent in Each DMA is a Relevant Market**...10
    A.  Applying the Hypothetical Monopolist Test........................................................ 10
    B.  Additional Evidence................................................................................... 15
    C.  Nexstar's Arguments Regarding the Relevant Product Market........................................ 17

6.  **Market Concentration in the Overlap Markets** ..........................................19

7.  **Anti-Competitive Effects of the Proposed Merger** .....................................24
    A.  Higher Retransmission Fees ...................................................................... 25
    B.  Reduction in the Amount and Variety of Local News........................................ 28

8.  **Nexstar's Claimed Efficiencies**..................................................................28

**Appendix A: Curriculum Vitae** ........................................................................30

**Appendix B: Testimony in the Past Four Years**................................................42

Contains Highly Confidential Information

# 1. Qualifications and Assignment

1. I am Carl Shapiro, Distinguished Professor of the Graduate School at the University of California at Berkeley. I have been studying antitrust, innovation, and competitive strategy for forty-five years. My curriculum vitae is provided in Appendix A.

2. I have considerable experience with the application of economics for the purpose of enforcing the antitrust laws. I served from 1995 to 1996 and again from 2009 to 2011 as the Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice ("DOJ"). In this role, I supervised the economists analyzing the cases that came before the Antitrust Division. I also led the working group responsible for developing the 2010 Horizontal Merger Guidelines. In addition, I have served in numerous mergers as an expert witness or consultant to the DOJ, the Federal Trade Commission ("FTC"), state attorneys general, and private parties.

3. From 2011 to 2012, I had the honor of serving as a Senate-confirmed Member of the President's Council of Economic Advisers ("CEA"). The CEA, an agency within the Executive Office of the President, is charged with offering the President objective economic advice on the formulation of economic policy. The CEA bases its recommendations and analyses on economic research and empirical evidence, using the best data available to support the President in setting our nation's economic policy.

4. I have been asked by DIRECTV to assess the likely effects on competition of Nexstar's proposed acquisition of TEGNA.

5. Appendix B lists my testimony in the last four years.

# 2. Summary of Opinions

6. **Proposed Merger of Major Television Broadcasting Groups**: Nexstar owns broadcast stations in more than 100 Designated Market Areas ("DMAs") that are affiliated with the Big Four (ABC, CBS, NBC, and FOX) broadcast networks. TEGNA owns broadcast stations in more than 50 DMAs that are affiliated with the Big Four broadcast networks. In 31 DMAs around the country, Nexstar and TEGNA each own at least one Big Four broadcast station.

Contains Highly Confidential Information

7. **Retransmission Fees and Retransmission Consent**: Both Nexstar and TEGNA each earn a substantial share of their total revenue from Retransmission Fees. These Retransmission Fees are the prices that Nexstar and TEGNA charge Multichannel Video Programming Distributors ("MVPDs") such as DIRECTV in exchange for their Retransmission Consent, i.e., for granting those MVPDs the right to distribute the video content associated with the broadcast stations owned by Nexstar and TEGNA.

8. **Market Definition**: Retransmission Consent for Big Four broadcasting stations is a properly defined relevant product market in which to evaluate Nexstar's proposed acquisition of TEGNA. Each of the 31 DMAs in which Nexstar and TEGNA both own one or more Big Four broadcasting stations is a properly defined geographic market associated with Big Four Retransmission Consent. I refer to these 31 relevant markets as the "overlap markets." These 31 overlap markets satisfy the Hypothetical Monopolist Test ("HMT") that antitrust economists use to determine whether a collection of products and geographies qualifies as a relevant market.

9. **Market Concentration and Structural Presumption**: In each of the 31 overlap markets, Nexstar's proposed acquisition of TEGNA would lead to a very large increase in concentration and result in a highly concentrated market. Based on the Merger Guidelines issued by the DOJ and the FTC, these increases in concentration create a strong presumption that the merger will substantially lessen competition in each of the 31 overlap markets.

10. **Anti-Competitive Effect on Prices:** Nexstar's proposed acquisition of TEGNA is likely to lead to significantly higher prices – Retransmission Fees – in each of the 31 overlap markets. There are three reinforcing economic reasons to expect the proposed merger to lead to higher Retransmission Fees: (i) the substantial increases in concentration just noted; (ii) the increased bargaining leverage that the merged entity will have when negotiating with MVPDs over Retransmission Fees; and (iii) empirical evidence that consolidation among Big Four broadcasting stations within a DMA is associated with higher Retransmission Fees. Increases in Retransmission Fees resulting from the merger will harm not only Nexstar's direct customers, the MVPDs, but also the households that subscribe to those MVPDs, because MVPDs will pass along some

Contains Highly Confidential Information

portion of the higher Retransmission Fees to their subscribers in the form of higher subscription prices.

11. **Anti-Competitive Effect on Local News:** Local news is an important component of the video content that MVPDs obtain in exchange for the Retransmission Fees they pay to Nexstar and TEGNA. Nexstar's proposed acquisition of TEGNA is likely to lead to a reduction in the variety and quantity of local news available to viewers. This particular anti-competitive effect is likely based on (a) evidence that Nexstar uses the same newsroom staff and infrastructure for multiple Big Four stations that it owns in the same DMA, and (b) Nexstar's stated plans for cost savings associated with its proposed acquisition of TEGNA.

12. **Lack of Cognizable Efficiencies**: I am aware that Nexstar is claiming that the merger will allow it to achieve certain efficiencies. However, as best I can tell at this point in time, the bulk of those claimed efficiencies do not appear to meet the requirements that are necessary under the Merger Guidelines for them to prevent customers in the relevant market – here, MVPDs – from being harmed by the merger. Regarding Retransmission Fees, at least two major MVPDs, DIRECTV and DISH, expect the merger will cause Retransmission Fees to rise. They have petitioned the Federal Communications Commission ("FCC") to deny this transaction. So far as I am aware, Nexstar is not claiming that its acquisition of TEGNA will cause Retransmission Fees to fall rather than rise. Regarding the anti-competitive effect on local news identified above, many of the cost savings that Nexstar has reported to investors appear to stem from these anti-competitive effects, so they cannot offset those effects. In the language used by the Merger Guidelines, these claimed cost savings are not "cognizable."

## 3. Industry Background

13.  This section provides some key background information that serves as a foundation for my economic analysis. To the best of my knowledge, all of the information provided in this section is undisputed.

14. Nexstar and TEGNA each own a large number of local broadcast stations across the country, including many stations affiliated with the Big Four (ABC, CBS, NBC, and

Contains Highly Confidential Information

FOX) broadcast networks. Nexstar reports owning 164 full-power stations in 114 U.S. markets.[1] TEGNA reports owning 64 stations in 51 U.S. markets.[2]

15. In 31 DMAs around the country, Nexstar and TEGNA each own at least one station affiliated with a Big Four broadcasting network. I refer to these DMAs as the "overlap markets."

16. Big Four broadcasting stations originally reached consumers directly through over-the-air broadcasting via "rabbit ears" on television sets. But now they primarily reach consumers through MVPDs. MVPDs as a category includes cable companies (such as Comcast and Charter), telcos (such as Verizon FiOS), and Direct Broadcast Satellite ("DBS") companies (DIRECTV and DISH). MVPDs provide packages of multiple channels to their viewers. MVPDs purchase the right to distribute video programming from a variety of program suppliers, including "cable networks" (like ESPN and TNT) and local broadcast stations. Big Four broadcasting stations also reach consumers through virtual MVPDs ("vMVPDs") such as You Tube TV and DIRECTV Stream. Like MVPDs, vMVPDs provide packages of channels to their viewers, but not with their own facilities, hence the name "virtual."

17. FCC rules and licensing restrictions imposed by copyright owners govern the manner in which MVPDs can distribute the programming offered by broadcasting stations. These, along with network-affiliation agreements, generally provide that an MVPD may only distribute the signal of a broadcasting station to a subscriber if that subscriber resides in the geographic area served by that broadcasting station. In other words, an MVPD is generally not allowed to "import" the programming provided by out-of-region broadcast stations.

18. Under FCC rules, a broadcast station can elect "must carry" status. As the name suggests, MVPDs are required to carry the signal of any broadcast station that elects "must carry" status, but then the broadcast station cannot charge the MVPD for its

---

[1] *See* Nexstar Media Group, Inc., 2025 Form 10-K at pp.7-11.

[2] *See* TEGNA Inc., 2025 Form 10-K, at p.30.

Contains Highly Confidential Information

programming. Many non-Big Four broadcast stations elect must carry status, and PBS stations are required to do so.

19. Alternatively, a broadcast station can elect to have the right to negotiate fees that MVPDs must pay in exchange for the right to carry that station's signal. In that case, the MVPD cannot "retransmit" the station's signal without its "consent." If the station cannot reach an agreement with an MVPD, the station can withhold its signal from that MVPD, causing a blackout of that station. All or nearly all Big Four broadcast stations elect to negotiate fees with MVPDs.

20. The fees that MVPDs pay to local broadcast stations for the right to retransmit their signals are generally referred to as Retransmission Fees. These fees are negotiated in the form of Retransmission Consent agreements. Retransmission Consent agreements typically specify a per-subscriber, per-month ("PSPM") fee that the MVPD pays to the owner of the broadcast station. To illustrate how this works, if the negotiated PSPM fee is $5 and the MVPD has 1 million subscribers in a given month that receive a local broadcast station's signal, the MVPD will pay the owner of that broadcast station $5 million in Retransmission Fees that month.

21. The Retransmission Consent agreements that Nexstar and TEGNA enter into with MVPDs such as DIRECTV typically specify a single PSPM Retransmission Fee for all of the Big Four broadcast stations covered by the agreement, regardless of their location.

22. The average Retransmission Fee paid by MVPDs for a single Big Four broadcast station in 2025 is estimated to be $4.83 PSPM.[3] MVPDs are thus paying an average of about $19 PSPM for the right to distribute the signals of all Big Four local broadcast stations to their subscribers. The magnitude of these Retransmission Fees implies that MVPDs believe they would lose a significant number of subscribers if they were not able to provide their subscribers with access to the Big Four broadcast stations. In this basic economic sense, MVPDs believe their subscribers place a high value on the

---

[3] *See* Broadcast outlook 2025 tables and chart data, S&P Market Intelligence via Capital IQ Pro, available at https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/docviewer?KeyProductLinkType=2&mid=248240620, tab "Retrans revenue."

programming provided by the Big Four broadcast stations. In 2025, 88% of all Retransmission Fees paid to broadcast stations were paid to Big Four broadcast stations.[4]

23. Nexstar and TEGNA earn a substantial share of their revenue from Retransmission Fees. In 2025, Nexstar reported distribution revenue of $2.9 billion, which was 59% of their total net revenue. Likewise, in 2025 TEGNA reported distribution revenue of $1.5 billion, which was 54% of their total revenue.[5]

24. The local news operations of Big Four broadcast stations and their extensive sports rights are central to their value to subscribers and hence to MVPDs. Nexstar explained to its investors in its 2024 Annual Report that each of the stations it operates is "a highly recognized local brand, primarily attributable to our high quality local news programming, extensive local sports coverage, and community presence."[6]

## 4. Economic Analysis of Horizontal Mergers

25. In this section I provide a brief overview of the manner in which antitrust economists analyze horizontal mergers. Horizontal mergers are those that combine competing products or services. I focus on those parts of the analysis that are most applicable to the Nexstar/TEGNA merger. I believe there is a consensus among antitrust economists regarding everything is this section. For more details, see the Merger Guidelines issued in 2023 by the DOJ and the FTC.[7]

26. I illustrate the general principles with a hypothetical merger between two chains of gas stations. The primary concern in such a merger is that a lessening of competition among

---

[4] Calculation based on 2025 retransmission revenue data in, U.S Broadcast Station Database, S&P Market Intelligence via Capital IQ Pro, available at https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/templateLibrary?download&version=444ce0bd-d608-f2e7-e8c6-3ea71a9d3715&file=SPG KaganBroadcastStationDatabase_v1&ext=.xls.

[5] *See* Nexstar Media Group, Inc., 2025 Form 10-K at 34, and TEGNA Inc., 2025 Form 10-K, p. 31. Nexstar's and TEGNA's other main source of revenue is advertising.

[6] *See* Nexstar 2024 Annual Report, https://www.nexstar.tv/wp-content/uploads/2025/05/Nexstar-2024-Annual-Report.pdf, p. 5.

[7] *See* U.S. Department of Justice and the Federal Trade Commission, *Merger Guidelines*, December 18, 2023, available at https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

Contains Highly Confidential Information

gas stations will lead to higher gas prices. An additional concern is that the merged firm will close some gas stations, forcing some customers to drive further to obtain gasoline.

27. The analysis always begins by identifying the products or services sold by the merging firms that compete against each other. One then defines *relevant markets* that include those competing products or services.

28. In the gas station merger, it is obvious that nearby gas stations compete against each other, but distant ones do not. The analysis thus begins by identifying towns in which both merging firms own a gas station. Those "overlap towns" are the *geographic markets* in which the merger may lessen competition.

29. Within each overlap town, we still need to determine the relevant *product market*. In a merger involving chains of gas stations, the natural candidate product is "retail gasoline." But even in this simple example, complexities arise. Do we need to also include electric charging stations in the relevant market? After all, more and more people are purchasing electric vehicles, and many of these vehicles are hybrid, so they can use either gasoline or electric power.

30. Nearly 50 years ago, antitrust economists developed a method to guide market definition in horizontal merger cases. That method is called the Hypothetical Monopolist Test ("HMT"). The HMT has been central to how relevant antitrust markets are defined since 1982. In my example, the HMT starts with a "candidate" product market of "retail gasoline" and asks whether the price of gasoline would go up by at least 5% if a single, profit-maximizing firm (the "hypothetical monopolist") controlled *all* sales of retail gasoline in a given town. If so, then "retail gasoline" in that town passes the HMT and qualifies as a relevant product market. If not, then "retail gasoline" in that town fails the HMT and is thus too narrow to qualify as a relevant product market. In that case, more substitute products for "retail gasoline," such as electric charging stations, must be included in the relevant market.

31. In my example, there is no doubt that "retail gasoline" satisfies the HMT and thus qualifies as a relevant product market. Why? Well, suppose the price of gasoline is $4 per gallon, so a 5% price increase would lead to a price of $4.20 per gallon. This price increase would add 20 cents per gallon to the profit margin of each gas station.

Contains Highly Confidential Information

Therefore, it would be profitable for the hypothetical monopolist unless motorists would significantly reduce their use of gasoline in response to the higher price. (All of this can be quantified, but I hope the basic point is clear without providing the calculations.) But we know from historical experience that people only very slightly reduce their use of gasoline in response to price increases of this magnitude. So "retail gasoline" passes the HMT and qualifies as a properly defined product market.

32. That conclusion is correct even though *some* owners of hybrid vehicles will shift to some degree from using gasoline to using electricity when the price of gas goes up, and even though *some* more people will purchase all-electric vehicles if gas costs $4.20 per gallon rather than $4 per gallon. In other words, electric charging stations are a substitute for retail gasoline – but they are not a *close enough* substitute that they must be included in the relevant market. Likewise, *some* more people might commute by train rather than driving to work if the price of gasoline goes up by 20 cents per gallon, but not enough that "train rides" needs to be included in the relevant market. In this way, the HMT includes *reasonable substitutes* for the products sold by the merging firms in the relevant market, but not *all* substitutes. Distant substitutes are not included in the relevant market.

33. Once we have defined one or more relevant markets, the next step is to measure market shares in those markets. If the market shares of the merging firms in a given market are sufficiently high, under the Merger Guidelines there is a presumption that the merger will substantially lessen competition in that market. Below, I provide more details on what levels of concentration trigger the structural presumption under the Merger Guidelines. In my gas station example, the structural presumption would be triggered if the merger combined two of five gas stations in a given town, but not if the merger combined two of ten gas stations. Now we can see why it would be a mistake to include train rides in the relevant market: doing so would lower the market shares of the merging gas stations and thus could cause us to erroneously conclude that a merger between those gas stations was benign rather than harmful to competition.

34. In addition to defining the relevant market and analyzing concentration in that market, antitrust economists typically also ask how the merger may harm customers by

Contains Highly Confidential Information

lessening competition. This involves analyzing the *competitive effects* of a merger. Since every merger is unique and the world is constantly changing, predictions regarding competitive effects inevitably involve likelihoods, not certainties. Quantifying competitive effects often is not possible.

35. Antitrust economics most commonly study how a horizontal merger is likely to affect prices. In my gas station example, if the merger combines two nearby gas stations, the merged firm may find it profitable to raise the prices at one or both of those stations, knowing that customers would need to drive some distance to find another gas station. Price increases of this type are known as *unilateral* anticompetitive price effects. The merger also may make it easier for the merged firm and its remaining rivals to collude or otherwise coordinate to raise prices. Price increases of this type are known as *coordinated* anticompetitive price effects. A merger can cause both unilateral and coordinated anticompetitive price effects.

36. Post-merger price increases are not the only way in which a horizontal merger can harm customers. Customers also can be harmed by a loss of variety. In my gas station example, if the merger combines two nearby stations, the merged firm may find it profitable to close one of them. Why? Because some, perhaps most, of the customers who patronized that station will shift to the nearby station that the merged firm now also owns. Closing one such overlap station would no doubt generate cost savings for the merged firm, but most likely at the expense of the customers who must then travel further to purchase gasoline. This example shows how a loss of variety (here, in station locations) harms customers.

37. Antitrust economists also consider whether the merger will generate merger-specific cost savings that will be large enough, and passed through to customers sufficiently, so that customers in the relevant market will not be harmed by the merger. Not all cost savings qualify. In my example, the cost savings resulting from closing one gas station do not qualify because they reflect an anticompetitive effect of the merger. By contrast, if the merged firm's greater scale would allow it to pay less for the gasoline it purchases from refineries, that cost reduction could offset the upward pricing pressure caused by the merger. If such cost savings are merger-specific, we ask whether they are

Contains Highly Confidential Information

large enough that the merger is likely to lead to lower gas prices, notwithstanding the increased concentration it causes in the market for retail gasoline.

38. In the remainder of this declaration, I follow these steps to analyze Nexstar's proposed acquisition of TEGNA.

## 5. Big Four Retransmission Consent in Each DMA is a Relevant Market

### A. Applying the Hypothetical Monopolist Test

39. I now apply the HMT to the proposed merger between Nexstar and TEGNA.

40. As always, the analysis begins by identifying the products or services sold by the merging firms that compete against each other. Since both Nexstar and TEGNA own Big Four broadcast stations, we begin by asking which Nexstar Big Four stations compete against which TEGNA Big Four stations to be distributed to households.[8]

41. Recall that MVPDs generally cannot import out-of-region broadcast signals, so an MVPD cannot turn to the signal of an out-of-region broadcast station to substitute for the signal of in-region broadcaster. Therefore, a Nexstar station only competes against a TEGNA station if they are in the same DMA. Under the HMT, this establishes that the relevant geographic markets in which Nexstar stations compete against TEGNA stations are DMAs. This is why the DOJ has consistently defined DMAs as the relevant geographic markets when it has reviewed and challenged broadcast television mergers. We thus can focus our attention on DMAs in which both Nexstar and TEGNA own broadcast stations. I refer to these DMAs as the "overlap DMAs." In each  overlap DMA, Nexstar's proposed merger with TEGNA combines two competitors and is therefore a horizontal merger.

42. We are now ready to apply the HMT to define the relevant product market in which Nexstar and TEGNA compete in overlap DMAs. We are looking for a collection of video programming carried by MVPDs that includes the Nexstar and TEGNA Big Four stations and is broad enough to satisfy the HMT.

---

[8] This declaration does not address the markets in which Nexstar and TEGNA compete to sell advertising.

Contains Highly Confidential Information

43. The natural candidate product market is Big Four Retransmission Consent. This candidate product market involves the distribution rights that Big Four broadcasting stations sell to MVPDs. The prices for these distribution rights are the Retransmission Fees that MVPDs pay to station owners. This is a "business-to-business" market in which the Big Four broadcast stations are the sellers and MVPDs are the buyers. This market should not be confused with the downstream "business-to consumer" markets in which MVPDs, virtual MVPDs, and other streaming services compete to provide video programming to consumers.

44. When challenging a prior broadcast merger, the DOJ explained that Big Four broadcast stations are distinct from other programming purchased by MVPDs.

- The DOJ stated that Big Four broadcast stations have "special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable networks . . . [they] usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs." [9]

- The DOJ found that "Non-Big Four broadcast stations are typically not close substitutes for viewers of Big Four stations" because they "typically feature niche programming without local news, weather or sports" or non-English language programming, and "Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal." [10]

- The DOJ also observed that "cable networks offer different content" than Big Four broadcast stations; for example, "cable networks generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big Four stations."[11]

---

[9] See Complaint at ¶ 15, *United States v. Gray Television, Inc. et al.*, No. 1:21-cv-02041 (D.D.C. Jul. 28, 2021), ECF No. 1, at https://www.justice.gov/atr/case-document/file/1418306/dl?inline.

[10] See *id.* at ¶ 17.

[11] See *id.* at ¶ 20.

Contains Highly Confidential Information

45. Based on these observations, the DOJ concluded that Big Four Retransmission Consent satisfies the HMT: "Because viewers do not regard non-Big Four broadcast stations or cable networks as close substitutes for the programming they receive from Big Four stations, these other sources of programming are not sufficient to discipline an increase in the fees charged for Big Four television retransmission consent."[12]

46. Reflecting that conclusion, the DOJ has repeatedly used Big Four Retransmission Consent as a relevant product market when it has reviewed and challenged mergers involving owners of Big Four stations. When the DOJ challenged Nexstar's acquisition of Tribune Media in 2019 it stated: "The licensing of Big 4 television retransmission consent therefore constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act."[13] When the DOJ challenged Gray Television's acquisition of Quincy Media in 2021, it again defined this product market.[14]

47. I now apply the HMT to the candidate market of Big Four Retransmission Consent. Suppose that a single firm (the hypothetical monopolist) controls the ABC, CBS, NBC and FOX broadcast stations in a given DMA. Could that firm profitably raise the Retransmission Consent Fees charged to MVPDs by at least 5% above prevailing levels? If so, then Big Four Retransmission Consent qualifies as a relevant market.

48. Ideally, we would observe Retransmission Fees in DMAs where a single firm controls all Big Four broadcasting stations, so we could compare those fees with the fees in DMAs where the Big Four broadcasting stations are owned by four separate entities. Equally good would be to observe DMAs in which a single firm gained control over all Big Four broadcasting stations so we could measure the effect of that consolidation on Retransmission Fees. If the Retransmission Fees in the "monopoly" DMAs exceed those in the "competitive" DMAs by at least 5%, the HMT would be satisfied.[15]

---

[12] See *id.* at ¶ 21.

[13] See Complaint at ¶ 7, *United States v. Nexstar Media Group, Inc., et al.*, No. 1:19-cv-12295 (D.D.C. Jul. 31, 2019), ECF No. 1, at https://www.justice.gov/atr/case-document/file/1192131/dl?inline.

[14] See Complaint at ¶ 3, *United States v. Gray Television, Inc. et al.*, No. 1:21-cv-02041 (D.D.C. Jul. 28, 2021), ECF No. 1, at https://www.justice.gov/atr/case-document/file/1418306/dl?inline.

[15] This statement assumes that the difference in fees is not due to some factor other than consolidated ownership.

49. Because the FCC has enforced its local television broadcast ownership rules and the DOJ has enforced Section 7 of the Clayton Act against proposed mergers involving Big Four broadcast stations, we almost never observe a single entity controlling all of the Big Four broadcast stations in a given DMA, so we cannot perform this type of data analysis. However, somewhat surprisingly, we do have evidence from one such case. That evidence supports the conclusion that consolidated ownership of all Big Four stations leads to significantly higher Retransmission Fees, so Big Four Retransmission Consent passes the HMT and qualifies as a relevant product market.[16]

50. We also can study the effect of *partial* consolidation of ownership of Big Four broadcast stations on Retransmission Fees. To do this, we examine Retransmission Fees in DMAs where a single entity controls two or three Big Four stations. If partial consolidation leads to significantly higher Retransmission Fees, then complete consolidation surely would, so the HMT is satisfied with room to spare.

51. There is recent directly on-point evidence that the owner of two or three Big Four broadcast stations in a given DMA can indeed charge higher Retransmission Fees than the owners of those stations would be able to charge if those stations were separately owned. In October 2025 DIRECTV concluded a carriage negotiation with the broadcaster News-Press & Gazette ("NPG"), which operates in 10 DMAs. ███████ ████████████████████████████████████████████ ███████████████████████████████████████ DIRECTV management discussed the possibility of dropping NPG to avoid such a large increase in Retransmission Fees, but DIRECTV determined that a blackout of NPG's stations in the eight DMAs where NPG

---

[16] "To take perhaps the most egregious example, Mr. McDonald described Cable ONE's recent negotiations with Northwest Broadcasting. Northwest Broadcasting operates individual stations in several of Cable ONE's Idaho markets. In Greenwood-Greenville, Mississippi, however, Northwest Broadcasting controls *all four* 'Big Four' network affiliates. Mr. McDonald described negotiations with Northwest Broadcasting in which Northwest Broadcasting refused to negotiate the Idaho stations separately from the Mississippi quadropoly. He described a month-long blackout in which Cable ONE's Mississippi viewers lost access to *all* network programming—and in which Cable ONE lost a substantial percentage of its Mississippi subscribers. And he described the results: Cable ONE now pays Northwest Broadcasting significantly higher retransmission fees than it pays any other broadcaster, including larger station groups, station groups in larger Cable ONE markets, and station groups with stations serving more Cable ONE subscribers." Letter from Michael Nilsson, Counsel, American Television Alliance, to Marlene Dortch, Secretary, FCC, MB Docket Nos. 15-216 *et al*. at 3-4 (filed Oct 25, 2017), at https://www.fcc.gov/ecfs/document/1025047606580/1. So far as I know, this description of what happened was not disputed.

Contains Highly Confidential Information

owned two or three Big Four stations would have caused so much churn (loss of subscribers) that DIRECTV was better off accepting a large increase in Retransmission Fees. On the day before DIRECTV's Retransmission Consent agreement with NPG was set to expire, Senior Vice President Michael Santogrossi at DIRECTV concluded that DIRECTV's best course of action was to avoid a blackout of NPG programming. He explained why: "Churn is high because of the high % of duopolies and triopolies."[17] The next day, DIRECTV's Chief Content Officer Rob Thun observed in response: "They [NPG] have always punched above their weight on rates given the fact that 8 of their 10 Big 4 markets are duopolies (5) or triopolies (3)."[18]

52. Mr. Thun's testimony indicates that NPG is not unique in this respect:  "DIRECTV generally must also pay higher retransmission consent fees to the extent the station group controls two or more affiliates of the Big Four networks in one or more DMAs—all other factors being equal."[19] Mr. Thun's testimony supports the conclusion that partial consolidation of ownership among Big Four stations in a single DMA leads to higher Retransmission Fees.

53. One can also perform a "partial consolidation" empirical test by comparing Retransmission Fees charged by entities that own multiple Big Four broadcast stations in a DMA with the Retransmission Fees charged by entities that own only one Big Four broadcast station. As noted above, a positive result from this test is sufficient, but not necessary, for the HMT to be satisfied, because the hypothetical monopolist controlling all Big Four stations in a given DMA would charge fees at least as high as those charged by an entity controlling just two or three of those stations.

54. A study submitted in a recent FCC proceeding performed a partial consolidation test using data on DIRECTV's payments to broadcaster affiliates.[20] That study found that,

---

[17] *See* October 8, 2025, email from M. Santogrossi to D. Kim, *et al.*, re News Press & Gazette (NP&G). As used here, a "duopoly" is a DMA where NPG owns two of the Big Four broadcast stations, and a "triopoly" is a DMA where NPG owns three of the Big Four broadcast stations.

[18] *See* October 9, 2025, email from R. Thun to M. Santogrossi, *et al.*, re News Press & Gazette (NP&G).

[19] Affidavit of Robert D. Thun, March 18, 2026, para. 14.

[20] Declaration of Allan Shampine, Ph.D.*, In the Matter of Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule,* September 16, 2025, attached to DIRECTV *ex parte* letter,

after controlling for group size and other factors, owners of Big Four broadcast stations that own more than one Big Four station in a DMA charge DIRECTV more per station.





55. If one accepts the results of this study, the candidate market of Big Four Retransmission Consent in a DMA easily passes the HMT. I say "easily" because ▮▮▮▮▮▮▮▮▮▮, and because we would expect a hypothetical monopolist controlling all of the Big Four broadcast stations in a given DMA to charge higher Retransmission Consent Fees than does an entity controlling only two or three of them, which are the within-DMA ownership patterns observed in the study.

56. Lastly, consider what one would have to believe to conclude that Big Four Retransmission Consent in a DMA does *not* satisfy the HMT. One would have to believe that a merger combining *all four* of the Big Four broadcasting stations in a given DMA would not cause Retransmission Fees to go up by at least 5%. That prediction is inconsistent with a variety of evidence and contrary to how regulators, antitrust enforcers, and many industry participants see and experience the market.

## B. Additional Evidence

57. Additional evidence supports my conclusion that the candidate market of Big Four Retransmission Consent qualifies as a relevant product market.

58. First, the FCC concluded in 2014 that combining top-rated broadcast stations in a DMA would lead to higher Retransmission Consent Fees: "Specifically, we find that joint

submitted to the FCC Media Bureau, MB Docket No. 17-318, para. 18. The focus on this study was on the effect on Retransmission Fees of increased *national* scale by a broadcast ownership group. But Dr. Shampine's regressions also include a variable measuring the extent of local overlaps within an ownership group. That is my focus here.

[21] *Id.*

[22] *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

negotiation gives such stations both the incentive and the ability to impose on MVPDs higher fees for retransmission consent than they otherwise could impose if the stations conducted negotiations for carriage of their signals independently."[23] The basic economic logic and market forces underlying this statement remain valid in 2026.

59. Second, the FCC's Broadcast Ownership Rules use the Big Four Retransmission Consent market when they "effectively prohibit a merger between any two of the big four broadcast television networks: ABC, CBS, Fox, and NBC" in a given DMA.[24]

60. Third, Big Four Retransmission Consent is widely discussed in regulatory proceedings, and Big Four broadcasting stations are often referenced in the industry as a distinct source of video programming. Big Four broadcasting stations also typically represent the four most-viewed networks of any type (broadcast or cable) in a DMA.[25]

61. Fourth, MVPDs typically do not pay Retransmission Fees for non-Big Four broadcast stations (unless such stations are owned by groups that also own Big Four affiliates), which instead usually elect must-carry status.

62. Fifth, Big Four stations carry local news, and they also have substantial rights to sports programming. Nexstar recently told investors that they are "the largest owner of local broadcast television stations carrying the most-watched programming" and "broadcast continues to be the gold standard for sports and news programming."[26] Nexstar has also stated in a June 2025 investor presentation that MVPDs "need to carry broadcast stations because they carry the sports and local news content viewers demand."[27]

---

[23] *See* Report and Order and Further Notice of Proposed Rulemaking *In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent*, MB Docket No. 10-71, March 31, 2014, para. 13. The Top Four and the Big Four stations are usually but not always the same. Top Four refers to the four most popular stations based on ratings.

[24] See, e.g., FCC Broadcast Ownership Rules, at https://www.fcc.gov/consumers/guides/fccs-review-broadcast-ownership-rules.

[25] See, e.g., Luke Bouma, "ABC, CBS, FOX, and NBC Broadcast Networks Still Reign Supreme Along With Sports & News Dominate," *Cord Cutters News,* December 24, 2024, https://cordcuttersnews.com/abc-cbs-fox-and-nbc-broadcast-networks-still-reign-supreme-along-with-sports-news-dominate-2024-cable-ratings/.

[26] Nexstar Q4 2024 Earnings Call Transcript, February 27, 2025, https://mlq.ai/stocks/NXST/earnings-call-transcript/Q4-2024/ (statement of Perry Sook, Nexstar Chairman and CEO).

[27] Nexstar Media Group, Inc.*, Investor Presentation – June 2025* at 30 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

## C.    Nexstar's Arguments Regarding the Relevant Product Market

63. Nexstar and TEGNA hotly dispute that Big Four Retransmission Consent is a relevant product market. They go so far as to state that "it is ridiculous for MVPDs and their allies to suggest that, in 2026, local broadcast stations (let along Big Four affiliates) are a market to themselves."[28] Nexstar and TEGNA assert that any such Retransmission Consent market is fatally flawed because it fails to account for "fundamental shifts that have occurred in the video distribution marketplace in the past five years."[29]

64. Nexstar and TEGNA are arguing that the relevant product market in which Big Four broadcast stations compete must include a much wider range of video programming. Their core assertion regarding Retransmission Fees in their Consolidated Opposition at the FCC is that Big Four station groups cannot raise those fees because they face increasing competition from streaming services like Netflix and Apple TV.

65. But Nexstar's argument is flatly contradicted by recent, hard evidence.

66. In particular, Big Four Retransmission Fees have risen sharply even as streaming services have become far more popular recent years. In 2019, the average Retransmission Fee paid by an MVPD for all Big Four stations together was $9.64 PSPM. By 2025, it had grown to $19.30 PSPM.[30]  Thus, the average annual growth rate in the PSPM Retransmission Fees that MVPDs paid for the Big Four stations over the six-year period between 2019 and 2025 was more than 12%.[31] During this same period of time, the average annual growth rate in the Consumer Price Index was only 4.0%.[32]

---

[28] "Consolidated Opposition to Petitions to Deny and Comments," In the Matter of Applications of TEGNA Inc. and Nexstar Media Inc., For Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc., Before the Federal Communications Commission, MB Docket No. 25-331, January 15, 2026, p. 48 (henceforth "Nexstar and TEGNA Consolidated Opposition")

[29] Nexstar and TEGNA Consolidated Opposition, p. 46.

[30] Calculation based on data from Broadcast outlook 2025 tables and chart data, S&P Market Intelligence via Capital IQ Pro, (available at https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/docviewer?KeyProductLinkType=2&mid=248240620) tab "Retrans revenue."

[31] The compound annual growth rate was $(19.30 / 9.64)^{\wedge}(1/6) - 1 = \sim 12\%$.

[32] In January 2019 the CPI for "All Urban Consumers, U.S. city average, All items" was 251.7. In January 2025 it was 317.7. See, for example, US Bureau of Labor Statistics, https://data.bls.gov/toppicks?survey=cu.

Contains Highly Confidential Information

67. Furthermore, the Retransmission Fees paid by MVPDs have consistently grown at a much faster pace than their other programming expenses. Retransmission Fees as a share of basic cable and regional sports network fees rose from 15.7% in 2015 to 36.3% in 2025.[33]

68. These figures convincingly establish that the increased popularity of streaming services over the past five or six years has not prevented large increases in Retransmission Fees.

69. Nexstar and TEGNA assert that the parties opposing this transaction, including DIRECTV, "offer nothing more than self-serving speculation and conjecture that is grounded in a utopian-era caricature of local broadcast television that does not exist today."[34] But my analysis here is based on recent data, not speculation or conjecture.

70. Recognizing that streaming services have grown rapidly in popularity in recent years, it may be helpful to explain how the HMT accounts for this growth. More specifically, what role do streaming services play when we ask how MVPDs would respond if all of the Big Four broadcast stations in a given DMA raised their Retransmission Fees?

71. First of all, let me explain why streaming services such as Netflix and Apple TV are not in the relevant market that is applicable to this merger. The reason is that, from the perspective of the buyers in this market, MVPDs, these streaming services are not substitutes for Big Four Retransmission Consent. Why not? Because these streaming services are a consumer product and Retransmission Consent is a business-to-business activity. Put differently, Retransmission Consent and streaming services are present at different stages of the distribution chain for video programming. Retransmission Consent takes place at the wholesale level, with broadcast stations making their programming available to MVPDs, while streaming services compete against MVPDs at the retail level – the distribution of programming to consumers.

72. Second, the fact that streaming services are not in the relevant market does not mean that the HMT somehow ignores their recent growth. Quite to the contrary, *by design* the

---

[33] See Broadcast outlook 2025 tables and chart data, S&P Market Intelligence via Capital IQ Pro, available at https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/docviewer?KeyProductLinkType=2&mid=248240620. These shares include payments by virtual MVPDs.

[34] Consolidation Opposition, p. ii.

Contains Highly Confidential Information

HMT fully accounts for that growth. How so? When we ask how MVPDs would respond to an increase in Retransmission Fees, that response *automatically* accounts for the fact that MVPDs are competing against streaming services to attract subscribers. One can imagine a world in which MVPDs, in the face of growing competition from streaming services, would accept the high churn caused by a simultaneous blackout of all Big Four broadcast stations in a given DMA rather than pay 5% more (about $1 PSPM) in Retransmission Fees for those stations. But the data tells us that we do not live in that world. Instead, we live in a world in which MVPDs have been paying higher and higher Retransmission Fees for Big Four broadcast stations even while MVPDs have faced increased competition from streaming services. We live in a world in which Big Four broadcast stations continue to provide valuable and distinct programming to MVPDs. We live in a world in which a single entity controlling all Big Four broadcast stations in a given DMA would be able to charge significantly higher Retransmission Fees to MVPDs. The HMT is grounded in this reality.

## 6. Market Concentration in the Overlap Markets

73. Having defined the relevant antitrust markets, we are now ready to see how much the proposed merger increases concentration within those markets.

74. Table 1 lists the Nexstar and TEGNA affiliates in the 31 overlap markets in this case.

Contains Highly Confidential Information

## Table 1: Nexstar and TEGNA Affiliates in the Overlap DMAs

| DMA | Nexstar Big Four Station(s) | TEGNA Big Four Station(s) | New Duopoly | New Triopoly |
|---|---|---|---|---|
| Abilene-Sweetwater, TX | KTAB-TV (CBS) | KXVA (FOX) | X | |
| Austin, TX | KXAN-TV (NBC) | KVUE (ABC) | X | |
| Buffalo, NY | WIVB-TV (CBS) | WGRZ (NBC) | X | |
| Charlotte, NC | WJZY (FOX) | WCNC-TV (NBC) | X | |
| Cleveland-Akron (Canton), OH | WJW (FOX) | WKYC (NBC) | X | |
| Columbus, OH | WCMH-TV (NBC) | WBNS-TV (CBS) | X | |
| Davenport-Rock Island-Moline, IA-IL | WHBF-TV (CBS), KGCW (CBS)* | WQAD-TV (ABC) | X | |
| Denver, CO | KDVR (FOX), KFCT (FOX) | KUSA (NBC) | X | |
| Des Moines-Ames, IA | WHO-DT (NBC) | WOI-DT (ABC), KCWI-TV (ABC)* | X | |
| Ft. Smith-Fayetteville-Springdale-Rodgers, AR | KNWA-TV (NBC), KFTA-TV (FOX) | KFSM-TV (CBS) | | X |
| Grand Rapids-Kalamazoo-Battle Creek, MI | WOTV (ABC), WOOD-TV (NBC), WOGC-CD (NBC) | WZZM (ABC) | | |
| Greensboro-High Point-Winston Salem, NC | WGHP (FOX) | WFMY-TV (CBS) | X | |
| Harrisburg-Lancaster-Lebanon-York, PA | WHTM-TV (ABC) | WPMT (FOX) | X | |
| Hartford & New Haven, CT | WTNH (ABC) | WTIC-TV (FOX) | X | |
| Huntsville-Decatur (Florence), AL | WHNT-TV (CBS) | WZDX (FOX) | X | |
| Indianapolis, IN | WTTV (CBS), WTTK (CBS), WXIN (FOX) | WTHR (NBC) | | X |
| Knoxville, TN | WATE-TV (ABC) | WBIR-TV (NBC) | X | |
| Little Rock-Pine Bluff, AR | KARK-TV (NBC) | KTHV (CBS) | X | |
| Memphis, TN | WREG-TV (CBS) | WATN-TV (ABC) | X | |
| New Orleans, LA | WGNO (ABC) | WWL-TV (CBS) | X | |
| Norfolk-Portsmouth-Newport News, VA | WAVY-TV (NBC), WVBT (FOX) | WVEC (ABC) | | X |
| Odessa-Midland, TX | KMID (ABC) | KWES-TV (NBC) | X | |
| Portland, OR | KOIN (CBS) | KGW (NBC) | X | |
| Sacramento-Stockton-Modesto, CA | KTXL (FOX) | KXTV (ABC) | X | |
| San Angelo, TX | KLST (CBS) | KIDY (FOX) | X | |
| San Diego, CA | KSWB-TV (FOX) | KFMB-TV (CBS) | X | |
| St. Louis, MO | KTVI (FOX) | KSDK (NBC) | X | |
| Tampa-St.Petersburg (Sarasota), FL | WFLA-TV (NBC) | WTSP (CBS) | X | |
| Tyler-Longview (Lufkin & Nacogdoches), TX | KETK-TV (NBC) | KYTX (CBS) | X | |
| Waco-Temple-Bryan, TX | KWKT-TV (FOX), KYLE-TV (FOX)* | KCEN-TV (NBC), KAGS-LD (NBC | X | |
| Wilkes Barre-Scranton-Hazleton, PA | WBRE-TV (NBC) | WNEP-TV (ABC) | X | |

**Note:** In Grand Rapids-Kalamazoo-Battle Creek, MI, the transaction increases local Big Four consolidation but does not create a new duopoly. *Station with a secondary (but not primary) affiliation to a Big Four network.

**Source**: S&P Capital IQ, U.S. Broadcast Station Database (accessed February 25, 2026). I change the owner of KFXK-TV and rebroadcaster KFXL-LD (both FOX) in the Tyler-Longview, TX DMA to White Knight Broadcasting to reflect the ownership reported in the FCC's public inspection files (see https://publicfiles.fcc.gov/tv-profile/KFXK-TV/ownership-reports).

75. In measuring market concentration, I follow the Merger Guidelines, which is standard practice for economists studying horizontal mergers. Under the Merger Guidelines, a horizontal merger is presumed to substantially lessen competition if the post-merger level of concentration and the increase in concentration both exceed certain thresholds.

76. For this purpose, the Merger Guidelines primarily measure market concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is equal to the sum of the squares of the market shares of all firms in the market. For example, if there are three firms, each with a market share of 33%, then the HHI is equal to $33^2 + 33^2 + 33^2 = 3,267$.

77. A horizontal merger will always cause the HHI to increase. The increase in the HHI as calculated in the Merger Guidelines is equal to twice the product of the shares of the two merging firms. For example, if one firm has a market share of 10% and the other has a market share of 20%, then the increase in the HHI is equal to 2 x 10 x 20 = 400.

Contains Highly Confidential Information

78. Section 2.1 of the Merger Guidelines states that a merger is presumed to harm competition if it causes the HHI to go up by at least 100 points and either (a) leads to a post-merger HHI of more than 1,800, or (b) gives the merged firm a market share of more than 30%.

79. Table 2 below reports Nexstar's and TEGNA's market shares in each of the 31 overlap markets, along with the pre-merger and post-merger HHIs in these markets. The market shares in Table 2 are calculated based on the television ratings of the Big Four broadcast stations in each of the overlap DMAs. A station's television rating measures its average viewership over the entire week as a percentage of all TV households in the DMA. Television ratings are a good measure of a station's competitive significance in the Big Four Retransmission Consent market because a station with more viewers is more valuable to MVPDs. The blackout a more popular station would be more likely to induce an MVPD's subscribers to switch to another distributor, all else equal.

80. In Table 2, the combined share of Nexstar and TEGNA ranges from 30.0% to 84.8%. The post-merger HHIs range from 3,361 to 7,422. The increase in the HHI ranges from 413 to 3,433. In all 31 overlap markets these metrics are far above the levels that trigger the structural presumption of harm to competition found in the Merger Guidelines.

Contains Highly Confidential Information

# Table 2: Shares and HHIs Based on Station Ratings in 2025

| DMA | Big Four Stations Ratings Share (2025Q4) | | | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| | Nexstar | TEGNA | Combined | | | |
| Abilene-Sweetwater, TX | 35.9% | 11.8% | 47.7% | 2,816 | 3,665 | 849 |
| Austin, TX | 29.0% | 31.3% | 60.3% | 2,631 | 4,445 | 1,814 |
| Buffalo, NY | 37.0% | 32.7% | 69.7% | 2,905 | 5,322 | 2,417 |
| Charlotte, NC | 14.1% | 21.0% | 35.1% | 2,768 | 3,361 | 592 |
| Cleveland-Akron (Canton), OH | 30.3% | 22.9% | 53.2% | 2,541 | 3,927 | 1,387 |
| Columbus, OH | 24.9% | 28.9% | 53.8% | 3,589 | 5,029 | 1,440 |
| Davenport-Rock Island-Moline, IA-IL | 16.3% | 25.2% | 41.5% | 3,262 | 4,083 | 821 |
| Denver, CO | 27.4% | 29.8% | 57.2% | 2,557 | 4,191 | 1,633 |
| Des Moines-Ames, IA | 35.8% | 13.6% | 49.4% | 3,110 | 4,081 | 972 |
| Ft. Smith-Fayetteville-Springdale-Rodgers, AR | 27.7% | 39.9% | 67.6% | 3,409 | 5,619 | 2,210 |
| Grand Rapids-Kalamazoo-Battle Creek, MI | 33.7% | 17.1% | 50.7% | 2,664 | 3,813 | 1,149 |
| Greensboro-High Point-Winston Salem, NC | 26.2% | 29.1% | 55.3% | 2,721 | 4,245 | 1,524 |
| Harrisburg-Lancaster-Lebanon-York, PA | 25.6% | 14.2% | 39.8% | 2,810 | 3,537 | 726 |
| Hartford & New Haven, CT | 25.9% | 16.1% | 42.0% | 2,675 | 3,508 | 833 |
| Huntsville-Decatur (Florence), AL | 30.6% | 8.3% | 38.9% | 2,878 | 3,384 | 506 |
| Indianapolis, IN | 51.4% | 33.4% | 84.8% | 3,989 | 7,422 | 3,433 |
| Knoxville, TN | 29.0% | 33.2% | 62.2% | 2,783 | 4,711 | 1,928 |
| Little Rock-Pine Bluff, AR | 25.9% | 23.1% | 49.1% | 2,869 | 4,069 | 1,200 |
| Memphis, TN | 33.8% | 14.4% | 48.2% | 2,692 | 3,667 | 975 |
| New Orleans, LA | 13.5% | 25.7% | 39.2% | 2,729 | 3,424 | 695 |
| Norfolk-Portsmouth-Newport News, VA | 49.1% | 26.1% | 75.1% | 3,705 | 6,261 | 2,557 |
| Odessa-Midland, TX | 27.1% | 28.4% | 55.5% | 2,685 | 4,223 | 1,538 |
| Portland, OR | 23.3% | 22.4% | 45.8% | 2,524 | 3,571 | 1,046 |
| Sacramento-Stockton-Modesto, CA | 16.2% | 17.3% | 33.5% | 2,943 | 3,503 | 560 |
| San Angelo, TX | 45.1% | 14.9% | 60.0% | 3,057 | 4,401 | 1,344 |
| San Diego, CA | 22.5% | 28.7% | 51.2% | 2,539 | 3,832 | 1,293 |
| St. Louis, MO | 27.3% | 27.6% | 54.9% | 2,837 | 4,344 | 1,507 |
| Tampa-St.Petersburg (Sarasota), FL | 22.2% | 23.1% | 45.3% | 2,401 | 3,427 | 1,026 |
| Tyler-Longview (Lufkin & Nacogdoches), TX | 14.9% | 15.1% | 30.0% | 4,028 | 4,477 | 449 |
| Waco-Temple-Bryan, TX | 9.8% | 21.0% | 30.8% | 3,063 | 3,476 | 413 |
| Wilkes Barre-Scranton-Hazleton, PA | 20.0% | 52.9% | 72.9% | 3,582 | 5,701 | 2,119 |

**Notes:** Ratings used are local market 24/7 household averages. This is a metric that represents a TV station's average viewership across its entire broadcast week (24 hours a day, 7 days a week), as a percentage of all TV households in the local market. For example, if a station has a 24/7 average rating of 1.0, this means that 1% of all local TV households were watching this station *on average* over the entire broadcast week. Ratings shares are calculated based on Big Four network (ABC, CBS, FOX, NBC) local affiliate stations for which data are reported. DMA reported is the "TV Market Name" variable from Comscore.

**Source:** Ratings per S&P Capital IQ, Comscore TV Station Average Ratings, Q4 2025 (accessed February 24, 2026). I change the owner of KFXK-TV (FOX) in the Tyler-Longview, TX DMA to White Knight Broadcasting to reflect the ownership reported in the FCC's public inspection files (see https://publicfiles.fcc.gov/tv-profile/KFXK-TV/ownership-reports). Capital IQ's Comscore data lists WAAY-TV (ABC) in Huntsville, AL as owned by Allen Media, whereas Capital IQ's retransmission revenue data used in Table 3 lists WAAY-TV as owned by Gray Media. In each case I have used the ownership affiliation for WAAY-TV provided in the corresponding Capital IQ dataset.

81. I also have calculated market shares and HHIs based on each firm's estimated revenue from Big Four Retransmission Fees. I do this because a firm's market share based on the revenue it earns in the relevant market often is a good measure of that firm's competitive significance in that market. However, the publicly available data on Retransmission Fees earned by individual Big Four television stations are imperfect for

Contains Highly Confidential Information

this purpose, so I place greater weight on the market shares measured using television ratings. My conclusions do not depend at all on which set of markets shares I use.

82. Table 3 reports Nexstar's and TEGNA's market shares and HHIs in the overlap DMAs based on estimated revenue from Retransmission Fees.[35] As shown in Table 3, the combined market share of Nexstar and TEGNA ranges from 45.7% to 85.9%. The post-merger HHIs range from 3,615 to 7,578. The increase in the HHI ranges from 997 to 2,331. As in Table 2, in all 31 overlap markets, these metrics are far above the levels that trigger the structural presumption of harm to competition found in the Merger Guidelines.

---

[35] The calculations underlying Table 3 are similar to those in Table 2 in DIRECTV's Petition to Deny, but they use 2025 retransmission revenue rather than 2024 retransmission revenue.

Page 23

Contains Highly Confidential Information

# Table 3: Shares and HHIs Based on Retransmission Revenue in 2025

| DMA | Big Four Stations Retransmission Revenue Share (2025) | | | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| | Nexstar | TEGNA | Combined | | | |
| Abilene-Sweetwater, TX | 44.1% | 19.0% | 63.1% | 2,988 | 4,664 | 1,676 |
| Austin, TX | 38.0% | 21.9% | 59.8% | 2,846 | 4,507 | 1,661 |
| Buffalo, NY | 39.3% | 20.0% | 59.3% | 2,800 | 4,371 | 1,571 |
| Charlotte, NC | 24.7% | 26.2% | 50.9% | 2,566 | 3,860 | 1,294 |
| Cleveland-Akron (Canton), OH | 28.0% | 24.5% | 52.4% | 2,562 | 3,930 | 1,368 |
| Columbus, OH | 46.1% | 23.8% | 69.9% | 3,597 | 5,793 | 2,196 |
| Davenport-Rock Island-Moline, IA-IL | 44.6% | 11.2% | 55.8% | 3,111 | 4,108 | 997 |
| Denver, CO | 30.9% | 26.2% | 57.1% | 2,562 | 4,182 | 1,620 |
| Des Moines-Ames, IA | 30.5% | 27.0% | 57.4% | 2,619 | 4,263 | 1,644 |
| Ft. Smith-Fayetteville-Springdale-Rodgers, AR | 73.0% | 12.9% | 85.9% | 5,694 | 7,578 | 1,883 |
| Grand Rapids-Kalamazoo-Battle Creek, MI | 48.4% | 13.1% | 61.4% | 3,256 | 4,520 | 1,264 |
| Greensboro-High Point-Winston Salem, NC | 27.2% | 26.0% | 53.2% | 2,541 | 3,957 | 1,416 |
| Harrisburg-Lancaster-Lebanon-York, PA | 30.5% | 23.3% | 53.8% | 2,584 | 4,004 | 1,420 |
| Hartford & New Haven, CT | 38.1% | 25.3% | 63.3% | 2,838 | 4,762 | 1,923 |
| Huntsville-Decatur (Florence), AL | 25.5% | 28.2% | 53.6% | 3,592 | 5,027 | 1,435 |
| Indianapolis, IN | 65.8% | 17.7% | 83.5% | 4,914 | 7,245 | 2,331 |
| Knoxville, TN | 30.4% | 20.8% | 51.3% | 2,602 | 3,870 | 1,268 |
| Little Rock-Pine Bluff, AR | 36.7% | 22.5% | 59.2% | 2,699 | 4,350 | 1,651 |
| Memphis, TN | 26.4% | 31.2% | 57.6% | 2,610 | 4,259 | 1,649 |
| New Orleans, LA | 30.2% | 26.8% | 57.1% | 2,568 | 4,191 | 1,622 |
| Norfolk-Portsmouth-Newport News, VA | 62.2% | 15.7% | 77.9% | 4,607 | 6,556 | 1,949 |
| Odessa-Midland, TX | 38.7% | 16.7% | 55.4% | 2,798 | 4,089 | 1,291 |
| Portland, OR | 39.9% | 15.0% | 54.9% | 2,835 | 4,029 | 1,194 |
| Sacramento-Stockton-Modesto, CA | 39.7% | 22.5% | 62.2% | 2,797 | 4,581 | 1,784 |
| San Angelo, TX* | 45.1% | 14.9% | 60.0% | 3,057 | 4,401 | 1,344 |
| San Diego, CA | 41.9% | 22.7% | 64.6% | 2,911 | 4,813 | 1,902 |
| St. Louis, MO | 26.1% | 22.5% | 48.6% | 2,508 | 3,684 | 1,175 |
| Tampa-St.Petersburg (Sarasota), FL | 34.9% | 22.5% | 57.4% | 2,347 | 3,918 | 1,571 |
| Tyler-Longview (Lufkin & Nacogdoches), TX | 36.3% | 21.8% | 58.1% | 2,672 | 4,257 | 1,585 |
| Waco-Temple-Bryan, TX | 22.6% | 23.2% | 45.7% | 2,569 | 3,615 | 1,046 |
| Wilkes Barre-Scranton-Hazleton, PA | 39.8% | 20.6% | 60.5% | 2,796 | 4,440 | 1,644 |

**Notes:** The retransmission revenue reflects the value of the primary network's carriage on multichannel video platforms (cable, satellite, telco, vMVPD) and does not include incremental retransmission revenue from digital multicast. Owners with multiple stations typically negotiate with a platform for a uniform per subscriber per month fee for its stations with the same network affiliation. Because of this, the fees earned by any one station may in part reflect the competitive significance of stations in other DMAs. Shares are calculated based on Big Four network (ABC, CBS, FOX, NBC) local affiliate stations for which data are reported. DMA reported is the "TV Market Name" variable from Capital IQ. *Capital IQ does not report 2025 retransmission revenue for the ABC affiliate (KTXE-LD) owned by Sinclair in San Angelo, TX. For San Angelo, share and HHI figures are calculated using Big Four ratings shares, as in Table 2.

**Source**: Retransmission revenue figures per S&P Capital IQ, U.S. Broadcast Station Database (accessed February 25, 2026). I change the owner of KFXK-TV (FOX) in the Tyler-Longview, TX DMA to White Knight Broadcasting to reflect the ownership reported in the FCC's public inspection files (see https://publicfiles.fcc.gov/tv-profile/KFXK-TV/ownership-reports). Capital IQ's retransmission revenue data lists WAAY-TV (ABC) in Huntsville, AL as owned by Gray Media, whereas Capital IQ's Comscore data used in Table 2 lists WAAY-TV as owned by Allen Media. In each case I have used the ownership affiliation for WAAY-TV provided in the corresponding Capital IQ dataset.

# 7. Anti-Competitive Effects of the Proposed Merger

83. As I noted above, antitrust economists studying horizontal mergers typically do not stop once they have defined the relevant markets and measured concentration in them. Instead, we look further, both to understand the mechanism by which competition may

be lessened and to evaluate whether there is evidence that rebuts the structural presumption.

84. I address two competition concerns associated with the Nexstar/TEGNA merger.[36] The first concern is that the loss of competition between Big Four stations in overlap DMAs will result in higher Retransmission Fees. Higher Retransmission Fees directly harm MVPDs. They also harm consumers indirectly as MVPDs pass on a portion of those higher fees to consumers by raising MVPD subscription prices. The second concern is that Nexstar's consolidation of Big Four broadcasting stations in overlap DMAs will harm MVPDs and consumers by reducing the variety and quantity of local news available to viewers in the overlap DMAs. Both of these effects arise in the Big Four Retransmission Consent Markets defined above. The first effect involves a price increase, and the second effect involves a decrease in the variety or quantity of the product being sold.

## A.  Higher Retransmission Fees

85. The market concentration metrics reported above create a presumption that, in each overlap DMA, the Nexstar/TEGNA merger will substantially lessen competition and thus lead to higher Retransmission Fees. This section looks at additional evidence regarding the likely effects of the proposed merger on Retransmission Fees and explains the economic logic underlying these predicted fees increases.

86. DIRECTV's experience negotiating with NPG, described above, illustrates that the owner of multiple Big Four broadcast stations within a given DMA can charge higher PSPM Retransmission Fees than can the owner of a single station within that DMA. In particular, DIRECTV's willingness to pay for NPG's Retransmission Consent was elevated because NPG could threaten DIRECTV with the blackout of multiple stations in eight of the ten DMAs where it owned stations.

---

[36] There are two additional concerns that I do not address. First, the merger may elevate Retransmission Fees due to increased *national* consolidation among Big Four broadcasting stations. Second, the merger may lessen competition in the sale of local broadcast television advertising in overlap DMAs.

Page 25

Contains Highly Confidential Information

87. Dr. Shampine's study of the Retransmission Fees paid by DIRECTV to Big Four stations further supports the conclusion that the Nexstar/TEGNA merger will cause Retransmission Fees to rise. ███████████████████████████ ███████████████████████████████████ ███████████████████████████ .

88. To understand the mechanism by which the proposed merger will raise Retransmission Fees, one must first understand what governs the size of those Retransmission Fees.[37] From the perspective of an MVPD, the commercial benefit of carrying a given Big Four station is to attract and retain subscribers. A good way to think about this benefit is to ask how many subscribers the MVPD would *lose* over time if that Big Four station were blacked out. The more subscribers the MVPD would lose from a blackout, the greater is the stations bargaining leverage, and the more the MVPD will pay for the right to carry that station. This economic logic explains why MVPDs paid each Big Four broadcast station an average of $4.83 PSPM in 2025, while they paid nothing for most non-Big Four broadcasting stations. The same economic logic also explains why MVPDs paid an average of $10.79 PSPM for ESPN.[38]

89. Now that we understand how a Big Four broadcast station's bargaining leverage drives Retransmission Fees, we can see why the owner of two or more Big Four stations within a given DMA has increased bargaining leverage. The reason is that a blackout by two or more Big Four stations in a given DMA would create proportionally more churn than would the blackout of just a single Big Four station.[39]

---

[37] The underlying economics of bargaining between broadcast stations and MVPDs is nicely explained in "The Commission Should Consider Impacts on Retransmission Consent Fees as Part of its Quadrennial Review of Local Broadcast Rules," William P. Rogerson, December 15, 2025 ("Rogerson FCC Declaration"), Appendix A to Comments of DIRECTV, LLC, In the Matter of 2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 22-459, December 17, 2025 ("DIRECTV FCC Submission").

[38] See US basic cable network affiliate fee revenue and average license fee per subscriber per month, 1989–2029, S&P Market Intelligence via Capital IQ Pro, available at https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/docviewer?KeyProductLinkType=2&mid=248851837, tab "License fees".

[39] The analysis of bargaining leverage is always based on the cost to each party of *not* reaching an agreement. This is true even in settings where we rarely observe breakdowns in bargaining because the gains from trade are high.

Contains Highly Confidential Information

90. Higher Retransmission Fees will predictably harm consumers, not just MVPDs. Basic economic theory predicts that a portion of any increase in Retransmission Fees will be passed through to subscribers in the form of higher subscription prices.[40] Consistent with basic economic theory, DIRECTV's Chief Marketing Officer Vince Torres has previously submitted a declaration stating: "When broadcast station groups raise retransmission consent fees, DIRECTV passes through those increases to its subscribers in the form of higher subscription prices."[41]

91. In addition to the within-DMA effects I have been addressing, there is economic evidence that the increased *national* scale of Nexstar and TEGNA together will further elevate the Retransmission Fees the merged firm will be able to charge. Here, the national scale of a broadcast group is measured by the total number of MVPD subscribers in the entire country that are reached by Big Four broadcast stations owned by that group. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████ Dr. Shampine's finds that these national scale effects are statistically and economically significant.[42] Including these national scale effects, the proposed Nexstar/TEGNA merger will likely cause Retransmission Fees to go up by more than would be estimated based on within-DMA effects alone.

---

[40] See, for example, "Pass-Through as an Economic Tool: Principles of Incidence Under Imperfect Competition," E. Glen Weyl and Michael Fabinger, *Journal of Political Economy* 121(3), 2013, 528-583. The portion of any cost increase that a firm will pass on to its customers depends on a number of factors identified in this article. Moreover, that "pass-through rate" is higher if the cost increase applies not only to one firm (here, one MVPD) but also to its rivals (here, all MVPDs). I offer no opinion at this time about the pass-through rate for Retransmission Fees.

[41] Declaration of Vince Torres, December 17, 2025, para. 2, attached to Comments of DIRECTV, LLC, In the Matter of 2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 22-459.

[42] See Declaration of Allan Shampine, para 5. The Shampine Reply Declaration confirmed these results with some additional control variables. See *Reply Declaration of Allan Shampine, Ph.D., In the Matter of Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, January 19, 2026, MB Docket No. 17-318.

Contains Highly Confidential Information

### B.    Reduction in the Amount and Variety of Local News

92. There is reason to be concerned that the merged firm will consolidate local news operations in a way that may lead to a reduction in the variety and quantity of local news available to viewers. Nexstar expects that its transaction will allow it to reduce operating costs by roughly $165 million per year.[43] Nexstar has stated that "the largest component of the operating expense efficiencies is the overlap markets . . . where you really can operate 2 television stations off of 1 infrastructure."[44] In at least some DMAs, this may involve combining two newsrooms into one and reducing news staff.

93. This reduction in the variety and quantity of local news available to viewers would be consistent with how Nexstar has historically managed its news operations in DMAs where it owns more than one Big Four broadcast station. As described in the Declaration of Robert E. Bowen, in DMAs where Nexstar currently owns more than one Big Four broadcast station, it commonly operates only a single news website, employs a single news director, has the same news talent/journalism teams for both stations, and may simulcast local news programming across both stations.[45] I am not aware of any reason to expect that Nexstar will adopt a different approach in the overlap DMAs after it acquires TEGNA.

94. This effect on local news, when combined with higher Retransmission Fees, would mean that DIRECTV and other MVPDs would be paying more in Retransmission Consent Fees and receiving less valuable programming.

## 8. Nexstar's Claimed Efficiencies

95. In rare cases, an otherwise anticompetitive merger can still benefit customers because it generates sufficiently large efficiencies. However, under the Merger Guidelines there are four requirements that must be met for that to occur. They are not met in this case.

---

[43] "So $300 million of synergies is about 45% coming from net retrans, 55% coming from operating expense synergies." Lee Ann Gliha, Nexstar CFO, UBS Global Media and Communications Conference Transcript, December 8, 2025 available at https://seekingalpha.com/article/4851317-nexstar-media-group-inc-nxst-presents-at-ubs-global-media-and-communications-conference-2025.

[44] *Id.*

[45] Declaration of Robert E. Bowen, March 18, 2026.

Contains Highly Confidential Information

96. First, the efficiencies must be large enough, and passed through sufficiently to customers, so that customers are not harmed by the merger.[46] In such cases, one would expect the customers of the merging firms to *welcome* the merger. Yet here, DIRECTV, DISH, and other customers of the merging firms are actively opposing the merger.

97. Second, the efficiencies must not themselves reflect the anticompetitive effects. In my gas station example, the cost savings from closing one gas station reflect one of the anticompetitive effects of the merger and thus are not cognizable. The same principle applies to the Nexstar/TEGNA merger for cost savings that result from reducing the variety and quantity of local news available to viewers.

98. Third, the efficiencies must be verified, meaning they are likely to be realized, and not vague, speculative, or merely aspirational. I offer no opinion on whether Nexstar has met this requirement.

99. Fourth, the efficiencies must be merger specific, which means that they "could not be achieved without the merger under review."[47] Any efficiency claims put forward by Nexstar and TEGNA should be evaluated carefully for merger-specificity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 18th day of March 2026, at Berkeley, California.

*Carl Shapiro*

_____

Carl Shapiro

---

[46] Merger Guidelines, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 3.3.

[47] Merger Guidelines, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf, § 3.3.

Contains Highly Confidential Information

# Appendix A: Curriculum Vitae

# CARL SHAPIRO

Haas School of Business
University of California
Berkeley, CA 94720

email: cshapiro@berkeley.edu
website: http://faculty.haas.berkeley.edu/shapiro

## Professional Positions

**Distinguished Professor of the Graduate School**
Haas School of Business and Department of Economics
University of California at Berkeley, 2018 - present

**Senior Consultant**

Charles River Associates, 1998 – 2009 and 2012 – present

**Transamerica Professor of Business Strategy**
Haas School of Business
University of California at Berkeley, 1994 - 2017

**Professor of Business and Economics**
Haas School of Business and Department of Economics
University of California at Berkeley, 1990 - 2017

**Senate-Confirmed Member of the President's Council of Economic Advisers**
Executive Office of the President, The White House, 2011-12

**Deputy Assistant Attorney General for Economics**
Antitrust Division, U.S. Department of Justice, 2009 - 2011

**Director of the Institute of Business and Economic Research**
University of California at Berkeley, 1998 - 2008

**Principal and Co-Founder, The Tilden Group, LLC**, 1996 – 1998

**Deputy Assistant Attorney General for Economics**
Antitrust Division, U.S. Department of Justice, 1995 - 1996

**Chair, Economic Analysis and Policy Group**
Haas School of Business
University of California at Berkeley, 1991 - 1993

**Professor of Economics and Public Affairs**
Woodrow Wilson School of Public and International Affairs and
Department of Economics, Princeton University, 1987 - 1990

Contains Highly Confidential Information

**Research Fellow**
Center for Advanced Study in the Behavioral Sciences
Stanford University, 1989 - 1990

**Visiting Scholar**
Stanford Law School, Stanford University, 1989 - 1990

**Assistant Professor of Economics and Public Affairs**
Woodrow Wilson School of Public and International Affairs and
Department of Economics, Princeton University, 1980 - 1987

**Visiting Fellow**
Institute for International Economic Studies, University of Stockholm, 1986

**Visiting Assistant Professor of Economics and Public Policy**
Graduate School of Business, Stanford University, 1982 - 1983.

**Economist**
Bureau of Economics, Federal Trade Commission, Summer 1980

# Education

Ph.D.   Economics, M.I.T., 1981

M.A.    Mathematics, University of California at Berkeley, 1977

B.S.    Economics, M.I.T., 1976

B.S.    Mathematics, M.I.T., 1976

# Publications

Trends in Competition in the United States: What Does the Evidence Show?, with Ali
Yurukoglu, *Journal of Political Economics Microeconomics*, 2026.

Acquisitions to Enter New Markets, *Journal of Economic Perspectives,* 2025.

The FTC is Threatening Free Speech, with Aaron Edlin, Promarket, May 2025.

Evolution of the Merger Guidelines: Is This Fox Too Clever By Half?, *Review of Industrial
Organization*, 2024.

Single-Firm Conduct Working Group Report, California Law Review Commission Study of
Antitrust Law, with Aaron Edlin, Doug Melamed, Sam Miller, and Fiona Scott Morton, January
2024.

Recommended Revisions to the Draft Merger Guidelines, Submission to the Department of
Justice and the Federal Trade Commission, September 2023.

How Would These Draft Guidelines Work in Practice?, Promarket, September 2023.

Why Dropping Market Power from the Merger Guidelines Matters, Promarket, August 2023.

Contains Highly Confidential Information

Using and Misusing Microeconomics: *Federal Trade Commission vs. Qualcomm*, with Keith Waehrer, in *Antitrust Economics at a Time of Upheaval: Competition Policy Cases on Two Continents*, John Kwoka, Tommaso Valletti, and Larry White, eds., 2023.

What Next for the Horizontal Merger Guidelines? with Nancy Rose, *Antitrust Magazine*, 2022.

Antitrust: What Went Wrong and How To Fix It, Antitrust Magazine, 2021.

How Will the FTC Evaluate Vertical Mergers? with Herbert Hovenkamp, ProMarket, September 2021

Vertical Mergers and Input Foreclosure: Lessons from the AT&T/Time Warner Case, *Review of Industrial Organization*, 2021.

Judicial Response to the 2010 Horizontal Merger Guidelines, with Howard Shelanski, *Review of Industrial Organization*, 2021.

The 2010 Horizontal Merger Guidelines After 10 Years, with Joseph Farrell, *Review of Industrial Organization*, 2021.

Restoring Competition in the United States: A Vision for Antitrust Enforcement for the Next Administration and Congress, with Bill Baer, Jonathan B. Baker, Michael Kades, Fiona Scott Morton, Nancy L. Rose, and Tim Wu, Washington Center for Equitable Growth, November 2020.

The Role of Antitrust in Preventing Patent Holdup, with Mark A. Lemley, *University of Pennsylvania Law Review,* 2020.

Protecting Competition in the American Economy: Merger Control, Tech Titans, Labor Markets, *Journal of Economic Perspectives,* 2019.

Antitrust and Innovation: Welcoming and Protecting Disruption, with Giulio Federico and Fiona Scott Morton, *Innovation Policy and the Economy*, National Bureau of Economic Research, 2019.

Antitrust in a Time of Populism, *International Journal of Industrial Organization*, 2018.

Horizontal Mergers, Market Structure, and Burdens of Proof, with Herbert Hovenkamp, *Yale Law Journal*, 2018.

How Antitrust Law Can Make FRAND Commitments More Effective, with A. Douglas Melamed, *Yale Law Journal*, 2018.

Whither Antitrust in the Trump Administration?, with Steven Salop, *Antitrust Source*, 2017.

Patent Remedies, *American Economic Review Papers & Proceedings*, 2016.

Patent Assertions: Are We Any Closer to Aligning Rewards to Contribution?, with Fiona Scott Morton, *Innovation Policy and the Economy*, National Bureau of Economic Research, 2016.

The Actavis Inference: Theory and Practice, with Aaron Edlin, Scott Hemphill, and Herbert Hovenkamp, *Rutgers University Law Review*, 2015.

Jean Tirole's Nobel Prize in Economics: The Rigorous Foundations of Post-Chicago Antitrust Economics, with Steven Salop, *Antitrust*, 2015.

Contains Highly Confidential Information

Actavis and Error Costs: A Reply to Critics, with Aaron Edlin, Scott Hemphill, and Herbert Hovenkamp, *Antitrust Source*, 2014.

Strategic Patent Acquisitions, with Fiona Scott Morton, *Antitrust Law Journal*, 2014.

A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents, with Mark Lemley, *Berkeley Technology Law Journal,* 2013.

Activating *Actavis*, with Aaron Edlin, Scott Hemphill, and Herbert Hovenkamp, *Antitrust,* 2013.

Competition and Innovation: Did Arrow Hit the Bull's Eye?, in *The Rate & Direction of Inventive Activity Revisited,* Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, University of Chicago Press, 2012.

The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years, *Antitrust Law Journal*, 2010.

Injunctions, Hold-Up, and Patent Royalties, *American Law and Economics Review*, 2010.

The Year in Review: Economics at the Antitrust Division: 2009-2010, with Ken Heyer, *Review of Industrial Organization,* 2010.

Recapture, Pass-Through, and Market Definition, with Joseph Farrell, *Antitrust Law Journal*, 2010.

Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, with Joseph Farrell, *BE Journal of Theoretical Economics: Policies and Perspectives*, 2010.

Upward Pricing Pressure in Horizontal Merger Analysis: Reply to Epstein and Rubinfeld, *BE Journal of Theoretical Economics: Policies and Perspectives*, 2010.

Upward Pricing Pressure and Critical Loss Analysis, with Joseph Farrell, *Global Competition Review*, 2010.

Competition Policy in Distressed Industries, in *Competition as Public Policy,* American Bar Association, 2010.

The Year in Review: Economics at the Antitrust Division: 2008-2009, with Ken Heyer, *Review of Industrial Organization,* 2010.

A Tribute to Oliver Williamson: Antitrust Economics, *California Management Review,* 2010.

Updating the Merger Guidelines: Issues for the Upcoming Workshops, Antitrust Division, U.S. Department of Justice, November 2009.

Microsoft: Remedial Failure, *Antitrust Law Journal,* 2009.

How Strong Are Weak Patents? with Joseph Farrell, *American Economic Review,* 2008.

Detecting and Reversing the Decline in Horizontal Merger Enforcement, with Jonathan Baker, *Antitrust*, Summer 2008.

Reinvigorating Horizontal Merger Enforcement, with Jonathan Baker, in *Where the Chicago School Overshot the Mark: The Effect of Conservative Economic Analysis on Antitrust,* Robert Pitofsky, ed., Oxford University Press, 2008.

Merger to Monopoly to Serve a Single Buyer: Comment, with Jonathan Baker and Joseph Farrell, *Antitrust Law Journal,* 2008.

Contains Highly Confidential Information

Improving Critical Loss, with Joseph Farrell, *Antitrust Source,* February 2008.

Patent Reform: Aligning Reward and Contribution, *Innovation Policy and the Economy,* Adam Jaffe, Josh Lerner, and Scott Stern, eds., National Bureau of Economic Research, vol. 8, pp. 111-156, 2007.

Standard Setting, Patents and Hold-Up, with Joseph Farrell, John Hayes and Theresa Sullivan, *Antitrust Law Journal*, 74, 2007.

Antitrust, with Louis Kaplow, in *Handbook of Law and Economics, Volume 2,* A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, pp. 1073-1225, 2007.

Patent Hold-Up and Royalty Stacking, with Mark A. Lemley, *Texas Law Review*, vol. 85, no. 7, pp. 1991-2049, June 2007.

> Patent Hold-Up and Royalty Stacking: Reply, with Mark A. Lemley, *Texas Law Review*, vol. 85, no. 7, pp. 2163-2173, June 2007.

Market Definition in Crude Oil: Estimating the Effects of the BP/ARCO Merger, with John Hayes and Robert Town, *Antitrust Bulletin*, Summer 2007.

Prior User Rights, *American Economic Review Papers & Proceedings,* May 2006.

Probabilistic Patents, with Mark A. Lemley, *Journal of Economic Perspectives*, Spring 2005.

Patent System Reform: Economic Analysis and Critique, *Berkeley Technology Law Journal,* vol. 19, no. 3, pp. 1017-1047, 2004.

*The Economics of Information Technology,* with Hal R. Varian and Joseph Farrell, Cambridge University Press, 2004.

Further Thoughts on Critical Loss, with Michael L. Katz, *Antitrust Source,* March 2004.

Antitrust Limits to Patent Settlements, *Rand Journal of Economics,* vol. 34, no. 2, pp. 391-411, Summer 2003.

Antitrust Analysis of Patent Settlements Between Rivals, *Antitrust Magazine,* pp. 70-77, Summer 2003.

Critical Loss: Let's Tell the Whole Story, with Michael L. Katz, *Antitrust Magazine, pp. 49-56,* Spring 2003.

The FTC's Challenge to Intel's Licensing Practices, in *The Antitrust Revolution: Economics, Competition, and Policy, 4ᵗʰ Edition,* John E. Kwoka, Jr. and Lawrence J. White, eds., Oxford University Press, 2003.

The British Petroleum/ARCO Merger: Alaskan Crude Oil, with Jeremy Bulow, in *The Antitrust Revolution: Economics, Competition, and Policy, 4ᵗʰ Edition,* John E. Kwoka, Jr. and Lawrence J. White, eds., Oxford University Press, 2003.

Antitrust Policy in the Clinton Administration, with Robert E. Litan, in *American Economic Policy in the 1990s*, Jeffrey Frankel and Peter Orszag, eds., Center for Business and Government, John F. Kennedy School of Government, Harvard University, 2002.

Trans-Atlantic Divergence in *GE/Honeywell:* Causes and Lessons, with Donna E. Patterson, *Antitrust Magazine,* Fall 2001.

Contains Highly Confidential Information

Scale Economies and Synergies  in Horizontal Merger Analysis, with Joseph Farrell, *Antitrust Law Journal*, vol. 68, no. 3, 2001.

Navigating the Patent Thicket: Cross Licenses, Patent Pools and Standard Setting, in *Innovation Policy and the Economy*, Adam Jaffe, Joshua Lerner, and Scott Stern, eds., National Bureau of Economic Research, vol. 1, pp. 1190-150, 2000.

Setting Compatibility Standards: Cooperation or Collusion?, in *Expanding the Bounds of Intellectual Property*, Rochelle Dreyfuss, Diane Zimmerman, and Harry First, eds., 2001, Oxford University Press.

Simulating Partial Asset Divestitures to 'Fix' Mergers, with Jith Jayaratne, *International Journal of the Economics of Business*, 2000.

Competition Policy: A Century of Economic and Legal Thinking, with William Kovacic, *Journal of Economic Perspectives*, Winter 2000.

Competition Policy in the Information Economy, in *Competition Policy Analysis*, Einar Hope, ed., 2000, Routledge Studies in the Modern World Economy.

*Information Rules:  A Strategic Guide to the Network Economy,* with Hal R. Varian, Harvard Business School Press, 1999.

Exclusivity in Network Industries, *George Mason Law Review*, Spring 1999.

The Art of Standards Wars, with Hal R. Varian, *California Management Review*, Winter 1999.

Antitrust in Software Markets, with Michael L. Katz, in *Competition, Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace*, Jeffrey A. Eisenbach and Thomas M. Lenard, eds., 1999, Kluwer Academic Publishers.

Versioning: The Smart Way to Sell Information, with Hal R. Varian, *Harvard Business Review*, November-December 1998.

Unilateral Refusals to License Intellectual Property and International Competition Policy, with Richard J. Gilbert, in *Competition and Trade Policies*, Einar Hope and Per Maeleng, eds., 1998, Routledge.

Antitrust Issues in the Licensing of Intellectual Property: The Nine No-No's Meet the Nineties, with Richard J. Gilbert, *Brookings Papers on Economics: Microeconomics*, 1997.

Crown-Jewel Provisions in Merger Consent Decrees, with Michael Sohn, *Antitrust Magazine*, 1997.

Privacy, Self-Regulation, and Antitrust, with Joseph Kattan, in *Privacy and Self-Regulation in the Information Age*, National Telecommunications and Information Administration, U.S. Department of Commerce, 1997.

Antitrust Policy: Towards a Post-Chicago Synthesis, *Jobs & Capital*, Winter 1997.

An Economic Analysis of Unilateral Refusals to License Intellectual Property, with Richard J. Gilbert, *Proceedings of the National Academy of Sciences*, November 12, 1996.

Re-Examining Dominance and Unlawful Exclusion Rules, *Antitrust Conference Report,* The Conference Board, 1996.

Antitrust in Network Industries,  Antitrust Division, U.S. Department of Justice, March 1996.

Contains Highly Confidential Information

Mergers with Differentiated Products, *Antitrust*, Spring 1996. See also http://www.usdoj.gov/atr/public/speeches/shapiro.spc.htm.

Aftermarkets and Consumer Welfare: Making Sense of *Kodak*, *Antitrust Law Journal*, Spring 1995.

Systems Competition and Network Effects, with Michael L. Katz, *Journal of Economic Perspectives*, Spring 1994.

Systems Competition and Aftermarkets: An Economic Analysis of *Kodak*, with David J. Teece, *Antitrust Bulletin*, Spring 1994.

The Dynamics of Bandwagons, with Joseph Farrell, in *Problems of Coordination in Economic Activity*, James W. Friedman, ed., Kluwer Press, 1993.

Standard Setting in High Definition Television, with Joseph Farrell, *Brookings Papers on Economic Activity: Microeconomics*, 1992.

Product Introduction with Network Externalities, with Michael L. Katz, *Journal of Industrial Economics*, March 1992.

Horizontal Mergers: Reply, with Joseph Farrell, *American Economic Review*, September 1991.

Introduction to Liability Symposium, *Journal of Economic Perspectives*, Summer 1991.

Economic Rationales for the Scope of Privatization, with Robert D. Willig, in *The Political Economy of Public Sector Reform and Privatization*, Ezra N. Suleiman and John Waterbury, eds., Westview Press, San Francisco, CA, 1990.

On the Antitrust Treatment of Production Joint Ventures, with Robert D. Willig, *Journal of Economic Perspectives*, Summer 1990.

Asset Ownership and Market Structure in Oligopoly, with Joseph Farrell, *Rand Journal of Economics*, Summer 1990.

Optimal Patent Length and Breadth, with Richard Gilbert, *Rand Journal of Economics*, Spring 1990.

Horizontal Mergers: An Equilibrium Analysis, with Joseph Farrell, *American Economic Review*, March 1990.

Theories of Oligopoly Behavior, in *The Handbook of Industrial Organization*, R. Schmalensee and R.D. Willig (eds.), 1989.

Market Power and Mergers in Durable Goods Industries: Comment, *Journal of Law and Economics*, 1989

The Theory of Business Strategy, *Rand Journal of Economics*, Spring 1989.

Optimal Contracts with Lock-In, with Joseph Farrell, *American Economic Review*, March 1989.

Dynamic Competition with Switching Costs, with Joseph Farrell, *Rand Journal of Economics*, Spring 1988.

Counterfeit-Product Trade, with Gene. M. Grossman, *American Economic Review*, March 1988.

Foreign Counterfeiting of Status Goods, with Gene. M. Grossman, *Quarterly Journal of Economics*, February 1988.

Contains Highly Confidential Information

Dynamic R&D Competition, with Gene M. Grossman, *Economic Journal*, June 1987.

R&D Rivalry with Licensing or Imitation, with Michael L. Katz, *American Economic Review*, June 1987.

Optimal Dynamic R&D Programs, with Gene M. Grossman, *Rand Journal of Economics*, Winter 1986.

Product Compatibility Choice in a Market with Technological Progress, with Michael L. Katz, *Oxford Economic Papers*, Special Issue on the New Industrial Economics, November 1986.

Investment, Moral Hazard, and Occupational Licensing, *Review of Economic Studies*, October 1986.

How to License Intangible Property, with Michael L. Katz, *Quarterly Journal of Economics*, August 1986.

Research Joint Ventures: An Antitrust Analysis, with Gene M. Grossman, *Journal of Law Economics and Organization*, Fall 1986.

Consumer Shopping Behavior in the Retail Coffee Market, with Michael L. Katz, in *Empirical Approaches to Consumer Protection*, Pauline M. Ippolito and David T. Scheffman, eds., Federal Trade Commission, 1986.

Technology Adoption in the Presence of Network Externalities, with Michael L. Katz, *Journal of Political Economy*, August 1986.

Entry Dynamics with Mixed Strategies, with Avinash K. Dixit, in *The Economics of Strategic Planning*, L.G. Thomas, ed., Lexington Press, 1986.

Exchange of Cost Information in Oligopoly, *Review of Economic Studies*, July 1986.

InterLATA Capacity Growth and Market Competition, with Robert D. Willig, in *Telecommunications and Equity: Policy Research Issues*, Proceedings of the Thirteenth Annual Telecommunications Policy Research Conference, James Miller, ed., North Holland, 1986.

Can Unemployment be Involuntary? Reply, with Joseph E. Stiglitz, *American Economic Review*, December 1985.

On the Licensing of Innovations, with Michael L. Katz, *Rand Journal of Economics*, Winter 1985.

Normative Issues Raised by International Trade in Technology Services, with Gene M. Grossman, in *Trade and Investment in Service: Canada/U.S. Perspectives*, R.M. Stern (ed.), Ontario Economic Council, 1985.

Equilibrium Unemployment as a Worker Discipline Device: Reply, with Joseph E. Stiglitz, *American Economic Review*, September 1985.

Advances in Supervision Technology and Economic Welfare: A General Equilibrium Analysis, with Janusz Ordover, *Journal of Public Economics*, December 1984.

The General Motors-Toyota Joint Venture: An Economic Assessment, with Janusz A. Ordover, *Wayne Law Journal*, Summer 1985.

Contains Highly Confidential Information

Network Externalities, Competition, and Compatibility, with Michael L. Katz, *American Economic Review*, June 1985.

Patent  Licensing and R&D Rivalry, *American Economic Review Papers and Proceedings*, May 1985.

Equilibrium Unemployment as a Worker Discipline Device, with Joseph E. Stiglitz,  *American Economic Review*, June 1984.

Informative Advertising with Differentiated Products, with Gene M. Grossman, *Review of Economic Studies*, January 1984.

Premiums for High Quality Products as Returns to Reputation, *Quarterly Journal of Economics*, November 1983.

Consumer Protection in the United States, *Zeitscrift für die gesamte Staatswissenschaft*, *Journal of Institutional and Theoretical Economics*, October 1983.

A Theory of Factor Mobility, with Gene M. Grossman, *Journal of Political Economy*, October 1982.

Optimal Pricing of Experience Goods, *Bell Journal of Economics*, Autumn 1983.

Consumer Information, Product Quality, and Seller Reputation, *Bell Journal of Economics*, Spring 1982.

Advertising and Welfare: Comment, *Bell Journal of Economics*, Autumn 1980.


## Working Papers, Research Memoranda, Work in Progress

Property Rules vs. Liability Rules for Patent Infringement, January 2017.

Unilateral Effects Analysis After *Oracle*,  Roundtable Discussion (multiple participants), *Antitrust Magazine,* Spring 2005.

The Role of Innovation in Competitive Analysis, Chair's Showcase Program (multiple participants), *Antitrust Source,* July 2005.

Linux Adoption in the Public Sector: An Economic Analysis, 2003, with Hal R. Varian.

Competition Policy and Innovation, Prepared for the Directorate for Science, Technology, and Industry, OECD, STI Working Paper No. 2002/11, April 2002, www.oecd.org/sti.

U.S. Government Information Policy, with Hal R. Varian, prepared for the Office of the Assistant Secretary of Defense (Command, Control, Communications and Intelligence), U.S. Department of Defense, August 1997.

*Economic Models of Counterfeiting*, with Gene M. Grossman, Report to the U.S. Department of Labor, International Labor Affairs Bureau, January 1988.

Contains Highly Confidential Information

# Book Reviews

Review of Rethinking Merger Analysis by Louis Kaplow in the *Journal of Economic Literature*, 2024.

Review of *Bandwagon Effects in High-Technology Industries* by Jeffrey H. Rohlfs, in the *Journal of Economics*, 2003.

Review of *Will E-Commerce Erode Liberty? Review of Code and Other Laws of Cyberspace*, by Lawrence Lessig, in *Harvard Business Review*, May/June 2000.

Review of *Sunk Costs and Market Structure: Price Competition, Advertising, and the Evolution of Concentration*, by John Sutton, in the Journal of Economic Literature, 1993.

Review of *Controlling Industrial Pollution: The Economics and Politics of Clean Air*, by Robert W. Crandall, in the *Journal of Economic Literature*, June 1984, pp. 625-627.

# Other Professional Activities

Member, Single-Firm Conduct Working Group, California Law Review Commission Study of Antitrust Law, 2023-2024.

Member, MIT Economics Department Visiting Committee, 2020 – present.

Member, Long Range Planning Committee, Antitrust Section, American Bar Association, 2015-2016.

Member, Foreign Investment, Sectoral Review, and Trade Policy Task Force, Antitrust Section, American Bar Association, 2013- 2015.

Member, Academic Research Council, Housing Finance Center, Urban Institute, 2013 – 2018.

Member, Budget and Interdepartmental Relations Committee, Berkeley Division of the Academic Senate, University of California, 2004-2007.

Member, University of California, Committee on Academic Personnel, 2006-2008.

Member, Economic Evidence Task Force, Antitrust Section, American Bar Association, 2005-2006.

Member, Program Committee, American Economic Association Annual Meetings, 2006.

Member, Market Surveillance Committee, California Independent System Operator, 1997-2000, see http://www.caiso.com/.

Member, Advisory Board, *Journal of Economic Perspectives*, 1999-2002.

Member, Advisory Board, *Antitrust and Regulation Abstracts*, 1998-2002.

Member, Advisory Board, *Journal of Network Industries*, 1999-2001.

Vice-Chair, Economics Committee, Antitrust Section, American Bar Association, 1995 - 1998.

Editor, *Journal of Economic Perspectives*, 1993 - 1995.

Contains Highly Confidential Information

President, Industrial Organization Society, 1995 - 1996.

Member, Defense Science Board Task Force on Antitrust Aspects of Defense Industry Consolidation, U.S. Department of Defense, 1993 - 1994.

Co-Editor, *Journal of Economic Perspectives*, 1986 - 1993.

Associate Editor, *Quarterly Journal of Economics*, 1984 - 1987.

Associate Editor *Rand Journal of Economics*, 1984 - 1986.

Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1988 - 1989

Associate Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1987 - 1988.


# Honors, Fellowships, and Research Grants

Fellow of the Econometric Society, 2020

Economist of the Year, Global Competition Review, 2017

Susan Bies Lecture on Economics and Public Policy, Northwestern University, 2015.

Distinguished Fellow, Industrial Organization Society, 2013.

National Science Foundation Graduate Research Fellowship Program, 60th Anniversary Awardee (one of 60 Awardees selected from over 45,000 Fellows)

Runner-Up, Teaching Prize, MBA Program, Haas School of Business, U.C. Berkeley, 1999-2000.

National Science Foundation Research Grant #SES-9209509, Technology Transitions with Network Externalities, 1992-1994, (with Joseph Farrell).

National Science Foundation Research Grant #SES-8821529, The Evolution of Network Industries, 1989-1991, (with Joseph Farrell).

Center for Advanced Study in the Behavioral Sciences, Stanford California, Research Fellowship, 1989-1990.

National Science Foundation Research Grant #SES-8606336, Issues of Industrial Organization in International Trade, 1986-1988, (with Gene M. Grossman).

Alfred P. Sloan Foundation Research Fellowship, 1985-1987.

National Science Foundation Research Grant #SES-8408622, Technological Competition and International Trade, 1984-1986, (with Gene M. Grossman).

National Science Foundation Research Grant #SES-8207337, Signals of Product Quality, 1982-1984.

National Science Foundation Graduate Fellowship, 1977-1980.

University of California Fellowship, 1976-1977.

Contains Highly Confidential Information

Phi Beta Kappa and Sigma Xi, M.I.T., 1976.

## Affiliations

American Bar Association

American Economic Association

## Consulting Activities

Extensive experience working with private parties and government agencies on matters involving antitrust, regulation, and intellectual property.

Contains Highly Confidential Information

# Appendix B: Testimony in the Past Four Years

## November 2024

### Steves and Sons, Inc. v. JELD-WEN, Inc.

Case No. 3:16-CV-545-REP
Eastern District of Virginia
Testified in deposition on behalf of Steves and Sons.