Eliot A. Adelson (CA Bar No. 205284)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: EAdelson@mofo.com

Henry Huttinger (CA Bar No. 312843)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
Telephone: 213.892.5200
Facsimile: 213.892.5454
Email: HHuttinger@mofo.com

Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Alexa Rae DiCunzolo (*pro hac vice pending*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
Email: AOkuliar@mofo.com
         BLui@mofo.com
         ADiCunzolo@mofo.com

Attorneys for Defendants Nexstar Media
Group, Inc. and TEGNA Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| DIRECTV, LLC,<br><br>              *Plaintiff*,<br><br>       v.<br><br>Nexstar Media Group, Inc. and<br>TEGNA Inc.,<br><br>              *Defendants*. | Case No. 2:26-cv-00976-TLN-CKD<br><br>**DEFENDANTS NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.'S OPPOSITION TO PLAINTIFF DIRECTV, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION OF MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Judges: Honorable Troy L. Nunley and Honorable Carolyn K. Delaney<br>Action Filed: March 18, 2026 |

OPP. TO PLF'S MOTION FOR TRO

## TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 3

    A.      The Modern Media Landscape.................................................................... 3

    B.      The Transaction........................................................................................... 5

III.    LEGAL STANDARD.............................................................................................. 6

IV.     ARGUMENT ........................................................................................................... 7

    A.      Plaintiff Cannot Meet the High Standard for a TRO ................................. 7

        1.      Plaintiff Does Not Establish Immediate and Irreparable Harm ................. 8

        2.      Plaintiff Fails to Show Likelihood of Success ......................................... 11

        3.      A TRO Would Harm the Public Interest................................................... 16

            a.      Create Conflicts of Law ................................................................ 16

            b.      Deprive Public Benefits to the Community ................................... 16

            c.      Undermine Congressional Intent.................................................... 17

    B.      The Balance of the Equities Tips Strongly in Nexstar's Favor............................ 18

    C.      Plaintiff Unduly Delayed in Seeking Relief.............................................. 19

    D.      Plaintiff Must Post a Bond ........................................................................ 20

V.      CONCLUSION...................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
   116 F. Supp. 2d 1159 (C.D. Cal. 2000) ................................................................................. 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................. 11

*Brady v. Nat'l Football League*,
   640 F.3d 785 (8th Cir. 2011) ................................................................................................. 9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ............................................................................................................. 10

*Cal. v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495
   U.S. 271 (1990), *reinstated in relevant part*, 930 F.2d 776 (9th Cir. 1991) ..................... 15

*California v. Sutter Health Sys.*,
   130 F. Supp. 2d 1109 (N.D. Cal. 2001) ............................................................................... 12

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ......................................................................................... 7, 8, 9

*DeHoog v. Anheuser-Busch InBev SA/NV*,
   899 F.3d 758 (9th Cir. 2018) ............................................................................................... 12

*Disbar Corp. v. Newsom*,
   508 F. Supp. 3d 747 (E.D. Cal. 2020) ........................................................................... 1, 2, 6

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ............................................................................................... 14

*Garcia v. Google*,
   786 F.3d 733 (9th Cir. 2015) ................................................................................................. 7

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000) ............................................................................................................. 18

*Homeowners Against the Unfair Initiative v. Cal. Bldg. Indus. Ass'n*,
   No. 06-CV-152, 2006 WL 5003362 (S.D. Cal. Jan. 27, 2006) .............................................. 8

*In re Los Angeles Dodgers LLC*,
    465 B.R. 18 (D. Del. 2011) ........................................................................................... 9

*Lucero v. Pennella*,
    No. 18-CV-01448, 2018 WL 5291980 (E.D. Cal. Oct. 23, 2018) ........................................ 19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009).......................................................................................... 7

*Morgan Stanley & Co., LLC v. Couch*,
    134 F. Supp. 3d 1215 (E.D. Cal. 2015), *aff'd*, 659 F. App'x 402 (9th Cir. 2016).................. 10

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020)............................................................................. 18

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
    16 F.3d 1032 (9th Cir. 1994)......................................................................................... 20

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993)........................................................................................ 15

*St. Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    78 F.3d 775 (9th Cir. 2015)............................................................................................ 14

*Taleff v. Southwest Airlines Co.*,
    828 F. Supp. 2d 1118 (N.D. Cal. 2011) .......................................................................... 19

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ..................................................................................................... 17

*Uulu v. Warden*,
    No. 25-CV-01812, 2026 WL 412204 (E.D. Cal. Feb. 13, 2026)............................................ 7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................................................................... 16, 17, 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 7, 16, 18

**Statutes**

15 U.S.C. § 26............................................................................................................ 20

47 U.S.C. § 325(b)(3)(C) ............................................................................................... 2

Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 .................................................................................................. 3

Clayton Act Section 7, 15 U.S.C. § 18 ................................................................... 2, 11

Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a ..................................... 6

**Other Authorities**

47 C.F.R. § 76.65 ............................................................................................... 2, 18

*Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion and Order, MB Docket No. 25-331, DA 26-267 (F.C.C. Mar. 19, 2026).................................................................... *passim*

Fed. R. Civ. P. 65(c)................................................................................................ 20

E.D. Cal. L.R. 231 ............................................................................................... 19, 20

S. Rep. No. 102-92 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133 ............................... 3, 17, 18

OPP. TO PLF'S MOTION FOR TRO

## I.    INTRODUCTION

Nexstar and TEGNA announced this transaction in August 2025.  The U.S. Department of Justice ("DOJ") and the Federal Communications Commission ("FCC") then spent several months reviewing it and considered many of the very issues and arguments being raised here. They ultimately cleared the deal.  Plaintiff advocated against it in front of at least the FCC, if not other agencies.  *See* Okuliar Decl. Ex. A (FCC Order) ¶ 1.[1]  But Plaintiff never engaged with the parties until its last-minute demand that Nexstar delay closing to allow them to file a self-interested lawsuit against the transaction.

Now Plaintiff (a more than $15 billion company, substantially larger than the size of the combined Nexstar and TEGNA)—asks this Court to upend—on an expedited basis without adequate review—the well-considered decisions of two expert agencies.  The FCC concluded the transaction serves the public interest by enabling expanded local news and information.  Okuliar Decl. Ex. A (FCC Order) ¶ 1.

DIRECTV seeks an "extraordinary remedy" reserved for rare situations involving imminent, irreparable harm.  *Disbar Corp. v. Newsom*, 508 F. Supp. 3d 747, 751 (E.D. Cal. 2020).  It does so based on vague and specious allegations of distant possible financial harm. Rarer still is such relief when it is sought by a private plaintiff challenging a merger that received regulatory approval from two federal agencies.  The Court need not issue such unusual relief here because no harm or emergency exists.  Instead, Plaintiff seeks to dress up its naked self-interest and hypothetical future potential commercial dispute as an antitrust claim.

---

[1] All exhibits herein are attached to the Declaration of Alexander Okuliar in Support of Defendants' Opposition to Plaintiff's Motion for Protective Order ("Okuliar Decl.").

1                                   OPP. TO PLF'S MOTION FOR TRO

Plaintiff claims that the deal will allow Nexstar to improperly raise rates applicable to it. Not true. Indeed, Plaintiff's economist's claims to the contrary rely on a fundamentally incorrect characterization of the industry and Nexstar's role in it. Further, Plaintiff itself knows there is no imminency either: "The next negotiation will occur later this year, when DIRECTV's agreement with Nexstar expires." Compl. ¶ 110. In any event, individual negotiations such as those between DIRECTV and Nexstar are subject to a statutory "good faith" negotiation requirement enforceable through an FCC complaint process. 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. § 76.65.

Plaintiff's speculative claims that it will be forced to raise rates on its own customers, or that those customers will receive lower quality news, are both unsupported and irrelevant. Again, among other reasons, the FCC Order commits Nexstar to *expand* local journalism and programming, just as it has done after prior deals. Okuliar Decl. Ex. A (FCC Order) ¶¶ 75, 82.

Beyond the lack of immediate, irreparable harm—which is enough for the Court to deny a TRO—the Court should also decline to issue a TRO because DIRECTV has not established a likelihood of success on the merits. *Disbar Corp.*, 508 F. Supp. 3d at 752. Plaintiff's claims are deficient on essentially every element under Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff makes contradictory, conclusory, self-interested, and unsupported allegations of relevant markets and anticompetitive effects. Such weak claims would normally be dispatched on a motion to dismiss. Even a cursory review of Plaintiff's own public documents confirms the flaws in its theory.

Finally, the equities and public interest strongly favor denial. A TRO preventing integration would irreparably harm Nexstar and others, halt the benefits of expanded local programming for millions, disrupt a fully approved and closed deal, jeopardize Nexstar's business

2                                    OPP. TO PLF'S MOTION FOR TRO

by creating confusion in the market, and impose ▇▇▇▇▇▇▇ in losses while creating a direct conflict with a lawful FCC Order.

Plaintiff cites to no court that has issued such a TRO on a consummated deal where an expert federal agency has already approved the deal for being in the national public interest and ordered specific localism commitments, as here. Accordingly, the Court should deny DIRECTV's thirteenth-hour request.

## II.   FACTUAL BACKGROUND

### A.   The Modern Media Landscape

Local broadcasters operate in a media landscape that is unlike even a few years ago. Israel Decl. ¶ 10. They distribute content to viewers for free over the air within defined geographic regions, often as affiliates of major networks. Network-affiliated stations broadcast network content and their own content, including local news or lifestyle programming, which they produce at substantial cost.

Historically, the Big Four television networks relied on local affiliates to reach viewers. As a way to protect the broadcast industry and consumers, in 1992, Congress reinforced that broadcasting model by requiring cable operators to obtain retransmission licensing to carry certain broadcast station content (which they had previously carried without compensation to broadcasters).[2] The law was intended to fix the "distortion in the video marketplace which threaten[ed] the future of over-the-air broadcasting" under which "broadcasters in effect subsidize[d] the establishment of their chief competitors," MVPDs.[3] It also set out "to provide

---

[2] *See* S. Rep. No. 102-92, at 35–36 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133, 1168–69 (quoting Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385).
[3] *Id.*

OPP. TO PLF'S MOTION FOR TRO

protection for consumers against [MVPD] monopoly rates and poor customer service."[4]  The FCC in 2005 reported to Congress that the law was functioning as intended by preserving access to local broadcasting while allowing compensation to reflect marketplace negotiations.  Okuliar Decl. Ex. B ¶ 33.

That model has since been disrupted.  Viewers now access programming across dozens of different subscription and ad-supported services, including Netflix, Disney+, YouTube, and Amazon Prime Video.  Live sports are likewise distributed across streaming services, league-owned direct-to-consumer (DTC) platforms, and virtual MVPDs (*e.g.,* Hulu Live and YouTube TV) ("vMVPDs").[5]  Israel Decl. ¶¶ 12–15.  Americans also obtain local news and information through numerous non-broadcast-TV options.[6]

At the same time, the Big Four networks no longer depend exclusively on local broadcast affiliates.  Instead, they simulcast their most valuable programming—live sports, news, and primetime scripted content—on their own DTC platforms (*e.g.*, Paramount+, Peacock, Disney+, ESPN+, and Fox One) nationwide and *directly* to cable companies.  Israel Decl. at ¶¶ 13–14.  For example, in 2023, Charter secured the right to include Disney+ and ESPN+ as part of Charter's linear video package, and now offers Disney+ Hulu Bundle, ESPN Unlimited, HBO Max, Paramount+, Peacock Premium, AMC+, ViX , the Tennis Channel, and FOX One via its new Spectrum App Store.[7]

---

[4] *Id.* at 1134.
[5] Sara Lebow, *Live Sports Viewers Increasingly Embrace Digital*, EMARKETER (Oct. 28, 2024), https://www.emarketer.com/content/live-sports-viewers-increasingly-embrace-digital.
[6] Okuliar Decl. Ex. C at 16.  Elisa Shearer, et al., *Sources of Local News,* PEW RESEARCH CENTER (May 7, 2024), https://www.pewresearch.org/journalism/2024/05/07/sources-of-local-news/.
[7] Press Release, *Charter Commc'ns,* Introducing The Spectrum App Store, The Next Big Step in Seamless Entertainment (Oct. 9, 2025), https://corporate.charter.com/newsroom/spectrum-introduces-the-spectrum-app-store.  *See also* Okuliar Decl. Ex. D at 14–16.  Indeed, while other forms of distribution have

4                              OPP. TO PLF'S MOTION FOR TRO

Plaintiff itself is all too familiar with this phenomenon—after years of subscriber losses directly attributed to rising competition from these sources, Plaintiff has significantly increased its investment and promotion of its own streaming service.[8]

### B.      The Transaction

A key purpose of the Nexstar-TEGNA deal is to sustain and enhance the diversity of local voices and viewpoints in local communities.  The Transaction aims to "preserve[] high-quality local journalism and diversity of opinion" through enhancing Nexstar's "local presence."[9]

The FCC supports this deal as a way to protect and promote its "longstanding media goals of competition, localism, and diversity."  Okuliar Decl. Ex. A (FCC Order) ¶ 2.  The FCC's review of the deal began on December 1, 2025 and included commentary and submissions from 14 private parties.  *Id.* ¶ 10 & nn.19–22.  After completing its review of the deal and taking into account that commentary (including from DIRECTV), the FCC issued an Order clearing the deal with certain conditions.  *Id.* ¶ 7.  The FCC found the following:

- **Tribune.** Following Nexstar's 2019 acquisition of Tribune, Nexstar's stations increased local news coverage of 28,000 hours per year (more than 12.5%) and increased local lifestyle and political programming by 9,000 (more than 75%) and 800 hours per year

---

proliferated, well over 90% of the MVPD market is controlled by the ten largest providers.  *See* Okuliar Decl. Ex. E at 25–26.  Many leading MVPDs are corporate giants that pool their cable assets with broadband operations, television networks, and/or streaming services and have market capitalizations that far exceed those of Nexstar and TEGNA combined.  For example, Nexstar's and TEGNA's combined market of approximately $9.97 billion is dwarfed by each of Verizon ($214.7 billion), EchoStar ($32.02 billion), and DIRECTV parent Company TPG Inc. ($15.45 billion).  *See, e.g.*, *TPG Inc. (TPG)*, YAHOO! FINANCE, https://finance.yahoo.com/quote/TPG/ (last visited Mar. 24, 2026).

[8] Patricia Battle, *DirecTV Sends Stern Warning About Growing Rival as Customers Exit*, YAHOO! FINANCE (Dec. 25, 2025), https://finance.yahoo.com/news/directv-sends-stern-warning-growing-170300883.html.

[9] Acquisition of TEGNA Inc. – August 2025, Nexstar Media Group, Inc. (Aug. 2025), https://www.nexstar.tv/wp-content/uploads/2025/08/August-2025-TEGNA-Acquisition-Deck.pdf.

OPP. TO PLF'S MOTION FOR TRO

(more than 40%), respectively.  *Id.* ¶ 68.

- **Commitments.** The FCC secured commitments from Nexstar to "expand[] its investment in local news and programming, including increasing the amount of local news it provides in acquired markets," continue "offering those [MVPDs] with which it has an existing retransmission agreement an extension of its agreement at the existing rates for a certain period of time," and "commit[] to equal opportunity employment and nondiscrimination." *Id.* ¶ 6.  Additionally, Nexstar commits to divesting six stations.  *Id.* ¶ 55.

Consistent with those commitments, Nexstar intends to invest more heavily in local programming and news coverage, expand advertising solutions, and compete more effectively against dominant technology and media platforms.  Biard Decl. ¶ 22.

The DOJ also reviewed the transaction.  On September 30, 2025, Nexstar and TEGNA filed a pre-merger notification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a (the "HSR Act").  The DOJ issued a Request for Additional Information ("Second Request") pursuant to 15 U.S.C. § 18a(e)(1)(A), triggering a mandatory waiting period for the parties and the production of millions of documents.  On March 19, 2026, after a seven-month investigation, the DOJ terminated the waiting period without any conditions.

The Transaction closed on March 19 after receiving all necessary regulatory approvals.

### III.    LEGAL STANDARD

"A TRO is an extraordinary remedy" intended "to preserve the status quo pending a fuller hearing." *Disbar Corp. v. Newsom*, 508 F. Supp. 3d at 751.  To prevail, Plaintiff must make a "clear showing" of: (1) a likelihood of success on the merits; (2) a likelihood that it will suffer immediate irreparable harm absent preliminary injunctive relief; (3) that the balance of equities

tips in its favor; and (4) that preliminary injunctive relief is in the public interest.  *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Plaintiff must demonstrate—rather than simply allege—that irreparable harm is imminent.  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988).

DIRECTV's Motion appears to seek a mandatory injunction, which "orders a responsible party to take action," because it would require Nexstar and TEGNA to run as separate businesses (they are not).  *Uulu v. Warden*, No. 25-CV-01812, 2026 WL 412204, at *2 (E.D. Cal. Feb. 13, 2026) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009) and *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015)).  Such TROs are "subject to a doubly demanding standard and require[] the moving party to establish that the law and facts clearly favor his position, not simply that he is likely to succeed" and generally "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."  *Marlyn*, 571 F.3d at 879.  However construed, its Motion fails.

### IV.    ARGUMENT

#### A.    Plaintiff Cannot Meet the High Standard for a TRO

Plaintiff does not establish a single element necessary for an injunction and fails to meet the even higher standard applicable to mandatory TROs.  *See Winter*, 555 U.S. at 24; *Uulu v. Warden*, No. 25-CV-01812, 2026 WL 412204, at *2 (E.D. Cal. Feb. 13, 2026).  First, Plaintiff's alleged harm is neither immediate nor irreparable because it is based on speculative changes in rates that might occur, if at all, many months from now.  Second, Plaintiff will not succeed on the merits because it does not adequately allege, and will fail to prove, that Nexstar could

substantially harm competition in any relevant market.  Third, a TRO would impair the public interest because it would prevent Nexstar from providing immediate benefits to consumers and undermine the national policy goals and statutory authority of the FCC.  Fourth, the balance of the equities strongly favors Nexstar because, unlike Plaintiff's speculative injury, Nexstar will suffer immediate irreparable harm to its business and potential liability.

### 1.    Plaintiff Does Not Establish Immediate and Irreparable Harm

Plaintiff cannot demonstrate required elements that its alleged injury is "irreparable" and "immediate."  *Homeowners Against the Unfair Initiative v. Cal. Bldg. Indus. Ass'n*, No. 06-CV-152, 2006 WL 5003362, at *2 (S.D. Cal. Jan. 27, 2006) (quoting Fed. R. Civ. P. 65(b)); *see also Caribbean Marine Servs.*, 844 F.2d at 674 ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm.").  To show irreparable harm, Plaintiff must "demonstrate immediate threatened injury." *Caribbean Marine Servs. Co.*, 844 F.2d at 675. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* at 674.

As an initial matter, no alleged harm is imminent, nor could it be.  Nexstar's current retransmission rates to companies with expiring contracts like Plaintiff will not change until at least December 1, 2026.  *See* Okuliar Decl. Ex. A (FCC Order) ¶ 75.  As Plaintiff points out, its "next negotiation will occur later this year, when DIRECTV's agreement with Nexstar expires." Compl. ¶ 110.  Further, the (former) TEGNA stations' rates ███████ for purposes of calculating retransmission payments for those stations for the same period.  Biard Decl. ¶ 9.

Moreover, Plaintiff's core theory of harm is pure conjecture, and sounds more like a justification for a forthcoming commercial dispute of its own making than antitrust injury related to the Transaction it seeks to thwart.  Plaintiff claims that the transaction will give it "significantly

OPP. TO PLF'S MOTION FOR TRO

diminished bargaining power" in forthcoming retransmission consent negotiations.  Mot. at 18. This "speculative injury" based on theoretical price outcomes in future negotiations is not sufficient to warrant a TRO.  *Caribbean Marine Servs. Co.*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction").  Neither *In re Los Angeles Dodgers LLC*, 465 B.R. 18 (D. Del. 2011) nor *Brady v. Nat'l Football League,* 640 F.3d 785 (8th Cir. 2011) lend DIRECTV any support.  The former involved the unique, court-supervised constraints of a bankruptcy sale process, 465 B.R. at 35, and the latter, involving a labor dispute, actually found that *both* parties would suffer "some degree of irreparable harm" regardless of the outcome, 640 F.3d at 793, hardly an endorsement of the principle that DIRECTV's alleged diminished bargaining leverage alone constitutes irreparable injury.  Moreover, unlike *In re Los Angeles Dodgers*, where the debtor was negotiating rights to a truly unique asset—the exclusive television broadcast rights of a Major League Baseball franchise, 465 B.R. at 22–23—DIRECTV is negotiating ordinary course retransmission consent agreements for Big Four broadcast stations, agreements it routinely negotiates with numerous broadcasters across the country.

Plaintiff does not allege, much less demonstrate, that Nexstar **will in fact** increase retransmission fees.  Nor could it.  Plaintiff's speculative theory—trumpeted by its expert—is belied by market and economic realities.  Israel Decl. ¶¶ 50–56.  Notably, after months of review addressing precisely the same concerns raised by Plaintiff, the FCC concluded that there was no "cognizable case" that the transaction would result in "higher prices or increased blackouts of programming."  FCC Order ¶ 71.  The DOJ, the expert economic agency, also expressed no concerns, clearing the transaction with no conditions.  The notion that MVPDs like DIRECTV are

OPP. TO PLF'S MOTION FOR TRO

beholden to broadcasters is likewise belied by the fact that many such distributors, including DIRECTV, have offerings that exclude local stations, decline to carry certain stations, and/or obtain network programming directly from networks. Biard Decl. ¶¶ 3, 12-13. DIRECTV should not be able to use the threat of a TRO as a negotiating tactic.

Even if Plaintiff could establish that Nexstar would increase retransmission fees, that alone would not establish that the transaction is imminently harmful or anticompetitive. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977) ("Every merger of two existing entities, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons. But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects."). Further, mere financial injury can be adequately remedied by money damages. *See Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1235 (E.D. Cal. 2015), *aff'd*, 659 F. App'x 402 (9th Cir. 2016) ("Typically, monetary harm does not constitute irreparable harm."). If Nexstar could improperly raise retransmission rates in its negotiations with MVPDs after November 30, those increases would be easily quantifiable and compensable. Plaintiff is not entitled to a TRO where "money damages would fairly compensate [it] for any wrongdoing." *Id.*[10]

DIRECTV's ambiguous assertions that the transaction threatens to degrade the quality and quantity of local news programming also cannot justify a TRO. Mot. at 15–16. That Nexstar would degrade its own product in such a competitive media environment makes no sense. It also

---

[10] Monetary damages, rather than injunctive relief, are more appropriate here, especially in light of DirecTV's pursuit of damages against Nexstar in a separate, ongoing antitrust action regarding retransmission consent negotiations. *See* Complaint at 50, *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 23-CV-2221 (S.D.N.Y. 2023).

contradicts this company's history of expanding news and local content and requires speculation that Nexstar would violate its commitments under the FCC Order.  Okuliar Decl. Ex. A (FCC Order) ¶ 85; Biard Decl. ¶ 17.  Moreover, Plaintiff does not attempt to define any relevant market for "local news programming." The numerous alternative sources of news, further undermine any such theory of harm.  The Court should disregard it entirely.

### 2.    Plaintiff Fails to Show Likelihood of Success

Plaintiff will not be able to show that the effect of the Transaction "may be substantially to lessen competition, or to tend to create a monopoly" in a properly defined relevant market.[11] Plaintiff relies on vague and generalized conclusory allegations to support its complaint, without any meaningful recitation of alleged facts to support a plausible claim.  Such formulaic pleadings have long been viewed as insufficient to support an antitrust claim.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554–55 (2007).

*First,* Plaintiff claims Nexstar will be able to raise rates improperly.  Rather than offer substantive allegations supporting this theory, DIRECTV instead fills its Complaint with generic quotes from obsolete DOJ settlement proceedings.  For instance, DIRECTV alleges "Big Four broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable networks," Compl. ¶ 55, directly copying from DOJ's now outdated action against a merger involving different broadcasters five years ago.[12]  Unfortunately for Plaintiff, its cut-and-paste job missed something: DOJ has already cleared this deal, rendering its reliance on its prior statements irrelevant.  Plaintiff does not

---

[11] 15 U.S.C. § 18.

[12] Competitive Impact Statement at 4, *United States v. Gray Television, Inc.*, No. 21-CV-02041 (D.D.C. July 28, 2021).

attempt to address the fundamental changes in the industry that led to the DOJ's decision. Nor does its expert. *See* Israel Decl. ¶ 10. Recycling outdated allegations does not sustain its burden—this particularly true given the extent to which its own product offerings have evolved (which its Complaint ignores).

*Second,* Plaintiff relies on thin and contradictory allegations in its attempt to define a relevant market. While the Court need not decide the bounds of the relevant market at this stage, Plaintiff's incoherent allegations fall well short. Plaintiff must properly define both a relevant product and geographic market. *See California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1132 (N.D. Cal. 2001) ("Identification of a relevant market is a necessary predicate to a successful challenge under the Clayton Act and thus to establishing a likelihood of ultimate success for preliminary injunction purposes.") (internal quotations omitted); *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Even taking Plaintiff's allegations as true shows that it will fail on both dimensions and its Motion should be denied on this basis alone. *Sutter Health*, 130 F. Supp. 2d at 1132 (denying preliminary injunction where plaintiff failed to define a geographic market).

Plaintiff freely acknowledges that broadcast groups and MVPDs negotiate licenses that (1) cover all their stations nationwide and (2) have a common price for each similar station covered by the agreements, regardless of location. Compl. ¶ 87. Yet Plaintiff alleges local and Designated Market Area ("DMA")-specific geographic markets and claims that increases in concentration in specific DMAs will lead to higher retransmission consent fees. Mot. at 14–15. This makes no economic sense.

> [C]onsider the DMA Abilene-Sweetwater, TX, which contains both Nexstar and TEGNA Big Four stations, and which Professor Shapiro includes in his list of

OPP. TO PLF'S MOTION FOR TRO

DMAs exceeding the Merger Guidelines structural presumptions . . . . This DMA has ███ DIRECTV subscribers, or just ██ % of the ████████ subscribers across all DMAs where Nexstar or TEGNA operate a Big Four station. For [the Plainitff's] geographic market to be valid, it must be the case that a hypothetical broadcaster monopolist in this DMA could leverage a blackout with DIRECTV— one causing just ██ % of DIRECTV's viewers to be unable to watch just *two* Big Four stations—to negotiate a 5% increase in retransmission rates across the entire DIRECTV footprint—impacting all of DIRECTV's ████████ subscribers."

Israel Decl. ¶ 46. This result is clearly nonsensical.

*Third,* the Complaint contains sparse and speculative allegations about anticompetitive effects. DIRECTV argues Nexstar will have greater "leverage to extract higher prices." Compl. ¶ 78. Plaintiff's anecdote of a broadcaster being able to negotiate an increase in the retransmission rates paid by DIRECTV includes no evidence that the increase is attributable to an increase in Big Four station ownership. Compl. ¶ 79. Nor does the testimony of its own executive. Thun Affidavit ¶ 22–23. Instead, "due to the many MVPD alternatives that have become available to consumers in the last five years, much of this churn will be due to cord-cutting." Israel Decl. ¶ 52. As Dr. Israel explains, "cord-cutting is detrimental not only to the MVPD, but also to the broadcaster. One cannot assume . . . that an increase in churn and cord-cutting in the event of a blackout will increase the bargaining power of the broadcaster. In fact, there is good reason to believe that the opposite may be true . . . . cord-cutting creates a negative externality among broadcasters that is internalized when broadcasters merge, creating downward pressure on retransmission rates." *Id.* Among other deficiencies, DIRECTV ignores the many programming alternatives available to distributors. Plaintiffs' suggestion that only certain local programming from select Big Four stations is the only alternative is inconsistent with reality.

Biard Decl. ¶¶ 12–13.[13]

DIRECTV also claims that it will suffer loss of goodwill due to potential blackouts, and that it "will not be able to restore that loss of goodwill."  Complaint ¶ 112.  This is false. DIRECTV has historically accounted for a disproportionate share of retransmission consent blackouts, reflecting that such disputes are a routine feature of its bilateral negotiations rather than evidence of merger-specific anticompetitive effects.[14]  Notwithstanding its extensive history of blackouts, DIRECTV has continued to operate, undermining any claim that such disruptions result in irreparable harm to its goodwill.  Furthermore, DIRECTV fails to acknowledge that its customers potentially affected by broadcast blackouts have alternative options, as DIRECTV carries network programming in its own streaming product.  Biard Decl. ¶ 12; Mot. at 12, n.10 ("DIRECTV is able to purchase access to streaming services offered by the Big Four networks," which "require DIRECTV to license the Big Four's affiliates.").

Additionally, "actual or alleged harms to customers and consumers outside the relevant markets are ***beyond the scope of antitrust law***."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).  DIRECTV defines the relevant product market as "the market for distribution rights that Big Four broadcasting stations sell to MVPDs," in which "owners of broadcast stations" are the sellers and "MVPDs are the buyers."  Compl. ¶¶ 53–54.  Yet DIRECTV attempts to claim

---

[13] Moreover, Plaintiff cites no Section 7 case condemning a transaction merely because one sophisticated counterparty predicts that the merged firm may negotiate more aggressively in future contractual dealings. Mot. at 14; *Cf. St. Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 78 F.3d 775, 786–87 (9th Cir. 2015) (finding that merged entity would be able to raise prices over insurers, given limited competition and internal documents highlighting ability to pressure payors).

[14] According to data from the American Television Alliance, DIRECTV was responsible for 83% of blackouts in 2025 and 40% of blackouts between 2021–2025.  *See* AMERICAN TELEVISION ALLIANCE, *A Dark Record: Big Broadcast Blackouts 2010–2025*, https://americantelevisionalliance.org/blackouts-in-your-area/.

OPP. TO PLF'S MOTION FOR TRO

harm based on alleged downstream effects in a separate market where it is a seller—the retail market for video programming services in which MVPDs compete to sell packages to consumers. Compl. ¶¶ 90–93, 111. DIRECTV cannot base its claim on hypothetical harm it might suffer in this distinct downstream market. Indeed, DIRECTV's own expert acknowledges the distinction, noting that the "business-to-business" alleged relevant market "should not be confused with the downstream 'business-to-consumer' markets in which MVPDs, virtual MVPDs, and other streaming services compete to provide video programming to consumers." Shapiro Decl. ¶ 43. The alleged harm to consumers from pass-through pricing occurs in this downstream consumer market, not in the market where DIRECTV competes as a buyer of retransmission consent licenses. Moreover, this alleged harm is in DTV's own direct control. It does not have to raise the price of what it charges to its customers, which in any case, the fees it agrees to with Nexstar are a fraction of its overall pricing to its customers.

DIRECTV has impermissibly attempted to assert cognizable harm in one market by pointing to speculative effects in another, separate market in which it does not compete with Nexstar. Such attenuated allegations of injury fail to establish the required harm within the relevant market and fail to meet the *Twombly/Iqbal* standard.

Even assuming Plaintiff could establish a *prima facie* case—which it cannot—Defendants could easily rebut any finding of anticompetitive effects. A variety of factors can rebut a *prima facie* case, including that the merger is *on balance* procompetitive.[15]

---

[15] *See Cal. v. Am. Stores Co.*, 872 F.2d 837, 842–43 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990), *reinstated in relevant part*, 930 F.2d 776, 777 (9th Cir. 1991); *Olin Corp. v. FTC*, 986 F.2d 1295, 1304–06 (9th Cir. 1993).

### 3.    A TRO Would Harm the Public Interest

Granting a TRO would create an unnecessary conflict between an administrative and judicial order, prevent the benefits of the deal from flowing to millions of Americans, and undermine the stated public interests of the United States.  Plaintiff ignores the FCC's findings regarding the integration of these two broadcast businesses and promotion of journalism, much less refute them.  These concrete harms to the public interest would be based on tenuous allegations raised by one private party.  This alone is reason enough for the Court to deny a TRO. *Winter*, 555 U.S. at 23.

#### a.    Create Conflicts of Law

Granting a TRO would create conflict with an FCC order, resulting in repercussions that counter the FCC's "regulatory structure designed to deter and remedy anticompetitive harm."[16]  The FCC Order requires Nexstar to expand and increase its investment in local news.  Okuliar Decl. Ex. A (FCC Order) ¶ 85.  The FCC's regulatory regime ensures the broadcast industry is in order and serving vital national interests.

#### b.    Deprive Public Benefits to the Community

Granting a TRO will deprive Nexstar's communities of the very benefits the FCC found to be in the public interest.  Nexstar will be less able to invest in local programming and local coverage that benefits viewers, which will provide a substantial benefit to the public.  Okuliar Decl. Ex. A (FCC Order) ¶ 83.  Plaintiff has it backwards when it claims that the transaction will degrade local news.  Nexstar has committed to increasing the amount and availability of local programming in the aggregate in the affected markets as part of the transaction.  Biard Decl. ¶ 22.

---

[16] *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004).

The FCC has found the transaction would foster greater competition against national networks, large technology companies, and enhance the sophistication and scale of competing broadcast entities. A hold-separate order would prevent Nexstar from delivering these benefits to viewers. *Id.* It would also irreparably harm the interests of the United States, as stated by the FCC in advancing this deal. *See Trump v. CASA, Inc.,* 606 U.S. 831, 860 (2025) (finding entry of overbroad injunction would irreparably harm government).

Postponing integration will also delay Nexstar's accelerated plans to upgrade broadcast infrastructure and provide all TEGNA stations with access to ATSC 3.0, a new over-the-air broadcasting standard combining television with internet content, which offers superior audio and video quality, improved reception, and enables advanced emergency alerts. *Id.*; *see e.g.* Okuliar Decl. Ex. A (FCC Order) ¶ 86. Granting a hold-separate order would harm the public interest in these and other efforts.

### c.    Undermine Congressional Intent

Further, the public interest favors adherence to Congressional intent. The Supreme Court has instructed that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," and that where "there exists a regulatory structure designed to deter and remedy anticompetitive harm, the additional benefit to competition provided by antitrust enforcement will tend to be small." *Trinko*, 540 U.S. at 411–12. Here, Congress established precisely such a structure. The Cable Television Consumer Protection and Competition Act of 1992 created the retransmission consent regime "to establish a marketplace for the disposition of the rights to retransmit broadcast signals" and to restore competitive balance to a market that had "tilted" too far in favor of cable operators. *See* S. Rep. No. 102-92, at 35–36

(1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133, 1168–69.  That regime is administered through FCC's rulemaking and enforcement authority, and the good-faith negotiation requirements under 47 C.F.R. § 76.65(a).

The Communications Act's antitrust saving clause does not change this analysis. Although *Trinko* recognized that such a clause "bars a finding of implied immunity," the Court nonetheless held that where regulators have established "an effective steward of the antitrust function," courts should question "the additional benefit to competition provided by antitrust enforcement." 540 U.S. at 406–07, 412–14; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 862 (2000) (stating "this Court has repeatedly declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law").

The FCC did exactly that here and the Court should afford substantial weight to its determinations. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225–26 (S.D.N.Y. 2020) (federal review "contribut[es] substantially to rebutting" *prima facie* case where regulators are "intimately familiar with this technical subject matter" and "competitive realities involved").

## B.    The Balance of the Equities Tips Strongly in Nexstar's Favor

The balance of the equities favors Nexstar because the TRO would "impose a significant burden" on Nexstar. *Winter*, 555 U.S. at 27.  Nexstar will suffer irreparable operational, financial, and competitive harm if forced to hold TEGNA separate.  Biard Decl. ¶ 18.  A hold-separate order would prevent Nexstar from effectuating plans designed to result in cost savings and efficiencies, including systems integration, policy standardization, and retention of key employees.  *Id.* ¶ 17.  A delay will also impede coordination on key business functions, such as advertising sales, pricing, inventory management, and contract negotiations.  *Id.* ¶ 18.  Lost

operational efficiencies alone have been valued at approximately ████████ and cannot be recaptured. *Id.* A hold-separate requirement would also create uncertainty regarding the company's operations and strategic direction, impairing Nexstar's ability to preserve and grow key relationships and compete effectively. *Id.* ¶ 21. Finally, a TRO would force Nexstar not to implement its commitments under the FCC Order, putting it at risk of fines or revocation of its broadcast licenses.

### C.    Plaintiff Unduly Delayed in Seeking Relief

As a final consideration, courts routinely decline to issue TROs where, as here, plaintiffs lie in wait to try and disrupt a consummated deal. If the Court finds Plaintiff "unduly delayed in seeking injunctive relief" it "may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground." *See Lucero v. Pennella*, No. 18-CV-01448, 2018 WL 5291980, at *1 (E.D. Cal. Oct. 23, 2018) (denying TRO where plaintiff had "known for many months of the conduct about which he complains"). *See also* Local Rule 231(b). Courts have denied relief where plaintiffs failed to exercise "proper diligence" and delayed in filing suit challenging a merger. *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1172–73 (C.D. Cal. 2000) (applying laches to bar relief).

*Garabet* is particularly instructive: there, the Court denied plaintiffs' request for divestiture where plaintiffs were aware of the merger months before its consummation but took no "significant action" prior to its consummation, only to file suit the day of consummation. *Id.* at 1173; *see, e.g., Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1124 (N.D. Cal. 2011). Plaintiff has known about the Transaction of which it now complains since August 2025.

Plaintiff had the opportunity to express its views to the FCC, which acknowledged and addressed those views in its Order.  FCC Order ¶¶ 58–59.  The Court should reject this last-minute effort to disrupt a merger announced 8 months ago.

### D.    Plaintiff Must Post a Bond

The Court should deny Plaintiff's Motion in its entirety.  If it does not, Plaintiff should be required to post a bond commensurate with the significant losses Nexstar will incur if it were wrongfully enjoined from integrating with TEGNA.  *See* Fed. R. Civ. P. 65(c); *see also* 15 U.S.C. § 26 (preliminary injunctions shall issue only "upon the execution of proper bond against damages for an injunction improvidently granted"); *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1037 (9th Cir. 1994) (explaining that Rule 65(c) serves to discourage injunctions based on "tenuous legal grounds" and to protect against the risk of wrongful restraint).

Plaintiff's failure to address the bond requirement (as required by Local Rule 231) highlights the extent to which it ignores the very real and significant harm to Nexstar should the Court accept its tenuous theory.  In contrast to the speculative harm the Plaintiff claims justifies its Motion, Nexstar will suffer irreparable harm in at least three ways: (1) the unnecessary expense of operating two separate companies nationwide; (2) the cost of lost opportunities and revenue loss resulting from the uncertainty Plaintiff's Complaint and TRO will cause among advertisers; and (3) substantial risk of attrition among key personnel.  The combined financial losses easily surpass whatever future harm could befall some unknown citizen or entity from the Transaction.

### V.    CONCLUSION

Plaintiff's last-minute, unfounded, extraordinary request for relief should be denied in its entirety.

OPP. TO PLF'S MOTION FOR TRO

Dated:  March 24, 2026

Respectfully submitted,

By: */s/ Alexander P. Okuliar*
Alexander P. Okuliar (*admitted pro hac vice*)
Eliot A. Adelson (CA Bar No. 205284)
Bradley S. Lui (CA Bar No. 143088)
Henry Huttinger (CA Bar No. 312843)
Alexa Rae DiCunzolo (*pro hac vice pending*)


MORRISON & FOERSTER LLP
Attorneys for Defendants Nexstar
Media Group, Inc. and TEGNA Inc.

21                    OPP. TO PLF'S MOTION FOR TRO