UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

DIRECTV, LLC,

*Plaintiff*,

v.

Nexstar Media Group, Inc., and TEGNA Inc.,

*Defendants*.

Case No. 2:26-cv-00976-TLN-CKD

**DECLARATION OF MARK A. ISRAEL IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

I.    Qualifications, Assignment, and Summary of Conclusions ........................................ 3

    A.    Qualifications ............................................................................................... 3

    B.    Assignment and Summary of Conclusions ................................................... 4

II.    Professor Shapiro's Analysis Does Not Reflect the Recent Foundational
Changes to The Video Distribution Industry That Have Fundamentally
Altered How Video Content Is Distributed and Consumed ........................................ 5

    A.    The Unique Position Once Held by Broadcast Television Stations Is Being
Eliminated by Changes Happening in Real-Time Today ...................................... 6

    B.    Consistent with these Changes, Cord-Cutting is Rampant, and Any
Distinction Between Linear/Broadcast Television and Digital/Streaming
Content is Evaporating ......................................................................................... 14

    C.    Professor Shapiro's Analyses Are Backward Looking and Drawn from a
Time Before These Changes, and Thus They Cannot Capture Competition
Between Broadcasters or the Likely Effects of the Proposed Transaction
Today ................................................................................................................... 16

III.    Professor Shapiro's Relevant Product Market and Geographic Market
Definitions are Unsupported by Economic Analysis and Rely Exclusively on
Outdated Precedent ......................................................................................... 19

    A.    Relevant Product Market ...................................................................... 19

    B.    Geographic Market ............................................................................... 25

IV.    Professor Shapiro's Analysis of the Competitive Effects of the Acquisition
Does Not Account For Important Economic Realities of the Video
Distribution Industry ........................................................................................ 27

V.    Professor Shapiro's Market Definition Does Not Allow for an Assessment of
the Effects of This Acquisition on Competition in Local News ................................ 30

**I.        Qualifications, Assignment, and Summary of Conclusions**

**A.        Qualifications**

1.        I am a Founding Partner of Econic Partners, an economic consulting firm that was formed in 2025.  Previously, I was the President of Compass Lexecon, another economic consulting firm, where I worked from January 2006 to March 2025.  Prior to joining Compass Lexecon, I served as an Associate Professor at Northwestern University's Kellogg School of Management.  I received my Ph.D. in Economics from Stanford in 2001.

2.        I specialize in the economics of industrial organization—which is the study of competition in imperfectly competitive markets, including the study of antitrust and regulatory issues—as well as applied econometrics.  At Kellogg and Stanford, I taught graduate-level courses covering topics including business strategy, industrial organization economics, and econometrics.  I have presented on these topics to academic, business, and government audiences around the world, and I have published more than 25 articles on a variety of topics related to many aspects of competition economics and applied econometrics.  My research has been published in leading, peer-reviewed scholarly and applied journals including, among others, The American Economics Review, The Rand Journal of Economics, The Review of Industrial Organization, The Journal of Competition Law and Economics, and The Review of Network Economics.

3.        My work focuses on the application of economic theory and econometric methods to the competitive analysis of the impact of mergers, antitrust issues including a wide variety of single-firm and multi-firm conduct, and damages estimation.  I have substantial testifying and consulting experience in connection with antitrust cases and litigation matters in the United States, Canada, the United Kingdom, and the European Union, as well as in connection with regulatory proceedings and arbitrations.  I have served as an economic expert for government agencies and private parties in over 100 matters in the United States, Canada, Europe, the United Kingdom, and Asia; provided live testimony more than 50 times; and submitted well over 100 expert reports, declarations, and affidavits.  I have been qualified by courts to provide expert testimony more than 10 times; my opinions have been favorably relied upon by courts in multiple countries.

4.        A copy of my *curriculum vitae* is attached to this Affidavit as **Exhibit A**.

5.      In preparing this Declaration, I have relied on my training and experience in antitrust economics, as well as my experience as an industrial organization economist and econometrician more generally.  Although I cite to certain specific documents in this Declaration, I do not specifically refer to every piece of evidence that may support my opinions.

6.      I reserve the right to modify or supplement this Declaration, and the conclusions set out herein, if new information becomes available that affects my conclusions.

**B.      Assignment and Summary of Conclusions**

7.      I was asked by counsel for Nexstar to evaluate, from the perspective of an industrial organization economist, the Declaration proffered by Professor Shapiro and to assess whether it provides any reliable basis from which to conclude that Nexstar's acquisition of TEGNA would substantially lessen competition.[1]

8.      My main conclusion is simple: Professor Shapiro's Declaration provides no reliable basis from which to conclude that Nexstar's acquisition of TEGNA would substantially lessen competition.

9.      That main conclusion is based on several more detailed findings, developed in the remainder of this Declaration.

- The video distribution industry has undergone foundational changes in the past several years—accelerating very recently—and Professor Shapiro's analysis of Nexstar's acquisition of Tegna relies on historical analysis that fails to consider the effect of these changes.  For this reason alone, Professor Shapiro's Declaration is incapable of providing a reliable assessment of the competitive effects of a merger between two broadcast station owners today and going forward, and is thus incapable of serving as a reliable basis for any conclusion regarding the competitive effects of the transaction.  (**See Section II).**

- Professor Shapiro's product market definition analysis relies on evidence that is outdated, anecdotal, and/or lacking economic rigor; and therefore cannot support his proposed

---

[1]      Declaration of Professor Carl Shapiro in Support of DIRECTV's Motion for Temporary Restraining Order, *DIRECTV, LLC vs. Nexstar Media Group, Inc.; and TEGNA Inc.*, United States District Court Eastern District of California, Sacramento Division, 2:26-cv-00976-TLN-CKD, March 18, 2026 ("Shapiro Declaration").

"Retransmission Consent for Big Four broadcasting stations" market definition. (**See Section III.A).**

- While Professor Shapiro acknowledges that market definition—and the hypothetical monopolist test—should be based on how prices are actually set, and thus what a monopolist would actually do, his geographic market definition is based on a fictional world in which retransmission rates are set DMA by DMA. They are not. As he acknowledges, they are set at a single level for an MVPD's entire operation—nationwide in the case of DIRECTV.  As such, his geographic market definition is invalid.  (**See Section III.B).**

- Professor Shapiro's market concentration analysis relies on an unsupported market definition, meaning that it cannot support any conclusion of likely price increases or other harm to competition.  And the rest of his competitive effects analysis ignores current competitive realities, in which the overwhelming importance of "cord cutting" means that the transaction will create strong downward pricing pressure, undermining his claims of harm to competition.  (**See Section IV).**

- Professor Shapiro fails to define a local news market and does not provide any economic analysis of local news; as such, his conclusions regarding competitive effects on local news are without basis. (**See Section V).**

II.     **Professor Shapiro's Analysis Does Not Reflect the Recent Foundational Changes to The Video Distribution Industry That Have Fundamentally Altered How Video Content Is Distributed and Consumed**

10.     In the last half decade, the video distribution industry has experienced seismic changes in how consumers access video content.  These changes have affected all aspects of the industry, including what types of content providers (*e.g.*, broadcast networks, cable networks, streaming platforms) carry various types of content (*e.g.*, live content, sports), as well as how consumers

subscribe to those providers (*e.g.*, traditional MVPDs[2] and virtual MVPDs;[3] as well as direct to consumer (DTC)[4] and free ad-supported streaming TV (FAST)[5] offerings that bypass MVPDs altogether). These changes have fundamentally altered the competitive landscape of the video distribution industry, introducing a vast array of new options to consumers. Professor Shapiro's analysis fails to consider the effect of these changes in any meaningful detail, instead relying on outdated historical analysis. For this reason alone, he cannot reach reliable conclusions about the effects of a broadcast merger in today's environment, with all the new competitive options, and with new competitive constraints on broadcasters.

11. Because these changes are so fundamental to any understanding of competition between broadcasters—and to any understanding of the likely competitive effects of the proposed transaction in *today's environment*—and because Professor Shapiro spends no time analyzing them with any rigor, I discuss them in some detail next. This detail provides important context for understanding the present transaction and for understanding why a Declaration that does not grapple with these changes—but instead relies heavily on precedents and data from before these changes occurred—provides no valid basis for any conclusions about the proposed transaction.

**A. The Unique Position Once Held by Broadcast Television Stations Is Being Eliminated by Changes Happening in Real-Time Today**

12. Where broadcast stations (primarily accessed via retransmission on traditional MVPDs) once represented a unique channel to access the types of video content available from Big Four

---

[2] Multichannel video programming distributors, or MVPDs, include video content distributors such as cable providers (*e.g.*, Comcast/Xfinity, Cox, and Charter), direct-broadcast satellite ("DBS") providers (*e.g.*, DIRECTV and Dish Network), and broadband providers (*e.g.*, Verizon Fios).

[3] Virtual multichannel video programming distributor, or vMVPDs, stream linear television programming and on-demand video programming over the internet rather than through traditional MVPD channels (*e.g.*, cable or DBS).

[4] DTCs are streaming platforms where video content is streamed directly to consumers from the creators or owners of the video content. Examples include Peacock, Disney+, Paramount+, ESPN+, and FOX One.

[5] FASTs are free, ad supported streaming platforms accessed over the internet that offer linear programming similar to MVPDs. Examples include Tubi, Pluto TV, Sling TV, and Samsung TV Plus.

networks (such as the most popular scripted series, live sports, and so on), consumers can now select from a wide variety of delivery channels for the same television content, including vMVPDs, DTCs, FASTs, and other streaming services. Industry participants colloquially describe subscriber migration from MVPDs to these alternative delivery channels as "cord cutting." For present purposes, what matters most about cord cutting is it provides a way for subscribers to leave the traditional MPVD ecosystem—with the associated system of retransmission payments that Professor Shapiro describes—and access similar video content in an ecosystem where broadcasters receive less, if any, retransmission compensation.

13. Due to recent developments, viewers can now access Big Four network content through the networks' own DTC platforms—Peacock (NBC), Paramount+ (CBS), and FOX One (Fox)—including live, streamed content, and the network affiliated local stations' broadcast (including sports programming). *The introduction and growth of these DTC platforms is a very recent phenomenon.* In 2019, NBC's DTC platform Peacock did not exist; by the end of 2025, it had approximately 44 million subscribers.[6] Similarly, CBS's DTC platform Paramount+ was launched in March 2021 and its subscribers have grown from approximately 30 million in 2021 to 79 million in 2026.[7] FOX One just launched in August 2025, garnering 2.3 million subscribers within a couple of months.[8]

14. Critically, Peacock, Paramount+, and FOX One also offer packages that include local NBC, CBS, and FOX affiliated stations (respectively branded Peacock Premium Plus, Paramount+ Premium, and FOX One).[9] Notably, during a blackout between a broadcaster and an

---

[6] *See*, Comcast Corporation Form 10-K for the fiscal year ended December 31, 2025, p. 33.

[7] Paramount Skydance Corporation Form 10-K for the fiscal year ended December 31, 2025, p. II-13. Previously, some CBS content was available through its CBS All Access app, but Paramount+ also included content from BET, Comedy Central, MTV, Nickelodeon, and Smithsonian Channel. *See*, Paramount+: Everything You Need To Know About The New Streaming Service, available at https://www.paramountplus.com/shows/paramount-plus/news/1010174/paramount-plus-everything-you-need-to-know-about-the-new-streaming-service/.

[8] BNM Staff, "FOX One Surpasses More Than 2 Million Subscribers, New Data Shows," *Barrett Media*, November 25, 2025, available at https://barrettmedia.com/2025/11/25/fox-one-surpasses-more-than-2-million-subscribers-new-data-shows/.

[9] Peacock, "Local NBC Channel," available at https://www.peacocktv.com/help/article/nbc-local-news-channel; Paramount+, "Pick a Plan," available at

DECLARATION OF MARK A. ISRAEL

MVPD, the broadcaster's local feeds would still be available through the DTC platform, potentially reducing the harm to the MVPD from the blackout since many of its subscribers can access the content in another way, and potentially increasing the harm to the local broadcaster since the MVPD and the subscriber may recognize it has less independent value.

15.     Another important development has been the growth of vMVPDs, which distribute content using other providers' facilities (*i.e.*, "over the Internet").  vMVPDs air both network and local content from Big Four-affiliated (and non-Big Four-affiliated) stations.  YouTube TV, the largest vMVPD, had around 1 million subscribers in 2019; it now has over 10 million.[10] YouTube TV carries nearly every local network-affiliated station.[11]  Forbes estimates that in 2026 YouTube TV will have more subscribers than any other pay-TV provider, including MVPDs.[12] Hulu with Live TV, the second largest vMVPD, has grown from approximately 2 million subscribers in 2019 to approximately 4.4 million subscribers today, and also carries most local network-affiliated stations.[13]  Like with DTC platforms, during a blackout between a broadcaster and an MVPD, all of the broadcaster's local feeds would still be available through the vMVPDs.

16.     Two features of vMVPDs are critical for present purposes.  First, the retransmission rates they pay broadcasters are lower than those paid by traditional MVPDs.  And second, they

---

https://www.paramountplus.com/account/signup/live-tv/cbs-news/; Fox, "What is FOX One?" available at https://help.fox.com/s/article/What-is-FOX-ONE-and-when-does-it-launch. Subscriber counts for the Peacock Premium Plus and Paramount+ Premium are not publicly disclosed.

[10]     Bastone, Nick, "YouTube's cable TV alternative now has more than 1 million paying subscribers," *Business Insider*, March 1, 2019, available at https://www.businessinsider.com/youtube-tv-has-more-than-1-million-subscribers-2019-3; Zdinjak, Nina, "YouTube TV surprises subscribers with a long-awaited addition," Yahoo!Finance, December 4, 2025, available at https://finance.yahoo.com/news/youtube-tv-surprises-subscribers-long-203700670.html.

[11]     "Local and regional programming is also provided with YouTube TV, offering complete local network coverage in over 98% of US TV households." Kinetic, "Which networks are available with YouTube TV?" available at https://www.gokinetic.com/support/tv-entertainment/youtube-tv/which-networks-are-available-with-you-tube-tv.

[12]     Adgate, Brad, "YouTube TV Is Forecasted To Be The Largest Pay-TV Distributor In 2026," *Forbes*, April 7, 2024, available at https://www.forbes.com/sites/bradadgate/2024/04/07/youtube-tv-is-forecast-to-be-the-largest-pay-tv-distributor-in-2026/.

[13]     *See*, The Walt Disney Company Form 10-K for the fiscal year ended September 27, 2025, p. 40; Hulu, "Watch Live TV From 957+ Channels," available at https://www.hulu.com/live-tv.

negotiate those retransmission rates directly with the networks, not with the local broadcasters. As described more fully below, these facts increasingly constrain what local broadcasters can charge MVPDs for retransmission rights and create a significant source of downward pricing pressure from the proposed transaction, which directly refute claims of harm to competition.

17.     Viewers can now also access television content through FAST providers, including popular providers such as Tubi, Pluto TV, Sling, Samsung TV Plus, and Roku.  Many of these providers include feeds from local network-affiliated stations.[14]  In 2019 Tubi's viewership was approximately 25 million; it is over 100 million now.[15]  In 2019 Pluto TV's viewership was approximately 22 million; it is over 80 million now.[16]  The Current magazine reports that "U.S. viewers streamed 1.8 billion hours of FAST content through August 2025, up from 1.3 billion hours during the same period in 2024[.] That's a 43% increase year over year."[17]  Hence, FASTs provide yet another rapidly growing, non-MVPD way in which viewers can access local network-affiliated content, which did not exist during the time period covered by either the precedents or most of the data cited by Professor Shapiro, and which Professor Shapiro does not discuss.

18.     Marquee sports programming, which was once exclusively distributed on broadcast television stations distributed through MVPDs and over the air—and which is frequently referenced as a reason why broadcast television content is unique and valuable—is now widely available through an array of alternative distribution channels, which air the same content as

---

[14]     Tubi, "Tubi Help Center," available at https://tubitv.com/help-center/Content/articles/24898743777435; Paramount, "PlutoTV Categories," available at https://www.paramountpressexpress.com/pluto-tv/page/categories; Sling, "Sling TV Fact Sheet," June 2023, available at https://news.sling.com/about-us; Samsung TV Plus, "Find your favorite TV Channels," available at https://www.samsungtvplus.com/#channel-list; Roku, "Streaming now: live TV," available at https://www.roku.com/whats-on/live-tv.

[15]     Tubi, "Tubi Announces Record Growth for 2019," February 11, 2020, available at https://corporate.tubitv.com/press/tubi-announces-record-growth-for-2019/; Tubi, "Tubi Achieves Record Audience Scale and Engagement," June 17, 2025, available at https://corporate.tubitv.com/press/tubi-achieves-record-audience-scale-and-engagement/.

[16]     ViacomCBS Inc. Form 10-K for the fiscal year ended December 31, 2019, p. I-12; Naffis, David, "Pluto TV's Viewing Share: Free Streaming Market Data," *Adwave*, July 14, 2025, available at https://adwave.com/resources/pluto-tv-viewing-share.

[17]     Clark, Travis, "FAST viewing has surged 43% in the US since last year," *the Current*, November 25, 2025, available at https://www.thecurrent.com/readout-fast-viewing-surged-us-streaming.

broadcast television stations or exclusively license their own content. YouTube TV replaced DIRECTV at the start of the 2023-2024 NFL season as the exclusive distributor of the NFL's Sunday Ticket, with approximately 1.3 million subscribers.[18] In 2026, for the first time ever, the Superbowl was aired on the FAST network Tubi, with 13 million viewers.[19] NFL games recently started streaming on Netflix (first game aired Christmas Day, 2024),[20] Peacock (first game aired December 23, 2023),[21] FOX One (launched in 2025),[22] and Prime Video (became the exclusive home for Thursday Night Football in the United States starting in 2022).[23] Comcast opted in 2025 to air a week-17 NFL game between the Ravens and Packers exclusively on Peacock rather than on NBC.[24] As shown in

19.    **Figure 1**, popular sports programming can now be accessed through numerous streaming platforms. Clearly, since the time of the precedents cited by Professor Shapiro, this source of uniqueness for broadcast content—long lauded as its most important source of value—has disappeared.

---

[18]    Adgate, Brad, "YouTube TV Is Forecasted To Be The Largest Pay-TV Distributor In 2026," *Forbes*, April 7, 2024, available at https://www.forbes.com/sites/bradadgate/2024/04/07/youtube-tv-is-forecast-to-be-the-largest-pay-tv-distributor-in-2026/.

[19]    Koblin, John, "It's Official: Streaming Is Now the King of TV," *The New York Times*, June 17, 2025, available at https://www.nytimes.com/2025/06/17/business/media/streaming-beats-cable-broadcast.html.

[20]    Wile, Rob and Saba Hamedy, "Netflix Inks Deal to Stream its First NFL Games on Christmas Day," *NBC News*, May 15, 2024, available at https://www.nbcnews.com/business/business-news/netflix-inks-deal-broadcast-first-ever-live-nfl-games-christmas-day-rcna152366.

[21]    Adams, Peter, "Peacock's First Exclusive NFL Game Will Go Commercial-Free for a Quarter," *Marketing Dive*, December 21, 2023, available at https://www.marketingdive.com/news/NFL-airs-first-commercial-free-broadcast-NBCUniversal-Peacock/703272/.

[22]    Fox Sports, "How to Watch NFL on FOX One: Live games, streaming, channel," September 23, 2025, available at https://www.foxsports.com/stories/nfl/how-watch-nfl-fox-one-live-games-streaming-channel.

[23]    Sherman, Alex, and Young, Jabari, "NFL Finalizes New 11-Year Media Rights Deal, Amazon Gets Exclusive Thursday Night Rights," *CNBC*, March 18, 2021, available at https://www.cnbc.com/2021/03/18/nfl-media-rights-deal-2023-2033-amazon-gets-exclusive-thursday-night.html.

[24]    Mangione, Nick, "Baltimore Ravens to Face Green Bay Packers in Peacock Holiday Exclusive," *Peacock*, December 12, 2025, available at https://www.peacocktv.com/blog/ravens-vs-packers-in-peacock-holiday-exclusive#.

**Figure 1: Sports Programming Available on Streaming Services**



20.     The recent availability of sports content through alternative channels has been well documented by industry reporting.  In its Cord-Cutting Monitor series, MoffettNathanson reported in 2024 that "linear video is no longer the only answer for 'where to get sports'…[m]arquee sporting events, including the just-ended Olympics, and even the NFL, have increasingly moved to streaming platforms."[25]

21.     Other popular programming once uniquely available on broadcast stations and their retransmission on MVPDs is now widely available on vMVPDs, DTCs, and other streaming services.  For example, the Oscars will air exclusively on YouTube TV starting in 2029.[26]  The

---

[25]     MoffettNathanson Research, "Cord-Cutting Monitor Q2 2024: Pandora's Box," September 3, 2024, p. 7.

[26]     Barnes, Brooks and John Koblin, "The Oscars Will Be Streamed," *The New York Times*, December 17, 2025, available at https://www.nytimes.com/2025/12/17/business/media/oscars-youtube.html.

Screen Actors Guild award show was streamed live on Netflix on March 1, 2026.[27]  The Tony Awards started streaming live on Paramount+ in 2022.[28]  MoffettNathanson reports that "[n]ews is increasingly available outside the linear model as well."[29]  All of this has eroded and continues to erode any unique position that broadcast television once held, and it almost entirely post-dates the precedents and data on which Professor Shapiro bases his conclusions.

22.    Streaming platforms, including vMVPDs, DTC platforms, and other streaming services, are also now creating high-quality, original programming that competes, on at least even footing, with network-produced Big Four entertainment programming.  Well-known examples of such programming are plentiful:

- **Apple TV+** (launched in 2019; 45 million subscribers today)[30]: The Morning Show, Ted Lasso, Severance;

- **Hulu** (28 million subscribers in 2019; 64 million subscribers today)[31]: The Handmaids Tale, Little Fires Everywhere, Mrs. America;

- **Disney+** (launched in 2019; 132 million subscribers today)[32]: The Mandalorian, WandaVision, The Falcon and the Winter Soldier, Loki;

---

[27]    Tudum Staff, "The 2026 Actor Awards Presented by SAG-AFTRA: See the Full List of Winners," *Tudum*, March 3, 2026, available at https://www.netflix.com/tudum/articles/actor-awards-sag-aftra-2026-netflix.

[28]    Tony Awards, "Watch Broadway's Biggest Night: The Tony Awards," available at https://www.tonyawards.com/tonynight/watch-online/.

[29]    MoffettNathanson Research, "Cord-Cutting Monitor Q2 2024: Pandora's Box," September 3, 2024, p. 7.

[30]    Spangler, Todd, "Apple Is Losing Over $1 Billion per Year on Streaming Service, Has 45 Million Apple TV+ Subscribers," *Variety*, March 20, 2025, available at https://variety.com/2025/digital/news/apple-tv-plus-streaming-losses-1-billion-per-year-1236344052/.

[31]    Feiner, Lauren, "Hulu gained twice as many US subscribers as Netflix at the start of 2019," *CNBC,* May 1, 2019, available at https://www.cnbc.com/2019/05/01/hulu-gained-twice-as-many-subscribers-as-netflix-in-us.html; The Walt Disney Company Form 10-K for the fiscal year ended September 27, 2025, p. 40.

[32]    *See*, The Walt Disney Company Form 10-K for the fiscal year ended September 27, 2025, p. 40.

- **Amazon Prime** (approximately 100 million viewers in 2019; approximately 300 million viewers in 2025)[33]: Rings of Power, The Boys, Reacher, Invincible;

- **HBO Max** (launched in 2020; 132 million subscribers today)[34]: True Detective, Game of Thrones, Succession;

- **Netflix** (167 million subscribers in 2019; 325 million in 2025)[35]: The Diplomat, The Crown, Bridgerton, Squid Games, Stranger Things.

23.    By objective metrics, this original programming at least matches, if not surpasses, the quality of programming on the Big Four networks.  Reporting from Variety on the Critics' Choice shows that programming produced by streaming platforms won several awards, including Netflix's Adolescence (Best Limited Series), Apple TV+'s The Studio (Best Comedy Series), HBO Max's The Pitt (Best Drama Series), Peacock's Bridget Jones: Mad About the Boy (Movie Made for Television).[36]  New York Times reporting on the Golden Globes similarly highlights the success of programming outside of the Big Four MVPD ecosystem: Netflix's Adolescence, HBO Max's The Pitt, and Apple TV+'s The Studio all won "best of" categories.[37]  Netflix's KPop Demon Hunters won Best Animated Film at the 2026 Oscars and Best Original Song.[38]

---

[33]    Milan, Richi, "How Does Prime Video Make Money – Revenue Model Explained," *Muvi,* March 6, 2025, available at https://www.muvi.com/blogs/how-does-prime-video-make-money/; Palmer, Annie, "Amazon to Hike Price of Ad-Free Prime Video Tier by $2 a Month," *CNBC*, March 13, 2026, available at https://www.cnbc.com/2026/03/13/amazon-to-hike-price-of-ad-free-prime-video-tier-by-2-a-month.html.

[34]    *See*, Warner Bros. Discovery, Inc. Form 10-K for the fiscal year ended December 31, 2025 Form, p. 9.

[35]    *See*, Netflix, Inc. Q4 2019 Shareholder Letter, p. 7; Netflix, Inc. Q4 2025 Shareholder Letter, p. 1.

[36]    Lang, Brent, "Critics Choice Awards 2026: 'One Battle After Another' Wins Best Film, 'The Pitt,' 'Adolescence' and 'The Studio' Dominate TV Prizes," *Variety*, January 4, 2026, available at https://variety.com/2026/tv/news/critics-choice-awards-2026-winners-list-1236621119/.

[37]    Gonzalez, Shivani, "Golden Globes Winners: The Complete List," *The New York Times*, January 11, 2026, available at https://www.nytimes.com/2026/01/11/movies/golden-globes-winners-list.html.

[38]    Ewe, Koh, "Kpop Demon Hunters wins Oscars for best animated film and best original song," *BBC*, March 15, 2026, available at https://www.bbc.com/news/articles/cvg823zkx0go.

24.    Streaming platforms compete with broadcast networks on quantity as well as quality.  Not only do these streaming platforms compete for the attention of viewers with their newly-produced, original programming, but they also offer catalogs of older programming on demand that viewers can and do turn to in lieu of Big Four MVPD programming.  Reporting from Screen Rant in 2024 highlights that "all the most-watched shows on streaming platforms are older network shows like *The Office* and *Suits…*A Nielsen streaming data breakdown shows that every one of the top ten shows on streaming platforms, measured by minutes viewed, was acquired from traditional networks."[39]  *Suits*, a show aired on USA from 2011 through 2019, broke a Nielsen streaming record when it debuted on Netflix and Peacock in 2023, with over 3.7 billion viewing minutes in a week.[40]  Gunsmoke, the popular television show from the 1950s through 1970s, has regularly been making Nielsen's most-watched streaming lists.[41]

   **B.    Consistent with these Changes, Cord-Cutting is Rampant, and Any Distinction Between Linear/Broadcast Television and Digital/Streaming Content is Evaporating**

25.    Industry reporting and data show that cord cutting is widespread.  For example, eMarketer, a widely used provider of video distribution industry data, reported in 2025 that "[c]onnected TV (CTV) and streaming are now integral to how audiences consume content…[a] decade ago, streaming was a small, subscription-based slice of TV viewing.  Today, it commands a significant share.  As of March 2025, streaming accounted for 43.8% of all US TV time, up ten

---

[39]    Protheroe, Ben, "7 Reasons Why Old Network Shows Are Still So Successful On Streaming," *Screen Rant*, March 10, 2024, available at https://screenrant.com/network-tv-shows-successful-streaming/.

[40]    Campione, Katie, "'Suits' Breaks its Own Nielsen Streaming Record; 'The Lincoln Lawyer' Draws Over 1B Minutes Viewed Following Season 2 Debut," *Deadline*, August 3, 2023, available at https://deadline.com/2023/08/suits-ratings-netflix-peacock-nielsen-streaming-record-the-lincoln-lawyer-season-2-1235454457.

[41]    Koblin, John, "It's Official: Streaming Is Now the King of TV," *The New York Times*, June 17, 2025, available at https://www.nytimes.com/2025/06/17/business/media/streaming-beats-cable-broadcast.html.

percentage points in two years."[42]  It further noted that "the boundary between linear and streaming TV is dissolving.  Audiences move fluidly between broadcast and digital platforms" making "TV…a converged media environment."  As shown in Error! Reference source not found. below, data from S&P Kagan shows that the share of households with a TV set using an MVPD has declined from nearly 90% in 2013Q3, to 65% in 2019Q3, to *only 31% in 2025Q3*.  Clearly, cord-cutting is now a, if not the, dominant competitive force facing the entire linear television ecosystem, including broadcasters and MVPDs.

**Figure 2: Share of Households in Overlap DMAs with MVPD vs. Without MVPDs 2013-2025**



Source:
[1] S&P Kagan Data from Q1 2013 to Q3 2025.
[2] *Beyond Big Data: The Audience Watching Over The Air*, Nielsen Insights, January 2024.
Note:
[1] Shares based on estimate of households with a TV set, equal to 97% of total households in a given DMA, based on Nielsen Insights TV viewership estimate.

---

[42]    eMarketer, "Connected TV continues to redefine TV advertising," June 11, 2025, available at https://www.emarketer.com/content/connected-tv-continues-redefine-tv-advertising.

**C.**     **Professor Shapiro's Analyses Are Backward Looking and Drawn from a Time Before These Changes, and Thus They Cannot Capture Competition Between Broadcasters or the Likely Effects of the Proposed Transaction Today**

26.     Against this backdrop of seismic video distribution industry changes in the past half decade, Professor Shapiro's reliance on historical approaches used by DOJ in its Nexstar/Tribune suit from 2019, and later its Gray/Quincy suit from 2021, are inapposite for evaluating the *current* competitive landscape in television.  DOJ's 2019 claims predate the introduction and proliferation of many of the streaming services—including Peacock, Disney+, Apple TV+, and HBO Max— that hundreds of millions of viewers turn to today.  When DOJ issued the complaint in the Nexstar/Tribune matter, *65% of households used an MVPD; 31% did so in 2025Q3*.  A reliable analysis of the current video distribution industry must address these recent changes; Professor Shapiro's analysis does not.

27.     In particular, Professor Shapiro notes that "DOJ stated that Big Four broadcast stations have 'special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable networks ... [they] usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs.'"[43]  Professor Shapiro similarly points to prior DOJ assertions that "Non-Big Four broadcast stations are typically not close substitutes for viewers of Big Four stations" because they "typically feature niche programming without local news, weather or sports" or non-English language programming, and "Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal."[44]  He also points to an assertion from DOJ that "cable networks generally do not offer

---

[43]     Shapiro Declaration, ¶ 44.

[44]     Shapiro Declaration, ¶ 44.

local news, which provides a valuable connection to the local community that is important to viewers of Big Four stations."[45]

28.    These outdated DOJ assertions form the heart of Professor Shapiro's Declaration. Strikingly, Professor Shapiro's Declaration contains no economic analysis evaluating these claims.  Instead, Professor Shapiro simply presents DOJ's claims as though they are true today, offering no evidence that this is the case.  They are not, thus undermining the bulk of his claims.

29.    Professor Shapiro's Declaration makes scant mention of the radical changes to the video distribution industry experienced in the last five years, offering no rigorous analysis of how competition has changed or how DOJ's conclusions might look different today.  I count three instances where he mentions these changes at all.  First, Professor Shapiro acknowledges that "MVPDs, virtual MVPDs, and other streaming services compete to provide video programming to consumers."[46]  But he then simply assumes that these are outside of his relevant market because these are part of "'business-to consumer' markets" instead of "a 'business-to-business' market."[47]  This misses the point on multiple levels.  Most basically, the points made above were not just about vMVPDs (which I return to in the next paragraph), they were about all the ways to get content that was once the unique domain of broadcast networks, such as live sports, other top rated events (like the Oscars), top rated scripted series, and so on.  Those are increasingly available on DTC and other streaming platforms—with that *just* happening for the Oscars—such that the sources I cite above say that the lines are fully blurring *right now*.  That is the same

---

[45]    Shapiro Declaration, ¶ 44.

[46]    Shapiro Declaration, ¶ 43.  Earlier in the Declaration, Professor Shapiro similarly mentions in his "Industry Background" section that "Big Four broadcasting stations also reach consumers through virtual MVPDs ('vMVPDs') such as You Tube TV and DIRECTV Stream." Shapiro Declaration, ¶ 16.

[47]    Shapiro Declaration, ¶ 43.  Professor Shapiro rehashes the same arguments later in his Declaration, asserting that "streaming services are not substitutes for Big Four Retransmission Consent. Why not? Because these streaming services are a consumer product and Retransmission Consent is a business-to-business activity. Put differently, Retransmission Consent and streaming services are present at different stages of the distribution chain for video programming. Retransmission Consent takes place at the wholesale level, with broadcast stations making their programming available to MVPDs, while streaming services compete against MVPDs at the retail level - the distribution of programming to consumers." Shapiro Declaration, ¶ 71.

content being purchased in Professor Shapiro's business-to-business market, and the fact that it is available from places other than broadcast stations, as a matter of economics, reduces the value of those broadcast stations to MVPDs. Said differently, those other places to get the same content that broadcast stations provide must be relevant competitors that affect the prices that broadcast stations can charge MVPDs for content that is no longer unique, and yet they are excluded from Professor Shapiro's overly narrow "retransmission consent for Big Four broadcasting stations" market. In Professor Shapiro's world, the fact that the Oscars and the NFL are moving away from broadcast stations to other platforms is irrelevant to an analysis of the market power created by a merger of two broadcasters. That cannot be correct.

30. Second, Professor Shapiro contends that "Nexstar and TEGNA are arguing that the relevant product market in which Big Four broadcast stations compete must include a much wider range of video programming," but that such arguments are "contradicted by recent, hard evidence."[48] However, the only "hard evidence" that he points to are summary statistics showing that retransmission fees have increased over time.

31. That said, a more fundamental point is that whatever was happening with retransmission rates historically was due to the complicated interplay of many factors and does not answer the relevant question for market definition (discussed in more detail in the next section), which is what a single owner of the "Big Four" broadcast stations would do to those rates, relative to four separate owners (the relevant question for the hypothetical monopolist test, or HMT).[49] Each separate broadcaster contributes only a small amount to the total cost of video content, so each one may believe it can raise its retransmission rates—trying to capture as much as it can for itself—while having a relatively small effect on the overall cost of video service, and thus leading

---

[48] Shapiro Declaration, ¶¶ 64-65.

[49] Antitrust practitioners routinely use the HMT to evaluate market definition. *See,* U.S. Department of Justice and the Federal Trade Commission, *Merger Guidelines*, December 18, 2023 ("2023 Merger Guidelines"), § 4.3.A ("[T]he Hypothetical Monopolist Test … is a method by which the Agencies often define relevant antitrust markets. When evaluating a merger of sellers, the HMT asks whether a hypothetical profit-maximizing firm … that was the only present and future seller of a group of products ('hypothetical monopolist') likely would undertake at least a small but significant and non-transitory increase in price ('SSNIP')"). Indeed, Professor Shapiro explicates at length about the centrality of the HMT to market definition. *See*, Shapiro Declaration, ¶¶ 30-37.

DECLARATION OF MARK A. ISRAEL

relatively few subscribers to cut the cord.  In contrast, in today's world in which cord-cutting is recognized as the dominant competitive consideration, a single owner of all broadcast stations may recognize that it plays a large role and needs to help control prices to limit cord cutting (since cord cutting subscribers earn broadcasters little or no retransmission fees).  That is, the continued growth in retransmission rates in the face of cord cutting may well be because no single broadcaster fully internalizes the effect of higher retransmission rates on the broadcast ecosystem, and thus they are all too willing to keep raising retransmission rates, looking out only for themselves.  This is a form of "tragedy of the commons."  In contrast, a single combined broadcaster may consider the overall effect of combined retransmission rates on cord cutting, internalizing all these effects, and realizing that total retransmission rates need to be constrained to limit cord cutting.  In this case, the hypothetical monopolist would not raise retransmission rates, but instead would respond more strongly to cord cutting and reduce them, or at least stop the increase, meaning Professor Shapiro's market definition is incorrect.  And none of this would be captured by historical precedents or data from a time when cord cutting was *not* the dominant consideration.  More on this (as well as discussion of Professor Shapiro's third reference to the recent changes in the industry) in the next section.

III.    **Professor Shapiro's Relevant Product Market and Geographic Market Definitions are Unsupported by Economic Analysis and Rely Exclusively on Outdated Precedent**

32.    An evaluation of market definition is a serious exercise that requires careful consideration of the available substitutes.  Professor Shapiro has not met this burden.  In particular, as described in the previous section, the video distribution industry has undergone foundational changes in the last five years that have fundamentally altered and expanded the available substitutes to viewers. Professor Shapiro's application of his market definition exercise fails to consider these changes to available substitutes—relying on old precedents and data—and, more generally, offers no reliable economic analysis supporting his market definition.

    **A.  Relevant Product Market**

33.    Professor Shapiro asserts that "Big Four Retransmission Consent"—the retransmission rights for Big Four broadcasts that station owners sell to MVPDs—is the relevant product market

to assess the effects of this acquisition.[50]  Professor Shapiro conducts no economic analysis to support this relevant product market, instead relying solely on:

1) DOJ's alleged market definitions from challenging broadcast television mergers in 2021 and in 2019; [51]

2) A single anecdote regarding a Big Four monopoly from 2017 (or before) in a small DMA with a small station owner;[52]

3) an anecdote from a DIRECTV executive that a broadcaster was able to negotiate an increase in retransmission fees;[53]

4) testimony from a DIRECTV executive that the company pays higher retransmission fees to station groups with more affiliates in the same DMA;[54]

5) a study conducted by another economist putatively showing that "owners of Big Four stations that own more than one Big Four station in a DMA charge DIRECTV more per station";[55]

6) a study conducted by the FCC in 2014;[56]

7) and other miscellaneous evidence that does not constitute economic analysis in support of his claims.[57]

34.    None of these items, individually or collectively, is probative with respect to this transaction.

---

[50]    Shapiro Declaration, ¶ 43.

[51]    Shapiro Declaration, ¶¶ 44-46.

[52]    Shapiro Declaration, ¶ 49.

[53]    Shapiro Declaration, ¶ 51.

[54]    Shapiro Declaration, ¶ 52.

[55]    Shapiro Declaration, ¶¶ 53-55.

[56]    Shapiro Declaration, ¶ 58.

[57]    Shapiro Declaration, ¶¶ 57-62.

### 1.   Outdated evidence is not informative

35.   As discussed above, the video distribution industry has undergone foundational changes in the past five years, rendering any studies predating this period inapt for studying the *current* video distribution industry.  Professor Shapiro's evidence of DOJ's alleged market definitions from previous broadcast merger challenges, a single anecdote regarding a Big Four monopoly, and a study conducted by the FCC—items (1), (2), and (6) from the list above—are from 2019 and 2021, 2017, and 2014, respectively, and are thus too outdated to have any bearing on the current transaction at issue.

### 2.   Anecdotes do not constitute economic analysis

36.   The testimony and anecdotes from DIRECTV executives—items (3) and (4) from the list above—are not based on economic analysis that increases in retransmission rates are attributable to an increase in Big Four station ownership.  As such, they cannot serve as the basis for a rigorous economic opinion on "the likely effects on competition of Nexstar's proposed acquisition of TEGNA."[58]   Such anecdotes or testimony are simply not sufficiently rigorous to control for alternative explanations for observed increases in retransmission rates.  Nor are they sufficiently rigorous to compare what would be charged by a single owner of multiple stations to multiple owners of the same stations, *holding all other factors constant*, particularly given the ongoing changes to the industry.  Said differently, in my experience as an economic expert witness in many merger trials, such evidence would be unlikely to succeed in establishing the case.

### 3.   Dr. Shampine's regression analysis is based largely on outdated data and cannot reliably establish that a monopoly owner of all broadcast stations would raise retransmission rates

37.   Professor Shapiro's reliance on an analysis from Dr. Allan Shampine—item (5)—suffers from many of the same deficiencies.  First, his analysis includes retransmission agreements that were negotiated as early as October 2020.  Hence, given all the changes to video distribution industry in the last half decade, this study relies on data too outdated to be of probative value.  To

---

[58]   Shapiro Declaration, ¶ 4.

rely on an econometric study in light of the massive changes in the industry, one would need to show that its conclusions still hold using only very recent data.  Professor Shapiro has not done so, and thus there is no basis from which to conclude the results apply to the present environment.

38.     Second, Dr. Shampine's analysis purports to establish that "the share of owner's DIRECTV subscribers located in DMAs where the owner controls more than one network" is positively correlated with the rates DIRECTV pays to the station owner.  But Professor Shapiro provides minimal details as to the structure and implementation of Dr. Shampine's study to evaluate its applicability to the current transaction, and I only have access to a heavily redacted version of the study.  Moreover, Professor Shapiro does not address any of the unrebutted criticisms of Dr. Jay Ezrielev, who carefully reviewed Dr. Shampine's analysis and concluded that there "are significant methodological flaws in Dr. Shampine's regression analysis, likely leading to biased estimates and unreliable results."[59]

39.     Additionally, as the economics literature has established, correlation does not imply causation, and Dr. Shampine's results only establish correlation.  Dr. Shampine's analysis is a cross-sectional analysis that purports to show a positive relationship between broadcasting groups' size and the retransmission rates that DIRECTV pays to them.  However, there are meaningful differences between station owners—*e.g.*, some are better at running their business than others, and such owners would both (i) tend to acquire more stations and (ii) tend to operate better stations that can command higher retransmission rates.  This results in what economists refer to as an "endogeneity problem."[60]  Such endogeneity concerns are at the heart of econometrics and there are specific methods established to deal with them.  To my knowledge, Dr. Shampine does not show that he has implemented any of these methods.[61]  The well-known

---

[59]     To my knowledge, Dr. Shampine has also not addressed these criticisms.

[60]     A common example of an endogeneity problem is trying to understand if more education *leads to* higher income, since, instead, it may be that a third factor, say intelligence (which is hard to measure and thus hard to control for) causes people to both get more education and earn higher income.

[61]     *See*, Israel, Mark et al. (2017), "Chapter 6: Econometrics and Regression Analysis," in *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, ABA Book Publishing, pp. 149, 156-159.  Note that simply adding controls for quality differences is not generally recognized as a solution

implication of this is that his study can only establish correlation, not causation: he may be able to claim that larger broadcasting groups tend to have higher retransmission rates, but he cannot conclude that if you made a particular group larger—such as through a hypothetical merger to monopoly—its rates would go up.  Without such a causal conclusion, this study cannot support an HMT and thus cannot support Professor Shapiro's market definition.

### 4.    Professor Shapiro has not implemented any valid Hypothetical Monopolist Test

40.    Professor Shapiro claims to have run an HMT, which is a tool routinely used by economists to evaluate whether a given market definition is valid.  Here Professor Shapiro introduces his third and final mention of streaming services, claiming that his application of the HMT "automatically accounts for the fact that MVPDs are competing against streaming services to attract subscribers."[62]  To the contrary, Professor Shapiro has not implemented an HMT *at all*, let alone one that that accounts for the widespread and foundational changes to the video distribution industry marketplace.  Instead, Professor Shapiro has relied on evidence that is outdated, anecdotal, and lacking economic rigor, for all the reasons given above.  Moreover, even if this evidence were credited, it does not actually implement an HMT, but rather makes some general arguments about one.

41.    In order to implement an HMT, Professor Shapiro would need to answer the question "how would a hypothetical broadcast monopolist (*i.e.*, one owning all Big Four broadcast stations) *in 2026* price?"  Specifically, the question one should be answering is: Today, if there were a single monopolist owner of all four broadcast stations, what retransmission rate would it actually charge, and would that rate be significantly higher than the rate currently observed in the marketplace?  Professor Shapiro seems to agree with this premise, noting in his Declaration that "Ideally, we would observe Retransmission Fees in DMAs where a single firm controls all Big

to endogeneity concerns, since many of the differences in between station owners are likely to be hard to observe and thus hard to control for.

[62]    Shapiro Declaration, ¶ 72.  *See also*, Shapiro Declaration, ¶ 70 ("Recognizing that streaming services have grown rapidly in popularity in recent years, it may be helpful to explain how the HMT accounts for this growth").

Four broadcasting stations, so we could compare those fees with the fees in DMAs where the Big Four broadcasting stations are owned by four separate entities."[63]

42.    I now evaluate how a hypothetical broadcast monopolist in 2026 would act with respect to retransmission rates, relative to the rates observed in the marketplace.  This discussion mirrors my discussion regarding the effect of the recent changes on how a hypothetical monopolist would price, so I keep it brief here.

43.    First, even if there were a single owner of all broadcast stations, MVPDs may be unwilling to agree to a 5% price increase given the dilution of the value of broadcasters' content.[64]  Because content that was once accessible only from a broadcaster is now accessible through a number of other channels, and some of broadcasters' most valuable content has moved to other platforms entirely, MVPDs may be more willing to accept a blackout (or drop the content altogether), knowing that its subscribers care less than they once did about being able to access that broadcaster's signal.  Critically, many of these changes are happening in real time today, and will continue to happen in the coming months, so Professor Shapiro's historical evidence cannot refute this point.

44.    Second, and even more importantly, the decision made by a monopolist controller of all broadcast networks would likely be to cut retransmission rates, not raise them.  To explain the logic presented above in slightly different terms, note first that, today, if Nexstar asks for higher retransmission rates from an MVPD, some of this will be passed through to the MVPD's subscribers.  Professor Shapiro agrees with this.[65]  In the current environment, that will cause

---

[63]    Shapiro Declaration, ¶ 48.

[64]    A 5% price increase is routinely used by economists when implementing the hypothetical monopolist test, which they term a small but significant and non-transitory increase in price, or SSNIP. *See, e.g.*, 2023 Merger Guidelines, § 4.3.B ("When considering price, the Agencies will often use a SSNIP of five percent of the price charged by firms for the products or services to which the merging firms contribute value").

[65]    *See, e.g.*, Shapiro Declaration, ¶ 84 ("MVPDs pass on a portion of those higher fees to consumers by raising MVPD subscription prices").  Professor Shapiro also cited evidence from the AT&T-Time Warner merger showing pass-through rates of programming costs to subscribers of 75-100 percent. Shapiro, Carl, "Vertical Mergers and Input Foreclosure Lessons from the *AT&T/Time Warner* Case," *Review of Industrial Organization*, 59:303–341, 2021, p. 328.

some subscribers to cut the cord.  When they cut the cord, the retransmission revenue received will fall, *not just for Nexstar but for all broadcasters whose signal that subscriber would have received.*  So, in today's world, in which cord cutting is a dominant competitive force, higher retransmission rates charged by Nexstar (or any broadcaster) impose an important externality on other broadcasters.  On its own, Nexstar does not consider the effects on other broadcasters.  In general, each broadcaster may be willing to raise retransmission rates to get its additional revenue, while ignoring the effect that cord cutting is having on all the other broadcasters.  In effect, increasing retransmission rates may occur because no broadcaster today is considering the whole cord cutting picture. But a hypothetical monopolist would consider the whole picture, and thus the hypothetical monopolist would have a strong incentive to cut rates.  Critically, Professor Shapiro entirely ignores this force, and thus he has no basis to conclude that a hypothetical monopolist of Big Four broadcasters would raise retransmission rates significantly.   And his historical precedents, anecdotes, and data cannot capture it, as they predate today's environment.  Even the views of industry participants, like DIRECTV and others, are unlikely to capture it correctly, as no one has ever participated in an industry like the one today or observed what a monopolist owner of all the broadcasters would do. That requires economic analysis, which Professor Shapiro has simply not done, leaving him with no valid hypothetical monopolist test.

### B.   Geographic Market

45.   Professor Shapiro claims that individual DMAs are the appropriate geographic market. This implies that in his worldview a hypothetical monopolist owner of all Big Four stations in a given DMA could profitably increase prices by at least 5%.[66]  However, Professor Shapiro conducts no economic analysis to support this narrow geographic market.  In fact, it ignores the realities of how retransmission rates are set in practice.

46.   As Professor Shapiro recognizes,[67] broadcast groups and MVPDs negotiate retransmission rates for all stations in their overlapping DMAs, setting the same retransmission rate for all

---

[66]      Shapiro Declaration, ¶ 41.

[67]      *See, e.g.,* Shapiro Declaration, Table 3.

stations with the same network affiliation—indeed, this is how both Nexstar and TEGNA have negotiated with DIRECTV. Professor Shapiro's geographic market definition is incompatible with this reality. In particular, Professor Shapiro's market definition implies that the formation of a hypothetical monopolist in a single DMA would result in the hypothetical monopolist raising rates to MVPDs in that DMA. But for that to be true, given that rates are set across the entire footprint, the monopolist would have to raise rates across its entire footprint by at least 5%. This is simply implausible.

47.    To illustrate, consider the DMA Abilene-Sweetwater, TX, which contains both Nexstar and TEGNA Big Four stations, and which Professor Shapiro includes in his list of DMAs exceeding the Merger Guidelines structural presumptions.[68] This DMA has ██████ DIRECTV subscribers, or just ██% of the ████████ subscribers across all DMAs where Nexstar or TEGNA operate a Big Four station. For Professor Shapiro's geographic market to be valid, it must be the case that a hypothetical broadcaster monopolist in this DMA could leverage a blackout with DIRECTV—one causing just ██% of DIRECTV's viewers to be unable to watch just *two* Big Four stations—to negotiate a 5% increase in retransmission rates across the entire DIRECTV footprint—impacting all of DIRECTV's ████████ subscribers.[69]

48.    The only MVPDs with which a hypothetical monopolist in a single DMA could conceivably profitably negotiate a 5% increase in retransmission rates are MVPDs with a small footprint—*i.e.*, consisting of just the hypothetically monopolized DMA and potentially a small number of additional DMAs. However, Nexstar's retransmission data shows that ██████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████. So, a hypothetical monopolist of just one DMA could not raise prices to the MVPDs to which the vast majority of consumers subscribe, since those MVPDs have footprints *much larger* than a single DMA.

---

[68]    *Id*.

[69]    This includes DMAs in which Nexstar and DIRECTV overlap.

49.    What about raising prices just to the smaller MVPDs?  In theory, the hypothetical monopolist could try this, but those smaller MVPDs compete in a market with the larger MVPDs and their subscribers could switch to one of the larger MVPDs that is insulated from any such price increase (or to a vMPVD, DTC, or streaming service).  More importantly, if the price increase were just to the small MVPDs within the DMA, this would be extremely unlikely to result in a significant increase in overall retransmission rates in the DMA.  Specifically, in practice, a significant price increase under the hypothetical monopolist test is generally taken to be at least 5%, and a price increase to just the small MVPDs in one DMA is extremely unlikely to result in an overall 5% increase in retransmission rates in the DMA.  Hence, the hypothetical monopolist test would fail even if retransmission rates were raised to this group of small MVPDs.

50.    Bottom line, given that retransmission rates are set across MVPD's entire footprints, there is simply no basis for a DMA level geographic market.  Prices are not set by DMA and thus market shares and concentration levels by DMA are not relevant, and all of Professor Shapiro's associated analysis is not informative.

**IV.    Professor Shapiro's Analysis of the Competitive Effects of the Acquisition Does Not Account For Important Economic Realities of the Video Distribution Industry**

51.    As an initial matter, properly assessing the competitive effects from a merger requires properly defining the market.  As discussed above, Professor Shapiro provides no valid market definition, and the "market concentration metrics" he claims demonstrate a presumption that the acquisition will substantially lessen competition and lead to higher retransmission fees are not valid.  In particular:

- Professor Shapiro has not justified a product market consisting only of Big Four broadcast stations, so market shares and concentration levels based just on these stations are not meaningful.
- Retransmission rates are not set at the DMA level, so a DMA level geographic market is not appropriate, and market shares and concentration levels at the DMA level are not meaningful.

The second point is particularly damning here. Professor Shapiro's analysis is entirely based on a view that high market concentration *in a DMA* should create a presumption of harm in that DMA. But retransmission rates are not set at the DMA level and thus there is simply no basis for that conclusion.

52.    Professor Shapiro's further discussion of competitive effects is equally flawed. As with his attempt to define markets, Professor Shapiro's attempt to explain why the acquisition will harm competition fails to account for the current economic realities of the video distribution industry. Professor Shapiro claims that "[t]he more subscribers the MVPD would lose from a blackout, the greater is the stations [sic] bargaining leverage, and the more the MVPD will pay for the right to carry that station." Professor Shapiro provides no economic analysis supporting this statement.

53.    I agree with Professor Shapiro that an analysis of bargaining leverage effects from the transaction depends on analysis of churn in the event of a blackout.[70] But due to the many MVPD alternatives that have become available to consumers in the last five years, much of this churn will be due to cord-cutting. As explained above, cord-cutting is detrimental not only to the MVPD, but also to the broadcaster. One cannot assume, as Professor Shapiro does, that an increase in churn and cord-cutting in the event of a blackout will increase the bargaining power of the broadcaster. In fact, there is good reason to believe that the opposite may be true. As explained above, cord-cutting creates a negative externality among broadcasters that is internalized when broadcasters merge, creating downward pressure on retransmission rates.

54.    To see this in the context of the merger (as opposed to the hypothetical monopolist test), note that, prior to the merger, if Nexstar's retransmission rates go up, some of this would have been passed through to end consumers, resulting in some cord cutting, *harming TEGNA which would have lost the associated retransmission revenue from the subscribers that cut the cord.* Prior to the merger, Nexstar did not care about the effects on TEGNA. Today it internalizes these effects, making it more hesitant to push for higher retransmission rates—the costs of cord-cutting

---

[70]    Shapiro Declaration, ¶ 51.

will have gone up. This is an important source of downward pricing pressure from the transaction that Professor Shapiro has ignored, meaning he cannot even say which direction the effects of the transaction go.

55.     More generally, as a matter of economics, the direction of the effect on bargaining leverage depends on whether the offerings of Nexstar and TEGNA are substitutes or complements. If they are substitutes, the merger tends to increase the broadcasters' bargaining leverage; if they are complements, it tends to *decrease* the broadcasters' bargaining leverage.[71] Professor Shapiro is implicitly assuming they are substitutes. In addition to ignoring the cord-cutting externality described above, he is ignoring the fact that broadcast networks are packaged as part of a bundle of content by MPVDs. When you subscribe even to the most basic MVPD tier, you get all the broadcast networks. In that sense, the broadcast networks are each inputs in making up that tier of content, much like the inputs that come together to make up an automobile. And different inputs in one product are known, as a matter of economics, to be complements. That is, if Nexstar gets more expensive, the tier of service gets more expensive, and this *reduces* the number of subscribers who buy it, the characteristic feature of complements. If they were substitutes, a more expensive Nexstar would lead more people to buy TEGNA, not less. The reason this complementarity reduces bargaining leverage is clear—and once again relates to internalization—if Nexstar pushed for higher retransmission rates this would have resulted in higher prices for the tier of service and thus more consumers dropping TEGNA, meaning that Nexstar has a reduced incentive to push for such higher prices post-merger.[72]

56.     Even without considering these pricing effects, there are other reasons why Nexstar and TEGNA may be complements. Professor Shapiro argues that "a blackout by two or more Big

---

[71]     *See, e.g.*, Chipty, Tasneem and Christopher M. Snyder, "The Role of Firm Size in Bilateral Bargaining: A Study of the Cable Television Industry," *The Review of Economics and Statistics*, 81(2):326-340, 1999.

[72]     Note that many implementations of "Nash-in-Nash" bargaining models—such as that used by Professor Shapiro himself in the AT&T-Time Warner merger—would miss this effect because they unrealistically assume that the downstream price (that is the price of the MVPD service) is unaffected by the upstream price being bargained over. Given that the products sold by the merging parties are inputs into a common tier of service—making them downstream complements—it is critical that this effect be incorporated in the analysis here.

Four stations in a given DMA would create proportionally more churn than would the blackout of just a single Big Four station,"[73] by which he presumably means that the combined effect of blacking out two stations would be more than the sum of two single blackouts, as that is the condition required for them to be substitutes. But he provides absolutely no support for this assertion. And there are strong reasons to believe it could go the other way. To the extent that Plaintiffs are right that broadcast networks are "must have," then losing one would already leave an MVPD quite weakened, and it is not clear how much more harm would come from losing two; it is surely not clear that the effect of losing two would be larger than the sum of two single blackouts. In any case, the answer to this question is subtle and an empirical issue that Professor Shapiro has not investigated, and likely to be swamped by the cord-cutting and pricing externalities—which create definite complementarities as described above.

57. Put simply, then, Professor Shapiro has no valid market definition and thus no concentration measures from which to argue for harm to competition, and his theory of bargaining leverage is, in my opinion, more likely to indicate a reduction in bargaining leverage post-merger and thus downward pricing pressure than upward pricing pressure.

**V.    Professor Shapiro's Market Definition Does Not Allow for an Assessment of the Effects of This Acquisition on Competition in Local News**

58. Professor Shapiro defines one relevant product market: the market for "Big Four Retransmission Consent." He does not define a relevant product market for local news. As such, Professor Shapiro has no framework with which to evaluate whether this acquisition will harm competition in local news.

59. Despite this, Professor Shapiro asserts that the acquisition "may lead to a reduction in the variety and quantity of local news available to viewers."[74] However, he provides no economic analysis at all on this point, certainly none that demonstrates that Nexstar after acquiring TEGNA will have the incentive to reduce the variety or quantity of local news. Professor Shapiro does not

---

[73]    Shapiro Declaration, ¶ 89.

[74]    Shapiro Declaration, ¶ 92.

even attempt to quantify "variety and quantity of local news,"[75] a necessary first step toward any economic analysis.

60.    Professor Shapiro also provides no economic analysis to support his suggestion that Nexstar "may [] combin[e] two newsrooms into one and reduc[e] news staff."[76]  And any such economic analysis must also consider whether such a consolidation of local news would have any procompetitive benefits, which Professor Shapiro likewise does not provide.  The consolidation of two news operations into one in the same DMA may allow the broadcaster to reach both stations' audience at lower cost.  These cost reductions would increase the marginal impact of every dollar invested into local news, as any increases in news programming or improvements in news quality will reach a broader audience (the combined audience of both stations).  With greater return on every dollar invested in news, the incentive to invest goes up.  Put simply, greater efficiency in news operations should be expected to both lower costs *and* increase quality and investment.  Professor Shapiro does not consider this possibility, instead *assuming* without any analysis that any potential consolidation in local news is detrimental to consumers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March, 2026 in Washington, D.C.

By:  _____Mark A. Israel_____

Mark A. Israel

---

75    Shapiro Declaration, ¶ 92.

76    Shapiro Declaration, ¶ 92.