+

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DIRECTV, LLC,

        Plaintiff,

     v.

NEXSTAR MEDIA GROUP, INC., et al.,

        Defendants.

No. 2:26-cv-00976-TLN-CKD

**ORDER**

This matter is before the Court on Plaintiff DIRECTV, LLC's ("DIRECTV" or "Plaintiff") Motion for Temporary Restraining Order ("TRO"). (ECF No. 14.) Defendants Nexstar Media Group, Inc. and TEGNA Inc. (collectively, "Defendants") filed an opposition. (ECF No. 48.) Plaintiff filed a reply. (ECF No. 56.) For the reasons set forth below, Plaintiff's motion is GRANTED and this Court issues a TRO requiring Defendants to hold TEGNA Inc. separate from Nexstar Media Group, Inc.

///

///

///

///

///

///

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

The instant action arises from Defendant Nexstar Media Group, Inc.'s ("Nexstar") allegedly unlawful acquisition of Defendant TEGNA, Inc. ("TEGNA").  (*See* ECF No. 1.) Nexstar is the largest owner of local broadcast television stations in the country.  (*Id.* at 3.) TEGNA is the second largest owner of local English-language television stations in the nation. (*Id.*)  Plaintiff asserts Nexstar's proposed merger with TEGNA will drive up the cost of television service to tens of millions of Americans, shutter local newsrooms around the country, substantially reduce competition in dozens of local markets, and harm consumers.  (*Id.*)

Plaintiff brings this action to enjoin the allegedly unlawful merger.  (*Id.*)  Plaintiff is a distributor that purchases, among other things, the rights to retransmit local television broadcast stations to its subscribers.  (*Id.*)  Plaintiff asserts Nexstar's purpose in acquiring TEGNA is to drive up the price it can extract from Plaintiff and other distributors, which will force them to raise prices on their subscribers.  (*Id.*)

Nexstar admits the merger will greatly increase its already huge "scale" and its "leverage," *i.e.*, the ability to force its TV distribution customers, including Plaintiff, to pay even higher fees for local news, live sports, and other content they distribute to their subscribers.  (*Id.*) Plaintiff alleges Nexstar will also shut down local newsrooms in dozens of markets, reducing the amount, variety, and quality of local broadcast news that Americans rely on for trusted information about their communities.  (*Id.*)  Plaintiff asserts those harms from reduced competition are precisely what antitrust laws are designed to prevent.  (*Id.*)

Despite the proliferation of video streaming services, Americans continue to depend heavily on local broadcast television for access to news about their communities, sporting events, and other local content.  (*Id.*)  Because broadcast content remains very valuable, the local broadcast television business collects more revenue from its broadcast rights than ever before. (*Id.*)

///

---

[1]    The following facts are taken largely verbatim from Plaintiff's Complaint and from its brief on the motion for TRO.  (*See* ECF Nos. 1, 14-1.)

Local Broadcast Stations

Almost every community has four local television stations that are affiliates of one of the "Big Four" national networks: ABC, CBS, FOX, and NBC. (ECF No. 14-1 at 9.) When separately owned, Big Four stations compete to provide the most entertaining, timely, and diverse content, including local news. (*Id.* at 10.) Each also offers live sports, national news, and prime-time entertainment programming provided by its affiliated national network. (*Id.*)

Nexstar is already the largest owner of local broadcast stations in the United States. (*Id.*) It owns 164 broadcast stations across 114 Designated Market Areas ("DMAs") — geographic regions used by the Federal Communications Commission ("FCC") to regulate broadcast licenses. (ECF No. 1 at 3–4; ECF No. 14-1 at 10.) Its stations already reach 70 percent of American households. (ECF No. 1 at 4.) In 14 DMAs, Nexstar owns two or three of the Big Four affiliates — referred to in the broadcast industry as Big Four "duopolies" or "triopolies." (ECF No. 14-1 at 10.) Nexstar has annual revenues of approximately $5.4 billion. (*Id.*) TEGNA, as the second-largest owner of broadcast stations, owns 64 local broadcast stations across 51 DMAs. (*Id.*; ECF No. 1 at 4.) TEGNA has a market capitalization of more than $3 billion and annual revenues at almost the same figure. (ECF No. 14-1 at 10; ECF No. 1 at 4.) TEGNA reached 40 percent of U.S. households in 2025. (ECF No. 14-1 at 10.)

Plaintiff asserts this merger would create a massive concentration of market power. (ECF No. 1 at 4.) The acquisition would give Nexstar control of 228 broadcast stations reaching 80 percent of television households in 132 local markets and increase concentration in more than a dozen local markets. (*Id.*) The acquisition would also give Nexstar control of additional Big Four stations in 31 local markets where it already owns one or more such stations, including 27 new duopolies and 3 new triopolies. (ECF No. 14-1 at 10.) Those DMAs include: San Diego, CA; Sacramento, CA; Denver-Aurora, CO; Charlotte, NC; St. Louis, MO; and Portland, OR. (*Id.*) The enormous increase in market power will enable Nexstar to raise prices and reduce the amount, variety, and quality of local news without having to worry about losing business to competition. (ECF No. 1 at 4.)

3

Retransmission Consent Fees

Nexstar and TEGNA's stations operate under licenses to broadcast signals over airwaves that are owned by the American people. (*Id.*) Big Four affiliates sell multi-channel video programming distributors ("MVPDs") like Plaintiff the rights to retransmit their content to viewers. (*Id.*) Plaintiff and other MVPDs must buy those rights to retransmit broadcast content as part of the pay TV packages they offer to subscribers. (*Id.*) Since 2010, retransmission license fees charged by broadcasters have increased more than 2,000 percent. (*Id.* at 5.) Any increase in retransmission fees raises MVPDs' programming costs and in turn results in higher prices for TV subscribers. (*Id.*)

This merger will enable Nexstar to increase license fees further, resulting in even higher prices for Plaintiff and its subscribers. (*Id.*) Nexstar has a "Consolidation Playbook" that describes acquisitions as a way to gain "scale" and "leverage," with the ultimate aim of raising prices. (*Id.*) Nexstar would gain leverage from this merger not only by significantly increasing the number of stations it owns, from 164 to 228 local stations, but also by acquiring Big Four affiliates in 31 local markets where it owns at least one Big Four affiliate already. (*Id.*)

A key source of Nexstar's leverage is the ability to threaten and impose blackouts. (*Id.*) When Plaintiff or any other MVPD refuses to agree to the increased fees Nexstar demands, Nexstar will black out its stations or threaten to do so as a means of coercing the MVPD to agree to its pricing demands. (*Id.*) That threat leaves distributors with two bad options: acquiesce to Nexstar's higher fees or lose access to these stations, thereby blocking the MVPD's subscribers from accessing the content carried on the blacked-out stations and driving some consumers to switch to other distributors' services where they can find that same content. (*Id.*)

Blackouts of Big Four networks cause MVPDs significant harm because they can cause subscribers to leave the blacked out MVPD for another provider, and in many cases they don't come back. (*Id.*) On the other hand, Nexstar suffers relatively limited harm in a blackout because many subscribers who leave a blacked out MVPD switch to another distributor that is paying Nexstar. (*Id.*) Thus, in any blackout, Nexstar has far less to lose than Plaintiff or other MVPDs. (*Id.*)

The merger would make Nexstar's Big Four blackout threats even more coercive. (*Id.*) Once Nexstar owns not just one but two or even three Big Four affiliates in a local market — the situation this merger will create in 31 local markets nationwide — any MVPD that refuses Nexstar's demands will risk leaving its subscribers in that area without multiple sources of live sports and local news, and potentially unable to watch any NFL games on Sunday afternoons, for example. (*Id.*) That will make subscribers even more likely to switch to another distributor that is still paying for Nexstar's stations. (*Id.* at 5–6.) In short, by making blackouts even more painful for distributors like DIRECT, the merger will make it even harder for them to resist Nexstar's demands for higher prices. (*Id.* at 6.)

Local News

Local stations compete to offer original, high-quality local news coverage. (ECF No. 14-1 at 11.) They compete to hire the best on-air talent, from news anchors and meteorologists to reporters and correspondents. (*Id.*) They compete to offer the most compelling editorial perspective, selecting which news stories to cover and how to cover them. (*Id.*) They also compete to be the first to break stories that will matter to their viewers, from local political corruption to public safety. (*Id.*)

When Nexstar or TEGNA creates a Big Four duopoly or triopoly, this competition is eliminated. (*Id.*) In DMAs where Nexstar or TEGNA has a Big Four duopoly, it is common practice for both stations to have a single news director, share news talent and journalist teams, operate a single news website, and "simulcast" the same programming. (*Id.*) Plaintiff asserts this is Nexstar's strategy, as Nexstar has admitted that after buying TEGNA it will "[o]perate multiple stations with one infrastructure," *i.e.*, turn two newsrooms into one in the overlap markets, which it can do at any time now that the transaction has closed. (*Id.* at 12.)

The Merger

On March 19, 2026, the U.S. Department of Justice ("U.S. DOJ") terminated its antitrust review and the FCC approved Defendants' application for broadcast license transfers — not through a full, public Commission vote but through its Media Bureau (which acts under the FCC Chairman's discretion). (*Id.* at 13.) Immediately thereafter, effective March 19, 2026, Nexstar

acquired TEGNA, its assets, and the power to exercise control over them (the "Transaction"). (*Id.*) This includes, but is not limited to: (i) consolidating operations, such as closing newsrooms and laying off reporters in any market where it now owns two or more Big Four stations because of the merger; (ii) accessing TEGNA's competitively sensitive information and using that information to inform its negotiation and pricing strategy for retransmission consent fees; and (iii) terminating TEGNA's senior leadership. (*Id.*) Once undertaken, these actions would be extremely difficult to undo. (*Id.*)

On March 18, 2026, Plaintiff filed this action seeking to enjoin the Nexstar-TEGNA merger pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18. (*See id.*) On March 20, 2026, Plaintiff filed the instant motion for TRO. (ECF No. 14.)

**II.    STANDARD OF LAW**

A TRO is an extraordinary remedy. The purpose of a TRO is to preserve the status quo pending a fuller hearing. *See* Fed. R. Civ. P. 65. In general, "[t]emporary restraining orders are governed by the same standard applicable to preliminary injunctions." *Aiello v. One West Bank*, No. 2:10-cv-0227-GEB-EFB, 2010 WL 406092, at *1 (E.D. Cal. Jan. 29, 2010) (internal citations omitted); *see also* E.D. Cal. L.R. 231(a).

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Costa Mesa City Emps. Ass'n v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a trial."); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell (Alliance)*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id*. A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. Simply put, a plaintiff must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in the plaintiff's favor in order to succeed in a request for preliminary injunction. *Id*. at 1134–35.

**III.    ANALYSIS**

The Court considers each of the *Winter* elements with respect to Plaintiff's motion.

**A.    Likelihood of Success on the Merits**

Plaintiff alleges "Nexstar's proposed acquisition of TEGNA would substantially and irreversibly lessen competition in interstate trade and commerce for retransmission consent licenses for broadcast stations affiliated with the Big Four networks in dozens of DMAs across the country, in violation of [§] 7 of the Clayton Act, 15 U.S.C. § 18." (ECF No. 1 at 38.)

Section 7 of the Clayton Act prohibits mergers where "the effect of such acquisition . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Analysis of the effects of such acquisitions is focused on "probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). "[W]hether the effect of the merger 'may be substantially to lessen competition' in the relevant market . . . requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future," as § 7 is "intended to arrest anticompetitive tendencies in their 'incipiency.'" *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963) (citing *Brown Shoe Co.*, 370 U.S. at 317, 322). "Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the

Clayton Act." *St. Alphonsus Medical Ctr.-Nampa Inc. v. St. Luke's Health System, Ltd.* (*St. Alphonsus*), 778 F.3d 775, 783 (9th Cir. 2015) (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974)).  The Court will first determine the relevant product and geographic markets and then evaluate whether the merger violates the Clayton Act.

i.      The Relevant Markets

a)      Product Market

A relevant product market "consists of what customers consider to be reasonable substitutes for a company's products." *Federal Trade Comm'n v. Kroger Co.* (*Kroger Co.*), No. 3:24-cv-00347-AN, 2024 WL 5053016, at *6 (D. Or. Dec. 10, 2024); *see also Brown Shoe*, 370 U.S. at 325 (a relevant product market under § 7 is defined as "reasonable interchangeability of use . . . between the product itself and substitutes for it").  A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).

Here, Plaintiff states the relevant product market is retransmission consent licenses for Big Four broadcasting stations — the sellers are broadcast stations like Nexstar and TEGNA that have licenses to transmit Big Four broadcast signals, and the customers are MVPDs that negotiate for retransmission consent licenses to distribute programming to subscribers.  (ECF No. 14-1 at 17–18.)  Plaintiff alleges MVPDs do not have reasonable substitutes for Big Four stations.  (ECF No. 1 at 16.)  The Court finds persuasive Plaintiff's contention that licenses to retransmit Big Four broadcast content are not reasonably interchangeable with licenses to any other stations because MVPDs cannot obtain the combination of local news and live sports that their customers demand anywhere else.  (*Id.*)  Plaintiff cites to a U.S. DOJ Competitive Impact Statement that states: "Big Four stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly-ranked primetime programs."  (ECF No. 14-1 at 18 (quoting U.S. DOJ Competitive Impact Statement at 4, *United States v. Gray Television, Inc.*, No. 21-CV-02041 (D.D.C. July 28, 2021), https://www.justice.gov/atr/case-document/file/1418276/dl ("U.S. DOJ Competitive Impact

8

Statement")).)  The U.S. DOJ Competitive Impact Statement also notes these offerings give "Big Four broadcast content" a "special appeal to television viewers."[2]  (*Id.*)

Plaintiff notes that in the event of a blackout of a Big Four station in a particular DMA, consumers are far more likely to switch to another Big Four station for live sports and local news than to a non-Big Four broadcast station or to cable programming.  (*Id.*)  Plaintiff alleges licenses to non-Big Four broadcast stations (such as The CW, PBS, or Telemundo) are not reasonably close substitutes because they do not offer network primetime programming (such as regular season NFL games or college football which are among the most popular content for pay TV subscribers).  (ECF No. 1 at 16–17.)  Instead, non-Big Four broadcast stations offer niche or foreign language content that appeals only to a fraction of pay TV subscribers.  (*Id.* at 17.)  Plaintiff alleges licenses for cable programming are also not reasonably close substitutes because "cable networks offer different content than Big Four stations" and they "generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big Four stations."  (*Id.* (citing U.S. DOJ Competitive Impact Statement).)

Finally, other than stating "Plaintiff relies on thin and contradictory allegations in its attempt to define a relevant market," Defendants do not offer any substantive opposition to Plaintiff's definition of the relevant product market as retransmission consent licenses for Big Four broadcasting stations.  (ECF No. 48 at 17.)

Based on the foregoing, the Court finds retransmission consent licenses for Big Four broadcasting stations is the relevant product market.

b)      *Geographic Market*

"The relevant geographic market is the 'area of effective competition where buyers can turn for alternate sources of supply.'"  *St. Alphonsus*, 778 F.3d at 784 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.3d 1484, 1490 (9th Cir. 1991)).  In other words, "a

---

[2]      Defendants assert U.S. DOJ's prior statements are irrelevant because U.S. DOJ cleared this deal.  (ECF No. 48 at 16.)  The Court disagrees.  Simply because U.S. DOJ cleared this deal does not necessarily render its past statements on Big Four stations and the unique offerings of local broadcast stations irrelevant.  Indeed, Defendants offer no other substantive arguments or evidence to render these statements untrue.  (*See id.*)

market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Id.* A plaintiff has the burden to establish the relevant geographic market. *Id.*

Here, Plaintiff asserts the relevant geographic markets are DMAs, which federal law uses to regulate broadcast stations. (ECF No. 14-1 at 17.) Plaintiff notes that MVPDs cannot turn to stations outside of a DMA to replace blacked out stations, as FCC regulations, federal law, and network-affiliate agreements largely prohibit MVPDs from distributing broadcast stations outside of the local DMA where that station is licensed. (*Id.* at 19.) The U.S. DOJ has explained: "MVPD subscribers in one DMA cannot switch to Big Four programming in another DMA in the face of a blackout. Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA." (*Id.* at 20.) Plaintiff alleges both Nexstar and TEGNA have recognized local DMAs are geographic areas relevant to their broadcast businesses, as Nexstar's filings with the U.S. Securities and Exchange Commission ("SEC") describe DMAs as "markets" and TEGNA claims it owns "64 television stations in 51 U.S. markets," corresponding to 51 DMAs. (*Id.*)

In opposition, Defendants appear to contest Plaintiff's definition of the geographic market. (ECF No. 48 at 17.) Defendants argue Plaintiff acknowledges broadcast groups and MVPDs negotiate license that cover all stations nationwide and have a common price for each similar station covered by the agreements, regardless of location. (*Id.*) However, Plaintiff is correct that U.S. DOJ "has defined local markets because retransmissions are limited to local areas: 'FCC rules generally prohibit an MVPD from importing the same network's content from another DMA,' so viewers in one DMA cannot switch to Big [Four] programming in another DMA in the face of a blackout.'" (ECF No. 56 at 8.) Defendants do not adequately rebut this argument. Further, Defendants contend Plaintiff's claim that increases in concentration in specific DMAs will lead to higher retransmission consent fees makes no economic sense. (ECF No. 48 at 17.) However, this argument still does not contest Plaintiff's definition of relevant product market as retransmission consent licenses for Big Four broadcasting stations. (*Id.*)

///

10

Based on the foregoing, the Court agrees with Plaintiff that DMAs are the relevant geographic market.

### ii. Whether the Merger Violates the Clayton Act

The Ninth Circuit has adopted a burden-shifting framework to assess § 7 claims. *St. Alphonsus*, 778 F.3d at 783. Under this framework, "the plaintiff must first establish a prima facie case that a merger is anticompetitive." *Id.* Next, the burden shifts to the defendant to rebut the prima facie case. *Id.* If the defendant successfully rebuts the prima facie case, "the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion[.]" *Id.* The Court will consider each stage of this burden-shifting framework in turn.

### a) Plaintiff's Prima Facie Case

A plaintiff can establish a prima facie case if a plaintiff "proves that the merger will probably lead to anticompetitive effects in that [geographic] market." *Id.* at 785. To prevail, a plaintiff need only demonstrate the merger creates a "reasonable probability of anticompetitive effect." *Federal Trade Comm'n v. Warner Comm'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984). Further, the Supreme Court has held a merger that would result in "a significant increase in the concentration of firms in that market" establishes a presumption that the merger "*is so inherently likely to lessen competition substantially that it must be enjoined* in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Philadelphia Nat'l Bank*, 374 U.S. at 363 (emphasis added); *Kroger Co.*, 2024 WL 5053016, at *15. "A prima facie case can be established simply by showing high market share." *St. Alphonsus*, 778 F.3d at 785. Courts use two metrics to establish high market share — combined firm market share and the Herfindahl-Hirschman Index ("HHI"). The Court will consider each metric in turn and then evaluate Plaintiff's arguments on anticompetitive effects.

### I. Combined Firm Market Share

The Supreme Court has found that a merger that creates a firm with a combined market share of 30 percent or more is presumed likely to violate the antitrust laws. *Philadelphia Nat'l Bank*, 374 U.S. at 364. ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

Plaintiff cites to its attached declaration of Dr. Carl Shapiro, Professor of Economics at UC Berkeley and former Deputy Assistant Attorney General for Economics at U.S. DOJ. (ECF No. 14-1 at 16.) Dr. Shapiro notes the merger will give Nexstar a 30 percent market share or greater in 31 local markets and, in 16 of these 31 local markets, Nexstar's post-merger market share exceeds 50 percent. (ECF No. 14-3 at 23–24.) Defendants do not provide any substantive opposition to this argument. (*See* ECF No. 48.) Accordingly, Plaintiff establishes the proposed merger is presumed likely to violate antitrust laws based on the combined firm market share alone. *See Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1021 (9th Cir. 2016) (a "prima facie case can be established simply by showing" that such "a high market share would result from the proposed merger").

## II.    Herfindahl-Hirschman Index

HHI is "calculated by summing the squares of the individual firms' market shares," which "gives proportionally greater weight to the larger market shares." *St. Alphonsus*, 778 F.3d at 786 (citing *ProMedica Health Sys., Inc. v. Federal Trade Comm'n*, 749 F.3d 559, 568 (6th Cir. 2014); *Federal Trade Comm'n v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001)). This analysis considers "both the post-merger level of the HHI and the increase in the HHI resulting from the merger." *Id.* The U.S. DOJ and Federal Trade Commission ("FTC") *Merger Guidelines* classify markets as (1) unconcentrated (HHI below 1500), (2) moderately concentrated (HHI between 1500 and 2500), and (3) highly concentrated (HHI above 2500). *Id.* "Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power.'" *Id.* (quoting *Merger Guidelines* § 5.3). "Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive." *Id.* Here, Dr. Shapiro notes in his declaration that the merger increases market concentration by more than 1,000 points. (ECF No. 14-3 at 23–24.) Dr. Shapiro states: "[T]he combined share of Nexstar and TEGNA ranges from 30.0% to 84.8%. The post-merger HHIs range from 3,361 to 7,422. The increase in the HHI ranges from 413 to 3,433. In all 31 overlap markets these metrics are far above the levels that trigger the structural presumption of harm to competition found in the Merger Guidelines." (*Id.* at 23.) As Plaintiff notes, courts have found such mergers unlawful when they

12

increase market concentration by far smaller amounts." (ECF No. 14-1 at 17 (citing *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (HHI increase of approximately 400 points); *H.J. Heinz Co.*, 246 F.3d at 716 (HHI increase of 510 points); *Federal Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022) (HHI increase of 841 points)).) Again, Defendants do not provide any substantive opposition to this argument. (*See* ECF No. 48.) Accordingly, Plaintiff also establishes the proposed merger is presumed likely to violate antitrust laws based on HHI.

*III.     Anti-Competitive Effects*

Plaintiffs argue the Transaction will lead to higher prices for Plaintiff and its subscribers and will harm competition for local news, reducing the quality of the content Plaintiff licenses. (ECF No. 14-1 at 21–22.) The Court will consider each of these arguments in turn.

First, Plaintiff argues the Transaction will give Nexstar additional Big Four networks in 31 DMAs in which it already has at least one Big Four network and thereby increase Nexstar's bargaining leverage to impose higher fees. (*Id.* at 21.) Plaintiff asserts that Nexstar will be able to black out two or three local broadcast channels in 31 DMAs, and such a blackout will be disruptive, affect more of Plaintiff's subscribers, and increase the number of subscribers who switch to another MVPD. (*Id.*) Plaintiff notes the harm is not theoretical, as Nexstar already has Big Four duopolies and has used blackouts "to secure huge increases in retransmission fees from [Plaintiff]." (*Id.*) In opposition, Defendants contend Plaintiff does not cite to evidence that this increase in retransmission fees is attributable to an increase in Big Four station ownership.[3] (ECF No. 48 at 18.) Defendants assert "many MVPD alternatives that have become available to consumers in the last five years" has resulted in "cord-cutting" and created a "downward pressure on retransmission rates." (*Id.*)

The Court ultimately finds Plaintiff's arguments persuasive. As Plaintiff notes, courts

---

[3]     Defendants also argue the "actual or alleged harm to customers and consumers outside the relevant markets are beyond the scope of antitrust law." (ECF No. 48 at 19 (quoting *Federal Trade Comm'n v. Qualcomm*, 969 F.3d 974, 993 (9th Cir. 2020)).) Accordingly, the Court declines at this juncture to recognize the harm "based on alleged downstream effects in a separate market where [Plaintiff] is a seller — in the retail market for video programming services[.]" (*Id.*)

13

faced with the § 7 inquiry have found that "a merger would have anticompetitive effects where it would increase the merging parties' bargaining leverage." (ECF No. 14-1 at 21 (citing *St. Alphonsus*, 778 F.3d at 786–87 (affirming the district court finding that entity would use its post-merger bargaining power to negotiate higher rates).)  Here, Defendants do not contest this merger will increase Nexstar's bargaining leverage to extract higher fees.  Indeed, as Plaintiff notes, Nexstar's "Consolidation Playbook" for investors says that acquisitions give Nexstar "scale" so it can "[b]enefit from leverage." (ECF No. 56 at 6 (citing ECF No. 14-45 at 23).)  Further, the Court finds particularly persuasive Plaintiff's assertion that despite Defendants' claim the rise of streaming services and "cord-cutting" will create a downward pressure on retransmission rates, Nexstar's CEO Perry Sook recently told investors the opposite: "Historically we've been able to outrun the rate of attrition by those rate increases and deliver positive growth in net retrains growth.  And we think that, again, we'll see a continuation of that trend." (ECF No. 56 at 6–7 (citing ECF No. 14-47 at 12).)  The Declaration of Dr. Carl Shapiro attached to Plaintiff's motion also notes that as streaming services and YouTubeTV have grown, broadcasters' fees have continued to rise.  Dr. Shapiro states:

> In particular, Big Four Retransmission Fees have risen sharply even as streaming services have become far more popular [in] recent years.  In 2019, the average Retransmission Fee paid by an MVPD for all Big Four stations together was $9.64 PSPM[4].  By 2025, it had grown to $19.30 PSPM.  Thus, the average annual growth rate in PSPM Retransmission Fees that MVPDs paid for the Big Four stations over the six-year period between 2019 and 2025 was more than 12%.  During this same period of time, the average annual growth rate of the Consumer Price Index was only 4.0%.

(ECF No. 14-3 at 19 (citations omitted).)

Second, Plaintiff argues the Transaction will reduce the output, variety, and quality of local broadcast news that is licensed. (ECF No. 14-1 at 22.)  In opposition, Defendants assert this is a "speculative claim" that is "unsupported and irrelevant," as the FCC Order commits Nexstar to expanding local journalism and programming as it has done after prior deals. (ECF No. 48 at 7.)  Defendants note that it does not make sense for Nexstar to degrade "its own product in such a

---

[4]   Dr. Shapiro notes that PSPM is a "per-subscriber, per-month" fee the MVPD pays to the owner of a broadcast station. (ECF No. 14-3 at 7.)

14

competitive media environment" and it contradicts the "company's history of expanding news and local content and requires speculation that Nexstar would violate its commitments under the FCC Order."  (*Id.* at 16.)

Here again, the Court ultimately finds Plaintiff's arguments persuasive.  Plaintiff cites to Nexstar's CFO's statement in which he told investors "the synergy playbook [in the TEGNA transaction] is really the same" as Nexstar's past deals and that where Nexstar and TEGNA stations "overlap" is "where we can really operate 2 stations off of [] 1 infrastructure."  (ECF No. 14-1 at 23 (quoting ECF No. 14-52 at 7; ECF No. 14-47 at 7).)  The Nexstar CFO also points to "facility consolidation" and notes that where TEGNA owns their station and Nexstar owns its station, "we can move these groups together and then execute on the sale of 1 of the properties[.]" (ECF No. 14-47 at 8.)  Defendants also do not contest Plaintiff's assertion that in the 16 DMAs in which Nexstar or TEGNA has a Big Four duopoly or triopoly, they appoint a single news director to oversee a single newsroom and use the same on-air talent for all Big Four channels they own in the DMA.  (ECF No. 14-1 at 23.)  Finally, the Statement of FCC Commissioner Anna M. Gomez in consideration of the Nexstar-TEGNA merger is telling.  Commissioner Gomez notes: "The claim that media consolidation will lead to more local news is belied by history as submitted by DirecTV in the record of this proceeding.  In short, history shows that media consolidation leads to commonly owned stations sharing common news website[s] and content, common news leadership, and common news talent."  (ECF No. 56-3 at 5 (internal citations and quotations omitted).)

### b) Defendants' Rebuttal

After a plaintiff establishes its prima facie case, "[t]he burden then shifts to the defendants to rebut the presumption." *Kroger Co.*, 2024 WL 5053016, at *2.  "The more compelling the prima facie case, the more evidence the defendant[s] must present to rebut it successfully." *Id.* (internal citation omitted).  "Defendants 'may rebut that presumption by showing that the traditional economic theories of the competitive effects of market concentration are not an accurate indicator of the merger's probable effect on competition or that the procompetitive effects of the merger are likely to outweigh any potential anticompetitive effects." *Id.* at *20

(quoting *Sysco Corp.*, 113 F. Supp. 3d at 72).

Defendants appear to advance three primary arguments on rebuttal: (1) Plaintiff's anecdote about a broadcaster being able to negotiate an increase in retransmission rates paid by Plaintiff includes no evidence the increase is attributable to an increase in Big Four station ownership; (2) Plaintiff's assertion that it will not be able to restore loss of goodwill due to potential blackouts is false because Plaintiff has continued to operate during blackouts and it carries network programming on its streaming product; and (3) Plaintiff cannot base its claim on hypothetical harm it might suffer in downstream effects in a separate market where it is a seller of programming services to consumers. (ECF No. 48 at 18–20.)

The Court already addresses Defendants' first and third arguments above. To reiterate briefly, Plaintiff offers sufficient evidence to contradict Defendants' first argument. With respect to the third argument, the Court declines at this juncture to recognize the harm based on a separate downstream consumer market where Plaintiff is a seller. Finally, Plaintiff does not appear to contradict Defendants' second argument in its reply. (*See* ECF No. 56.) However, even assuming the truth of Defendants' second argument, that alone is insufficient to rebut Plaintiff's prima facie case, especially in light of the evidence Plaintiff presents on high market share.

Therefore, the Court finds Defendants' rebuttal evidence is insufficient to overcome Plaintiff's prima facie case. Plaintiff establishes "a reasonable probability of anticompetitive effect" in the market. *See Warner Comm'ns Inc.*, 742 F.2d at 1160. Plaintiff further sufficiently establishes its prima facie case "by showing high market share." *See St. Alphonsus*, 778 F.3d at 785. Accordingly, Plaintiff establishes a likelihood of success on the merits of its § 7 claim.

### B.    Irreparable Harm

Plaintiff argues absent a hold-separate order, Nexstar will fully absorb TEGNA and eliminate the companies' head-to-head competition in the 31 overlap markets. (ECF No. 14-1 at 25.) Plaintiff asserts it will suffer irreparable harm from significantly diminished bargaining power vis-à-vis Nexstar in retransmission consent negotiations. (*Id.*) Plaintiff contends it will soon find itself negotiating for access to highly sought after content, including Big Four sports

and local news broadcasts, with a merged firm that intends to threaten blackouts doubling or even tripling their present danger.[5]  (*Id.*)

In opposition, Defendants argue Plaintiff cannot establish immediate, irreparable harm because: (1) Nexstar's current retransmission rates to companies with expiring contracts like Plaintiff will not change until at least December 1, 2026; (2) Plaintiff's claim the Transaction will give it diminished bargaining power is a "speculative injury" based on theoretical price outcomes in future negotiations that is not sufficient to warrant a TRO; and (3) Plaintiff does not allege or demonstrate Nexstar will in fact increase retransmission fees and the FCC and U.S. DOJ found no concerns on this point.  (ECF No. 48 at 13–16.)

The Ninth Circuit has held that "[a] lessening of competition constitutes an irreparable injury under [its] case law."  *Boardman*, 822 F.3d at 1023.  Because Plaintiff establishes the Nexstar-TEGNA merger will substantially lessen competition in markets in which it participates, it has shown irreparable harm for a TRO.  (ECF No. 14-1 at 24.)  The Court also does not find Defendants' arguments persuasive.  First, the Court agrees with Plaintiff that Nexstar's commitment to extend its own existing retransmission consent contracts until November 2026 does not remedy this irreparable harm.  (ECF No. 56 at 5.)  Second, as stated above, the Transaction increases Defendants' bargaining leverage.  This necessarily means Plaintiff has reduced bargaining leverage, which is not merely "speculative" in light of this irreparable harm.  Third, although Plaintiff does not demonstrate Nexstar *will in fact* raise retransmission fees, Plaintiff sets forth sufficient evidence to show Nexstar's intention is to increase its bargaining power leverage.  Owners of broadcast stations like Nexstar and TEGNA negotiate with MVPDs like Plaintiff to sell retransmission consent licenses for Big Four broadcast stations.  Presumably, the bargaining power leverage is related to its ability to conduct business with MVPDs like

---

[5]  Plaintiff also argues it will suffer irreparable harm in the form of losing customer goodwill it has spent decades establishing, as Plaintiff will ultimately be forced to raise its prices when Nexstar blacks out broadcasts, and such a loss in revenue from losing subscribers is difficult to measure with the precision monetary damages require.  (ECF No. 14-1 at 26.)  However, as stated previously, the Court declines at this juncture to consider the harm based on a separate downstream consumer market where Plaintiff is a seller.  Accordingly, the Court does not consider these arguments on irreparable harm at this time.

17

Plaintiff — and ultimately, to raise rates.

Based on the foregoing, the Court finds Plaintiff sufficiently establishes irreparable harm in the absence of a TRO.

### C.   Public Interest

Plaintiff asserts that "[b]y enacting [§] 7, Congress declared that the preservation of competition is always in the public interest." (ECF No. 14-1 at 26 (quoting *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB (PJWx), 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016)). Plaintiff maintains that because the Transaction is likely to result in significant anticompetitive effects in local markets across the country and "the public interest in preserving the possibility of a successful divestiture is quite strong," the public interest sharply favors a TRO. (*Id.* at 27 (quoting *United States v. Acorn Eng'g Co.*, No. C 80-3388 TEH, 1981 WL 2112, at *3 (N.D. Cal. June 18, 1981)).)

In opposition, Defendants argue a TRO would harm the public interest because: it would create a conflict with the FCC Order that requires Nexstar to expand and increase its investment in local news; deprive Nexstar's communities of the benefits the FCC found to be in the public interest because it will be less able to invest in local programming and local coverage that benefits viewers; and undermine congressional intent because the FCC, in its role as a regulator, has already cleared the Transaction. (ECF No. 48 at 21–23.)

Again, the Court does not find Defendants' arguments persuasive. First, Defendants do not adequately explain why a hold-separate order would prevent Nexstar or TEGNA from expanding and increasing its investment in local news or prevent it from investing in local programming and local coverage. Second, congressional intent will not be undermined simply because the FCC has cleared this transaction. As Plaintiff correctly notes, the FCC was "not given the power to decided antitrust issues" and FCC action "was not intended to prevent enforcement of the antitrust laws in federal courts." (ECF No. 56 at 8); *United States v. Radio Corp. of Am.*, 358 U.S. 334, 346 (1959). A court order to enforce antitrust laws, therefore, would not undermine congressional intent in regulation of the broadcast industry.

///

18

The Ninth Circuit has noted "the central purpose of the antitrust laws, state and federal, is to preserve competition" and "[i]t is competition . . . that [the antitrust laws] recognize as vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *see also Boardman*, 822 F.3d at 1023–24 (affirming district court injunction was in the public interest where merger "could substantially lessen competition"). Because Plaintiff raises serious questions on the merits of its § 7 claim, the Court ultimately finds the public interest favors a hold-separate order.

### D.     Balance of Equities

A court balancing the equities will look to possible harm that could befall either party. *See CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

Plaintiff asserts the TRO seeks to preserve the status quo and ensure efficacy of any divestiture remedy by requiring Nexstar and TEGNA to continue to compete while the Court evaluates the proposed merger. (ECF No. 14-1 at 27.) Plaintiff maintains private benefits to Nexstar are "easily outweighed" by the irreparable harm to Plaintiff and the public interest in maintaining robust competition. (*Id.*) In opposition, Defendants argue the balance of equities favors Nexstar because a TRO would "impose significant burden" in the form of irreparable operational, financial, and competitive harm if it were forced to hold TEGNA separate. (ECF No. 48 at 23.) Defendants contend a hold-separate order would prevent Nexstar from effectuating plans designed to result in cost savings and efficiencies, impede coordination on key business functions, create uncertainty regarding the company's operations and strategic direction, and force the company not to implement its commitments under the FCC Order. (ECF No. 48 at 24.)

Here, the Court agrees with Plaintiff that Defendants' integration efforts are exactly those that would make it more difficult to divest TEGNA stations, eliminate competition, and result in newsroom layoffs and shutdowns. (*See* ECF No. 56 at 10.) The Court also notes Plaintiff filed the instant suit prior to Defendants' consummation of the Transaction. Accordingly, Defendants could have waited to complete the acquisition until after this Court's ruling on Plaintiff's claims.

19

Therefore, especially in light of the fact that Plaintiff raises a likelihood of success on the merits of its § 7 claim, the Court agrees with Plaintiff that the private benefits Nexstar could obtain by acquiring TEGNA are outweighed by the harm to Plaintiff. (ECF No. 14-1 at 27.) Finally, Plaintiff also notes that Nexstar is not unfamiliar with hold-separate orders, as Nexstar agreed to hold-separate agreements as a part of its prior acquisitions in 2014, 2016, and 2019. (*Id.*) For these reasons, the Court finds the balance of equities sufficiently tips in Plaintiff's favor.

E.      Undue Delay

Defendants finally argue Plaintiff has unduly delayed in seeking the instant TRO, as it has known about the Transaction since August 2025 and has had an opportunity to express its views to the FCC, which addressed Plaintiff's views in the FCC Order. (ECF No. 48 at 24–25.) Defendants contend courts have denied relief where plaintiffs failed to exercise "proper diligence" and delayed in filing suit challenging a merger. (*Id.* at 24 (citing *Antoine L. Garabet M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1172–73 (C.D. Cal. 2000); *Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1124 (N.D. Cal. 2011)).)

In reply, Plaintiff insists it did what market participants are supposed to do in such a merger — it engaged with the agencies responsible for investigation and evaluating the transaction and some courts have even held a private lawsuit challenging a merger is not ripe before regulators have completed their review. (ECF No. 56 at 11.) Plaintiff maintains the case law Defendants cite is factually distinguishable from the instant matter. (*Id.*)

Here, courts have indeed found that where federal regulators are still in the process of reviewing a merger, a lawsuit by private plaintiffs is likely to be dismissed or stayed on ripeness grounds. *See Whalen v. Albertsons Cos. Inc.*, No. 23-cv-00459-VC, 2023 WL 4955141, at *1 (N.D. Cal. Aug. 2, 2023) ("[T]he Federal Trade Commission is currently in the process of reviewing the merger, and the companies may agree to changes as a condition of the Commission's approval" and therefore, "it would be premature to adjudicate the antitrust claims[.]"); *S. Austin Coalition Cmty. Council v. SBC Comm'ns Inc.*, 191 F.3d 842, 844 – 45 (7th Cir. 1999) ("Courts often wait for agencies, even when the agencies' views are not legally conclusive — not only because the agencies may have something helpful to say, but also

20

because what the agencies *do* may shape the litigation." (emphasis in original)). The parties do not dispute that the FCC and DOJ cleared the deal on March 19, 2026 (*see* ECF No. 14-1 at 9; ECF No. 48 at 11; ECF No. 48-2), *one day* after Plaintiff filed the instant suit.

Further, the Court finds *Garabet* and *Taleff* are factually distinguishable from the instant matter. In *Garabet*, the court noted the doctrine of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." 116 F. Supp. 2d at 1172. Applying this standard, the court concluded the plaintiffs were on notice of the merger months before it was consummated but took no significant action prior to its consummation, plaintiffs did not provide evidence they participated in the FTC investigation of the proposed merger, plaintiffs did not argue their lack of diligence might be excused by a desire to wait for the outcome of the FTC investigation, and plaintiffs filed suit the day of the merger's consummation. *Id.* at 1172–73. Similarly, in *Taleff*, the plaintiffs filed suit after defendants' merger had been consummated and did not participate in any investigation. 828 F. Supp. 2d at 1124. Here, as established above, Plaintiff was awaiting outcome of FCC and DOJ review as it participated in both investigations, filed the instant suit before the merger closed, and filed the instant motion just after Defendants consummated the merger.

Accordingly, because Plaintiff adequately "make[s] a showing on all four prongs" of the *Winter* test, *Alliance*, 632 F.3d at 1135, the Court GRANTS Plaintiff's motion for TRO. The Court therefore issues a hold-separate order maintaining the status quo ante litem.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order (ECF No. 14) is GRANTED. The Court further ORDERS as follows:

1. Defendants and all of their respective agents, employees, or attorneys, shall be and hereby are restrained and enjoined from all actions relating to integration and consolidation of Nexstar and TEGNA until the time of the issuance of the Notice of Electronic Filing (NEF) on the fourteenth (14th) day after this Order issues or further order of this Court. Defendants must immediately cease all ongoing actions relating to integration and consolidation of Nexstar and TEGNA. To the extent that it is impossible to immediately

21

cease any particular actions, Defendants shall immediately notify the Court of any such actions and provide a proposal as to how to cease those actions or otherwise perform them in a manner that complies with the other provisions of this Order; A copy of this Order shall be furnished by Defendants to each of their directors and officers;

2. Nexstar must permit TEGNA to continue operating as a separate and distinct, independently managed business unit from Nexstar, and Nexstar must put measures in place to maintain TEGNA as an ongoing, economically viable, and active competitor. TEGNA shall have separate management that operates TEGNA in the ordinary course consistent with pre-closing practices;

3. Nexstar must immediately put in place internal controls and procedures to prevent the sharing of competitively sensitive information, including any information related to retransmission consent fee negotiations, between Nexstar and TEGNA, which may include erecting firewalls, providing instructions to employees and contractors, and issuing a corporate policy;

4. Nexstar must not influence the management of the held-separate TEGNA business unit. TEGNA personnel must maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations, newsroom personnel, operations and programming, product and service offerings, product development, advertisement sales, and personnel. Nexstar must not hire, terminate, transfer, or otherwise alter the terms of employment of any TEGNA officers or employees;

5. Nexstar must hold separate all assets, rights, and licenses acquired as a result of the Transaction. All assets held by TEGNA or its direct or indirect subsidiaries at the time of consummation should be maintained within TEGNA and must not be transferred to any other entity, including any Nexstar affiliate other than TEGNA or one of its pre-existing direct or indirect subsidiaries;

6. Defendants shall take all steps necessary to ensure that (a) the local television broadcast stations owned by TEGNA immediately prior to the Transaction (the "Acquired Stations") will be maintained and operated as independent, ongoing, economically viable, and active

competitors in the business of licensing retransmission consent to MVPDs; (b) each of Nexstar and the held-separate TEGNA business unit will not influence the management of the stations owned by the other entity immediately prior to the Transaction; and (c) the books, records, competitively sensitive sales, marketing and pricing information, and decision making concerning the production, distribution, provision, or sale of products or services by or under any of the Acquired Stations will be kept separate and apart from all other stations owned by Nexstar immediately prior to the Transaction and any of Nexstar's other operations;

7. Defendants shall use all reasonable efforts to preserve, in accordance with current practice, the existing relationships of TEGNA and of each Acquired Station with each MVPD retransmitting its programming, with each network providing affiliation and programming, and with others doing business with the Acquired Stations;

8. Defendants shall use all reasonable efforts to maintain — at 2025 levels or 2026 levels that were approved prior to the Transaction, whichever are higher — all station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations;

9. Defendants shall, to the extent permitted by the terms and conditions of the FCC's Equity/Debt Plus rule (47 C.F.R. § 73.3555, note 2(i)), provide sufficient working capital and lines and sources of credit to continue to maintain the Acquired Stations as economically viable and competitive, ongoing businesses;

10. Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records for each Acquired Station that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of that station;

11. No later than April 6, 2026, Nexstar shall (i) provide a report to the Court explaining what steps have been taken to comply with all requirements imposed by this Order; (ii) any issues in compliance and proposed solutions as discussed in Paragraph 1 of this Order and (iii) identify the employee or officer responsible for ensuring Defendants' compliance

with this Order. The report must be contemporaneously served on Plaintiff;

12. Defendants are ORDERED to SHOW CAUSE why a preliminary injunction should not issue enjoining Defendants from further integration, consolidation, or joint management of Nexstar and the held-separate TEGNA business unit. Defendants shall file and serve any opposition to the requested preliminary injunction by April 1, 2026. Plaintiff may file a reply, if any, by April 3, 2026. An in-person hearing is scheduled for **Tuesday, April 7, 2026** at **2:00 p.m.** in Courtroom 2; and

13. The Court reserves ruling on the bond requirement of Federal Rule of Civil Procedure 65(c) and will hear argument on this issue at the April 7, 2026 hearing. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (noting a "district court retains discretion as to the amount of security required, *if any*" (emphasis in original) (internal quotation marks and citation omitted)).

IT IS SO ORDERED.

Date: March 27, 2026

_____
TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE