Eliot A. Adelson (CA Bar No. 205284)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: EAdelson@mofo.com

Henry Huttinger (CA Bar No. 312843)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
Telephone: 213.892.5200
Facsimile: 213.892.5454
Email: HHuttinger@mofo.com

Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Robert W. Manoso (*pro hac vice*)
Alexa Rae DiCunzolo (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
Email: AOkuliar@mofo.com
       BLui@mofo.com
       RManoso@mofo.com
       ADiCunzolo@mofo.com

Attorneys for Defendants Nexstar Media
Group, Inc. and TEGNA Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| DIRECTV, LLC,<br><br>   *Plaintiff*,<br><br>  v.<br><br>Nexstar Media Group, Inc. and<br>TEGNA Inc.,<br><br>   *Defendants*. | Case No. 2:26-cv-00976-TLN-CKD<br><br>**DEFENDANTS' NOTICE AND PROPOSALS SEEKING COMPLIANCE GUIDANCE UNDER THE TEMPORARY RESTRAINING ORDER**<br><br>Judges: Honorable Troy L. Nunley and Honorable Carolyn K. Delaney<br>Action Filed: March 18, 2026 |

## I. INTRODUCTION

As directed by the Court in its temporary restraining order ("TRO") of March 27, 2026 (ECF No. 60 at 21, 23), Defendants Nexstar Media Group, Inc. ("Nexstar") and TEGNA Inc. ("TEGNA") (collectively "Defendants") hereby notify the Court that Defendants cannot implement certain provisions of the TRO as written because of actions already completed at closing and legal obligations that cannot be reversed. The TRO creates immediate operational harm to TEGNA and Nexstar, regulatory conflicts, and a governance vacuum. Defendants include proposals for compliance as directed in paragraph 1 of the TRO.

Upon closing, Nexstar and TEGNA took many typical steps that may not have been apparent to the Court when it issued its TRO. It is particularly difficult to freeze integration that was already taking place, unlike a conventional hold-separate order. Complying with certain aspects of the TRO is impossible and could jeopardize Nexstar and the TEGNA assets the Court seeks to preserve.

## II. FACTUAL BACKGROUND

On March 19, 2026, Nexstar completed its acquisition of TEGNA (the "Transaction"), following approval by both the U.S. Department of Justice Antitrust Division ("DOJ") and the Federal Communications Commission ("FCC"). Upon closing, TEGNA became a subsidiary of Nexstar. This change of status triggered a series of actions that cannot be undone, creating intractable operational and regulatory issues that require the Court's attention:

### A. Corporate Governance and Control

At closing, █████████████████████████████████████████████ ██████████████████████████ (Biard Decl. ¶ 45). █████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (*Id.*).

### B. Employment Compensation

███████████████████████████████████████████████████████████ ███████████████████████████ (Gliha Decl. ¶ 19). ██████████████

████████████████████████████████████ (*Id.*). The administrative integration cannot be reversed without significant disruption to employee compensation, ████████████████████████████████████ (*Id.* ¶ 20).

**C. Financial Structure and Obligations**

████████████████████████████████ issued $5.4 billion of new debt, ████████████████████████████████████ ████████████████████ (*Id.* ¶ 5). Nexstar and TEGNA are, or are required to be, ████████ ████████████████████████████ ████████ (*Id.*). ████████████████████████████ ████████████████████████████ (*Id.*). ████████████████████████████ ████████████████████████████ (*Id.*). ████████ ████████████████████████████ ████████████████████████████ ████████████████ (*Id.* ¶ 6). ████████ ████████████████████████ a financial failure of either entity would materially harm the other. (*Id.*).

████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████ (*Id.* ¶ 15).

Nexstar has ongoing SEC and debt agreement reporting obligations that require the inclusion of TEGNA's financial information into Nexstar's reports from the date of closing. (*Id.* ¶ 21). These obligations include the issuance of pro forma financial statements within 71 days of closing, including TEGNA's financial information. (*Id.*). These obligations also require representation by Nexstar management as to the accuracy of the financial statements, including

DEFENDANTS' NOTICE AND
PROPOSALS UNDER TRO

compliance with internal controls and procedures. (*Id.*). This means Nexstar management must have the ability to oversee such controls and procedures, including those of TEGNA. (*Id.*). If Defendants are unable to fulfill these requirements, Nexstar and TEGNA will be in breach of securities laws and SEC rules and of its debt covenants and obligations. (*Id.*). Such breaches could result in litigation, SEC enforcement actions, material loss of equity value, and the accelerated requirement to repay debt obligations which Nexstar would not be able to do. (*Id.*).

### D. Contractual and Commercial Integration

At closing—prior to entry of the Order—TEGNA's retransmission agreements with multichannel video programming distributors ("MVPDs") that also carry a Nexstar station were contractually superseded by Nexstar agreements with those MVPDs, and carriage of TEGNA stations became governed by Nexstar's existing agreements (with few, short-term exceptions). (Biard Decl. ¶ 25). There were approximately ███ such TEGNA agreements. (*Id.*).

This creates an internal contradiction: the TRO requires "separate management" of TEGNA and that "TEGNA personnel must maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations," (TRO ¶¶ 2, 4), yet those stations are now contractually governed by Nexstar's agreements to which no former TEGNA personnel are privy. (Biard Decl. ¶ 26). Payments and carriage terms are all covered by Nexstar's contracts. (*Id.*). As is typically required by those agreements, ████████████ ████████████████████████████████ ████████████████████ (*Id.*). News of the TRO has already created confusion of its impact on the applicability of the Nexstar agreements to the TEGNA stations, and Nexstar has begun to receive questions from distributors that will accelerate in volume and urgency as Nexstar approaches the end of the month billing cycle. (*Id.*).

████████████████████████████████ ████████████████ (*Id.* ¶ 27). ████████████ ████████████████████████████ ████████████████████████████

DEFENDANTS' NOTICE AND
PROPOSALS UNDER TRO

██████████████ (*Id.*). Accordingly, ████████████████████████

██████████████████████████████████████████████████

████████ which is subject to extension through November 30, 2026 pursuant to the FCC Order. (*Id.*). It is unclear what other MVPDs will do. (*Id.*). This creates operational chaos and accounting complexity that harms both Nexstar and TEGNA. (*Id.*).

In addition, unfettered ability for TEGNA management to enter into long-term contracts and/or make operating or capital decisions above a certain threshold will irreparably harm Nexstar and the combined company and cause operational confusion.

### E. FCC Commitments and Regulatory Conflicts

The FCC has ordered Nexstar to take certain actions in connection with the approval of the transaction which the TRO appears to contradict. As part of its commitments to the FCC, Nexstar committed to: (a) divest stations in Denver, CO; Indianapolis, IN; New Haven, CT; Portsmouth, VA; Slidell, LA; and Rogers, AR (Biard Decl. ¶ 10); (b) increase news programming in certain DMAs (*id.* ¶ 9); and (c) "offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RCA') that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RCA at the existing rates through November 30, 2026," (*id.* ¶ 31). The FCC accepted these commitments as enforceable conditions of Transaction approval. (*Id.*). If Nexstar speaks for TEGNA to honor the FCC's rate-extension commitment, Nexstar would appear to violate the TRO. (*Id.* ¶ 33).

The TRO creates yet another paradox with respect to distribution agreements approaching expiration or renewal. The scope of distribution agreements requiring renewal in the near term is substantial. (*Id.* ¶ 29). Nexstar has approximately ██ distribution agreements expiring between now and November 30, 2026. (*Id.*). There are approximately ██ additional distribution agreements that will expire sometime in 2026 covering the former TEGNA stations with MVPDs with whom Nexstar has no contractual relationship. (*Id.*). Importantly, ████████████████

████████████████████████████████████████ (*Id.* ¶ 30). If former TEGNA personnel are required to manage the now-governing Nexstar contracts, ██████████████

_____, which would violate the separation requirements of the TRO. (*Id.*).

The TRO's restrictions also create an untenable conflict with the FCC's requirement to expand content offerings in the acquired DMAs. Prior to the Transaction, _____ _____ _____ (*Id.* ¶ 39). Nexstar made plans to provide the former TEGNA stations with access to Nexstar's Washington, D.C. news bureau for creation of important local programming ahead of the midterm elections. (*Id.* ¶ 40). This cooperation benefits those former TEGNA stations and their viewers by providing access to content that TEGNA does not otherwise have the infrastructure to produce—yet such cooperation must apparently cease under the Order's separation requirements. (*Id.*). Depriving the former TEGNA stations of access to content from the D.C. bureau is an outcome contrary to better local news and the public interest. (*Id.* ¶ 41). The cessation of these efficiencies does not preserve competition—it eliminates benefits that were beginning to flow to those stations and their viewers. (*Id.*). It also creates a direct conflict with Defendants' commitments under the FCC Order. (*Id.*).

The TRO also threatens to disrupt valuable joint programming that benefits local communities, including _____ _____ (*Id.* ¶ 42). The Order's overbroad separation requirements create uncertainty as to whether such joint programming may proceed, even though these are the type of arrangements Nexstar regularly undertakes with unaffiliated third parties. (*Id.*).

### F. Staffing and Headcount Plans

TEGNA's pre-merger standalone plans included _____ (*Id.* ¶ 48). The TRO dictates additional restrictions on TEGNA's own plans. (*Id.*). Between February 2024 and June 2024, TEGNA publicly announced a $90-100 million cost reduction initiative that would eliminate newsroom positions and support positions, consolidate station operations and management, and develop technologies like AI automation. (*Id.* ¶ 50). And

DEFENDANTS' NOTICE AND
PROPOSALS UNDER TRO

TEGNA implemented another round of cost-containment this year. (*Id.*). Under the TRO, it is unclear whether TEGNA is required to operationalize its pre-Transaction reduction plans—or is prohibited from doing so—to maintain current staffing levels or even increase staffing levels to their 2025 peak, which could harm TEGNA financially. (*Id.*).

### G. Other Integration Actions

Other integration actions have already taken place that cannot be undone, including:

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████. (*Id.* ¶ 51).

███████████████████████████ (*Id.* ¶ 52). ████████████

███████████████████████████████████████████████████████

████████████████████████████████████ (*Id.*).

The above represents an incomplete list of immediately apparent issues. Nexstar anticipates further ordinary course activity that will require additional notice and guidance from the Court over the next several days to help address and possibly mitigate at least some of the harm accruing to Nexstar, TEGNA, and their customers. Nexstar has already taken steps to comply with the TRO.

### III. CLARIFICATIONS

#### A. The TRO Cannot Be Implemented without Clarifications from the Court and May Harm TEGNA Assets

To keep these issues from reaching the point of a material adverse event to the viability of the TEGNA assets over the next several days, Nexstar respectfully proposes at least the following clarifications and/or modifications to the TRO as directed by paragraph 1 of the TRO:

1. **Debt and Cash Management**: The TRO (paragraphs 1, 2, 4, 5, 9, and 10) shall allow Nexstar to undertake ordinary-course cash management, intercompany transfers, and debt service and repayment activities necessary to comply with Nexstar's financing obligations, including refinancing activities, security perfection, and guaranty

obligations.  This includes permitting intercompany loans and cash management arrangements necessary for TEGNA to access working capital and for the combined enterprise to service its debt obligations, as well as completion of the required post-closing security perfection process and avoidance of default under Nexstar's debt instruments.

2. **Corporate Governance and Operational Control**: The TRO (paragraphs 1, 2, 3, 4, and 5) shall allow Nexstar to take reasonable actions necessary to maintain TEGNA's day-to-day operations, including authorizing routine financial transactions such as wire transfers for ordinary course payments, without violating the TRO's prohibition on "influence."

3. **Distribution Agreements and Retransmission**: The TRO (paragraphs 1, 2, 3, 4, and 5) shall allow the continued administration of existing retransmission agreements, the handling of payments, or necessary discussions relating to expiring contracts and fulfilling the commitments under the FCC Order, and does not require unwinding or invalidating contractual provisions recognized pre-closing that occurred at closing.

4. **Corporate Governance Structure and Officer Authority:** The TRO (paragraphs 1, 2, 4, and 6) shall allow Nexstar to take actions necessary to establish a functional governance structure for TEGNA, including appointing or reappointing officers, to the extent necessary to permit TEGNA to fulfill the TRO. It shall not be considered "influence" for Nexstar to provide and implement Sarbanes-Oxley requirements, including setting thresholds for contract approval, expenditure authorization, and other financial limits similar to the interim operating covenants that applied to TEGNA's independent management of the business pre-closing.

5. **Financing and Reporting Obligations**: The TRO (paragraphs 1, 2, 3, 4, and 5) shall allow Nexstar to take all reasonable steps to perform all obligations required under its debt instruments, SEC reporting requirements, or refinancing transactions, including coordination with TEGNA personnel as necessary. This includes permitting Nexstar to

DEFENDANTS' NOTICE AND
PROPOSALS UNDER TRO

complete required SEC and debt agreement reporting for the combined company within applicable deadlines, oversight by Nexstar management as to the accuracy of the TEGNA financial statements, including compliance with internal controls and procedures, in coordination with TEGNA personnel.

6. **Management Authority and "Ordinary Course" Operations**: The TRO (paragraphs 1, 2, 4, and 6) shall allow Nexstar to take actions necessary to ensure TEGNA's continued operations, including officer appointments, contract administration, and responses to third-party requests.

7. **Corporate Governance and Officer Authority:** The TRO (paragraphs 1, 2, 3, and 4) shall allow Nexstar to appoint or reappoint TEGNA officers as necessary for TEGNA to exercise independent decision-making authority for retransmission matters.

8. **Employee Compensation and Workforce Decisions:** The TRO (paragraphs 1, 2, 3, 4, and 5) shall allow TEGNA to the extent necessary to proceed with pre-existing, ordinary-course compensation and workforce actions, including merit-based salary adjustments and related payroll actions planned prior to the Transaction.

9. **Interim Operating Covenants:** To provide appropriate guardrails for TEGNA's operations over the coming days and limit its ability to make financial commitments beyond the typical obligations of a subsidiary, the interim operating covenants set forth in the Merger Agreement (Biard Decl. Ex. C) shall govern what actions TEGNA may take without Nexstar's input or approval.

## IV. CONCLUSION

Nexstar's above proposals may allow Defendants to mitigate some of the irreparable harm occurring to the combined company, comply with the TRO, and protect TEGNA station assets over the next several days. The proposals, however, do not fully address the harm and are not sustainable beyond the preliminary injunction hearing set for April 7, 2026. Additional proposals and clarifications may be required in the coming days to forestall further material harm associated with the TRO.

DEFENDANTS' NOTICE AND PROPOSALS UNDER TRO

Defendants continue to object to the entry of any TRO for all the reasons explained in Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order. (ECF No. 48). Defendants respectfully request the Court's guidance on the above proposals.

Dated: March 31, 2026

Respectfully submitted,

By: /s/ Alexander P. Okuliar
Alexander P. Okuliar (*pro hac vice*)
Eliot A. Adelson (CA Bar No. 205284)
Bradley S. Lui (CA Bar No. 143088)
Robert W. Manoso (*pro hac vice)*
Henry Huttinger (CA Bar No. 312843)
Alexa DiCunzolo (*pro hac vice*)


MORRISON & FOERSTER LLP
Attorneys for Defendants Nexstar
Media Group, Inc. and TEGNA Inc.

DEFENDANTS' NOTICE AND
PROPOSALS UNDER TRO