UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

DIRECTV, LLC,
                              *Plaintiff*,

              v.                                    Case No. 2:26-cv-00976-TLN-CKD

Nexstar Media Group, Inc., and TEGNA Inc.,

                              *Defendants*.

**DECLARATION OF MICHAEL BIARD IN SUPPORT OF DEFENDANTS'
NOTICE AND PROPOSALS SEEKING COMPLIANCE GUIDANCE
UNDER THE TEMPORARY RESTRAINING ORDER**

I, Michael Biard, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am President and Chief Operating Officer of Nexstar Media Group, Inc. ("Nexstar"). I submit this declaration in support of Defendants' Notice and Proposals Seeking Compliance Guidance under the Temporary Restraining Order. In my position, I have direct knowledge of the broadcast television industry, including retransmission consent negotiations and industry economics.

2.      I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently to them under oath.

3.      As explained below, compliance with the Court's Temporary Restraining Order issued on March 27, 2026 ("Order"), (ECF No. 60), as currently written will cause irreparable harm to Nexstar, TEGNA, and the combined enterprise. Moreover, as I understand the Order, it contains numerous ambiguities and internal contradictions that make full compliance impossible without clarification from the Court.

4.      Upon closing of the Transaction on March 19, 2026, a series of actions occurred that cannot be undone. Because these actions are post-closing, it is particularly difficult to freeze integration. Complying with parts of the Order is impossible and could jeopardize both the TEGNA assets the Court seeks to preserve and Nexstar.

5.      The combined company currently covers 132 Designated Market Areas ("DMAs"). Plaintiff's complaint identifies alleged competitive overlaps in only 31 DMAs. (Compl. ¶ 4). The Order's reach therefore extends far beyond the alleged relevant markets identified by Plaintiff. Significantly, Nexstar and TEGNA do not have any "Big 4" network affiliation overlaps in multiple DMAs where both companies operate, which are listed in **Exhibit A** attached hereto. In these non-overlap DMAs, the concerns alleged by Plaintiff are entirely absent, yet the Order's requirements extend to all stations regardless of whether they are part of the relevant markets alleged by Plaintiff.

6.      Moreover, Plaintiff has not alleged any competitive harm from non-Big 4 stations. Non-Big 4 stations are expressly outside the relevant market alleged by Plaintiff. Based on the current language of the Order, these non-Big 4 stations—and any other non-Big 4 properties of Nexstar or TEGNA—are also subject to the Order's requirements. A list of Nexstar and TEGNA stations that are not affiliated with Big 4 networks is attached hereto as **Exhibit B**.

7.      The Order's requirements create substantial confusion and harm to Nexstar, TEGNA, the combined company, and consumers. The Order further prevents Nexstar from implementing planned benefits to news coverage and local programming that would have flowed to TEGNA stations and their viewers.

8.      In approving the Transaction, the Federal Communications Commission ("FCC") found that the Transaction will provide "public interest benefits to viewers of Nexstar's and TEGNA's stations," including the ability to "invest in local news production and increase local coverage in the communities the combined company will serve." Okuliar Decl. Ex. A  ¶ 83 (ECF No. 48-2) ("FCC Order").

9.      Pursuant to the FCC Order, Nexstar committed to "expand its investment in local news and programming after its acquisition of TEGNA is complete" and to "increas[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation. *Id.* ¶ 44.

10.      Additionally, as part of its commitments to the FCC, Nexstar committed to divest stations in Denver, CO; Indianapolis, IN; New Haven, CT; Portsmouth, VA; Slidell, Louisiana; and

Rogers, Arkansas. *See* FCC Order ¶ 55. The Order's requirements prohibit Nexstar from proceeding with these required divestitures. The Order's requirements conflict with Nexstar's commitments to the FCC, placing Nexstar in an untenable position of potential non-compliance with our obligations and commitments to the federal regulatory authorities.

**Industry Practice in and History of Retransmission Consent Negotiations**

11.     To understand why the Order's requirements are contradictory and impossible to implement, it is important to review the history of retransmission consent negotiations and how such negotiations occur in practice.

12.     Local broadcast television stations, including those owned by Nexstar, broadcast their stations programming for free over the air to anyone within the markets where they operate. Anyone within range of one of our transmitters can use an inexpensive antenna to receive high-quality, digital broadcasts without paying us anything. Nexstar and its stations are licensed by the Federal Communications Commission to use these public airwaves for broadcasting, which licenses come with numerous obligations and responsibilities.  Nexstar incurs millions of dollars in expense annually to meet those obligations.

13.     Nexstar incurs great expense to provide this free over-the-air service, including its local news and journalism, and generates revenue to offset that expense by selling advertising and licensing its signals to multichannel video programming distributors ("MVPDs") such as cable, satellite, and other pay TV providers.

14.     MVPDs pay Nexstar "retransmission consent fees" for the right to retransmit or carry our over-the-air signals to their respective subscribers or customers.

15.     Congress created and vested local broadcasters with retransmission consent rights in the Cable Television Consumer Protection and Competition Act of 1992 ("Cable Act") to ensure that MVPDs could not profit from valuable broadcast content without compensating the broadcasters. The Cable Act was intended to correct the competitive imbalance that had developed as cable operators built subscriber bases partly on the strength of broadcast signals. Despite the passage of this law in 1992, MVPDs essentially refused to pay anything to broadcasters for many years. It was not until the early 2000s that local broadcasters were able to negotiate meaningful

DECLARATION OF MICHAEL BIARD

compensation for their signals, a dynamic that has continued to evolve as the industry has evolved and new distribution platforms have emerged.

16.     Local broadcasters also act as distributors for content provided by large television networks, including the "Big 4"—NBC, ABC, CBS, and FOX. Broadcasters transmit this network content on their local network-affiliated stations.

17.     Big 4 networks also own and operate their own stations, particularly in major DMAs. However, these Big 4 networks historically also paid local affiliate stations for the service of broadcasting the network's programming, including live sports. However, as the Big 4 networks faced increasing competition from cable networks, the Big 4 networks began to demand payment from their local affiliates—a reversal of the traditional compensation flow. This started to occur in roughly 2010.  These payments from local affiliates to networks are referred to in the industry as "reverse compensation." These fees to the Big 4 Networks payable by local broadcasters like Nexstar represent the single largest cost to Nexstar for its content. These fees have grown dramatically over the last decade and are one of the main drivers of increases in retransmission fees that Nexstar charges to MVPDs. Networks now extract a substantial portion of their broadcast affiliates' retransmission consent revenues, significantly reducing the net revenues retained by local broadcasters like Nexstar and TEGNA.

18.     Local broadcasters face growing financial pressures as the reverse compensation fees and cost of content supplied by Big 4 Networks skyrockets while at the same time, the networks fundamentally erode the traditionally exclusive rights to distribute network programming in the markets where they operate a network-affiliated station.

19.     According to S&P Global Market Intelligence Kagan, these fees now account for the majority of retransmission fees charged by local broadcasters to MVPDs: an average of 53% of affiliate stations' retransmission fees from MVPDs were paid back to networks in the form of reverse compensation in 2025, which is expected to increase to 62% by 2030.[1] This trend has accelerated over the past decade: in 2010, reverse compensation as a percentage of gross

---

[1] S&P Global Market Intelligence Kagan, *U.S. Basic Cable Network Affiliate Fee Revenue and Average License Fee Per Subscriber Per Month, 1989–2029.*

retransmission revenue was nearly zero; by 2024, it exceeded 50%. At the same time, traditional MVPD subscriber bases have declined dramatically—over 50% in the ten years from 2014 to 2024—further eroding the revenue base from which local broadcasters can sustain operations. These trends place enormous pressure on local broadcasters like Nexstar and TEGNA to find operational efficiencies and maintain investment in local news and programming.

20.     The escalating reverse compensation fees payable to networks have compressed broadcasters' net margins. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

21.     Retransmission consent negotiations are generally conducted for a broadcaster's entire portfolio of Big 4 network-affiliated stations on a national level. Nexstar negotiates for all of its Big 4 stations (and non-Big 4 stations) as a single portfolio. In my experience involving distribution of broadcast television stations over the past 26 years at Nexstar and elsewhere, there are rarely (if ever) any negotiations for individual stations, or for subsets of a company's portfolio of stations.

22.     Similarly, Nexstar and others do not negotiate for specific DMAs or for groups of DMAs that are smaller than an MVPD's entire footprint. Both sides have an interest in comprehensive, consistent terms that cover the full geographic scope of an MVPD's operations.

23.     Under FCC regulations implementing the Cable Act of 1992, every three years, broadcasters must elect between must-carry status (guaranteed carriage without compensation) or retransmission consent (the right to negotiate compensation in exchange for retransmission). As a result of this statutory framework, retransmission consent agreements are typically for three-year terms. Importantly, Nexstar's and TEGNA's respective agreements with MVPDs do not expire at the same time—meaning Nexstar and TEGNA have historically negotiated with the same MVPDs (where they overlap) on their own timelines.

DECLARATION OF MICHAEL BIARD

24.    There are additional idiosyncratic differences between how Nexstar and TEGNA conduct their respective negotiations with MVPDs. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████ These structural differences mean that Nexstar and TEGNA historically have approached the same MVPDs with fundamentally different portfolios and negotiating positions.

**Renewal of Retransmission Consent Agreements**

25.    At closing—prior to entry of the Order—TEGNA's retransmission agreements with multichannel video programming distributors ("MVPDs") that also carry a Nexstar station were contractually superseded by Nexstar agreements with those MVPDs, and carriage of TEGNA stations became governed by Nexstar's existing agreements (with few, short-term exceptions). There were approximately ██ such TEGNA agreements.

26.    This creates an internal contradiction: the Order requires "separate management" of TEGNA (Order ¶ 2) and that "TEGNA personnel must maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations" (Order ¶ 4), yet those stations are now contractually governed by Nexstar's agreements to which no former TEGNA personnel are privy. Payments and carriage terms are all covered by Nexstar's contracts. As is typically required by those agreements, ██████████████████ ████████████████████████████████████████ ██████████████ News of the Order has already created confusion of its impact on the applicability of the Nexstar agreements to the TEGNA stations, and Nexstar has begun to

receive questions from distributors that I expect will accelerate in volume and urgency as Nexstar approaches the end of the month billing cycle.

27. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████ which is subject to extension through November 30, 2026 pursuant to the FCC Order.

28. It is unclear what other MVPDs will do. This creates operational chaos and accounting complexity that harms both Nexstar and TEGNA.

29. The scope of distribution agreements requiring renewal in the near term is substantial. Nexstar has approximately ██ distribution agreements expiring between now and November 30, 2026. I understand that there are approximately ██ additional distribution agreements that will expire sometime in 2026 (Nexstar does not yet have complete information on the term of those agreements) covering the former TEGNA stations with MVPDs with whom Nexstar has no contractual relationship.

30. Importantly, ████████████████████████████████████
████████████████████████ If former TEGNA personnel are required to manage the now-governing Nexstar contracts, ████████████████████████████
████████████████████ which would violate the separation requirements of the Order.

31. As part of its commitments to the FCC, Nexstar committed to "offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RTCA') that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026." FCC Order ¶ 75. This commitment also applies to TEGNA stations as well, the majority of which would be governed by Nexstar's agreements post-closing. The FCC accepted this commitment as an enforceable condition of Transaction approval. *See id.*

DECLARATION OF MICHAEL BIARD

32.     The Order's hold separate requirement creates an untenable conflict with this FCC commitment. Under the Order, TEGNA personnel must "maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations." (Order ¶ 4). Yet the FCC commitment was made by Nexstar on behalf of both companies' stations. It is now unclear whether Nexstar can honor this commitment for TEGNA stations, or whether TEGNA must negotiate independently.

33.     This creates a paradox that undermines the very harm Plaintiff claims to be preventing. If TEGNA negotiates independently, TEGNA could seek increased rates from MVPDs—the exact type of rate increase that Plaintiff has alleged this Transaction would facilitate. Conversely, if Nexstar speaks for TEGNA to honor the FCC's rate-extension commitment, Nexstar would appear to violate the Order's requirement that TEGNA personnel maintain control over retransmission consent negotiations.

**Local News and Programming Competition**

34.     Nexstar stations face their most significant competition in local news and programming from a wide array of non-Big 4 broadcast sources, including social media platforms, news websites and e-newsletters, Big 4-owned paid streaming services (e.g., Peacock, Paramount+, Fox One) and free streaming services (e.g., NBC News Now, ABC News Live, CBS News 24/7, LiveNow from Fox), free streaming services on connected apps (e.g., Haystack News, Local Now, NewsOn, The Roku Channel) and non-Big 4-affiliated stations. The competitive landscape for local news has fundamentally changed with the explosion of new options available across devices and platforms, and broadcast television stations now compete with an innumerable traditional, digital, and non-traditional news sources for viewers' attention.

35.     In response to this competitive environment, Nexstar has over the past five years steadily increased its output of local programming, including local news. Following Nexstar's 2019 acquisition of Tribune, Nexstar's stations increased local news coverage by 28,000 hours per year (more than 12.5%) and increased local lifestyle programming by 9,000 hours (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%),

respectively. FCC Order ¶ 68. This track record demonstrates Nexstar's commitment to serving local communities and competing effectively against news alternatives of all types.

36.     The FCC secured commitments from Nexstar to expand its investment in local news and programming, including increasing the amount of local news it provides in acquired markets. *See* FCC Order ¶ 6. The Order's separation requirements threaten to undermine these commitments by preventing Nexstar from implementing its plans to enhance local news coverage at TEGNA stations.

37.     The Order would deprive Nexstar's communities of the very benefits the FCC found to be in the public interest. Nexstar will be able to invest in local programming and local coverage that benefits viewers, which will provide a substantial benefit to the public. FCC Order ¶ 83. The Order also would prevent Nexstar from delivering these benefits to viewers and would irreparably harm the interests of the United States, as stated by the FCC in advancing this Transaction.

38.     Disrupting the combined stations operations would severely hurt Nexstar's plans to upgrade broadcast infrastructure and provide all TEGNA stations with access to ATSC 3.0, a new over-the-air broadcasting standard combining digital television with innovative data transmission capabilities that enable functionality like broadcast positioning service ("BPS"), which has been proposed as an essential service that provides redundancy and resiliency to GPS.  FCC Order ¶ 86. These technological benefits also serve the public interest.

**Content Sharing and Operational Synergies**

39.     Prior to the Transaction, ███████████████████████████████ ████████████████████████████████████████████ The Order's requirement that Nexstar "must not influence the management" of TEGNA (Order ¶ 4) appears to require halting all such cooperation that benefits stations and consumers.

40.     Additionally, Nexstar made plans to provide the former TEGNA stations with access to Nexstar's Washington, D.C. news bureau for creation of important local programming ahead of the midterm elections. This cooperation benefits those former TEGNA stations and their viewers by providing access to content that TEGNA does not otherwise have the infrastructure to

DECLARATION OF MICHAEL BIARD

produce—yet such cooperation must apparently cease under the Order's separation requirements. (*See* Order ¶¶ 2, 4).

41.     Depriving the former TEGNA stations of access to content from the D.C. bureau is an outcome contrary to better local news and the public interest. The cessation of these efficiencies does not preserve competition—it eliminates benefits that were beginning to flow to those stations and their viewers. It also creates a direct conflict with Defendants' commitments under the FCC Order. FCC Order ¶¶ 6, 82.

42.     The Order also threatens to disrupt valuable joint programming that benefits local communities. Prior to the Transaction, █████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████

43.     These examples—the D.C. bureau content access, ██████████████████████ ████████████████████—demonstrate how the Order's requirements produce outcomes that are contrary to the public interest. The FCC supports this Transaction as a way to protect and promote its "longstanding media policy goals of competition, localism, and diversity." FCC Order ¶ 2. The Order does not preserve competition; it prevents beneficial cooperation that serves viewers and undermines the FCC's stated public interest goals.

**Employment and Compensation**

44.     The Order provides that Nexstar "must not hire, terminate, transfer, or otherwise alter the terms of employment of any TEGNA officers or employees." (Order ¶ 4). This requirement is ambiguous and creates several implementation problems.

45.     At closing and prior to the Order's issuance, ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

10                        DECLARATION OF MICHAEL BIARD

▮▮▮▮▮▮▮▮▮▮ Their "terms of employment" have already been "altered" within the meaning of the Order (Order ¶ 4) as a result of the change in control that happened at closing.

46.    Further, if TEGNA personnel are to have authority over TEGNA's decision-making as the Order requires (Order ¶ 4), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ The Order does not specify whether Nexstar is prohibited from making such appointment, or whether any such appointment would constitute an impermissible "alter[ation of] the terms of employment." (Order ¶ 4).

47.    The Order requires Defendants to "use all reasonable efforts to maintain—at 2025 levels or 2026 levels that were approved prior to the Transaction, whichever are higher—all station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations." (Order ¶ 8).

48.    This requirement creates significant ambiguity and potential operational harm. ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ The Order appears to prohibit TEGNA from implementing its own pre-existing workforce plans.

49.    Read literally, the "whichever are higher" language in Order ¶ 8 could require TEGNA to hire back employees to meet 2025 levels, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This interpretation would go beyond preserving the status quo and would affirmatively require TEGNA to expand its workforce beyond what its own management deemed appropriate.

50.    To illustrate this paradox: I understand between February 2024 and June 2024, TEGNA publicly announced a $90-100 million cost reduction initiative that would eliminate newsroom positions and support positions, consolidate station operations and management, and develop technologies like AI automation.[2] I also understand that TEGNA has additional plans that it began to implement in 2026. Under the Order, it is unclear whether TEGNA is now required to

---

[2] See TEGNA, Inc. Earnings Call Tr. at 3 (May 8, 2025), https://investors.tegna.com/static-files/b29f41c0-2e5e-48cd-a092-9414f82939ab.

operationalize its pre-Transaction reduction plans—or is prohibited from doing so—to maintain current staffing levels or even increase staffing levels to their 2025 peak. ████████

████████████████████████████

████████████████████████████

████ If TEGNA proceeds with its further planned reductions, the Order would have the perverse effect of jeopardizing local news coverage that Nexstar had planned to enhance (including expansion of local content on both linear and streaming platforms in multiple markets)—the exact opposite of the public interest benefits that the FCC found this Transaction would deliver.

**Operational Issues**

51.    Many other integration actions have already been taken that cannot be undone, including:

████████████████████████████

████████████████████████████

████████████████████

52.    ████████████████████████

████████████████████████████

████████████████

53.    On the day after the Transaction closed, Nexstar installed a redirect page on the TEGNA website indicating that "TEGNA Inc is now part of Nexstar Media Group, Inc." Under the Order, TEGNA would have to restore its full pre-closing website to comply with the separation requirements—yet Nexstar cannot direct TEGNA employees to take any action to do so without potentially violating the Order's prohibition on "influence."

54.    The Order does not address whether TEGNA may enter into new long-term contracts, including leases for new facilities, without any oversight. Nor does it address whether there should be any ordinary-course covenants limiting TEGNA's ability to enter into major new contractual commitments—such as sports programming deals—in an active marketplace.

55.    Notably, even prior to the Transaction, TEGNA was subject to interim operating covenants in Section 6.1(b) of the Agreement and Plan of Merger ("Merger Agreement"),

attached hereto as **Exhibit C**. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *See* Merger Agreement § 6.1(b). The Order's silence on these matters creates a regime with fewer safeguards than existed during the pre-closing period even though Nexstar is responsible for the business.

DECLARATION OF MICHAEL BIARD

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30th day of March, 2026 in Irving, Texas.

By: _____
    Michael Biard

DECLARATION OF MICHAEL BIARD