Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Rob Manoso (*pro hac vice*)
Alexa Rae DiCunzolo (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
Email: AOkuliar@mofo.com
        BLui@mofo.com
        RManoso@mofo.com
        ADiCunzolo@mofo.com

Eliot A. Adelson (CA Bar No. 205284)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: EAdelson@mofo.com

Henry Huttinger (CA Bar No. 312843)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
Telephone: 213.892.5200
Facsimile: 213.892.5454
Email: HHuttinger@mofo.com

Attorneys for Defendants Nexstar Media
Group, Inc. and TEGNA Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re Nexstar-TEGNA Merger Litigation | Case No. 2:26-cv-00976-TLN-CKD |
| | **DEFENDANTS NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.'S RESPONSE TO ORDER TO SHOW CAUSE AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |
| | Judges: Honorable Troy L. Nunley and Honorable Carolyn K. Delaney |
| | Action Filed: March 18, 2026 |

1                    DEFS.' RES. TO ORDER & OPP. TO P.I.

## **TABLE OF CONTENTS**

                                                                                                                    **Page**

I.      INTRODUCTION ................................................................................................................... 1

II.     BACKGROUND .................................................................................................................... 1

        A.      History of Retransmission............................................................................................ 1

        B.      Technology and the Modern Media Industry............................................................ 3

        C.      Structure and Benefits of the Transaction................................................................. 4

III.    ARGUMENT .......................................................................................................................... 6

        A.      Plaintiffs Have Not Shown Specific Facts Necessary to Support a
                Preliminary Injunction ................................................................................................. 6

        B.      Plaintiffs Show No Proof of Immediate Irreparable Harm ..................................... 8

        C.      Plaintiffs Fail to Demonstrate Likelihood of Success on the Merits ..................... 10

                1.      Alleged Product Market Is Fatally Flawed ................................................. 10

                        a.      Big 4 Stations Are Complements, Not Substitutes ....................... 10

                        b.      Big 4 Stations Compete with Other Content Sellers..................... 12

                2.      Alleged Geographic Market Is Facially Implausible ................................. 13

                3.      Plaintiffs Cannot Make a *Prima Facie* Case.............................................. 14

                        a.      Plaintiffs' HHI and Market Share Calculations Are Not
                                Entitled to Any Weight .................................................................. 14

                        b.      Plaintiffs Have Not Demonstrated Any Causal Connection
                                Between Alleged Retransmission Rate Increases and the
                                Transaction....................................................................................... 14

                        c.      Alleged Harms to Local News Are a Red Herring ....................... 16

                4.      Defendants Can Rebut Any *Prima Facie* Case......................................... 17

        D.      Balance of Equities and the Public Interest Weigh Against Injunctive
                Relief .......................................................................................................................... 18

        E.      Plaintiffs Must Post a Bond ..................................................................................... 18

        F.      Plaintiff States' Additional Arguments Are Unavailing...................................... 19

        G.      Requested Relief Is Overbroad and Unworkable.................................................. 20

IV.     CONCLUSION ................................................................................................................... 20

DEFS.' RES. TO ORDER & OPP. TO P.I.

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)............................................................................................ 6

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
    750 F.2d 1470 (9th Cir. 1985)............................................................................................ 8

*Boardman v. Pac. Seafood Grp.*,
    822 F.3d 1011 (9th Cir. 2016)........................................................................................ 6, 9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)........................................................................................................ 13

*Cal. v. Am. Stores Co.*,
    495 U.S. 271 (1990).......................................................................................................... 6

*Cal. v. Sutter Health Sys.*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) ........................................................................... 10

*Cal. v. Sutter Health Sys.*,
    84 F. Supp. 2d 1057 (N. D. Cal. 2000) ........................................................................... 14

*Caribbean Marine Servs. Co. v. Baldridge*,
    844 F.2d 668 (9th Cir. 1988)........................................................................................ 9, 19

*DeHoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018)........................................................................................... 14

*DeMartini v. Microsoft Corp.*,
    No. 22-cv-8991-JSC, 2023 WL 3569993 (N.D. Cal. May 19, 2023) ............................... 9, 10

*Dream Big Media Inc. v. Alphabet Inc.*,
    No. 24-4968, 2025 WL 3485388 (9th Cir. Dec. 4, 2025)....................................................... 11

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987)........................................................................................... 20

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ........................................................................................ 19

*FTC v. PPG Indus., Inc.*,
    798 F.2d 1500 (D.C. Cir. 1986) ...................................................................................... 14

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)........................................................................................... 10

DEFS.' RES. TO ORDER & OPP. TO P.I.

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................................ 14

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025) ................................................................................ 15

*Hawaii ex rel. Anzai v. Gannett Pac.*,
  99 F. Supp. 2d 1241 (D. Haw. 1999) ........................................................................ 19

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ................................................................................... 7

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) .......................................................................... 10, 11

*In re Nat'l Credit Mgmt. Grp.*,
  21 F. Supp. 2d 424 (D.N.J. 1998) ............................................................................ 19

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  No. 21-16817, 2022 WL 16756365 (9th Cir. Nov. 8, 2022) ..................................... 15

*Intel Corp. v. Seven Networks, LLC*,
  562 F. Supp. 3d 454 (N.D. Cal. 2021) ...................................................................... 11

*K-2 Ski Co. v. Head Ski Co.*,
  467 F.2d 1087 (9th Cir. 1972) ................................................................................... 8

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ................................................................................... 6

*Malaney v. UAL Corp.*,
  No. 3:10-cv-02858-RS, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010), *aff'd*,
  434 F. App'x 620 (9th Cir. 2011) .............................................................................. 6

*Marlyn Nutraceuticals v. Mucos Pharma*,
  571 F. 3d 873 (9th Cir. 2009) ................................................................................... 20

*MLW Media LLC v. World Wrestling Ent., Inc.*,
  655 F. Supp. 3d 946 (N.D. Cal. 2023) ...................................................................... 10

*Morgan Stanley & Co., LLC v. Couch*,
  134 F. Supp. 3d 1215, 1235 (E.D. Cal. 2015), *aff'd*,
  659 F. App'x 402 (9th Cir. 2016) .............................................................................. 9

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ................................................................................... 12

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) ...................................................................... 18

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
    16 F.3d 1032 (9th Cir. 1994)................................................................................................ 18

*Ohio v. Am. Express Co.*,
    525 U.S. 529 (2018)............................................................................................................ 10

*Price v. City of Stockton*,
    390 F.3d 1105 (9th Cir. 2004)............................................................................................ 20

*Reilly v. Medianews Grp., Inc.*,
    No. C 06-04332, 2006 WL 2419100 (N.D. Cal. July 28, 2006)......................................... 10

*Sampson v. Murray*,
    415 U.S. 61 (1974)............................................................................................................... 7

*Schurz Commc'n, Inc. v. FCC*,
    982 F.2d 1043 (7th Cir. 1992)............................................................................................ 17

*Taleff v. Southwest Airlines Co.*,
    828 F. Supp. 2d 1118 (N.D. Cal. 2011), *aff'd*, 554 F. App'x 598 (9th Cir.
    2014) ..................................................................................................................................... 6

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)............................................................................................................ 20

*U.S.A. Express Cab, LLC v. City of San Jose*,
    No. C-07-06171 RMW, 2007 WL 4612926 (N.D. Cal. Dec. 31, 2007)................................ 7

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ...................................................................................... 14, 17

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)............................................................................................................ 14

*United States v. Hewlett Packard Enter. Co.*,
    No. 25-cv-00951-PCP, 2026 WL 194852 (N.D. Cal. Jan. 26, 2026) .................................. 20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................................................................ 18

*Washington v. Chimei Innolux Corp.*,
    659 F.3d 842 (9th Cir. 2011)............................................................................................... 20

*Washington v. Franciscan Health Sys.*,
    388 F. Supp. 3d 1296 (W.D. Wash. 2019)........................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................................. 6, 8

**Statutes**

15 U.S.C. § 16(h) ................................................................................................................. 7

15 U.S.C. § 26 ............................................................................................................... 14, 18

Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No.
    102-385, 106 Stat. 1460 .............................................................................................. 2, 3

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
    2949 (3d ed. 2020) ......................................................................................................... 7

2017 Ownership Reconsideration Order, 32 FCC Rcd (2017) ...................................... 17

Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar
    Media Inc., Memorandum Opinion and Order, MB Docket No. 25-331, DA
    26-267 (F.C.C. Mar. 19, 2026) .............................................................................. *passim*

Fed. R. Civ. P. 65 ...................................................................................................... 6, 18

*Review of the Commission's Regulations Governing Television Broadcasting,*
    Report and Order, 14 FCC Rcd 12903, 12911 (1999) ................................................. 17

S. Rep. No. 102-92, at 35–36 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133,
    1168–69 ....................................................................................................................... 2, 3

DEFS.' RES. TO ORDER & OPP. TO P.I.

## I.      INTRODUCTION

Defendants respond to the Court's Order to Show Cause and in Opposition to the Plaintiffs' (both DIRECTV and Plaintiff States) motions for preliminary injunction. Plaintiffs ask this Court to derail an already closed merger between Nexstar and TEGNA (the "Transaction") and enter a preliminary injunction, based almost entirely on Plaintiffs' generalized and speculative allegations of future harm. The Court should decline to do so. Preliminary injunctive relief will cause immediate irreparable harm to Defendants and viewers in communities across the United States—this includes harm to local television stations that will not get the benefits of enhanced journalism, technological upgrades, and other immediate investments Nexstar had planned to make.

This case presents no immediate, irreparable harm to the Plaintiffs. The States claim the deal ***could*** create harm to consumers at some point in the future ***if*** their co-Plaintiff DIRECTV and other cable and satellite companies ***choose*** to raise rates. But even if DIRECTV were to raise rates to protect its profits, consumers can always watch Nexstar stations over-the-air ***for free***. DIRECTV, for its part, is both a distributor and competitor of Nexstar and will embark on contract renewal negotiations with Nexstar later this year. This case is nothing more than an attempt by DIRECTV to maximize its leverage in these upcoming negotiations. Defendants respectfully ask the Court to reject DIRECTV's tactics, deny Plaintiffs' Motions for Preliminary Injunction, and allow Nexstar to invest in the future of broadcasting and begin providing viewers with more and better free local programming.[1]

## II.     BACKGROUND

### A.      History of Retransmission

Nexstar is a local broadcast television company with stations serving communities around the United States. Local broadcasters operate under the oversight of the Federal Communications Commission ("FCC") and by law are required to serve the public interest, convenience and

---

[1] Defendants incorporate herein their Oppositions to Plaintiffs' Motions for Temporary Restraining Orders (ECF 48; ECF 73, *California v. Nexstar Media Grp.*, No. 2:26-cv-00978 (E.D. Cal. Mar. 18, 2026) (now consolidated with *DIRECTV v. Nexstar Media Grp.*, No. 2:26-cv-00976 (E.D. Cal.)) and Defendants' Notice and Proposals Seeking Compliance Guidance Under the Temporary Restraining Order (ECF 63).

necessity. They acquire, license, and create content that they transmit over the air for free and compete with a wide range of video alternatives for viewers' attention. In addition to distributing content over the air, like other broadcasters, Nexstar licenses its broadcast signals for retransmission by cable and satellite companies (also called "multichannel video programming distributors" or "MVPDs"). Nexstar earns a "retransmission consent fee" from those MVPDs. Biard Decl. ¶ 42. MVPDs then charge their subscribers fees to access a bundle or package of video content provided by many sources. *Id.* ¶ 17. Nexstar pays major television networks, including the four largest networks, ABC, NBC, CBS, and FOX ("Big 4") and others, to allow its network-affiliated stations to broadcast network content, including live sports and primetime programming. *Id.* ¶ 45. Payments to networks (called "reverse compensation" or "affiliate fees") have risen dramatically over the past ten years and may soon eclipse 100% of local broadcasters' retransmission consent fees.[2] From Q4 2022 through Q4 2025, Nexstar's per subscriber reverse compensation fees paid to Big 4 networks ██████████████████████████ ██████████████████████████████████████. *Id.* ¶ 48.

Congress views local broadcasters as an important national resource, including for their critical role providing emergency alerts. For many years, MVPDs simply took local broadcast content and retransmitted it to their subscribers without paying the broadcasters. To address this issue, Congress passed the Cable Television Consumer Protection and Competition Act (the "Cable Act") in 1992 to require cable companies to obtain retransmission licensing to carry certain broadcast station content.[3] The law was intended to fix the "distortion in the video marketplace which threatens the future of over-the-air broadcasting" under which "broadcasters in effect subsidize the establishment of their chief competitors," MVPDs.[4] It also set out "to provide protection for consumers against [MVPD] monopoly rates and poor customer service."[5] Congress emphasized that requiring MVPDs to compensate broadcasters for retransmission was

---

[2] Brendan Carr, FCC Commissioner, Ltr. to Robert A. Iger, CEO of Walt Disney Co. (Dec. 21, 2024), https://www.fcc.gov/sites/default/files/Carr-Letter-to-Disney-12212024.pdf.

[3] *See* S. Rep. No. 102-92, at 35–36 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 1133, 1168–69 (quoting Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460).

[4] *Id.*

[5] *Id.* at 1134.

DEFS.' RES. TO ORDER & OPP. TO P.I.

"to ensure that our system of free broadcasting remain vibrant, and not be replaced by a system which requires consumers to pay for television service."[6] In approving the Transaction, the FCC noted it will "empower these broadcasters to better serve their communities by investing in local news and reporting" and "promote the FCC's longstanding media policy goals of competition, localism, and diversity."[7]

### B.    Technology and the Modern Media Industry

As the FCC recognized, since the Cable Act was passed "the media landscape has shifted dramatically, as a plethora of video distribution technologies have come to market at a pace that eclipsed all changes that came before." *See* Okuliar Decl. Ex. 3-A (FCC Order) ¶ 27. Broadcast television stations compete with numerous digital platforms for viewership and revenue. *Id.* ¶ 49. The Big 4 networks, which used to work exclusively with local broadcasters, now also sell their content directly to consumers through digital platforms and negotiate directly with MVPDs to include those digital platforms as part of MVPD packages. *See id.* ¶¶ 28 & n.91, 29. Thus, while local broadcasters like Nexstar still carry network content, they do not have exclusive rights to distribute that content. That is especially true for live sports, which are now carried by numerous platforms and channels. Israel Decl. ¶ 14.

Digital platforms are incredibly popular today. More people now watch streaming or other services than watch broadcast television and cable, combined.[8] The expansion of digital video advertising inventory has driven down revenues for local broadcasters. "[F]orecasts predicting decreases in local television advertising revenue are further compounded by rising operating costs for producing or acquiring video content." FCC Order ¶ 84. Local television accounted for only

---

[6]*Id.* at 1168–69.

[7] Press Release, *FCC Empowers Local Broadcast TV Stations: Agency Approval of Nexstar - TEGNA TV Station Deal, with Conditions Committed to by Nexstar, Promotes FCC's Media Policy Goals of Localism, Diversity, and Competition* (Mar. 19, 2026), https://docs.fcc.gov/public/attachments/DOC-419971A1.pdf

[8] NIELSEN, *Streaming Reaches Historic TV Milestone, Eclipses Combined Broadcast and Cable Viewing For First Time* (Jun. 2025), https://www.nielsen.com/news-center/2025/streaming-reaches-historic-tv-milestone-eclipses-combined-broadcast-and-cable-viewing-for-first-time/; *see also* FCC Order at ¶ 27.

6% of total media spending through June 2025, less than half the13% share it held in 2017, while digital video increased its share from 15% in 2017 to 50% in the first half of 2025.[9]

Plaintiffs ask the Court to ignore these facts and instead rely on allegations. DIRECTV's expert, Dr. Shapiro, concedes "MVPDs are competing against streaming services to attract subscribers." (ECF 14-2) Shapiro Decl. ¶ 72. Nonetheless, instead of adopting a modern analysis, he copies antiquated DOJ analysis from unrelated years-old deals and ignores the impact of modern video alternatives shaping the industry. *Id.* ¶¶ 71-72. The Plaintiffs point to Nielsen for their use of designated market areas ("DMAs") as a geographic market. States' Compl. ¶ 52.[10] Whether or not DMAs are correct to use, even Nielsen acknowledges the "rise of digital platforms" and has updated its audience measurement metrics in response.[11] Indeed, when evaluating this Transaction, the FCC considered and, after receiving public comments, squarely rejected the "backwards-looking" competitive analysis and market landscape urged by Plaintiffs. FCC Order ¶ 66.[12] The FCC recognized that "[w]hen placed in its proper market context, the harms and arguments pressed by this Transaction's opponents melt away and are otherwise offset by the substantial, competitive benefits." *Id.* ¶ 76.

### C.    Structure and Benefits of the Transaction

Nexstar and TEGNA now own or operate 259 television stations (after committed divestitures) in 132 DMAs. *Id.* ¶ 2 n.1. This represents just under 15% of the 1,777 full-power stations in the United States. *Id.* ¶ 2 & n.1. The Transaction is expected to create "approximately $300 million" in synergies, most of which will occur in the first year, "enabling greater investment in content, technology, and local journalism" and positioning the combined company to address the "existential changes to the market in which [broadcasters] compete." *Id.* ¶¶ 14, 84.

---

[9] George Winslow, *Local TV Has Lost More than Half of Its Media Spending Market Share Since 2017*, TV Tech (Sept. 15, 2025), https://www.tvtechnology.com/news/local-tv-has-lost-more-than-half-of-its-share-of-media-spending-since-2017.

[10] All references to "States' Compl." or "States' Complaint" herein refers to Complaint, *California v. Nexstar Media Grp.*, No. 2:26-cv-00978 (E.D. Cal. Mar. 18, 2026) (now consolidated with *DIRECTV v. Nexstar Media Grp.*, No. 2:26-cv-00976 (E.D. Cal.)).

[11] As Nielsen describes it, DMAs emerged in the 1950s at the dawn of broadcast television. https://www.nielsen.com/insights/2025/what-is-a-designated-market-area-and-why-does-it-matter/

[12] *Id.* ("Petitioners and Opposing Commenters also take a backwards-looking approach to competition.").

DEFS.' RES. TO ORDER & OPP. TO P.I.

Nexstar and TEGNA overlap in 35 of the 132 DMAs. They expect the combined company will better compete against large technology and media platforms that have diverted and continue to divert audiences and advertising revenues from local broadcast television.[13] The combined company would be able to offer advertisers broader reach and more comprehensive advertising solutions, including through TEGNA's Premion digital advertising platform.[14]

The deal also will allow Nexstar to improve news offerings at TEGNA stations, as well as some of its own stations. Biard Decl. ¶¶ 24, 36–37. Nexstar will also be able to reduce operational costs—*e.g.,* redundant office buildings or equipment—similar to multiple competing newspapers that use a single printing press to produce separate, discrete products more efficiently. Consistent with Nexstar's history after prior transactions, and pursuant to its regulatorily required commitments, it must expand journalism and local programming for its viewers, including over the air.[15] The acquired TEGNA stations would gain access to Nexstar's Washington, D.C. news bureau—"a resource TEGNA stations will not otherwise have, 'which provides in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the individual DMAs where Nexstar's stations operate'"—as well as Nexstar's "24 state capital news bureaus that provide local viewers with increased access to state lawmakers." FCC Order ¶ 85.[16] It will also allow "Nexstar to accelerate the shift to ATSC 3.0 for those TEGNA stations that are not already equipped for the next generation broadcast television standard." *Id.* ¶ 86.

---

[13] "[C]ombining Nexstar with TEGNA 'provides the only hope to achieve the scale needed to sustain operations,'" given TEGNA's pre-Transaction plans to reduce costs and consolidate certain operations "as 'part of its extensive cost-containment efforts.'" FCC Order ¶ 44.

[14] "[L]ocal advertisers in the DMAs where Nexstar's stations operate will benefit from Nexstar's integration of TEGNA's digital ad sales platform (Premion) for providing premium connected TV ('CCTV') and over-the-top ('OTT') impressions for local and regional advertisers." *Id.* ¶ 15.

[15] *Id.* ¶ 83. Following Nexstar's 2019 acquisition of Tribune, "Nexstar's stations (including many of its newly acquired stations) increased local news coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence." *Id.* ¶ 68. During the same period, "local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%)." *Id.*

[16] The Transaction also provides TEGNA stations with access to Nexstar's Aggregated Content Team (ACT), which "collect[s] and distribute[s] stories of interest from Nexstar's local stations around the country" and enables stations to "provide 'wider and/or more in-depth coverage of stories occurring within the stations' local communities.'" *Id.* ¶¶ 15, 43.

5                    DEFS.' RES. TO ORDER & OPP. TO P.I.

These many benefits will be available to viewers for free over the air, unlike the content sold by DIRECTV and other MVPDs to their customers. FCC Order ¶ 72. In addition, to smooth the transition with distributors, Nexstar committed to offer MVPDs with which Nexstar has an existing retransmission consent agreement that expires before November 30, 2026, an extension of its existing terms and rates through November 30, 2026. *Id.* ¶ 75.

**III.     ARGUMENT**

    **A.     Plaintiffs Have Not Shown Specific Facts Necessary to Support a Preliminary Injunction**

"A preliminary injunction is 'an extraordinary and drastic remedy.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted). It is never "awarded as of right." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Plaintiffs bear the burden of making a "clear showing" of all elements for a preliminary injunction: (1) they are likely to succeed on the merits, (2) they are likely to suffer immediate irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

In challenges brought by "persons" (which includes States) under Sections 7 and 16 of the Clayton Act, injunctions are only awarded when ***personal*** antitrust injuries are ***proven*** by specific facts and monetary damages would be inadequate. *See Cal. v. Am. Stores Co.,* 495 U.S. 271, 295 (1990); *Malaney v. UAL Corp.*, No. 10-cv-02858-RS, 2010 WL 3790296, at *5 (N.D. Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011); *Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1123 (N.D. Cal. 2011), *aff'd*, 554 F. App'x 598 (9th Cir. 2014). Plaintiffs do not even attempt to meet their burden here.

Plaintiffs offer the Court allegations and advocacy to prop up their request for injunctive relief. The Court should disregard all unverified and unsworn allegations in evaluating their request. Fed. R. Civ. P. 65(b)(1)(A) (requiring that "specific facts in ***an affidavit or a verified complaint*** clearly show that immediate and irreparable injury, loss, or damage will result"). The Ninth Circuit has confirmed this in no uncertain terms: "a plaintiff must ***demonstrate*** immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood*

*Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis added). The Court's Temporary Restraining Order ("TRO") rests on language "taken largely verbatim from [DIRECTV's] Complaint and from its brief on the motion for TRO." ECF 60 at 2 n.1. Such unsupported allegations cannot pass as "specific facts" necessary to warrant a preliminary injunction under Ninth Circuit law.[17] Instead, Plaintiffs must offer proof "beyond the unverified allegations of the pleadings and motion papers," and here, they have failed to do so.[18]

Plaintiffs also rely on old DOJ Competitive Impact Statements ("CIS") filed in 2019 and 2021, even though these statements were made in unrelated cases involving different parties, different transactions, and fundamentally different market conditions. ECF 60 at 8–9. While filed with courts, CISs are neither sworn affidavits nor a Court's findings of fact. The Antitrust Procedures and Penalties Act specifically provides that CISs "shall not be admissible against any defendant in any action or proceeding brought by any other party against such defendant under the antitrust laws."[19] As such, all references to the CISs in Plaintiffs' Complaints and Declarations should be stricken. These should not be given any weight and cannot form the basis of a preliminary injunction. *See Herb Reed Enters., LLC*, 736 F.3d at 1250.

Moreover, specific facts relating to **this** Transaction contradict these CISs. *See* ECF 48 at 9 (citing ECF 48-9 ¶¶ 12-15). Plaintiffs do not offer any rationale for this Court to credit their allegations over record facts, including the approval of this deal by two federal expert agencies, the findings of the FCC, and Defendants' sworn rebuttal evidence. *See* Biard Decl. ¶¶ 17–18 (explaining that the notion that MVPDs like DIRECTV are beholden to broadcasters is refuted by the fact that many such distributors, including DIRECTV, have offerings that exclude local stations, decline to carry certain stations, and/or obtain network programming directly from networks); Israel Decl. ¶ 12 (demonstrating that cord-cutting trends create downward pressure on

---

[17] *See also Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013).

[18] 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed. 2020) (collecting cases); *see also Sampson v. Murray*, 415 U.S. 61, 88-89 (1974); *U.S.A. Express Cab, LLC v. City of San Jose*, No. C-07-06171 RMW, 2007 WL 4612926, at *6 (N.D. Cal. Dec. 31, 2007).

[19] 15 U.S.C. § 16(h) ("[T]he competitive impact statement filed under subsection (b) of this section, shall not be admissible against any defendant in any action or proceeding brought by any other party against such defendant under the antitrust laws or by the United States under section 15a of this title nor constitute a basis for the introduction of the consent judgment as prima facie evidence against such defendant in any such action or proceeding.").

retransmission rates and that the merger would not give Nexstar the ability to raise prices).

Plaintiffs also fail to address much of Defendants' rebuttal evidence, including:

- MVPDs must license *all* Big 4 stations in a DMA—they do not and cannot substitute between or among them (Israel Decl. ¶¶ 10);

- DIRECTV offers products today that do not include *any* Big 4 stations in a DMA, because DIRECTV acquires network content directly from the network (Biard Decl. ¶ 18);

- MVPDs and Big 4 station owners negotiate retransmission consent terms across the owners and MVPDs' entire footprints rather than by station or DMA, including for non-Big 4 stations (*Id.* ¶ 22);

- Retransmission consent agreements between MVPDs and Big 4 station owners generally last three years or longer and expire and are renegotiated on different intervals (*Id.* ¶ 52);

- DIRECTV and some other MVPDs can extend their preexisting retransmission consent terms for TEGNA and Nexstar Big 4 stations through November 30, 2026 (*Id.* at ¶¶ 57–59, 61);

- Other MVPDs' contracts covering millions of subscribers were renegotiated in the past year and will not expire for multiple years, and Nexstar's agreements covering approximately 70% of its subscribers nationally do not even begin to expire until 2027 (ECF 48-7 ¶¶ 10–11);

- MVPDs can and do negotiate directly with Big 4 networks to carry those networks' content via those networks' DTC products (Biard Decl. ¶ 18);

- MVPDs and broadcasters both lose revenue when there is a blackout or price increase that causes subscriber attrition (*Id.* ¶ 21; Israel Decl. ¶¶ 12, 15);

- Consumers switch between MVPD subscriptions and digital subscriptions (*Id.* ¶ 15);

- Defendants have no incentive to degrade the quality or output of their stations' local news (*Id.* ¶¶ 23–24); and

- Defendants are obligated under the FCC's Order to increase the quality and output of their stations' local news, provide TEGNA stations access to Nexstar's Washington, DC, news bureau, accelerate the shift of TEGNA stations to ATSC 3.0 infrastructure, and provide TEGNA stations access to EdgeBeam Wireless (FCC Order ¶¶ 85–86).

No preliminary injunction should issue where, as here, Plaintiffs' "general assertions" are "substantially controverted by counter-affidavits." *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972).

### B.    Plaintiffs Show No Proof of Immediate Irreparable Harm

Injunctive relief is not appropriate for the additional reason that Plaintiffs have not shown personal, immediate irreparable harm. *See Winter*, 555 U.S. at 22, 32; *see also Am. Passage*

DEFS.' RES. TO ORDER & OPP. TO P.I.

*Media Corp. v. Cass Commc'ns*, 750 F.2d 1470, 1473 (9th Cir. 1985). The Ninth Circuit has not qualified this requirement. In order for Plaintiffs to obtain injunctive relief under Section 16 of the Clayton Act, they "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."[20] *Boardman*, 822 F.3d at 1022 (emphasis in original). As Judge Corley explained recently in *DeMartini v. Microsoft Corp.*, the Ninth Circuit in *Boardman* "did not hold that a threat of irreparable harm, even if not immediate, is sufficient." No. 22-cv-8991-JSC, 2023 WL 3569993, at *4 (N.D. Cal. May 19, 2023) (counseling against an overbroad reading of the statement in *Boardman* that "[a] lessening of competition constitutes an irreparable injury." 822 F.3d at 1023). Harms outside the alleged market do not qualify. *FTC v. Qualcomm*, 969 F.3d 974, 993 (9th Cir. 2020) ("[H]arms to customers and consumers outside the relevant markets are beyond the scope of antitrust law."); ECF 60 at 13 & n.3 (acknowledging same).

Nor can possible future increases in retransmission rates for MVPDs justify injunctive relief. First, strictly monetary harm is not irreparable. *See Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1235 (E.D. Cal. 2015), aff'd, 659 F. App'x 402 (9th Cir. 2016). Second, no alleged increases are imminent. Plaintiffs would be in the same position with respect to those fees for most of this year, whether or not a preliminary injunction issues—using Judge Corley's language, the Plaintiffs were the same "the day after the merger … [as] before the merger." *DeMartini*, 2023 WL 3569993 at *3. Existing retransmission consent rates for DIRECTV are contractually fixed through at least ███████ and potentially through November 30, 2026. Biard Decl. ¶¶ 12–14. Negotiations for future pricing on expiring contracts ███████ *Id.* ¶ 16. Third, Plaintiffs' theory that Nexstar will used increased "leverage" to raise rates is speculative and contrary to economic realities. *See infra* Part III.C.3.b; *Caribbean Marine Servs. Co.*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."). In an attempt at support, Plaintiffs cite a fragment of a quote from a Nexstar document containing the word "leverage." ECF 60 at 4. But that document does not discuss leverage as to MVPDs. Rather, it refers to a potential benefit of the

---

[20] *See also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

DEFS.' RES. TO ORDER & OPP. TO P.I.

deal. As noted above, ███████████████████████████████████████████████████████████████████████████████████ Biard Decl. ¶ 45. Perry Sook, CEO of Nexstar, describes in that document the potential increased "bargaining position vis-a-vis the traditional networks" ██████████████████████████████████ ███████████████████████████████████████████████████████████████████████ *See* ECF 14-47 at 14.

Further, because divestiture remains available after a trial on the merits, Plaintiffs' alleged harm is not irreparable. Here, Plaintiffs allege harm in specific overlap DMAs, which could be remedied through sale of specific stations. *See DeMartini*, 2023 WL 3569993 at *4 (denying preliminary injunction in part because the acquired company would "continue to exist as a subsidiary," preserving the possibility of divestiture); *see also Reilly v. Medianews Group*, No. C 06-04332, 2006 WL 2419100, at *6 (N.D. Cal. July 28, 2006).

### C.    Plaintiffs Fail to Demonstrate Likelihood of Success on the Merits

#### 1.    Alleged Product Market Is Fatally Flawed

To prevail on their Section 7 claim, Plaintiffs must first "accurately define the relevant market, which refers to 'the area of effective competition.'" *Qualcomm Inc.*, 969 F.3d at 992 (citation omitted); *see also Cal. v. Sutter Health Sys.,* 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001); *Ohio v. Am. Express Co.*, 585 U.S. 529, 543-44 (2018). Plaintiffs propose a market for Big Four retransmission consent.[21] Compl. ¶¶ 12–14. But a proposed market that only includes complementary products and excludes "reasonably interchangeable products" (*i.e.,* substitutes) is facially unsustainable. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120, 1123-24 (9th Cir. 2018); *see also MLW Media LLC v. World Wrestling Ent., Inc.*, 655 F. Supp. 3d 946, 952 (N.D. Cal. 2023). Plaintiffs' proposed market suffers from precisely these and other defects and should be rejected.

#### a.    Big 4 Stations Are Complements, Not Substitutes

Plaintiffs' alleged market is based on unsupported allegations that are internally

---

[21] The States refer to this as "Licensing of Big 4 Television Retransmission Consent." States' Compl. ¶¶ 12–14.

inconsistent and contrary to the facts submitted by Defendants. Specifically, DIRECTV fails to reconcile its allegations that Nexstar and TEGNA compete in the product market for "distribution rights that Big Four broadcasting stations sell to MVPDs" (Compl. ¶ 53) with its claim that MVPDs *must carry* all Big 4 stations in a given DMA. ECF 14-2 (Thun Decl. ¶ 8) ("customers highly value the … programming carried on Big Four local broadcast stations and expect and demand that DIRECTV will carry such Big Four local broadcast stations"). The States make the same contradiction. States' Compl. ¶¶ 36, 65.

Plaintiffs' expert, Dr. Shapiro, confirms Big 4 stations are complements as each "provides *unique* and valuable content to MVPDs." Shapiro Decl. ¶ 4 (ECF 56-1). Nexstar, in Mr. Biard's unrebutted declaration, explains why: no other network affiliated station has the same rights to broadcast the same network programs carried by *another* network-affiliated station in a DMA. Biard Decl. ¶ 3. Thus, the 49ers' game on CBS will not and *cannot* be aired in the same DMA on FOX. A hypothetical "blackout" of CBS would not cause 49ers fans to switch to FOX, regardless of whether the local FOX and CBS affiliates are both owned by Nexstar. Because DIRECTV and other MVPDs must carry all Big 4 stations in a DMA to meet customer demands, companies offering retransmission licenses for those stations are not competitors. *Dream Big Media Inc. v. Alphabet Inc.*, No. 24-4968, 2025 WL 3485388, at *2 (9th Cir. Dec. 4, 2025) (proposed product market deficient because it is "comprised of complements, not substitutes").[22]

Plaintiffs offer no rebuttal to this point. DIRECTV has never even alleged, much less proven, that it can carry less than all Big 4 stations in a DMA. Nor do Plaintiff States as to MVPDs. Additionally, Nexstar and TEGNA each negotiate retransmission consent agreements with MVPDs approximately every three years. Biard Decl. ¶ 52. But their contracts expire at *different times* and are renegotiated at *different intervals*. Id. ¶ 52. MVPDs cannot play Big 4 station group owners off one another to get better terms, and DIRECTV never claims it has. Israel Decl. ¶ 6. For example, DIRECTV's agreement with TEGNA expires on ███████████ and its agreement with Nexstar expires on ██████████ Biard Decl. ¶¶ 12, 57. DIRECTV did not have the option of turning to Nexstar for lower rates when negotiating with TEGNA earlier. Israel

---

[22] *Cf. Hicks*, 897 F.3d at 1120; *Intel Corp. v. Seven Networks*, 562 F. Supp. 3d 454, 461 (N.D. Cal. 2021).

DEFS.' RES. TO ORDER & OPP. TO P.I.

Decl. ¶ 7.

Unsurprisingly, Nexstar does not consider the retransmission rates of other broadcasters in its negotiations with DIRECTV, further proof of the lack of any historical competition between them for retransmission licensing. Biard Decl. ¶ 51. Finally, negotiations are idiosyncratic and do not—and have never—focused *solely* on Big 4 stations. Negotiations involve comprehensive discussions that can include such things as ███████████████████████████ ████████████████████ *See* Biard Decl. Ex. 2.

**b.   Big 4 Stations Compete with Other Content Sellers**

Plaintiffs fail to allege—much less prove—why the Court should exclude consideration of the numerous modern video alternatives from the product market. First, MVPDs like DIRECTV can and do bypass local stations and directly negotiate with Big 4 networks at the corporate level for access to content on digital streams. MVPDs then include the networks' digital streaming services for their subscribers through national agreements that extend into the markets of local broadcast affiliates like Nexstar and TEGNA.[23] Biard Decl. ¶¶ 17–19.

Indeed, MVPDs like DIRECTV obtain Big 4 network's live sports content directly from the networks. Biard Decl. ¶¶ 17–19. They also can and have licensed sports content directly from the sports leagues; content it claims is unique to Big 4 stations. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1148 (9th Cir. 2019) ("Under the NFL-DirecTV Agreement, the NFL allows DirecTV to obtain all of the live telecasts produced by CBS and Fox, package those telecasts, and deliver the bundled feeds to NFL Sunday Ticket subscribers.").

Plaintiffs do not explain and cannot prove why Nexstar would willingly degrade its news product in a world where Americans look to numerous sources to get their news. Today Americans regularly obtain local news from means other than a television set. In a 2024 study by

---

[23] *See* Press Release, Charter Communications, *The Walt Disney Company and Charter Communications Announce Transformative Agreement for Distribution of Disney's Linear Networks and Direct-to-Consumer Services* (Sept. 11, 2023), https://corporate.charter.com/newsroom/the-walt-disney-company-and-charter-communications-announce-transformative-agreement-2023 (including Disney+ and ESPN+ as part of Spectrum TV packages and broader DTC distribution reach); *see also* Press Release, Charter Communications, *Spectrum TV Select Customers to Receive Hulu as Part of Expanded Agreement Between Charter and The Walt Disney Company* (June 26, 2025), https://ir.charter.com/news-releases/news-release-details/spectrum-tv-select-customers-receive-hulu-part-expanded (Hulu added to streaming bundle).

DEFS.' RES. TO ORDER & OPP. TO P.I.

the Pew Research Center, almost half of the respondents preferred getting local news from websites (26%) or social media (23%).[24] Plaintiffs do not contend with Defendants' record evidence, including its history of expanding local news and commitments to do so in the future. In addition, they do not allege a market for local news.

Plaintiffs also concede that viewers switch away from MVPDs to alternative sources of programming, including streaming and other digital services. Compl. ¶ 113. Local broadcasting content, including Big 4 affiliates, remains available to viewers for free over the air. Compl. ¶¶ 34-35. In short, competition occurs between the various content packages available to consumers from MVPDs, vMVPDs, DTC platforms and more. Israel Decl. ¶¶ 14–17. The greater volume of competition may be harmful to MVPDs' bottom lines, but it does not merit a preliminary injunction at the expense of Nexstar and its viewers. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (denying relief where plaintiff suffered a "loss of windfall profits" because the antitrust laws do not protect "competitors").

### 2.   Alleged Geographic Market Is Facially Implausible

Plaintiffs' DMA-based geographic market definition is also fundamentally flawed. As Defendants have demonstrated, broadcast groups and MVPDs negotiate the same retransmission rates for all stations with the same network affiliation across their entire national footprints. Compl. ¶ 36; Israel Decl. ¶ 18; Shapiro Decl. ¶ 41. In a separate lawsuit DIRECTV brought against Nexstar in New York, DIRECTV *agreed* that the relevant market is national, not local:

> The first relevant geographic market in this case is the United States because when MVPDs negotiate retransmission consent agreements with broadcasters and broadcast station groups, they generally do so for an area covering their respective national or multi-state geographic footprints. ***These contracts are not negotiated on a station-by-station basis; rather, retransmission rates are negotiated for some or all of that broadcast group's stations all at once***.

Complaint ¶ 82, *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 23-CV-2221 (S.D.N.Y. 2023) (emphasis added). There, DIRECTV premises its definition of DMA-level submarkets on the fact that "[n]ot every broadcaster and broadcast station group, however, competes at a national level" (*Id.* ¶ 83), but here it does not allege any facts, let alone *demonstrate*, that TEGNA competes with

---

[24] Elisa Shearer, *Americans' Changing Relationship With Local News*, PEW RSCH. CTR. (May 7, 2024), https://www.pewresearch.org/journalism/2024/05/07/americans-changing-relationship-with-local-news/.

Nexstar to license Big 4 retransmission rights to DIRECTV at a DMA level.

The real-life manner in which prices are determined dictates geographic market definition and here there is "simply no basis for a DMA level geographic market." ECF 48-9 ¶ 50; *see e.g., FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 49 (D.D.C. 2015) (defining a national geographic market where customers with a "geographically dispersed footprint" enter into "a single contract whose terms, including pricing, apply across regions"); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 575 (1966) (finding a national geographic market where local services were priced and contracted for on a national level). Because Plaintiffs do not allege any competition for retransmission rights at a local level, their geographic market is unduly narrow.

### 3.   Plaintiffs Cannot Make a *Prima Facie* Case

In addition to the flawed arguments on relevant market, Plaintiffs do not and cannot make a *prima facie* showing that the Transaction will create "'an appreciable danger' or 'a reasonable probability' of anticompetitive effects in [a] relevant market." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018); 15 U.S.C. § 26.

#### a.   Plaintiffs' HHI and Market Share Calculations Are Not Entitled to Any Weight

Plaintiffs' outdated market share and HHI math have no bearing on potential anticompetitive effects. Such measures are only informative to the extent that they are computed using the correct market definition. These calculations appear to have been made at DMA level to generate big numbers, but because prices are not set at DMA level, they predict nothing. Israel Decl. ¶¶ 18–19; *see FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986) (finding that where the relevant market is not correctly defined, "the HHI's computed are meaningless and do not reflect market reality"); *Cal. v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1081 (N. D. Cal. 2000); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 992 (D.C. Cir. 1990).

#### b.   Plaintiffs Have Not Demonstrated Any Causal Connection Between Alleged Retransmission Rate Increases and the Transaction

Plaintiffs argue that the Transaction "would likely," "may," or "could" lead to higher retransmission consent fees for MVPDs (and, if MVPDs choose to pass through costs, to their subscribers) because Nexstar will have greater bargaining leverage. Compl. ¶ 41; States' Compl.

14                    DEFS.' RES. TO ORDER & OPP. TO P.I.

¶ 65. But to plausibly allege antitrust injury, Plaintiffs must allege that any price increase to MVPDs is "traceable to a restraint on trade." *See Intel Corp. v. Fortress Inv. Grp. LLC*, No. 21-16817, 2022 WL 16756365, at \*2 (9th Cir. Nov. 8, 2022); *see also Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1077, 1088 (9th Cir. 2025). DIRECTV mischaracterizes a Nexstar statement about "leverage" to purportedly support their position (DIRECTV Mot. at 14), but the actual statement is about negotiating ***down*** costs for Big 4 content, a ***potential benefit*** of the deal. *See* Raphael Decl. Ex. 5 at 14.

Plaintiffs otherwise do not offer any evidence and cannot prove that an increase in Big 4 station ownership in a DMA would lead to higher costs for MVPDs, given that Nexstar and TEGNA are not competitors in negotiations with MVPDs. Instead, they offer a misleading allegation about the industry that "[s]ince 2010, retransmission license fees charged by broadcasters have increased more than 2,000 percent." Order at 4; Compl. ¶ 11.

This allegation is measured from essentially a $0 starting point, since MVPDs resisted paying broadcasters for years (even after passage of the Cable Act). Biard Decl. ¶ 43. Since 2005, following the introduction of cash compensation, retransmission consent evolved alongside broader changes in the content marketplace. *Id.* ¶¶ 43–46. Retransmission fees increased against the backdrop of increased value and rising compensation for video content generally as competition for viewers intensified with the entry and expansion of online video distributors and streaming platforms like Amazon and Netflix. *Id.* Increases in Nexstar's retransmission consent fees are commensurate with increases in other competitive providers of content. *Id.* ¶ 46.

Plaintiffs' allegation about retransmission rates also says nothing of the ***cost*** to local broadcasters like Nexstar to pay for Big 4 and other proprietary content, which has skyrocketed. Today local affiliate stations pay networks a significant portion of their retransmission revenue in the form of "reverse compensation," often through escalating formulas that capture about 50% on average, and in some cases 60% to 70% of gross retransmission receipts.[25] Biard Decl. ¶¶ 45–48.

---

[25] Jon Lafayette, *Affiliates Seek to Change How They Pay Networks for Programming,* NEXTTV (March 1, 2024), https://www.nexttv.com/news/affiliates-seek-to-change-how-they-pay-networks-for-programming; Matthew Lochte, *MFM: As Retrans Revenue Slides, Broadcast Stations Are Finding New Ways to Grow*, MEDIA GROUP ONLINE (Nov. 18, 2022), https://mediagrouponlineinc.com/2022/11/18/mfm-as-retrans-revenue-slides-broadcast-stations-are-finding-new-ways-to-grow/.

Alleging price increases after Nexstar's acquisition of Tribune in 2019, likewise, does not offer Plaintiffs any support. Compl. ¶ 44. Nexstar's acquisition of Tribune did not involve the acquisition of any second or third Big 4 stations in any DMAs so any alleged price increases could not have been the result of allegedly increased bargaining leverage from owning multiple Big 4 stations in a DMA. Compl. ¶¶ 44; 41. If anything, it strongly suggests that the increasing costs to Nexstar of Big 4 affiliate fees and other content impacted any alleged price increases to MVPDs. Israel Decl. ¶ 12. Plaintiffs do not rebut these facts and their misleading allegations cannot be used to predict future effects or as evidence in support of a preliminary injunction.

Moreover, from an economic perspective, post-Transaction Nexstar should have more incentive not only to push down its costs and create more value, but also to drive down its costs to MVPDs in the hope the MVPD will charge less or offer more value to its customers. That is because, when a subscriber leaves for digital or over-the-air options, both the MVPD and the local broadcaster lose revenue. *Id.* ¶ 15. "That MVPDs compete with these streaming alternatives means that broadcasters also (indirectly) compete with them. If an MVPD's product becomes less competitive, as would occur when it raises its prices in response to an increase in retransmission rates, the MVPD's subscribers will switch to streaming options for which the broadcaster receives less revenue or no revenue. Importantly, because broadcasters' offerings are complements for one another, this diversion does not hurt just one broadcaster, but all broadcasters whose content is included in the MVPD's bundle." *Id.* ¶ 15.

c. **Alleged Harms to Local News Are a Red Herring**

Plaintiffs' allegations that the Transaction will enable Nexstar to "reduce the amount, variety, and quality of local news without having to worry about losing business to competition" fare no better. Order at 5. First, this alleged harm is not cognizable because Plaintiffs do not allege any market for Big 4 stations' "local news," let alone properly define or defend one. Shapiro Decl. ¶ 8 (ECF 56-1) (acknowledging criticism for "not defining a relevant market for local news"). Additionally, DIRECTV assigns *no value* to local news unless it runs alongside Big 4 network content, even though many of Nexstar's non-Big 4 stations like WGN9, KTLA, and KRON produce substantial news hours,

16                DEFS.' RES. TO ORDER & OPP. TO P.I.

Biard Decl. Ex. 6; *see also* ECF 14-2, ¶ 10.

Even if the Court were not persuaded by the evidence of Nexstar's prior history of expanding local news and commitments under the FCC Order, common ownership of stations has been shown to correlate to increased news output. Israel Decl. ¶ 23. DIRECTV criticizes statements that multiple news stations can run "under one infrastructure" without considering that "greater efficiency in news operations should be expected to both lower costs and increase quality and investment." ECF 48-9 ¶ 60. Numerous empirical studies by multiple economists have found a "positive and statistically significant relationship between revenue and local news production."[26] They further found that local broadcast news production is "subject to strong economies of both scale and scope," such that increased common station ownership is "prima facie welfare enhancing."[27] The FCC has also concluded that the "efficiencies of common ownership" enables broadcasters to increase "high-quality programming," especially in smaller and mid-sized markets.[28] *See also* Israel Decl. ¶¶ 22–24. As stated above, the competing options available to consumers require broadcasters to provide high quality, locally oriented content to draw viewership and thus revenue to support news production. *Id.*

### 4.    Defendants Can Rebut Any *Prima Facie* Case

Plaintiffs have not and cannot make a *prima facie* showing of anticompetitive effects in any relevant market. Defendants could easily rebut any case as "inaccurately predict[ing] the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 991. As noted in Defendants' evidence and briefing (and conceded by Plaintiffs' expert), the media landscape is rapidly and constantly evolving. *See* Shapiro Decl. ¶ 3 (ECF 56-1). The industry is

---

[26] *See, e.g.,* J.A. Eisenach and K.W. Caves, The Effects of Regulation on Economies of Scale and Scope in TV Broadcasting, at 4, 45-46 and Table 8 (2011) ("Eisenach"), attached to Reply Comments of NAB, MB Docket No. 10-71 (June 27, 2011).

[27] *Id.* at 1-3; *accord* Decl. of M. Israel and A. Shampine, Comments of NAB, MB Docket No. 10-71, at Appendix B ¶¶ 49-51 (June 26, 2014) (finding that economies of scale and scope exist in TV broadcasting and that both lead "to increased investment in news programming").

[28] 2017 Ownership Reconsideration Order, 32 FCC Rcd at 9834, 9836 (relaxing the local TV rule by repealing the "eight voices" test); *see also Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12911 (1999) (acknowledging that economies of scale "can result in stronger stations and improved service to the public" and modifying the local TV rule to allow duopolies for the first time); Israel Decl. ¶ 25; *see also Schurz Commc'n, Inc. v. FCC*, 982 F.2d 1043, 1054 (7th Cir. 1992).

characterized by rapid entry and vigorous competition. Biard Decl. ¶¶ 43–48. Past competitive dynamics and even those that exist at this moment cannot predict Nexstar's future position. Israel Decl. ¶¶ 14–15; *see also* FCC Order.

### D. Balance of Equities and the Public Interest Weigh Against Injunctive Relief

Extending the delay of Defendants' integration will prevent the benefits of the deal from flowing to millions of Americans. And it will frustrate the public benefits and national broadcast policy of the FCC. Granting a preliminary injunction here will also contradict existing case law and set an unworkably low bar for almost anyone (including a competitor, as here) to overturn the well-reasoned decisions, orders, and remedies of expert federal agencies based on public comment and review, including as to possible implications for competition. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004); *see also New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225–26 (S.D.N.Y. 2020).

A preliminary injunction will extend and worsen Defendants significant operational, financial, and competitive harm. Biard Decl. ¶¶ 23-24; Gliha Decl. ¶ 3. Defendants will continue to be unable to realize cost savings and efficiencies from the Transaction. *Id.* ¶¶ 25-27. They are already operationally impaired in attempting to navigate compliance with the existing TRO. *Id.* ¶¶ 32-35. Continued delay will endanger Defendants' compliance with the FCC Order, financial obligations, and SEC requirements. *Id.* ¶¶ 38, 61-62. Employees are stuck in limbo and at risk of departing. Biard Decl. ¶ 30. The Court should balance these ongoing harms, including as described in Defendants' declarations, against the lack of imminent harm to anyone else.

### E. Plaintiffs Must Post a Bond

If the Court grants a preliminary injunction, Plaintiffs must post a bond of ▮▮▮▮▮ commensurate with the significant losses Nexstar already has and will continue to incur. *See* Fed. R. Civ. P. 65(c); 15 U.S.C. § 26 (preliminary injunctions shall issue only "upon the execution of proper bond against damages for an injunction improvidently granted"); *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1037 (9th Cir. 1994) (explaining that Rule 65(c) serves to

discourage injunctions based on "tenuous legal grounds" and to protect against the risk of wrongful restraint). States are not exempt from the bond requirement.[29]

### F.    Plaintiff States' Additional Arguments Are Unavailing

Plaintiff States' motion contains additional, incorrect arguments. First, Plaintiffs argue that Defendants have "concede[d] that loss of competition is irreparable harm" and thus "waived" any contrary argument. States' Rep. at 4. To the contrary, Defendants directly contested Plaintiffs' allegations of irreparable harm, arguing their "inconsisten[cy] with the economic realities of the industry." Defs.' Opp. at 12. Plaintiffs cannot show irreparable harm under their own theories of harm—even without Defendants' accepting those theories to be true.

Second, Plaintiffs argue that the FCC Order has "no bearing" on any analysis of this Transaction. However, where the FCC has conducted independent regulatory review, courts "treat [its] views and actions as persuasive and helpful evidence in analyzing the competitive effect of [a] merger." *New York*, 439 F. Supp. 3d at 225.

Third, Plaintiff States' theory that retransmission consent fee increases will be "likely pass[ed] on" to consumers ignores the fact that DIRECTV, not Nexstar, decides what to charge its customers. States' Compl. ¶ 9.[30] Speculation "does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co.*, 844 F.2d at 674.

Fourth, Plaintiffs' allegations of Nexstar's "serial acquisition strategy" are intended to provoke and distract from the issues at hand. Defendants' history of acquisitions has no bearing on whether *this* Transaction violates Section 7, which Plaintiffs cannot show.[31] *See Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1300 (W.D. Wash. 2019) (rejecting State's argument that "a court may analyze multiple transactions jointly" in a Section 7 claim).

Lastly, Plaintiff States fail to adequately allege standing.[32]

---

[29] *See, e.g., Hawaii ex rel. Anzai v. Gannett Pac.*, 99 F. Supp. 2d 1241, 1255 (D. Haw. 1999) (imposing bond on state); *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 465 (D.N.J. 1998) (same).

[30] The FCC specifically considered this concern and found that "Nexstar does not set the rates that MVPDs charge to their customers. Nor have MVPDs provided transparency in our record regarding the current and potential future inputs that go into their consumer pricing for us to conclude that the relevant MVPDs would have to raise prices in response to this Transaction." FCC Order ¶ 74.

[31] Plaintiff States cite the Merger Guidelines, which are "not binding" on courts, as their sole support. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001).

[32] The claimed injury to States' citizens (and the citizens of non-parties) is derivative and depends entirely upon an assumed pass-through of costs that is not supported by any facts. This is too attenuated to confer

### G.     Requested Relief Is Overbroad and Unworkable

Injunctions "must be narrowly tailored to remedy only the specific harms shown by the plaintiffs." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004); *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (district courts lack authority to issue injunctions "broader than necessary to provide complete relief to each plaintiff with standing"). Plaintiffs' core allegation is that MVPDs may have to pay higher retransmission fees in certain DMAs. Even were injunctive relief warranted (*cf. supra* at 9 explaining why this harm is addressable through monetary damages and speculative), the requested injunction is far broader than necessary to address that purported harm. Plaintiffs only allege injury in overlap DMAs, except that the States vaguely allege "nationwide" effects without explanation. Compl. ¶¶ 70, 80; States' Compl. ¶¶ 54-62. Yet they seek relief nationally and across unrelated Nexstar businesses. ECF 60 at 21–24.[33]

Moreover, as explained in Defendants' Notice and Proposals and related exhibits (*see* Exs. 4–5 to Biard Decl.; Ex. 1 to Gliha Decl.), Defendants cannot implement certain provisions of the draft injunctions Plaintiffs propose. They do not give Defendants fair notice of what conduct is permissible, would create regulatory conflicts and would harm the very former TEGNA assets Plaintiffs seek to preserve. Gliha Decl. ¶¶ 14-16, 23-24. That is incompatible with Rule 65(d)(1). *Schmidt v. Lessard*, 414 U.S. 473, 475, 476 (1974) (injunctions must "be specific in terms" and "describe in reasonable detail" the acts restrained because contempt may follow). Requiring Nexstar to operate TEGNA as a separate business is a mandatory injunction subject to a "doubly demanding standard" that has not been met here. *Marlyn Nutraceuticals v. Mucos Pharma*, 571 F. 3d 873, 878-79 (9th Cir. 2009).

### IV.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny a preliminary injunction.

---

standing. *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987). States also fail to make the requisite showing to invoke *parens patriae* standing, which only "allows a sovereign to bring suit on behalf of its citizens when," among other factors, it "alleges injury to a sufficiently substantial segment of its population." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011).

[33] *Cf. United States v. Hewlett Packard Enter.,* No. 25-cv-00951-PCP, 2026 WL 194852, at *2 (N.D. Cal. Jan. 26, 2026).

DEFS.' RES. TO ORDER & OPP. TO P.I.

Dated: April 1, 2026

Respectfully submitted,

By: /s/ *Alexander P. Okuliar*
Alexander P. Okuliar (*pro hac vice*)
Eliot A. Adelson (CA Bar No. 205284)
Bradley S. Lui (CA Bar No. 143088)
Rob Manoso (*pro hac vice)*
Henry Huttinger (CA Bar No. 312843)
Alexa DiCunzolo (*pro hac vice*)


MORRISON & FOERSTER LLP
Attorneys for Defendants Nexstar
Media Group, Inc. and TEGNA Inc.

DEFS.' RES. TO ORDER & OPP. TO P.I.