UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

In re Nexstar-TEGNA Merger Litigation

Case No. 2:26-cv-00976-TLN-CKD

**DECLARATION OF MICHAEL BIARD IN SUPPORT OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

I, Michael Biard, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am President and Chief Operating Officer of Nexstar Media Group, Inc. ("Nexstar"). I submit this declaration in support of Defendants' Response to Order to Show Cause and Opposition to Plaintiffs' Motions for Preliminary Injunction. In my position, I have direct knowledge of the broadcast television industry, including retransmission consent negotiations, and industry economics.

2. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently to them under oath.

3. As explained below, compliance with the Court's Temporary Restraining Order issued on March 27, 2026 (ECF No. 60), as currently written will cause irreparable harm to Nexstar, TEGNA, and the combined enterprise. Moreover, as I understand the Order, it contains certain ambiguities and contradictions that make full compliance impossible without clarification from the Court.

4. I previously submitted a declaration in support of Defendant's Opposition to DIRECTV's Motion for Temporary Restraining Order (ECF No. 48-7), which is attached as **Exhibit 1** to this declaration. ("March 24, 2026 Biard Decl."). Exhibit A to the March 24, 2026 Biard Decl. (ECF No. 48-8) is attached hereto as **Exhibit 2**. The facts set forth in the March 24, 2026 Biard Decl.

remain true and correct, and I could and would testify competently to them under oath. I adopt and incorporate that prior declaration by reference herein and shall be deemed to be part of this declaration as if fully set forth herein.

5.    I previously submitted a declaration in support of Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order in *State of California, et al. v. Nexstar Media Group, Inc., et al.*, No. 2:26-cv-00978-TLN-CKD (E.D. Cal.)[1] (ECF No. 73-8), which is attached as **Exhibit 3** to this declaration. The facts set forth in that prior declaration remain true and correct and I could and would testify competently to them under oath. I adopt and incorporate that prior declaration by reference herein and shall be deemed to be part of this declaration as if fully set forth in full herein.

6.    I previously submitted a declaration in support of Defendant's Notice and Proposals Seeking Compliance Guidance under the Temporary Restraining Order (ECF No. 63-1), which is attached as **Exhibit 4** to this declaration ("March 30, 2026 Biard Decl."). Exhibits A, B, and C to the March 30, 2026 Biard Decl. are attached hereto as **Exhibit 5**. The facts set forth in the March 30, 2026 Biard Decl. remain true and correct, and I could and would testify competently to them under oath. I adopt and incorporate that prior declaration by reference herein and shall be deemed to be part of this declaration as if fully set forth in full herein.

7.    DIRECTV is one of multiple multichannel video programming distributors ("MVPDs") that negotiate with local broadcasters, including Nexstar, to license the rights to retransmit their broadcast television station feeds to their subscribers. Virtual MVPDs ("vMVPDs") generally negotiate for these rights with networks. Station content includes both local content produced by

---

[1] Pursuant to the Court's Order consolidating *DIRECTV, LLC v. Nexstar Media Group, et al.*, No. 2:26-cv-00976-TLN-CKD and *State of California, et al. v. Nexstar Media Group Inc., et al.*, No. 2:26-cv-00978-TLN-CKD (ECF No. 65), Plaintiffs refer to all plaintiffs in this consolidated action, individually and collectively.

the station and content from its affiliated national network (if any).

8.      MVPDs contract with local broadcasters to acquire rights for different stations in a given DMA to include those stations' programming in the video products they offer their subscribers. Such programming is not interchangeable between stations because (typically) each market only has one station affiliated with each network (CBS, FOX, ABC, NBC). So, for example, if a CBS station carrying an NFL Sunday Afternoon game is not carried by an MVPD, that MVPD's subscriber cannot go to an ABC, FOX, or NBC station to watch that game. None of the other network affiliated stations have rights to broadcast that particular NFL Sunday Afternoon game. They are simply not substitutes for watching that NFL game. However, the same viewer could easily go to the NFL+ streaming product or Paramount+ to watch that particular Sunday Afternoon game (and many others), and might even have that game provided by their MVPD outside of the local CBS station. Indeed, MVPDs increasingly seek to offer Paramount+ directly to their viewers. I understand Charter (Spectrum), for example, offers Paramount+ at no additional cost as part of its Spectrum TV Select plan. So, regardless of whether the MVPD carries that station, viewers have a number of other options to watch that CBS programming, and the MVPD also may have the rights to carry that programming through an alternative agreement entered directly with the applicable Big 4 network.

9.      Broadcasters receive from MVPDs what are referred to as license or consent fees generally determined by the number of subscribers for a particular MVPD that will be covered by the agreement. These fees help broadcasters like Nexstar fund the affiliate fees that they pay to the networks for its stations to serve as network affiliates. Such retransmission consent agreements have a range of terms and expiration dates, and different broadcasters negotiate with various MVPDs at different points based on when their respective agreements expire.

10.      The specific terms of the retransmission consent rights are set out in each applicable Retransmission Consent Agreement. Nexstar and DIRECTV have had a Retransmission Consent

Agreement in place since ▓▓▓▓▓▓▓▓ ("Agreement"). (**Exhibit 2**). The Agreement was the successor to prior agreements between Nexstar and DIRECTV. Nexstar's 2025 Certification of its News Program Hour Minimum and News Program Investment Minimum, in connection with the Agreement, is attached hereto as **Exhibit 6**.

11.     Consistent with industry practice, the Agreement is between Nexstar, on behalf of its broadcast television stations, and DIRECTV. Nexstar and DIRECTV negotiated the Agreement company-to-company and on a national portfolio-wide basis—DIRECTV did not negotiate directly with any Nexstar station nor, to my knowledge, did it ever seek to do so. The Agreement was the product of arms-length, good-faith negotiations between Nexstar and DIRECTV. Those negotiations took several months to complete, including a period of over two months during which DIRECTV did not distribute any Nexstar station, network, or other Nexstar-controlled programming.

12.     The below highlights several of the Agreement's relevant terms:

DECLARATION OF MICHAEL BIARD

████ ██████████████████████████████████████

██████████████████████████████████

13.     Under Section 11 of the parties' Agreement, the terms governing DIRECTV's carriage of Nexstar's stations ███████████████████████████████████████

███████████████████████████

14.     I understand that the Federal Communications Commission ("FCC") Order approving the Transaction includes a commitment by Nexstar to offer to extend, on existing terms, any retransmission consent agreement in effect at the time of closing that expires prior to November 30, 2026. Memorandum Opinion and Order ¶ 75, MB Docket No. 25-331 (F.C.C. Mar. 19, 2026) ("FCC Order"). It is my understanding that, if DIRECTV elects to accept such an extension, the current terms of its agreement with Nexstar would remain in place through November 30, 2026.

15.     Accordingly, should DIRECTV avail itself of the extension (which is in its sole discretion), any consequences from the parties' failure to successfully negotiate a long-term extension or renewal of the current agreement, will not occur until the expiration of an extension accepted by DIRECTV, e.g. no earlier than December 1, 2026. Until that time, DIRECTV will continue to operate under the same contractual framework that existed prior to the Transaction.

16.     ████████████████████████████████████████████ Nexstar will negotiate in good faith in any such future negotiations, as it does with each of the MVPDs with whom it has a retransmission agreement. The parties' negotiations will be subject to the parties' independent business decisions and numerous other factors. Despite declining subscribers, DIRECTV is among the larger MVPDs and remains a valued customer of Nexstar. Based on historical experience, Nexstar expects DIRECTV to continue to negotiate aggressively to secure itself the best deal possible at the lowest possible cost.

17.     There are other constraints on retransmission consent negotiations. MVPDs like DIRECTV have evolved their product offerings. For example, DIRECTV has developed and

marketed a set of "skinny bundle" products focused on content genres, including sports-focused package of content, through its internet-delivered service, DIRECTV Stream (i.e., "MySports" offering). This product includes a subset of broadcast stations ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

18.   ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████ These practices demonstrate that DIRECTV makes independent business decisions regarding which broadcast stations to carry and on what terms, and that it has alternatives for obtaining network programming that does not depend on carriage of all local broadcast stations.

19.     The products discussed above in paragraphs 17 and 18 refer to DIRECTV's streaming digital video products.

20.     Nexstar benefits from higher numbers of MVPD subscribers. More MVPD subscribers means Nexstar can reach a larger viewing audience for advertising and other purposes. Given that Nexstar's license fees are determined by the number of subscribers, more subscribers means more revenue for Nexstar. Both DIRECTV and Nexstar thus benefit from maintaining MVPD subscriptions.

21. ███████████████████████████████ The loss of MVPD subscribers—whether because of a dispute/blackout, price increase, or otherwise—is contrary to Nexstar's interest. When subscribers leave the MVPD/vMVPD system, Nexstar's audience shrinks and it receives less in license fees. Thus, it is against Nexstar's interest to pursue strategies that drive subscribers away from DIRECTV or any other MVPD platforms.

22. ████████████████████████████████████████████████████████████████████████████████████████ (*See, e.g.,* **Exhibit 2**).

23. In contrast to these distant outcomes regarding speculative future retransmission fees, Nexstar will suffer permanent operational, financial, and competitive harm if forced to hold separate TEGNA. Those harms are not limited to the initial post-closing period. The longer Nexstar and TEGNA are required to operate under an artificial hold-separate structure after closing, the more those harms will compound through lost efficiencies, deferred investments, disrupted planning, and deterioration of employee, advertiser, and distributor relationships.

24. Nexstar has developed a comprehensive plan to incorporate TEGNA into its operations, including centralized functions designed to improve efficiency, performance, quality, and innovation. This includes the manner, type and quality of local programming (and its production); integration of information systems and internal controls over accounting and financial reporting; expanded utilization of advertising operations tools and digital sales platforms; consolidation of corporate and administrative functions; conforming of standards, controls, procedures, policies, and compensation structures; and retention of key employees. Nexstar has devoted significant resources to plan a rapid integration to begin delivering on the benefits of the transaction. A delay in integration will prevent Nexstar from implementing these plans during a critical post-closing period, resulting in continued duplicative functions, inefficient parallel operations, and delayed or foregone strategic initiatives. It will also be at greater risk of losing key employees. These losses

DECLARATION OF MICHAEL BIARD

cannot be recaptured, and their full magnitude cannot be quantified. Any temporary measures Nexstar may take to navigate the current uncertainty—such as maintaining duplicative processes, delaying integration milestones, or routing decisions through ad hoc workarounds—are not a viable long-term operating model. Those measures increase cost, slow decision-making, and reduce accountability, and they become progressively less workable the longer they remain in place.

25.    TEGNA cannot operate as a fully independent company following its acquisition by Nexstar without significant hardship. Absent integration, Nexstar and TEGNA will be required to maintain artificial operational separation despite common ownership, which will impede coordination in key business functions such as advertising sales, management, local news production, distribution, and business strategy. This constraint will reduce operational efficiency and limit Nexstar's (and a separate TEGNA's) ability to compete effectively. One of the fundamental reasons for the transaction was to allow the combined resources of the companies to better compete against its many rivals, including a wide array of internet streaming services. Forcing Nexstar and TEGNA to artificially operate separately will slow Nexstar down even further while its competitors only increase their current advantage. These operational efficiencies alone have been valued in excess of ███████. Delay in execution on Nexstar's integration plans for even a short time period will result in millions of dollars in lost efficiencies that cannot be recovered. Moreover, maintaining parallel operating structures post-closing would necessitate ongoing duplicative (and inconsistent) business functions that the transaction was intended to eliminate, such as personnel, systems, workflows, approvals, and vendor relationships.

26.    Nexstar financed the acquisition with $5.1 billion of new debt secured by the assets of the combined Nexstar and TEGNA. That debt was based on the credit of the combined operations, including operational and revenue synergies. A hold-separate order could lead to a downgrade of Nexstar's credit ratings, reduce its ability to service and repay debt, and materially degrade the

Company's standing in the financial markets. Those financing risks would become more acute if the market comes to view the combined company as unable to execute its post-closing operating plan for a prolonged period. In that circumstance, uncertainty itself may impair Nexstar's access to capital and increase financing costs in ways that cannot be fully remedied after the fact.

27.     More broadly, the inability to realize the full extent of integration benefits, or delays encountered in the integration process, will have an adverse effect on Nexstar's revenues, level of expenses, and operating results. Those adverse effects would not simply be deferred until a later date; many would be permanently lost. Missed opportunities to streamline operations, deploy shared resources, negotiate from a unified position, and invest during particular business cycles cannot later be recreated to recapture those synergies for any period of time during which integration is prohibited.

28.     A hold-separate requirement would create significant marketplace uncertainty regarding the combined company's operations and strategic direction. That uncertainty will impact Nexstar's ability to preserve and grow key business relationships. In particular, it will undermine advertisers' willingness to commit budgets—particularly for multi-market or forward-looking campaigns—and impair Nexstar's ability to compete effectively for advertising revenue during a critical selling and marketing period known as the annual sales "Upfront," which takes place in the spring and summer every year. As midterm elections, summer and fall sports seasons, and other key revenue cycles approach, prolonged uncertainty over Nexstar's future will result in advertisers looking to the numerous alternatives available to meet their needs—whether video streaming platforms, other local broadcasters, broadcast and cable networks, MVPDs, vMVPDs, mobile video platforms, and other forms of video advertising. Moreover, these losses are not recoverable, particularly to the extent they erode Nexstar's or TEGNA's longstanding relationships with both national and local advertisers. Once advertising budgets are committed

elsewhere for a season or campaign cycle, those dollars generally cannot be recovered later by resuming integration at some future date.

29.     Delayed integration will also prevent Nexstar from delivering anticipated benefits to viewers. As part of the transaction, Nexstar committed to invest in local news production and expanded local coverage. As the FCC determined, Nexstar's anticipated ability to increase investment in local news production and increase local coverage in communities served would be a public interest benefit to millions of Americans. Nexstar's ability to implement these investments quickly and efficiently depends on integrating TEGNA's operations, and a hold separate would delay or limit Nexstar's ability to expand this programming in the near term. Likewise, Nexstar intends to convert TEGNA stations to the ATSC 3.0 standard, or "NextGen TV," that combines broadcast television with the power of broadband internet, to provide higher quality experiences to more markets. A hold-separate order will stall the expansion of this technology. These are time-sensitive initiatives. Delaying them until final judgment would mean that viewers lose the benefit of those improvements during the entire pendency of this case, and those lost months of local programming, operational upgrades, and technological deployment cannot be restored on a retroactive basis.

30.     A hold-separate order will also create substantial risk of attrition among key personnel. Prolonged uncertainty regarding organizational structure, roles, and future operations would make it more likely that employees—particularly high-performing personnel with readily available alternatives—would leave the company. The loss of such employees will disrupt operations and diminish Nexstar's ability to execute its business plans. In my experience, once employees conclude that the post-closing organization is unstable or lacks clarity as to authority, role, compensation, or future direction, that perception is difficult to reverse. If key personnel depart during a prolonged hold-separate period, their institutional knowledge, business relationships, and execution capabilities cannot be fully replaced or restored through later relief. The Court's

temporary restraining order has caused significant confusion among former TEGNA employees, and this is particularly sensitive since TEGNA had previously gone through an unsuccessful contract to be acquired.

31.     The same uncertainty will impair Nexstar's ability to recruit new employees. Prospective hires are less likely to join an organization facing unresolved operational constraints and structural uncertainty, further hindering Nexstar's ability to maintain and build an effective workforce. This problem becomes more severe the longer the uncertainty persists, because recruiting delays compound existing vacancies and increase strain on remaining personnel.

32.     Upon closing of the Transaction on March 19, 2026, a series of actions occurred that cannot be undone. Because these actions are post-closing, it is particularly difficult to freeze integration. Complying with parts of the Order is impossible and could jeopardize both the TEGNA assets the Court seeks to preserve and Nexstar.

33.     The combined company currently covers 132 Designated Market Areas ("DMAs"). Plaintiffs' complaints identify alleged competitive overlaps in only 31 DMAs. (*See, e.g.,* Compl. ¶ 4). The Order's reach therefore extends far beyond the alleged relevant markets identified by Plaintiffs. Significantly, Nexstar and TEGNA do not have any Big 4 network affiliation overlaps in multiple DMAs where both companies operate. (**Exhibit 5** at 3). In these non-overlap DMAs, the concerns alleged by Plaintiffs are entirely absent, yet the Order's requirements extend to all stations regardless of whether they are part of the relevant markets alleged by Plaintiffs.

34.     Moreover, Plaintiffs have not alleged any competitive harm from non-Big 4 stations. Non-Big 4 stations are expressly outside the relevant market alleged by Plaintiffs. Based on the current language of the Order, these non-Big 4 stations—and any other non-Big 4 properties of Nexstar or TEGNA—are also subject to the Order's requirements. A list of Nexstar and TEGNA stations that are not affiliated with Big 4 networks is provided in **Exhibit 5**. (**Exhibit 5** at 5–6).

35.     The Order's requirements create substantial confusion and harm to Nexstar, TEGNA, the combined company, and consumers. The Order further prevents Nexstar from implementing planned benefits to news coverage and local programming that would have flowed to TEGNA stations and their viewers.

36.     In approving the Transaction, the FCC found that the Transaction will provide "public interest benefits to viewers of Nexstar's and TEGNA's stations," including the ability to "invest in local news production and increase local coverage in the communities the combined company will serve." FCC Order ¶ 83.

37.     Pursuant to the FCC Order, Nexstar committed to "expand its investment in local news and programming after its acquisition of TEGNA is complete" and to "increas[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation. *Id.* ¶ 44.

38.     Additionally, as part of its commitments to the FCC, Nexstar committed to divest stations in Denver, CO; Indianapolis, IN; New Haven, CT; Portsmouth, VA; Slidell, Louisiana; and Rogers, Arkansas. *See* FCC Order ¶ 55. The Order's requirements prohibit Nexstar from proceeding with these required divestitures. The Order's requirements conflict with Nexstar's commitments to the FCC, placing Nexstar in an untenable position of potential non-compliance with our obligations and commitments to the federal regulatory authorities.

**Industry Practice in and History of Retransmission Consent Negotiations**

39.     To understand why the Order's requirements are contradictory and impossible to implement, it is important to review the history of retransmission consent negotiations and how such negotiations occur in practice.

40.     Local broadcast television stations, including those owned by Nexstar, broadcast their stations programming for free over the air to anyone within the markets where they operate. Anyone within range of one of our transmitters can use an inexpensive antenna to receive high-

quality, digital broadcasts without paying us anything. Nexstar and its stations are licensed by the FCC to use these public airwaves for broadcasting, which licenses come with numerous obligations and responsibilities. Nexstar incurs millions of dollars in expense annually to meet those obligations.

41.    Nexstar incurs great expense to provide this free over-the-air service, including its local news and journalism, and generates revenue to offset that expense by selling advertising and licensing its signals to MVPDs such as cable, satellite, and other pay TV providers.

42.    MVPDs pay Nexstar "retransmission consent fees" for the right to retransmit or carry our over-the-air signals to their respective subscribers or customers.

43.    Congress created and vested local broadcasters with retransmission consent rights in the Cable Television Consumer Protection and Competition Act of 1992 ("Cable Act") to ensure that MVPDs could not profit from valuable broadcast content without compensating the broadcasters. The Cable Act was intended to correct the competitive imbalance that had developed as cable operators built subscriber bases partly on the strength of broadcast signals. Despite the passage of this law in 1992, MVPDs essentially refused to pay anything to broadcasters for many years. It was not until the early 2000s that local broadcasters were able to negotiate meaningful compensation for their signals, a dynamic that has continued to evolve as the industry has evolved and new distribution platforms have emerged.

44.    Local broadcasters also act as distributors for content provided by large television networks, including the Big 4—NBC, ABC, CBS, and FOX. Broadcasters transmit this network content on their local network-affiliated stations.

45.    Big 4 networks also own and operate their own stations, particularly in major DMAs. However, these Big 4 networks historically also paid local affiliate stations for the service of broadcasting the network's programming, including live sports. However, as the Big 4 networks faced increasing competition from cable networks, the Big 4 networks began to demand payment

13          DECLARATION OF MICHAEL BIARD

from their local affiliates—a reversal of the traditional compensation flow. This started to occur in roughly 2010. These payments from local affiliates to networks are referred to in the industry as "reverse compensation." These fees to the Big 4 Networks payable by local broadcasters like Nexstar represent the single largest cost to Nexstar for its content. These fees have grown dramatically over the last decade and are one of the main drivers of increases in retransmission fees that Nexstar charges to MVPDs. Networks now extract a substantial portion of their broadcast affiliates' retransmission consent revenues, significantly reducing the net revenues retained by local broadcasters like Nexstar and TEGNA.

46.     Local broadcasters face growing financial pressures as the reverse compensation fees and cost of content supplied by Big 4 Networks skyrockets while at the same time, the networks fundamentally erode the traditionally exclusive rights to distribute network programming in the markets where they operate a network-affiliated station.

47.     According to S&P Global Market Intelligence Kagan, these fees now account for the majority of retransmission fees charged by local broadcasters to MVPDs: an average of 53% of affiliate stations' retransmission fees from MVPDs were paid back to networks in the form of reverse compensation in 2025, which is expected to increase to 62% by 2030.[2] This trend has accelerated over the past decade: in 2010, reverse compensation as a percentage of gross retransmission revenue was nearly zero; by 2024, it exceeded 50%. At the same time, traditional MVPD subscriber bases have declined dramatically—over 50% in the ten years from 2014 to 2024—further eroding the revenue base from which local broadcasters can sustain operations. These trends place enormous pressure on local broadcasters like Nexstar and TEGNA to find operational efficiencies and maintain investment in local news and programming.

---

[2] S&P Global Market Intelligence Kagan, *U.S. Basic Cable Network Affiliate Fee Revenue and Average License Fee Per Subscriber Per Month, 1989–2029.*

48.     The escalating reverse compensation fees payable to networks have compressed broadcasters' net margins. ███████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

██████

49.     Retransmission consent negotiations are generally conducted for a broadcaster's entire portfolio of Big 4 network-affiliated stations on a national level. Nexstar negotiates for all of its Big 4 stations (and non-Big 4 stations) as a single portfolio. In my experience involving distribution of broadcast television stations over the past 26 years at Nexstar and elsewhere, there are rarely (if ever) any negotiations for individual stations, or for subsets of a company's portfolio of stations.

50.     Similarly, Nexstar and others do not negotiate for specific DMAs or for groups of DMAs that are smaller than an MVPD's entire footprint. Both sides have an interest in comprehensive, consistent terms that cover the full geographic scope of an MVPD's operations. This has been the case for my entire career (more than 25 years), and I do not expect this practice to change.

51.     In my experience, retransmission consent negotiations between an MVPD and a broadcast station group are conducted confidentially and independently, without reference to that MVPD's negotiations with other station groups. ████████████████████

████████████████████████████████████████

52.     Under FCC regulations implementing the Cable Act of 1992, every three years, broadcasters must elect between must-carry status (guaranteed carriage without compensation) or retransmission consent (the right to negotiate compensation in exchange for retransmission). As a result of this statutory framework, retransmission consent agreements are typically for three-year terms. Importantly, Nexstar's and TEGNA's respective agreements with MVPDs do not expire at the same time—meaning Nexstar and TEGNA have historically negotiated with the same MVPDs (where they overlap) on their own timelines.

53.     There are additional idiosyncratic differences between how Nexstar and TEGNA conduct their respective negotiations with MVPDs.

These structural differences mean that Nexstar and TEGNA historically have approached the same MVPDs with fundamentally different portfolios and negotiating positions.

54.     In my experience,

16                          DECLARATION OF MICHAEL BIARD

████████████████████████████████████████████████████████

████████████████████████████████████

**Renewal of Retransmission Consent Agreements**

55.     At closing—prior to entry of the Order—TEGNA's retransmission agreements with MVPDs that also carry a Nexstar station were contractually superseded by Nexstar agreements with those MVPDs, and carriage of TEGNA stations became governed by Nexstar's existing agreements (with few, short-term exceptions). There were approximately ███ such TEGNA agreements.

56.     This creates an internal contradiction: the Order requires "separate management" of TEGNA (Order ¶ 2) and that "TEGNA personnel must maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations" (Order ¶ 4), yet those stations are now contractually governed by Nexstar's agreements to which no former TEGNA personnel are privy. Payments and carriage terms are all covered by Nexstar's contracts. As is typically required by those agreements, ████████████████ ████████████████████████████████████████████████ ██████████████████████████ News of the Order has already created confusion of its impact on the applicability of the Nexstar agreements to the TEGNA stations, and Nexstar has begun to receive questions from distributors that I expect will accelerate in volume and urgency as Nexstar approaches the end of the month billing cycle.

57.     ████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ which is subject to extension through November 30, 2026 pursuant to the FCC Order.

58.   It is unclear what other MVPDs will do. This creates operational chaos and accounting complexity that harms both Nexstar and TEGNA.

59.   The scope of distribution agreements requiring renewal in the near term is substantial. Nexstar has approximately ██ distribution agreements expiring between now and November 30, 2026. I understand that there are approximately ██ additional distribution agreements that will expire sometime in 2026 (Nexstar does not yet have complete information on the term of those agreements) covering the former TEGNA stations with MVPDs with whom Nexstar has no contractual relationship.

60.   Importantly, ███████████████████████████████████████████████████████████████████████████ If former TEGNA personnel are required to manage the now-governing Nexstar contracts, █████████████████████████████████████ ███████████████████ which would violate the separation requirements of the Order.

61.   As part of its commitments to the FCC, Nexstar committed to "offer those MVPDs with which Nexstar has an existing retransmission consent agreement ("RTCA") that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026." FCC Order ¶ 75. This commitment also applies to TEGNA stations as well, the majority of which would be governed by Nexstar's agreements post-closing. The FCC accepted this commitment as an enforceable condition of Transaction approval. *See id.*

62.   The Order's hold separate requirement creates an untenable conflict with this FCC commitment. Under the Order, TEGNA personnel must "maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations." (Order ¶ 4). Yet the FCC commitment was made by Nexstar on behalf of both companies'

18                                           DECLARATION OF MICHAEL BIARD

stations. It is now unclear whether Nexstar can honor this commitment for TEGNA stations, or whether TEGNA must negotiate independently.

63.     This creates a paradox that undermines the very harm Plaintiffs claim to be preventing. If TEGNA negotiates independently, TEGNA could seek increased rates from MVPDs—the exact type of rate increase that Plaintiffs have alleged this Transaction would facilitate. Conversely, if Nexstar speaks for TEGNA to honor the FCC's rate-extension commitment, Nexstar would appear to violate the Order's requirement that TEGNA personnel maintain control over retransmission consent negotiations.

**Local News and Programming Competition**

64.     Nexstar stations face their most significant competition in local news and programming from a wide array of non-Big 4 broadcast sources, including social media platforms, news websites and e-newsletters, Big 4-owned paid streaming services (e.g., Peacock, Paramount+, Fox One) and free streaming services (e.g., NBC News Now, ABC News Live, CBS News 24/7, LiveNow from Fox), free streaming services on connected apps (e.g., Haystack News, Local Now, NewsOn, The Roku Channel) and non-Big 4-affiliated stations. The competitive landscape for local news has fundamentally changed with the explosion of new options available across devices and platforms, and broadcast television stations now compete with an innumerable traditional, digital, and non-traditional news sources for viewers' attention.

65.     In response to this competitive environment, Nexstar has over the past five years steadily increased its output of local programming, including local news. Following Nexstar's 2019 acquisition of Tribune, Nexstar's stations increased local news coverage by 28,000 hours per year (more than 12.5%) and increased local lifestyle programming by 9,000 hours (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%), respectively. FCC Order ¶ 68. This track record demonstrates Nexstar's commitment to serving local communities and competing effectively against news alternatives of all types.

66.     The FCC secured commitments from Nexstar to expand its investment in local news and programming, including increasing the amount of local news it provides in acquired markets. *See* FCC Order ¶ 6. The Order's separation requirements threaten to undermine these commitments by preventing Nexstar from implementing its plans to enhance local news coverage at TEGNA stations.

67.     The Order would deprive Nexstar's communities of the very benefits the FCC found to be in the public interest. Nexstar will be able to invest in local programming and local coverage that benefits viewers, which will provide a substantial benefit to the public. FCC Order ¶ 83. The Order also would prevent Nexstar from delivering these benefits to viewers and would irreparably harm the interests of the United States, as stated by the FCC in advancing this Transaction.

68.     Disrupting the combined stations operations would severely hurt Nexstar's plans to upgrade broadcast infrastructure and provide all TEGNA stations with access to ATSC 3.0, a new over-the-air broadcasting standard combining digital television with innovative data transmission capabilities that enable functionality like broadcast positioning service ("BPS"), which has been proposed as an essential service that provides redundancy and resiliency to GPS. FCC Order ¶ 86. These technological benefits also serve the public interest.

**Content Sharing and Operational Synergies**

69.     Prior to the Transaction, ██████████████████████████████████████████████████████████████████████████████████████ The Order's requirement that Nexstar "must not influence the management" of TEGNA (Order ¶ 4) appears to require halting all such cooperation that benefits stations and consumers.

70.     Additionally, Nexstar made plans to provide the former TEGNA stations with access to Nexstar's Washington, D.C. news bureau for creation of important local programming ahead of the midterm elections. This cooperation benefits those former TEGNA stations and their viewers by providing access to content that TEGNA does not otherwise have the infrastructure to

produce—yet such cooperation must apparently cease under the Order's separation requirements. (*See* Order ¶¶ 2, 4).

71.    Depriving the former TEGNA stations of access to content from the D.C. bureau is an outcome contrary to better local news and the public interest. The cessation of these efficiencies does not preserve competition—it eliminates benefits that were beginning to flow to those stations and their viewers. It also creates a direct conflict with Defendants' commitments under the FCC Order. FCC Order ¶¶ 6, 82.

72.    The Order also threatens to disrupt valuable joint programming that benefits local communities. Prior to the Transaction, ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████

73.    These examples—the D.C. bureau content access, ███████████████ ███████████████—demonstrate how the Order's requirements produce outcomes that are contrary to the public interest. The FCC supports this Transaction as a way to protect and promote its "longstanding media policy goals of competition, localism, and diversity." FCC Order ¶ 2. The Order does not preserve competition; it prevents beneficial cooperation that serves viewers and undermines the FCC's stated public interest goals.

**Employment and Compensation**

74.    The Order provides that Nexstar "must not hire, terminate, transfer, or otherwise alter the terms of employment of any TEGNA officers or employees." (Order ¶ 4). This requirement is ambiguous and creates several implementation problems.

DECLARATION OF MICHAEL BIARD

75.     At closing and prior to the Order's issuance, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Their "terms of employment" have already been "altered" within the meaning of the Order (Order ¶ 4) as a result of the change in control that happened at closing.

76.     Further, if TEGNA personnel are to have authority over TEGNA's decision-making as the Order requires (Order ¶ 4), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Order does not specify whether Nexstar is prohibited from making such appointment, or whether any such appointment would constitute an impermissible "alter[ation of] the terms of employment." (Order ¶ 4).

77.     The Order requires Defendants to "use all reasonable efforts to maintain—at 2025 levels or 2026 levels that were approved prior to the Transaction, whichever are higher—all station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations." (Order ¶ 8).

78.     This requirement creates significant ambiguity and potential operational harm. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Order appears to prohibit TEGNA from implementing its own pre-existing workforce plans.

79.     Read literally, the "whichever are higher" language in Order ¶ 8 could require TEGNA to hire back employees to meet 2025 levels, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This interpretation would go beyond preserving the status quo and would affirmatively require TEGNA to expand its workforce beyond what its own management deemed appropriate.

22                              DECLARATION OF MICHAEL BIARD

80.     To illustrate this paradox: I understand between February 2024 and June 2024, TEGNA publicly announced a $90-100 million cost reduction initiative that would eliminate newsroom positions and support positions, consolidate station operations and management, and develop technologies like AI automation. I also understand that TEGNA has additional plans that it began to implement in 2026. Under the Order, it is unclear whether TEGNA is now required to operationalize its pre-Transaction reduction plans—or is prohibited from doing so to maintain current staffing levels or even increase staffing levels to their 2025 peak.

If TEGNA proceeds with its further planned reductions, the Order would have the perverse effect of jeopardizing local news coverage that Nexstar had planned to enhance (including expansion of local content on both linear and streaming platforms in multiple markets)—the exact opposite of the public interest benefits that the FCC found this Transaction would deliver.

**Operational Issues**

81.     Many other integration actions have already been taken that cannot be undone, including:

Because these steps have already occurred, attempting to preserve an artificial long-term separation now would not restore a true pre-closing status quo. Instead, it would impose an unstable and inefficient hybrid structure that is difficult to administer and increasingly impractical to maintain over time.

82.

DECLARATION OF MICHAEL BIARD

████████████████████████████████████████ A prolonged inability to provide ordinary-course answers and guidance to employees is not sustainable. Over time, that communication vacuum would predictably increase confusion, reduce morale, impair retention, interfere with routine business operations, and defer important innovation at a time when competition for viewers with an array of digital options (especially of local news) is increasingly fierce.

83.    On the day after the Transaction closed, Nexstar installed a redirect page on the TEGNA website indicating that "TEGNA Inc is now part of Nexstar Media Group, Inc." Under the Order, TEGNA would have to restore its full pre-closing website to comply with the separation requirements—yet Nexstar cannot direct TEGNA employees to take any action to do so without potentially violating the Order's prohibition on "influence."

84.    The Order does not address whether TEGNA may enter into new long-term contracts, including leases for new facilities, without any oversight. Nor does it address whether there should be any ordinary-course covenants limiting TEGNA's ability to enter into major new contractual commitments—such as sports programming deals—in an active marketplace. That uncertainty may be manageable only briefly. It is not a workable framework through final judgment because the business must continue making ordinary-course commitments, allocating capital, and responding to marketplace developments on an ongoing basis. In particular, delays or constraints risk the permanent loss of valuable rights opportunities that cannot later be recaptured. In many cases, effectively competing for such rights requires the ability to program across multiple stations within a combined portfolio—for example, where no single station has sufficient capacity to carry all of a local team's games.

85.    Notably, even prior to the Transaction, TEGNA was subject to interim operating covenants in Section 6.1(b) of the Agreement and Plan of Merger ("Merger Agreement"). (**Exhibit 5** at 7). ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████ *See* Merger

Agreement § 6.1(b). The Order's silence on these matters creates a regime with fewer safeguards than existed during the pre-closing period even though Nexstar is responsible for the business. That mismatch underscores why the current arrangement cannot sensibly continue through final judgment: Nexstar bears the economic and legal consequences of the business, but lacks the practical ability to manage it in an ordinary and coherent way.

86.    The limited proposals Defendants have advanced may reduce some immediate harm in the very short term, but they do not provide a sustainable framework for operating the business through final judgment. The combined company cannot function indefinitely through temporary accommodations that preserve duplicative structures, delay integration, create uncertainty as to authority and obligations, and prevent Nexstar from realizing the time-sensitive benefits of the transaction. In my opinion, continuing such a regime for the duration of this litigation would cause Nexstar and TEGNA irreparable harm. The impact of the Order and the Court's recent Order Consolidation Cases (ECF No. 65) on Nexstar, if extended through a preliminary injunction, would continue to cause significant and irreparable harm to Nexstar as described herein.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of April, 2026 in Irving, Texas.

By: _____
     Michael Biard

DECLARATION OF MICHAEL BIARD