UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

In re Nexstar-TEGNA Merger Litigation

Case No. 2:26-cv-00976-TLN-CKD

**DECLARATION OF MARK A. ISRAEL IN SUPPORT OF DEFENDANTS' RESPONSE TO SHOW CAUSE AND OPPOSITION TO PLAINTIFFS' OPPOSITION FOR PRELIMINARY INJUNCTION**

DECLARATION OF MARK A. ISRAEL

**TABLE OF CONTENTS**

I.      **QUALIFICATIONS AND ASSIGNMENT** ........................................................ 3

II.    **NEXSTAR AND TEGNA DO NOT COMPETE FOR CARRIAGE ON MVPDS, BUT RATHER ARE COMPLEMENTARY INPUTS IN BUILDING MVPD PROGRAMMING BUNDLES** ........................................................................... 4

      a.    Nexstar and TEGNA Do Not Compete for Carriage on MVPDs ........................... 5

      b.    Nexstar and TEGNA Are Complementary Inputs in Building MVPD Programming Bundles, Meaning the Merger Creates Downward Pricing Pressure ............................................................................................................ 6

III.   **THE RELEVANT PRODUCT MARKET MUST INCLUDE STREAMING ALTERNATIVES AGAINST WHICH MVPDS COMPETE** ..................................... 8

IV.   **DMA-LEVEL GEOGRAPHIC MARKETS ARE INCOMPATIBLE WITH HOW RETRANSMISSION RATES ARE SET** ........................................................ 11

      a.    Retransmission Rates Are Set at the Footprint-Level, Not the DMA Level, Meaning DMA-Level Markets are Invalid ................................................. 11

      b.    DMA-Level Geographic Markets Are Inconsistent with the Merger Guidelines' Presumption of Harm to Competition ................................................ 12

V.    **THE NEXSTAR AND TEGNA MERGER WILL ENHANCE INCENTIVES TO IMPROVE THE QUALITY OF LOCAL NEWS PROGRAMMING** ...................... 14

DECLARATION OF MARK A. ISRAEL

## I.    QUALIFICATIONS AND ASSIGNMENT

1.    I previously submitted a declaration in support of Defendants' Opposition to DIRECTV's Motion for Temporary Restraining Order (ECF No. 48-9), which is attached as **Exhibit 1** to this declaration ("March 24, 2026 Israel Declaration").[1]  My qualifications can be found therein. Exhibit A to the March 24, 2026 Israel Declaration (ECF No. 48-10), a copy of my curriculum vitae, is attached hereto as **Exhibit 2**.  The facts set forth in the March 24, 2026 Israel Declaration remain true and correct, and I could and would testify competently to them under oath.  I adopt and incorporate that prior declaration by reference herein and shall be deemed to be part of this declaration as if fully set forth in full herein.

2.    I previously submitted a declaration in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order in *State of California, et al. v. Nexstar Media Group, Inc., et al.*, No. 2:26-cv-00978-TLN-CKD (E.D. Cal.) (ECF No. 73-9), which is attached as **Exhibit 3** to this declaration.  Exhibit A to that declaration (ECF No. 73-10) is attached hereto as **Exhibit 4**.  The facts set forth in that prior declaration remain true and correct and I could and would testify competently to them under oath.  I adopt and incorporate that prior declaration by reference herein and shall be deemed to be part of this declaration as if fully set forth in full herein.

3.    I have been asked by counsel for Nexstar to file this additional Declaration to respond to certain points raised by Plaintiffs and Professor Shapiro in their filings, made on March 18,

---

[1] Declaration of Mark A. Israel in Support of Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order, *DIRECTV, LLC vs. Nexstar Media Group, Inc., et al.*, United States District Court Eastern District of California, Sacramento Division, 2:26-cv-00976-TLN-CKD, March 24, 2026 ("March 24, 2026 Israel Declaration").

2026,[2] March 20, 2026,[3] and March 26, 2026.[4]

4.      I reserve the right to modify or supplement this Declaration, and the conclusions set out herein, if new information becomes available that affects my conclusions.

## II.    NEXSTAR AND TEGNA DO NOT COMPETE FOR CARRIAGE ON MVPDS, BUT RATHER ARE COMPLEMENTARY INPUTS IN BUILDING MVPD PROGRAMMING BUNDLES

5.      Plaintiffs allege that Nexstar and TEGNA compete to be carried by MVPDs in their putative "Big Four Retransmission Consent" market.[5]  To say that products compete to be carried describes an either/or situation in which one product will be carried at the expense of the other, or there is at least a risk that one product will be dropped in favor of the other, such that the products are in head-to-head competition.  Hence, if Plaintiffs' characterization was correct, we should observe MVPDs choosing between Nexstar's and TEGNA's broadcast stations, threatening to carry one *instead of the other,* with the two in direct competition for carriage.  And we should observe MVPDs playing the broadcasters against one another in retransmission consent negotiations, so as to extract lower retransmission rates (or other concessions).  We observe none of that in practice.  Instead, we observe entirely separate negotiations between Nexstar and MVPDs on the one hand, and TEGNA and MVPDs on the other hand, with both ultimately carried as complementary inputs into the MVPD bundle of programming content.  I describe the implications of this next.

---

[2] Declaration of Professor Carl Shapiro in Support of DIRECTV's Motion for Temporary Restraining Order, *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 2:26-cv-00976-TLN-CKD (E.D. Cal. Mar. 18, 2026) ("Shapiro Declaration").

[3] Plaintiff DIRECTV, LLC's Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order, *DIRECTV, LLC, v. Nexstar Media Group, Inc.*, No. 2:26-cv-00976-TLN-CKD (E.D. Cal. Mar. 20, 2026).

[4] Reply Declaration of Carl Shapiro, *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 2:26-cv-00976-TLN-CKD (E.D. Cal. Mar. 26, 2026) ("Shapiro Reply Declaration"); Plaintiff DIRECTV, LLC's Reply in Support of Motion for Temporary Restraining Order, *DIRECTV, LLC, v. Nexstar Media Group, Inc.*, No. 2:26-cv-00976-TLN-CKD (E.D. Cal. Mar. 26, 2026).

[5] Shapiro Decl. ¶ 84 ("The first concern is that the loss of competition between Big Four stations in overlap DMAs will result in higher Retransmission Fees").

### A.    Nexstar and TEGNA Do Not Compete for Carriage on MVPDs

6.    Nexstar and TEGNA do not compete with one another to be carried by MVPDs—*e.g.*, by offering MVPDs lower retransmission rates than the other broadcaster—nor do MVPDs leverage competing offers from Nexstar and TEGNA in retransmission consent negotiations to secure more favorable terms.  Each of Nexstar and TEGNA negotiates for the best terms it can receive, but it is not an "either/or" situation.  Rather, it is an "and" situation, in which both are carried, as complementary inputs in the MVPD's programming bundle.

7.    Nexstar President and Chief Operating Officer Michael Biard is ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████ ██████████████████████████████████ ████████████████████████████  Leveraging competing offers during negotiations is a hallmark of substitute products competing head-to-head; ████████████████████ ██████████████████████████████████████████  indicates that Nexstar and TEGNA are not in competition with one another.

8.    Moreover, Nexstar and TEGNA negotiate retransmission consent agreements with MVPDs that include the entire portfolio of each broadcasters' stations in the area served by the MVPD.[8]  Nexstar operates broadcast stations across 116 DMAs; TEGNA operates broadcast stations across 51 DMAs.  Of these, Nexstar and TEGNA overlap in 35 DMAs.  This means that, when negotiating with MVPDs over the entire portfolio of each broadcaster's stations, Nexstar and TEGNA are negotiating for entirely different footprints covering heterogenous stations

---

[6] Declaration of Michael Biard in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ¶ 51, *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 2:26-cv-00976-TLN-CKD (E.D. Cal. April 1, 2026) ("Biard Declaration").

[7] *Id.*

[8] *See* Biard Decl. ¶¶ 49–50.

DECLARATION OF MARK A. ISRAEL

(including many independent and non-Big Four network stations) and geographies. Such negotiations with MVPDs have never involved stations in only the overlapping footprints of Nexstar and TEGNA (unless, of course, an MVPD operates in a footprint that includes *only* DMAs where Nexstar and TEGNA both operate).[9] Bottom line, the negotiations carried out by Nexstar and TEGNA are quite distinct, with each seeking to get these best terms it can get, on its own merits, ultimately resulting in both being part of the MVPD's bundle of programming content, as complementary inputs.

### B. Nexstar and TEGNA Are Complementary Inputs in Building MVPD Programming Bundles, Meaning the Merger Creates Downward Pricing Pressure

9.      Broadcasters do not sell their content directly to consumers.[10] Rather, they sell their content via retransmission consent to an MVPD, which then bundles this content alongside the content from other broadcasters and other content providers (*e.g.*, cable networks). This means that the broadcast stations (along with the other networks) are *inputs* into the bundle sold by an MVPD. While it is a different sort of product, the economics of the situation are similar to inputs into an automobile: Different products come together to create the final product, and those products are sold to consumers indirectly, through inclusion in that final product.

10.     Big Four broadcasters do not compete for inclusion in an MVPD's bundle; rather, *all* Big Four broadcasters' stations are included in an MVPD's bundle (where such Big Four broadcasters operate in the same DMAs as the MVPD).[11] Consumers cannot subscribe *a la carte* to individual

---

[9] *See* Biard Decl. ¶¶ 49–50.

[10] Broadcasters do provide content directly to consumers for free over-the-air. In the case of stations that are affiliated with a network, the broadcaster's content includes both the content they produce themselves, and the content of their network affiliate.

[11] Fed. Commc'n Comm'n, *Consumer Options for Selecting Cable Channels and the Tier Buy-Through Prohibition*, https://www.fcc.gov/media/consumer-options-selecting-cable-channels-and-tier-buy-through-prohibition (last visited April 1, 2026) ("[C]able companies are required to offer a basic service tier and all subscribers must purchase this tier before purchasing any other video programming. The basic service tier is required to include, at a minimum, the local broadcast television stations carried on the system"); Fed. Commc'n Comm'n, *Television Broadcast Stations on Satellite* (Sept. 23, 2021), https://www.fcc.gov/media/television-broadcast-stations-satellite ("Generally, a satellite company that

Big Four broadcast stations carried by an MVPD—on DIRECTV, consumers can opt for subscriptions that either include all local broadcast stations or none, but they cannot pick and choose only some.[12]

11.    Putting these facts together—that broadcast stations are inputs into the MVPD bundle, and that it is not an either/or situation but rather all broadcast stations are carried in the bundle—means that the broadcast stations are complements.[13]  As complements, when a broadcaster increases its retransmission rates to the MVPD—and the MVPD correspondingly raises the price of the bundle—less of the bundle is sold, and thus less of all the inputs are sold, meaning that the quantity sold of subscriptions that include other broadcasters' content is correspondingly reduced. The flip side of this is that when one broadcaster reduces its retransmission rates—and the MVPD correspondingly lowers the price of the bundle—more of the bundle is sold, which *helps* other broadcasters by making the bundle more attractive to consumers, and thus increasing the quantity sold of subscriptions that include other broadcasters' content.  As noted above, consumers can drop the DIRECTV bundle that includes the broadcast channels either by opting for a DIRECTV subscription that does not include them, or by cutting the cord (and switching to streaming options); but either way, she has to take them all or drop them all, meaning they are definitely economic complements.

---

chooses to offer local-into-local service is required to provide subscribers with all the local broadcast TV signals that are assigned to that DMA, as long as they ask to be carried on the satellite system and are otherwise eligible (called the 'carry-one, carry-all' rule).").

[12] Bevin Fletcher, *Directv Lets Customers Opt Out of Local Broadcast Stations in TV Package Lineup*, STREAMTV INSIDER (Mar. 18, 2024), https://www.streamtvinsider.com/video/directv-lets-customers-opt-out-local-broadcast-stations-tv-package-lineup ("Consumers won't be able to pick and choose which local stations they want to keep or exclude, but rather the opt-out/in ability applies to picking all or none of the broadcast stations licensed to serve in a customers' respective DMA"). *See also supr*a n.10.

[13] Complements are defined as goods having negative cross-elasticity of demand.  Said in simpler terms, they are goods for which raising the price of one *reduces* demand for the other; such as how higher prices for jelly reduce the demand for peanut butter because the two goods are complements.  *See*, *e.g.*, GREGORY N. MANKIW, PRINCIPLES OF MICROECONOMICS 70 (Cengage Learning, 7th ed. 2015) (goods where "a fall in the price of one good raises the demand for another good").

12.     As I explained in the March 24, 2026 Israel Declaration,[14] the fact that broadcast stations are complements—with a lower price for one *increasing* demand for the other and vice versa—*completely reverses standard merger economics*.  It is literally the same math, with the sign reversed.  In a merger of competitors, the merged firm has an incentive to *raise* prices because, post-merger, it internalizes the fact that higher prices on one of its (now merged) products helps the other product.  In contrast, in a merger of complements, the merged firm has an incentive to cut prices because, post-merger, it internalizes the fact that lower prices on one of its (now merged) products helps the other product.  Here, post-merger, Nexstar will internalize that lower retransmission rates (or at least slower growth in those rates, which still means lower rates than but-for the merger) helps TEGNA (by reducing cord cutting).  As such, post-merger, Nexstar will have an incentive to lower retransmission rates relative to the no-merger situation in which it ignores the effects on TEGNA.  That is the inherent effect of a merger of complements, the opposite of a merger of substitutes.  Plaintiffs entirely ignore this fundamental economic result.

## III.     THE RELEVANT PRODUCT MARKET MUST INCLUDE STREAMING ALTERNATIVES AGAINST WHICH MVPDS COMPETE

13.     Having established that Nexstar's and TEGNA's retransmission consent offerings are complements, not competitors, I now turn to what this means for market definition.  Specifically, what does the fact that Nexstar's and TEGNA's retransmission consent offerings are complements—in the present case, complements in building an MVPD bundle that competes with streaming options—imply for what competitors should be included in the relevant market?

14.     MVPDs compete to sell subscriptions of bundled content to consumers, which, as explained above, includes the content from all Big Four broadcasters in the DMA.  As explained in the March 24, 2026 Israel Declaration, consumers have many options—including an increasing

---

[14] Israel Decl. ¶¶ 54–55.

number of streaming options, which do not involve any traditional MVPD services, and which generally pay no or significantly less in retransmission fees—for their video content.[15] vMVPDs offer subscription packages that are essentially identical to those offered by MVPDs in addition to having on-demand content.[16] Direct-to-Consumer ("DTC") offers the same network content and broadcasters' local feeds that MVPDs carry, as well as other on-demand content.[17] Free Ad-Supported Streaming Television ("FAST") offers free, ad-supported streaming content and live video, including, in many instances, Big Four broadcasters' content.[18] Subscription Video on Demand ("SVOD") offers high-quality entertainment content and, increasingly, live events, including sports.[19] When an MVPD increases prices, subscribers will increasingly move to these streaming alternatives.

15.     That MVPDs compete with these streaming alternatives means that broadcasters also (indirectly) compete with them.  If an MVPD's product becomes less competitive, as would occur when it raises its prices in response to an increase in retransmission rates, the MVPD's subscribers will switch to streaming options for which the broadcaster receives less revenue or no revenue.  Importantly, because broadcasters' offerings are complements for one another, this

---

[15] *See generally* Israel Decl. Section II.  Consumers can also watch broadcast content free over the air.  *See* RABBITEARS, https://www.rabbitears.info/ (last visited April 1, 2026).

[16] Frankie Karrer, *MVPD and vMVPD: Differences & Similarities Explained*, MNTN, https://mountain.com/blog/mvpd-vmvpd/ (last visited April 1, 2026) ("In addition to scheduled, linear TV content from the same channels as MVPD services, vMVPD providers typically offer video-on-demand (VOD) content.").

[17] *Local NBC Channel,* PEACOCK, https://www.peacocktv.com/help/article/nbc-local-news-channel (last visited April 1, 2026); *Pick a Plan*, PARAMOUNT+, https://www.paramountplus.com/account/signup/live-tv/cbs-news/ (last visited April 1, 2026); *What is FOX One?*, FOX, https://help.fox.com/s/article/What-is-FOX-ONE-and-when-does-it-launch (last visited April 1, 2026).  Subscriber counts for the Peacock Premium Plus and Paramount+ Premium are not publicly disclosed.

[18] *Tubi Help Center*, TUBI, https://tubitv.com/help-center/Content/articles/24898743777435 (last visited April 1, 2026); *PlutoTV Categories*, PARAMOUNT, https://www.paramountpressexpress.com/pluto-tv/page/categories (last visited April 1, 2026); *Sling TV Fact Sheet*, SLING, (June 2023), https://news.sling.com/about-us; *Find Your Favorite TV Channels*, SAMSUNG TV PLUS, https://www.samsungtvplus.com/#channel-list (last visited April 1, 2026); *Streaming Now: Live TV*, ROKU, https://www.roku.com/whats-on/live-tv (last visited April 1, 2026).

[19] EMARKETER, *Sports Rights Are Getting Spread Across Streaming Services in a Complicated Way*, https://chart-na1.emarketer.com/c/354556/sports-rights-getting-spread-across-streaming-services-complicated-way-354556 (last visited April 1, 2026).  *See also* Israel Decl. ¶¶ 18–20.

switching does not hurt just one broadcaster, but all broadcasters whose content is included in the MVPD's bundle.  As explained more fully below, a hypothetical monopolist of all broadcasters would naturally internalize these effects on all broadcasters and thus have an incentive to reduce retransmission rates, meaning that broadcasters alone are not a market—they do not satisfy the hypothetical monopolist test.  And it is the presence of these streaming options that makes this so, meaning that it is these streaming options that need to be included as competitors in the relevant market.

16.     As recognized in the Shapiro Declaration, and further explained in the March 24, 2026 Israel Declaration, economists typically use a Hypothetical Monopolist Test to evaluate the validity of a market definition.[20]  That test says that if broadcast stations alone were a valid product market, then a *hypothetical* monopolist owner of all broadcast stations would raise prices by a small but significant amount.  In fact, however, if a hypothetical broadcaster monopolist were to form (which Nexstar is not, nor even alleged to be—again, the test is a thought experiment about a hypothetical monopolist), that hypothetical monopolist would internalize the consequence of selling complementary inputs, and thus would be incentivized to *lower* retransmission rates, not increase them, meaning that Plaintiffs' proposed product market—which contains only the "Big Four" broadcaster stations—fails.  This result on pricing of complements is well recognized by economists:  When firms selling complements merge, they have an incentive to cut prices because they recognize the benefits of lower prices, and the harms of higher prices, on one another.[21]  Here, the hypothetical broadcast monopolist would internalize

---

[20] Israel Decl. ¶ 31.

[21] *See* **Exhibit 5**, a true and correct copy of Craig Minerva, Loren K. Smith & Peter Herrick, *The Other Side of the Coin: Complementarity in Mergers of Multiproduct Firms*, ANTITRUST MAGAZINE ONLINE (Oct. 2021) ("The fundamental economics that underpin this result are some of the oldest in the field of industrial organization … dating back to at least Cournot (1838). When firms that produce complements operate independently, each firm does not have an interest in how their pricing strategy affects the other. For example, if a jelly maker raises its price, demand for peanut butter will fall, but this externality (the effect of one good's pricing on another good's demand) has no direct effect on the jelly maker's profit and thus is not considered in the jelly maker's pricing decisions. However, if the firms merge, the combined

the benefit to the full broadcast ecosystem from lower prices and less cord cutting—something no single broadcaster does today—thus incentivizing lower prices.

17.     Plaintiffs' analysis ignores this effect by defining a relevant product market that includes only Big Four Retransmission Consent to MVPDs.  In fact, however, MVPDs' direct—and broadcasters' indirect—competition with streaming options is the competitive force that prevents the hypothetical broadcast monopolist from raising prices, giving it an incentive to lower prices instead.  Hence, it is that competition with streaming options that must be included in a proper market definition.  Because Plaintiffs ignore this competition, Plaintiffs' market definition is invalid and cannot be used to reach reliable conclusions about the effects of Nexstar's acquisition of TEGNA.

## IV.  DMA-LEVEL GEOGRAPHIC MARKETS ARE INCOMPATIBLE WITH HOW RETRANSMISSION RATES ARE SET

### A.  Retransmission Rates Are Set at the Footprint-Level, Not the DMA Level, Meaning DMA-Level Markets are Invalid

18.     As I explained in the March 24, 2026 Israel Declaration, Plaintiffs' geographic market definition—individual DMAs—is incompatible with how MVPDs negotiate retransmission rates with broadcasters, including Nexstar and TEGNA.[22]  MVPDs do not negotiate retransmission rates on a DMA-by-DMA basis, but rather negotiate the same retransmission rates across all DMAs where they operate.  Under these conditions, the Hypothetical Monopolist Test cannot be satisfied for DMA-level markets, meaning Plaintiffs' geographic market is not valid.

19.     To be meaningful, the Hypothetical Monopolist Test should reflect how prices are actually set.  Even Professor Shapiro acknowledges that, ideally, the test should focus on what an actual

---

firm will take into account not only the effect its prices for jelly will have on jelly sales and profits but also how its jelly pricing strategy will affect peanut butter sales and profits (and vice-versa). This 'internalization' of the externality will cause the merged entity to decrease the price it sets on both products to generate greater demand and increase profits").

[22] Israel Decl. Section III.B.

11                          DECLARATION OF MARK A. ISRAEL

broadcast monopolist does.[23]  An actual broadcast monopolist would negotiate retransmission rates with DIRECTV or other MVPDs in the way those MVPDs always negotiate retransmission rates—for their entire footprint.  Broadcasters do not negotiate retransmission rates separately for a single DMA to take advantage of different competitive conditions in that single DMA:  This is the practice today and there is no indication it will change in the future.[24]  Plaintiffs' geographic market defined around DMAs therefore fails for this simple reason:  A hypothetical broadcaster monopolist *cannot raise retransmission rates in an individual DMA, meaning that DMA is the wrong unit of geography in which to study competition related to retransmission consent*.[25]

**B.  DMA-Level Geographic Markets Are Inconsistent with the Merger Guidelines' Presumption of Harm to Competition**

20.      Another way to see that Plaintiffs' geographic market definition is incompatible with the standard practice of setting footprint-wide retransmission rates is to consider the implications for the 2023 Merger Guidelines' structural presumptions.  The reasoning behind these presumptions—and the share- and HHI-metrics used to determine whether their thresholds are exceeded—is that the greater the level of and increase in market concentration (and the greater the merging parties' share of the market) the greater the likelihood that the parties will be able to harm competition, including by increasing prices.  In the present case, the presumption would imply that one can look at the level of and change in HHI in a given DMA (and the parties' combined market share in the DMA) and use it to predict harm to competition *in that DMA*—that is, the HHI in a given DMA is predictive of pricing in that DMA.  But this only works if retransmission rates are set DMA by DMA.  Otherwise, HHI in the DMA does not predict rates in that DMA because rates in that DMA are set at the same level as the entire footprint, and it is the

---

[23] Shapiro Decl. ¶ 48.
[24] Biard Decl. ¶ 50.
[25] Even if an MVPD operates in just one DMA—a situation where a DMA-level geographic market definition might be appropriate—a price increase to just the small MVPDs in one DMA is extremely unlikely to result in an overall 5% increase in retransmission rates in the DMA.  *See* Israel Decl. ¶ 49.

HHI in the entire footprint that matters (to the extent any HHI matters at all). The only way the use of HHIs and the associated presumptions can make any sense is if the geographic market is set to the level at which prices are set, otherwise the computed HHIs are divorced from actual prices, and the associated presumptions of harm mean nothing. Here, Plaintiffs have divorced their geographic markets from reality in exactly this way, meaning their HHIs are uninformative as to whether this merger is presumptively harmful to competition.

21.    An actual example proves the point that DMA level geographic markets are not valid, and thus the shares and HHIs computed from them, are not informative. Professor Shapiro's Table 3 alleges that Nexstar has a 22.6% market share in Waco-Temple-Bryan, TX, which allegedly has an HHI of 2,569.[26] In contrast, Professor Shapiro's Table 3 alleges that Nexstar has a 46.1% market share in Columbus, OH, which allegedly has an HHI of 3,597. Despite the fact that Columbus allegedly has a Nexstar share that is more than twice as high as that in Waco-Temple-Bryan, and an HHI that is allegedly over 1,000 points higher than that in Waco-Temple-Bryan, DIRECTV pays the exact same retransmission rate for subscribers of Nexstar's FOX-affiliated stations in these two DMAs.[27] This illustrates the fallacy in defining markets, and generating associated competitive predictions, at a geographic level that is divorced from the level at which prices are set.

---

[26] Shapiro Decl. at 24, tbl. 3.

[27] Table 3 from Professor Shapiro's report calculates shares and HHIs using retransmission revenue, but he notes that he "place[s] greater weight on the market shares measured using television ratings" as found in his Table 2 (Shapiro Decl. at 22, tbl. 2). An example from Table 2 can also prove the point. Table 2 alleges that Nexstar has a 14.1% market share in Charlotte, NC, which allegedly has an HHI of 2,768. In contrast, Table 2 alleges that Nexstar has a market share of 49.1% in Norfolk-Portsmouth-Newport News, VA, which allegedly has an HHI of 3,705. The market share is greater than three times the market share in Charlotte, NC and the HHI is almost 1,000 points higher. Yet the retransmission rates that Nexstar pays DIRECTV for FOX-affiliated stations are the same here too.

13                                    DECLARATION OF MARK A. ISRAEL

## V.    THE NEXSTAR AND TEGNA MERGER WILL ENHANCE INCENTIVES TO IMPROVE THE QUALITY OF LOCAL NEWS PROGRAMMING

22.    Professor Shapiro acknowledges that there is no allegation of a market for local news, explaining that any harm Plaintiffs allege from local news "will take place *in the relevant markets that I have defined.*"[28]  In other words, in Professor Shapiro's analysis, local news programming is simply one component of the offerings covered by retransmission consent negotiations.  As explained above, Nexstar's and TEGNA's offerings in this alleged market are complementary inputs into the MVPD bundle.  As such, the analysis that I laid out in Section II through IV above all applies directly to news programming.  Said differently, Plaintiffs are not alleging anything unique about news programming; they are simply alleging harm to news programming as an effect in the retransmission consent market.  Hence, my analysis of the alleged retransmission consent market—and the fact that Nexstar and TEGNA offer complementary products in that alleged market—all applies to local news as well.

23.    In the same way that one broadcaster reducing its retransmission rates *helps* other broadcasters (as complementary input providers), so too does one broadcaster *increasing the quality of its local news*.[29]  Either of these can be thought of as a reduction in the "quality adjusted price" of the broadcaster's offering.  In the case of local news content, if one broadcaster in an MVPD's bundle increases the quality of its local news programming, this increases the value of the MVPD's bundle, which reduces cord-cutting to the benefit of all broadcasters in the MVPD's bundle.

24.    The logic of the merger's incentive effect on complementary products then follows directly.  Post-merger, Nexstar will have the incentive to increase the quality of the local news

---

[28] Shapiro Reply Decl. ¶ 8 (emphasis in original).
[29] Increasing the quality of a broadcaster's local news broadcast can mean improving programming (*i.e.*, producing better content) or adding additional programming (*i.e.*, increasing the "quantity" of local news).

DECLARATION OF MARK A. ISRAEL

produced by its stations (including the stations that were formerly owned by TEGNA) relative to what Nexstar and TEGNA offered as standalone broadcasters.[30]  Prior to the merger, Nexstar does not care about any benefits that would accrue to TEGNA due to a diminution of cord-cutting caused by an increase in the quality of its local news; after the merger, it internalizes this benefit to TEGNA, thus increasing its incentive to invest in such improvements.

25.     Moreover, as I explained in the March 24, 2026 Israel Declaration, an economic analysis of the effects of this merger on local news programming must also consider whether the consolidation of local news operations, which Plaintiffs claim will occur, would have any procompetitive benefits.  The efficiencies from consolidating local news operations would increase the marginal impact of every dollar invested into local news, further adding to the incentive to increase local news quality.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1st day of April, 2026 in Washington, DC.

By: _____
       Mark A. Israel

---

[30] Consistent with this, Nexstar has committed to expanding the quantity of local news programming. Memorandum Opinion and Order ¶ 82, MB Docket No. 25-331 (F.C.C. Mar. 19, 2026) ("Nexstar commits to increasing the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years from consummation. In addition, Nexstar plans to expand the local news it provides in nine DMAs.") (internal quotations omitted).