Glenn D. Pomerantz (State Bar No. 112503)
    glenn.pomerantz@mto.com
Kuruvilla J. Olasa (State Bar No. 281509)
    kuruvilla.olasa@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Justin P. Raphael (State Bar No. 292380)
    justin.raphael@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

*Attorneys for Plaintiff DIRECTV, LLC*

*Attorney Information Continued on Page 2*

McGregor Scott (State Bar No. 142413)
    mscott@kslaw.com
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone:  (916) 321-4800

Olivier N. Antoine (*pro hac vice*)
    oantoine@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Telephone: (212) 556-2100

M. Sean Royall (*pro hac vice*)
    sroyall@kslaw.com
Emily Blackburn (*pro hac vice*)
    eblackburn@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In Re: Nexstar-TEGNA Merger Litigation | Case No. 2:26−cv−00976−TLN−CKD<br><br>**PLAINTIFF DIRECTV, LLC'S RESPONSE TO DEFENDANTS' NOTICE AND PROPOSALS SEEKING COMPLIANCE GUIDANCE UNDER THE TEMPORARY RESTRAINING ORDER** |

Robert E. Bowen (State Bar No. 335932)
  robert.bowen@mto.com
Liam Gennari (State Bar No. 350177)
  liam.gennari@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Carson J. Scott (State Bar No. 339868)
  carson.scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

Xiaonan April Hu (State Bar No. 321354)
  april.hu@mto.com
Brandon H. Thomas (State Bar No. 334240)
  brandon.thomas@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100

Laura Harris (*pro hac vice*)
  lharris@kslaw.com
Joshua Hazan (*pro hac vice*)
  jhazan@kslaw.com
Sean Murray (*pro hac vice*)
  smurray@kslaw.com
Arthur B. Schoen (*pro hac vice*)
  aschoen@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Telephone:  (212) 556-2100

*Attorneys for Plaintiff DIRECTV, LLC*

### A. **Introduction**

In the face of lawsuits filed by DIRECTV and Plaintiff States to enjoin this unlawful merger—and despite explicit warnings that it was acting at its peril—Nexstar rushed to close the merger knowing this choice would make it more difficult for the Court to award complete relief. But equity is not so easily frustrated. "After a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status[.]" *Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000) (citation omitted). In such circumstances, a court of equity "retains broad discretion to fashion equitable remedies," *id.*, including "divestiture," "the remedy best suited to redress the ills of an anticompetitive merger." *California v. Am. Stores Co.*, 495 U.S. 271, 285 (1990).

After concluding that Nexstar's "integration efforts are exactly those that would make it more difficult to divest TEGNA stations, eliminate competition, and result in newsroom layoffs and shutdowns," Dkt. No. 60 ("Order") at 19, this Court issued a Temporary Restraining Order ("TRO"), in the form of a hold-separate order, with the purpose of maintaining the "status quo ante litem." Order at 21. As the Court recognized, Nexstar could have entirely avoided the need for a hold-separate order had it simply "waited to complete the acquisition until after this Court's ruling on Plaintiff's claims." *Id.* at 19.

Nexstar dedicates most of its Notice to bemoaning the consequences of its own hasty actions. It tells the Court that compliance with the TRO is "particularly difficult" and could cause "operational harm" due to the "many" integration steps that it has "already completed" post-closing. Dkt. No. 63 ("Notice") at 1. But "[p]lacing significant weight on financial obligations that Defendants knowingly undertook would, in effect, reward them for self-inflicted wounds." *Sierra Club v. Trump*, 929 F.3d 670, 706 (9th Cir. 2019) (denying stay of injunction where defendants took actions "in the face of litigation"). Nexstar should not be allowed to complain that a situation it *knowingly created* in the face of this litigation is purportedly rendered more difficult or costly by a hold-separate order that it surely understood it might face.

Nexstar eventually turns, in the last two pages of its Notice, to describing the actual "modifications" and "clarifications" it seeks with respect to the TRO.  As detailed below, DIRECTV does not object to most of these proposals—indeed many are already contemplated by the TRO—subject to minor wording adjustments to make clear that Nexstar cannot use these clarifications as a pretext to evade the thrust of the Court's Order.  A few of Nexstar's proposals are overbroad, and should be narrowed to effectuate the purposes of the hold-separate order.

**B.      The Alleged Harms Nexstar Claims It Would Suffer from Compliance with the Court's Order Are Grossly Exaggerated and Largely Self-Inflicted**

DIRECTV and Plaintiff States filed their respective complaints for injunctive relief prior to the close of Defendants' merger, asked Defendants to hold off on closing, and proposed an orderly process for briefing a TRO or preliminary injunction.  Dkt. No. 33-1 ("Pomerantz Aff.") Ex. A; *California v. Nexstar Media Group, Inc., et al.*, No. 2:26-cv-00978-TLN-CKD, Dkt. No. 27-2 ("Sung Decl.") ¶ 4.  Defendants did not respond, and instead rushed to close their transaction the next day, moments after they received clearance from the FCC and the Department of Justice.

The same day the parties closed, DIRECTV again "urge[d] Nexstar not to take any further steps to integrate or combine the assets, rights, stations, and licenses it has acquired from TEGNA until the Court has an opportunity to adjudicate DIRECTV's motion for a hold-separate order" and explained that "if Nexstar takes steps to integrate these assets, it will do so at its own peril."  Dkt. No. 33-2, Pomerantz Aff. Ex. B at 2.  This warning could not have been clearer, yet Nexstar chose to press forward.

*See* Dkt. 63-1 ("Biard Decl.") ¶ 26

Where merging parties have "acted at their peril" to attempt to consummate a challenged merger, as Nexstar has done here, courts have consistently ordered relief that would restore "the

2

status quo," notwithstanding "some possibility" that the defendants could suffer some harm in the process. *FTC v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C. Cir. 1981); *see Ramsburg v. American Investment Co.*, 231 F.2d 333, 337 (7th Cir. 1956); *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1175 (W.D. Ark. 1995), *aff'd*, 139 F.3d 1180 (8th Cir. 1998).  This is especially true where, as here, a court determines that the merger is likely to violate the antitrust laws:  "The actions of the parties cannot be allowed to frustrate the public interest by completing a transaction of such dubious validity." *Weyerhaeuser Co.*, 648 F.2d at 742.

In addition to being self-inflicted, many of the supposed compliance harms Nexstar identifies are overstated.  Indeed, the "conflicts" Nexstar purports to identify between the Court's Order and its commitments to the FCC appear to be illusory:

*First*, Nexstar claims that there is a conflict between the TRO and its commitment to the FCC to divest certain stations.  Notice at 4.  But Nexstar fails to inform the Court that those divestitures need not be completed for *two years*, and even then only if a particular FCC rule remains in place at that time.  Dkt. No. 48-2 ("Okuliar Decl.") Ex. A (FCC Order ¶ 55).  Nexstar is under no obligation to divest these stations immediately, and says nothing to suggest that it has plans to effectuate near-term divestitures.

*Second*, Nexstar gestures at a commitment to "increase news programming in certain DMAs."  Notice at 4.  Yet Nexstar glosses over the actual substance of the commitment, which entails increasing "the amount and availability of local programming *in the aggregate*" in the "acquisition markets."  Okuliar Decl. Ex. A (FCC Order ¶ 53) (emphasis added).  Nothing in the TRO prevents Nexstar from investing in more local news in acquisition markets, which would have the effect of increasing such programming "in the aggregate."  Nor does the TRO prevent TEGNA from making similar investments.  While Nexstar describes its plans for "provid[ing] the former TEGNA stations with access to Nexstar's Washington, D.C. news bureau," Notice at 5, its FCC commitments impose no such obligations.

*Third*, Nexstar notes that it has agreed to "offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RCA') that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RCA at the existing rates through November

3

30, 2026." Notice at 4 (citation omitted). Nothing in the TRO prevents Nexstar from offering such an extension. The "existing retransmission consent" agreements that Nexstar is a party to covered Nexstar's stations, and Nexstar can offer renewal of retransmission consent for those stations on any terms it wishes (just as it could before consummating the merger).

Even if the Court's Order *did* conflict in some way with Nexstar's FCC commitments (which it does not), this would not justify modifying the TRO in a manner that undermines the Court's ability to order remedies as needed to protect against the harms posed by Defendants' unlawful merger. FCC approval does not supersede the antitrust laws. The FCC was "not given the power to decide antitrust issues." *United States v. Radio Corp. of Am.*, 358 U.S. 334, 346 (1959). Indeed, the 1996 Telecommunications Act included "an antitrust-specific saving clause providing that 'nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.'" *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004) (quoting 110 Stat. 143, 47 U.S.C. § 152, note). "Congress envisioned a system in which . . . the FCC's decisions would not preclude the operation of independent antitrust statutes." *Havens v. Mobex Network Servs., LLC*, 2011 WL 6826104, at *10 (D.N.J. Dec. 22, 2011), *aff'd,* 820 F.3d 80 (3d Cir. 2016).

Many of Nexstar's other concerns about compliance with the Court's Order are overblown. For instance, Nexstar argues that it cannot comply with the TRO's provision that it must maintain staffing at acquired TEGNA stations at levels approved for 2025 or 2026 prior to the merger. Notice at 5-6. But a nearly identical provision was included in each of the three DOJ hold-separate orders to which Nexstar agreed to facilitate antitrust approval of its prior mergers.[1]

Nexstar also suggests that it poses issues for corporate governance and control that ███ ████████████████████████████████████████████ but in the next breath it states that ████████████████████████████████████████████ suggesting that Defendants are

---

[1] Hold Separate Stipulation and Order at 9, *United States v. Nexstar Media Group, Inc.*, No. 1:19-cv-02295 (D.D.C. July 31, 2019); Hold Separate Stipulation and Order at 7, *United States v. Nexstar Broadcasting Group, Inc.*, No. 1:16-cv-01772 (D.D.C. Sept. 14, 2016); Hold Separate Stipulation and Order at 7, *United States v. Nexstar Broadcasting Group, Inc.*, No. 1:14-cv-02007 (D.D.C. Nov. 26, 2014).

perfectly capable of ██████████████████████████████████████████████ ██████████████████████. *Id.* at 1.

Nexstar gestures at "employment compensation" as another purportedly "intractable" issue, but its concern boils down to the notion that TEGNA cannot ██████████████████ ████████████████ *Id.* at 2 (emphasis added).  Nexstar does not—and cannot—claim that TEGNA will be unable to adequately compensate or incentivize its employees, including through alternative compensation structures such as milestone-based cash bonuses.

### C.    **DIRECTV Does Not Object to Many of Nexstar's Proposed Conditions So Long as They Are Construed in Accordance with the Order's Aims**

DIRECTV shares Nexstar's stated interest in facilitating the orderly operation of TEGNA's assets during the pendency of the hold-separate order.  The paramount objective of the hold-separate order is to *preserve competition* between Nexstar and TEGNA to allow for the possibility of an effective divestiture to address the harms from this unlawful merger.  To the extent that modifications to the TRO would facilitate TEGNA's continued operation as an independent, going concern, DIRECTV is not opposed.

Accordingly, subject to minor wording adjustments, DIRECTV does not object to most of Nexstar's requests.  In fact, many of the requested "clarifications" or "modifications" that Nexstar seeks are already permitted by the Court's Order.  This section addresses these relatively uncontroversial requests.

On the other hand, as Section D discusses, some of Nexstar's requested modifications are overbroad and would undermine the core purposes of the hold-separate order.

DIRECTV does not object to the following requested clarifications, subject to the minor wording changes proposed below (additions underscored in bold), to ensure such provisions are consistent with the Order's purpose of maintaining TEGNA as an independent entity:

- **Proposed Modification 1:** The TRO (paragraphs 1, 2, 4, 5, 9, and 10) shall allow Nexstar to undertake ordinary-course cash management, **ordinary-course** intercompany transfers, and **ordinary-course** debt service and repayment activities necessary to comply with Nexstar's financing obligations, including refinancing

5

activities, security perfection, and guaranty**, provided that Nexstar does not use this provision as a pretext to undermine TEGNA's viability as a going concern.**

- **Proposed Modification 2:** The TRO (paragraphs 1, 2, 3, 4, and 5) shall allow Nexstar to take reasonable actions necessary to maintain TEGNA's day-to-day operations, including authorizing routine financial transactions such as wire transfers for ordinary course payments, without violating the TRO's prohibition on "influence."

- **Proposed Modification 4:** The TRO (paragraphs 1, 2, 4, and 6) shall allow Nexstar to take actions necessary to establish a functional governance structure for TEGNA, including appointing or reappointing officers, to the extent necessary to permit TEGNA to fulfill the TRO.  It shall not be considered "influence" for Nexstar to provide and implement Sarbanes-Oxley requirements, including setting thresholds for contract approval, expenditure authorization, and other financial limits similar to the interim operating covenants that applied to TEGNA's independent management of the business pre-closing.  **Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar.**

- **Proposed Modification 5:** The TRO (paragraphs 1, 2, 3, 4, and 5) shall allow Nexstar to take all reasonable steps to perform all obligations required under its debt instruments, SEC reporting requirements, or refinancing transactions, including coordination with TEGNA personnel as necessary**, provided that such coordination is narrowly tailored to complying with reporting requirements and avoiding breaches under debt instruments.**  This includes permitting Nexstar to complete required SEC and debt agreement reporting for the combined company within applicable deadlines, oversight by Nexstar management as to the accuracy of the TEGNA financial statements, including compliance with internal

controls and procedures, in coordination with TEGNA personnel.  **If the sharing of TEGNA's confidential information with certain Nexstar employees is necessary to accomplish such reporting requirements, such information must be maintained separately from Nexstar's files and used solely for those reporting requirements.**

- **Proposed Modification 7:** The TRO (paragraphs 1, 2, 3, and 4) shall allow Nexstar to appoint or reappoint TEGNA officers as necessary for TEGNA to exercise independent decision-making authority for retransmission matters. **Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar.**

- **Proposed Modification 9:**[2] **The TRO shall allow Nexstar to require that management of TEGNA adhere to** ~~To provide appropriate guardrails for TEGNA's operations over the coming days and limit its ability to make financial commitments beyond the typical obligations of a subsidiary,~~ the interim operating covenants set forth in the Merger Agreement (Biard Decl. Ex. C)**, in their entirety, and in the same manner as applied pre-closing, provided however that TEGNA shall continue to have authority concerning ordinary course contracts, including contracts concerning retransmission fees, as provided by operating covenant 6.1(b)(xiii).** ~~shall govern what actions TEGNA may take without Nexstar's input or approval.~~

---

[2] The interim operating covenants do not conflict with the TRO.  While the covenants required TEGNA to seek Nexstar's authorization for certain contract actions outside of the ordinary course between the signing of the merger agreement and closing, they did not give Nexstar any authority with respect to TEGNA contracts "in the ordinary course of business."  Dkt. No. 63-4, § 6.1(b)(3).  In any event, as required by antitrust law, the operating covenants make clear that "[n]othing contained in" the agreement "directly or indirectly" gives Nexstar "the right to control or direct [TEGNA's] operations prior to the" merger.  *Id.* § 6.1(c).  And the operating covenants expressly required TEGNA to "conduct its operations in all material respects in the ordinary course of business," and "preserve intact in all material respects its current business organizations, ongoing businesses and material relationships with third parties."  *Id.* § 6.1(a).

7

**D.      DIRECTV Objects to Certain of Nexstar's Requests**

A small number of Nexstar's requested modifications present serious concerns because they are unnecessarily overbroad and would undermine the TRO's purpose of preserving TEGNA as a viable competitor to Nexstar.  In particular:  (1) Proposed Modification 3 seeks broad authority to use this unlawful merger to immediately raise retransmission fees; (2) Proposed Modification 6 seeks what would seem to be nearly unlimited authority "to take actions necessary to ensure TEGNA's continued operations" that would swallow the rule of separate management; and (3) Proposed Modification 8 seeks authority to fire TEGNA employees with no guardrails to ensure that TEGNA remains viable as a going concern and as a strong competitor to Nexstar in the event the assets are ultimately required to be divested.

Nexstar has not demonstrated that any of these provisions is necessary to the operation of either Nexstar or TEGNA, and each would substantially undermine the TRO's purpose of ensuring that TEGNA continues to be operated independently as a going concern and strong competitor to Nexstar.  DIRECTV respectfully requests that the Court decline to order these modifications.

**1.      Proposed Modification 3**

Nexstar claims that "TEGNA's retransmission agreements with [MVPDs] that also carry a Nexstar station were contractually superseded by Nexstar agreements with those MVPDs," and so seeks authority to "allow the continued administration of existing retransmission agreements," without "unwinding or invalidating contractual provisions recognized pre-closing that occurred at closing."  Notice at 3, 7.  In other words, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Biard Decl. ¶ 26 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  That is not "the continued

8

administration of existing retransmission agreements." Rather, ██████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████, which would seriously undermine TEGNA's independence, and thereby frustrate the core purposes of the Court's Order.  It would also impose significant, potentially irreversible harm on MVPDs that ████████████████████████████████████████████ at a time when the legality of the acquisition is subject to ongoing Court scrutiny.

Nexstar would of course prefer ████████████████████████, but Nexstar has not identified any reason why ██████████████████████████████████████████████ ██████████████████████████████████.  *See* Biard Decl. ¶ 26 (██████████████████ ██████████████).  Nexstar chose to close the merger despite a pending challenge from DIRECTV and eight States, and █████████████████████████████████████ with full awareness that both DIRECTV and the States sought a hold-separate order.  ██████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████.  Nexstar took these steps at its peril—with eyes wide open regarding DIRECTV's Complaint and requested TRO.  It should not be permitted to use those same steps to frustrate effective relief.  *See supra* p. 2–3.

Nexstar also seeks authority to "fulfill[] the commitments under the FCC order," but, as discussed *supra* p. 3–4, Nexstar has not identified any actual conflict between the Court's Order and Nexstar's commitments to the FCC.  The Court should not give Nexstar a blank check to take any action it deems necessary for this purpose.  To the extent Nexstar views any actions contrary to the terms of the Court's TRO as necessary to fulfilling its commitments to the FCC, Nexstar should identify the *specific* actions it seeks to take, the *specific* reasons those actions conflict with the TRO, and the *specific* commitment it seeks to fulfill, so the Court can consider whether that action is actually necessary.

9

## 2.    Proposed Modification 6

Nexstar also seeks authority "to take actions necessary to ensure TEGNA's continued operations," with respect to "Management Authority and 'Ordinary Course' Operations." Notice at 8.  This requested modification would be the exception that swallows the rule.  It goes to the very heart of the TRO's requirement that TEGNA be operated in the ordinary course as an independent going concern.  Again, Nexstar does not identify any specific actions it seeks authority to take under this proposed modification, and there is no limiting principle to what actions Nexstar might deem to be "necessary."  As written, this modification would permit Nexstar to take *nearly any action* regarding the management and ordinary course operations at TEGNA with no oversight from the Court regarding whether such authority is consistent with the TRO.

To the extent that Nexstar needs any particular, specific authority to ensure TEGNA's continued operations, it should specifically identify that authority and seek modification of the TRO, as it has with respect to debt, cash management, and corporate governance—all of which DIRECTV agrees with, subject to the minor adjustments proposed above.

## 3.    Proposed Modification 8

Finally, Nexstar seeks authority "to proceed with pre-existing, ordinary-course compensation and workforce actions."[3]  Notice at 8.  In particular, Nexstar argues that TEGNA has planned "a $90-100 million cost reduction initiative" that would achieve savings through a combination of "eliminat[ing] newsroom positions and support positions," and cost savings unrelated to lay-offs.  Notice at 5.

DIRECTV would not oppose a modification of the TRO to permit TEGNA management to implement a workforce reduction plan that was approved by former TEGNA management prior to the announcement of the merger, was unrelated to preparations for a potential closing, and was reasonably detailed as to the functional areas to be impacted, the scale of the reduction, and other

---

[3] DIRECTV has no objection to Nexstar taking actions necessary to facilitate already-agreed-upon compensation agreements for TEGNA employees, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

relevant details.  However, given that TEGNA's staffing is central to its on-going viability as an independent competitor, DIRECTV requests that the Court require that Nexstar provide additional details and frame any authority to reduce the size of TEGNA's workforce narrowly.  In particular, Nexstar should be permitted to execute such lay-offs only to the extent that it provides a declaration under penalty of perjury from a TEGNA employee with personal knowledge that a workforce reduction reasonably detailed as to the functional areas to be impacted and the scale of the reduction was planned prior to the announcement of the Nexstar-TEGNA transaction based on an assumption of continued separate operations.

Nexstar's proposed modification of the TRO would give it carte blanche to lay off TEGNA employees to the extent that it deems those lay-offs to be consistent with pre-merger financial targets.  The proposed modification provides the Court with no assurance that any lay-offs are truly ordinary course and would have occurred but-for the merger.  This risk is illustrated by Nexstar's Notice, which leaves critical questions unanswered.  For example, what portion of the $90-100 million in cost savings did Nexstar plan to achieve through lay-offs prior to announcement of the Nexstar-TEGNA transaction?  And prior to the announcement of the Nexstar-TEGNA transaction, had TEGNA identified the specific positions that would be eliminated to achieve that cost reduction?  Without answers to these questions—and without a more narrowly framed authorization—Plaintiffs and the Court are left with no assurance that any workforce reductions Nexstar seeks to make would have occurred absent the merger and therefore no assurance that such staffing reductions would preserve TEGNA's ability to compete rather than diminish it—although the latter outcome seems more likely.

**E.**     **Conclusion**

DIRECTV respectfully requests that the Court modify its Order, if at all, in accordance with the foregoing and with the Proposed Order submitted concurrently with this Response.

DATED:  April 2, 2026                     MUNGER, TOLLES & OLSON LLP


By:          /s/ Glenn D. Pomerantz
    _____

    Glenn D. Pomerantz (State Bar No. 112503)
        glenn.pomerantz@mto.com
    Kuruvilla J. Olasa (State Bar No. 281509)
        kuruvilla.olasa@mto.com
    Robert E. Bowen (State Bar No. 335932)
        robert.bowen@mto.com
    Liam Gennari (State Bar No. 350177)
        liam.gennari@mto.com
    MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, 50th Floor
    Los Angeles, California 90071
    Telephone:  (213) 683-9100

    Justin P. Raphael (State Bar No. 292380)
        justin.raphael@mto.com
    Carson J. Scott (State Bar No. 339868)
        carson.scott@mto.com
    MUNGER, TOLLES & OLSON LLP
    560 Mission Street, 27th Floor
    San Francisco, California 94105
    Telephone:  (415) 512-4000

    Xiaonan April Hu (State Bar No. 321354)
        april.hu@mto.com
    Brandon H. Thomas (State Bar No. 334240)
        brandon.thomas@mto.com
    MUNGER, TOLLES & OLSON LLP
    601 Massachusetts Ave. NW, Suite 500E
    Washington, D.C. 20001-5369
    Telephone:  (202) 220-1100
    Facsimile:  (202) 220-2300


    KING & SPALDING LLP

    McGregor Scott (State Bar No. 142413)
        mscott@kslaw.com
    KING & SPALDING LLP
    621 Capitol Mall, Suite 1500
    Sacramento, California 95814
    Telephone:  (916) 321-4800

12

Olivier N. Antoine (*pro hac vice*)
   oantoine@kslaw.com
Laura Harris (*pro hac vice*)
   lharris@kslaw.com
Joshua Hazan (*pro hac vice*)
   jhazan@kslaw.com
Sean Murray (*pro hac vice*)
   smurray@kslaw.com
Arthur B. Schoen (*pro hac vice*)
   aschoen@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Telephone:  (212) 556-2100

M. Sean Royall (*pro hac vice*)
   sroyall@kslaw.com
Emily Blackburn (*pro hac vice*)
   eblackburn@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone:  (202) 737-0500

*Attorneys for Plaintiff DIRECTV, LLC*

13