ROB BONTA
Attorney General of California
PAULA BLIZZARD (SBN 207920)
Senior Assistant Attorney General
LAURA ANTONINI (SBN 271658)
PAUL CHANDER (SBN 305133)
ELIZABETH CHEEVER (SBN 341421)
EMILY CURRAN (SBN 293065)
KOMAL K. PATEL (SBN 342765)
CONNIE P. SUNG (SBN 304242)
BRIAN WANG (SBN 284490)
Deputy Attorneys General
 455 Golden Gate Ave., Suite 11000
 San Francisco, CA  94102
 Telephone: (213) 269-6277
 E-mail: Laura.Antonini@doj.ca.gov
*Attorneys for Plaintiff, The State of California*

Additional counsel identified on signature page

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| **In Re: Nexstar-TEGNA Merger Litigation** | Case No. 2:26-cv-00976-TLN-CKD |
| **THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON, AND THE COMMONWEALTH OF VIRGINIA**<br><br>                                    Plaintiffs,<br><br>        **v.**<br><br>**NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.,**<br><br>                                    Defendants. | **PLAINTIFF STATES' REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**<br><br>**REDACTED PUBLIC VERSION** |

## I.    <u>INTRODUCTION</u>

Defendants' Response to Order to Show Cause and Opposition to Plaintiffs' Motions for Preliminary Injunction ("Opposition") repeats arguments the Court has already rejected. Defendants fail to present any effective new arguments contravening the fact that this presumptively unlawful Transaction will cause imminent irreparable harm. That harm includes further integration of the two companies; substantial lessening of competition; degradation of local-news quality; and higher retransmission consent fees in the future due to the merged entity's increased bargaining leverage. Plaintiff States have shown these harms to be imminent and irreparable without immediate relief from this Court.

Nothing in the Opposition changes the Court's conclusion that Plaintiffs are likely to succeed on the merits. TRO Order (ECF No. 60)[1] at 7-15. Plaintiff States adequately allege a product market for the Licensing of Big 4 Retransmission Consent, and geographic markets in the relevant Overlap DMAs. The merged firm's market shares in the Overlap DMAs establish the structural presumption and therefore a prima facie case that Defendants' Transaction is anticompetitive. *See Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).

Defendants' merger is a textbook violation of Section 7 of the Clayton Act, which Plaintiff States have *parens patriae* standing to challenge. Because "[t]he public interest in effective enforcement of the antitrust laws is of primary importance," *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 197-98 (D.D.C. 2018), this Court directed Defendants to take appropriate measures to hold separate the merging entities pending a decision on a preliminary injunction, TRO Order at 21-24—a remedy that is neither overbroad nor unworkable. The Court should preserve the hold separate remedy by issuing a preliminary injunction.[2]

---

[1] Unless otherwise noted, all ECF references are to Case No. 2:26-cv-00976-TLN-CKD.
[2] Pursuant to Local Rule 231(d)(3), Plaintiff States do not suggest that evidence be presented at the April 7, 2026 hearing. Plaintiff States estimate the hearing to last no longer than two hours without oral testimony.

## II.     PLAINTIFFS HAVE SHOWN FACTS SUPPORTING AN INJUNCTION[3]

Defendants' argument that unsupported allegations cannot "warrant a preliminary injunction under Ninth Circuit law," Opp. At 7, ignores the multiple sworn declarations Plaintiffs submitted. The sworn declarations from Robert Thun, Chief Content Officer at DIRECTV; Vince Torres, Chief Marketing Officer at DIRECTV; and Prof. Carl Shapiro—along with several attorney declarations attaching evidence of Nexstar's plans for the merged entity—support the States' and DirecTV's motions. *See* Thun Aff. (ECF No. 14-2); Torres Decl. (No. 2:26-cv-00978, ECF No. 27-12); Decl. of Carl Shapiro ("Shapiro TRO Decl."), ECF No. 14-3; Bowen Decl., ECF No. 14-4; Sung Decl. (No. 2:26-cv-00978, ECF No. 27-2). Such evidence is plainly sufficient to support a preliminary injunction. *See, e.g.*, *Go Daddy Operating Co., LLC v. Ghaznavi*, 2018 WL 1091257, at *12-13 (N.D. Cal. Feb. 28, 2018).

Defendants' request to strike references to prior DOJ Competitive Impact Statements ("CISs"), Opp. at 7, should be summarily denied. Whether a CIS is "admissible" evidence is irrelevant in deciding a motion for preliminary injunction, where "the rules of evidence do not strictly apply." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). In any event, the States cite DOJ's prior CISs not to prove any fact at this stage, but to show the federal government's longstanding recognition of Plaintiff States' proposed product market and the facts underlying it. As the Court noted in granting the TRO, "Defendants offer no [] substantive arguments or evidence to render [the cited statements from DOJ CISs] untrue." TRO Order at 9 n.2.

## III.     PLAINTIFFS HAVE SHOWN IMMEDIATE IRREPARABLE HARM

Absent an injunction, the merger will cause irreparable harm as Nexstar takes over TEGNA's retransmission contracts and consolidates newsrooms. The Court already recognized these forms of harm when entering its hold-separate order. *See* TRO Order at 14-18. And Plaintiffs have already shown that the Transaction will likely substantially lessen competition—

---

[3] Plaintiff States incorporate herein their Motion for Temporary Restraining Order, No. 2:26-cv-00978-TLN-CKD, ECF No. 27 (E.D. Cal. Mar. 20, 2026) ("TRO Mot."), and Reply in Support of Motion for Temporary Restraining Order, No. 2:26-cv-00978-TLN-CKD, ECF No. 81 (E.D. Cal. Mar. 26, 2026) ("TRO Reply").

indeed, the merger is presumptively unlawful because it creates higher market shares in the Licensing of Big 4 Retransmission Consent market and eliminates head-to-head rivalry between Nexstar and TEGNA.[4] The Court's Order granting DirecTV's TRO explicitly held that "[b]ecause Plaintiff establishes the Nexstar-TEGNA merger will substantially lessen competition in markets in which it participates, it has shown irreparable harm." TRO Order at 17. Nothing in Defendants' Opposition changes that conclusion.

In granting DirecTV's TRO, the Court found "persuasive" the evidence set forth by Plaintiff DirecTV that the Transaction "will reduce the output, variety, and quality of local broadcast news that is licensed." *Id.* at 14-15. Plaintiff States likewise offer ample evidence that Nexstar's takeover of TEGNA stations will harm local news. *See, e.g.*, Plaintiff States' Compl. (No. 2:26-cv-00978, ECF No. 1) ¶¶ 12, 71, 72, 73; Plaintiff States' TRO Mot. (No. 2:26-cv-00978, ECF No. 27) at 17; Shapiro TRO Decl. ¶¶ 86-94; *see also* Bowen Decl. (ECF No. 14-4) ¶¶ 3-16, 18-19 (describing news duplication in the DMAs where Nexstar or TEGNA has a Big Four duopoly); Decl. of Jon Schleuss ("Schleuss Decl."); Decl. of Jessica J. González ("Gonzalez Decl.")..[5]

In response, Defendants once again cast newsroom consolidation as beneficial and cite vague "commitments" under the FCC Opinion to expand local news..[6] However, the president of the nation's largest media workers' labor union warns that, to the contrary, the Transaction will decrease the quality of news coverage and reduce employment, noting that "[c]onsolidation leads

---

[4] Nexstar and TEGNA acknowledge they are head-to-head competitors. Antonini Decl., Ex. 1 (Document D-02 ( ██████████████████████████████ )), Ex. 2 (Document D-14 (same).

[5] *See also* Antonini Decl., Ex. 3 (NXST-002301574 at 577 ( ████████████████████████████████ )); Ex. 4 (NXST-001884763 ( ████████ )).

[6] Nexstar's "commitments" under the FCC Opinion to "expand journalism and local programming," Opp. at 5, do not remedy the harm alleged by Plaintiffs. Defendants claim the FCC found that Nexstar stations increased the number of hours of local news after Nexstar's acquisition of Tribune in 2019. *Id.* However, an increase in the number of hours of news proves nothing, especially since Nexstar is a notorious news-duplicator. Nexstar's additional "commitments" come directly from Nexstar's *Localism Commitment Letter*, a three-page letter containing no supporting evidence or declarations, which was submitted the same day the FCC Opinion was issued. *See* Memorandum Op. and Order, In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc., MB Docket No. 25-331, DA 26-267, at ¶ 68, n. 223 (F.C.C. Media Bureau Mar. 19, 2026) ("FCC Opinion").

to less local news coverage and decreased quality of local news, due to layoffs and job elimination, centralization of news creation, and news duplication across multiple markets." Schleuss Decl. ¶¶ 10-13. Similarly, the Co-CEO of advocacy group Free Press states that the Transaction will "significantly reduce the quality and amount of original local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social, and cultural issues." González Decl. ¶ 15.[7]

Defendants reassert that the extension of existing retransmission consent fees to November 30, 2026, renders the harm speculative, Opp. at 17, but the Court explicitly rejected this argument, finding the extension "does not remedy this irreparable harm." TRO Order at 17. The Court's conclusion is consistent with the arguments and evidence set forth by Plaintiffs, which demonstrates irreparable harm in the affected DMAs in the form of increased retransmission fees. Thun Decl. (No, 2:26-cv-00978, ECF No. 27-3) ¶ 2 ("DIRECTV generally will pay more to a station group in retransmission consent fees to the extent they control two or more affiliates of the Big Four networks"); Torres Decl. (No. 2:26-cv-00978, ECF No. 27-12) ¶ 2 (increases in retransmission consent fees are passed through to subscribers).

Defendants next argue that increased retransmission consent fees are only monetary harm and are therefore not irreparable. Opp. at 9. However, increased prices are precisely the sort of evidence of lessening of competition that can establish irreparable injury. *See, e.g.*, *FTC v. Kroger Co.*, 2024 WL 5053016, at *19-20 (D. Or. Dec. 10, 2024).

Neither Nexstar's empty "commitments" regarding local news, nor the extension of retransmission rates to November 30, 2026, cure the immediate and irreparable structural damage to competition that will result from Nexstar absorbing one of its largest competitors. This harm cannot be retroactively remedied by monetary damages or behavioral commitments. Courts routinely reject defendants' attempts to downplay the harm from a transaction by promising to simply ignore their economic incentives and behave well. *See, e.g.*, *Kroger Co.*, 2024 WL

---

[7] Defendants further claim that the harm to local news is "not cognizable" because Plaintiffs do not allege a market for local news. Opp. at 16. But the degradation in the quality and content of local news in each impacted DMA is an anticompetitive effect flowing from the consolidation of Nexstar and TEGNA in the Licensing of Big 4 Retransmission Consent market. Decl. of Carl Shapiro ("Shapiro TRO Reply Decl."), ECF No. 56-1, ¶ 8.

5053016, at *24 ("Courts ordinarily must be skeptical of unenforceable promises, especially those made during an antitrust investigation, because promises can be broken at will." (internal quotation marks omitted)).

## IV. PLAINTIFFS HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff States' evidence shows that the Transaction is likely to substantially lessen competition in the market for the Licensing of Big 4 Retransmission Consent. *See* TRO Mot. at 10-16. Defendants' efforts to undermine this conclusion are unavailing.

First, Defendants argue that Plaintiffs have failed to adequately allege a relevant market for the Licensing of Big 4 Retransmission Consent. Opp. at 10-13. Preliminarily, Defendants are incorrect that Big 4 stations are complements rather than substitutes. Products are complements if consumption of one product increases demand for the other. For example, cars and tires are complementary, as an increase in car purchases increases demand for tires. *See Intel Corp. v. Seven Networks*, 562 F. Supp. 3d 454, 461-62 (N.D. Cal. 2021). Here, Big 4 stations are not complements. In fact, as the accompanying Declaration of Professor Shapiro demonstrates, under the Hypothetical Monopolist Test—which Defendants concede is an appropriate test to evaluate the validity of a market definition, *see* Israel Decl. (ECF No. 77-17) ¶ 16—the correct product market is the licensing of Big 4 Retransmission Consent, in which MVPDs typically, but need not necessarily, license all Big 4 stations. Decl. of Carl Shapiro filed concurrently herewith ("Shapiro PI Decl."), ¶¶ 3-17.

Defendants' fallback argument that the relevant market must include streaming services is equally off base. Even vMVPDs like YouTube TV, which can contain local broadcast content, are not substitutes for an MVPD seeking to provide that content to their users. It is axiomatic that "market definition focuses solely on demand substitution factors, i.e., on customers' *ability* and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service." 2010 Horizontal Merger Guidelines (emphasis added); *see also FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1087 (N.D. Cal. 2023) ("A product is construed to be a reasonable substitute for another

when the demand for it increases in response to an increase in the price for the other." (internal quotation marks omitted)); *FTC v. Rag-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) ("Product markets are almost always defined by demand substitution."); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018) ("Accordingly, the touchstone [of market definition] is demand substitution . . . ."); 2023 Merger Guidelines 4.3.D.3 ("Market definition focuses solely on demand substitution factors, that is, on customers' ability and willingness to substitute away from one product or location to another in response to a price increase or other worsening of terms."). But as a practical matter, MVPDs lack the ability to substitute vMVPD content for the content that is provided under a retransmission-consent agreement and thus streaming services cannot be included in the relevant product market. Decl. of Robert Thun ("Thun PI Decl."), ¶¶ 7-8, 10, 12-13; Shapiro TRO Reply Decl. ¶ 4.

Next, Defendants rehash their erroneous argument that DMAs cannot be a relevant geographic market because retransmission consent is negotiated on a nationwide basis. Opp. at 13-14. This contention does not undermine Plaintiffs' geographic market. As the Court recognized, "The relevant geographic market is the area of effective competition where buyers can turn for alternate sources of supply," and because FCC rules generally prohibit an MVPD from importing content from one DMA into another, MVPDs *cannot* turn to other DMAs "for alternate sources of supply." TRO Order at 9-10 (citations omitted); *see also* Shapiro PI Decl. ¶¶ 18-20; *United States v. Sinclair Broad. Group, Inc.*, 74 F. Supp. 3d 468, 470 (D.D.C. 2014) (approving geographic market based on DMAs in broadcaster merger case); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (same).

Finally, Defendants contend that Plaintiffs cannot show that the Transaction is likely to cause anticompetitive effects, arguing both that Plaintiffs fail to show any "causal connection" between industry consolidation and higher retransmission fees, Opp. at 14, and that decreased quality of news through the elimination of local newsrooms and the firing of local journalists will—contrary to experience and common sense—"increase[] news output," *id.* at 17.[8] Neither

---

[8] Defendants also assert in passing that Plaintiffs' HHI calculations "predict nothing" because they are
(continued…)

contention has merit. As to higher fees, the Court correctly recognized in granting the TRO that the Transaction gives Defendants greater leverage to extract higher fees in retransmission negotiations with the MVPDs—leverage that Nexstar itself acknowledged when promising to deliver investors "'rate increases'" and "'positive growth in net retrains [sic] growth.'" TRO Order at 14 (quoting Nexstar CEO Perry Sook); *see also* Shapiro PI Decl. ¶ 24. As to harm to local news, the Court also correctly recognized that Nexstar's track record of combining newsrooms and firing local journalists is, to put it mildly, inconsistent with Defendants' assurances that news "output" —a phrase that, tellingly, makes no mention of "quality"—will increase as a result of the Transaction. *Id.* at 15; *see also* Schleuss Decl. ¶¶ 10-13; González Decl. ¶ 19-26.

## V.    THE BALANCE OF EQUITIES STRONGLY FAVORS THE PUBLIC INTEREST

The public's interest in a competitive broadcast landscape and diverse local news sources far outweighs Nexstar's private interest in reaping profits through harmful consolidation borne from an illegal deal. *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB (PJWx) 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016) ("[P]rivate harm does not outweigh the public interest in the preservation of competition."). Defendants claim that an injunction would deprive viewers of the benefits of the Transaction, including "reduc[ed] operational costs," Opp. at 5, and "opportunities to streamline operations," Biard Decl. ¶ 27 (ECF No. 77-8). But these claimed "efficiencies" are merely anticompetitive output reductions reflective of the irreparable harm to competition inflicted by Defendants' merger. *See Tribune*, 2016 WL 2989488, at *5; *see also FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 350 (3d Cir. 2016) (claimed efficiencies "must not result in any anticompetitive reduction in output"); *St. Alphonsus*, 778 F.3d at 790 ("[A]ny [efficiencies] defense must demonstrate that the prima facie case portray[s] inaccurately the merger's probable effects on competition." (internal quotation marks omitted)).

_____

based on what Defendants contend is an incorrect market definition. Opp. at 14. But Plaintiffs' market definition is sound, as explained above, and Defendants do not identify any other basis for disregarding the HHIs, which resoundingly show that the Transaction is presumptively unlawful. As the Court concluded in the TRO Order (at 12), the HHIs easily clear the thresholds of the 2010 Merger Guidelines discussed in *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd*., 778 F.3d 775, 783 (9th Cir. 2015), and thus even more easily clear the 2023 Merger Guidelines. *See* TRO Mot. at 13-14.

Any purported benefit to news programming from the Transaction is similarly outweighed by the competitive harm, including local-newsroom consolidation, an undisputed part of Nexstar's "playbook." *See* TRO Order at 15; TRO Mot. at 18-19. And because "the central purpose of the antitrust laws . . . is to preserve competition," *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (internal quotation marks omitted), that public interest "weighs heavily in the balance-of-hardships calculus," "especially . . . where the consumer access to local news is at stake." *Tribune*, 2016 WL 2989488, at *5.

## VI.    THE REQUESTED RELIEF IS NEITHER OVERBROAD NOR UNWORKABLE

Plaintiffs seek a preliminary injunction "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); TRO Order at 6. An order barring further integration is not overbroad, especially because Defendants chose to close the Transaction the day after Plaintiffs sued, knowing full well the operational and legal consequences of that decision.[9] And preliminary relief is needed precisely because "acquisitions are often followed by a commingling of assets and other substantial changes" that Nexstar would undoubtedly claim makes "a return to the status quo … impossible" (and that, in practice, could complicate the ability of a court to order a full and effective divestiture). *See FTC v. Exxon Corp.*, 636 F.2d 1336, 1342-43 (D.C. Cir. 1980).

Defendants suggest they cannot follow the Court's Order even for the few business days before the preliminary injunction hearing on April 7 because "[i]t is particularly difficult to freeze integration that was already taking place." Defs' Not. (ECF No. 63) at 1. Defendants knowingly created the purportedly "difficult" circumstances in which they find themselves. If compliance with the Order risks "operational chaos," *id.* at 7, that is because Defendants, aware of pending lawsuits, "stole[] [a] march" by "accelerating the closing date" to evade judicial oversight. *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989) (Posner, J.). Any difficulty the injunction imposes on Defendants reflects their own "desire . . . to make the deal hard . . . to reverse," *Roche*

---

[9] The authority Defendants cite to support their overbreadth argument in fact undermines it. *See Price v. City of Stockton*, 390 F.3d 1105, 1117-18 (9th Cir. 2004) (finding the district court did not abuse its discretion "[b]ecause the breadth of the injunction was necessary to preserve the status quo for all Plaintiffs").

*Diagnostics Corp. v. Medical Automation Sys.*, 646 F.3d 424, 427 (7th Cir. 2011), and any ongoing hardship from pausing integration is a risk Defendants knowingly assumed.

If Defendants find the requested relief truly unworkable, the Court should rescind the merger until the merits are decided at trial. *See Elders Grain*, 868 F.2d at 907 ("[T]he power to issue a preliminary injunction carries with it the power to issue whatever ancillary equitable relief is necessary to the effective exercise of the granted power . . . . [R]escission [of a merger] is an authorized form of ancillary relief."); *see also FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1049-50 (D.C. Cir. 2008) (Tatel, J., concurring) (same). Rescinding Defendants' merger pending a review on the merits would seem to cure the purportedly "intractable operational and regulatory issues" purportedly created by this Court's Order. Defs' Not. at 1. In any event, this Court certainly should not reward Defendants' efforts to frustrate judicial review by allowing them to pursue *further* integration, which Defendants admit will be difficult to undo. The Court should not relax the terms imposed by its Order.

## VII.    THE STATES HAVE STANDING

Defendants contend that the "States fail to adequately allege standing," in part because the claimed injury to their citizens depends upon harms passed through from Nexstar's overcharges to upstream buyers. Opp. at 19.[10] Defendants' cited precedent does not support their argument. In *Texas v. Google LLC*, 764 F. Supp. 3d 500, 524-26 (E.D. Tex. 2025)—a case on which Defendants previously relied, *see* Opp. to States' Mot., No. 2:26-cv-00978, ECF No. 73, at 7 n.14—the court rejected the very arguments Defendants raise here.[11] The *Texas v. Google* court

---

[10] Defendants also contend in their papers that the States' standing is based on "assumed pass-through of costs that is not supported by any facts." Opp. at 19 n.32. However, the States have alleged in their complaint (Compl. ¶ 81) and cited sworn declarations (Torres Decl. (ECF No. 27-12, No. 2:26-cv-00978) ¶ 2; Thun Decl. (ECF No. 14-2) ¶ 12) for the proposition that MVPDs, including DIRECTV, pass on increased retransmission consent fees. Other cable companies confirmed that increased transmission fees will result in higher prices to consumers. *See* Antonini Decl., Exs. 5-8 (cable providers noting increased costs to consumers).

[11] The other cases cited by Defendants in connection with standing are inapposite. In *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987), the court addressed the standing of indirectly harmed individuals to recover damages under Section 4 of the Clayton Act. In contrast, the States seek only injunctive relief under Section 16 of the Clayton Act, which involves a different and more lenient standing analysis. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-111 (1986). *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011), does not evaluate standing at all, and instead addresses the question whether *parens patriae* cases qualify as class actions under the Class Action Fairness Act.

held that although the conduct at issue was Google's overcharges or underpayment to advertisers and website publishers, the plaintiff states had *parens patriae* standing to sue based on the downstream harms to the states' citizens in the form of higher prices from advertisers and worse website content from publishers. 764 F. Supp. 3d at 520-24; *accord FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 21, 87 (D.D.C. 2015) (states proceeded as *parens patriae* against merger affecting wholesale food distribution, where impact of transaction was potential higher prices for consumers eating at establishments that had overpaid). That the price effects of the Transaction will pass from MVPDs to the States' citizens does not undermine the States' standing. Moreover, the States seek to protect against reduced quantity, quality, and diversity of perspectives in local news, which is essential to a functioning democracy, thriving economy, and the well-being of the States' citizens.

Since the States allege that substantial portions of their citizens will likely suffer substantially higher bills, Compl. ¶¶ 9, 81, and degradations to local news, Compl. ¶¶ 12-13, 70-73, Defendants' suggestion that increased prices and newsroom changes from the Transaction do not affect enough of the States' citizens to support *parens patriae* standing fails. Nexstar itself confirms that Big 4 stations offer the "nation's most watched programming," Compl. ¶ 3, and a long list of cases support *parens patriae* standing where the affected population is the consumer of a particular type of product or in certain geographic areas of a state. *See, e.g., California v. Am. Stores Co.*, 697 F. Supp. at 1131, 1134 (*parens patriae* standing in suit involving supermarket acquisitions in local markets); *Texas v. Google*, 764 F. Supp. 3d at 508-09 (collecting cases).[12] The States' standing to challenge Defendants' merger is beyond reasonable dispute.

## VIII.   CONCLUSION

For the reasons stated, the Court should grant the Plaintiff States' request for a preliminary injunction.

---

[12] Defendants also repeat their unfounded request that the Court require Plaintiffs to post a bond. Plaintiff States have addressed this issue, to which Defendants offer no response. The bond requirement should be waived in this case, where Defendants have offered no evidence to support the amount requested and where Plaintiff States have sued to enforce public interests. *See* TRO Reply at 10.

Dated: April 3, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

/s/ *Laura Antonini*
Laura Antonini (SBN 271658)
Deputy Attorney General

Paula Blizzard (SBN 207920)
Senior Assistant Attorney General
Deputy Attorney General
Paul Chander (SBN 305133)
Elizabeth Cheever (SBN 341421)
Emily Curran (SBN 293065)
Komal K Patel (SBN 342765)
Connie P. Sung (SBN 304242)
Brian Wang (SBN 284490)
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7014
Telephone: (415) 510-3495
E-mail: Laura.Antonini@doj.ca.gov

/s/ *Shaoul Sussman* (as authorized on April 3, 2026)
Shaoul Sussman (*Admitted Pro Hac Vice*)
Nico Gurian (*Pro Hac Vice forthcoming*)
Victoria M. O. Field (*Pro Hac Vice forthcoming*)
Paul M. Goodrich (*Admitted Pro Hac Vice*)
Simonsen Sussman LLP
307 W. 38th St., 16th Fl.
New York, NY 10018
Telephone: (646) 693-3929
Email: shaoul@simonsensussman.com
          nico.gurian@simonsensussman.com
          victoria.field@simonsensussman.com
          paul.goodrich@simonsensussman.com

Catherine S. Simonsen (SBN 307325)
Thomas G. Mattes (SBN 355010)
Simonsen Sussman LLP
418 Bamboo Ln., Suite C-18
Los Angeles, CA 90012
Telephone: (917) 747-5196
Email: catherine@simonsensussman.com
          thomas.mattes@simonsensussman.com

Nicolas A. Stebinger (*Admitted Pro Hac Vice*)
Victoria R. Sims (*Pro Hac Vice forthcoming*)
Simonsen Sussman LLP
1629 K St. NW, Suite 300

Washington, DC 20006
Telephone: (202) 384-3130
Email: nicolas@simonsensussman.com
victoria.sims@simonsensussman.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General

*/s/ Bryn Williams* (as authorized on April 3, 2026)
Bryn A. Williams
First Assistant Attorney General (SBN 301699)
Jonathan B. Sallet (*Admitted Pro Hac Vice*)
Special Assistant Attorney General
Robin Alexander (*Admitted Pro Hac Vice*)
Assistant Attorney General
Amy Bowles (*Admitted Pro Hac Vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Bryn.Williams@coag.gov
Jon.Sallet@coag.gov
Robin.Alexander@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General
(*Admitted Pro Hac Vice*)

*/s/ Julián A. Quiñones Reyes* (as authorized on April 3, 2026)
Julián A. Quiñones Reyes (*Admitted Pro Hac Vice*)
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General of Illinois

/s/ *Paul J. Harper* (as authorized on April 3, 2026)

Elizabeth L. Maxeiner (*Admitted Pro Hac Vice*)
Chief, Antitrust Bureau
Sarah J. North (*Admitted Pro Hac Vice*)
Deputy Chief, Public Interest Division
Paul J. Harper (*Admitted Pro Hac Vice*)
Supervising Attorney, Antitrust Bureau
John R. Milligan (*Admitted Pro Hac Vice*)
Daniel R. Betancourt (*Admitted Pro Hac Vice*)
Assistant Attorneys General
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (312) 814-1004
E-Mail: paul.harper@ilag.gov

*Attorneys for Plaintiff State of Illinois*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ *Elinor R. Hoffmann* (as authorized on April 3, 2026)
Elinor R. Hoffmann (*Admitted Pro Hac Vice*)
Chief, Antitrust Bureau
CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

Amy McFarlane (*Admitted Pro Hac Vice)*
Deputy Chief, Antitrust Bureau
Morgan Feder (*Admitted Pro Hac Vice*)
Assistant Attorney General, Antitrust Bureau
New York State Office of the Attorney

PLFS' REP. IN SUPPORT OF P.I.

General
28 Liberty Street
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov | (212) 416-8269
Christopher.D'Angelo@ag.ny.gov | (212) 416-6124
Amy.McFarlane@ag.ny.gov | (212) 416-6195
Morgan.Feder@ag.ny.gov | (212) 416-8288

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

*/s/ Francisco Benzoni* (as authorized on April 3, 2026)
KUNAL CHOKSI (*Admitted Pro Hac Vice*)
Senior Deputy Attorney General
Francisco Benzoni (*Admitted Pro Hac Vice*)
Special Deputy Attorney General
Brian Rabinovitz (*Admitted Pro Hac Vice*)
Director of Major Litigation for Consumer Protection
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
fbenzoni@ncdoj.gov
brabinovitz@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

*/s/ Alex DeLorenzo* (as authorized on April 3, 2026)

Timothy D. Smith (*Admitted Pro Hac Vice*)
Attorney-in-Charge
Ian Van Loh (SBN 280254)
Alex DeLorenzo (*Admitted Pro Hac Vice*)
Senior Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR  97201
tim.smith@doj.oregon.gov | 503.798.3297
ian.vanloh@doj.oregon.gov | 971.239.7457
alex.delorenzo@doj.oregon.gov | 503.428.9482

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:

JAY JONES
Attorney General of Virginia

<u>*/s/ Tyler T. Henry*</u> (as authorized on April 3, 2026)
Tyler T. Henry (*Admitted Pro Hac Vice*)
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
THenry@oag.state.va.us
(804) 692-0485

*Attorneys for the Plaintiff Commonwealth of Virginia*

PLFS' REP. IN SUPPORT OF P.I.