# EXHIBIT 7

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| **Nexstar Media Group, Inc.** | )   MB Docket No. 25-331 |
| **and** | ) |
| **TEGNA Inc.** | ) |
| | ) |
| Applications For Consent To Transfer | ) |
| Control of Licenses | ) |
| | ) |

## <u>PETITION TO DENY OF ECHOSTAR CORPORATION</u>

| | |
|---|---|
| Pantelis Michalopoulos | Jeffrey H. Blum, Executive Vice President |
| Andrew Golodny | External & Legislative Affairs |
| Colleen McCroskey | Hadass Kogan, Vice President and Associate |
| **Steptoe LLP** | General Counsel |
| 1330 Connecticut Ave NW | **EchoStar Corporation** |
| Washington, D.C.  20036 | 1001 Vermont Avenue NW, Suite 750 |
| (202) 429-3000 | Washington, D.C.  20005 |
| | (202) 463-3703 |

*Counsel for DISH Network Corporation*

December 31, 2025

**Table of Contents**

I.   INTRODUCTION AND SUMMARY ............................................................... 1

II.  STANDARD OF REVIEW ........................................................................ 4

III. THE REQUESTED WAIVER IS LEGALLY UNTENABLE ........................................ 7

    A.   The 39% National Cap is a Statutory Bar the Applicants Propose to Eviscerate ... 8

    B.   In Addition to Being Unlawful, Waiving the National Cap Would Usher in the Extinction of Localism and Harm the Public Interest ............................................. 9

    C.   The UHF Discount Is Technically Obsolete and Legally Vulnerable .................. 11

IV.  THE MERGER SHOULD BE EVALUATED IN BOTH THE LOCAL AND NATIONAL MARKETS FOR THE NEGOTIATION OF RETRANSMISSION CONSENT ....................................................................................... 11

    A.   Each Network Affiliate is Often Irreplaceable for Many Consumers in Each Local Market ....................................................................................... 11

    B.   In Analyzing a Broadcast Merger, It Is Essential to Consider the National Market ....................................................................................... 14

    C.   The Commission and the Justice Department Have Repeatedly Recognized the National Effects of Similar Transactions ................................................. 16

V.   THE MERGER WOULD INCREASE FEES IN THE NATIONAL RETRANSMISSION MARKET BY CREATING A BROADCAST BEHEMOTH ........................................ 21

    A.   Local Market Duopolies ................................................................... 21

    B.   The Elimination of Duopolies Cannot Cure the Harm of National Scale ............. 22

VI.  THE MERGER WOULD CONTRADICT CHAIRMAN CARR'S STANCE AGAINST CONCENTRATED CONTROL OF SPEECH BY CORPORATE BEHEMOTHS ........ 23

VII. CONCLUSION ................................................................................. 24

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Applications of | ) | MB Docket No. 25-331 |
| | ) | |
| **Nexstar Media Inc.** | ) | |
| **and** | ) | |
| **TEGNA Inc.** | ) | |
| | ) | |
| For Consent To Transfer Control of and | ) | |
| Assign Licenses | ) | |

## PETITION TO DENY OF ECHOSTAR CORPORATION

### I.   INTRODUCTION AND SUMMARY

Nexstar Media Group ("Nexstar"), the largest broadcast station owner in the country, proposes to acquire TEGNA, Inc. ("Tegna"), the fourth largest broadcast station owner in the country (and third by revenue).  EchoStar Corporation[1] respectfully petitions the Commission to deny the proposed acquisition.[2]

If approved, this transaction would create a broadcasting behemoth, combining Nexstar's 201 local broadcast stations with Tegna's 64.  This excessive concentration of licenses (265 local stations in the hands of one company) is exactly why Congress required the Commission to limit

---

[1] EchoStar is the parent company of DISH Network Corporation ("DISH"), a multichannel video programming distributor ("MVPD") that retransmits local broadcast stations in every one of the 210 designated market areas in the United States.  DISH today has retransmission consent agreements with both Applicants, allowing it to retransmit certain local broadcast stations owned by the Applicants.  DISH expects to negotiate with both Applicants in the future for continued retransmission of their stations.  For these and other reasons described herein, DISH is a party in interest under Section 309(d)(1) of the Communications Act.  *See* 47 U.S.C. § 309(d)(l).

[2] *See* Public Notice, Applications to Transfer Control of Tribune Media Company to Nexstar Media Group, Inc., MB Docket No. 25-331, DA 25-100 (Dec. 1, 2025).

a single company's ownership of television broadcast stations to 39% (the National Multiple Television Ownership Rule or the "National Cap").  Rather than live within the limits imposed by the law, Nexstar requests Commission authority to flout it with an unauthorized waiver.  If this transaction were allowed to be consummated, Nexstar would control 265 stations in 132, or 80%, of the country's 210 Designated Market Areas ("DMAs").  It will reach more than 54% of the U.S. viewers when accounting for the obsolete UHF discount, which turns into an unprecedented 72.3% if calculated without the discount.  What the Applicants call a request for waiver of the national cap is nothing less than a shameless request for its near-total obliteration.  The Commission does not have the authority to waive, let alone vitiate, the National Cap.

Even in the counter-factual world where the national cap did not exist, which it does, the transaction should be set for a hearing, and then denied.  Not only does it not serve the public interest—the statutory prerequisite to be approved;[3] it sharply contravenes that interest.  It would result in higher prices for multichannel video programming distributors and therefore for consumers.

Such price increases come at an especially perilous time.  Retransmission prices have already risen by an astronomical 7,230% over the last 15 years.[4]  If this transaction is approved, Nexstar is certain to outpace even that dizzying rate of increases, a feat it would achieve in a number of ways.  Nexstar would extract higher prices by exercising the leverage of controlling more than one station in each of 35 local markets.  And, even if the Commission required

---

[3] Section 310(d) of the Act requires the Commission to make an affirmative finding that the public interest, convenience, and necessity "will be served" by the transfer.  *See* 47 U.S.C. § 310(d).

[4] Pew Research Center, *Retransmission fee revenue for U.S. local TV stations* (July 13, 2021), https://www.pewresearch.org/chart/sotnm-local-tv-u-s-local-tv-station-retransmission-fee-revenue/

divestitures of these so-called duopolies, such a remedy would only scratch the surface of the competitive havoc that Nexstar will be able to wreak.  Control of more stations in disparate markets would give Nexstar the leverage to extract higher *national* retransmission prices.  In that regard, EchoStar has already made three key showings in connection with other proposed broadcast mega-mergers, none of which was as ambitious or far-reaching as this one:

- The larger a broadcast group, the higher the retransmission prices it extracts;

- Broadcast group mergers have historically led to price increases over and above even the vertiginous industry-wide retransmission price increase trajectory; and

- EchoStar pays higher prices than it expects to a broadcast station that comes up for renewal when EchoStar has already been subject to a blackout by another broadcaster elsewhere in the country.

Recent expert testimony submitted by DIRECTV confirms the existence and importance of these national effects.  DIRECTV's expert has validated many of DISH's showings, and has concluded that "the findings of DISH's study eight years ago continue to hold today:  Broadcast consolidation leads to higher retransmission consent prices even when markets do not overlap."[5]

Finally, the merger would strike at the heart of a goal that Chairman Carr has repeatedly articulated: that of nurturing diversity of opinion and avoiding excessive control over the digital town square.  In the broadcast sphere, this transaction would give Nexstar a loudspeaker that transmits louder than ever before, and one that crowds out other voices.  The Commission should not allow it.

---

[5] Letter from Michael Nilsson, Counsel to DIRECTV, to Marlene Dortch, FCC, MB Docket No. 17-318 at 5 (Sept. 19, 2025).

## II.    STANDARD OF REVIEW

The Commission starts its evaluation of a proposed transaction such as this with a rules-based analysis. First, it must determine whether the transaction complies with the Communications Act (the "Act"), and the Commission's rules.  Compliance with federal law is a threshold requirement; the Commission cannot approve a transaction that violates a statutory mandate, regardless of any claimed public benefits.[6]  If, and only if, the transaction is legally permissible, the Commission must proceed with the next step of its inquiry, the public interest evaluation required by Section 310(d)—it must determine whether the Applicants have met their burden of proving that the transfer serves the "public interest, convenience, and necessity."[7]

In reviewing a merger at that stage, the Commission specifically "considers whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes."[8]  For a broadcast merger, the Commission places particular emphasis on the values of localism and diversity[9]—values that

---

[6] *See* Applications of Ameritech Corp., Transferor, & GTE Consumer Services Inc., Transferee, for Consent to Transfer of Control of Licenses and Authorizations, *Memorandum Opinion and Order*, 15 FCC Rcd. 6667, 6669 ¶4 (1999) ("[a]s a regular part of our public interest analysis, we determine whether the proposed licensee is qualified to hold a Commission license and whether grant of the application would violate any Commission rules."); *see also* Applications of Vanguard Cellular Systems Inc., Transferor & Winston, Inc. Transferee, for Consent to Transfer of Control of Licenses and Authorizations, *Memorandum Opinion and Order*, 14 FCC Rcd. 3844, 3848 ¶ 12 (1999); Applications of BCP Commnet, L.P. Transferor, & Vodafone Airtouch, PLC. Transferee, for Consent to Transfer of Control of Licenses, *Memorandum Opinion and Order*, 15 FCC Rcd. 28, 29 ¶ 3 (1999).

[7] 47 U.S.C. § 310(d).

[8] Applications of Level 3 Communications Inc. and CenturyLink for Consent to Transfer Control of Licenses and Authorizations, *Memorandum Opinion and Order*, 32 FCC Rcd. 9581, 9585 ¶ 9 (2017) ("*CenturyLink-Level 3 Order*").

[9] *See* Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc., *Memorandum Opinion and Order*, 32 FCC Rcd. 183, 196 ¶ 35 (2017) ("*Nexstar/Media General Order*") (citing

4

Chairman Carr has vociferously championed.[10]   In addition, before considering any benefits, the

Commission evaluates whether the transaction will harm competition.[11]  If the Commission

determines that the transaction will harm competition, it must consider whether such harms can

be addressed by appropriate conditions on the transaction.[12]  Thus, the Commission must

examine the competitive effects of the transaction with special "reference to diversity, localism,

[and] other public interest considerations."[13]

Applications for Consent to Transfer of Control from Shareholders of Belo Corp., *Memorandum Opinion and Order*, 28 FCC Rcd. 16867, 16879 ¶ 30 (2013) ("*Gannet/Belo Order*") ("[W]e must giv[e] careful attention to the economic effects of, and incentives created by, a proposed transaction taken as a whole and its consistency with the Commission's policies under the Act, including our policies in favor of competition, diversity, and localism."); *Gannet/Belo Order*, 28 FCC Rcd. at 16876 ¶ 22 ("Where, as here, the Commission has adopted rules to promote diversity, competition, localism, or other public interest concerns, those rules may form a basis for determining whether the transfer and assignment applications are on balance in the public interest.").

[10] *See., e.g.*, 2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules And Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, *Report and Order*, 38 FCC Rcd 12782, 12874 (2018) (Dissenting Statement of Commissioner Brendan Carr) ("In a diverse and growing media marketplace, we need to do everything we can to promote investment in trusted local news and information."); Press Release, Office of Chairman Brendan Carr, Chairman Carr Welcomes 8th Circuit Decision on Media Ownership (July 23, 2025) ("For decades, the FCC's approach to regulating the broadcast industry has failed to promote the public interest.  That has only made it harder for trusted and local sources of news and information to compete in today's media environment.  And that is why I dissented from the Biden-era FCC's decision to retain a regulation that does not match marketplace realities."); @bennyjohnson, X (Sept. 17, 2025 at 1:01 PM) (video interview with Chairman Carr at 5:53-6:04: "One thing that we're trying to do is to empower those local stations to serve their own communities.  And the public interest means you can't be running a narrow partisan circus and still meeting your public interest obligations."), https://x.com/bennyjohnson/status/1968359685045838041.

[11] *CenturyLink-Level 3 Order*, 32 FCC Rcd. at 9586 ¶ 10 ("If the Commission has determined that a transaction raises no public interest harms or any such harms have been ameliorated by narrowly tailored conditions, the Commission next considers a transaction's public interest benefits.").

[12] *CenturyLink-Level 3 Order*, 32 FCC Rcd. at 9585 ¶ 9.

[13] Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and

The Commission's role in a merger review is more expansive than the Justice Department's analysis because of the Commission's expertise in communications and its public interest mandate.[14]  Because the Commission must find that a transaction affirmatively serves the public interest before approving it, it must determine "whether a transaction would enhance, rather than merely preserve, existing competition,"[15] and whether the merger will accelerate the decline of market power by dominant firms in relevant communications markets.[16]

Although the Commission's mandate is broader than that of the Justice Department, traditional antitrust principles also guide the Commission's analysis, especially in determining

---

Authorizations, *Memorandum Opinion and Order*, 31 FCC Rcd. 6327, 6338 ¶ 29 (2016) ("*Charter/TWC Order*").

[14] Jonathan B. Baker, FCC, *Sector-Specific Competition Enforcement at the FCC*, at 5 (Sept. 2010), https://www.fcc.gov/osp/projects/baker-enforcement-091210.pdf.

[15] *Charter/TWC Order*, 31 FCC Rcd. at 6338 ¶ 29; *see also* Applications of Comcast Corporation, General Electric Co. & NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees*, Memorandum Opinion and Order*, 26 FCC Rcd. 4238, 4248 ¶ 24 (2011) ("*Comcast/NBCU Order*"); Application of GTE Corp., Transferor, and Bell Atlantic Corp., Transferee, for Consent to Transfer Control of Domestic and International Authorizations and Application to Transfer Control of a Submarine Cable Landing License*, Memorandum Opinion and Order*, 15 FCC Rcd. 14032, 14046-47 ¶ 23 (2000) ("*Bell Atlantic/GTE Order*"); AT&T Corp., British Telecommunications, PLC, VLT Co. L.L.C., Violet License Co. LLC, and TNV [Bahamas] Limited Applications for Grant of Section 214 Authority, Modification of Authorizations and Assignment of Licenses in Connection with the Proposed Joint Venture Between AT&T Corp. and British Telecommunications, PLC, *Memorandum Opinion and Order*, 14 FCC Rcd. 19140, 19147-48 ¶ 15 (1999) ("*AT&T Corp./British Telecom Order*").

[16] Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from MediaOne Group, Inc., Transferor, to AT&T Corp., Transferee, *Memorandum Opinion and Order,*15 FCC Rcd. 9816, 9821 ¶ 10 (2000) ("*AT&T/MediaOne Order*"); *see also* Applications of NYNEX Corporation, Transferor, and Bell Atlantic Corporation, Transferee, for Consent to Transfer Control of NYNEX Corporation and Its Subsidiaries, *Memorandum Opinion and Order*, 12 FCC Rcd. 19985, 20035-36 ¶ 95 (1997).

whether a transaction will harm competition.[17]  The potential anti-competitive effects need not be defined with certainty for a merger to be challenged.[18]

If the Commission determines that a transaction will either not harm competition or the harm can be ameliorated by appropriate conditions, the Applicants must next prove that the transaction will provide affirmative benefits to the public.[19]  The claimed benefits must be: 1) transaction specific—meaning that the benefits will arise from the transaction and cannot be achieved by other practical means that have fewer anti-competitive effects; 2) verifiable—both in likelihood and magnitude; and 3) beneficial for the consumers, and not solely for the benefit of the Applicants.[20]

The Applicants have failed to meet their burden and make a public interest benefit showing.  As currently proposed, the merger will substantially harm competition, which alone is a ground to either deny the merger or designate the application for a hearing.[21]

## III.   THE REQUESTED WAIVER IS LEGALLY UNTENABLE

The analysis of this proposed transaction begins – and should end – with the National Cap.  In the Consolidated Appropriations Act of 2004, Congress amended the Act to explicitly forbid any entity from reaching more than 39% of national television households.  Congress's

---

[17] *CenturyLink-Level 3 Order*, 32 FCC Rcd. at 9585 ¶ 9.

[18] *See* U.S. Department of Justice and Federal Trade Commission, Merger Guidelines § 1 (2023) ("[T]he Agencies do not attempt to predict the future or calculate precise effects of a merger with certainty.  Rather, the Agencies examine the totality of the evidence available to assess the risk the merger presents.").

[19] *Comcast/NBCU Order*, 26 FCC Rcd. at 4249 ¶ 25; *see also Bell Atlantic/GTE Order,* 15 FCC Rcd. at 14046 ¶ 22; ; *AT&T Corp./British Telecom Order*, 14 FCC Rcd. at 19147-48 ¶ 15; Application for Consent to the Transfer of Control of Licenses from Comcast Corp. and AT&T Corp., Transferors, to AT&T Comcast Corp., Transferee*, Memorandum Opinion and Order*, 17 FCC Rcd. 23246, 23256 ¶ 28 (2002).

[20] *Nexstar/Media General Order*, 32 FCC Rcd. at 192-93 ¶¶ 22-24.

[21] 47 U.S.C. § 309(e); *see also Nexstar/Media General Order*, 32 FCC Rcd. at 191-92 ¶ 19.

command created a definitive limit that displaces the Commission's regulatory authority to modify or waive the cap.  Despite this express limitation, the Applicants admit the transaction will result in a national audience reach of at least 54.5%.  Because the transaction facially violates a statutory mandate that the Commission is powerless to waive it is unlawful.  The transaction must be denied on that basis alone.

###### A.     The 39% National Cap is a Statutory Bar the Applicants Propose to Eviscerate

Statutory interpretation "begin[s] with the text,"[22] and when a statute is unambiguous it "ends there as well."[23]  Following the Supreme Court's seminal decision in *Loper Bright Enterprises* v. *Raimondo*,[24] that hornbook tenet of statutory interpretation now applies with equal force in interpreting statutes administered by federal agencies.  Courts are thus obligated to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority" without affording special weight or deferring to an agency's own interpretation of its statutory authority.[25]

The Act states plainly that the Commission "shall modify its rules for multiple ownership" by "increasing the national audience reach limitation for television stations to 39 percent."[26]  And because "the word 'shall' generally signals a mandatory duty,"[27] it is clear that

---

[22] *Lackey* v. *Stinnie*, 604 U.S. 192, 199 (2025).

[23] *National Association of Manufacturers* v. *Department of Defense*, 583 U.S. 109, 127 (2018) (citation omitted).

[24] *See Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024).

[25] *Id.* at 412.

[26] 2004 Consolidated Appropriations Act, Pub. L. No. 108–199, § 629, 118 Stat. 3, 99 (2004) (modifying § 202(c)(1)(B) of the 1996 Act).

[27] *Bridgeport Hospital v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024).

the phrase "shall modify" is a congressional mandate that the FCC must impose the specified cap

without deviating from it.  As the Third Circuit found shortly after the Act was amended to

include the National Cap, Congress issued an unambiguous "statutory directive" to the

Commission to impose "a precise 39% cap," without any express suggestion of discretion to

change it.[28]  Any waiver of the 39% National Cap would thus defy Congress's unambiguous

mandate, and should be denied.

    **B.**    **In Addition to Being Unlawful, Waiving the National Cap Would Usher in the Extinction of Localism and Harm the Public Interest**

The purpose of the Commission's National Cap is to "ensure that local television stations

remain responsive to local communities"[29] by providing programming aimed at the specific

needs and interests of individual areas.  As the Supreme Court has long recognized, "an

important element of public interest and convenience affecting the issue of a [broadcast] license

is the ability of the licensee to render the best practicable service to the community reached by

[its] broadcasts."[30]  Localism is not only one of the Commission's guiding tenets when

considering the public interest impact of broadcast mergers, it is, under Chairman Carr, "one of

the key guiding stars of [the Commission's] media policy."[31]  Indeed, the Chairman has stated

that, during his term, he aims to "re-empower" local TV broadcasters to "serve the public

---

[28] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 396 (3d Cir. 2004).

[29] 2002 Biennial Regulatory Review-Review of the Commission's Broadcast Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, *Report and Order*, 18 FCC Rcd. 13620, 13624 ¶ 7 (2003).

[30] *NBC v. United States*, 319 U.S. 190, 216 (1943).

[31] Inside Radio, *FCC's Brendan Carr At Day 100: 'We Want Local Broadcasters To Feel Empowered.,'* (Apr. 29, 2025), https://www.insideradio.com/free/fcc-s-brendan-carr-at-day-100-we-want-local-broadcasters-to-feel-empowered/article_6acbcd7c-487b-4e27-b8c9-be44e6b2beb3.html.

interest."[32]  Despite a growing distrust of national news media, Chairman Carr has recognized, "people actually trust their local broadcasters."[33]   But this transaction poses an extinction-level threat to the very localism that has become so critically important.  Granting control of stations reaching more than 54% of the American broadcast audience in 80% of DMAs to a single national behemoth would accelerate the decline of this critically important focus on localism: the drive for economies of scale will lead to less resources for original local content, resulting in homogenized channels lacking local character and unresponsive to community needs.

The homogenization of radio as a broadcast medium provides an apt warning of the dangers of waiving the National Cap and granting this transaction.  After Congress loosened the ownership rules for radio stations in 1996, the number of radio stations in the nation increased 5.4 percent from 10,257 to 10,807.[34]  During the same period, however, the number of owners decreased 33.6 percent, from 5,133 to 3,408, while the two largest radio chains grew from fewer than 65 stations to over 1,400.[35]  This exponential expansion of ownership meant an attendant increase of the American listeners captured by a limited number of entities, leading to homogenization of local radio stations that had previously been responsive to the needs of their communities by providing local news and playing local musicians but now aired the same, bland tunes found across the country.[36]  The similar homogenization of the broadcast industry

---

[32] *Id*.

[33] *Id.*

[34] Gregory M. Prindle, *No Competition: How Radio Consolidation Has Diminished Diversity and Sacrificed Localism*, 14 Fordham Intell. Prop. Media & Ent. L.J. 279, 306 (2003).

[35] *Id.*

[36] *Id.*

threatened by this transaction would spell the demise of localism, harm the public interest, and should be denied.

### C.    The UHF Discount Is Technically Obsolete and Legally Vulnerable

The Applicants' calculation of 54.5% reach relies on the "UHF Discount," which counts UHF stations as reaching only 50% of households.  The Commission itself has recognized that "the technical basis for the discount is no longer valid" in the digital era.[37]  Even with this outdated discount, the proposed transaction blows through the 39% cap imposed by Congress. If this obsolete zombie rule were eliminated—as the Commission has proposed—Nexstar's actual national reach would soar to approximately **72.3%**.

### IV.    THE MERGER SHOULD BE EVALUATED IN BOTH THE LOCAL AND NATIONAL MARKETS FOR THE NEGOTIATION OF RETRANSMISSION CONSENT

Assuming that the transaction would not violate the statute and the Commission's rules (which it of course would), it should still be evaluated both at the local level—where each network affiliate negotiates retransmission consent with each MVPD—and at the national level—where Nexstar negotiates retransmission consent with national MVPDs for carriage of all its owned and operated stations.

### A.    Each Network Affiliate is Often Irreplaceable for Many Consumers in Each Local Market

The Commission regulates many industries.  But in not one of those industries have prices been able to keep up with the pace of retransmission fee increases.  To judge by revenue growth, broadcasters would be the telecom industry's premier growth industry over the past 10 years, despite the fact that their ratings have declined over this same time period, and even

---

[37] Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, *Report and Order*, 31 FCC Rcd. 10213, 10236 ¶ 50 (2016).

though they have done nothing particularly new or different to foster that revenue growth other than consolidating and demanding more money.  Retransmission prices have risen by 138% over the past 10 years—from $6.5 billion in 2015[38] to a projected $15.52 billion in 2025.[39] For the period from 2006 to 2010, the increase had been more than 500%.[40]  All in all, retransmission fees have increased by an astounding 7,230%, from $214.6 million to $15.52 billion, over the past 15 years.

As EchoStar has pointed out, these fee increases are unsupported by a rational explanation, such as dramatic investment in new creative content and commensurate ratings increases.  Indeed, the ratings of the broadcast networks have slipped both as a percentage of total video consumption and relative to the ratings of cable networks.[41]  Rather, the main reason is the power wielded by each network affiliate.  While less popular than they once were, the four networks are must-have staples for pay-TV customers.  As the Commission has concluded, "the top-four broadcast networks have a distinctive ability to attract, on a regular basis, larger primetime audiences than other broadcast and cable networks, which enables them to earn higher

---

[38] Justin Nielson, *Broadcast Outlook 2025: Challenges, Opportunities Facing US TV, Radio Stations*, S&P Global (Oct. 7, 2025), https://www.spglobal.com/market-intelligence/en/news-insights/research/2025/10/broadcast-outlook-2025-challenges-opportunities-facing-us-tv-radio-stations.

[39] Pew Research Center, *Retransmission fee revenue for U.S. local TV stations* (July 13, 2021), https://www.pewresearch.org/chart/sotnm-local-tv-u-s-local-tv-station-retransmission-fee-revenue/.

[40] Amendment of the Commission's Rules Related to Retransmission Consent, *Report and Order and Further Notice of Proposed Rulemaking*, 29 FCC Rcd. 3351, 3363 ¶ 16 n.68 (2014) (citing record evidence that retransmission consent fees for MVPDs increased from $214.6 million in 2006 to $1.1 billion in 2010).

[41] *See* Dade Hayes, *Broadcast TV Slips To All-Time Low Audience Share In Nielsen's Report On June Viewing*, Deadline (July 15, 2025), https://deadline.com/2025/07/broadcast-tv-slips-to-all-time-low-audience-nielsen-june-viewing-1236457577/.

rates from those advertisers that are willing to pay a premium for such audiences."[42]  While certain programming content "ha[s] become increasingly capable of attracting primetime audiences on par with, or even greater than, the top-four broadcast networks, no one cable network – let alone several – has been able to consistently deliver such audiences beyond individual programs or episodes."[43] As the Commission has further explained: "[W]hile non-broadcast video programming may offer consumers additional programming options in general, they do not serve as a meaningful substitute in local markets due to their national focus."[44]

For many consumers, the four network stations in each local market are complements to one another.  In other words, most of EchoStar's customers want a mix of all four stations, and they will not settle for one, two or even three of them.  Having only three out of the four Big-4 networks is worse for our customers than having all four, and having only two out of the Big-4 is less desirable than having just three, let alone all four.  For these reasons, each network affiliate is the "only saloon in town" for its network, playing two, three, or four distributors against one another.

For the same reason, blackouts are not nearly as problematic for broadcasters as they are for distributors.  In light of the virtual monopoly each network affiliate enjoys in its market, the "pain" experienced by a network station and a distributor during and as a result of a blackout is asymmetric: while the distributor is bleeding subscribers and associated revenues, its subscribers flee to competitive distributors and, as a result, the network does not lose the same number of

---

[42] 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, *Second Report and Order,* 31 FCC Rcd. 9864, 9958 ¶ 229 (2016).

[43] *Id*.

[44] *Id*. at 9874 ¶ 27.

"eyeballs" as the distributor.  But the distributor never recovers the subscription revenues from customers who left during the blackout, and always loses a portion of those customers and their revenues for good.

>### B.      In Analyzing a Broadcast Merger, It Is Essential to Consider the National Market

As EchoStar has explained, the national retransmission market, where large broadcast groups negotiate fees with distributors, is equally relevant for several reasons.[45]  First, negotiations between an MVPD serving large regions or the entire nation and a broadcast group owning stations in several areas are national in nature.[46]  This means that such MVPDs and broadcast groups typically negotiate and agree to a uniform retransmission fee per subscriber for each station affiliated with one of the "Big 4" networks, throughout the two parties' respective footprints, without regard to the location of each station.[47]

National distributors like DISH seek to offer local broadcast stations across their national footprint.[48]  Each of the broadcast groups is a separate pathway for DISH to having enough broadcast retransmission agreements to preserve its reputation for providing local stations to each market throughout the nation.[49]  It is important for EchoStar to be able to provide local stations in areas where customers are located or where they may move.[50]

---

[45] *See* Petition to Deny of DISH Network Corporation, MB Docket No. 19-30 (Mar. 18, 2019) ("DISH Nexstar/Tribune Petition to Deny").

[46] *Id*. at Exhibit B, 11-12..

[47] *Id*.

[48] *Id.*

[49] *Id*. at 7.

[50] *Id*.

Thus, an inability to retransmit a station in one market increases the price DISH is willing to pay for the right to retransmit a station in another market simply because it seeks to provide service to as many customers nationwide as possible.[51]  Conversely, if DISH has to renegotiate an expiring contract with broadcast group A shortly after having secured a contract with broadcast group B without having experienced a blackout, DISH is not under the Damocles sword of a blackout and is less coerced into paying above-market prices to group A.

DISH, as well as the broadcast groups, also attribute great importance to the sequencing of renewal negotiations:  DISH would want a difficult negotiation with a particularly large group to come after it has negotiated renewal with a number of smaller groups, and has already secured retransmission consent from them.  The large broadcast group would want the opposite, in order to increase bargaining pressure on DISH.[52]  Faced with the loss of either Nexstar's or Tegna's stations alone, DISH can take steps to avoid the loss of the other company's signal, and therefore be more able to resist significant price increases.  By contrast, the threat of simultaneously losing all of the Nexstar and Tegna stations would make DISH more likely to capitulate to a higher price increase than it would absent this transaction.

These blackouts are not merely theoretical.  Tegna has forced five major customer blackouts in recent years,[53] including the four-month-long blackout of 3 million DISH customers across 53 markets in 2021 that threatened to impact customers' access to the Super Bowl.[54]  Only

---

[51] *Id.* at 8.

[52] *Id.*

[53] American Television Alliance, *Tegna is Blacking Out Your TV Channels*, https://americantelevisionalliance.org/tegna-is-blacking-out-your-tv-channels/.

[54] Press Release, American Television Alliance, ATVA's Statement on TEGNA's Blackout of 3 Million DISH TV Customers (Oct. 7, 2021), https://americantelevisionalliance.org/atvas-statement-on-tegnas-blackout-of-3-million-dish-tv-customers/.

two months ago Nexstar blacked out its channels for Verizon subscribers in 14 markets, including Washington, D.C., Philadelphia, and New York City, during a retransmission consent negotiation.[55]  The merged entity that would result from this transaction, of course, would have even more leverage to inflict these forced blackouts on MVPDs and their customers.

>### C.   The Commission and the Justice Department Have Repeatedly Recognized the National Effects of Similar Transactions

In a series of transaction reviews, both the Commission and the DOJ have recognized the threat of national market effects arising from the merger-specific increase in bargaining power that exists above and beyond any adverse effects in local geographic markets.

For example, the Commission and the DOJ have looked at circumstances where broadband providers with non-overlapping service areas participated in both local markets and a national market where distinct competitive effects would be the likely result of the transactions.

In the *Charter/Time Warner Cable* transaction, the Commission understood that, despite the merging companies not having overlapping presence in any local market and the fact that the geographic market for the purchase of residential broadband subscriptions was local, there was still a separate product market in "the market for access to wireline [broadband] subscribers via interconnection," which it titled the "interconnection market,"[56] and that the geographic market for interconnection was national.  The relationship between broadband providers and content creators existed beyond the local geographic scope between the broadband providers and their local customers.

---

[55] American Television Alliance, *Protect Consumers from Nexstar's Blackout*, https://americantelevisionalliance.org/stop-nexstars-blackout/.

[56] *Charter/TWC Order*, 31 FCC Rcd. at 6378-79 ¶ 104.

As the Commission explained, edge providers who seek to have their content transmitted to residential subscribers understood that the different broadband providers offering the ability to reach residential subscribers act "as substitute sources for eyeballs regardless of the portion of the United States each [broadband] provider serves."[57]  The Commission also noted that "there is no indication that edge providers contract for direct or indirect interconnection with [broadband] providers on a local market-by-market basis[.]"  Rather "the record indicates that whether an edge provider is contracting for [interconnection services], it provides access to its full footprint."[58]  And the Commission concluded that the new company would be able "to impose higher costs on edge providers [and others] due to its increased market power."[59]

The analysis performed by the DOJ economists in the abandoned *Comcast/Time Warner Cable* merger reached a similar conclusion.  Again, the two applicants offered both local broadband services to consumers and distribution services through interconnection agreements to edge providers and, again, the two companies did not overlap in the local residential markets. The DOJ economists confronted the "question of how a merger that would have had no meaningful impact on concentration in the markets in which consumers purchase video or

---

[57] *Id*. at 6379 ¶ 106.

[58] *Id*. at 6379-80 ¶ 107.

[59] *Id*. at 6380 ¶ 108.  Similarly, the DOJ, focusing on the video programming side of the business in the same proposed transaction found national effects without regard to the lack of local overlap.  Like residential broadband, the geographic market for video programming distribution is local but the "anticompetitive effects of the proposed merger likely extend to the entire United States," Competitive Impact Statement, *United States v. Charter,* Case No. 1:16-cv-00759, at 7 (D.D.C. May 10, 2016), even though the merging companies "do not compete to provide video distribution services to consumers in the same local geographic markets . . . ." *Id*. at 10.  The Department specifically alleged that, with its larger size, "programmers will be less likely to risk losing access to New Charter's considerable subscriber base . . . ." *Id.* at 13.

17

broadband services came to be viewed as problematic by the Antitrust Division."[60] As the DOJ economists explained, both firms participated in the interconnection market, and in that national market economic analysis provided "powerful evidence that content providers view [broadband] subscribers as substitutes, that the merger would reduce this competition amongst ISPs, and that the end result likely would be higher interconnection fees."[61]

Indeed, the idea that separate national effects can arise from the combination of local markets is well-established. As the DOJ complaints in both *United States v. AT&T* ("*AT&T/T-Mobile*") and *United States v. U.S. Airways, Group, Inc.* ("*U.S. Airways/American Airlines*") demonstrate, the exercise of market power in local markets can yield national effects. For example, in *AT&T/T-Mobile*, the government alleged the existence of local geographic markets for mobile wireless telecommunications services[62] but also recognized the "national decision-making" of the biggest four mobile companies[63] and the fact that existence of "nationwide competition affecting those markets" made it "appropriate to consider the competitive effects of the transaction at a national level."[64] Similarly, in *U.S. Airways/American Airlines*, the DOJ alleged that each "city pair" (which designates the cities between which a flight departs and

---

[60] Nicholas Hill, Nancy L. Rose, and Tor Winston, *Economics at the Antitrust Division 2014-2015*, 47 R. Indus. Org. 425, 427 (2015) . And, as with interconnection, economic analysis found that "the merged firm would have gained additional bargaining leverage over programmers by removing programmers' ability to substitute the stand-alone firms for one another." *Id.* at 429.

[61] *Id.* at 428. Similarly, looking at the national market for video distribution, the DOJ economists concluded that "while Comcast and Time Warner Cable are rarely substitutes for access to particular customers, they are substitutes when a programmer is trying to build a national audience for content." *Id.* at 428-29.

[62] Complaint, *United States v. AT&T*, Case No. 1:11-cv-01560, ¶ 17 (D.D.C. Aug. 31, 2011).

[63] *Id*. at ¶ 19.

[64] *Id*. at ¶¶ 14, 20.

arrives) constituted a separate geographic market[65] but that, in addition, the reduction of major domestic airlines from five to four would separately "threaten[] substantial harm to consumers,"[66] through the danger of increased coordination that would likely lead to higher ancillary fees, such as for the checking of baggage.[67]  The DOJ took the same position in *JetBlue/Spirit*:  while the "harm [from the merger] would be most directly felt on the more than 40 nonstop routes where the acquisition is presumptively illegal,"[68] DOJ also relied on nationwide competitive effects, citing "Spirit's unique and disruptive role in the industry" that would be lost with JetBlue's planned absorption strategy, "dampen[ing] competition with other airlines" and heightening the risk of price coordination among the remaining airlines throughout the industry.[69]

The DOJ and the Commission performed the same type of analysis when they reviewed the *AT&T-MediaOne*[70] transaction in 2000—the merger of two cable operators that would have resulted in the combination of the Excite@Home and Road Runner broadband access portals. When the DOJ argued for the divestiture of the combined company's interest in one of the two portals, it defined a national market[71] for the "aggregation, promotion, and distribution of broadband content and services."[72]  In the DOJ's view, the proposed combination of the two

---

[65] Amended Complaint, *United States v. US Airways Group, Inc.*, Case No. 1:13-cv-01236, ¶ 28 (D.D.C. Sept. 5, 2013).

[66] *Id.* at ¶ 1.

[67] *Id.* at ¶¶ 71-72, 77.

[68] Complaint, *United States et al. v. JetBlue Airways Corp. and Spirit Airlines, Inc.*, Case No. 1:23-cv-10511, Dkt. No. 1, ¶ 32 (D. Mass Mar. 7, 2023).

[69] *Id.* at ¶¶ 5, 8, 9, 44-45.

[70] *AT&T/MediaOne Order,* 15 FCC Rcd. at 9817-18 ¶ 1.

[71] Complaint, *United States v. AT&T*, Case No. 1:00-cv-01176, ¶ 28 (D.D.C. May 25, 2000).

[72] *Id.* ¶ 25.

companies threatened competition in this market.[73]  The DOJ specifically alleged that "AT&T would substantially increase its leverage in dealing with broadband content providers, enabling it to extract more favorable terms for such services."[74]  The Commission reached a similar conclusion, stating that "the merged firm will control such a large portion of the broadband customer base that it could gain *de facto* power to dictate what content, products, and services are available to broadband customers generally, and at what price."[75]

The Federal Trade Commission considered effects on local markets in evaluating the national market in the broadline food distribution markets in *Sysco/US Foods*.  There, the FTC alleged concentration as to both the national market made up of national grocery chains that purchased groceries only from Sysco and US Foods as the two largest broadline distributors, and in local markets made up of single stores or local grocery chains who also purchased from regional distributors.[76]  The FTC noted that in the local markets, it is difficult and capital-intensive for regional distributors to expand into new markets, including because a combined "Sysco and US Foods ha[s] substantially more sales representatives than other broadline distributors" and a "strong incumbency advantage."[77]  But without getting bigger in the local markets, a regional distributor is prevented from competing in the national market, because it would not have "the geographic footprint to serve National Customers."[78]  Thus, the effects on

---

[73] *Id.*

[74] *Id.*

[75] *AT&T/MediaOne Order*, 15 FCC Rcd. at 9865 ¶ 111.

[76] Complaint, *Federal Trade Commission et al. v. Sysco Corp. et al.*, Case No. 1:15-cv-00256-APM, Dkt. No. 11-1, ¶ 1 (Feb. 20, 2015).

[77] *Id.* at ¶¶ 79-81.

[78] *Id.* at ¶ 78.

competition in the local broadline distribution markets would prevent competitors from entering the national market as well.

In sum, the Commission and the DOJ have long understood that the cumulative impact of market power in many local markets is more than just the sum of its parts.  That is the case here, where retransmission prices would rise as MVPDs would be forced to pay higher fees due to the combined power of the new company.  The combined company would, as a result of the merger, have more power than is simply the sum of its parts, and should be evaluated as such.

## V.    THE MERGER WOULD INCREASE FEES IN THE NATIONAL RETRANSMISSION MARKET BY CREATING A BROADCAST BEHEMOTH

The transaction would create a broadcast conglomerate of unprecedented scale that will inevitably drive up prices for consumers.  The Applicants will leverage their newfound size to increase retransmission fees in at least two ways.

### A.    Local Market Duopolies

The competitive harms of this transaction will start (but as described above, hardly end) at the local level.  The Applicants do not propose divesting their duopolies.  Instead, they explicitly argue that the Commission should allow them to keep these stations.  Unlike in the *Nexstar-Tribune* merger, where the applicants proposed divestitures to comply with local ownership rules, here the Applicants audaciously seek waivers to maintain these combinations. The transaction will result in Nexstar forming or acquiring duopolies in 17 DMAs, and in 10 of these DMAs, Nexstar will own two Top Four Stations.  Nexstar claims that "these duopolies are, as a practical matter, rule-compliant."[79]  As DISH demonstrated previously, owning two Big 4

---

[79] Applications of TEGNA Inc. and Nexstar Media Inc. for Transfer of Control of Licenses and Authorizations,  Comprehensive Exhibit at 18.

affiliates in a single market gives a broadcaster disproportionate leverage.[80]  A simultaneous blackout of two major network affiliates in the same city is catastrophic for a distributor.  By consolidating these duopolies, Nexstar would gain the power to threaten must-have programming on multiple fronts within the same community, forcing DISH to agree to supra-competitive rates.

### B.    The Elimination of Duopolies Cannot Cure the Harm of National Scale

Finally, even if the Commission were to require a divestiture of the duopolies, this would still leave intact the vast majority of the harm threatened by the transaction.  This is because control of more stations in disparate markets would give Nexstar the leverage to extract higher retransmission prices nationwide.  The sheer size of the combined entity creates a "super-additive" harm.  In that regard, EchoStar has already made three key showings:

- **The larger a broadcast group, the higher the retransmission prices it achieves**. Economic analysis consistently demonstrates a statistically significant relationship between a broadcast group's size and the retransmission fees it commands.  Both Ordover (2017)[81] and Shampine (2025)[82] confirm that the largest broadcast groups charge fees significantly higher than smaller groups.

- **Broadcast group mergers have led to price increases over and above the base retransmission increase**.  Empirical analysis of past mergers shows that prices spike immediately following consolidation.  In Nexstar-Tribune, DISH's economists found

---

[80] *See generally* DISH Nexstar/Tribune Petition to Deny.

[81] *See* Declaration of Janusz A. Ordover, attached to Petition to Deny or Dismiss of DISH Network Corporation, MB Docket No. 17-179, at Exhibit D (Aug. 7,  2017).

[82] *See* Declaration of Allan Shampine, PhD, attached to Letter from Michael Nilsson, Counsel to DIRECTV, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at Exhibit A (Sept. 19, 2025).

that, after controlling for industry trends, retransmission fees for acquired stations jumped by approximately 18% and fees for the acquirer's stations jumped by 29% in the first post-merger contract.

- **DISH pays higher prices than it expects to a broadcast station that comes up for renewal when DISH has already been subject to a blackout by another broadcaster.** DISH's data shows that it pays approximately 10% higher rates than its internal benchmarks had indicated when negotiating under the threat of a blackout from a different broadcast group. The inability to retransmit a station in one market increases the price DISH is willing to pay for the right to retransmit a station in another market. Nexstar can weaponize this cross-market leverage to a degree never before seen in the industry. It will possess the ability to threaten simultaneous blackouts across the vast majority of the country, creating a permanent scenario that forces distributors to capitulate to supra-competitive rates to avoid catastrophic subscriber losses.

## VI. THE MERGER WOULD CONTRADICT CHAIRMAN CARR'S STANCE AGAINST CONCENTRATED CONTROL OF SPEECH BY CORPORATE BEHEMOTHS

The broadcast behemoth this merger threatens to create would wholly contravene the principles articulated by Chairman Carr regarding the dangers of allowing a few powerful entities to monopolize the flow of information. Chairman Carr has consistently warned against the harms of "corporate behemoths" that "are not merely exercising market power" but "abusing dominant positions"[83] to control the "digital town square."[84] And, the Chairman aptly recognizes

---

[83] The Heritage Foundation, Project 2025 at 825.

[84] *Id.*

that centralized control over speech threatens freedom of speech and "true diversity of opinion"[85] and that these "censorship cartels"[86] pose a danger to democracy by allowing a handful of gatekeepers to decide "who gets to speak, what they can say, and who gets to listen to that speech."[87]

Broadcast giants that own a large number of stations in a large number of markets and control a large percentage of audience reach are a danger to free speech[.]   One of Chairman Carr's guiding tenets—that concentrated power over information is dangerous to democracy— applies fully to Big Broadcast.  Allowing Nexstar to swallow one of its last major competitors and gain control over an artificially suppressed 54.5% (and a real 72.3%) of the national audience will effectively create a single broadcast behemoth with the power to homogenize news coverage, mandate editorial policy, and "drive diverse political viewpoints"[88] from the local airwaves across the entire country, ultimately dictating "who gets to speak, what they can say, and who gets to listen to that speech."

## VII.    CONCLUSION

For the foregoing reasons, the Commission should designate the Applications for a hearing and deny them.

---

[85] Letter from Chairman Brendan Carr, FCC, to Sundar Pichai, Chief Executive Officer, Alphabet, Inc. et al. (Feb. 26, 2025) (Feb. 26, 2025), https://www.fcc.gov/sites/default/files/Chairman-Letter-to-Big-Tech-on-Digital-Services-Act.pdf.

[86] *Id*.

[87] Brendan Carr & Nathan Simington, *The First Amendment Does Not Prohibit The Government From Addressing Big Tech Censorship*, Yale Journal on Regulation: Notice & Comment Blog (Jan. 11, 2024), https://www.yalejreg.com/nc/the-first-amendment-does-not-prohibit-the-government-from-addressing-big-tech-censorship-by-brendan-carr-and-nathan-simington/.

[88] Project 2025 at 825.

Respectfully submitted,

_____/s/_____
Jeffrey H. Blum, Executive Vice President,
External and Legislative Affairs
Pantelis Michalopoulos
Andrew M. Golodny
Colleen McCroskey
**STEPTOE LLP**
1330 Connecticut Ave NW
Washington, DC 20036
(202) 429-3000

*Counsel for EchoStar Corporation*

December 31, 2025

Hadass Kogan, Vice President, Regulatory
Affairs
**ECHOSTAR CORPORATION**
1001 G Street NW, Suite 700
Washington, D.C.  20001

**DECLARATION**

I declare under penalty of perjury that the facts contained within the foregoing Petition to Deny, except for those facts for which official notice may be taken, are true and correct to the best of my information, knowledge, and belief.

Executed on December 31, 2025

_____/s/_____
Jeffrey H. Blum, Executive Vice President,
External and Legislative Affairs
EchoStar Corporation

**CERTIFICATE OF SERVICE**

I, Colleen McCroskey, certify that on December 31, 2025, a copy of the foregoing was served by electronic mail upon:


Jennifer A. Johnson
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com

*Counsel to TEGNA, Inc.*

Kathleen Kirby
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
kkirby@wiley.law

*Counsel to Nexstar Media Inc.*