**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| In Re: Nexstar-TEGNA Merger Litigation | Civil Case No. 2:26-cv-00976-TLN-CKD |

# REPLY DECLARATION OF CARL SHAPIRO

## 3 April 2026

1. I am Carl Shapiro. I have been retained on this matter on behalf of DIRECTV, and California, Colorado, Connecticut, Illinois, New York, North Carolina, Oregon, and Virginia, to assess the likely effects on competition of Nexstar's acquisition of TEGNA. On March 18, 2026, I submitted a declaration in this matter ("Shapiro TRO Declaration"), and on March 26, 2026, I submitted a reply declaration ("Shapiro TRO Reply Declaration").

2. I respond here to the April 1, 2026 Declaration of Mark Israel ("Israel PI Declaration").

## Big Four Retransmission Consent is a Relevant Product Market

3. In the Shapiro TRO Declaration (¶¶42-62) I explained why Big Four Retransmission Consent is a relevant product market. I showed that Big Four Retransmission Consent satisfies the Hypothetical Monopolist Test ("HMT"). Dr. Israel agrees that "economists typically use the Hypothetical Monopolist Test to evaluate the validity of a market definition."[1]

4. The Israel PI Declaration does not dispute any of the specific points made in the part of the Shapiro TRO Declaration (¶¶47-55) where I implemented the HMT. Notably, I cited recent evidence from real-world negotiations "that the owner of two or three Big Four broadcast stations in a given DMA can indeed charge higher Retransmission Fees than the owners of those stations would be able to charge if those stations were separately owned." (¶51) Dr. Israel does not address this example. I also cited an empirical study that "owners of Big Four broadcast stations that own more than one Big Four station in a DMA charge DIRECTV more per station." (¶54) The Israel PI Declaration does not address this empirical analysis.[2]

5. I then explained (¶55) that this evidence supports the conclusion that the HMT is satisfied, so Big Four Retransmission Consent is a relevant product market. The key point is that a hypothetical monopolist controlling all Big Four broadcasters in a DMA has even more bargaining leverage over MVPDs than does an entity controlling two or three of them, which

---

[1] Israel PI Declaration ¶16.

[2] Dr. Israel did raise several concerns about this empirical study by Dr. Shampine in his March 24, 2026 TRO Declaration (¶¶37-39), where he stated that to his knowledge neither I nor Dr. Shampine had addressed those concerns. However, Dr. Shampine submitted a reply declaration in the FCC proceeding responding to concerns and providing additional analysis and evidence, none of which is addressed by Dr. Israel. That reply declaration is cited in my TRO Declaration at note 42.

are the ownership patterns we observe in the data. Dr. Israel has not cited or conducted any empirical analysis regarding the HMT.

6.  Dr. Israel asserts that the HMT is not satisfied because of two features of the industry:

- **Pass-Through**: MVPDs will pass through higher retransmission fees to some degree to their customers in the form of higher subscription prices.
- **Streaming**: MVPDs compete against streaming services.

7.  I agree that these two features are present in the industry, but my implementation of the HMT fully accounts for both of them. Why? Because the evidence I used to perform the HMT comes from the real world, in which both features are present. Regarding pass-through, the price increases we see when a single entity owns two or three Big Four stations in a DMA are profitable for that entity notwithstanding the presence of pass-through. Likewise, the price increases we see from partial consolidation of Big Four stations within a DMA are happening in the real world where MVPDs are competing against streaming services, as I explained in ¶72 of the Shapiro TRO Declaration.

8.  Rather than implementing the HMT, Dr. Israel advances a theory (¶11) that "the broadcast stations are complements," not substitutes. He does not support that theory with any quantitative analysis. Rather, his theory is based on two features of the industry: pass-through and the fact that MVPDs normally carry all of the Big Four broadcast stations.

9.  Based on these two undisputed features of the industry, Dr. Israel reaches the striking conclusion that "NEXSTAR AND TEGNA DO NOT COMPETE FOR CARRIAGE ON MVPDS."[3] Moreover, because Dr. Israel believes that Big Four broadcast stations do not compete against each other for carriage on MVPDs, he concludes that a hypothetical monopolist controlling all of the Big Four broadcasters in Sacramento (or any other DMA) would naturally "have an incentive to reduce retransmission rates."[4]

10. Dr. Israel is mistaken. Nexstar and TEGNA *do* compete against each other for carriage on MVPDs, and a hypothetical monopolist controlling all Big Four broadcasters in a DMA would have an incentive to *raise* retransmission fees, not lower them.

---

[3] Israel PI Declaration, heading to Section II, p. 4.

[4] Israel PI Declaration, ¶15.

11. There are three ways to see why Dr. Israel is mistaken on this central point.

12. First, Dr. Israel's theory that Big Four stations do not compete is at odds with how Nexstar and MVPDs are acting in the marketplace.

13. If Dr. Israel were correct, then Nexstar would voluntarily and proactively be seeking to *lower* retransmission fees in the overlap DMAs following its acquisition of TEGNA. Instead, Nexstar has been planning to *increase* the retransmission fees it charges for the TEGNA stations it acquires.

14. Likewise, if Dr. Israel were correct that consolidation would lead to lower retransmission fees, then DIRECTV and other MVPDs would be *welcoming* Nexstar's acquisition of TEGNA, along with other mergers that consolidate the ownership of broadcast stations within DMAs, not opposing them. But the *opposite* is true. Not just DIRECTV, but DISH and a number of cable operators have publicly opposed the Nexstar/TEGNA merger.

15. The fact that marketplace actors are doing the opposite of what Dr. Israel's theory predicts is powerful economic evidence that his theory is flawed. One of the bedrock assumptions underlying antitrust economics is that firms act in accordance with their economic self-interest.

16. Second, Dr. Israel's theory is contradicted by the evidence noted above from ¶51 and ¶54 of the Shapiro TRO Declaration. If Dr. Israel's theory were correct, the HMT would not be satisfied. But it is, as shown in the Shapiro TRO Declaration ¶¶47-55.

17. Third, it is notable that Dr. Israel's opinions on the relevant product market contradict how the DOJ has repeatedly and consistently analyzed mergers between groups of broadcast stations. In my experience as a former Deputy Assistant Attorney General for Economics in the Antitrust Division of the DOJ, statements contained in DOJ Complaints against mergers, like those I cited in ¶¶44-46 of the Shapiro TRO Declaration, usually reflect careful analysis by economists applying the Merger Guidelines together with tools similar to those that I have applied in this case. Moreover, both features of the industry that Dr. Israel relies upon to reach his contrary conclusions about the relevant product market – pass-through and the fact that MVPDs normally carry all of the Big Four broadcast stations – were also present in 2019

and 2021 when the cited Complaints were filed. Dr. Israel's theory is inconsistent with how economists in the Antitrust Division have been analyzing broadcast mergers for years.

## Each Overlap DMA is a Relevant Geographic Market

18. Market definition in horizontal merger cases is all about identifying the reasonable substitutes available to the customers of the merging firms. In the Shapiro TRO Declaration (¶41), I explained why each DMA in which both Nexstar and TEGNA own a Big Four broadcast station is a relevant geographic market. The basic point is straightforward: if the ABC affiliate in Sacramento raises its price, an MVPD serving subscribers in Sacramento cannot substitute content from ABC affiliates in other DMAs. There is no factual dispute about this, which should settle the matter.

19. Nonetheless, Dr. Israel asserts that "DMA-Level Markets are Invalid."[5] Why? Because "Retransmission Rates Are Set at the Footprint-Level, Not the DMA Level."[6] Dr. Israel writes: "Under these conditions, the Hypothetical Monopolist Test cannot be satisfied for DMA-level markets, meaning Plaintiffs' geographic market is not valid."[7]

20. Dr. Israel has made a basic methodological error. The Hypothetical Monopolist is a *construct* used to identify the reasonable substitutes available to customers for the products in the candidate market – not a simulation of the merging parties' negotiations with their customers. When performing the HMT in the Sacramento DMA (for example) the Hypothetical Monopolist owns all of the Big Four broadcast stations in Sacramento *and nothing else*.[8] We then ask whether this Hypothetical Monopolist would be restrained from raising the fees it charges MVPDs who serve the Sacramento DMA because of competition from broadcasters operating *outside* the Sacramento DMA. The answer is clearly "no" because MVPDs are not permitted to import broadcast signals from other DMAs. The HMT thus returns the same correct answer we already knew based on the prohibition on importing broadcast signals from other DMAs. None of the points in the Israel PI Declaration (¶¶18-19) about how rates are set at the footprint level arise or matter when one performs the HMT properly.

---

[5] Israel PI Declaration, heading for Section IV.A, ¶18.

[6] Israel PI Declaration, heading for Section IV.A, ¶18.

[7] Israel PI Declaration, heading for Section IV.A, ¶18.

[8] More generally, the Hypothetical Monopolist owns all of the products in the candidate market and nothing else.

## Market Concentration in the Overlap Markets

21. Table 2 and Table 3 in the Shapiro TRO Declaration show that in all 31 overlap DMAs, the HHI metrics associated with the Nexstar/TEGNA merger are far above the levels that trigger the structural presumption of harm to competition found in the Merger Guidelines.

22. The market shares in Table 2 are calculated based on station ratings, while the market shares in Table 3 are calculated based on retransmission revenue. In ¶81 I stated that "I place greater weight on the market shares measured using television ratings."

23.  Dr. Israel does not dispute any of the market shares or HHI figures shown in Table 2 or Table 3 from the Shapiro TRO Declaration. The Israel PI Declaration (¶¶20-21) criticizes the use of retransmission revenue to measure market shares in Table 3, because retransmission fees are set on a footprint-wide basis. But he offers no criticism of the market shares reported in Table 2, which are based on station ratings, other than to say (¶21) that prices are not set at the DMA-level. But station ratings are measured at the DMA level, so they are not subject to the criticisms that Dr. Israel makes regarding retransmission fees in Table 3, and they do indeed measure the importance of a station to MVPDs. The structural presumption based on Table 2 thus stands unrebutted if one accepts the relevant markets I have defined.

## Anti-Competitive Effects of the Proposed Merger

24. The Shapiro TRO Declaration (¶¶85-91) explains how and why the merger between Nexstar and TEGNA is likely to reduce competition in each of the 31 overlap markets and lead to higher retransmission fees in those markets. Notably, I cited an example in which consolidation of the ownership of Big Four broadcasters within DMAs led to higher rates (¶86), and an empirical study finding that same pattern more generally (¶87). Dr. Israel does not rebut either of these highly relevant pieces of evidence.[9]

25. The underlying reason why Nexstar and TEGNA compete for carriage on MVPDs in overlap DMAs is that the Nexstar and TEGNA stations in an overlap DMA compete for *viewers*. When one Big Four station is blacked out, some viewers will switch some of their viewing to other Big Four stations even though they do not have identical content. That makes it even more important for an MVPD to have the other Big Four stations. For example, if CBS is

---

[9] See note 2 above.

blacked out on a Sunday afternoon, some viewers will turn to FOX to watch other NFL games, the local newscast, or scripted programming. If Nexstar can black out both CBS and FOX, DIRECTV will have much more to lose. That gives Nexstar more bargaining leverage and predictably will lead to higher Retransmission Fees.

26. Nexstar states: "Plaintiffs' expert, Dr. Shapiro, confirms Big 4 stations are complements as each 'provides unique and valuable content to MVPDs." Shapiro Decl. ¶ 4.[10] This statement is transparently false. My TRO Declaration made it very clear that I see Big Four broadcast stations in the same DMA as competitors (substitutes). More generally, substitute products are frequently "unique and valuable." For example, two restaurants with distinctive cuisine compete for business, and this is true even if many people patronize both restaurants.

## Local News

27. Dr. Israel asserts (¶¶22-24) that the merger between Nexstar and TEGNA will give the merged firm an incentive to increase, not decrease, the quality of its local news.

28. Dr. Israel's assertions here are unsupported and cannot be squared with evidence that Nexstar eliminates newsrooms and duplicates content when it controls two Big Four stations in the same DMA. (Shapiro TRO Declaration ¶93) Dr. Israel does not address that evidence.

29. Dr. Israel's economic argument regarding local news repeats his argument that the merger will give Nexstar and TEGNA an incentive to lower, not raise, Retransmission Fees. His entire argument here thus collapses (actually, is reversed) once one recognizes that Nexstar and TEGNA do compete for carriage by MVPDs, as shown above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd day of April, 2026, at Berkeley, California.

*Carl Shapiro*

_____

Carl Shapiro

---

[10] Nexstar Opposition to Preliminary Injunction, p. 11, April 1, 2026.