Glenn D. Pomerantz (State Bar No. 112503)
  glenn.pomerantz@mto.com
Kuruvilla J. Olasa (State Bar No. 281509)
  kuruvilla.olasa@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael (State Bar No. 292380)
  justin.raphael@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone: (415) 512-4000

*Attorneys for Plaintiff DIRECTV, LLC*

*Attorney Information Continued on Page 2*

McGregor Scott (State Bar No. 142413)
  mscott@kslaw.com
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone: (916) 321-4800

Olivier N. Antoine (*pro hac vice*)
  oantoine@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Telephone: (212) 556-2100

M. Sean Royall (*pro hac vice*)
  sroyall@kslaw.com
Emily Blackburn (*pro hac vice*)
  eblackburn@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

|  |  |
|---|---|
| In re Nexstar-TEGNA Merger Litigation | Case No. 2:26−cv−00976−TLN−CKD<br><br>**PLAINTIFF DIRECTV, LLC'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

Robert E. Bowen (State Bar No. 335932)
　　robert.bowen@mto.com
Liam Gennari (State Bar No. 350177)
　　liam.gennari@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:　(213) 683-9100

Carson J. Scott (State Bar No. 339868)
　　carson.scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:　(415) 512-4000

Xiaonan April Hu (State Bar No. 321354)
　　april.hu@mto.com
Brandon H. Thomas (State Bar No. 334240)
　　brandon.thomas@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone:　(202) 220-1100

Laura Harris (*pro hac vice*)
　lharris@kslaw.com
Joshua Hazan (*pro hac vice*)
　jhazan@kslaw.com
Sean Murray (*pro hac vice*)
　smurray@kslaw.com
Arthur B. Schoen (*pro hac vice*)
　aschoen@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Telephone:　(212) 556-2100

*Attorneys for Plaintiff DIRECTV, LLC*

-2-
REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

## I.    INTRODUCTION

This Court already found that DIRECTV "adequately make[s] a showing on all four prongs" of the test for issuing a TRO.  Dkt. 60 ("TRO") at 21.  Because "the legal standards applicable to TROs and preliminary injunctions are 'substantially identical,'" *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017), the Court should now reach the same conclusion.  As the record has grown, it has only become clearer that Defendants' arguments defy common sense and contradict both their own statements to shareholders and undisputed market facts.  The only quantitative economic evidence is from DIRECTV, which shows that owning more than one Big Four station in local markets enables broadcasters to charge higher prices.

Defendants' story is that a merged firm owning half the Big Four stations in 31 local areas will *reduce* prices to prevent cord-cutting.  But Defendants have no evidence.  If cord-cutting will keep prices down after the merger, why did Nexstar tell investors that the merger would increase revenues because it could raise fees on TEGNA stations?  Why did DOJ find that broadcast mergers would raise prices as recently as 2021 when cord-cutting was in full swing?  And why are MVPDs like DIRECTV opposing the merger if they will pay less?  Defendants' motion papers do not say.  But their most recent 10-K says it all:  "[T]he number of MVPD subscribers has been declining but we have been able to increase our distribution revenue" because "the rates per subscriber paid by MVPDs for our programming have increased at a faster pace than subscribers have declined."  PI Declaration of Xiaonan April Hu ("Hu Decl.") Ex. 13 at 24.  Nexstar thus has admitted the opposite of what it argues to this Court:  Nexstar can raise prices and still profit despite cord-cutting.

The equities favor pressing pause until this Court can hear all the facts, especially given all of Defendants' inconsistencies.  The merger will irreparably harm DIRECTV by giving Nexstar even more bargaining leverage and degrading the quality of local news programming that DIRECTV licenses.  Divestiture is the standard way to remedy those irreparable harms.  But that remedy is under imminent threat:  without a hold-separate, Nexstar will immediately layoff staff, shutter local newsrooms and integrate TEGNA in ways that will make divestiture much more difficult.  The public will suffer, too:  consumers will pay higher TV bills, and many MVPDs will have to negotiate with reduced bargaining leverage.  All those harms far outweigh Nexstar's complaints about waiting

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

to integrate.  Had Defendants acted responsibly and waited to close, integration would not even be on the table.  Defendants should not be rewarded for rushing to close with the help of agencies applying highly irregular procedures to thwart judicial review.

This Court should issue a hold-separate to ensure that, after trial, it can protect DIRECTV and the public from the effects of a clearly unlawful merger.[1]

## II.    ARGUMENT

### A.    This Court Correctly Found that DIRECTV is Likely to Succeed on the Merits

Rather than just "allegations and advocacy," Dkt. 76 ("Opp.") at 6, DIRECTV has sworn testimony from Professor Carl Shapiro of UC Berkeley and Rob Thun, Chief Content Officer, as well as evidence of Defendants' own statements and conduct.  And DIRECTV is the *only* party that can point to *empirical evidence* regarding the effect on prices of owning two Big Four stations in a DMA.  All that is proof "beyond the unverified allegations of the pleadings and motion papers," Opp. at 7; *see Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (affirming PI where "Plaintiffs support their argument with market concentration statistics and expert declarations.").  DIRECTV's complaint and brief were based on this evidence, as was this Court's TRO.  To avoid confusion, this Court can cite that evidence and the additional evidence DIRECTV has cited both in this reply and its Proposed Order.  Further, although DIRECTV has explained that the hold-separate is a prohibitory injunction, this Court should also make clear that the standard for a mandatory injunction is met because "the facts and law clearly favor" a hold-separate order. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted).

**Product Market.**  This Court found that "retransmission consent licenses for Big Four broadcasting stations is the relevant product market" because "MVPDs cannot obtain the combination of local news and live sports that their customers demand anywhere else."  TRO at 8–9.  Professor Shapiro defined the same market for similar reasons, Dkt. 51 ¶¶ 39–62.  That market definition is not "outdated." *Contra* Opp. at 14. *See FTC v. Kroger Co.*, 2024 WL 5053016, at *9 (D. Or. Dec. 10, 2024) (rejecting defendants' and Dr. Israel's arguments that "[t]he grocery industry

---

[1] DIRECTV does not believe that live testimony is needed at the April 7, 2026 hearing, which it estimates would last approximately 90 minutes.

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

has changed" such that that plaintiffs' market was "outdated"). DOJ defined the same market in analyzing broadcast mergers across both Democratic and Republican administrations as recently as 2021, *see* Hu Decl. Exs. 16, 17, 18—when the changes Defendants describe were well underway.

Defendants cannot erase DOJ's statements from the record (although DIRECTV is likely to succeed even without them). Because "the rules of evidence do not apply strictly to preliminary injunction proceedings," Defendants' own authority rejects their "assertion that the district court may rely only on admissible evidence" on this motion. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). Economists "reasonably rely" on DOJ statements, so Professor Shapiro can do so under Rule 703. PI Declaration of Carl Shapiro ("Shapiro Decl.") ¶ 17. At minimum, DOJ's statements from the *Gray/Sinclair* and *Gray/Raycom* mergers, which did not involve Defendants, are admissible. That is because 15 U.S.C. § 16(h) only applies to "other antitrust proceedings involving the same defendant," *United States v. Microsoft Corp.*, 215 F. Supp. 2d 1, 9 n.7 (D.D.C. 2002); *see also* H.R. Rep. No. 93-1463, *as reprinted in* 1974 U.S.C.C.A.N. 6535, 6537 (1974) (statements are "inadmissible against defendants of the public antitrust action in subsequent antitrust actions.").

Defendants argue that the world has changed so much that Big Four stations compete with Netflix in the relevant market but do not compete with each other. That cannot be right, and, in fact, Defendants have said the opposite. Nexstar has said that "our local stations also compete with other stations in their markets," Hu Decl. Ex. 1 at 14. TEGNA's most recent 10K says that they "compete with fellow broadcasters for carriage fees," Hu Decl. Ex. 14 at 6, which is the opposite of Dr. Israel's opinion that Defendants "Do Not Compete for Carriage," Dkt. 77-17 at 4. It does not matter that Big Four stations do not "broadcast the same network programs," Opp. at 11. "[P]roducts or services need not be identical to be part of the same market." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 450 (1964) (glass and metal containers in same market despite "different characteristics"). As Professor Shapiro explains, Shapiro Decl. ¶¶ 25–26, even if sports, local newscasts and scripted shows on CBS and FOX are not identical, if CBS is blacked out, then some viewers will watch FOX instead. Thus, when a CBS affiliate is blacked out, having the FOX affiliate as an alternative

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

becomes even more important for DIRECTV and losing access to both CBS and the FOX alternative becomes even more damaging.  The threat of greater damage gives Nexstar greater leverage.

Dr. Israel asserts that Big Four stations are complements, not substitutes, which he calls a "subtle and . . . empirical issue."  Dkt. 48-9 ¶ 56.  But Dr. Israel has not done any empirical study.  DIRECTV's empirical study, however, supports the market definition found by the Court.  Dkt. 14-3 ¶¶ 53–55; Hu Decl. Ex. 15.  Dr. Israel also has no price evidence to support his remarkable claim that a monopolist of all Big Four stations in a DMA would "cut retransmission rates" to help MVPDs reduce prices and avoid cord-cutting.  Dkt. 48-9 ¶ 44.  Nexstar's CEO told investors the opposite: It can "outrun the rate of attrition" by "grow[ing]" "distribution revenue."  Hu Decl. Ex. 2 at 8.

Defendants argue that MVPDs can get broadcast content directly from networks, but they cannot explain why MVPDs have been paying ever higher prices to broadcasters if that were a meaningful substitute.  Once again, the facts undermine Defendants' theory.  Big Four stations transmit (1) their own programming, like local news, and (2) the networks' programming, like NFL football.  The networks cannot give MVPDs rights to transmit the *broadcasters'* own programming, and networks have almost never agreed to permit DIRECTV to distribute a "national feed" of their own content.  PI Declaration of Robert D. Thun ("Thun Decl.") ¶¶ 10–11.  In fact, Mr. Thun understands that broadcast owners prohibit the Big Four networks from doing so for MVPDs.  Thun Decl. ¶ 12.  DIRECTV cannot "ingest" so-called "direct to consumer" ("DTC") services (such as Peacock or Paramount+) to distribute them to its own subscribers via DIRECTV's own services.  Thun Decl." ¶ 8.  Similarly, DIRECTV's now-expired NFL Sunday Ticket agreement prohibited DIRECTV from distributing "in-market" games airing on a local affiliate.  Thun Decl. ¶ 9.

**Geographic Market.**  "The relevant geographic market is the 'area of effective competition where buyers can turn for alternate sources of supply.'"  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).  This Court found "that DMAs are the relevant geographic market" because "MVPDs cannot turn to stations outside of a DMA to replace blacked out stations," TRO at 10–11.  Defendants do not dispute that fact, *see* Dkt. 63-1 ¶ 12, or address their prior statements describing DMAs as local "markets," TRO at 10.  As the National Association of Broadcasters put it, "[l]ocal stations compete locally," Dkt. 14-51 at 2.

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

Defendants' cases do not support their argument that the market must be national because broadcasters charge a single rate across DMAs.  The court in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015), also defined *local markets* for those customers that could not turn to sources of supply outside of their local area.  *Id.* at 50.  No similar geographic restriction on sources of supply was present in *United States v. Grinnell Corp.*, 384 U.S. 563, 575 (1966).  Finally, it is simply false that DIRECTV "agreed" in a separate lawsuit that "the relevant market is national, not local." *Contra* Opp. at 13.  DIRECTV alleged both local and national markets.  Exactly as in this case, DIRECTV alleged that "[e]ach DMA [] constitutes a geographic market for the licensing of Big-4 television retransmission consent" because (among other things) "the Copyright Act and FCC rules generally prohibit an MVPD from importing the same network's content from another DMA," Compl. ¶¶ 82-84, No. 23-CV-2221 (S.D.N.Y. 2023).

**Prima Facie Case.**  This Court found that "the proposed merger is presumed likely to violate antitrust laws based on the combined firm market share alone," TRO at 12 (citing *Boardman*, 822 F.3d at 1021), and "based on HHI" increases in concentration, TRO at 12–13.  Defendants still do not dispute Professor Shapiro's calculations of market shares or HHIs in 31 DMAs.

**Higher Prices.**  Defendants provide no reason to doubt this Court's finding that the merger "will lead to higher prices" for Big Four retransmission consent licenses.  TRO at 13.  It is false that DIRECTV does "not offer any evidence and cannot prove that an increase in Big 4 station ownership in a DMA would lead to higher costs for MVPDs," Opp. at 15.  DIRECTV cited Professor Shapiro's expert opinion and Mr. Thun's expectation based on his experience.  Dkt. 14-2 ¶¶ 14–22, 26–27; Dkt. 14-3 ¶¶ 85–91. Professor Shapiro cited a statistical analysis of retransmission fees, which DIRECTV has submitted to the Court, showing that owning duopolies enables broadcasters to charge higher fees, Dkt. 14-3 ¶ 54 & n.20; Hu Decl. Exs. 15, 19.  And Nexstar itself has said that when "we own or provide services to more than one station in certain markets," that enables Nexstar to "enhance our revenue share," Dkt. 14-43 at 6.

Defendants continue to argue that cord-cutting will pressure Nexstar to *lower* prices when it owns two stations in 31 DMAs.  But Defendants have not come close to adducing the "proof of 'extraordinary efficiencies'" that "is required to offset the anticompetitive concerns in highly

-5-
REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

concentrated markets." *Saint Alphonsus*, 778 F.3d at 790–91.  Defendants still cannot dispute that "as streaming services and YouTubeTV have grown, broadcasters' fees have continued to rise," TRO at 14.  The Court cannot credit Defendants' promise that new video options will stop price increases when these options have not done so to date.

Nor should the Court credit arguments that contradict Nexstar's own statements to investors, including that it has "been able to increase our distribution revenue" even though "the number of MVPD subscribers has been declining," Hu Decl. Ex. 13 at 24.  Nexstar promised that the merger would lead to "contractual revenue synergies," Dkt. 14-48 at 8, ████████████████████ ████████████████████ *See* Dkt. 14-54 at 16; Dkt. No. 63-1 ¶¶ 25-26.  That prediction makes no sense if Nexstar truly believed that cord-cutting would make price increases unprofitable.  In fact, Nexstar has played down that risk, saying that "[v]iewers will continue to subscribe to MVPD/vMVPD services for sports and local news content," and that "MVPD churn will moderate and subscriber levels will stabilize."  Dkt. 14-45 at 30.  And while Defendants argue that cord-cutters can find sports and other content outside of broadcast stations, Opp. at 12–13, Nexstar told investors that "Sports Franchises are Committed to Broadcast for the Long-Term, Dkt. 14-45 at 26, and that "nobody else do[es] local news in any material way in our markets except for local broadcast TV," Hu Decl. Ex. 3 at 4.

**Local News.**  Defendants do not dispute that in DMAs where they already own two Big Four stations, they operate one newsroom and often broadcast the same content on both stations.  Dkt. 14-4 ¶¶ 3–19, Exs. 2–37.  Nexstar has admitted that it will do just that in DMAs like Sacramento where a Nexstar station and a TEGNA station have competing newsrooms:  Nexstar will "operate 2 stations off 1 infrastructure."  Dkt. 14-47 at 6.  As one former broadcasting executive explained, there won't be "two news operations. . . It'll be combined."  Hu Decl. Ex. 4 at 4.  When a newsroom disappears, DIRECTV can no longer license that content.  That reduces the quality of content that DIRECTV licenses in the relevant market for Big Four retransmission consent.

Defendants fall far short of the "extraordinary" proof required to demonstrate that shutting newsrooms will efficiently *improve* local news.  *Saint Alphonsus*, 778 F.3d at 790.  Defendants have no evidence that shutting local newsrooms across the country, including in Sacramento, will lead to

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

more award-winning stories like KCRA3's coverage of school shootings, Hu Decl. Ex. 6 at 1, or ABC10's investigation into charter schools, Hu Decl. Ex. 5 at 4.  To the contrary, studies have found that "duopoly ownership *had a significantly negative relationship* with the amount of local news programming," Hu Decl. Ex. 7 at 12, and that consolidation *lowers* local news quality.  Hu Decl. Exs. 8, 9, 10.  Defendants will simply pump out the same content from their "Washington D.C. news bureau" to both Nexstar and TEGNA stations.  Opp. at 5.  Commoditizing local news is a harm, not a benefit.  Regardless, Defendants do not show why Nexstar could not license Washington Bureau content to TEGNA rather than acquiring the company.  *Saint Alphonsus*, 778 F.3d at 790–91 (efficiencies must be "merger-specific").

### B.    This Merger Will Imminently Cause Irreparable Harm

A hold-separate is necessary to prevent imminent irreparable harm.  This Court has found that the merger will cause irreparable harm because it "will substantially lessen competition," and require DIRECTV to negotiate with "reduced bargaining leverage."  TRO at 17.  Ninth Circuit precedent holds that "[a] lessening of competition constitutes an irreparable injury," *Boardman*, 822 F.3d at 1023, and Defendants do not dispute that "negotiating with respect to a unique asset with decreased leverage constitutes irreparable harm."  *In re L.A. Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011).  The Court will not be able to "recreat[e] a negotiating environment" untainted by Nexstar's enhanced power.  *Brady v. Nat'l Football League*, 640 F.3d 785, 793–94 (8th Cir. 2011) (NFL showed irreparable harm where it would lose "leverage" in negotiations).

This Court also found that Defendants' integration of TEGNA would "result in newsroom layoffs and shutdowns," TRO at 19, so subscribers will not be able to watch local news "exactly as they" did "just before the merger."  *DeMartini v. Microsoft Corp.*, 2023 WL 3569993, at *5 (N.D. Cal. 2023).  That will harm the quality of programming that DIRECTV licenses in the relevant market and harm DIRECTV's goodwill with subscribers.  "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).  *FTC v. Qualcomm, Inc.*, 969 F.3d 974 (9th Cir. 2020), is not to the contrary because it did not involve irreparable harm or goodwill at all.  Although the Court's TRO did not address harm to goodwill,

the Court should find that harm, too.

Defendants are wrong that no irreparable harm is imminent. Defendants' own authority recognizes that a "plaintiff's injury could be immediate" where "the merger, or particular aspects of the merger, could not be undone." *DeMartini*, 2023 WL 3569993, at *4. That is the case here. If DIRECTV prevails at trial, then divestiture will be the standard remedy to prevent irreparable harm from lost competition, bargaining leverage and goodwill. The threat to that remedy is imminent: Defendants admit they will *immediately* integrate TEGNA, Dkt. 48-7 at 6–7, which will *immediately* make it "more difficult to divest TEGNA stations," TRO at 19. A preliminary injunction was made for that scenario: "to preserve the court's ability to render a meaningful decision on the merits," *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (citation omitted). Indeed, the "central focus" of a hold-separate order is "preserving the possibility of effective relief." *United States v. Acorn Eng'g Co.*, 1981 WL 2112, at *1 (N.D. Cal. June 18, 1981).

The Court's TRO recognized that "Defendants' integration efforts . . . would make it more difficult to divest TEGNA stations," TRO at 19, in the context of the balance of equities. To make sure that the record is clear, DIRECTV respectfully submits that this Court should find that this undisputed threat *also* establishes imminent, irreparable harm. Further, shutting down local newsrooms will immediately reduce programming quality, and Mr. Thun explains that DIRECTV will suffer reduced bargaining leverage far sooner than Defendants say. Thun Decl. ¶¶ 14–18.

### C. The Public Interest Supports a Hold-Separate Order

This Court found that "the public interest favors a hold-separate order" because the merger would harm competition, which is "vital to the public interest." TRO at 19 (citing *Knevelbard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *Boardman*, 822 F.3d at 1023-24). "Since divestiture may prove to be the most or only effective remedy for [that] effect, the public interest in preserving the possibility of a successful divestiture is quite strong." *Acorn Eng'g Co.*, 1981 WL 2112, at *3. Defendants do not dispute those principles. And they agree that higher prices for MVPDs would mean higher TV bills for consumers, Opp. at 14. That surely is harm to the public. So is harm to the many MVPDs whose contracts will expire, Dkt. 63-1 ¶ 29, and will have to be re-negotiated with the merged firm with "reduced bargaining leverage," TRO at 17.

-8-

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

Defendants remain wrong that the FCC's clearance shows that the merger is in the public interest. If there were ever a case where "the views of the FCC and DOJ cannot simply be adopted entirely at face value," *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 224 (S.D.N.Y. 2020), then this is it. Since this Court's TRO, elected officials from both parties as well as industry commentators have criticized the highly irregular procedures used to clear this merger. *See, e.g.*, Hu Decl. Exs. 11, 12. Defendants do not dispute that they acted in concert with the agencies based on "considerations that are outside the scope of Section 7." *Id.*

## D. The Balance of the Equities Strongly Favors a Hold-Separate Order

Equity frowns upon Defendants' "gamble that [a] hurried up transaction would withstand antitrust scrutiny." *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1175 (W.D. Ark. 1995). It is "well established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined" even a "mandatory injunction" may issue to "restore the status quo." *FTC v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C. Cir. 1981) (ordering restoration of pre-consummation status where Defendants closed after being "told that the FTC would" seek injunction) (citation omitted)); *see also Ramsburg v. Am. Inv. Co.*, 231 F.2d 333, 336-338 (7th Cir. 1956) (similar); *Jones v. SEC*, 298 U.S. 1, 17–18 (1936). *Cf. People of Saipan, By & Through Guerrero v. U.S. Dep't of Interior*, 502 F.2d 90, 100 (9th Cir. 1974) (defendant did not "acquire[] . . . equities by proceeding with the construction of its hotel while its right to do so is being litigated").

At any rate, "the private benefits Nexstar could obtain by acquiring TEGNA are outweighed by the harm to Plaintiff," and Defendants' plea to consolidate should be discounted because that is "exactly" what "would make it more difficult to divest TEGNA stations, eliminate competition, and result in newsroom layoffs and shutdowns." TRO at 19-20. Nexstar claims it will lose talent, but last year it touted its "Ability to build and retain homegrown talent." Dkt. 14-45 at 5. Nexstar complains that it will suffer competitive harm under a hold-separate, but Nexstar boasted months ago that it has a "unique, scaled portfolio of local and national media assets" that "gives Nexstar a distinct competitive edge." *Id.* Further, Nexstar's statements suggest that it will put profits from integration into shareholders' pockets rather than reinvest them in competition. Nexstar "uses its excess free cash flow to generate shareholder value through dividends, debt reduction, share

-9-

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

repurchases and acquisitions." *Id.* at 19. There is no reason to doubt that Nexstar's self-described "Long-Term Record of Strong Financial Performance," *id.* at 18, will continue if Nexstar and TEGNA remain separate pending final judgment.

### E.      No Bond Is Required

Defendants have not explained how they calculated the requested bond, and none should be required. *First*, "[t]he bond requirement in Fed. R. Civ. Pro. 65(c) is discretionary, especially where the plaintiff is likely to succeed on the merits and the injunction is in the public interest," *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1075 n.1 (S.D. Cal. 2019), or where "the balance of equities tips strongly in [the movant's] favor." *City & County of S.F. v. Trump*, 783 F. Supp. 3d 1148, 1203 (N.D. Cal. 2025). This Court has already determined that all these factors tip in DIRECTV's favor. See TRO at 16, 19, 20. Further, a bond is particularly inappropriate where Defendants created their supposed harms by rushing to close. A defendant "cannot place itself in harm's way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct." *Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003). Parties that wait to close do not get a bond, so giving Nexstar one here would grant it with a windfall for rushing to close.

### F.      The Hold-Separate is Not Overbroad

Contrary to Defendants' argument, the hold-separate should not be limited to the TEGNA stations in the 31 DMAs where both companies owned Big Four stations. Opp. at 20. Defendants' evidence suggests that many of their functions operate across their many stations, and that Nexstar negotiates contracts for all stations at once. Dkt. 48-7 ¶¶ 6, 17–18. Thus, holding separate only the 31 stations—without the infrastructure and other functions that support all of Defendants' stations— would not preserve the TEGNA stations as viable assets to be divested. *See Acorn Eng'g Co.*, 1981 WL 2112, at *3 (rejecting argument that hold-separate order "should be limited to the products involved," where assets were "interrelated and noncompartmentalized").

## III.    CONCLUSION

For these reasons, and those set forth at Dkts. 14-1, 56, 97, DIRECTV respectfully requests that the Court enter its Proposed Order granting a hold-separate order.

-10-

DATED:  April 3, 2026                    MUNGER, TOLLES & OLSON LLP


By:        /s/ Glenn D. Pomerantz
   _____

Glenn D. Pomerantz (State Bar No. 112503)
   glenn.pomerantz@mto.com
Kuruvilla J. Olasa (State Bar No. 281509)
   kuruvilla.olasa@mto.com
Robert E. Bowen (State Bar No. 335932)
   robert.bowen@mto.com
Liam Gennari (State Bar No. 350177)
   liam.gennari@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Justin P. Raphael (State Bar No. 292380)
   justin.raphael@mto.com
Carson J. Scott (State Bar No. 339868)
   carson.scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

Xiaonan April Hu (State Bar No. 321354)
   april.hu@mto.com
Brandon H. Thomas (State Bar No. 334240)
   brandon.thomas@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300


KING & SPALDING LLP

McGregor Scott (State Bar No. 142413)
   mscott@kslaw.com
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone:  (916) 321-4800

-11-
REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

Olivier N. Antoine (*pro hac vice*)
   oantoine@kslaw.com
Laura Harris (*pro hac vice*)
   lharris@kslaw.com
Joshua Hazan (*pro hac vice*)
   jhazan@kslaw.com
Sean Murray (*pro hac vice*)
   smurray@kslaw.com
Arthur B. Schoen (*pro hac vice*)
   aschoen@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Telephone:  (212) 556-2100

M. Sean Royall (*pro hac vice*)
   sroyall@kslaw.com
Emily Blackburn (*pro hac vice*)
   eblackburn@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone:  (202) 737-0500

*Attorneys for Plaintiff DIRECTV, LLC*

-12-
REPLY IN SUPPORT OF PRELIMINARY INJUNCTION