UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re Nexstar-TEGNA Merger Litigation | Case No. 2:26−cv−00976−TLN−CKD |

**DECLARATION OF ROBERT D. THUN IN SUPPORT OF DIRECTV'S MOTION FOR PRELIMINARY INJUNCTION**

I, Robert D. Thun, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am Chief Content Officer at DIRECTV, LLC ("DIRECTV"). In my role as Chief Content Officer, I am primarily responsible for all strategy, investments, negotiations, and acquisitions for programming on DIRECTV's satellite, streaming, and U-verse platforms. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify to them competently under oath.

2. I previously submitted an affidavit in support of DIRECTV's Motion for a Temporary Restraining Order (ECF No. 14-2), which is attached as **Exhibit 1** to this declaration ("March 18, 2026 Thun Affidavit"). The facts set forth in the March 18, 2026 Thun Affidavit remain true and correct, and I could and would testify competently to them under oath if called.

**DIRECTV'S NEGOTIATIONS WITH BROADCASTERS**

3. In my role as Chief Content Officer, I have been personally involved in and have supervised teams responsible for conducting hundreds of retransmission consent negotiations and renewals with broadcasters, including Nexstar and TEGNA. Our multi-year retransmission consent agreements with Nexstar over the last several renewals have started with a large "reset" (rate increase); followed by annual escalator clauses under which the fees we pay have risen materially more sharply than the rate of inflation.

4. In many of these negotiations, broadcasters including Nexstar have explicitly used blackouts (or the threats thereto) to extract higher retransmission consent rates from DIRECTV. In my experience, Nexstar's blackout threats and blackouts have influenced the terms of the

retransmission consent agreements that DIRECTV has reached with Nexstar, specifically by causing DIRECTV to pay higher retransmission consent fees than it otherwise would have paid to Nexstar absent the leverage created by Nexstar's actual or threatened blackout.

5. As I explained in the March 18, 2026 Thun Affidavit, blackouts give broadcasters like Nexstar leverage in retransmission consent negotiations because if Nexstar refuses to license its content to DIRECTV, then DIRECTV subscribers can no longer watch programming such as live sports or local news on those Big Four stations via DIRECTV's services, which causes many subscribers to switch to DIRECTV's competitors—including both vMVPDs and MVPDs[1]—that are still able to carry this desirable content. For those subscribers who stay, it often costs DIRECTV significant amounts in retention offers and additional customer service efforts.

6. DIRECTV's services are reliant on offering Big Four stations licensed from broadcasters. As evidence of this, DIRECTV offers its subscribers an option to "remove locals" from any package DIRECTV offers via its satellite platform, but very few elect to do so. As of the end of 2025, fewer than [redacted] subscribers, making up less than [redacted]% of all subscribers to DIRECTV's satellite service, have opted for packages that do not include Big Four broadcast content.

**DIRECTV HAS NO REASONABLE ALTERNATIVE SOURCES FOR BIG FOUR BROADCAST PROGRAMMING APART FROM RETRANSMISSION CONSENT**

7. DIRECTV does not have any reasonable alternative sources to obtain Big Four broadcast content other than from broadcasters like Nexstar.

8. DIRECTV currently has obtained rights from [redacted], and [redacted] to sell their direct-to-consumer ("DTC") products[2] to our subscribers. Some premium versions of these DTC products include local broadcast feeds of the controlling Big Four Network affiliate's broadcast feeds. In all such cases, the networks do so only with the consent of the local affiliates. There are also important limitations imposed on DIRECTV in these arrangements. For

---

[1] When subscribers cancel their DIRECTV service, about 20% of them switch to another MVPD service.

[2] *I.e.*, Peacock, Paramount+, and HuluSVOD/ESPN Unlimited, respectively.

example, DIRECTV cannot "ingest" the content carried on DTC services into its own service to distribute to subscribers. Instead, our subscribers must create a separate username and password on the respective DTC app and can only access the content through the DTC app itself—this includes for any Big Four Network content or broadcast feed made available through the DTC app. As of the date of this declaration, only the CBS, FOX, and NBC local stations are fully available in their DTC apps (Paramount+, FOX One, and Peacock, respectively). DIRECTV currently only has the rights to sell [redacted] to its customers, as [redacted] has withheld the rights to sell from DIRECTV. Moreover, DIRECTV's agreements with [redacted] and [redacted] provide that during any period in which one of their network affiliates has ceased transmitting its broadcast stations to DIRECTV (*i.e.*, during a blackout of those stations), DIRECTV is prohibited from selling new subscriptions to the related DTC app to its subscribers in the respective affiliate station market(s).

9. Likewise, when DIRECTV distributed NFL Sunday Ticket—which ceased in 2022—it still could not provide the same content that subscribers could get on broadcast stations because Sunday Ticket is expressly limited to "out of market" games that do not air on a respective local broadcast station within that station's DMA. The only way for DIRECTV to get "in market" games was (and still is) to carry them via retransmission consent.

10. In cases where a broadcaster has refused to consent to DIRECTV's transmission of its stations, it has historically not been possible for DIRECTV to obtain from the Big Four Networks a right to at least transmit their "national feed" (*i.e.*, the national content included in broadcast stations) as a partial replacement of the local broadcast station. Big Four Networks have always refused to grant these rights to DIRECTV.

11. There has been one recent, minor exception to the Big Four Networks' historic refusal to license their national feeds to DIRECTV. DIRECTV recently obtained the rights to create, and launched, vMVPD offerings of what we call "Genre Packs." Two of these packages (MySports and MyNews) include Big Four broadcast stations. Creating Genre Packs required DIRECTV to obtain the approval of the Big Four Networks and "opt in" consents from broadcast affiliates. Nexstar refused to allow the content of its [redacted] [redacted] and [redacted] affiliates on

DIRECTV's Genre Packs unless DIRECTV [redacted]

12. It is also my understanding that at least two of the Big Four Networks have express prohibitions in their affiliation agreements with the broadcast stations on providing a national feed for distribution via the Internet (*i.e.*, vMVPD distribution) and all of the Big Four Networks have prohibitions on providing a national feed for traditional MVPD distribution (*i.e.*, satellite and cable) in affiliated station markets.

13. YouTube TV and other vMVPDs do not license broadcast content to other MVPDs or vMVPDs, so they are not substitutes for broadcast licenses.

**IMMINENT, IRREPARABLE EFFECTS OF THE NEXSTAR-TEGNA MERGER**

14. DIRECTV's current retransmission agreement with Nexstar will expire on [redacted] and will need to be renegotiated. As I stated in the March 18, 2026 Thun Affidavit, if Nexstar and TEGNA are operated as one company when this occurs, then I fully expect that combined company will demand, and DIRECTV will be forced to accept, significantly higher retransmission consent fees than they would if DIRECTV renegotiated the fees with Nexstar and TEGNA separately.

15. DIRECTV typically begins negotiating retransmission consent agreements with broadcasters, including Nexstar, around [redacted] before the end of the term of the agreement, which means we will likely start renegotiating over the Nexstar retransmission consent renewals [redacted]. Thus, the increased leverage Nexstar gets from the merger will start to impact us long before the contracts actually expire on [redacted].

16. Being forced to pay higher prices that it then must pass through to its subscribers in the form of higher monthly TV bills will push DIRECTV's subscribers towards its MVPD and vMVPD rivals—and most of these lost subscribers will not return to DIRECTV.

17. Nexstar's planned consolidation of local newsrooms, including headcount reductions, will also have an irreparably negative impact on the quality and variety of the local news programming that DIRECTV licenses from Nexstar.

18. Higher prices for subscribers and less quality and variety of local news will also irreparably damage DIRECTV's hard-won customer goodwill and reputation, which also will not be remedied by an eventual unwinding of the merger.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 3rd day of April, 2026, at El Segundo, California.

Robert D. Thun