# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| DIRECTV, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>Nexstar Media Group, Inc.; and TEGNA Inc.,<br><br>Defendants. | Case No. 2:26-cv-00976-TLN-CKD |

**AFFIDAVIT OF ROBERT D. THUN IN SUPPORT OF THE EXISTENCE OF IRREPARABLE INJURY PURSUANT TO LOCAL RULE 231(C)(4) IN SUPPORT OF DIRECTV'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Robert D. Thun, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am Chief Content Officer at DIRECTV, LLC ("DIRECTV"). In my role as Chief Content Officer, I am primarily responsible for all strategy, investments, negotiations, and acquisitions for programming on DIRECTV's satellite, streaming, and U-verse platforms.

**DIRECTV'S NEGOTIATIONS WITH BROADCASTERS**

2. The four largest national broadcast television networks in the United States—commonly known throughout the industry as the "Big Four"—are ABC, CBS, FOX, and NBC. "Big Four" broadcast networks provide a wide array of popular programming that includes prime-time dramas and comedies, national and local news, and live sports.

3. The Big Four networks maintain extensive affiliate relationships with local broadcasters (such as Nexstar and TEGNA). Local broadcasters' affiliations with television networks and other programming suppliers generally give local broadcasters the exclusive rights to air the network's programming within Designated Market Areas ("DMAs")—non-overlapping geographic regions defined by Nielsen Media. There are 210 DMAs throughout the United States.[1] Those affiliations enable the Big Four networks' content to reach virtually every

[1] *See Need to Know: What Is a Designated Market Area (DMA®), and Why Does It Matter?*, Nielsen (March 2025), https://www.nielsen.com/insights/2025/what-is-a-designated-market-area-

household in America.

4. DIRECTV negotiates with local broadcasters for the right to retransmit their station's signals to DIRECTV customers. The fees DIRECTV pays broadcasters for these rights are known as "retransmission consent fees."

5. DIRECTV's agreements with local broadcasters nearly always cover all of the local broadcaster's portfolio of stations. Those agreements also almost always provide for a single annual price for all of a local broadcaster's stations that fall within a particular category. Thus, for example, DIRECTV might pay $X per month per subscriber for stations (or multicast feeds) affiliated with the Big Four networks.

6. Over the last decade, there has been a wave of mergers among local broadcast owners, creating local broadcasters with ownership of larger and larger portfolios of stations. Because these mergers affect DIRECTV's existing retransmission consent agreements, as well as future retransmission consent negotiations, I monitor these mergers as part of my responsibilities at DIRECTV. In prior mergers, local broadcasters typically have quickly combined corporate operations.

7. Local broadcasters compete against each other to capture viewership by providing programming that is appealing to viewers in the DMAs they serve. Local broadcasters uniformly use their viewership as justification to seek higher revenue from advertisers and higher license fees from MVPDs in the markets they serve. One important way that local broadcasters compete for viewership is by trying to offer superior local news coverage, including by competing to hire the best on-air talent and journalists, have the most compelling editorial position, and be the first to break major local news stories.

8. DIRECTV market research shows that DIRECTV customers highly value the local news and live sports programming carried on Big Four local broadcast stations and expect and demand that DIRECTV will carry such Big Four local broadcast stations.

9. DIRECTV views the price it is willing to pay for all of a local broadcaster's

---

and-why-does-it-matter/.

stations as a "weighted average" of the rates it is willing to pay for each of the local broadcaster's individual stations including its non-Big Four stations.

10. DIRECTV pays retransmission consent fees for local broadcasters' Big Four affiliated stations. DIRECTV does not pay for non-Big Four stations, such as the CW, unless the station owner also owns Big Four stations. Local broadcaster station owners typically require the retransmission consent license for both the Big Four and non-Big Four stations to be bundled as part of an agreement to carry their portfolio of stations.

11. Where DIRECTV is able to provide its subscribers with access to local broadcast streaming services, it often negotiates those rights with the Big Four networks themselves. For example, DIRECTV has provided NBC Universal's Peacock service to its subscribers at a discounted rate. Those agreements come with onerous terms, including requirements that DIRECTV carry the Big Four Network's local affiliate in the subscriber's DMA and to not actively sell or market to our subscribers such direct-to-consumer products that include the respective local station if the respective Big Four Network affiliate is not carried by DIRECTV.

12. DIRECTV's retail pricing reflects its input costs. In absolute terms, on a per-subscriber basis, retransmission consent fees represent the majority of DIRECTV's content cost increases. Accordingly, when local broadcast station groups raise retransmission consent fees, DIRECTV in turn is forced to increase the subscription prices that it charges to customers. In DIRECTV's experience, when local broadcast station groups raise retransmission consent fees, DIRECTV increases the subscription prices that it charges to customers to offset those costs.

**FACTORS IN RETRANSMISSION FEE PRICING**

13. DIRECTV generally must pay higher retransmission consent rates to larger station groups than to smaller ones, everything else being equal. For purposes of this declaration, when I refer to DIRECTV "paying more" in retransmission consent fees, I intend that phrase to also include being forced to accept unfavorable terms and conditions other than rates.

14. DIRECTV generally must also pay higher retransmission consent rates to the extent the station group controls two or more affiliates of the Big Four networks in one or more DMAs—all other factors being equal. For purposes of this declaration, I refer to such combinations as "Big

Four Duopolies," "Big Four Triopolies," and "Big Four Quadropolies," using the term "Big Four Duopolies" to refer to all such combinations for clarity.

15. The reason that DIRECTV must pay more to larger station groups and to station groups with Big Four Duopolies is that those broadcasters have greater bargaining leverage for such markets that allows them to demand even higher fees from DIRECTV across all of such station group's Big Four stations.

16. A broadcaster's bargaining leverage comes from its ability to affect DIRECTV's business if it refuses to continue licensing (i.e., "blackout") its content to DIRECTV. If Nexstar refuses to license its content to DIRECTV, then DIRECTV customers can no longer watch programming such as live sports or local news on those Big Four stations, which causes many subscribers to switch to DIRECTV's competitors that are still able to carry this desirable content.

17. A blackout by an owner of multiple Big Four local stations in one or more DMAs puts more DIRECTV customers at risk of cancellation than a blackout by an owner of just one such station. As such, owners of multiple Big Four stations in one or more DMAs have more bargaining leverage than single Big Four station owners.

18. When DIRECTV prepares for negotiations with a broadcast station group, it collects a wide variety of data to help it set the higher bound of prices it will agree to pay a station group for its portfolio of stations. Among the most important set of data DIRECTV collects—and among the important variables DIRECTV considers in estimating the higher bound of prices—is the number of Big Four station subscribers a local station group has as well as the extent to which the local station group possesses Big Four Duopolies. Based on our historical experience in prior blackouts, the more Big Four station subscribers and the more Big Four Duopolies a station group controls, the more leverage that group has in its negotiations with DIRECTV.

19. The reason that Big Four Duopolies give broadcasters greater negotiation leverage is that, if a broadcaster with a Big Four Duopoly in a given DMA blacks out its content to DIRECTV, then DIRECTV's customers in that DMA will lose access to two or more local Big Four broadcast stations instead of one. Because Big Four stations carry unique and desirable content like live sports and local news, the loss of multiple Big Four stations at the same time is

even more disruptive to customers than the loss of a single station, so an even higher number of customers are likely to cancel their DIRECTV service and switch to a competing service. And, in fact, DIRECTV has found that more subscribers cancel their DIRECTV service when two Big Four stations are blacked out than when only one Big Four station is blacked out. DIRECTV has therefore found that broadcasters with Big Four Duopolies have more bargaining leverage than broadcasters without Big Four Duopolies (and broadcasters with Big Four Triopolies have even more leverage still).

20. While dual or triple Big Four blackouts increase the costs of a blackout to DIRECTV, DIRECTV understands that owning a Big Four Duopoly decreases the cost of a blackout to the broadcaster. That is because, ordinarily, the risk to a station owner during a blackout is that viewers might end up switching to a rival station carried by DIRECTV that is not blacked out and the viewers will not return to the broadcaster's station after the blackout is over. For instance, if a broadcaster owns just the ABC affiliate in a given DMA, blacked out consumers have the option of viewing the NBC, CBS, or FOX affiliates owned by its competitors. But when a station owner, like Nexstar, has a Big Four Duopoly in a DMA, there are fewer potential substitute Big Four stations on DIRECTV to gain Nexstar's viewers because another station that the subscriber might otherwise switch to view is also blacked out by Nexstar. Accordingly, dual or triple blackouts make it more likely that subscribers will leave DIRECTV for another MVPD that carries those Nexstar stations rather than switch Big Four broadcasters.

21. Local station owners' ownership of Big Four Duopolies is a substantial factor in what DIRECTV ultimately must pay the local station owner for retransmission consent. Ownership of Big Four Duopolies has historically proven to amplify subscriber churn during disputes, requiring DIRECTV to ultimately pay more for retransmission consent.

22. As Nexstar has accumulated additional Big Four Duopolies over time, it has become increasingly aggressive about using the added leverage from those Big Four Duopolies to increase the retransmission fees it charges DIRECTV. Since December 2015, retransmission negotiations with Nexstar have resulted in at least nine blackouts industry-wide, including a two-month blackout on DIRECTV in the summer of 2019 and a more than two-month blackout in the

summer of 2023. Nexstar's ability to amass a stable of 164 broadcast stations coupled with 14 Big Four Duopolies has disproportionately benefited them to date, as it has been able to obtain higher rates from DIRECTV than any other owner group.

23. TEGNA has used similar tactics to raise its retransmission fees. Since December 2015, it has engaged in at least ten industry-wide blackouts, including a three-week blackout on DIRECTV in November 2020 and a six-week blackout in November 2023. Each of these blackouts allowed TEGNA to significantly increase Big Four retransmission rates it charged DIRECTV above the previously contracted, pre-blackout rates.

**EXPECTED EFFECTS OF THE NEXSTAR-TEGNA MERGER**

24. I understand that Nexstar currently owns 164 local broadcast stations in 114 DMAs, including 14 Big Four duopolies.

25. I understand that, after the TEGNA acquisition, Nexstar will own 228 stations, and would result in Nexstar gaining additional Big Four local stations in 31 additional DMAs in which Nexstar already has at least one Big Four local station.

26. At that scale, a blackout on DIRECTV by all Nexstar Big Four local stations would be extremely damaging to DIRECTV's business. DIRECTV expects that Nexstar will insist that it pay significantly higher per-subscriber retransmission fees than it would without the merger, and that DIRECTV may have no choice but to agree to these unwarranted higher fees.

27. Nexstar's current retransmission agreement with DIRECTV will expire in 2026 and will need to be renegotiated. If the proposed merger between Nexstar and TEGNA closes before the current contract expires or is expected to close while we are negotiating, then I fully expect that combined company will demand, and DIRECTV will be forced to accept, significantly higher retransmission consent fees in DIRECTV's next agreement than they would if DIRECTV renegotiated the fees with Nexstar and TEGNA separately.

28. DIRECTV has offered MVPD services since 1994 and over the last 30 years DIRECTV has acquired and retained customers due to its reputation as a reliable provider, carrying all the channels customers want to watch, importantly including the Big Four broadcast networks.

29. When Nexstar blacks out Big Four broadcasts on DIRECTV or forces DIRECTV to raise prices to its customers, that damages the DIRECTV brand for high-quality and reliable coverage and will ultimately push DIRECTV customers towards other MVPD and vMVPD competitors.

30. Existing retransmission consent fee rates are important variables in setting subsequent retransmission consent rates. Typically, the current retransmission consent fee sets the price floor for future negotiations between DIRECTV and the local broadcasters. Price increases are rarely reduced, even when a broadcaster is smaller than it was at the time the previous rates were renegotiated.

31. Accordingly, the increase in retransmission fee rates that DIRECTV is forced to pay as a result of the merger is likely to set the floor in future negotiations (i.e., represent a durable and sustained increase in retransmission consent fees), even if Nexstar ultimately sells the acquired TEGNA stations.

32. In addition, price increases from after-acquired station clauses (whereby the buyer's pre-existing higher license fees are applied immediately to the seller's newly-acquired stations) impact future retransmission consent negotiations by setting a high price floor in such negotiations and arbitrarily driving consumer prices higher. These self-executing uplifts during the contract term shift the starting point in the next renewal and are also rarely reduced, delivering a timing benefit to the buyer (in the form of higher rates sooner than in the subsequent renewal) without any discernable corresponding consumer benefit (such as competitive efficiencies arising from lower costs). Existing retransmission consent rates are among the most important variables in setting subsequent retransmission consent rates.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 18th day of March, 2026, at El Segundo, California.

Robert D. Thun