ROB BONTA
Attorney General of California
PAULA BLIZZARD (SBN 207920)
Senior Assistant Attorney General
LAURA ANTONINI (SBN 271658)
PAUL CHANDER (SBN 305133)
ELIZABETH CHEEVER (SBN 341421)
EMILY CURRAN (SBN 293065)
KOMAL K. PATEL (SBN 342765)
CONNIE P. SUNG (SBN 304242)
BRIAN WANG (SBN 284490)
Deputy Attorneys General
   455 Golden Gate Ave., Suite 11000
   San Francisco, CA  94102
   Telephone: (213) 269-6277
   E-mail: Laura.Antonini@doj.ca.gov
*Attorneys for Plaintiff, The State of California*

Additional counsel identified on signature page

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| **In Re: Nexstar-TEGNA Merger Litigation** | Case No. 2:26-cv-00976-TLN-CKD |
| **THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON, AND THE COMMONWEALTH OF VIRGINIA** | |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION** |
| **v.** | |
| **NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.,** | |
| Defendants. | |

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

## [PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

Plaintiff DIRECTV, LLC ("DIRECTV") and Plaintiffs the States of California, the State of Colorado, the State of Connecticut, the State of Illinois, the State of New York, the State of North Carolina, the State of Oregon, and the Commonwealth of Virginia ("States" or "Plaintiff States") filed Complaints in this matter on March 18, 2026 seeking a preliminary and permanent injunction enjoining Defendant Nexstar Media Group, Inc.'s ("Nexstar") acquisition of Defendant TEGNA Inc. ("TEGNA," and, together with Nexstar, "Defendants")[1] (the acquisition herein referred to as the "Transaction") pursuant to Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26. On March 19, 2026, the Department of Justice ("DOJ") terminated its review of the merger early and the Media Bureau of the Federal Communications Commission ("FCC") announced it had approved the transfer of TEGNA's broadcast licenses to Nexstar. Minutes later, Defendants announced they had closed the transaction. On March 20, 2026, Plaintiffs sought temporary restraining orders. On March 27, 2026 this Court granted Plaintiff DIRECTV's Motion for Temporary Restraining Order to prevent integration and consolidation of the two Defendants pending this Court's determination of whether a preliminary injunction shall issue. On March 31, 2026, the Court consolidated the DIRECTV and States actions, and converted Plaintiff States' motion for temporary restraining order into a motion for preliminary injunction. After reviewing the briefing submitted by the parties and all supporting materials, the pleadings on file, and considering the arguments made at the April 7, 2026 hearing, Plaintiffs' Motions for Preliminary Injunction ARE GRANTED. The terms of Order are as set forth on pages 5-9 of this decision. The Court incorporates in its entirety its prior reasoning and analysis set forth in the TRO Order (Dkt. 60), with the following additions and clarifications based on the parties' briefing and submissions:

## I.    Factual Additions and Clarifications

1. Evidentiary support for pages 2–6 of the TRO Order, upon which the Court continues to rely may be found in the TRO Affidavit of Robert D. Thun ¶¶ 1–32 (Dkt. 14-2); Nexstar's

---

[1] For the avoidance of doubt, any reference to TEGNA in this Order encompasses the "Surviving Entity," into which Nexstar's subsidiary, Teton Merger Sub Inc., was merged to consummate this transaction.

and Tegna's 10K filings and investor presentations and remarks, as well as industry reports, which were submitted as Exhibits 1, 2, 3, 4, 5, 6, 10, 12, and 13 to the Declaration of Justin P. Raphael (Dkt. 14-42); the Declaration of Justin P. Raphael ¶ 15 (Dkt. 14-42); the TRO Declaration of Carl Shapiro ¶ 74 and associated Table (Dkt. 14-3); the Declaration of Robert E. Bowen ¶¶ 2–16, 18, 19 and the Exhibits attached to that Declaration (Dkt. 14-4); the Declaration of Olivier N. Antoine (Dkt. 14-56); the Affidavit of Glenn D. Pomerantz ¶ 4 (Dkt. 14-57); the TRO Declaration of Xiaonan April Hu and Exhibits 1, 2, 3, and 4 of that Declaration (Dkt. 56-2); and Exhibits. 1-6 & 9-10 of the Declaration of Connie Sung (No. 2:26-cv-00978, Dkt. 27-2).

2.  Additional evidentiary support for pages 7–16 of the TRO Order, and upon which the Court continues to rely, may be found in the TRO Declaration of Carl Shapiro ¶¶ 22, 51, 54, 55, 76, 78, 80, and supporting Tables (Dkt. 14-3); the Affidavit of Robert Thun ¶¶ 11, 12, 18, 19, 20, 22 (Dkt. 14-2); Exhibits. 1-10 of the Declaration of Connie Sung (No. 2:26-cv-00978, Dkt. 27-2); Defendants' public statements and SEC filings and other industry participant statements attached as Exhibits 1, 3, 5, 6, 7, 8, 9, 10, 11, 12 to the Declaration of Justin P. Raphael (Dkt. 14-42); and the Department of Justice's prior Competitive Impact Statements, cited in the TRO briefing and now attached as Exhibits 17, 18, 19 to the Declaration of Xiaonan April Hu in support of Plaintiff's Motion for Preliminary Injunction.

3.  Additional evidentiary support for pages 16–17 of the TRO Order, and upon which the Court continues to rely, may be found in the TRO Affidavit of Robert Thun (Dkt. 14-2), and Exhibits 1-6 & 9-10 of the Declaration of Connie Sung (No. 2:26-cv-00978, Dkt. 27-2).

4.  Upon review of the parties' additional submissions in connection with a preliminary injunction, the Court additionally credits and relies upon the following in support of its preliminary injunction: the Affidavit of Robert D. Thun in support of Plaintiff's Motion for Preliminary Injunction, the Declaration of Carl Shapiro in support of Plaintiff's Motion for Preliminary injunction, Exhibits 1–19 attached to the Declaration of Xiaonan April Hu in support of Plaintiff's Motion for Preliminary Injunction, Exhibits 1-8 of the Declaration of

Laura Antonini (Dkt. 109-1), the Declaration of Jon Schleuss (Dkt. 109-11), and the Declaration of Jessica Gonzalez (Dkt. 109-12).

## II.    **Legal Clarifications and Additions**

5.  Plaintiffs seek a prohibitory injunction, not a mandatory injunction.

6.  "A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal quotation marks omitted). "The relevant status quo is that between the parties pending a resolution of a case on the merits," id. at 1061 (citation omitted), and refers to the "last uncontested status which preceded the pending controversy," *GoTo.com v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (emphasis added) (citation omitted). As relevant here, the Ninth Circuit has concluded that when Defendants "affirmatively change[] th[e] status quo," a request to restore the status quo is "prohibitory." *Arizona Dream*, 757 F.3d at 1061 (citation omitted).

7.  Even if construed as a mandatory injunction, however, a hold-separate order is appropriate here. Plaintiffs have made a sufficiently strong showing on the merits of its claim to entitle them to a hold-separate order, irrespective of whether the heightened standard for mandatory injunctive relief applies. Furthermore, Defendants were on notice as early as March 10 that State regulators were scrutinizing the merger, when the State of California asked Defendants to consider entering into an agreement not to close while the State of California completed its investigation. Declaration of Connie Sung ¶ 3 (No. 2:26-cv-978 (E.D. Cal. 2026), Dkt. 27-2). Certainly, Defendants were on full notice once the States and DIRECTV filed their respective Complaints, that Plaintiffs were seeking to enjoin the merger to preserve Nexstar's and TEGNA's independence from one another. Pomerantz Affidavit ¶ 4 (Dkt. 14-57). To the extent Defendants undertook affirmative actions afterwards to integrate TEGNA, thereby disturbing the status quo, they did so at their own peril. *See Jones v. Sec. & Exch. Comm'n*, 298 U.S. 1, 17–18 (1936) ("[A]fter a defendant has been notified of the pendency of a suit seeking an injunction . . . he acts at his peril and

subject to the power of the court to restore the status quo[.]"); *Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000); *FTC. v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C. Cir. 1981).

8. Previously, the Court declined to address Plaintiff DIRECTV's argument that it "will suffer irreparable harm in the form of losing customer goodwill it has spent decades establishing." TRO Order at 17 n.5. The Court does so now. Unlike in *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020), DIRECTV is not relying on "actual or alleged harms to customers and consumers outside the relevant markets." Id. at 993. Rather, Plaintiff asserts that it will lose customer goodwill because the merger will enable Nexstar to threaten more painful blackouts, which will force DIRECTV to either endure blackouts of multiple Big Four stations in a DMA or agree to substantially increased retransmission fees, which costs will be passed on in part to DIRECTV's customers. DIRECTVf has submitted evidence that either outcome damages its brand for high quality and reliable coverage.

9. The loss of DIRECTV's goodwill among its customers and the damage to DIRECTV's reputation is a harm to DIRECTV—not a harm suffered by other parties in different markets, as was the case in *Qualcomm*. While DIRECTV may have weathered blackouts before, the Court is persuaded that the merger's creation of more than 30 Nexstar duopolies—which dwarfs the number of duopolies Nexstar possessed premerger—will substantially exacerbate the harms to Plaintiff DIRECTV's reputation and goodwill caused by blackouts. That harm, in addition to the harms identified by this Court in its TRO Order, is irreparable. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

10. Finally, preliminary injunctive relief is necessary to preserve this Court's ability to "prevent[] the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. ABMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020). It is undisputed that Defendants' integration efforts "are exactly those that would make it more difficult to divest TEGNA stations, eliminate competition, and result

in newsroom layoffs and shutdowns." TRO Order at 19. Only a preliminary injunction here will ensure that Defendants do not "bleed" TEGNA of "substantial assets and restructure" in a manner that would thwart a divestiture order at the end of a trial on the merits. *Tasty Baking Co. v. Ralston Purina, Inc*., 653 F. Supp. 1250, 1277 (E.D. Pa. 1987); *see also United States v. Acorn Eng'g Co.*, 1981 WL 2112, at *3 (N.D. Cal. June 18, 1981).

11. Plaintiff States have standing to challenge the merger. The States bring suit as *parens patriae* on behalf of and to protect the health and welfare of their residents and the general economies of their respective states.  The States have adequately alleged that the merger threatens their quasi-sovereign interests in the "economic well-being" of their citizens, and that the likely harms of the merger—including increased cable and satellite bills, and reductions in the quality, quantity, and diversity of perspectives in local news programming—impact a substantial share of the States' populations. *See Texas v. Google LLC*, 764 F. Supp. 3d 500, 510 (E.D. Tex. 2025); *New York v. Microsoft Corp.*,209 F. Supp. 2d 132, 150-52 (D.D.C. 2002).

12. The Court finds that Plaintiff States are likely to succeed in establishing that the merger will likely result in higher retransmission fees, and thus higher prices to consumers. As the Court has recognized, the merger gives Defendants greater leverage to extract higher fees in retransmission negotiations with the MVPDs—leverage that Nexstar itself acknowledged when promising to deliver investors "'rate increases'" and "'positive growth in net retrains [sic] growth.'" TRO Order at 14 (quoting Nexstar CEO Perry Sook); *see also* Shapiro PI Decl. (ECF No. 109-10) ¶ 24.  Ample evidence supports that retransmission fee increases are eventually passed on in the form of increased prices to consumers. *See* (Torres Decl. (ECF No. 27-12, No. 2:26-cv-00978) ¶ 2; Thun Decl. (ECF No. 14-2) ¶ 12); Antonini Decl. (ECF No. 109-1), Exs. 5-8.

IT IS HEREBY ORDERED:

1. Plaintiffs' Motions for Preliminary Injunction are GRANTED.

2. Defendants and all of their respective agents, employees, or attorneys, shall be and hereby are restrained and enjoined from all actions relating to integration and consolidation of

Nexstar and TEGNA until after 11:59 PM Eastern Time on the fourteenth (14th) day after final judgment is entered in this matter. Defendants must immediately cease all ongoing actions relating to integration and consolidation of Nexstar and TEGNA.

3. Nexstar must permit TEGNA to continue operating as a separate and distinct, independently managed business unit from Nexstar, and Nexstar must put measures in place to maintain TEGNA as an ongoing, economically viable, and active competitor independent of Nexstar management. TEGNA shall have management separate from, and not reporting to, Nexstar's management that operates TEGNA in the ordinary course consistent with pre-closing practices.

4. Nexstar must immediately put in place internal controls and procedures to prevent the sharing of competitively sensitive Nexstar and TEGNA information, including any information related to retransmission consent negotiations, between Nexstar and TEGNA. These firewalls may include providing instructions to employees and contractors, and issuing an antitrust corporate policy regarding such firewalls.

5. Nexstar must not influence the management of the held-separate TEGNA business unit. TEGNA personnel and management must maintain control over TEGNA's decision-making, including with respect to retransmission consent agreements and negotiations, newsroom personnel, operations and programming, product and service offerings, product development, advertisement sales, and personnel. Nexstar must not hire, terminate, transfer, or otherwise alter the terms of employment of any TEGNA officers or employees.

6. Nexstar must hold separate all assets, rights, and licenses acquired as a result of the Transaction. All assets held by TEGNA or its direct or indirect subsidiaries at the time of consummation should be maintained within TEGNA and must not be transferred to any other entity, including any Nexstar affiliate other than TEGNA or one of its pre-existing direct or indirect subsidiaries.

7. Defendants shall take all steps necessary to ensure that (a) the local television broadcast stations owned by TEGNA immediately prior to the Transaction (the "Acquired Stations") will be maintained and operated as independent, ongoing, economically viable, and active

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

competitors in the business of licensing retransmission consent to MVPDs; (b) each of Nexstar and the held-separate TEGNA business unit will not influence the management of the stations owned by the other entity immediately prior to the Transaction; and (c) the books, records, competitively sensitive information, and decision-making concerning the production, distribution, provision, or sale of products or services by or under any of the Acquired Stations will be kept separate and apart from all other stations owned by Nexstar immediately prior to the Transaction and any of Nexstar's other operations.

8. Defendants shall use all reasonable efforts to preserve, in accordance with current practice, the existing relationships of TEGNA and of each Acquired Station with each MVPD retransmitting its programming, with each network providing affiliation and programming, and with others doing business with the Acquired Stations.

9. Defendants shall use all reasonable efforts to maintain at 2025 or previously approved levels for 2026, whichever are higher, all station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations.

10. Defendants shall, to the extent permitted by the terms and conditions of the FCC's Equity/Debt Plus rule (47 C.F.R. § 73.3555, note 2(i)), provide sufficient working capital and lines and sources of credit to continue to maintain the Acquired Stations as economically viable and competitive, ongoing businesses.

11. Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records for each Acquired Station that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of that station.

12. Notwithstanding the foregoing, it shall not be a violation of this Order for Nexstar to:

   a. undertake ordinary-course cash management, ordinary-course intercompany transfers, and ordinary-course debt service and repayment activities necessary to comply with Nexstar's financing obligations, including refinancing activities, security perfection, and guaranty, provided that Nexstar does not use this provision as a pretext to undermine TEGNA's viability as a going concern;

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

b.  take reasonable actions necessary to maintain TEGNA's day-to-day operations, including authorizing routine financial transactions such as wire transfers for ordinary course payments;

c.  take actions necessary to establish a functional governance structure for TEGNA, including appointing or reappointing officers, to the extent necessary to permit TEGNA to fulfill its obligations under this Order, provided however that Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar;

d.  provide and implement Sarbanes-Oxley requirements, including setting thresholds for ordinary course contract approval, expenditure authorization, and other financial limits similar to the interim operating covenants that applied to TEGNA's independent management of the business pre-closing;

e.  take all reasonable steps to perform all obligations required under its debt instruments, SEC reporting requirements, or refinancing transactions, including coordination with TEGNA personnel as necessary, provided that such coordination is narrowly tailored to complying with reporting requirements and avoiding breaches under debt instruments; such permissible coordination includes coordination necessary to complete SEC and debt agreement reporting for the combined company within applicable deadlines, oversight by Nexstar management as to the accuracy of the TEGNA financial statements, including compliance with internal controls and procedures, in coordination with TEGNA personnel, provided however that if the sharing of TEGNA's confidential information with certain Nexstar employees is necessary to accomplish such reporting requirements, such information must be maintained separately from Nexstar's files and used solely for those reporting requirements;

f.  appoint or reappoint TEGNA officers as necessary for TEGNA to exercise independent decision-making authority for retransmission matters, provided

8

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

however that Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar; and

g. require that management of TEGNA adhere to the interim operating covenants set forth in the Merger Agreement (Dkt. 63-4), in their entirety, and in the same manner as applied pre-closing, provided however that TEGNA shall continue to have authority concerning ordinary course contracts, including contracts concerning retransmission consent, as provided by operating covenant 6.1(b)(xiii).

13. The provisions of this Order shall apply to each of Defendants' directors, officers, agents, and employees, and all persons acting on its behalf. A copy of this Order shall be furnished by Defendants to each of their directors and officers.

14. Plaintiff [need not post security][shall post security in the amount of $_____ by _____]. The bond amount requested by Defendants is not adequately supported by the evidence, particularly in light of the parties' agreement to adjust the preliminary injunction and temporary restraining order to account for many of the concerns raised by Defendants in their briefing. Dkt. 97.

IT IS SO ORDERED.

DATED: April 2026 at _____                                    _____
                                                                United States District Judge

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION