UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN RE: NEXSTAR-TEGNA MERGER
LITIGATION

No. 2:26-cv-00976-TLN-CKD

**ORDER**

On March 18, 2026, DIRECTV, LLC ("DIRECTV") filed an action against Nexstar Media Group, Inc. ("Nexstar") and TEGNA Inc. ("TEGNA") (collectively, "Defendants"), alleging Nexstar's acquisition of TEGNA violates § 7 of the Clayton Act, 15 U.S.C. § 18. (ECF No. 1.)[1] On the same day, the State of California, State of Colorado, State of Connecticut, State of Illinois, State of New York, State of North Carolina, State of Oregon, and Commonwealth of Virginia (collectively, "Plaintiff States") filed a second action against Defendants, also alleging violation of § 7 of the Clayton Act based on the Nexstar-TEGNA merger. (No. 2:26-cv-00978, ECF No. 1-2.)

In both cases, DIRECTV and Plaintiff States filed a motion for temporary restraining order ("TRO"). (ECF No. 14; No. 2:26-cv-00978, ECF No. 27.) Both motions seek the same

---

[1] Unless otherwise noted, all ECF citations are to No. 2:26-cv-00976-TLN-CKD.

1

remedy — a hold-separate order to require Nexstar to preserve TEGNA as a separate and independent entity during these proceedings. (*See id.*) On March 27, 2026, the Court issued a TRO restraining Defendants from further integration, consolidation, or joint management of Nexstar and the held-separate TEGNA business unit. (ECF No. 60.) The Court ordered Defendants to show cause why a preliminary injunction should not issue to extend the terms of the TRO pending a ruling on the merits. (*Id.*) In response, Defendants filed an opposition to the issuance of a preliminary injunction. (ECF No. 76.) Plaintiff States and DIRECTV filed replies. (ECF Nos. 109, 111.)

On March 31, 2026, the Court *sua sponte* consolidated both actions, finding the two actions involve common questions of law and clearly arise out of common facts. (ECF No. 65.) On April 7, 2026, the Court conducted an in-person hearing on whether a preliminary injunction should issue and heard oral argument from all parties (hereinafter "the hearing").[2] For the reasons set forth below, the Court issues a preliminary injunction.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

The instant action arises from Nexstar's allegedly unlawful acquisition of TEGNA. (*See* ECF No. 1.) Nexstar is the largest owner of local broadcast television stations in the country. (*Id.* at 3.) TEGNA is the second largest owner of local English-language television stations in the nation. (*Id.*) DIRECTV and Plaintiff States (collectively, "Plaintiffs") assert Nexstar's merger with TEGNA will drive up the cost of television service to tens of millions of Americans, shutter local newsrooms around the country, substantially reduce competition in dozens of local markets, and reduce the quality of news, thereby harming distributors like DIRECTV and consumers. (*Id.*; No. 2:26-cv-00978, ECF No. 1-2 at 5.)

Plaintiffs seek to enjoin the allegedly unlawful merger. DIRECTV is a distributor that purchases, among other things, the rights to retransmit local television broadcast stations to its subscribers. (ECF No. 1 at 3.) DIRECTV asserts Nexstar's purpose in acquiring TEGNA is to

---

[2]    In reaching this ruling, the Court has carefully considered all arguments raised by the parties at the hearing. The Court has also considered the arguments raised in the briefing on both motions for TRO, the order to show cause, and the request to modify the TRO.

drive up the price it can extract from DIRECTV and other distributors, which will force them to raise prices on their subscribers. (*Id.*) Plaintiff States, by and through their respective Offices of the Attorney General, bring this action as *parens patriae* on behalf of and to protect the health and welfare of their residents and the general economy of each of their states. (No. 2:26-cv-00978, ECF No. 1-2 at 6.) Plaintiff States assert the merger creates a "broadcast behemoth" that will raise prices for television consumers and degrade the quality and quantity of broadcast content such as local news and sports. (*Id.* at 2.)

DIRECTV alleges Nexstar acquired TEGNA to force its TV distribution customers, including DIRECTV, to pay even higher fees for local news, live sports, and other content they distribute to their subscribers. (No. 1 at 3.) Plaintiffs allege Nexstar will also shut down local newsrooms in dozens of markets, reducing the amount, variety, and quality of local broadcast news that Americans rely on for trusted information about their communities. (*Id.*; No. 2:26-cv-00978, ECF No. 1-2 at 5.) Plaintiffs assert those harms from reduced competition are precisely what antitrust laws are designed to prevent. (*Id.*)

Despite the proliferation of video streaming services, Americans continue to depend heavily on local broadcast television for access to news about their communities, sporting events, and other local content. (*Id.*) Because broadcast content remains very valuable, the local broadcast television business collects more revenue from its broadcast rights than ever before. (*Id.*)

### A.    Local Broadcast Stations

Almost every community has four local television stations that are affiliates of one of the "Big Four" national networks: ABC, CBS, FOX, and NBC. (ECF No. 14-1 at 9.) When separately owned, Big Four stations compete to provide the most entertaining, timely, and diverse content, including local news. (*Id.* at 10.) Each also offers live sports, national news, and prime-time entertainment programming provided by its affiliated national network. (*Id.*)

Nexstar is already the largest owner of local broadcast stations in the United States. (*Id.*) It owns 164 broadcast stations across 114 Designated Market Areas ("DMAs") — geographic regions used by the Federal Communications Commission ("FCC") to regulate broadcast

3

licenses. (ECF No. 1 at 3–4; ECF No. 14-1 at 10.) Its stations already reach 70 percent of American households. (ECF No. 1 at 4.) In 14 DMAs, Nexstar owns two or three of the Big Four affiliates — referred to in the broadcast industry as Big Four "duopolies" or "triopolies." (ECF No. 14-1 at 10.) Nexstar has annual revenues of approximately $5.4 billion. (*Id.*) TEGNA, as the second-largest owner of English-language broadcast stations, owns 64 local broadcast stations across 51 DMAs. (*Id.*; ECF No. 1 at 4.) TEGNA has a market capitalization of more than $3 billion and annual revenues almost the same figure. (ECF No. 14-1 at 10; ECF No. 1 at 4.) TEGNA reached 40 percent of U.S. households in 2025. (ECF No. 14-1 at 10.)

Plaintiffs assert this merger would create a massive concentration of market power. (ECF No. 1 at 4; No. 2:26-cv-00978, ECF No. 1-2 at 16–17.) The acquisition would give Nexstar control of 228 broadcast stations reaching 80 percent of television households in 132 local markets and increase concentration in more than a dozen local markets. (ECF No. 1 at 4.) The acquisition would also give Nexstar control of additional Big Four stations in 31 DMAs where it already owns one or more such stations, including 27 new duopolies and 3 new triopolies. (ECF No. 14-1 at 10.)

These 31 DMAs are Big Four "Overlap DMAs." (No. 2:26-cv-00978, ECF No. 1-2 at 3.) A Big Four Overlap DMA is a market area in which Nexstar and TEGNA each own at least one broadcast television station that is an affiliate of one of the Big Four networks. (*Id.*) With the merger, Nexstar owns the TEGNA Big Four stations in each Overlap DMA. (*Id.*) For example, the Sacramento-Stockton-Modesto, California DMA is an Overlap DMA: Nexstar owns the local FOX affiliate KTXL-TV and TEGNA owns the local ABC affiliate KXTV-TV. (*Id.*) After the acquisition, Nexstar now owns both the FOX and ABC affiliates in the 16-county area, placing two of the Big Four affiliates that previously competed in this area under common ownership. (No. 2:26-cv-00978, ECF No. 27-1 at 14.) Eleven of the Big Four Overlap DMAs directly impact the residents of each State or Commonwealth bringing this suit.[3]

---

[3] These eleven DMAs include: (i) Buffalo, New York; (ii) Charlotte, North Carolina; (iii) Davenport-Rock Island-Moline, Iowa-Illinois; (iv) Denver, Colorado; (v) Greensboro-High Point-Winston-Salem, North Carolina; (vi) Hartford-New Haven, Connecticut; (vii) Norfolk-Portsmouth-Newport News, Virginia; (viii) Portland, Oregon; (ix) Sacramento-Stockton-

Plaintiffs contend the loss of competition between Nexstar and TEGNA and the enormous increase in market power will enable Nexstar to raise prices and lead to the consolidation of local television newsrooms in the Big Four Overlap DMAs, reducing the quantity and quality of local news options available to consumers in each such DMA.  (No. 2:26-cv-00978, ECF No. 1 at 22; No. 2:26-cv-00978, ECF No. 1-2 at 4.)  Nexstar has an established track record of consolidating newsrooms when it owns more than one station in a DMA, meaning it reduces the independent news operations from two to one.   (No. 2:26-cv-00978, ECF No. 1-2 at 22–23.)  Plaintiffs assert Nexstar will follow its historical pattern of newsroom consolidation and viewers in the Big Four Overlap DMAs will lose options for where to get their local news.  (*Id.* at 24.)

                    B.       Retransmission Consent Fees

Nexstar and TEGNA's stations operate under licenses to broadcast signals over airwaves that are owned by the American people.  (ECF No. 1 at 4.)  Big Four affiliates sell multi-channel video programming distributors ("MVPDs"), like DIRECTV, the rights to retransmit their content to viewers.  (*Id.*)  DIRECTV and other MVPDs must buy those rights to retransmit broadcast content as part of the pay TV packages they offer to subscribers.  (*Id.*)  Since 2010, retransmission license fees charged by broadcasters have increased more than 2,000 percent.  (*Id.* at 5.)  Any increase in retransmission fees raises MVPDs' programming costs and in turn results in higher prices for TV subscribers.  (*Id.*)

This merger will enable Nexstar to increase license fees further, resulting in even higher prices for DIRECTV and its subscribers.  (*Id.*)  Nexstar has a "Consolidation Playbook" that describes acquisitions as a way to gain "scale" and "leverage," with the ultimate aim of raising prices.  (*Id.* (citing Nexstar Media Group, Inc., Investor Presentation – June 2025 at 7 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf).)  Nexstar would gain leverage from this merger not only by significantly increasing the number of stations it owns, from 164 to 228 local stations, but also by acquiring Big Four affiliates in 31 local markets where it owns at least one Big Four affiliate already.  (*Id.*)

---

Modesto, California; (x) San Diego, California; and (xi) St. Louis, Missouri (which includes several Illinois counties).  (No. 2:26-cv-00978, ECF No. 1-2 at 3.)

A key source of Nexstar's leverage is the ability to threaten and impose blackouts. (*Id.*) When DIRECTV or any other MVPD refuses to agree to the increased fees Nexstar demands, Nexstar can black out its stations or threaten to do so as a means of coercing the MVPD to agree to its pricing demands. (*Id.*) That threat leaves distributors with two bad options: acquiesce to Nexstar's higher fees or lose access to these stations, thereby blocking the MVPD's subscribers from accessing the content carried on the blacked-out stations and driving some consumers to switch to other distributors' services where they can find that same content. (*Id.*)

Blackouts of Big Four networks cause MVPDs significant harm because they can cause subscribers to leave the blacked-out MVPD for another provider, and in many cases they don't come back. (*Id.*) On the other hand, Nexstar suffers relatively limited harm in a blackout because many subscribers who leave a blacked out MVPD switch to another distributor that is paying Nexstar. (*Id.*) Thus, in any blackout, Nexstar has less to lose than DIRECTV or other MVPDs. (*Id.*)

The merger would make Nexstar's Big Four blackout threats even more coercive. (*Id.*) Once Nexstar owns not just one but two or even three Big Four affiliates in a local market — the situation this merger will create in 31 local markets nationwide — any MVPD that refuses Nexstar's demands will risk leaving its subscribers in that area without multiple sources of live sports and local news, and potentially unable to watch any NFL games on Sunday afternoons, for example. (*Id.*) That will make subscribers even more likely to switch to another distributor that is still paying for Nexstar's stations. (*Id.* at 5–6.) In short, by making blackouts even more painful for distributors like DIRECTV, the merger will make it even harder for them to resist Nexstar's demands for higher prices. (*Id.* at 6.)

C.    Local News

Local stations compete to offer original, high-quality local news coverage. (ECF No. 14-1 at 11.) They compete to hire the best on-air talent, from news anchors and meteorologists to reporters and correspondents. (*Id.*) They compete to offer the most compelling editorial perspective, selecting which news stories to cover and how to cover them. (*Id.*) They also compete to be the first to break stories that will matter to their viewers, from local political

corruption to public safety.  (*Id.*)

When Nexstar or TEGNA possess a Big Four duopoly or triopoly, this competition is eliminated.  (*Id.*)  In DMAs where Nexstar or TEGNA has a Big Four duopoly, it is common practice for both stations to have a single news director, share news talent and journalist teams, operate a single news website, and "simulcast" the same programming.  (*Id.*)  DIRECTV asserts this is Nexstar's strategy, as Nexstar has admitted that after buying TEGNA it will "[o]perate multiple stations with one infrastructure," *i.e.*, turn two newsrooms into one in the overlap markets.  (*Id.* at 12.)

### D.   Federal Regulatory Approvals

Regulatory oversight did not curb the manifest anticompetitive effects of this acquisition. (No. 2:26-cv-00978, ECF No. 27-1 at 14.)  Because this large merger involved the transfer of FCC licenses, it was subject to federal review by both the U.S. Department of Justice (the "U.S. DOJ") and the FCC.  (*Id.*)  The U.S. DOJ is tasked to conduct antitrust review of proposed mergers under § 7 of the Clayton Act, 15 U.S.C. § 18a, through the Hart-Scott-Rodino ("HSR") process.  (*Id.*)  On October 30, 2025, the U.S. DOJ issued to Defendants an HSR Second Request, a compulsory demand for documents and data.  (*Id.*)  On March 19, 2026, the U.S. DOJ announced it was closing its investigation of the deal through "early termination," clearing the way for Defendants to close before the end of what would otherwise be a standard statutory waiting period.  (*Id.* at 14–15.)

Since Nexstar's acquisition of TEGNA involved transfers of FCC licenses it also required FCC approval under § 310(d) of the Communications Act, 47 U.S.C. § 310(d).  (*Id.* at 15.)  The FCC initiated a proceeding reviewing the proposed merger on December 1, 2025.  (*Id.*)  In this agency proceeding, Nexstar sought multiple waivers from otherwise applicable ownership limits. (*Id.* (citing 47 C.F.R. § 1.3).)  Notably, Nexstar sought a waiver from the FCC's National Television Multiple Ownership Rule (the "national audience reach cap"), which generally prohibits a single entity from owning television stations that, in the aggregate, reach more than 39 percent of U.S. television households.  (*Id.*)  Because Nexstar would serve 54.5 percent of the national audience through this merger, it sought a waiver of the 39 percent cap to permit

consummation of the merger. (*Id.*) In unusual circumstances — with the FCC's quasi-adjudicatory licensing proceeding still pending — the President himself weighed in publicly in February and urged federal regulators to approve the deal to "knock out the Fake News." (*Id.*) FCC Chairman Brendan Carr publicly signaled his acknowledgement of, and agreement with, the President's endorsement. (*Id.*) At a press conference on February 18, 2026, Chairman Carr reiterated, "I support that [Nexstar/TEGNA] transaction. We're going to be moving forward." (*Id.* at 15–16.)

On March 19, 2026, the same day U.S. DOJ announced early termination of its antitrust review, the FCC issued a ruling granting Nexstar's requested waivers and green-lighting the acquisition. (*Id.* at 16.) The FCC approved Defendants' application for broadcast license transfers — not through a full, public Commission vote but through its Media Bureau (which acts under the FCC Chairman's discretion). (ECF No. 14-1 at 13.)

Immediately thereafter, effective March 19, 2026, Nexstar and TEGNA closed the deal (the "Transaction"). (*Id.*) Nexstar acquired TEGNA, its assets, and the power to exercise control over them, including: (i) consolidating operations, such as closing newsrooms and laying off reporters in any market where it now owns two or more Big Four stations because of the merger; (ii) accessing TEGNA's competitively sensitive information and using that information to inform its negotiation and pricing strategy for retransmission consent fees; and (iii) terminating TEGNA's senior leadership. (*Id.*) Once undertaken, these actions would be extremely difficult to undo. (*Id.*)

The evening before the merger closed, on March 18, 2026, Plaintiffs filed suit, seeking to enjoin the Nexstar-TEGNA merger pursuant to § 7 of the Clayton Act, 15 U.S.C. § 18. (*See* ECF No. 1; No. 2:26-cv-00978, ECF No. 1-2.) On March 20, 2026, Plaintiffs filed motions for TRO. (ECF No. 14; No. 2:26-cv-00978, ECF No. 27.) On March 27, 2026, the Court granted DIRECTV's motion and issued a TRO (ECF No. 60), which the Court later modified and extended (ECF No. 145). The Court converted Plaintiff States' motion into a motion for preliminary injunction. (ECF No. 65.) The Court now considers whether the terms of the TRO shall continue as a preliminary injunction pending adjudication on the merits.

8

## II. STANDARD OF LAW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id*. A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. Simply put, if "serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in plaintiff's favor in order to succeed in a request for a preliminary injunction. *Id*. at 1134–35.

## III. ANALYSIS

After addressing Plaintiff States' standing, the Court considers each of the *Winter* elements in turn. Where DIRECTV and Plaintiff States make substantially similar or overlapping arguments, the Court considers those arguments together.

///

///

A.      Plaintiff States' Standing

Defendants argue in a footnote that Plaintiff States do not have standing as the claimed injury to their citizens "is derivative and entirely depends on an assumed pass-through of costs that is not supported by any facts," and is "too attenuated to confer standing."  (ECF No. 76 at 25 n.32; No. 2:26-cv-00978, ECF No. 73 at 12 n.14.)  Defendants further argue Plaintiff States cannot establish *parens patriae* standing as localized harms do not approach the necessary pervasive, economy-wide injury.  (ECF No. 76 at 25 n.32; No. 2:26-cv-00978, ECF No. 73 at 12 n.14 (citing *Texas v. Google LLC*, 764 F. Supp. 3d 500, 524–26 (E.D. Tex. 2025)).)

In reply, Plaintiff States assert Defendants cite to no case in which *parens patriae* standing was found lacking and the alleged harm in this case is precisely the type of harm that has been recognized to confer *parens patriae* standing.  (No. 2:26-cv-00978, ECF No. 81 at 7.)  Plaintiff States also maintain Defendants' cited precedent does not support their argument, as the court in *Google LLC*, 764 F. Supp. 3d at 524–26, rejected the same arguments Defendants raise here. (ECF No. 109 at 10.)  Further, Plaintiff States contend their standing is not undermined by the fact that the price effects of the Transaction will pass from MVPDs to the States' citizens, as a substantial number of citizens will suffer significantly higher bills and degradation to local news. (*Id.* at 11.)  Plaintiff States note there is a long list of cases that support *parens patriae* standing where the affected population is the consumer of a particular type of product or in certain geographic areas of a state.  (*Id.* (citing *California v. Am. Stores Co.*, 697 F. Supp. 1125, 1134 (C.D. Cal. 1988) *rev'd on other grounds*, 872 F.2d 837 (1989), *rev'd on other grounds*, 495 U.S. 271 (1990); *Google LLC*, 764 F. Supp. 3d at 508–09).)

The *parens patriae* doctrine allows a state to bring suit on behalf of its citizens where the state "alleges injury to a sufficiently substantial segment of its population, articulates an interest apart from the interests of particular private parties, and expresses a quasi-sovereign interest." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011).  "States asserting *parens patriae* standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine."  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017).  Article III standing requires establishing (1) a concrete, particularized, and actual or

10

imminent injury, (2) that is fairly traceable to the challenged action, and (3) can be redressed by judicial relief. *Id.* In *parens patriae* cases, there are two additional requirements: (1) "the State must articulate an interest apart from the interests of particular parties, *i.e.*, the State must be more than a nominal party"; and (2) "[t]he State must express a quasi-sovereign interest." *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)).

Here, the parties dispute whether Plaintiff States can adequately establish the requisite injury to confer *parens patriae* standing. In *Google LLC*, the court found plaintiff states established *parens patriae* standing to challenge Google's alleged monopoly in online advertising because they identified "specific harms resulting from Google's conduct in display-advertising markets." 764 F. Supp. 3d at 518. The court summarized plaintiff states' allegations as follows: "By impairing competition, the relevant market participants pay higher prices, produce lower-quality content, and decrease their output. In turn, consumers suffer because the increased costs and lower-quality content are passed on to them." *Id.* at 519 (internal citations omitted). The court also noted that plaintiff states' allegations of the harms were "far reaching," as they alleged "Google's actions affect millions of users across billions of impressions" and "Google's influence stretches across millions upon millions of websites of all sizes." *Id.* (internal citations and quotations omitted).

The Court agrees with Plaintiff States that their allegations are sufficiently similar to plaintiff states' allegations in *Google LLC* to establish *parens patriae* standing. As in *Google LLC*, Plaintiff States set forth "detailed and extensive allegations" to support an injury to their quasi-sovereign interests. 764 F. Supp. 3d at 519–20. First, Plaintiff States adequately establish the specific harms resulting from the merger. Plaintiff States allege the Transaction will degrade local news and allow Nexstar to charge MVPDs higher retransmission consent fees for Big Four station content. (No. 2:26-cv-00978, *see* ECF No. 1-2 ¶¶ 9, 12–13, 70–73, 81.) Plaintiff States further allege MVPDs would pass on those increased fees to their subscribers via substantially higher cable and satellite bills. (*Id.* ¶¶ 9, 81.) Indeed, in addition to DIRECTV's statements that they will pass through costs to consumers, Plaintiff States provide declarations from executives of other MVPDs who attest the Transaction would result in higher prices for MVPDs and their

11

customers. (ECF No. 109-1 (citing ECF No. 109-6 ¶ 8 (Joe Lorah, Director of Government & Public Affairs at Blue Ridge Communications, states the Transaction "results in higher prices for our company and our customers"); ECF No. 109-7 ¶ 14 (Jack Capparell, General Manager at Service Electric Cable TV & Communications states "approval of the Transaction will directly cause an immediate increase in retransmission consent fees for our company and our customers"); ECF No. 109-8 at 5 (EchoStar Corporation (Dish Network Co.) notes in an FCC Petition to Deny the Transaction that higher costs for MVPDs would result in higher prices for consumers); ECF No. 109-9 (a letter from State Cable Petitioners (six MVPDs in six different states) to the Secretary of the FCC regarding the Transaction states "[a]cross all MVPDs, [retransmission consent-related] costs will rise and increase consumer TV prices by hundreds of millions of dollars annually over the next three years alone and continue rising even more after that")).)

Second, Plaintiff States adequately establish the harms are far-reaching. According to Plaintiff States:

> These higher fees will, in turn, be passed on to television consumers, resulting in higher costs for a substantial portion of the citizens of the Plaintiff States . . . These harms are not limited to television consumers in the Big [Four] Overlap DMAs. Because the . . . Transaction materially increases Nexstar's national footprint and bargaining leverage in negotiations that are commonly conducted on a station-group, multi-market basis, the . . . Transaction will likely result in higher retransmission consent fees and cost to television consumers — across the nation.

(No. 2:26-cv-00978, ECF No. 1-2 ¶¶ 81–82.)

Plaintiff States are correct that Defendants do not cite any authority with analogous facts where *parens patriae* standing was found lacking. The Court also finds persuasive Plaintiff States' argument that they seek only injunctive relief under § 16 of the Clayton Act, which requires establishing a different antitrust injury. (ECF No. 109 at 10 n.11); *see Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110–11, 113 (1986) (noting that in order to seek injunctive relief under § 16, a plaintiff "must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful" (internal citation and quotations omitted)). As discussed above, Plaintiff States adequately establish damage "of the type antitrust laws were designed to prevent[.]" *Cargill, Inc.*, 479 U.S.

at 113; *see, e.g.*, *Google LLC*, 764 F. Supp. 3d at 519.  Accordingly, the Court finds Plaintiff States have standing to bring their suit.[4]

B.     <u>Likelihood of Success on the Merits</u>

Plaintiffs allege Nexstar's acquisition of TEGNA violates § 7 of the Clayton Act, 15 U.S.C. § 18.  (ECF No. 1 at 38; No. 2:26-cv-00978, ECF No. 1-2 at 29.)  In its March 27, 2026 TRO, the Court found DIRECTV is likely to succeed on the merits of its § 7 Clayton Act claim.  (ECF No. 60.)

Section 7 of the Clayton Act prohibits mergers where "the effect of such acquisition . . . may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Analysis of the effects of such acquisitions is focused on "probabilities, not certainties."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962).  "[W]hether the effect of the merger 'may be substantially to lessen competition' in the relevant market . . . requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future," as § 7 is "intended to arrest anticompetitive tendencies in their 'incipiency.'"  *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963) (citing *Brown Shoe Co.*, 370 U.S. at 317, 322).  "Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act."  *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.* (*St. Alphonsus*), 778 F.3d 775, 783 (9th Cir. 2015) (quoting *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 618 (1974)).  The Court will first determine the relevant product and geographic markets and then evaluate whether the merger violates the Clayton Act.

///

///

---

[4]  At the hearing, Plaintiff States requested to maintain a separate complaint because they have different interests than DIRECTV.  The Court previously ordered DIRECTV and Plaintiff States to file a Consolidated Complaint within 30 days of the electronic filing date of its consolidation order.  (ECF No. 65 at 4.)  The order requiring a consolidated complaint is stricken.  Plaintiff States and DIRECTV may maintain separate complaints in this action.  By April 30, 2026, Plaintiffs may file any separate amended complaints (or, alternatively, Plaintiff States shall file their original Complaint under the operative case number so that it is on the correct docket).

13

*i.*        *The Relevant Markets*

*a)*        *Product Market*

A relevant product market "consists of what customers consider to be reasonable substitutes for a company's products." *Federal Trade Comm'n v. Kroger Co.* (*Kroger Co.*), No. 3:24-cv-00347-AN, 2024 WL 5053016, at *6 (D. Or. Dec. 10, 2024); *see also Brown Shoe*, 370 U.S. at 325 (a relevant product market under § 7 is defined as "reasonable interchangeability of use . . . between the product itself and substitutes for it"). A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).

The Court finds the relevant product market is retransmission consent licenses for Big Four broadcasting stations. Courts have found that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Intel Corp. v. Seven Networks, LLC*, 562 F. Supp. 3d 454, 461 (N.D. Cal. 2021) (quoting *Newscal Indus., Inc. v. Ikon Office Sol'n*, 513 F.3d 1038, 1045 (9th Cir. 2008)). The Court finds Big Four broadcast stations are reasonably interchangeable. For example, DIRECTV's expert, Dr. Carl Shapiro,[5] notes that even if sports, local newscasts, and scripted shows on CBS and FOX are not identical, if CBS is blacked out, some viewers will watch FOX instead. (ECF No. 111 at 5–6.) DIRECTV also stated during the hearing that when negotiations are taking place and Nexstar decides to black out a station unless DIRECTV pays a high price, DIRECTV can substitute the content from the other three Big Four broadcast stations' content and tell its customers to stay with DIRECTV for the duration of the blackout. For example, if DIRECTV knows customers want to watch a football game on CBS that is going through a blackout, it can substitute another football game on FOX — it is not the

---

[5]    Dr. Carl Shapiro is a Professor of Economics at University of California Berkeley, former Deputy Assistant Attorney General for Economics at the U.S. DOJ Antitrust Division (who led the working group responsible for developing the 2010 Horizontal Merger Guidelines), served as a Senate-confirmed Member of the President's Council of Economic Advisers, and served in numerous mergers as an expert witness or consultant. (ECF No. 14-3 at 3.)

customers' preferred choice, but it is a reasonable choice.

Further, as stated in the TRO, the Court finds persuasive Plaintiffs' contention that licenses to retransmit Big Four broadcast content are not reasonably interchangeable with licenses to any other stations because MVPDs cannot obtain the combination of local news and live sports that their customers demand anywhere else.  (ECF No. 60 at 8 (citing ECF No. 1 at 16).)  DIRECTV cites to a U.S. DOJ Competitive Impact Statement that states: "Big Four stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly-ranked primetime programs."[6]  (ECF No. 14-1 at 18 (quoting U.S. DOJ Competitive Impact Statement at 4, *United States v. Gray Television, Inc.*, No. 21-CV-02041 (D.D.C. July 28, 2021), https://www.justice.gov/atr/case-document/file/1418276/dl ("U.S. DOJ Competitive Impact Statement")).)  The U.S. DOJ Competitive Impact Statement also notes these offerings give "Big Four broadcast content" a "special appeal to television viewers."[7]  (*Id.*)

///

[6]    Defendants argue the Antitrust Procedures and Penalties Act provides Competitive Impact Statements "shall not be admissible against any defendant in any action or proceeding brought by any other party against such defendant under the antitrust laws" and therefore all references in Plaintiffs' Complaints and Declarations should be stricken.  (ECF No. 76 at 13.)  Plaintiffs argue whether Competitive Impact Statements are "admissible" is irrelevant in deciding a motion for PI, where "rules of evidence do not strictly apply."  (ECF No. 109 at 3; ECF No. 111 at 5.)  Plaintiff States maintain the statements are cited not to prove fact but to show the federal government's longstanding recognition of Plaintiffs' proposed product market.  (ECF No. 109 at 3.)  DIRECTV notes economists "reasonably rely" on these statements and so Dr. Shapiro can do so under Rule 703.  (ECF No. 111 at 5.)  DIRECTV states that at a minimum, these statements from the Gray/Sinclair and Gray/Raycom mergers (which did not involve Defendants) are admissible because 15 U.S.C. § 16(h) only applies to antitrust proceedings involving the same defendant.  (*Id.* at 5.)  The Ninth Circuit has concluded that "[d]ue to the urgency of obtaining a preliminary injunction at a point where there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  Accordingly, the Court considers the Competitive Impact Statements at this juncture.

[7]    Defendants assert U.S. DOJ's prior statements are irrelevant because U.S. DOJ cleared this deal.  (ECF No. 48 at 16.)  The Court disagrees.  Simply because U.S. DOJ cleared this deal does not necessarily render its past statements on Big Four stations and the unique offerings of local broadcast stations irrelevant.  Indeed, Defendants offer no other substantive arguments or evidence to render these statements untrue.  (*See id.*)

15

Plaintiffs assert that in the event of a blackout of a Big Four station in a particular DMA, consumers are far more likely to switch to another Big Four station for live sports and local news than to a non-Big Four broadcast station or to cable programming.  (*Id.*; No. 2:28-cv-00978, ECF No. 1-2 at 14.)  Plaintiffs allege licenses to non-Big Four broadcast stations (such as The CW, PBS, or Telemundo) are not reasonably close substitutes because they do not offer network primetime programming (such as regular season NFL games or college football which are among the most popular content for pay TV subscribers).  (ECF No. 1 at 16–17; No. 2:26-cv-00978, ECF No. 1-2 at 14–15.)  Instead, non-Big Four broadcast stations offer niche or foreign language content that appeals only to a fraction of pay TV subscribers.  (*Id.*)  Plaintiffs allege licenses for cable programming are also not reasonably close substitutes because "cable networks offer different content than Big Four stations" and they "generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big Four stations."  (ECF No. 1 at 16–17 (citing U.S. DOJ Competitive Impact Statement); No. 2:26-cv-00978, ECF No. 1-2 at 15.)

Based on the foregoing, the Court finds retransmission consent licenses for Big Four broadcasting stations is the relevant product market.  As the Court noted in the TRO, Defendants did not initially offer any substantive opposition to DIRECTV's definition of the relevant product market.  (ECF No. 60 at 9.)  In response to the order to show cause, however, Defendants advance two primary arguments: (1) Big Four broadcast stations are complements, not substitutes, and a proposed market that only includes complementary products is facially unsustainable; and (2) digital streaming and other video alternatives should be included in the product market.  (ECF No. 76 at 16–19.)  The Court will consider each of these arguments in turn.

*I.        Whether Big Four Stations are Complements or Substitutes*

First, Defendants argue Big Four stations are complementary to each other rather than substitutes for each other.  (*Id.* at 16.)  Defendants contend DIRECTV's expert, Dr. Shapiro, confirms this, as he states each Big Four station "provides unique and valuable content to MVPDs."  (*Id.* at 17 (citing ECF No. 56-1 ¶ 4).)  Defendants also cite to the declaration of

16

Michael Biard, the President and Chief Operating Officer of Nexstar, who explains that no other network-affiliated station has the same rights to broadcast the same network programs carried by another network-affiliated station.  (ECF No. 77-8 at 3.)  Mr. Biard provides the following example: "[I]f a CBS station carrying an NFL Sunday Afternoon game is not carried by an MVPD, that MVPD's subscriber cannot go to an ABC, FOX, or NBC station to watch that game.  None of the other network affiliated stations have rights to broadcast that particular NFL Sunday Afternoon game." (*Id.*)  Defendants assert that "[b]ecause DIRECTV and other MVPDs must carry all Big Four stations in a DMA to meet customer demands, companies offering retransmission licenses for those stations [like Nexstar and TEGNA] are not competitors."  (ECF No. 76 at 17.)

As an initial matter, Defendants' own statements evidence that broadcast stations compete with each other, as DIRECTV notes in its reply.  (ECF No. 111 at 5.)  Nexstar has said "[w]e compete against in-market broadcast station operators" and "our local stations compete with other stations in their markets to provide exclusive news stories and unique features such as investigative reporting and coverage of community events to their local audiences." (ECF No. 111-5 at 15 (Nexstar, Annual Report, Form 10-K (2024)).)  TEGNA's most recent 10-K states they "compete with fellow broadcasters for carriage fees[.]" (ECF No. 111-18 at 7.)  It is irrelevant that the Big Four stations do not broadcast the exact same programs, as courts have found that "[c]ommodities which are reasonably interchangeable for the same or similar uses normally should be included in the same product market for antitrust purposes." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) (internal citation and quotations omitted); *see also Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) ("Whether products are part of the same or different markets under antitrust law depends on whether consumers view those products as reasonable substitutes for each other and would switch among them in response to changes in relative prices[.]").  DIRECTV's expert — Dr. Shapiro — notes that even if sports, local newscasts, and scripted shows on CBS and FOX are not identical, if CBS is blacked out, some viewers will watch FOX instead.  (ECF No. 111 at 5–6.)  Therefore, according to Dr. Shapiro, when a CBS affiliate is blacked out, having a FOX affiliate as an

17

alternative becomes even more important for DIRECTV and losing access to both CBS and FOX becomes more damaging.  (*Id.*)

Next, with respect to Defendants' assertion that DIRECTV and other MVPDs must carry all Big Four stations in a given DMA to meet customer demands, Defendants do not supply evidence to support this proposition.  Further, DIRECTV's descriptions of blackouts are examples that it is not required to carry all Big Four stations.  Although carrying more stations may make an MVPD more attractive to consumers, there is no mandate for DIRECTV to carry any Big Four station.

Finally, the Court finds that Big Four broadcast stations are substitutes for each other, not complements.  Defendants' expert, Mark A. Israel,[8] contends the opposite.  (ECF No. 48-9 at 29– 30; ECF No. 77-17 at 7–8.)  Mr. Israel states that broadcast networks are packaged as part of a bundle of content by MVPDs and thus each of the broadcast networks are inputs in making up a tier of content — much like inputs that come together to make up an automobile.  (ECF No. 48-9 at 29.)  Dr. Israel contends, therefore, that "if Nexstar gets more expensive, the tier of service gets more expensive, and this reduces the number of subscribers who buy it, the characteristic feature of complements."  (*Id.* (emphasis omitted).)  Dr. Israel further contends that if they were substitutes, a more expensive Nexstar would lead more MVPDs to buy TEGNA, not less, and that in a merger of complements, the merged firm has an incentive to cut prices because — post- merger — it internalizes the fact that lower prices of one of its (now merged) product helps the other product.  (*Id.*; ECF No. 77-17 at 8.)  However, Defendants do not provide the Court with any concrete example in their briefing where this has actually occurred.

In response, DIRECTV's expert, Dr. Shapiro, asserts Nexstar and TEGNA compete against each other for carriage on MVPDs and there are three reasons Dr. Israel's theory of complements is mistaken.  (*Id.* at 3–4.)  The Court ultimately finds each of these explanations

---

[8] Mark A. Israel is a founding partner of an economic consulting firm, has worked for several decades in economic consulting (specializing in the economics of industrial organization), served as an Associate Professor at Northwestern's Kellogg School of Management, taught graduate-level courses at Kellogg and Stanford, and received his Ph.D. in Economics from Stanford in 2001.  (ECF No. 48-9 at 3.)

persuasive. First, Dr. Shapiro states that if Dr. Israel were correct, then "Nexstar would voluntarily and proactively be seeking to lower retransmission fees in the overlap DMAs following its acquisition of TEGNA" and DIRECTV and other MVPDs would be welcoming the merger. (*Id.* at 4 (emphasis omitted).) Instead, the opposite is true — DIRECTV, DISH, and other cable operators have publicly opposed the merger. (*Id.*) DIRECTV's Chief Content Officer Rob Thun also attests that "DIRECTV generally must also pay higher retransmission consent fees to the extent the station group controls two or more affiliates of the Big Four networks in one or more DMAs — all other factors being equal," which Dr. Shapiro states supports the conclusion that partial consolidation ownership among Big Four stations in a single DMA leads to higher fees. (ECF No. 14-3 at 16.)

Second, Dr. Shapiro asserts that if Dr. Israel's theory were correct, the hypothetical monopolist test ("HMT") would not be satisfied, but it is. (*Id.*) Under this test — which antitrust economists use to determine whether a collection of products or geographies qualifies as a relevant market — if "a hypothetical monopolist could impose a 'small but significant non-transitory increase in price' ('SSNIP') in the proposed market,'" then it is a properly defined market. (ECF No. 14-1 at 20 (quoting *St. Alphonsus*, 778 F.3d at 784); ECF No. 14-3 at 4.) Dr. Shapiro states the HMT includes reasonable substitutes for products sold by the merging firms in the relevant markets, but not all substitutes. (ECF No. 14-3 at 10 (emphasis omitted).) Applying the HMT to this Transaction, Dr. Shapiro examines a DMA where a single firm controls all Big Four broadcast stations and compares those fees with fees in DMAs where the Big Four broadcast stations are owned by four separate entities. (*Id.* at 14.) According to Dr. Shapiro, the "evidence supports the conclusion that consolidated ownership of all Big Four stations leads to significantly higher" fees, so this passes the HMT and qualifies as a relevant product market. (*Id.* at 15.)

Third, Dr. Shapiro states Dr. Israel's opinions contradict how the U.S. DOJ has repeatedly and consistently analyzed mergers between groups of broadcast stations. (ECF No. 109-10 at 4.) Dr. Shapiro maintains statements contained in DOJ complaints against mergers reflect careful analysis by economists applying the *Merger Guidelines* and tools Dr. Shapiro has applied in this case. (*Id.*) Dr. Shapiro contends that Dr. Israel's theory is premised on two undisputed features

19

of the broadcast industry — the fact that MVPDs pass-through higher retransmission fees to their consumers and the fact that MVPDs normally carry all Big Four broadcast stations. (ECF No. 109-10 at 3.) Both features were present in 2019 and 2021 when U.S. DOJ analyzed broadcast station mergers. (*Id.* at 4–5.) When U.S. DOJ challenged Nexstar's acquisition of Tribune Media in 2019 and Gray Television's acquisition of Quincy Media in 2021, it defined the relevant product markets as Big Four retransmission consent licenses. (ECF No. 14-3 at 14.) U.S. DOJ also explained in these complaints that Big Four broadcast stations are distinct from other programming purchased by MVPDs. (*Id.* at 13.)

The Court finds that the Big Four stations are reasonably interchangeable such that the relevant product is retransmission consent licenses for Big Four broadcasting stations.

II.  *Whether the Product Market Should Include*

*Streaming and Digital Services*

Defendants argue Plaintiffs fail to allege or much less prove why the Court should exclude consideration of numerous modern video alternatives from the product market. (ECF No. 76 at 18.) Defendants contend MVPDs can directly negotiate with Big Four networks for digital streaming content services and with sports leagues for licensed sports content. (*Id.*) Defendants assert Plaintiffs concede viewers switch away from MVPDs to streaming and other digital services and local broadcasting content (including Big Four affiliates) is still free to viewers over the air. (*Id.* at 19.)

The Court finds Plaintiffs' arguments in reply persuasive. DIRECTV argues that if MVPDs could get broadcast content directly from networks as a meaningful substitute, that does not explain why MVPDs have been paying higher prices to broadcasters. (ECF No. 111 at 6.) Plaintiff States assert MVPDs are unable to substitute streaming content for content provided under a retransmission consent agreement and therefore streaming cannot be included in the relevant product market. (ECF No. 109 at 7.) DIRECTV's Chief Content Officer Rob Thun confirms this and attests DIRECTV has no reasonable alternative sources for Big Four broadcast programming. (ECF No. 111-1 at 2.) Mr. Thun explains:

> DIRECTV currently has obtained rights from [companies] to sell their direct-to-consumer ("DTC") products to our subscribers. Some premium versions of these DTC products include local broadcast feeds of the controlling Big Four Network affiliate's broadcast feeds. In all such cases, the networks do so only with the consent of the local affiliates. There are also important limitations imposed on DIRECTV in these arrangements. For example, DIRECTV cannot "ingest" the content carried on DTC services into its own service to distribute to subscribers. Instead, our subscribers must create a separate username and password on the respective DTC app and can only access the content through the DTC app itself — this includes for any Big Four Network content or broadcast feed made available through the DTC app . . . [D]uring any period in which one of [the companies'] network affiliates has ceased transmitting its broadcast stations to DIRECTV (i.e., a blackout of those stations), DIRECTV is prohibited from selling new subscriptions to the related DTC app to its subscribers in the respective affiliate station market(s).

(*Id.* at 2–3.) Mr. Thun states that when DIRECTV distributed Sunday Ticket (which ceased in 2022), it was expressly limited to "out of market" games that do not air on a local broadcast station's DMA and the only way for DIRECTV to get those "in market" games was — and still is — via retransmission consent. (*Id.* at 3.) Further, Mr. Thun attests that "where a broadcaster has refused to consent to DIRECTV's transmission of its stations, it has historically not been possible for DIRECTV to obtain from the Big Four Networks a right to transmit their 'national feed' (*i.e.*, national content included in broadcast stations) as a partial replacement of the local broadcast station." (ECF No. 111-1 ¶ 10.) Mr. Thun also notes "YouTube TV and other vMVPDs do not license broadcast content to other MVPDs or vMPVDs, so they are not substitutes for broadcast licenses."[9] (*Id.* ¶ 13.)

The Court also finds particularly persuasive DIRECTV's argument from the hearing that streaming services cannot be included in the product market because customers do not consider them to be reasonable substitutes — customers cannot get Big Four station content from any streaming services, as they must get this content from MVPDs as a part of their cable packages.

---

[9] The only exception Mr. Thun notes is DIRECTV's recent acquisition of the rights to create and launch vMVPD offerings of "Genre Packs," two of which include Big Four broadcast stations. (ECF No. 111-1 at 3.) Creation of these "Genre Packs" required DIRECTV to obtain approval of Big Four Networks and "opt in" consents from broadcast affiliates, and it appears Nexstar refused to allow content of certain affiliates unless DIRECTV agreed to certain conditions. (*Id.* at 3–4.) As DIRECTV stated at the hearing, it is a narrow exception and only a small segment of its 10 million subscribers get the Genre Pack.

21

DIRECTV also stated at the hearing that on the chance it is lucky enough to obtain such an arrangement from a streaming service, such as Peacock, DIRECTV still cannot integrate Peacock into the DIRECTV service.  Instead, DIRECTV only serves as a sales agent of Peacock, which is not a reasonable substitute.  Finally, the Court also agrees with Plaintiff States that "[t]he live television content available from streaming services like YouTube TV, Hulu+, Sling TV or Fubo is more limited, less consistent, and less localized than the content that is available through an MVPD subscriber's unlimited access to all Big [Four] stations."  (No. 2:26-cv-00978, ECF No. 27-1 at 20.)

In sum, the Court finds the product market should not include streaming and digital services.

b)      Geographic Market

"The relevant geographic market is the 'area of effective competition where buyers can turn for alternate sources of supply.'"  *St. Alphonsus*, 778 F.3d at 784 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.3d 1484, 1490 (9th Cir. 1991)).  In other words, "a market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *Id.*  A plaintiff has the burden to establish the relevant geographic market. *Id.*

Plaintiffs assert the relevant geographic markets are DMAs, which federal law uses to regulate broadcast stations.  (ECF No. 14-1 at 17; No. 2:26-cv-00978, ECF No. 27-1 at 21.)  Plaintiffs note that MVPDs cannot turn to stations outside of a DMA to replace blacked out stations, as FCC regulations, federal law, and network-affiliate agreements largely prohibit MVPDs from distributing broadcast stations outside of the local DMA where that station is licensed.  (ECF No. 14-1 at 19; No. 2:26-cv-00978, ECF No. 27-1 at 21.)  DIRECTV also contends the market for retransmission licenses in each DMA satisfies the hypothetical monopolist test ("HMT"), as "[e]mpirical analysis shows that when a broadcaster controls two Big Four affiliates in a DMA, the price of a retransmission content license is significantly higher on average compared to controlling just one Big Four station."  (ECF No. 14-1 at 20.)  DIRECTV states this price increase is already greater than the 5 percent threshold commonly used as the

22

small but significant non-transitory increase in price ("SSNIP") in the HMT.  (*Id.*)

In opposition, Defendants contest Plaintiffs' definition of the geographic market.  (ECF No. 48 at 17; ECF No. 76 at 19.)  Defendants argue Plaintiff acknowledges broadcast groups and MVPDs negotiate licenses that cover all stations nationwide and have a common price for each similar station covered by the agreements, regardless of location.  (ECF No. 48 at 17.)  Defendants also note that in a separate lawsuit DIRECTV filed against Nexstar, it agreed the relevant market is national, not local.  (ECF No. 76 at 19 (citing *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 23-CV-2221 (S.D.N.Y. 2023)).)  Defendants contend DIRECTV premised its definition in that case on the fact that "not every broadcaster and broadcast station group . . . competes at the national level," but here it does not demonstrate TEGNA competes with Nexstar to license Big Four retransmission rights at a DMA level.  (*Id.* at 19–20.)

In reply, Plaintiffs maintain Defendants' arguments do not undermine their definition of a geographic market because MVPDs cannot turn to other DMAs for alternate sources of supply. (ECF No. 109 at 7; ECF No. 111 at 6.)  DIRECTV asserts Defendants do not dispute that MVPDs cannot turn to stations outside of a DMA to replace blacked out stations nor do Defendants address their prior statements describing DMAs as local markets.  (ECF No. 111 at 6.)  DIRECTV also maintains that it is false DIRECTV "agreed" in a separate lawsuit that the relevant market is national, not local, as DIRECTV alleged both local and national markets in that case.  (*Id.* at 7.)

The Court has reviewed the Complaint filed in *DIRECTV, LLC v. Nexstar Media Group, Inc.*, No. 23-CV-2221 (S.D.N.Y. 2023) and finds DIRECTV's explanation at the hearing of the differences between this case and the Southern District of New York case cited by Defendants to be satisfactory.  DIRECTV explained that in the Southern District of New York case, it alleged two different markets — a national market and a local market in the form of a DMA.  DIRECTV noted this is the exact same way U.S. DOJ has defined the market in merger after merger in this industry.  DIRECTV further clarified that the Southern District of New York case was not a merger case, but rather, a pricing fixing case that alleged a violation of § 1 of the Sherman Act resulting in anti-competitive effects in two markets.

The Court finds persuasive DIRECTV's explanation that the relevant market is where competition is lessened and where buyers can find an alternate source of supply.  The fact that MVPDs cannot turn to stations outside of a DMA to replace blacked out stations is determinative of the geographic market — there are no alternate sources of supply.  As DIRECTV alleges in its Complaint, the U.S. DOJ has explained: "MVPD subscribers in one DMA cannot switch to Big Four programming in another DMA in the face of a blackout.  Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA."  (ECF No. 1 at 20.)  DIRECTV alleges both Nexstar and TEGNA have recognized local DMAs are geographic areas relevant to their broadcast businesses, as Nexstar's filings with the U.S. Securities and Exchange Commission ("SEC") describe DMAs as "markets" and TEGNA claims it owns "64 television stations in 51 U.S. markets," corresponding to 51 DMAs.  (*Id.*)  DIRECTV also notes U.S. DOJ "has defined local markets because retransmissions are limited to local areas: 'FCC rules generally prohibit an MVPD from importing the same network's content from another DMA,' so viewers in one DMA cannot switch to Big [Four] programming in another DMA in the face of a blackout.'"  (ECF No. 56 at 8.)

Defendants do not adequately rebut this argument in their briefing.  Further, when Defendants were asked about this argument at the hearing, they replied that in terms of the broadcast signal that is correct, but in terms of content that is not correct as MVPDs could go to a network or streaming service.  As Plaintiffs have established above and DIRECTV explained at the hearing, MVPDs cannot get content directly from a network 99 percent of the time.  The networks tell DIRECTV to get content from affiliates in the local DMAs.  With respect to streaming, DIRECTV stated that networks provide the same response — DIRECTV has to get the content from the local affiliates.

Based on the foregoing, the Court agrees with Plaintiffs that DMAs are the relevant geographic market.

///

///

ii.    *Whether the Merger Violates the Clayton Act*

The Ninth Circuit has adopted a burden-shifting framework to assess § 7 claims. *St. Alphonsus*, 778 F.3d at 783. Under this framework, "the plaintiff must first establish a prima facie case that a merger is anticompetitive." *Id.* Next, the burden shifts to the defendant to rebut the prima facie case. *Id.* If the defendant successfully rebuts the prima facie case, "the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion[.]" *Id.* The Court will consider each stage of this burden-shifting framework in turn.

a)    *Plaintiffs' Prima Facie Case*

A plaintiff can establish a prima facie case if a plaintiff "proves that the merger will probably lead to anticompetitive effects in that [geographic] market." *Id.* at 785. To prevail, a plaintiff need only demonstrate the merger creates a "reasonable probability of anticompetitive effect." *Federal Trade Comm'n v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984). The Supreme Court has held a merger that would result in "a significant increase in the concentration of firms in that market" establishes a presumption that the merger "*is so inherently likely to lessen competition substantially that it must be enjoined* in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Philadelphia Nat'l Bank*, 374 U.S. at 363 (emphasis added); *Kroger Co.*, 2024 WL 5053016, at *15. "A prima facie case can be established simply by showing high market share." *St. Alphonsus*, 778 F.3d at 785. Courts use two metrics to establish high market share — combined firm market share and the Herfindahl-Hirschman Index ("HHI"). The Court will consider each metric in turn and then evaluate Plaintiffs' arguments on anticompetitive effects.

I.    *Combined Firm Market Share*

The Supreme Court has found that a merger that creates a firm with a combined market share of 30 percent or more is presumed likely to violate antitrust laws. *Philadelphia Nat'l Bank*, 374 U.S. at 364. ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). DIRECTV cites to its attached declaration of Dr. Shapiro, who notes the merger will give Nexstar a 30 percent market share or greater in 31 local markets and, in 16 of these 31 local markets,

Nexstar's post-merger market share exceeds 50 percent.  (ECF No. 14-3 at 23–24.)  Plaintiff States also state the data reflect that the merged firm has a market share of more than 30 percent. (No. 2:26-cv-00978, ECF No. 27-1 at 21.)  Defendants do not provide any substantive opposition to this argument.  (*See* ECF Nos. 48, 76.)  Defendants instead argue this measure is informative "to the extent it is computed using the correct market definition" and as the calculations appear have been made at the DMA level, "they predict nothing."  (ECF No. 76 at 20.)  Accordingly, the merger is presumed likely to violate antitrust laws based on the combined firm market share alone.  *See Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1021 (9th Cir. 2016) (a "prima facie case can be established simply by showing" that such "a high market share would result from the proposed merger").

*II.     Herfindahl-Hirschman Index*

HHI is "calculated by summing the squares of the individual firms' market shares," which "gives proportionally greater weight to the larger market shares."  *St. Alphonsus*, 778 F.3d at 786 (citing *ProMedica Health Sys., Inc. v. Federal Trade Comm'n*, 749 F.3d 559, 568 (6th Cir. 2014); *Federal Trade Comm'n v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001)).  This analysis considers "both the post-merger level of the HHI and the increase in the HHI resulting from the merger."  *Id.*  The U.S. DOJ and Federal Trade Commission ("FTC") *Merger Guidelines* classify markets as (1) unconcentrated (HHI below 1500), (2) moderately concentrated (HHI between 1500 and 2500), and (3) highly concentrated (HHI above 2500).  *Id.*  "Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power.'"  *Id.* (quoting *Merger Guidelines* § 5.3).  "Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive."  *Id.*

Here, Dr. Shapiro notes in his declaration that the merger increases market concentration in each of the 31 overlap markets by more than 1,000 points.  (ECF No. 14-3 at 23–24.)  Dr. Shapiro states: "[T]he combined share of Nexstar and TEGNA ranges from 30.0% to 84.8%.  The post-merger HHIs range from 3,361 to 7,422.  The increase in the HHI ranges from 413 to 3,433. In all 31 overlap markets these metrics are far above the levels that trigger the structural presumption of harm to competition found in the Merger Guidelines."  (*Id.* at 23.)  Similarly,

26

Plaintiff States submit a declaration from Olga Haislip, a Research Data Specialist at the California Department of Justice's Antitrust Law Section, who calculated HHI associated with retransmission consent licenses from the Big Four stations within 13 DMAs where Nexstar and TEGNA own at least one broadcast television station that is a Big Four affiliate. (No. 2:26-cv-00978, ECF No. 27-13 at 2.) Ms. Haislip calculated the pre-merger HHI and post-merger HHI based on retransmission revenue data and television ratings data. (*Id.* at 3.) Ms. Haislip concluded that in each of the 13 Big Four Overlap DMAs, the HHI (based on revenues or ratings) "was well above the thresholds for a market to be considered 'concentrated' or 'highly concentrated' under the 2023 federal Merger Guidelines." (*Id.* at 4.) For both revenue and ratings, the post-merger HHI is well above 1,800 and the HHI increases exceed 100 points. (ECF No. 27-1 at 21–22.)

As Plaintiffs note, "courts have found such mergers unlawful when they increase market concentration by far smaller amounts." (ECF No. 14-1 at 17 (citing *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (HHI increase of approximately 400 points); *H.J. Heinz Co.*, 246 F.3d at 716 (HHI increase of 510 points); *Federal Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022) (HHI increase of 841 points)); No. 2:26-cv-00978, ECF No. 27-1 at 23 (same).)

Again, Defendants do not provide any substantive opposition to this argument. (*See* ECF No. 48.) Defendants repeat the argument that this measure is informative "to the extent it is computed using the correct market definition" and as the calculations appear have been made at the DMA level, "they predict nothing." (ECF No. 76 at 20.)

Accordingly, the merger is presumed likely to violate antitrust laws based on HHI.

### III.     Anti-Competitive Effects

Plaintiffs argue the Transaction will lead to higher prices for DIRECTV and its subscribers and will harm competition for local news, reducing the quality of the content DIRECTV licenses. (ECF No. 14-1 at 21–22.) The Court will consider each of these arguments in turn.

///

First, Plaintiffs argue the Transaction will give Nexstar additional Big Four networks in 31 DMAs in which it already has at least one Big Four network and thereby increase Nexstar's bargaining leverage to impose higher fees.  (*Id.* at 21; No. 2:26-cv-00978, ECF No. 27-1 at 23.) DIRECTV asserts that Nexstar will be able to black out two or three local broadcast channels in 31 DMAs, and such a blackout will be disruptive, affect more of DIRECTV's subscribers, and increase the number of subscribers who switch to another MVPD.  (ECF No. 14-1 at 21.) DIRECTV notes the harm is not theoretical, as Nexstar already has Big Four duopolies and has used blackouts "to secure huge increases in retransmission fees from DIRECTV."  (*Id.* (citing ECF No. 14-2 ¶ 22).)

In opposition, Defendants contend Plaintiffs do not cite to evidence that this increase in retransmission fees is attributable to an increase in Big Four station ownership.[10]  (ECF No. 48 at 18; ECF No. 76 at 21.)  Defendants assert "many MVPD alternatives that have become available to consumers in the last five years" have resulted in "cord-cutting" and created a "downward pressure on retransmission rates."  (ECF No. 48 at 18.)  Defendants argue that from an economic perspective, post-Transaction Nexstar should have more incentive to push down costs, create more value, and drive down costs to MVPDs — in the hope the MVPD will charge less or offer more value to customers — because MVPDs must compete with streaming services and therefore broadcasters also indirectly compete with them.  (ECF No. 76 at 22.)  However, Defendants contend that retransmission fees have increased "commensurate with increases in other competitive providers of content."  (*Id.* at 21.)  Defendants argue the value and prices for video content generally have increased because competition for viewers has intensified with streaming platforms like Amazon and Netflix.  (*Id.*)  Defendants further note the cost to local broadcasters like Nexstar to pay for Big Four and proprietary content has increased, as local affiliate stations

---

[10]   Defendants also argue the "actual or alleged harm to customers and consumers outside the relevant markets are beyond the scope of antitrust law."  (ECF No. 48 at 19 (quoting *Federal Trade Comm'n v. Qualcomm*, 969 F.3d 974, 993 (9th Cir. 2020)).)  When asked about downstream effects in separate markets at the hearing, DIRECTV stated that the four prongs to assess a preliminary injunction includes the public interest.  DIRECTV argued the Court should look at how the public will be hurt and that is why Plaintiff States are in this lawsuit.  The Court agrees and will consider these arguments in its evaluation of the public interest factor.

pay networks a significant portion of retransmission revenue.  (*Id.*)

In reply, DIRECTV argues Defendants have not come close to adducing the "proof of extraordinary efficiencies" that "is required to offset the anticompetitive concerns in highly concentrated markets."[11]  (ECF No. 111 at 7–8 (quoting *Saint Alphonsus*, 778 F.3d at 790–91).)  DIRECTV contends Defendants still cannot dispute that as streaming services and YouTube TV have grown, broadcasters' fees have continued to rise.  (*Id.* at 8.)

As an initial matter, the Court understands Defendants' theory that growth of MVPD alternatives in the last five years creates a downward pressure on retransmission rates to remain economically competitive.  However, the reality tells a different story.  Defendants themselves concede retransmission rates have increased because the price of video content has increased and because Defendants pay networks a portion of retransmission revenue.  As the Court has already found above in its section on Plaintiff States' standing, Plaintiffs provide sufficient evidence to suggest that MVPDs will pass along increased retransmission rates to their subscribers.  (ECF No. 109-1 (citing ECF Nos. 109-6–109-9).)

Nexstar states in its 10K that it has "been able to increase [its] distribution revenue" even though "the number of MVPD subscribers has been declining."  (ECF No. 111-4 (citing https://www.sec.gov/Archives/edgar/data/1142417/000119312526078361/nxst-20251231.htm.)  This statement supports the proposition that Defendants will increase their retransmission rates.  As DIRECTV notes, Nexstar has played down the risk that cord-cutting would make price increases unprofitable, noting that "[v]iewers will continue to subscribe to MVPD/vMVPD services for sports and local news content" and "MVPD churn will moderate and subscriber levels will stabilize."  (ECF No. 111 at 8 (citing ECF No. 14-45 at 30).)  DIRECTV further states Nexstar told investors "Sports Franchises are Committed to Broadcast for the Long-Term" and "nobody else do[es] local news in any material way in our markets except for local broadcast TV."  (*Id.* (quoting ECF No. 14-45 at 26; ECF No. 111-4 at 1).)  DIRECTV also suggested during

---

[11]    As explained further below, a defendant may rebut a prima facie case by establishing a merger "will create a more efficient combined entity and thus increase competition."  *St. Alphonsus*, 778 F.3d at 790.

the hearing that if Defendants can show cost reduction, it should provide evidence of that cost reduction.  No such evidence has been set forth before this Court.

The Court ultimately finds Plaintiffs' arguments persuasive.  As DIRECTV states, courts faced with the § 7 inquiry have found that "a merger would have anticompetitive effects where it would increase the merging parties' bargaining leverage." (ECF No. 14-1 at 21 (citing *St. Alphonsus*, 778 F.3d at 786–87 (affirming the district court finding the entity would use its post-merger bargaining power to negotiate higher rates).)  At the hearing, Defendants contested that this merger will increase Nexstar's bargaining leverage to extract higher fees.  However, the Court finds particularly persuasive DIRECTV's assertion that despite Defendants' claim that the rise of streaming services and "cord-cutting" will create a downward pressure on retransmission rates, Nexstar's CEO Perry Sook recently told investors the opposite: "Historically we've been able to outrun the rate of attrition by those rate increases and deliver positive growth in net retrans growth.  And we think that, again, we'll see a continuation of that trend."  (ECF No. 56 at 6–7 (citing ECF No. 14-47 at 12).)  As Plaintiff States note, these promises to deliver investors "rate increases" and "positive growth in net retrans growth" is evidence the Transaction gives Defendants greater leverage to extract higher fees in retransmission negotiations with MVPDs. (ECF No. 109 at 8.)  Further, Dr. Shapiro finds that as streaming services and YouTubeTV have grown, broadcasters' fees have continued to rise.  Dr. Shapiro states:

> In particular, Big Four Retransmission Fees have risen sharply even as streaming services have become far more popular [in] recent years.  In 2019, the average Retransmission Fee paid by an MVPD for all Big Four stations together was \$9.64 PSPM[12].  By 2025, it had grown to \$19.30 PSPM.  Thus, the average annual growth rate in PSPM Retransmission Fees that MVPDs paid for the Big Four stations over the six-year period between 2019 and 2025 was more than 12%.  During this same period of time, the average annual growth rate of the Consumer Price Index was only 4.0%.

(ECF No. 14-3 at 19 (citations omitted).)  Defendants confirmed Dr. Shapiro's statement that fees have continued to rise as streaming services have grown.  When asked about this increase in fees at the hearing, Defendants argued the value and cost of content has gone up and, as a result, rates

---

[12]    Dr. Shapiro notes that PSPM is a "per-subscriber, per-month" fee the MVPD pays to the owner of a broadcast station.  (ECF No. 14-3 at 7.)

have gone up over time.[13]  Defendants provided the example of Amazon receiving the rights to Thursday Night Football (for which Amazon paid a considerable sum) and explained that this has increased prices for them.

Second, Plaintiffs argues the Transaction will reduce the output, variety, and quality of local broadcast news that is licensed.  (ECF No. 14-1 at 22; ECF No. 109 at 8.)  In opposition, Defendants assert this is a "speculative claim" that is "unsupported and irrelevant," as the FCC Order commits Nexstar to expanding local journalism and programming as it has done after prior deals.  (ECF No. 48 at 7.)  Defendants contend common ownership of stations has been shown to correlate to increased news output with lower costs and increased quality, as numerous empirical studies by multiple economists have found a "positive and statistically significant relationship between revenue and local news production."[14]  (ECF No. 76 at 23.)  In reply, DIRECTV maintains Defendants have no evidence that shutting local newsroom across the country, including in Sacramento, will lead to more award-winning stories like KCRA3's coverage of school shootings or ABC10's investigation into charter schools.  (ECF No. 111 at 8–9.) DIRECTV asserts that to the contrary, studies have found duopoly ownership had a significantly negative relationship with the amount of local news programming and consolidation lowers news quality.[15]  (*Id.* at 9.)  At the hearing, Defendants argued that Nexstar has increased the number of

---

[13]    Defendants argue Plaintiffs measure the rise in fees from a $0 starting point.  (ECF No. 76 at 21.)  Defendants also noted at the hearing that for many years there was no compensation paid to local broadcasters by MVPDs and that changed in 2005, so with that as the baseline it is going to accentuate the percentage change over time significantly.  The Court is not persuaded, however, that this distorts the increase in fees from 2019 to 2025.

[14]    Defendants cite to J.A. Eisenach and K.W. Caves, The Effects of Regulation on Economies of Scale and Scope in TV Broadcasting, at 4, 45–46 and Table 8 (2011) ("Eisenach Study").  Defendants do not provide this document, but the Court notes it is available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1894941.  Defendants also cite to "Decl. of M. Israel and A. Shampine, Comments of NAB, MB Docket No. 10-71, at Appendix B ¶¶ 49–51 (June 26, 2014)" (ECF No. 76 at 23 n.27) to support this proposition, but do not cite to any document in the record.  Without the ability to readily locate this document, the Court does not consider it.

[15]    During the hearing, DIRECTV also cited to exhibits to demonstrate that, in a Nexstar-owned duopoly in Arkansas, the news anchors photos bear both the NBC and FOX logos because they are the anchors on both stations.  (*See* ECF No. 14-15 at 23.)  DIRECTV further argued that

hours per year of local news, local lifestyle programming, and local political programming since 2019, and the quality of news is extremely high, as one of its stations won the Walter Cronkite Award last year.

The parties submitted studies in support of their respective arguments.  Defendants cite to the declaration of Dr. Israel for the proposition that "greater efficiency in news operations should be expected to both lower costs and increase quality and investment." (ECF No. 76 at 23 (quoting ECF No. 48-9 ¶ 60).)  Dr. Israel explains further:

> The consolidation of two news operations into one in the same DMA may allow the broadcaster to reach both stations' audience at lower cost.  These cost reductions would increase the marginal impact of every dollar invested into local news, as any increases in news programming or improvements in news quality will reach a broader audience (the combined audience of both stations).  With greater return on every dollar invested in news, the incentive to invest goes up.  Put simply, greater efficiency in news operations should be expected to both lower costs and increase quality and investment.

(ECF No. 48-9 ¶ 60 (emphasis omitted).)  To further support Dr. Israel's theory, Defendants cite to the Eisenach Study, which states "the empirical literature provides substantial evidence that an increase in the scale of operations is associated with increased news programming" and most of these studies "find at least some evidence of a positive and statistically significant relationship between revenue and local news production."[16]  Eisenach Study at 45–46.  Applying Dr. Israel's — and Defendants' — theory to this study, because there is an increase in revenue and local news production, there should be an increase in quality of the news.  But the Eisenach Study does not state an increase in news programming is associated with an increase in the *quality* of news programming.[17]  Nor do Defendants cite to such a study for this proposition.

Nexstar's motivation for this merger is to have one infrastructure for two stations in 31 new duopolies—which will eliminate competition for investigative reporters to find a great story and mean less news DIRECTV can offer its subscribers.

[16]    The study includes a footnote at the end of this sentence, stating: "The evidence with respect to 'duopoly' status is less conclusive: Of the seven studies that consider this effect, two find evidence of a positive and statistically significant effect, three find no evidence of such an effect, and two report contradictory results." *Id.* at 46.  The study notes that "[b]ecause of these less conclusive results, further research on this issue may be useful." *Id.*

[17]    In the Appendix, the Eisenach Study discusses the quality of news programming in the

For its part, DIRECTV cites to studies for the proposition that "duopoly ownership ha[s] a significantly negative relationship with the amount of local news programming" and consolidation lowers local news quality.  (ECF No. 111 at 9 (citing ECF No. 111-4 at 2).)[18] Indeed, the Yan Study states "duopoly ownership had a significantly negative relationship with the amount of local news programming, suggesting that co-owned stations actually perform worse than other stations in the provision of local news."  Yan Study at 10.  The Yanich Study, which the Court finds most persuasive, examined whether ownership/control affected news content and defined "affect" as "the exact duplication of text."[19]  Yanich Study at 28.  The Yanich Study found "[j]ust four station groups [Nexstar, Gray, News-Press, and Gazette and Sinclair] controlled

context of cross-ownership.  The study states researchers "have examined the relationship between local programming output by broadcast stations, particularly local news programming, and the scope of operations" and a key finding from this research is that "common ownership of newspapers and television stations is positively and significantly related to local news output" and research "has also found a relationship between newspaper/television cross-ownership and various metrics for programming quality," which the study does not discuss.  Eisenach at A-1–A-2.  The Eisenach study also notes another study was completed examining the performances of broadcast stations (on quality and quantity metrics) co-owned by newspapers with other affiliates. *Id.* at A-3.  Neither study states an increase in news programming is associated with an increase in the quality of news programming, which is the relevant question before the Court.

[18]     These studies are: (1) "Newspaper/Television Cross-Ownership and Local News and Public Affairs Programming on Television Stations: An Empirical Analysis," by Michael Yan, published by DONALD MCGANNON COMMUNICATION RESEARCH CENTER AT FORDHAM UNIVERSITY (2006), available at https://research.library.fordham.edu/cgi/viewcontent.cgi?article=1020&context=mcgannon_working_papers ("Yan Study"); (2) "Inspecting the Investigators: An Analysis of Television Investigative Journalism and Factors Leading to Its Production," by Jesse Abdenour, published in the JOURNALISM & MASS COMMUNICATION QUARTERLY (2018, Vol. 95(4)), available at https://journals.sagepub.com/doi/abs/10.1177/1077699017733438 ("Abdenour Study"); (3) "Local TV News and the New Media Landscape," by Debora Wenger et al., published by KNIGHT FOUNDATION (2018), available at https://legacy.knightfoundation.org/wpcontent/uploads/2020/03/TVNews_bundle-v5.pdf ("Wenger Study"); and (4) "Reusing the News: Duplication of Local Content," by Danilo Yanich et al., published by SNF ITHACA RESEARCH REPORT (2025), available at https://udspace.udel.edu/items/4e6b586b-a07e-41fb-b516-4938aa55d180 ("Yanich Study"). (ECF No. 111-4 at 2.)

[19]     The Court notes for the record that Defendants stated during the hearing that this study looked to similar words used and does not necessarily mean there is an issue as to duplication of news.  After reviewing this study, the Court disagrees with Defendants.

over half (54%) of the duplicating station pairs" and "Nexstar was the most active controller of duplicating station pairs" and was "responsible for controlling [22%] of the pairs."[20]  *Id.* at 4, 39. Among the Nexstar pairs, the study found 24% of Nexstar-owned station pairs exhibited duplication and 53% of Nexstar's Service-Agreement-controlled[21] station pairs exhibited duplication. *Id.* at 30.  The Yanich Study concluded:

> Text reuse — the duplication of the exact same material across news broadcasts — is a direct and unambiguous form of the achievement of economies of scale.  The station group bears the cost of production of the story once and sells it to advertisers multiple times.  It has all the hallmarks of a public good — its consumption by one consumer does not diminish its supply for another.  As fewer station groups control more of the local television ecosystem, accomplishing that duplication becomes easier . . .

> [Local news business] matters because our world is mediated.  The narrative that the media constructs about society is crucial to how we engage with it . . . The news matters because it is the "hard-wiring" of our democracy.  That is particularly true in local places, and when it is diminished or absent altogether, the effect is immediate and consequential . . .

> As media firms use their stations to simply duplicate content, whether in the same market or another market, the opportunities for local journalism decrease.  That is an inescapable certainty because the news selection process is a zero-sum game.  If one story is in, then another story is out.  Duplication is based on economies of scale, not the public information needs of citizens.

*Id.* at 66, 68–69 (citations omitted).  The Yanich Study provides compelling evidence that the economies of scale leads to duplication — with Nexstar specifically — and overall lowers the opportunities for local journalism.  This directly affects the quality of local news programming.

Even setting the studies aside, as the Court stated in the TRO, DIRECTV cites to Nexstar's CFO's statement in which he told investors "the synergy playbook [in the TEGNA transaction] is really the same" as Nexstar's past deals and that where Nexstar and TEGNA

---

[20]    The Yanich Study also states Nexstar was a "clearly dominant actor," as it "controlled the highest proportion of stations . . . for a station group, over three times as many stations as the fifth station group (E.W. Scripps) . . . and more than twice as many as [TEGNA]." *Id.* at 27.

[21]    The Yanich Study notes that stations can be connected through service agreements, where "stations with different owners have an arrangement in which the brokering station has effective control over a brokered station." *Id.* at 11.

stations "overlap" is "where we can really operate 2 stations off of [] 1 infrastructure."  (ECF No. 14-1 at 23 (quoting ECF No. 14-52 at 7; ECF No. 14-47 at 7).)  The Nexstar CFO also pointed to "facility consolidation" and noted that where TEGNA owns their station and Nexstar owns its station, "we can move these groups together and then execute on the sale of 1 of the properties[.]"  (ECF No. 14-47 at 8.)  Defendants also do not contest DIRECTV's assertion that in the 16 DMAs in which Nexstar or TEGNA has a Big Four duopoly or triopoly, they appoint a single news director to oversee a single newsroom and use the same on-air talent for all Big Four channels they own in the DMA.  (ECF No. 14-1 at 23.)  The Statement of FCC Commissioner Anna M. Gomez in consideration of the Nexstar-TEGNA merger is also telling.  Commissioner Gomez notes: "The claim that media consolidation will lead to more local news is belied by history as submitted by DirecTV in the record of this proceeding.  In short, history shows that media consolidation leads to commonly owned stations sharing common news website[s] and content, common news leadership, and common news talent."  (ECF No. 56-3 at 5 (internal citations and quotations omitted).)

Finally, Plaintiff States provide a declaration from Jon Schleuss, the President of The NewsGuild-Communication Workers of America ("TNG-CWA") who contends that consolidation leads to lower quality news:

> In my role as President of TNG-CWA, I represent workers in the news industry who have seen the effects of consolidation in their workplaces.  Our members have seen that companies' claims about economies of scale do not play out on the ground to create a better local news ecosystem.  On the contrary, consolidation results in downsizing and fewer journalists doing the work of reporting the news.  Our members see the quality of news suffer due to these job losses and fewer stories get covered because there are not enough staff.

(ECF No. 109-11 at 2.)  Plaintiff States also provide a declaration from Jessica Gonzalez, the co-CEO of the advocacy group Free Press, who states the Transaction will "significantly reduce the quality and amount of local news, eliminate diverse viewpoints, and reduce Nexstar's incentive to invest in robust coverage of local political, social, and cultural issues."  (ECF No. 109-12 at 2.)

In sum, the Court finds Plaintiffs have demonstrated a prima facie case that the merger creates a "reasonable probability of anticompetitive effect."  *See Warner Commc'ns Inc.*, 742

F.2d at 1160.

b)   <em>Defendants' Rebuttal</em>

After a plaintiff establishes its prima facie case, "[t]he burden then shifts to the defendants to rebut the presumption." *Kroger Co.*, 2024 WL 5053016, at *2.  "The more compelling the prima facie case, the more evidence the defendant[s] must present to rebut it successfully." *Id.* (internal citation omitted).  "Defendants 'may rebut that presumption by showing that the traditional economic theories of the competitive effects of market concentration are not an accurate indicator of the merger's probable effect on competition or that the procompetitive effects of the merger are likely to outweigh any potential anticompetitive effects." *Id.* at *20 (quoting *Sysco Corp.*, 113 F. Supp. 3d at 72).  The Ninth Circuit has stated "a defendant can rebut a prima facie case with evidence that the proposed merger will create a more efficient combined entity and thus increase competition" — known as the "efficiencies defense" — but the status of this defense "remains uncertain" in the Ninth Circuit. *St. Alphonsus*, 778 F.3d at 789–90.  The Ninth Circuit also noted the efficiencies defense must demonstrate the prima facie case "portray[s] inaccurately the merger's probable effects on competition." *Id.* at 790 (quoting *Am. Stores*, 872 F.2d at 842).

In their briefing and at the hearing, Defendants argued the product and geographic markets defined by Plaintiffs are inaccurate.  However, the Court has already addressed and dismissed these arguments.  Defendants also advance several new arguments on rebuttal without arguing any concrete theory.[22]  (ECF No. 76 at 14.)  Instead, Defendants provide a list of rebuttal evidence, which the Court addresses below.  The Court will summarize each in turn, although many of these arguments have been addressed above.

First, Defendants argue MVPDs "must" license all Big Four stations in a DMA, thus, the stations are complements rather than substitutes.  (*Id.*)  As the Court addressed this argument above, Defendants do not supply evidence to support the proposition that DIRECTV and other MVPDs must carry all Big Four stations in a given DMA.  Defendants aim to turn an ideal

---

[22]   The Court declines to address any arguments on rebuttal evidence that it already addressed in the TRO and incorporates that analysis herein.  (ECF No. 60 at 16.)

circumstance into a mandate, but do not proffer any evidence to support this claim.  Thus, this argument does not rebut the established prima facie case.

Second, Defendants assert DIRECTV offers products that do not include any Big Four stations in a DMA because DIRECTV acquires network content directly from the network.  (*Id.*) Defendants also assert MVPDs can and do negotiate directly with Big Four networks to carry those networks' content via DTC products.  (*Id.*)  As the Court already stated above, DIRECTV's Chief Content Officer Rob Thun attests DIRECTV does not have any reasonable alternative sources to obtain Big Four broadcast content other than from broadcasters like Nexstar.  (ECF No. 111-1 at 2.)  With respect to DTC products, Mr. Thun attests that Big Four networks only provide such content with the consent of local affiliates and there are many limitations placed on DIRECTV in these arrangements.  (*Id.* at 2–3.)

Third, Defendants note MVPDs and Big Four station owners negotiate retransmission consent terms across the owners and MVPDs' entire footprints rather than by station or DMA. (ECF No. 76 at 14.)  The Court has already found the proper definition of the geographic market to be DMAs and the companies' entire "footprints" do not alter this Court's findings.

Fourth, Defendants make several assertions with respect to retransmission consent agreements.  Defendants note: retransmission consent agreements between MVPDs and Big Four station owners generally last three years or longer and are renegotiated at different intervals; DIRECTV and other MVPDs can extend their preexisting retransmission consent terms for TEGNA and Nexstar Big Four stations through November 30, 2026; other MVPDs' contracts were renegotiated in the past year and will not expire for multiple years, and Nexstar's agreements covering 70% of its subscribers nationally do not begin to expire until 2027; and MVPDs and broadcasters both lose revenue when there is a blackout or price increase that causes subscriber attrition.  (*Id.*)  To the extent Defendants are reiterating its arguments regarding irreparable harm and how "Plaintiffs would be in the same position with respect to those fees for most of this year" (ECF No. 76 at 15), the Court will address these arguments in the irreparable harm section of this Order.

///

Fifth, Defendants state consumers switch between MVPD subscriptions and digital subscriptions.  To the extent that Defendants are suggesting digital streaming services should be included in the relevant product market, the Court has already explained above why they are not included.

Sixth, Defendants assert the increased scale of the company after the merger will make it more efficient and they have no incentive to degrade the quality or output of their stations' local news.  (*Id.*)  Whether Defendants have such an incentive or not, as the Court already noted above, Plaintiffs adequately establish the economies of scale leads to consolidation and overall lowers the opportunities for local journalism, which directly affects the quality of local news programming.

Seventh, Defendants argue they are obligated under the FCC Order to increase the quality and output of their stations' local news, provide TEGNA stations access to Nexstar's Washington, D.C. news bureau, and provide TEGNA with new infrastructure.  (*Id.*)  However, as the Court stated in the TRO, the FCC was "not given the power to decide antitrust issues" and FCC action "was not intended to prevent enforcement of the antitrust laws in federal courts."  *United States v. Radio Corp. of Am.*, 358 U.S. 334, 346 (1959).  Nexstar's commitments to the FCC are not relevant to whether the merger is unlawful.

Based on the foregoing, the Court finds Defendants' rebuttal evidence is insufficient to overcome Plaintiffs' prima facie case.  Plaintiffs establish "a reasonable probability of anticompetitive effect" in the market.  *See Warner Commc'ns Inc.*, 742 F.2d at 1160.  Plaintiffs further sufficiently establish their prima facie cases "by showing high market share."  *See St. Alphonsus*, 778 F.3d at 785.  Accordingly, Plaintiffs establish a likelihood of success on the merits of their § 7 claims.

C.    Irreparable Harm

Plaintiffs argue that because they have established the merger will substantially lessen competition, they demonstrate irreparable harm for injunctive relief.  (ECF No. 14-1 at 24 (citing *Boardman*, 822 F.3d at 1023; *California v. Am. Stores Co.*, 872 F.2d 837, 844 (9th Cir. 1989); No. 2:26-cv-00978, ECF No. 27-1 at 24 (citing *Boardman*, 822 F.3d at 1023; *United States v.*

*BNS Inc. et al.*, 858 F.2d 456, 464–66 (9th Cir. 1988)); ECF No. 109 at 4.)

In opposition, Defendants argue that for Plaintiffs to obtain injunctive relief under § 16 of the Clayton Act, they "must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." (ECF No. 76 at 15.) Defendants cite to *DeMartini v. Microsoft Corp.*, No. 22-cv-8891-JSC, 2023 WL 3569993, at *4 (N.D. Cal. May 19, 2023), where the court stated that the Ninth Circuit in *Boardman* "did not hold that a threat of irreparable harm, even if not immediate, is sufficient." (*Id.*) Defendants explained during the hearing that the court in *DeMartini* stated mere allegations are insufficient, as the harm must be immediate and Plaintiffs must show how their lives are different the day after the merger versus the day before. Defendants also contend that because divestiture remains available after a trial on the merits, the alleged harm is not irreparable. (*Id.* at 16.)

In reply, DIRECTV maintains a "plaintiff's injury could be immediate" where "the merger, or particular aspects of the merger, could not be undone." (ECF No. 111 at 10 (citing *DeMartini*, 2023 WL 3569993, at *4).) DIRECTV notes Defendants admit they will immediately integrate TEGNA, which will make it harder to divest TEGNA stations, and this also establishes imminent, irreparable harm. (*Id.*)

The Ninth Circuit has held "[a] lessening of competition constitutes an irreparable injury under [its] case law." *Boardman*, 822 F.3d at 1023. Because Plaintiffs establish the Nexstar-TEGNA merger will substantially lessen competition in markets in which it participates, they have shown irreparable harm for injunctive relief. As set forth in the likelihood of success on the merits section above, there is sufficient evidence in the record — beyond mere allegations —  to support Plaintiffs' § 7 Clayton Act claims. The Court finds allowing further integration of Nexstar and TEGNA constitutes immediate, irreparable harm[23] and disagrees with Defendants that divestiture will remain a viable remedy after a trial on the merits, if the companies integrate.

---

[23]    Defendants requested during the hearing that Plaintiffs' remedy should be tailored to the local DMAs only and noted integration at the corporate level is not material for purposes of divestiture down the road. However, as the Court already found in the TRO, Defendants' integration efforts and failure to maintain TEGNA as an independent entity would put any possible divesture remedy at risk.

39

(ECF No. 76 at 16.)  The Court agrees with Plaintiffs that Defendants' integration efforts are exactly those that would make it more difficult to divest TEGNA as a competitive entity and will result in newsroom layoffs and shutdowns.  (See ECF No. 56 at 10; ECF No. 109 at 8.)

The Court does not find persuasive Defendants' argument that Plaintiffs would be in the same position with respect to fees "the day after the merger . . . [as] before the merger."  (ECF No. 76 at 15 (quoting *DeMartini*, 2023 WL 3569993, at *3).)  As Plaintiff States maintained at the hearing, price increases could occur at the end of the year before a trial on the merits.  As DIRECTV also stated, before December 1, 2026, it must begin its negotiations with Nexstar and such negotiations will not happen on the date of the deadline, they start months before. DIRECTV argued it now must negotiate with an entity with new duopolies and triopolies and a trial is unlikely to proceed before these negotiations start.  The Court agrees.

Further, the Court notes Plaintiffs' injury is immediate, as "the merger, or particular aspects of the merger, [cannot] be undone."  *DeMartini*, 2023 WL 3569993, at *4.  Defendants argued at the hearing that integration is not the same as irreparable harm, as there are number of cases where private plaintiffs have challenged already-consummated deals and obtained divestiture, such as *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 19-1397, 2021 WL 630521 (4th Cir. Feb. 18, 2021).  This argument misses the mark.  The Court agrees with DIRECTV that *Steves & Sons, Inc.* is factually different from the instant matter.  As DIRECTV explained at the hearing, in *Steves & Sons, Inc.*, the asset for divestiture was a manufacturing plant where all the employees were still employed and the factory maintained their own systems during litigation. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 631, 661 (E.D. Va. 2018), *affirmed in part, vacated in part*, No. 19-1397, 2021 WL 630521 (4th Cir. Feb. 18, 2021) (noting that although JELD-WEN and CMI were supposed to developed an integration plan following the merger, the accounting systems for Towanda and JELD-WEN's "legacy plants" remained separate and "when JELD-WEN bought CMI, the Towanda management and employees came along with the facility").  Here, this is not the case.  (*See* ECF No. 63 at 2 (Defendants' Notice of Compliance with the TRO (redacted)).)  Further, as Plaintiff States allege in their Complaint, Nexstar has an established track record of consolidating newsrooms when it owns more than one

40

station in a DMA, meaning it reduces the independent news operations from two to one. (No. 2:26-cv-00978, ECF No. 1-2 at 22–23.) The Court has no reason to believe Nexstar will deviate from its historical pattern of newsroom consolidation and viewers in the Big Four Overlap DMAs will lose options for where to get their local news. (*Id.* at 24.) Defendants have not disputed these allegations throughout the proceedings.

Plaintiffs each advance further separate arguments as to irreparable harm as well.

i.    *DIRECTV*

DIRECTV argues absent a hold-separate order, Nexstar will fully absorb TEGNA and eliminate the companies' head-to-head competition in the 31 overlap markets. (ECF No. 14-1 at 25.) DIRECTV asserts it will suffer irreparable harm from significantly diminished bargaining power vis-à-vis Nexstar in retransmission consent negotiations. (*Id.*) DIRECTV contends it will soon find itself negotiating for access to highly sought-after content, including Big Four sports and local news broadcasts, with a merged firm that intends to threaten blackouts, doubling or even tripling their present danger. (*Id.*)

In opposition, Defendants argue DIRECTV cannot establish immediate, irreparable harm because: (1) strictly monetary harm is not irreparable; (2) no alleged fee increases are imminent; and (3) DIRECTV's theory that Nexstar will use increased "leverage" to raise rates is speculative. (ECF No. 48 at 13–16; ECF No. 76 at 15.)

The Court does not find Defendants' arguments persuasive. As the Court sets forth in this Order, harm in this case extends beyond monetary harm. Further, as established above, the Transaction increases Defendants' bargaining leverage. This necessarily means DIRECTV has reduced bargaining leverage, which is not merely "speculative." Although DIRECTV does not demonstrate Nexstar *will in fact* raise retransmission fees, DIRECTV sets forth sufficient evidence to show Nexstar's intention is to increase its bargaining power leverage. Owners of broadcast stations like Nexstar and TEGNA negotiate with MVPDs like DIRECTV to sell retransmission consent licenses for Big Four broadcast stations. Presumably, the bargaining power leverage is related to its ability to conduct business with MVPDs like DIRECTV — and ultimately, to raise rates.

Finally, the Court agrees with DIRECTV that it will suffer irreparable harm in the form of losing customer goodwill it has spent decades establishing, as DIRECTV will ultimately be forced to raise its prices when Nexstar blacks out broadcasts, and such a loss in revenue from losing subscribers is difficult to measure with the precision monetary damages require.  (ECF No. 14-1 at 26; ECF No. 111 at 9); *see Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").  At the hearing, while Nexstar stated that it also suffers harm during blackouts and has no incentive to engage in them, it did not refute DIRECTV's assertion that it does engage in blackouts.

ii.      *Plaintiff States*

Plaintiff States assert the Transaction eliminates competition between Nexstar and TEGNA in the licensing of Big Four station content to MVPDs for distribution to their subscribers, creates duopolies, and gives the new company unprecedented national and DMA-level reach.  (No. 2:26-cv-00978, ECF No. 27-1 at 24–25.)  Plaintiff States also assert the Transaction will likely lead to retransmission consent fee increases that will be passed onto consumers and the Transaction will lead to consolidation of local news operations in Big Four Overlap DMAs, impacting news content and jobs.  (*Id.* at 25.)

In opposition, Defendants argue Plaintiff States' theory of harm is speculative because they offer no facts to support the claim the higher retransmission fees will be passed onto consumers and it ignores the fact that DIRECTV, not Nexstar, decides what to charge consumers.  (No. 2:26-cv-00978, ECF No. 73 at 12; ECF No. 76 at 25.)  Defendants note the FCC reviewed these concerns and rejected this argument.  (No. 2:26-cv-00978, ECF No. 73 at 12–13.)  Defendants argue it does not make sense that Nexstar would degrade is own product in a competitive media environment.  (*Id.* at 13.)

As the Court has already stated above, Plaintiff States provide ample evidence that MVPDs will pass along higher retransmission fees to consumers.  (ECF No. 109-1 (citing ECF Nos. 109-6–109-9); No. 2:26-cv-00978, ECF No. 27-3 ¶ 2 ("DIRECTV generally will pay more to a station group in retransmission consent fees to the extent they control two or more affiliates

42

of the Big Four networks"), ECF No. 27-12 ¶ 2 (increases in retransmission consent fees are passed through to subscribers).)  Plaintiff States also cite to a declaration from Jon Schleuss (as detailed above), who warns that the Transaction will decrease the quality of news coverage and reduce employment.  (ECF No. 109-11 at 1.)

Based on the foregoing, the Court finds Plaintiffs sufficiently establish irreparable harm in the absence of injunctive relief.

### D.    Public Interest

DIRECTV asserts that "[b]y enacting [§] 7, Congress declared that the preservation of competition is always in the public interest."  (ECF No. 14-1 at 26 (quoting *United States v. Tribune Publ'g Co.*, No. CV 16-01822-AB (PJWx), 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016)).  DIRECTV maintains that because the Transaction is likely to result in significant anticompetitive effects in local markets across the country and "the public interest in preserving the possibility of a successful divestiture is quite strong," the public interest sharply favors an injunction.  (*Id.* at 27 (quoting *United States v. Acorn Eng'g Co.*, No. C 80-3388 TEH, 1981 WL 2112, at *3 (N.D. Cal. June 18, 1981)).)

Similarly, Plaintiff States argue there is a public interest in enforcement of antitrust laws and in ensuring effective relief remains available if Plaintiffs succeed in adjudication on the merits of their Clayton Act claim.  (No. 2:26-cv-00978, ECF No. 27-1 at 26.)  Plaintiff States note that without this Court's intervention, Defendants could proceed with integration that gives Nexstar "outsized power in retransmission fee negotiations and operational consolidation, including the abolition of separate news operations in overlap DMAs."  (*Id.* at 27.)  Plaintiff States maintain such changes would be difficult to reverse and would alter competitive conditions before the Court has an opportunity to adjudicate the merits.  (*Id.*)

Defendants make the same arguments with respect to DIRECTV's and Plaintiff States' motion in opposition.  In opposition, Defendants argue an injunction would harm the public interest as follows: it would create a conflict with the FCC Order that requires Nexstar to expand and increase its investment in local news; deprive Nexstar's communities of the benefits the FCC found to be in the public interest because it will be less able to invest in local programming and

43

local coverage that benefits viewers; and undermine congressional intent because the FCC, in its role as a regulator, has already cleared the Transaction.[24]  (ECF No. 48 at 21–23; ECF No. 76 at 24; No. 2:26-cv-00978, ECF No. 73 at 18–20.)  Defendants also argued at the hearing that the Court should consider Defendants' commitments to the FCC because the FCC is an antitrust enforcer and the deal cleared after several months of review and public comment.  According to Defendants, as the FCC has conducted "independent regulatory review, courts 'treat [its] views and actions as persuasive and helpful evidence in analyzing the competitive effect of [a] merger."  (ECF No. 76 at 25 (quoting *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225 (S.D.N.Y. 2020)).)

Setting aside the unusual FCC clearance process here, the Court does not find Defendants' arguments persuasive.  Defendants do not cite to any authority for the proposition that the FCC Order is binding on this Court, especially where it has found that the merger is likely to violate § 7 of the Clayton Act.  Defendants do not adequately explain why a hold-separate order would prevent Nexstar or TEGNA from expanding and increasing its investment in local news or prevent it from investing in local programming and local coverage.  Further, congressional intent will not be undermined simply because the FCC has cleared this transaction.  As DIRECTV correctly states, the FCC was "not given the power to decide antitrust issues" and FCC action "was not intended to prevent enforcement of the antitrust laws in federal courts."  (ECF No. 56 at 8); *United States v. Radio Corp. of Am.*, 358 U.S. 334, 346 (1959).  A court order to enforce antitrust laws, therefore, would not undermine congressional intent in regulation of the broadcast industry.  As Plaintiff States note, "[a] few agencies have the power to insulate mergers from antitrust suits, *see* 15 U.S.C. § 18; the FCC is not among them."  (No. 2:26-cv-00978, ECF No. 81 at 5 (quoting *S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, 191 F.3d 842, 844 (7th Cir. 1999)).)  The Supreme Court has also noted that private enforcement of the Clayton Act "was in no sense an afterthought; it was an integral part of the congressional plan for protecting

---

[24]  Defendants also contend granting a preliminary injunction would contradict existing case law.  (ECF No. 76 at 24.)  However, because Defendants do not develop this argument substantively or actually cite to case law, the Court declines to consider this argument.

competition." *California v. Am. Stores Co.*, 495 U.S. 271 284 (1990).

The Ninth Circuit has found "the central purpose of the antitrust laws, state and federal, is to preserve competition" and "[i]t is competition . . . that [the antitrust laws] recognize as vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *see also Boardman*, 822 F.3d at 1023–24 (affirming district court injunction was in the public interest where merger "could substantially lessen competition"). Plaintiffs adequately establish that the quality of local news will diminish and MVPDs will pass on higher retransmission consent fees to their consumers, which means higher bills for consumers. The Court agrees with Plaintiff States that this constitutes harm to the public. (ECF No. 111 at 10.) Ultimately, because Plaintiffs raise a likelihood of success on the merits of their § 7 claims and establish irreparable harm absent an injunction, the Court finds the public interest favors a hold-separate order.

### E. Balance of Equities

A court balancing the equities will look to possible harm that could befall either party. *See CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

DIRECTV asserts the injunction seeks to preserve the status quo and ensure efficacy of any divestiture remedy by requiring Nexstar and TEGNA to continue to compete while the Court evaluates the merger. (ECF No. 14-1 at 27.) DIRECTV maintains private benefits to Nexstar are "easily outweighed" by the irreparable harm to Plaintiff and the public interest in maintaining robust competition. (*Id.*) Plaintiff States make the same arguments with respect to the public interest and balance of equities elements.[25] (No. 2:26-cv-00978, ECF No. 27-1 at 26–27.)

In opposition, Defendants argue the balance of equities favors Nexstar because injunctive relief would "impose significant burden" in the form of irreparable operational, financial, and competitive harm if it were forced to hold TEGNA separate. (ECF No. 48 at 23.) Defendants contend a hold-separate order would prevent Nexstar from effectuating plans designed to result in

---

[25] As to the final two *Winter* factors, "[w]hen the government is a party, the analysis of the balance of the hardships and the public interest merge." *Nat'l Urban League v. Ross*, 484 F. Supp. 3d 802, 807 (N.D. Cal. 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

cost savings and efficiencies, impede coordination on key business functions, create uncertainty regarding the company's operations and strategic direction, and force the company not to implement its commitments under the FCC Order.  (ECF No. 48 at 24; ECF No. 76 at 24.)

In reply, Plaintiff States and DIRECTV maintain the "claimed 'efficiencies' are merely anticompetitive output reductions" that reflect the irreparable harm to competition resulting from Defendants' merger.  (ECF No. 109 at 8; *see also* ECF No. 111 at 11.)  Plaintiff States also contend any purported benefit to news programming is outweighed by this competitive harm, including local newsroom consolidation.  (ECF No. 109 at 9.)

Here, the Court agrees with Plaintiffs that Defendants' integration efforts are exactly those that would make it more difficult to divest TEGNA stations, as they will eliminate competition and result in newsroom layoffs and shutdowns.  (*See* ECF No. 56 at 10; ECF No. 109 at 8.)  The Court also notes Plaintiffs filed the instant suits prior to Defendants' consummation of the Transaction.  Accordingly, Defendants could have waited seven days to complete the acquisition or begin integration efforts until after this Court ruled on Plaintiffs' motions for TRO.  Therefore, especially in light of the fact that Plaintiffs raise a likelihood of success on the merits of their § 7 claims and establish an injunction is in the public interest, the Court agrees with Plaintiffs that the private benefits Nexstar could obtain by acquiring TEGNA are outweighed by the harm to Plaintiffs.  (ECF No. 14-1 at 27.)  Finally, Plaintiffs also note that Nexstar is not unfamiliar with hold-separate orders, as Nexstar agreed to hold-separate agreements as a part of its prior acquisitions in 2014, 2016, and 2019.  (*Id.*)  This Court's hold-separate injunction should be similarly workable.  For these reasons, the Court finds the balance of equities sufficiently tips in Plaintiffs' favor.

### F.    Bond Requirement

Federal Rule of Civil Procedure 65(c) provides, in pertinent part: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

///

46

Defendants request Plaintiffs post a bond of $150 million should the Court grant a preliminary injunction.  (ECF No. 76 at 24; ECF No. 77-4 at 23.)  Defendants assert that states are not exempt from the bond requirement.  (ECF No. 76 at 25 (citing *Hawaii v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1255 (D. Haw. 1999); *In re Nat'l Credit Mgmt. Grp., LLC*, 21 F. Supp. 2d 424, 465 (D.N.J. 1998).)

In reply, Plaintiff States maintain the bond requirement should be waived because Defendants offer no evidence to support the amount requested and Plaintiff States have sued to enforce public interests.  (ECF No. 109 at 11.)  Plaintiff States assert that Defendants' cited cases demonstrate that states are not exempt from the bond requirement and courts issued bonds in nominal amounts because of the state's unique position.  (No. 2:26-cv-00978, ECF No. 81 at 11 n.10 (citing *Hawaii*, 99 F. Supp. 2d at 1255; *Nat'l Credit*, 21 F. Supp. 2d at 465)).  DIRECTV also contends Defendants have not explained how they calculated the requested bond and a bond is inappropriate where Defendants have created their supposed harms by rushing to close.  (ECF No. 111 at 12.)  Moreover, DIRECTV argues a bond should not be required where Plaintiffs have proven they are likely to succeed on the merits and the balance of equities tip in their favor, as it has already shown on its motion for TRO.  (*Id.*)

Here, the Court finds Plaintiffs' arguments persuasive.  Defendants "offer no financial analysis or documentary evidence to support a bond in this amount" or "any specific evidence of the financial losses [Defendants] will sustain if the injunction is ultimately found to have been erroneously entered."  *CytoSport, Inc.*, 617 F. Supp. 2d at 1082.  The Court notes that where plaintiffs "bring suit to enforce important federal and public interests," like Plaintiffs here, courts commonly waive the bond requirement.  *Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1160 (E.D. Cal. 2011); *Colorado v. DeJoy*, 487 F. Supp. 3d 1061, 1066 (D. Colo. 2020); *cf. Washington v. U.S. Dep't of Ed.*, 807 F. Supp. 3d 1275, 1293 (W.D. Wash. 2025).  However, courts have also issued bonds in nominal amounts where a state is advocating for the public interest.  *See Nat'l Credit*, 21 F. Supp. 2d at 465 ($10,000); *Hawaii*, 99 F. Supp. 2d at 1255 ($10,000).  Accordingly, the Court finds it appropriate to require Plaintiffs to post a nominal bond in the amount of $10,000.

47

## IV.   CONCLUSION

For the foregoing reasons, the Court issues a preliminary injunction to preserve the status quo and prohibit Nexstar and TEGNA from further integration pending adjudication on the merits.  Accordingly, the Court ORDERS as follows:

1. Defendants and all of their respective agents, employees, or attorneys, shall be and hereby are restrained and enjoined from all actions relating to integration and consolidation of Nexstar and TEGNA until final judgment is entered in this matter.  Defendants are prohibited from all actions to integrate and consolidate Nexstar and TEGNA;

2. Nexstar must permit TEGNA to continue operating as a separate and distinct, independently managed business unit from Nexstar, and Nexstar must put measures in place to maintain TEGNA as an ongoing, economically viable, and active competitor. TEGNA shall have separate management that operates TEGNA in the ordinary course consistent with pre-closing practices;

3. Nexstar must place and maintain internal controls and procedures to prevent the sharing of competitively sensitive information, including any information related to retransmission consent fee negotiations, between Nexstar and TEGNA, which may include erecting firewalls, providing instructions to employees and contractors, and issuing a corporate policy;

4. Nexstar must not influence the management of the held-separate TEGNA business unit. TEGNA personnel must maintain control over TEGNA's decisionmaking, including with respect to retransmission consent agreements and negotiations, newsroom personnel, operations and programming, product and service offerings, product development, advertisement sales, and personnel.  Nexstar must not hire, terminate, transfer, or otherwise alter the terms of employment of any TEGNA officers or employees;

5. Nexstar must hold separate all assets, rights, and licenses acquired as a result of the Transaction.  All assets held by TEGNA or its direct or indirect subsidiaries at the time of consummation should be maintained within TEGNA and must not be transferred to any other entity, including any Nexstar affiliate other than TEGNA or one of its pre-existing

48

direct or indirect subsidiaries;

6. Defendants shall take all steps necessary to ensure that (a) the local television broadcast stations owned by TEGNA immediately prior to the Transaction (the "Acquired Stations") will be maintained and operated as independent, ongoing, economically viable, and active competitors in the business of licensing retransmission consent to MVPDs; (b) each of Nexstar and the held-separate TEGNA business unit will not influence the management of the stations owned by the other entity immediately prior to the Transaction; and (c) the books, records, competitively sensitive sales, marketing and pricing information, and decisionmaking concerning the production, distribution, provision, or sale of products or services by or under any of the Acquired Stations will be kept separate and apart from all other stations owned by Nexstar immediately prior to the Transaction and any of Nexstar's other operations;

7. Defendants shall use all reasonable efforts to preserve, in accordance with current practice, the existing relationships of TEGNA and of each Acquired Station with each MVPD retransmitting its programming, with each network providing affiliation and programming, and with others doing business with the Acquired Stations;

8. Defendants shall use all reasonable efforts to maintain — at 2025 levels or 2026 levels that were approved prior to the Transaction, whichever are higher — all station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations;[26]

9. Defendants shall, to the extent permitted by the terms and conditions of the FCC's Equity/Debt Plus rule (47 C.F.R. § 73.3555, note 2(i)), provide sufficient working capital

---

[26] Defendants sought a modification to the Court's TRO to clarify whether the held-separate TEGNA entity may undertake cost reduction initiatives approved prior to the merger. (ECF No. 63.) The Court required Defendants to submit evidence of the initiatives, which Defendants supplied. (ECF Nos. 136, 160.) Plaintiffs filed a response. (ECF No. 144.) Upon review of the filings, the Court does not find sufficient evidence that these initiatives were approved prior to the merger or that the plans are sufficiently detailed such that management could execute the plans in accordance with TEGNA's pre-merger goals. Thus, the Court declines to modify this term. The held-separate TEGNA entity must maintain status quo staffing levels. However, the Court will consider any stipulation submitted by the parties to modify this term.

and lines and sources of credit to continue to maintain the Acquired Stations as economically viable and competitive, ongoing businesses;

10. Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records for each Acquired Station that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of that station;

11. Notwithstanding the foregoing, it shall not be a violation of this Order for Nexstar to:

    a. undertake ordinary-course cash management, ordinary-course intercompany transfers, and ordinary-course debt service and repayment activities necessary to comply with Nexstar's financing obligations, including refinancing activities, security perfection, and guaranty, provided that Nexstar does not use this provision as a pretext to undermine TEGNA's viability as a going concern;

    b. take reasonable actions necessary to maintain TEGNA's day-to-day operations, including authorizing routine financial transactions such as wire transfers for ordinary course payments;

    c. take actions necessary to establish a functional governance structure for TEGNA, including appointing or reappointing officers, to the extent necessary to permit TEGNA to fulfill its obligations under this Order, provided however that Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar;

    d. provide and implement Sarbanes-Oxley requirements, including setting thresholds for ordinary course contract approval, expenditure authorization, and other financial limits similar to the interim operating covenants that applied to TEGNA's independent management of the business pre-closing;

    e. take all reasonable steps to perform all obligations required under its debt instruments, SEC reporting requirements, or refinancing transactions, including coordination with TEGNA personnel as necessary, provided that such coordination

50

is narrowly tailored to complying with reporting requirements and avoiding breaches under debt instruments; such permissible coordination includes coordination necessary to complete SEC and debt agreement reporting for the combined company within applicable deadlines, oversight by Nexstar management as to the accuracy of the TEGNA financial statements, including compliance with internal controls and procedures, in coordination with TEGNA personnel, provided however that if the sharing of TEGNA's confidential information with certain Nexstar employees is necessary to accomplish such reporting requirements, such information must be maintained separately from Nexstar's files and used solely for those reporting requirements;

    f.   appoint or reappoint TEGNA officers as necessary for TEGNA to exercise independent decision-making authority for retransmission matters, provided however that Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar; and

    g.   require that management of TEGNA adhere to the interim operating covenants set forth in the Merger Agreement (ECF No. 63-4), in their entirety, and in the same manner as applied pre-closing, provided however that TEGNA shall continue to have authority concerning ordinary course contracts, including contracts concerning retransmission consent, as provided by operating covenant 6.1(b)(xiii).

The provisions of this Order shall apply to each of Defendants' directors, officers, agents, and employees, and all persons acting on their behalf.  A copy of this Order shall be furnished by Defendants to each of their directors and officers.

At Defendants' request, this **preliminary injunction shall take effect starting April 21, 2026, at 5:00 p.m. PDT**.[27]  In the meantime, to preserve the status quo and good cause appearing,

---

[27]    At the hearing, Defendants requested the Court hold its preliminary injunction in abeyance a few days while they consider appeal.  DIRECTV did not object to giving Defendants time to consider appeal, so long as Defendants were prohibited from integration during that time.  Accordingly, the Court will grant a delay in the commencement of the preliminary injunction.

the Court **extends its Temporary Restraining Order** (ECF No. 60) as modified (ECF No. 145) **through April 21, 2026, at 6:00 p.m. PDT**.

Plaintiffs shall post security in the amount of $10,000 with the Clerk of the Court within fourteen (14) days of the electronic filing date of this Order.

Plaintiffs may file separate amended complaints by April 30, 2026.

IT IS SO ORDERED.

Date: April 17, 2026

_____
TROY L. NUNLEY
CHIEF UNITED STATES DISTRICT JUDGE

However, to preserve the status quo and to prevent irreparable harm, the Court finds good cause to extend the Temporary Restraining Order (ECF No. 60) as modified (ECF No. 145) two business days.