ROB BONTA
Attorney General of California
PAULA BLIZZARD (SBN 207920)
Senior Assistant Attorney General
LAURA ANTONINI (SBN 271658)
PAUL CHANDER (SBN 305133)
ELIZABETH CHEEVER (SBN 341421)
EMILY CURRAN (SBN 293065)
JENNIFER HANE (SBN 275729)
KOMAL K. PATEL (SBN 342765)
CONNIE P. SUNG (SBN 304242)
BRIAN WANG (SBN 284490)
Deputy Attorneys General
  455 Golden Gate Ave., Suite 11000
  San Francisco, CA  91402
  Telephone: (213) 269-6277
  E-mail: Paula.Blizzard@doj.ca.gov
          Laura.Antonini@doj.ca.gov
*Attorneys for Plaintiff, The State of California*

Additional counsel identified on signature page

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| **In Re: Nexstar-TEGNA Merger Litigation** | Case No. 2:26-cv-00976-TLN-CKD |

| | |
|---|---|
| **THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF KANSAS, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OREGON, THE COMMONWEALTH OF PENNSYLVANIA, THE STATE OF VERMONT AND THE COMMONWEALTH OF VIRGINIA,** | **PLAINTIFF STATES' FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION** <br><br> **PUBLIC REDACTED VERSION** |
| Plaintiffs, <br> **v.** | |
| **NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.,** | |
| Defendants. | |

The State of California, State of Colorado, State of Connecticut, State of Illinois, State of Indiana, State of Kansas, Commonwealth of Massachusetts, State of New York, State of North Carolina, State of Oregon, Commonwealth of Pennsylvania, State of Vermont, and Commonwealth of Virginia, by and through their respective Attorneys General (collectively, "Plaintiff States"), bring this civil action against Nexstar Media Group, Inc. ("Nexstar") and TEGNA Inc. ("TEGNA") to remedy and unwind Nexstar's acquisition of TEGNA. Plaintiff States allege as follows:

## I. NATURE OF THE CASE

1. Nexstar, the largest local television broadcast company in the United States, has acquired TEGNA, the third largest television broadcast company in the country,[1] in a $6.2 billion transaction (the "Transaction"). The Transaction created a broadcast behemoth with the increased and substantial power to raise prices for television consumers and to control and degrade the quality and quantity of broadcast content such as local news and sports.

2. The merged entity owns 265 television stations across 44 states and the District of Columbia, reaching ~80% of U.S. households. The Transaction consolidates ownership of many popular local television stations that currently compete against each other, likely resulting in significant harm to competition.

3. Specifically, the Transaction gave Nexstar control over an unprecedented 221 "Big 4" stations. The Big 4 stations are the well-known local stations affiliated with the FOX, NBC, ABC, and CBS networks. Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels. Big 4 stations usually are the highest ranked in terms of audience share and ratings, largely because of unique offerings such as local news, sports, and highly ranked primetime programs. Nexstar confirms that the "Big 4 broadcast networks carry the nation's most watched

---

[1] If only counting English-language television broadcast companies, TEGNA is the second largest by household reach.

1

programming by a significant margin (including the substantial majority of [NFL] games)."[2]  As Nexstar put it to investors: "Broadcast and news networks continue to be the most watched."[3]

4. Thirty-one[4] Designated Market Areas ("DMAs")[5] are "Big 4 Overlap DMAs."  A Big 4 Overlap DMA is a market area in which Nexstar and TEGNA each owned at least one broadcast television station that is an affiliate of one of the Big 4 television networks.  After the Transaction, Nexstar owns TEGNA Big 4 stations in each Overlap DMA.  For example, the Sacramento-Stockton-Modesto, California DMA is an Overlap DMA: Nexstar owns the local FOX affiliate KTXL-TV, and TEGNA owned the local ABC affiliate KXTV-TV.  After the Transaction, Nexstar now owns both KTXL-TV and KXTV-TV.

5. Fourteen of the Big 4 Overlap DMAs directly impact the residents of the Plaintiff States or Commonwealths: (1) Buffalo, New York; (2) Charlotte, North Carolina; (3) Davenport-Rock Island-Moline, Iowa-Illinois; (4) Denver, Colorado; (5) Greensboro-High Point-Winston-Salem, North Carolina; (6) Harrisburg-Lancaster-Lebanon-York, Pennsylvania; (7) Hartford-New Haven, Connecticut; (8) Indianapolis, Indiana; (9) Norfolk-Portsmouth-Newport News, Virginia; (10) Portland, Oregon; (11) Sacramento-Stockton-Modesto, California; (12) San Diego, California; (13) St. Louis, Missouri (which includes several Illinois counties); and (14) Wilkes Barre-Scranton-Hazleton, Pennsylvania.[6]

_____

[2] Nexstar Media Group, Inc. (Form 10-K) at 4 (Feb. 27, 2026).

[3] Nexstar Media Group, Inc. Investor Presentation at 8 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf ("Nexstar Investor Presentation").

[4] Huntsville-Decatur, Alabama; Little Rock-Pine Bluff, Arkansas; Ft. Smith-Fayetteville-Springdale-Rodgers, Arkansas; San Diego, California; Sacramento-Stockton-Modesto, California; Denver, Colorado; Hartford-New Haven, Connecticut; Tampa-St. Petersburg, Florida; Des Moines-Ames, Iowa; Davenport-Rock Island-Moline, Iowa-Illinois; Indianapolis, Indiana; New Orleans, Louisiana; Grand Rapids-Kalamazoo-Battle Creek, Michigan; St. Louis, Missouri; Charlotte, North Carolina; Greensboro, North Carolina; Buffalo, New York; Cleveland-Akron, Ohio; Columbus, Ohio; Portland, Oregon; Harrisburg-Lancaster-Lebanon-York, Pennsylvania; Wilkes Barre-Scranton-Hazleton, Pennsylvania; Knoxville, Tennessee; Memphis, Tennessee; Abilene-Sweetwater, Texas; Austin, Texas; Odessa-Midlands, Texas; San Angelo, Texas; Tyler-Longview, Texas; Waco-Temple-Bryan, Texas; and Norfolk-Portsmouth-Newport News, Virginia.

[5] DMAs are geographic units which are widely accepted as the standard geographic areas to use in evaluating television audience size and demographic composition.

[6] Although Nexstar has conditionally agreed to divest a Big 4 station in the Indianapolis and Norfolk-Portsmouth-Newport News DMAs, it would maintain a duopoly in both DMAs. *See* Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc., MB

(continued…)

2

6. The States of Kansas and Vermont and the Commonwealth of Massachusetts are harmed by the Transaction because the Transaction will raise retransmission fees and viewers' subscription prices in all markets in which Nexstar owns a Big 4 station, in part because Nexstar charges uniform pricing across DMAs, which spreads the harm of the creation of duopolies across DMAs. Cable, satellite, and fiber optic television providers (referred to collectively as multichannel video programming distributors or "MVPDs"), in turn, pass some portion of those increased retransmission consent fees on to subscribers.

7. Big 4 broadcast content includes all the programming that a Big 4 station offers to MVPDs, including both local (such as local news and sports) and national (such as programming from ABC, CBS, FOX, and NBC). Many consumers get their Big 4 broadcast content through MVPDs like Comcast, DirecTV, DISH, Verizon, or Charter. Because Big 4 broadcast content is more watched and is clearly differentiated from other forms of content, both viewers and MVPDs view Big 4 stations as distinct from other content providers and thus Big 4 broadcast content is a highly valued input to an MVPD's service.

8. Millions of Americans subscribe to MVPD services, and they are attracted to Big 4 broadcast content. Important among them are subscribers who are unlikely to "cut the cord" even if their MVPD subscription cost increases as a result of higher retransmission consent fees.[7] For instance, surveys show that older viewers are unlikely to drop their MVPD subscriptions in response to increased subscription costs.[8] Additionally, Virtual Multichannel Video Programming Distributors ("vMVPDs") and other streaming services require Internet access that

Docket No. 25-331, Memorandum Opinion and Order, DA 26-267, ¶ 5 & n. 4. (Media Bur. Mar. 19, 2026). Because Nexstar has two years to make divestitures (*id.,* ¶ 53), the analysis in this Amended Complaint reflects the current state of affairs.
[7] NXST-004145061 at -087-88 (

)

*See, e.g.,* Eugenie Park and Colleen McClain, 83% of U.S. adults use streaming services, far fewer subscribe to cable or satellite TV, Pew Research Center (Jul. 1, 2025), https://www.pewresearch.org/short-reads/2025/07/01/83-of-us-adults-use-streaming-services-far-fewer-subscribe-to-cable-or-satellite-tv ("Americans ages 65 and older are most likely to say they subscribe to cable or satellite, at 64%. Smaller shares of those 50 to 64 (44%), 30 to 49 (23%) and 18 to 29 (16%) say the same.").

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

a small percentage of Americans still lack.[9]  Further reasons for these subscribers' relatively inelastic demand for traditional MVPDs may include switching costs, knowledge barriers, and contractual issues.

9. MVPDs contract with broadcast companies like Nexstar and TEGNA for inclusion of Big 4 station content in their offerings to consumers.  MVPDs enter into a "retransmission consent agreement" with broadcast companies under which MVPDs pay "retransmission consent fees" for Big 4 station content.

10. Viewers choose between Big 4 stations when they view Big 4 broadcast content. MVPDs want to include Big 4 stations in their consumer offerings to satisfy those viewer desires. In each Big 4 Overlap DMA, the merger has eliminated competition between Nexstar and TEGNA in the licensing of Big 4 station content to MVPDs for distribution to their subscribers.

11. By consolidating with a major competitor, Nexstar acquired greater bargaining leverage to charge MVPDs higher retransmission consent fees for Big 4 station content.  The U.S. Department of Justice ("U.S. DOJ") challenged two previous Nexstar acquisitions in 2016 (Media General) and 2020 (Tribune) on such grounds.  For example, in the Nexstar/Tribune merger, the U.S. DOJ noted "the combined company would likely charge . . . higher retransmission [consent] fees … resulting in higher monthly cable and satellite bills for millions of Americans."[10]

12. The merger will increase retransmission consent fees for all stations that Nexstar currently owns, including the former TEGNA stations.  Higher retransmission fees applied by Nexstar for access to any and all of its Big 4 broadcast content will arise from both the duopoly[11]

---

[9] *See* Trevor Wheelwright, The U.S. Digital Divide Is Shrinking, But Nearly 8 Million Households Remain Offline, Reviews.org (Oct. 16, 2025), https://www.reviews.org/internet-service/how-many-us-households-are-without-internet-connection/ (6.29% of U.S. households lack Internet).

[10] The U.S. DOJ ultimately required Nexstar to divest Big 4 stations in both mergers. Press Release, U.S. DOJ, Justice Department Requires Structural Relief to Resolve Antitrust Concerns in Nexstar's Merger with Tribune (Jul. 31, 2019), https://www.justice.gov/archives/opa/pr/justice-department-requires-structural-relief-resolve-antitrust-concerns-nexstar-s-merger; *see* Press Release U.S. Dep't of Just., Justice Department Requires Divestitures in Order for Nexstar to Proceed with Media General Acquisition (Sept. 2, 2016), https://www.justice.gov/archives/opa/pr/justice-department-requires-divestitures-order-nexstar-proceed-media-general-acquisition.

[11] As used in this Complaint, "duopoly" also refers to common ownership of two of the Big 4 stations in the same DMA; "triopoly" means three of the Big 4 are commonly owned.

4

effects in Overlap DMAs and because Nexstar will now serve a much higher percentage of MVPD subscribers acrosss its DMA markets and thus will gain increased bargaining power. The combined result of these price effects will impact MVPDs and viewers across the DMAs in which Nexstar owns stations, because Nexstar charges uniform fees without regard to the source of price increases. Economic analysis demonstrates that retransmission consent fees "are higher for affiliates owned by larger groups."[12] Viewers across the Nexstar DMAs will be affected by increased subscription fees as MVPDs pass on a portion of their increased retransmission costs to subscribers.

13. The Transaction may also result in fee increases through contractual "after-acquired" clauses that move TEGNA stations to Nexstar's preexisting retransmission consent agreements. Among all broadcasting groups, Nexstar charges the highest average monthly retransmission consent fees per subscriber.[13]

14. The adverse impact on MVPDs, and through them consumers, will also likely result from the elimination of variety and choice in local news operations and through consolidation, which will likely lower incentives for quality improvements. Based on Nexstar's pattern of newsroom closures and its recent statements to investors, the merged entity is likely to consolidate newsrooms of previously separate Big 4 stations, degrading the content, quantity, and quality of local news broadcasts through the Big 4 stations. A recent study found that Nexstar is the worst offender in "news duplication" in local news, meaning Nexstar stations air local news content that is identical across multiple stations in one location.[14]

15. Eliminating independent sources of local news is a variety and quality degradation resulting from the aggregation of market power and, as such, fits neatly within traditional antitrust concerns over the ability of firms with significant market power to face less competitive pressure

---

[12] Decl. of Allan L. Shampine at ¶ 5, Petition to Deny of DIRECTV, LLC at E-14, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Meda Inc.,* MB Docket No. 25-331 (Dec. 31, 2025).
[13] *See* Nexstar Investor Presentation at 28.
[14] Danilo Yanich & Benjamin E. Bagozzi, *Reusing the News: Duplicating Local TV Content*, SNF Ithaca Initiative, Univ. of Del. (Aug. 2025), https://udspace.udel.edu/server/api/core/bitstreams/414834a9-fa05-4be0-a5cd-9b317fdbe02b/content, at 4.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

to maintain the quality of products (even as they boost prices). Eliminating independent news operations will diminish diversity in news coverage at a time when, with challenges to local newspapers, local broadcast news coverage is critical to the ability of an informed citizenry to participate in local governmental and community activities. The Nexstar track record reveals that consumers and communities will have less choice in news and less access to diversity in perspectives as a result of the merger, all while retransmission fees rise.

16. Section 7 of the Clayton Act prohibits mergers and acquisitions in "any line of commerce . . . in any section of the country," where the effect "may be substantially to lessen competition, or tend to create a monopoly." For all of the foregoing reasons, the merger of Nexstar and TEGNA has substantially lessened, or is substantially likely to lessen, competition in the market for Licensing of Big 4 Retransmission Consent in each of the Big 4 Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, while creating price effects that will touch every Nexstar Big 4 station.

## II.     JURISDICTION AND VENUE

17. Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff States, by and through their respective Offices of their Attorneys General, bring this action as *parens patriae* on behalf of and to protect the health and welfare of their residents and the general economy of each of their states.

18. The Court has subject matter jurisdiction over this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337(a).

19. Defendants license retransmission of Big 4 television network content to MVPDs in the flow of interstate commerce, and such activities substantially affect interstate commerce. Defendants are, and at all relevant times have been, engaged in commerce in the States or Commonwealths of California, Colorado, Connecticut, Illinois, Indiana, New York, North Carolina, Oregon, Pennsylvania, and Virginia. Defendant Nexstar is, and at all relevant times has been engaged in commerce in the State of Vermont, including ownership of a Big 4 station duopoly in the Burlington-Plattsburgh, VT-NY DMA. Defendant Nexstar is, and at all relevant

6

times has been, engaged in commerce in the State of Kansas, including ownership of three out of four Big 4 stations in the Topeka DMA. Defendant Nexstar is, and at all relevant times has been, engaged in commerce in the Commonwealth of Massachusetts, including ownership of three Big 4 stations—one serving each of the Springfield-Holyoke, MA DMA, the Albany-Schenectady-Troy, NY DMA, and the Providence, RI-New Bedford, MA DMA, respectively, all DMAs which cover counties in Massachusetts.

20. Both Defendants transact business in this district, including in Sacramento County. Defendant Nexstar owns the FOX affiliate KTXL-TV, or FOX40, based in Sacramento. Defendant TEGNA owned the local ABC affiliate KXTV-TV or ABC10, based in Sacramento. The Court therefore has personal jurisdiction over the Defendants, and venue is therefore proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(1) and (c). Additionally, for the foregoing reasons, assignment to the Sacramento Division is proper.

### III.    THE PARTIES

21. Plaintiff State of California is a sovereign state of the United States. This action is brought by and through its Attorney General, Rob Bonta, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of California has its principal offices at 1300 "I" Street, Sacramento, CA 95814.

22. Plaintiff State of Colorado is a sovereign state of the United States. This action is brought by and through its Attorney General, Philip Weiser, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Colorado has its principal offices at 1300 N. Broadway, Denver, CO 80203.

23. Plaintiff State of Connecticut is a sovereign state of the United States. This action is brought by and through its Attorney General, William Tong, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant

to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Connecticut has its principal offices at 165 Capitol Ave, Hartford, CT 06106.

24. Plaintiff State of Illinois is a sovereign State of the United States. This action is brought by and through its Attorney General, Kwame Raoul, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Illinois has its principal offices at 115 S. LaSalle Street, Chicago, IL 60603.

25. Plaintiff State of Indiana is a sovereign State of the United States. This action is brought by and through its Attorney General, Todd Rokita, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Indiana Attorney General has its prinicipal offices at 302 W. Washington St., Fifth Floor, Indianapolis, IN 46204.

26. Plaintiff State of Kansas is a sovereign State of the United States. This action is brought by and through its Attorney General, Kris Kobach, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Kansas has its principal offices at 120 SW 10th Avenue, 2nd Floor, Topeka, KS 66612.

27. Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States. This action is brought by and through its Attorney General, Andrea Joy Campbell, who is the chief law enforcement officer of the Commonwealth, with the authority to bring this action on behalf of the Commonwealth pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the Commonwealth of Massachusetts has its principal offices at One Ashburton Place, Boston, MA 02108.

28. Plaintiff State of New York is a sovereign state of the United States. This action is brought by and through its Attorney General, Letitia James, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of New York has its principal offices at The Capitol, Albany, NY 12224-0341.

29. Plaintiff State of North Carolina is a sovereign state of the United States. This action is brought by and through its Attorney General, Jeff Jackson, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of North Carolina has its principal offices at 114 W. Edenton Street, Raleigh, NC 27603.

30. Plaintiff State of Oregon is a sovereign state of the United States. This action is brought by and through its Attorney General, Dan Rayfield, who is the chief law enforcement officer of the State and heads the Oregon Department of Justice ("OR DOJ"), with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of the State of Oregon is a division of the OR DOJ and has its principal offices at 1162 Court Street NE, Salem, OR 97301.

31. Plaintiff Commonwealth of Pennsylvania is a sovereign state of the United States. This action is brought by and through its Attorney General, David W. Sunday, Jr., who is the chief law enforcement officer of the Commonwealth, with the authority to bring this action on behalf of the Commonwealth pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Pennsylvania Office of Attorney General has its principal offices at Strawberry Square, 14th Floor, Harrisburg, Pennsylvania 17120.

32. Plaintiff State of Vermont is a sovereign State of the United States. This action is brought by and through its Attorney General, Charity R. Clark, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of Vermont has its principal offices at 109 State Street, Montpelier, VT, 05676.

33. Plaintiff Commonwealth of Virginia is a sovereign state of the United States. This action is brought by and through its Attorney General, Jay Jones, who is the chief law enforcement officer of the Commonwealth, with the authority to bring this action on behalf of the Commonwealth pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of Virginia has its principal offices at 202 North 9th Street, Richmond, VA, 23219.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

34.    Each Plaintiff State is seeking relief pursuant to Clayton Act Section 16, 15 U.S.C. § 26.

35.    Defendant Nexstar is a Delaware corporation with its headquarters in Irving, Texas. Nexstar owns America's largest local television broadcasting group comprised of top network affiliates, with more than 200 owned or partner stations in 116 U.S. markets reaching 220 million people.[15] In 2025, Nexstar reported revenues of over $4.9 billion. Nexstar is a leading affiliate of all major broadcast networks, holding dozens of Big 4 stations nationwide: 49 CBS affiliates, 51 FOX affiliates, 35 NBC affiliates, and 33 ABC affiliates:[16]

Source: Nexstar Investor Presentation at 7.

36.    Defendant TEGNA was a Delaware corporation with its headquarters in Tysons, Virginia. After the merger, TEGNA became a wholly-owned subsidiary of Nexstar. Pre-merger,

---

[15] Nexstar, *Stations,* https://www.nexstar.tv/stations/ (last visited Mar. 18, 2026); Nexstar Investor Presentation at 5 ("We are the Largest Local Television Broadcast Group"; "Nexstar Has Unmatched Local Broadcast Television Scale with Nationwide Reach via its Owned Broadcast and News Networks.").

[16] Nexstar, *Stations,* https://www.nexstar.tv/stations/ (last visited Mar. 18, 2026); While not considered Big 4 networks, as of June 2025, Nexstar also held 54 CW affiliates, 27 MyTV affiliates, and 7 independent and Telemundo affiliates. Nexstar Investor Presentation at 7.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

TEGNA owned 64 television stations in 51 DMAs.[17]  In 2025, TEGNA earned revenues of more than $2.7 billion.  TEGNA was the largest owner of Big 4 affiliates in the top 25 markets, and the location of TEGNA stations is illustrated below:



Source: TEGNA, *Trustworthy, Impactful Journalism,* https://www.tegna.com/about/trustworthy-impactful-journalism/ (last visited Mar. 18, 2026).

## IV.    THE MERGER

37.    On March 18, 2026, Plaintiff States filed their initial complaint in this matter, challenging the then-proposed merger of Nexstar and TEGNA.  The next day, March 19, 2026, Nexstar acquired TEGNA for $6.2 billion.  The Transaction created the largest broadcast station group in the United States, with Nexstar owning 265 stations across 44 states and D.C. and reaching 80% of U.S. television households.  The combined company now operates broadcast stations in 132 U.S. DMAs, 9 of the top 10 DMAs, and 41 of the top 50 DMAs.  Notably, 35 of TEGNA's 51 DMAs overlap with Nexstar DMAs.  In 31 DMAs, both TEGNA and Nexstar own at least one broadcast station affiliated with a Big 4 network.

[17] TEGNA, *Trustworthy, Impactful Journalism,* https://www.tegna.com/about/trustworthy-impactful-journalism/ (last visited Mar. 18, 2026).

38.     Taking into acount DMAs where Nexstar already owned two or more Big 4 stations, the acquisition created 30 new Big 4 duopolies or triopolies.[18] Consequently, the Transaction created an unprecedented number of Big 4 duopolies and triopolies (especially in light of Nexstar's pre-Transaction Big 4 duopolies and triopolies), and gave the combined company record-setting national and DMA-level concentration and reach.

39.     In Nexstar Chairman and CEO Perry Sook's own words, this is a merger that creates "███████████████████████."

## V.     RELEVANT ANTITRUST MARKET

40.     MVPDs, such as Comcast, DirecTV, DISH, and Charter, typically pay the owner of each local Big 4 broadcast station a per-subscriber per-month retransmission consent fee for the right to retransmit the station's Big 4 broadcast content to the MVPD's subscribers. This fee and other terms under which an MVPD is permitted to distribute a station's content to its subscribers are set forth in a retransmission consent agreement. A retransmission consent agreement is negotiated directly between a broadcast station group, such as Nexstar or TEGNA, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or "footprint."[19] Because MVPDs may have a service area that covers much or all of the nation, the agreements with such MVPDs can cover all the broadcasting company's stations.

41.     Retransmission consent agreements generally provide a single price for all of a broadcasting company's stations in a particular category (*e.g.*, all stations affiliated with Big 4 networks). Retransmission consent agreements also commonly address what happens if the broadcast station group acquires additional stations during the term of the agreement, including

---

[18] In the Grand Rapids-Kalamazoo-Battle Creek, MI DMA, Nexstar already owned three stations affiliated with two different Big 4 networks: WOTV (ABC), WOOD-TV (NBC), and WOGC-CD (NBC). Now, through the Transaction, Nexstar owns WZZM, an additional ABC affiliate in this DMA. Thus, the Transaction increases local Big 4 consolidation even though it does not create a new duopoly.

[19] *See* Competitive Impact Statement at 4, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-02295 (D.D.C. Aug. 1, 2019).

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

that those newly acquired stations will be added to the agreement and will be subject to the agreement's pricing terms.[20]

42.     Each broadcast station group typically renegotiates retransmission consent agreements with the MVPDs every few years.  If an MVPD and a broadcast station group cannot agree on a retransmission consent fee at the expiration of a retransmission consent agreement, the result may be a "blackout" of the broadcast group's stations from the particular MVPD—*i.e.*, an open-ended period during which the MVPD may not distribute those stations to its subscribers until a new contract is successfully negotiated.  For example, if Nexstar and an MVPD operating in Sacramento cannot agree to the terms of a retransmission consent agreement, that MVPD's customers will not have access to either KTXL-TV (FOX) or KXTV-TV (ABC) during any blackout.  Indeed, all Nexstar stations across the MVPD's entire footprint would be blacked out for that MVPD's subscribers.

**A. The Licensing of Big 4 Retransmission Consent Is a Relevant Product Market**

43.     The Licensing of Big 4 Retransmission Consent is a relevant product market in which to evaluate the competitive effects of the Transaction.  A relevant product market under Section 7 is defined by the "reasonable interchangeability of use . . . between the product itself and substitutes for it."[21]  In this market, sellers are the broadcast groups that own Big 4 stations in a given community and the buyers are the MVPDs that purchase the right to that Big 4 broadcast content, for distribution alongside other programming to their local subcribers.

44.     Big 4 broadcast content includes all the programming that a Big 4 station offers to MVPDs, including both local (such as news and sports) and national (such as ABC, CBS, Fox and NBC programming).  Many consumers get their Big 4 broadcast content through cable, satellite, and fiber optic television (referred to collectively as multichannel video programming distributors or "MVPDs") like Comcast, Charter, DISH, DIRECTV, and Verizon.  Because Big 4 broadcast content is more watched and is clearly differentiated from other forms of content, both

---

[20] *See* Memorandum Op. & Order at ¶ 16, *In the Matter of the Applications of Tribune Media Company and Nexstar Media Group, Inc. et al.,* FCC 19-89 (Sept. 16, 2019).
[21] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

viewers and MVPDs treat Big 4 stations as distinct from other content providers and thus Big 4 broadcast content is highly valued by MVPDs.

45. Because of viewer preference for Big 4 stations' differentiated and popular content (including, for example, local news and different kinds of sports programming), MVPDs regard Big 4 broadcast content as important for inclusion in the packages they offer subscribers. Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels. Big 4 stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly-ranked primetime programs.

46. In noting that "market shifts are benefiting broadcast," Nexstar boasts that "[b]roadcast television remains the most important medium for engaging live sports audiences."[22] And, as Nexstar put it to investors: "Broadcast and news networks continue to be the most watched,"[23] and "broadcast continues to be the gold standard for sports and news programming."[24] Nexstar confirms that the "Big 4 broadcast networks carry the nation's most-watched programming by a significant margin (including the substantial majority of [NFL] games)."[25]

47. Nexstar's CEO Perry Sook stated, "If we look at recent industry strategic activity, broadcast has been a consistently coveted asset because of the scale, reach and results it delivers to premium programming, especially sports. The numbers speak for themselves. . . . The data is clear when it comes to delivering scaled audiences for premium live sports and events, broadcast remains unmatched."[26] Nexstar highlights the unique benefits of broadcast television:

[22] Nexstar Investor Presentation at 25.
[23] Nexstar Investor Presentation at 8.
[24] Nexstar, *Nexstar Media Group Q4 2024 Earnings Call Transcript* (Feb. 27, 2025).
[25] Nexstar Media Group, Inc. (Form 10-K) at 4 (Feb. 27, 2026).
[26] Nexstar, *Nexstar Media Group Q4 2025 Earnings Call Transcript* (Feb. 26, 2026).

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION



Source: Nexstar Investor Presentation at 30.

48. The Licensing of Big 4 Restransmission Consent from broadcast groups has peculiar characteristics and uses, as it offers unique and highly watched must-have content such as local news, sports, and primetime programs; has distinct prices in the form of retransmission consent fees that get passed on to consumers' cable and satellite bills; has distinct customers in the form of MVPDs that collect content to be provided to viewers; and uses specialized vendors, the broadcast companies.

49. Retransmission consent fees for Big 4 stations are higher than the retransmission consent fees for non-Big 4 stations, indeed, significant numbers of non-Big 4 stations charge no retransmission consent fees at all.[27] Moreover, federal law requires that Big 4 affiliates and MVPDs "shall negotiate in good faith the terms and conditions of retransmission consent agreements" and largely prohibits the ability of MVPDs to replace blacked-out content in one

---

[27] *See e.g.* Declaration of Linda Burakoff ¶ 11–12, *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, No. 1:20-cv-02108-TWP-TAB (S.D. Ind. Jan. 1, 2022), ECF No. 132-17 (describing non-payment to non-Big 4 stations).

local market by bringing in network programming from another.[28] The only firms that acquire Big 4 station content by paying retransmission consent fees are MVPDs.

50. If an MVPD suffers a blackout of a Big 4 station in a given DMA, some of the MVPD's subscribers in that DMA are likely to turn to other Big 4 stations in the DMA to watch similar content, such as sports, primetime shows, and local news and weather. This willingness of viewers to switch between competing Big 4 broadcast stations limits an MVPD's expected losses in the case of a blackout, and thus limits (though it does not fully eliminate) a broadcaster's ability to extract higher fees from that MVPD—since an MVPD's willingness to pay higher retransmission consent fees for Big 4 broadcast content rises or falls with the harm it would suffer if that content were lost. But when the same owner controls more Big 4 options in the same DMA, that "escape valve" is weakened.

51. Because the programming typically offered by non-Big 4 stations often has narrower audience appeal, viewers are much less likely to switch to a non-Big 4 station than to switch to other Big 4 stations in the event of a blackout of a Big 4 station, particularly for local news or sports programming. Stations that are affiliates of networks other than the Big 4, such as the CW Network, MyNetworkTV, or Telemundo, typically feature niche programming without local news or sports—or, in the case of Telemundo, programming aimed at a Spanish-speaking audience. Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal. Accordingly, competition from non-Big 4 stations does not impose a significant competitive constraint on the retransmission consent fees charged by the owners of Big 4 stations, and non-Big 4 stations are therefore not meaningful substitutes for Big 4 stations.

52. For the same reasons, subscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big 4 network content. This is primarily

[28] 47 CFR § 76.65(a); Competitive Impact Statement at 6, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041 (D.D.C. Jul. 28, 2021) ("In the event of a blackout of a Big Four network station, FCC rules generally prohibit an MVPD from importing the same network's content from another DMA. Thus, MVPD subscribers in one DMA cannot switch to Big Four programming in another DMA in the face of a blackout. Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA.")

16

because cable channels offer different content. For example, cable channels generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big 4 stations. The high price of retransmission consent fees also demonstrates that the market for the Licensing of Big 4 Retransmission Consent is a relevant product market. Retransmission consent fees are higher for Big 4 stations than any retransmission consent fees for non-Big 4 stations.

53. Streaming services are also not available to the MVPDs as substitutes for Big 4 broadcast content. Streaming services do not obtain content through federally governed retransmission consent; they are not, therefore, buyers of retransmission services like the MVPDs. Rather, they focus on serving consumers directly.

54. Some streaming services provide an on-demand library of content via an app, the Internet, or an online platform where users either pay a recurring fee (*e.g.*, Netflix, HBO Max, or Disney+)[29] or get the content free with advertisements (*e.g.*, Tubi, Pluto TV, and FreeVee).[30] These streaming services are not close substitutes for Big 4 station broadcast content because they do not replicate the uniquely differentiated offerings of a Big 4 station, including the in-the-moment nature of local live news, sports, and network programming, including live events. These types of streaming services instead provide an on-demand viewing experience from cultivated collections.

55. Nor are vMVPD streaming services like YouTube TV, Hulu+, Sling TV or Fubo an alternative source of Big 4 station content to an MVPD. vMVPDs that contract directly with ABC, NBC, FOX, and CBS to stream network content can also provide local content if Big 4 stations give their approval. Legal and practical realities, including the requirement that MVPDs receive Big 4 broadcast station signals through retransmission, the nature of content contracts, and the limitations on the use of intellectual property, effectively prevent an MVPD from receiving Big 4 broadcast station signals outside of retransmission consent agreements.

---

[29] This type of streaming service is called a Subscription Video on Demand (SVOD) service.
[30] This type of streaming service is called an Ad-based Video on Demand (AVOD) service.

56. Moreover, the live content available from vMVPDs is more limited, less consistent, and less localized than the content that is available through an MVPD subscriber's unlimited access to all Big 4 stations.

57. The hypothetical monopolist test is a tool used to determine if a group of products is sufficiently broad to be a properly defined antitrust product market. If a single firm (*i.e.*, a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake a small but significant and non-transitory increase in price ("SSNIP"), then that group of products is a properly defined antitrust product market.

58. Here, a hypothetical monopolist of Big 4 television stations likely would undertake a SSNIP on MVPDs to increase the retransmission consent fees it charges to MVPDs for Big 4 stations. In the event of a SSNIP for Big 4 television stations, MVPDs would not switch to other sources of programming in sufficient volumes to render the price increase unprofitable.

59. Because of viewer preferences, legal restrictions, and marketplace realities, non-Big 4 broadcast stations, cable networks, or the streaming services described above are not close substitutes for the programming MVPDs receive from Big 4 stations; thus, these other sources of programming are not sufficient to discipline an increase in the fees charged for the Licensing of Big 4 Retransmission Consent. In fact, all or nearly all MVPDs in the United States have restransmission agreements for Big 4 stations with local broadcasters. If there were cheaper, available substitutes, economic principles suggest that MVPDs would be giving up the quest for Big 4 retransmission licenses. That they are sticking with retransmission consent agreements despite their rising costs—doubling between 2019 and 2025[31]—supports the view that there are no other sellers of equivalent content to MVPDs.

60. The Licensing of Big 4 Retransmission Consent therefore constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

---

[31] *See* Decl. of Prof. Carl Shapiro in Support of DIRECTV's Mot. for Temporary Restraining Order at ¶ 66 (ECF No. 14-3) (Average retransmission fee paid by an MVPD per subscriber per month grew from $9.64 in 2019 to $19.30 in 2025); *see also* American Television Alliance, *Big Broadcast Raises Prices as Viewership Falls* (Oct. 16, 2025), ATVA-Rising-Prices-as-Viewership-Falls-6.25.pdf (2018 = $9.48; 2024 = $21.71).

### B. Geographic Markets

61. A DMA is a geographic unit for which A.C. Nielsen Company—a firm that surveys television viewers—furnishes broadcast television stations, MVPDs, cable and satellite television networks, advertisers, and advertising agencies in a particular area with data to aid in evaluating audience size and composition. DMAs are widely accepted by industry participants as the standard geographic areas to use in evaluating television audience size and demographic composition. The Federal Communications Commission ("FCC") also uses DMAs as geographic units with respect to its MVPD regulations.

62. In the event of a blackout of a Big 4 network station, FCC rules generally prohibit an MVPD from importing the same network's content from another DMA.[32] Thus, Big 4 viewers in one DMA cannot switch to Big 4 programming in another DMA in the face of a blackout. Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA. Each DMA thus constitutes a relevant geographic market for the Licensing of Big 4 Retransmission Consent within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### VI. THE TRANSACTION IS PRESUMPTIVELY UNLAWFUL

63. The merger is presumptively unlawful. The acquisition has caused significant increases in concentration in multiple geographic markets in the already-consolidated Licensing of Big 4 Retransmission Consent market that exceed the threshold for presumptive illegality.

64. The Herfindahl-Hirschman Index ("HHI") is a well-established method for calculating concentration in a market. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2,000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2,000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. For example, if 100 firms each had 1% of the market, the HHI would would be 100 ($1^2$ added together 100 times). A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

---

[32] 47 C.F.R. 76.65(a) ("Television broadcast stations and multichannel video programming distributors shall negotiate in good faith the terms and conditions of retransmission consent agreements."); Cable Television Consumer Protection and Competition Act of 1992.

65. The U.S. DOJ and the Federal Trade Commission jointly publish the Merger Guidelines. Rooted in established caselaw and widely accepted economic thinking, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger. The Merger Guidelines—themselves guided by numerous court decisions, including from the Ninth Circuit—support using the HHI method to calculate market concentration.

66. The increase in market concentration caused by the Transaction is indicative of the Transaction's likely negative impact on competition. The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically:

- A merger that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.

- A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1,800 and the merger increases the HHI by more than 100 points.

67. The chart below summarizes Defendants' approximate Licensing of Big 4 Retransmission Consent market shares, based on revenue, and the effect of the Transaction on the HHI in each of the fourteen Big 4 Overlap DMAs whose viewers include residents of the Plaintiff States.

| Big 4 Overlap DMA [33] | Nexstar Share | TEGNA Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Buffalo, NY | 39.3% | 20.0% | 59.3% | 2,800 | 4,371 | 1,571 |
| Charlotte, NC | 24.7% | 26.2% | 50.9% | 2,566 | 3,860 | 1,294 |
| Davenport-Rock Island-Moline, IA-IL.[34] | 44.6% | 11.2% | 55.8% | 3,111 | 4,108 | 997 |

[33] Retransmission revenue data from S&P Capital IQ, U.S. Broadcast Station Database.
[34] This table reports ownership as reflected in FCC license records. Those records, however, do not fully capture Nexstar's practical influence in the Davenport-Rock Island-Moline, IL DMA.
(continued…)

20

| | | | | | | |
|---|---|---|---|---|---|---|
| Denver, CO | 30.9% | 26.2% | 57.1% | 2,562 | 4,182 | 1,620 |
| Greensboro-High Point-Winston-Salem, NC | 27.2% | 26.0% | 53.2% | 2,541 | 3,957 | 1,416 |
| Harrisburg-Lancaster-Lebanon-York, PA | 27.6% | 24.6% | 52.1% | 2,564 | 3,919 | 1,354 |
| Hartford-New Haven, CT | 38.1% | 25.3% | 63.3% | 2,838 | 4,762 | 1,923 |
| Indianapolis, IN | 65.8% | 17.7% | 83.5% | 4,914 | 7,245 | 2,331 |
| Norfolk-Portsmouth-Newport News, VA | 62.2% | 15.7% | 77.9% | 4,607 | 6,556 | 1,949 |
| Portland, OR | 39.9% | 15.0% | 54.9% | 2,835 | 4,029 | 1,194 |
| Sacramento-Stockton-Modesto, CA | 39.7% | 22.5% | 62.2% | 2,797 | 4,581 | 1,784 |
| San Diego, CA | 41.9% | 22.7% | 64.6% | 2,911 | 4,813 | 1,902 |
| St. Louis, MO | 26.1% | 22.5% | 48.6% | 2,508 | 3,684 | 1,175 |
| Wilkes Barre-Scranton-Hazleton, PA | 36.6% | 22.7% | 59.3% | 2,686 | 4,088 | 1,402 |

68. As indicated by the preceding chart, the post-merger HHI in each Big 4 Overlap DMA is well above 1,800, and the HHI increase in each Big 4 Overlap DMA far exceeds the 100-point threshold. In fact, the post-merger HHIs are **all** over 3,500 and the HHI increases are **all** over 900. The **lowest** merger share is over 48%.

69. Another way to assess market shares related to the Transaction is through ratings—the measure of how many viewers are watching a station. The chart below summarizes Defendants' approximate market shares based on ratings and the effect of the Transaction on the

KLJB, the Fox affiliate in that DMA, is licensed to Mission Broadcasting, but Nexstar controls key aspects of KLJB's operations through a "sidecar" arrangement. *See* Nexstar Media Group, Inc. (Form 10-K) at F-10 (Feb. 26, 2026). As the FCC has explained, sidecar arrangements typically allow one station group to sell advertising and provide operational services for a separately licensed station through coordinated agreements, such as joint sales and shared-services agreements. *See* FCC, *How the Sidecar Business Model Works* (Mar. 6, 2014), https://www.fcc.gov/news-events/blog/2014/03/06/how-sidecar-business-model-works. The U.S. DOJ has noted that sidecars "often exercise little or no competitive independence from the other station." *Ex Parte* Submission of the United States Department of Justice at 11, *In the Matter of 2010 Quadrennial Regulatory Review,* MB Docket No. 09-182 et al. (Feb. 20, 2013), https://www.justice.gov/sites/default/files/atr/legacy/2014/02/24/303880.pdf. Nexstar and Mission use this structure in several additional DMAs where each owns Big 4 affiliates, including Rockford, IL; Joplin-Pittsburg, MO-KS; Wilkes-Barre-Scranton-Hazleton, PA; Erie, PA; Terre Haute, IN; Utica, NY; and Grand Junction-Montrose, CO. Treating KLJB as Nexstar-controlled may better reflect the competitive reality.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

HHI in each of the fourteen Big 4 Overlap DMAs whose viewers include residents of Plaintiff States:

| Big 4 Overlap DMA[35] | Nexstar Share | TEGNA Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Buffalo, NY | 37.0% | 32.7% | 69.7% | 2,905 | 5,322 | 2,417 |
| Charlotte, NC | 14.1% | 21.0% | 35.1% | 2,768 | 3,361 | 592 |
| Davenport-Rock Island-Moline, IA-IL | 16.3% | 25.2% | 41.5% | 3,262 | 4,083 | 821 |
| Denver, CO | 27.4% | 29.8% | 57.2% | 2,557 | 4,191 | 1,633 |
| Greensboro-High Point-Winston-Salem, NC | 26.2% | 29.1% | 55.3% | 2,721 | 4,245 | 1,524 |
| Harrisburg-Lancaster-Lebanon-York, PA | 25.6% | 14.2% | 39.8% | 2,810 | 3,537 | 726 |
| Hartford-New Haven, CT | 25.9% | 16.1% | 42.0% | 2,675 | 3,508 | 833 |
| Indianapolis, IN | 51.4% | 33.4% | 84.8% | 3,989 | 7,422 | 3,433 |
| Norfolk-Portsmouth-Newport News, VA | 49.1% | 26.1% | 75.1% | 3,705 | 6,261 | 2,557 |
| Portland, OR | 23.3% | 22.4% | 45.8% | 2,524 | 3,571 | 1,046 |
| Sacramento-Stockton-Modesto, CA | 16.2% | 17.3% | 33.5% | 2,943 | 3,503 | 560 |
| San Diego, CA | 22.5% | 28.7% | 51.2% | 2,539 | 3,832 | 1,293 |
| St. Louis, MO | 27.3% | 27.6% | 54.9% | 2,837 | 4,344 | 1,507 |
| Wilkes Barre-Scranton-Hazleton, PA | 19.1% | 50.5% | 69.6% | 3,265 | 5,196 | 1,931 |

70. As indicated by the preceding chart, the post-merger HHI in each Big 4 Overlap DMA is well above 1,800, and the HHI increase in each Big 4 Overlap DMA far exceeds the 100-point threshold. In fact, the post-merger HHIs are **all** over 3,300 and the HHI increases are **all** well over 100. All of the merged shares are above 30%.

71. Thus, the merger presumptively violates Section 7 of the Clayton Act in each Big 4 Overlap DMA.[36]

---

[35] Ratings data from S&P Capital IQ, Comscore TV Average Ratings, Q4 2025.
[36] "Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive." *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001).

## VII. THE TRANSACTION ELIMINATES DIRECT HEAD-TO-HEAD COMPETITION

72. The elimination of head-to-head competition provides additional reasons that the Transaction is unlawful. A merger is unlawful if it substantially lessens competition between the parties independent of the analysis of market shares, as recognized by the Merger Guidelines.

73. Prior to closing, Nexstar and TEGNA were close competitors. Nexstar and TEGNA competed for viewers, and Nexstar and TEGNA competed closely in the Licensing of Big 4 Retransmission Consent market. TEGNA acknowledged in an internal email that ███ ████████████████████████████████████████ Additionally, Nexstar tracked TEGNA's ███████████████████████████ and monitored and compared ███ ████████████████████████████████

74. The Transaction eliminated substantial head-to-head competition between Defendants in each Big 4 Overlap DMA in the Licensing of Big 4 Retransmission Consent market. Increased duopoly power through the loss of Nexstar/TEGNA competition will lead to higher retransmission fees that, as a result of business practices, Nexstar will spread among its Big 4 stations generally. The loss of competition between Nexstar and TEGNA in the Overlap DMAs gives Nexstar the power to charge MVPDs higher fees to retransmit its content across its entire portfolio because of its massively increased baragaining leverage. In turn, those MVPDs are likely to pass on the increased retransmission consent fees, in significant measure, to their subscribers in the form of substantially higher cable and satellite bills.[37]

75. Nexstar's Chief Financial Officer Lee Ann Gliha acknowledged that Nexstar anticipates collecting higher retransmission consent fees when she stated that "there's about $300 million of synergies [in this merger]. It breaks out very similar to how the synergies broke out on the [Nexstar/Tribune Merger], which was about 45% from net retrans[.]"[38]

---

[37] Decl. of Allan L. Shampine at ¶ 5, Petition to Deny of DIRECTV, LLC at E-14, *In the Matter of Applications to Transfer Control of TEGNA Inc. to Nexstar Meda Inc.,* MB Docket No. 25-331 (Dec. 31, 2025); see *id*., at 29-31 (citing previous comments filed with the FCC and economic studies).

[38] Nexstar, *Nexstar Media Group, Inc. Q3 2025 Earnings Call Transcript* (Nov. 6, 2025).

76. The Transaction has increased the bargaining power of Nexstar because, in more DMAs, it will be providing access to multiple Big 4 stations rather than to only one. That increases its ability to demand higher fees and to threaten negative consequences to MVPDs and their viewers if the MVPDs resist. The merged company has the power to threaten to black out multiple Big 4 stations simultaneously in each of the Big 4 Overlap DMAs, something Nexstar and TEGNA could not do independently prior to the merger. And the merger has reduced the extent to which MVPD subscribers in a Big 4 Overlap DMA could substitute an independently-owned competing Big 4 station in the event of a blackout, thereby increasing an MVPD's expected losses from a blackout and increasing the retransmission consent fees that Defendants could profitably demand.

77. By way of an example, prior to the merger, if an MVPD serving Sacramento was negotiating with Nexstar and a blackout resulted from stalled negotiations, the Sacramento MVPD customer could switch from the Nexstar-owned FOX affiliate KTXL-TV (FOX10) to the TEGNA-owned ABC affiliate KXTV-TV (ABC10) to watch local news or sports programming. Post-merger, in the same scenario, Nexstar now owns the local ABC affiliate, KXTV-TV, meaning: (1) a consumer who lives in Sacramento will be unable to watch either FOX or ABC during the Nexstar-related blackout; and (2) in order to avoid its customers canceling their subscriptions *en masse* due to a blackout of two of the Big 4, the bargaining MVPD will be far more incentivized to pay higher retransmission consent fees to reach a deal with Nexstar and expeditiously end the blackout. Higher retransmission consent fees ultimately lead to higher prices borne by consumers.

78. The Transaction will also increase retransmission consent fees across Nexstar's entire portfolio because of the growth in the number of MVPD subscribers in Nexstar DMAs based solely on the increased number of subscribers with access to Nexstar content (*i.e.*, independent of the increased leverage gained from the Overlap DMAs). By increasing Nexstar's footprint across the nation, the merger will likely increase its bargaining leverage in those negotiations which, in turn, will result in higher retransmission fees for Nexstar Big 4 broadcast

content across its DMAs.  Standard industry practice demonstrates that Nexstar spreads these price increases across its Big 4 stations.

79. The Transaction may also result in increased retransmission consent fees because, as part of Nexstar's established acquisition strategy, it moves acquired stations to Nexstar's retransmission consent agreements.[39]  Among all broadcasting groups, Nexstar charges the highest average monthly retransmission consent fees per subscriber.[40]

80. The loss of competition between Nexstar and TEGNA will also likely lead to the consolidation of local television newsrooms in the Big 4 Overlap DMAs, reducing the quantity and quality of local news options available to consumers in each such DMA.

81. Nexstar has an established track record of consolidating newsrooms when it owns more than one station in a DMA, meaning it reduces the independent news operations from two to one.[41]  As Nexstar described it to investors in June 2025, a key component of "The Nexstar Consolidation Playbook" is "[o]perat[ing] multiple stations with one infrastructure," and "[r]ationalization of station overhead costs."[42]  Among other things, a significant portion of the

[39] Nexstar Media Group, Inc. (Form 10-K) at 6 (Feb. 27, 2026) ("Historically, we have been able to achieve significant improvements from acquisitions of television broadcasting assets by applying our favorable distribution contracts to newly acquired stations…"); Nexstar Investor Presentation at 22.
[40] *See* Nexstar Investor Presentation at 28.
[41] *See*, *e.g.*, Mark. K. Miller, *WYOU Dumps Local News, Fires 14*, TVNewsCheck (Apr. 3, 2009), https://tvnewscheck.com/uncategorized/article/wyou-dumps-local-news-fires-14/?rcp_action=lostpassword; Scott D. Pierce, *New Owners Lay Off KTVX and KUCW Staffers*, The Salt Lake Tribune (Dec. 19, 2012), https://archive.sltrib.com/article.php?id=55491871&itype=CMSID; Merrill Knox, *Richard Doutree Jones Named GM at Salt Lake City's KTVX-KUCW*, AdWeek (Jan. 7, 2013), https://www.adweek.com/tvspy/richard-doutrejones-named-gm-at-salt-lake-citys-ktvx-kucw/; Kevin Eck, *Layoffs Hit Little Rock's KLRT and KARK*, AdWeek (Jan. 30, 2013), https://www.adweek.com/tvspy/layoffs-hit-little-rocks-klrt-and-kark/; Kevin Eck, *Nexstar Putting Both Fresno Stations Under One Roof*, AdWeek (May 24, 2013), https://www.adweek.com/tvspy/nexstar-putting-both-fresno-stations-under-one-roof/; Arkansas Business Staff, *Almost 30 Lose Jobs at KARK, KLRT as TV Owners Consolidate*, Arkansas Business (Jan. 29, 2013), https://archive.ph/ju9PX#selection929.0-934.0; *More Layoffs from Nexstar at NewsChannel9*, CNYRadio.com (Dec. 3, 2012), https://cnyradio.com/2012/12/03/layoffs-rumored-as-new-owners-arrive-at-newschannel-9/; Christopher Lawrence, *Layoffs Hit Las Vegas' KLAS-TV*, Las Vegas Rev. J. (June 4, 2015), https://www.reviewjournal.com/business/layoffs-hit-las-vegass-klas-tv/; Dade Hayes & Ted Johnson, *Nexstar Laying Off 2% Of Workforce, Focusing Cuts On Local Stations*; *The Hill Editor-In-Chief Bob Cusack Also Sets Exit*, Deadline (Dec. 11, 2024), https://deadline.com/2024/12/nexstarlayoffs-local-stations-the-hill-editor-in-chief-bob-cusack-exits-1236200879/.
[42] Nexstar Investor Presentation at 22.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

cost savings that Nexstar achieves from newsroom consolidation arises from eliminating jobs.  In such DMAs, formerly independent newsrooms that generated their own stories, employed separate slates of staff and talent, and made separate editorial decisions, now rely on a single talent team, share a single website, and offer essentially the same local news.  For example, Nexstar has a duopoly in the Indianapolis DMA, where it owns both the FOX and CBS affiliates.  These two Big 4 networks' local affiliate newsrooms, however, are not independent: they are under the leadership of a single news director, they share the same anchors and reporting team, and they have a single website (Fox59.com)..[43]  The same is true in numerous other DMAs where Nexstar is a duopolist..[44]

82.    Having acquired TEGNA, Nexstar will now follow its historical pattern of newsroom consolidation, and viewers in the Big 4 Overlap DMAs will lose options for where to get their local TV news.  Indeed, this anticipated consolidation is central to Nexstar's plan: in its August 2025 presentation to investors regarding the acquisition of TEGNA, Nexstar highlighted the cost savings associated with shrinking news operations as a source of efficiencies in the deal..[45]  Nexstar's Chief Financial Officer Lee Ann Gliha told investors, "there is obviously the significant amount of 35 or 51 markets that are the overlap markets that we can really operate two stations off of one infrastructure.  [T]hat is an area where there's a significant portion of those synergies.".[46]  Simply put, the loss of competition between Nexstar and TEGNA in the Big 4 Overlap DMAs means that viewers in those DMAs will have fewer options for local news.

[43] Fox59.com (last visited Mar. 18, 2026).

[44] *See, e.g.,* DirecTV February 20, 2026 Letter at 16-17, *2022 Quadrennial Regulatory Review - Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 22-459 (describing 14 duopoly DMAs in which the two Nexstar Big 4 affiliate stations share a single news website, the same news director, and the same talent).

[45] Nexstar Media Group, Inc. Acquisition of TEGNA Inc. at 8 (Aug. 2025), https://www.nexstar.tv/wp-content/uploads/2025/08/August-2025-TEGNA-Acquisition-Deck.pdf; *see also*

Nexstar, *Nexstar Media Group, Inc. Q3 2025 Earnings Call Transcript* (Nov. 6, 2025).

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

83. Fewer newsrooms in a Big 4 Overlap DMA will also likely result in a shift from local news to more centralized programming, and a loss of independent, diverse viewpoints.[47] Audiences rely on their local news broadcasts for reporting on community events, local elections, and local emergency coverage, among other things.[48] Multiple stations in a DMA can compete by differentiating their news focus, with some emphasizing "breaking news" stories or crime-related topics, for example, and others following a more local-government/issues-focused strategy.[49] Combining newsrooms in a DMA reduces the number of independent decision-making centers that determine what is newsworthy and how to report it, potentially diminishing the depth and variety of information reported in that community. When combining newsrooms, Nexstar has often shifted local news programs toward more regional or national programming, and the emphasis on profitability means that station managers are "incentivized to run centralized content," negatively impacting the quality of local news viewers can access.[50] Furthermore, by

[47] *See, e.g.*, Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs*, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/ (finding, based on a survey of television station executives and employees in 504 local news stations, a significant decrease in local news quality and increase in reliance on outside produced material particularly for stations tied to large conglomerates).

[48] Local TV stations are "one of the few trusted sources" for viewers looking for local stories. Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs*, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/.

[49] Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs* at 19, Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/.

[50] *See* Petition to Deny of Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Indiana Cable and Broadband Association, Mississippi Cable Telecommunications Association, Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia at 53, *In the Matter of Applications to Transfer Control of Tegna Inc. to Nexstar Media Inc.,* MB Docket No. 25-331 (Dec. 31, 2025), https://www.fcc.gov/ecfs/document/123173493805/1; *see also* Meaghan Winter, Nexstar Nation, Columbia Journalism Review, (July 20, 2020), https://www.cjr.org/special_report/nexstar-nation.php (Even where station managers personally value accountability journalism, they are ultimately "tasked with keeping the station profitable," which requires "running more hours of news programming with a lean staff" ); Danilo Yanich & Benjamin E. Bagozzi, *Reusing the News: Duplicating Local TV Content*, Univ. Of Del. Biden Sch. Of Pub. Pol'y & Admin. (Aug. 2025), https://www.reusingthenews.org (finding Nexstar, across all major station owners, controls the highest share of stations with duplicated content across the United States; "Duplication is based on economies of scale not on the information needs of citizens"); Thomas E. Patterson, *Can They Do Good and Still Do Well? Local TV Stations and Communities' Information Needs*,

(continued…)

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

eliminating competition from TEGNA in the Big 4 Overlap DMAs and by vastly expanding its footprint nationwide, Nexstar has gained significant control over editorial policy and the power to suppress viewpoints and exclude voices that are essential to a robust political and social discourse.[51]

84. For these reasons, the merger of Nexstar and TEGNA has substantially lessened, or is substantially likely to lessen, competition in the Licensing of Big 4 Retransmission Consent in each of the Big 4 Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VIII. THE ACQUSITION IS PART OF NEXSTAR'S LONGSTANDING STRATEGY OF SERIAL ACQUSITIONS

85. "A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7."[52] Under the Merger Guidelines, "the Agencies will consider individual acquisitions in light of the cumulative effect of related patterns or business strategies."[53]

86. Nexstar has engaged in an anticompetitive pattern and strategy of pursuing consolidation through acquisitions in the Licensing of Big 4 Retransmission Consent market. This Transaction is the latest in Nexstar's serial acqusition strategy. Nexstar has engaged in what it describes as a "consolidation wave" of 20 acquisitions of stations and broadcast companies between 2010 and 2019, including its acquisitions of Tribune Media for $6.4 billion and Media

Shorenstein Center (June 4, 2025), https://shorensteincenter.org/resource/can-good-still-well-local-tv-stations-communities-information-needs/ ("Ownership groups for decades have been extracting more output from fewer staff with less money. We're getting ever closer to the point of simply being unable to get newscasts on the air because we just don't have the people to do it... Our corporate ownership cares more about making money than serving our community. Local news needs investment from ownership, not just to increase content and coverage, but for staff. The current staff is spread too thin.")

[51] Nexstar has already exercised its editorial power over local news to promote views that favor its own business agenda. *See, e.g.*, Matthew Keys, *Nexstar Orders Stations to Run News Stories about FCC Deregulation Efforts*, The Desk (Apr. 7, 2025) https://thedesk.net/2025/04/nexstar-fcc-must-runs-ownership-caps-deregulation/ ("Nexstar Media Group has ordered most of its 160-plus owned stations to air segments during local newscasts encouraging viewers to contact the FCC to support broadcast ownership deregulation").

[52] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, Guideline 8 at 23.

[53] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, Guideline 8 at 23.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

General for $4.6 billion.[54]  And Nexstar is not stopping anytime soon, announcing, "We plan to continue to pursue television station acquisitions."[55]

87.  Nexstar's acquisitions follow its "Consolidation Playbook,"[56] in which it moves acquired entities to Nexstar's retransmission consent agreements and "[o]perate[s] multiple stations with one infrastructure."[57]  This playbook increases retransmission consent fees for MVPDs, leads to higher cable and satellite bills for consumers, and degrades the content, quantity and quality of local news broadcasts throughout the Big 4 stations.

88.  Additionally, under the Merger Guidelines, "the Agencies may evaluate the series of acquisitions as part of an industry trend[.]"[58]

89.  Nexstar's acquisitions are part of an industry trend toward consolidation.  For example, between 2014 and 2024, a series of broadcast television ownership deals resulted in the three largest firms controlling 40% of all local stations.  In 2025, Sinclair, Inc., the second-largest broadcast television company in the United States, acquired a stake in E.W. Scripps, another large broadcast television company, "in a move to push toward a merger of the companies."[59]  Over the past year, Gray Media, another large broadcast television company in the United States, acquired television stations across the country.[60]  These large broadcast television companies have acknowledged that the Transaction will embolden them to pursue more consolidation themselves.

[54] Nexstar Investor Presentation at 20; Tribune Media Co., *Nexstar Media Group Enters Into Definitive Agreement To Acquire Tribune Media Company* (December 3, 2018), https://www.tribunemedia.com/nexstar-media-group-enters-into-definitive-agreement-to-acquire-tribune-media-company/; Nexstar Media Group, Inc., *Nexstar Broadcasting Group Enters Into Definitive Agreement To Acquire Media General For $4.6 Billion In Accretive Cash And Stock Transaction* (January 27, 2016) https://www.nexstar.tv/nexstar-broadcasting-group-enters-into-definitive-agreement-to-acquire-media-general-for-4-6-billion-in-accretive-cash-and-stock-transaction/.
[55] Nexstar Media Group, Inc. (Form 10-K) at 6 (Feb. 27, 2026).
[56] Nexstar Investor Presentation at 22.
[57] *Id.*
[58] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, Guideline 8 at 23.
[59] Lillian Rizzo, *E.W. Scripps Stock Surges 40% After Sinclair Takes Stake, Pushes for a Merger,* CNBC (Nov. 17, 2025), https://www.cnbc.com/2025/11/17/sinclair-scripps-stake-merger-push.html.
[60] Jeff Kolkey, *Gray Media to Buy 13 WREX in Rockford and 9 other TV Stations Across US for $171M,* Knox News (Aug. 8, 2025), https://www.knoxnews.com/story/news/regional/2025/08/08/gray-media-moves-to-acquire-10-new-television-stations/85574733007/.

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

Sinclair's President and CEO stated that "[T]here's no doubt that having a precedence of such a large transaction like Nexstar, Tegna go through and people seeing what the rules are on a confirmed basis is going to be exceptionally helpful for M&A going forward. . . . [I]t is going to be very helpful in terms of paving the way for future transactions."[61] Gray Media's Executive Chairman and CEO stated, "[I]f Nexstar-Tegna closes. . . it may put a little impetus on our company to get larger. … we, believe that consolidation is important for the industry[.]"[62]

90.     Thus, the cumulative effects of Nexstar's serial acquisitions include increased consolidation and substantial lessening of competition in the relevant market for the Licensing of Big 4 Retransmission Consent.

## IX.     <u>THE TRANSACTION WILL LIKELY HAVE SERIOUS ANTICOMPETITIVE EFFECTS</u>

91.     The Transaction has resulted, and will continue to result, in a substantial lessening of competition in the market for the Licensing of Big 4 Retransmission Consent.  The loss of competition between Nexstar and TEGNA gives Nexstar the power to charge MVPDs higher fees to retransmit its content, both through increased bargaining leverage in retransmission negotiations with MVPDs and, separately, through "after-acquired" clauses.  These higher fees are being, or will be, passed on to television consumers, resulting in higher costs for a substantial portion of the citizens of the Plaintiff States.

92.     These harms are not limited to television consumers in the Big 4 Overlap DMAs.  Because the Transaction materially increases Nexstar's national footprint and bargaining leverage in negotiations that are commonly conducted on a station-group, multi-market basis, the Transaction will likely result in higher retransmission consent fees—and costs to television consumers—in all Nexstar Big 4 DMAs.

93.     The Transaction also threatens to degrade the quality and quantity of local news programming in each impacted DMA—an additional harm to competition, to the citizens of the Plaintiff States, and to the general economies of the States.

---

[61] Sinclair, Inc., *Q4 2025 Earnings Call Transcript* at 11 (Feb. 25, 2026).
[62] Gray Media, Inc. *Q4 2025 Earnings Call Transcript* at 8 (Feb. 26, 2026).

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

## X. THERE ARE NO COUNTERVAILING FACTORS TO JUSTIFY THE TRANSACTION

94. The Merger Guidelines recognize that, in certain transactions, there may exist "'other pertinent factors' that may 'mandate[] a conclusion that no substantial lessening of competition [is] threatened by the acquisition.'"[63] No "other pertinent factors" mandate such a conclusion here.

95. Entry of a new broadcast station group into a Big 4 Overlap DMA would not be timely, likely, or sufficient to prevent or remedy the merger's likely anticompetitive effects in the relevant markets. The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited, and the regulatory process associated with obtaining a license is lengthy. Even if a new signal were to become available, commercial success would come over a period of many years, if at all.

96. Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption of the Transaction's anticompetitive effects.

97. Defendants cannot establish that TEGNA, the acquired firm, "face[s] the grave probability of a business failure," has "dim or nonexistent" prospects for reorganization, and/or that Nexstar "is the only available purchaser."[64]

## XI. VIOLATIONS ALLEGED

98. The merger of Nexstar and TEGNA has substantially lessened, or is substantially likely to lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

99. Unless remedied, the merger likely would have the following effects in the market for the Licensing of Big 4 Retransmission Consent across the nation, among others:

a. Competition between Nexstar and TEGNA in the Licensing of Big 4 Retransmission Consent in each of the Big 4 Overlap DMAs would be eliminated, raising prices and harming variety, differentiation and quality, such as with the elimination of

---

[63] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines § 3, at 30 (quoting *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974)).
[64] U.S. Department of Justice and Federal Trade Commission, 2023 Merger Guidelines, § 3 at 30 (alterations in original) (internal quotation marks omitted).

31

independent local news and other content.

b. Nexstar's total subscriber base and bargaining power in the Licensing of Big 4 Retransmission Consent across its national footprint would increase significantly as a result;

c. the fees charged to MVPDs for the Licensing of Big 4 Retransmission Consent in each of the Big 4 Overlap DMAs would increase due to the loss of competition between Nexstar and TEGNA; and

d. the fees charged to MVPDs for the Licensing of Big 4 Retransmission Consent in DMAs beyond the Big 4 Overlap DMAs would increase due both to Nexstar imposing higher fees from Big 4 Overlap DMAs across other DMAs and Nexstar's increased bargaining power across its national footprint.

## XII. REQUESTED RELIEF

100. The Plaintiff States request that:

a. the Court adjudge Nexstar's acquisition of TEGNA to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b. the Court order effective relief to restore competition and unwind or remedy the anticompetitive effects of Nexstar's acquisition of TEGNA, including divestiture, recission, or such other structural and injunctive relief as the Court deems necessary and proper;

c. the Court award Plaintiff States the fees and costs of this action; and

d. the Court award such other relief to Plaintiff States as the Court may deem just and proper.

Dated: April 30, 2026

Respectfully submitted,

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

/s/ *Laura Antonini*
Laura Antonini (SBN 271658)
Deputy Attorney General

Paula Blizzard (SBN 207920)
Senior Assistant Attorney General
Paul Chander (SBN 305133)
Elizabeth Cheever (SBN 341421)
Emily Curran (SBN 293065)
Jennifer Hane (SBN 275729)
Komal K Patel (SBN 342765)
Connie P. Sung (SBN 304242)
Brian Wang (SBN 284490)
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7014
Telephone: (415) 510-3765
Email: Paula.Blizzard@doj.ca.gov
       Laura.Antonini@doj.ca.gov

s/ *Shaoul Sussman*
Shaoul Sussman (*Admitted Pro Hac Vice*)
Nico Gurian (*Admitted Pro Hac Vice*
Victoria M. O. Field (*Admitted Pro Hac Vice*)
Paul M. Goodrich (*Admitted Pro Hac Vice*)
Simonsen Sussman LLP
307 W. 38th St., 16th Fl.
New York, NY 10018
Telephone: (646) 693-3929
Email:  shaoul@simonsensussman.com
        nico.gurian@simonsensussman.com
        victoria.field@simonsensussman.com
        paul.goodrich@simonsensussman.com

Catherine S. Simonsen (SBN 307325)
Thomas G. Mattes (SBN 355010)
Simonsen Sussman LLP
418 Bamboo Ln., Suite C-18
Los Angeles, CA 90012
Telephone: (917) 747-5196
Email: catherine@simonsensussman.com
        thomas.mattes@simonsensussman.com

Nicolas A. Stebinger (*Admitted Pro Hac Vice*)
Victoria R. Sims (*Admitted Pro Hac Vice*)
Simonsen Sussman LLP
1629 K St. NW, Suite 300

33

Washington, DC 20006
Telephone: (202) 384-3130
Email: nicolas@simonsensussman.com
victoria.sims@simonsensussman.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General

*/s/Bryn Williams*
Bryn A. Williams
First Assistant Attorney General (SBN 301699)
Jonathan B. Sallet (*Admitted Pro Hac Vice*)
Special Assistant Attorney General
Robin Alexander (*Admitted Pro Hac Vice*)
Assistant Attorney General
Amy Bowles (*Admitted Pro Hac Vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Bryn.Williams@coag.gov
Jon.Sallet@coag.gov
Robin.Alexander@coag.gov
Amy.Bowles@coag.gov

*Attorneys for the State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General
(*Admitted Pro Hac Vice*)

*/s/ Julián A. Quiñones Reyes*
Julián A. Quiñones Reyes (*Admitted Pro Hac Vice*)
Assistant Attorney General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF STATE OF ILLINOIS:

KWAME RAOUL
Attorney General of Illinois

/s/ *Paul J. Harper*
Paul J. Harper (*Admitted Pro Hac Vice*)
Supervising Attorney, Antitrust Bureau

Elizabeth L. Maxeiner (*Admitted Pro Hac Vice*)
Chief, Antitrust Bureau
John R. Milligan (*Admitted Pro Hac Vice*)
Daniel R. Betancourt (*Admitted Pro Hac Vice*)
Assistant Attorneys General
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (312) 814-1004
E-Mail: paul.harper@ilag.gov
*Attorneys for Plaintiff State of Illinois*


FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
Attorney General of Indiana

/s/ *Scott L. Barnhart*
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Consumer Protection
(*Pro hac vice forthcoming*)
Jesse Moore, Atty. No. 37654-49
Deputy Attorney General (*Pro hac vice forthcoming*)
Jacob Patterson, Atty. No. 38302-29
Deputy Attorney General (*Pro hac vice forthcoming*)

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956

35

Fax: (317) 232-7979
Email: Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*


FOR PLAINTIFF STATE OF KANSAS:

KRIS KOBACH
Attorney General of Kansas

*/s/ John Harris*
John Harris (*Pro Hac Vice forthcoming*)
Assistant Attorney General
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
John.Harris@ag.ks.gov
785-296-2215

*Attorney for the Plaintiff State of Kansas*


FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL,
Attorney General of Massachusetts

*/s/ Anthony W. Mariano*
Anthony W. Mariano (*Pro Hac Vice forthcoming*)
Chief, Antitrust Division
Jennifer E. Greaney (*Pro Hac Vice forthcoming*)
Deputy Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (781) 835-7990
Anthony.Mariano@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FIRST AMENDED COMPLAINT FOR A PERMANENT INJUNCTION

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ *Elinor R. Hoffmann*
Elinor R. Hoffmann (*Admitted Pro Hac Vice*)
Chief, Antitrust Bureau
Christopher D'Angelo (*Admitted Pro Hac Vice*)
Chief Deputy Attorney General
Economic Justice Division
Amy McFarlane (*Admitted Pro Hac Vice*)
Deputy Chief, Antitrust Bureau
Morgan Feder (*Admitted Pro Hac Vice*)
Assistant Attorney General, Antitrust Bureau
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov | (212) 416-8269
Christopher.D'Angelo@ag.ny.gov |
   (212) 416-6124
Amy.McFarlane@ag.ny.gov | (212) 416-6195
Morgan.Feder@ag.ny.gov | (212) 416-8288

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF NORTH
CAROLINA:

JEFF JACKSON
Attorney General of North Carolina

KUNAL CHOKSI (*Admitted Pro Hac Vice*)
Senior Deputy Attorney General

/s/ *Francisco Benzoni*
Francisco Benzoni (*Admitted Pro Hac Vice*)
Special Deputy Attorney General
Brian Rabinovitz (*Admitted Pro Hac Vice*)
Director of Major Litigation for Consumer
Protection
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
fbenzoni@ncdoj.gov
brabinovitz@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon


*/s/ Alex DeLorenzo*
Timothy D. Smith (*Admitted Pro Hac Vice*)
Attorney-in-Charge
Ian Van Loh (SBN 280254)
Alex DeLorenzo (*Admitted Pro Hac Vice*)
Senior Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR  97201
tim.smith@doj.oregon.gov | 503.798.3297
ian.vanloh@doj.oregon.gov | 971.239.7457
alex.delorenzo@doj.oregon.gov | 503.428.9482

*Attorneys for Plaintiff State of Oregon*


FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA:

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

*/s/ Tracy W. Wertz*
Tracy W. Wertz (*Pro Hac Vice forthcoming*)
Chief Deputy Attorney General
Antitrust Section
twertz@attorneygeneral.gov

*/s/ Joseph S. Betsko*
Joseph S. Betsko (*Pro Hac Vice forthcoming*)
Assistant Chief Deputy Attorney General
Antitrust Section
jbetsko@attorneygeneral.gov

Jennifer A. Thomson (*Pro Hac Vice forthcoming*)
Senior Deputy Attorney General
Antitrust Section
jthomson@attorneygeneral.gov

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: (717) 787-4530

*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

38

FOR PLAINTIFF STATE OF VERMONT:

CHARITY R. CLARK
Attorney General of Vermont

*/s/ Sarah L. J. Aceves*
Sarah L. J. Aceves (*Pro Hac Vice forthcoming*)
Assistant Attorney General
Public Protection and Antitrust Unit
Office of the Attorney General of Vermont
109 State Street
Montpelier, VT 05676
sarah.aceves@vermont.gov
(802) 828-3170

*Attorney for Plaintiff State of Vermont*

FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:

JAY JONES
Attorney General of Virginia

*/s/ Tyler T. Henry*
Tyler T. Henry (*Admitted Pro Hac Vice*)
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
THenry@oag.state.va.us
(804) 692-0485

*Attorneys for the Plaintiff Commonwealth of Virginia*

39