Glenn D. Pomerantz (State Bar No. 112503)
  glenn.pomerantz@mto.com
Kuruvilla J. Olasa (State Bar No. 281509)
  kuruvilla.olasa@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Justin P. Raphael (State Bar No. 292380)
  justin.raphael@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

McGregor Scott (State Bar No. 142413)
  mscott@kslaw.com
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone:  (916) 321-4800

Olivier N. Antoine (*pro hac vice*)
  oantoine@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Telephone:  (212) 556-2100

M. Sean Royall (*pro hac vice*)
  sroyall@kslaw.com
Emily Blackburn (*pro hac vice*)
  eblackburn@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone:  (202) 737-0500

*Attorneys for Plaintiff DIRECTV, LLC*
*Additional Counsel on Signature Page*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| IN RE: NEXSTAR-TEGNA MERGER LITIGATION | No. 2:26-cv-00976-TLN-CKD |
| | **DIRECTV, LLC'S AMENDED COMPLAINT FOR INJUNCTIVE RELIEF** |

# I. <u>INTRODUCTION</u>

1.       Defendant Nexstar Media Group, Inc. ("Nexstar"), the largest owner of local broadcast television stations in the country, proposes to follow through with a merger that, if fully consummated, will drive up the cost of television service to tens of millions of Americans and shutter local newsrooms around the country, substantially reduce competition in dozens of local markets and harm consumers, and violate the Clayton Act's clear prohibitions.  This unlawful merger should be stopped.

2.       Nexstar, already number one, seeks to fully integrate its operations with those of Defendant TEGNA Inc. ("TEGNA"), the second largest owner of local English-language television stations in the nation.

3.       Nexstar admits the merger will greatly increase its already huge "scale" and its "leverage," *i.e.*, its ability to force its TV distribution customers, including Plaintiff DIRECTV, LLC ("DIRECTV"), to pay ever higher fees for local news, live sports, and other content they distribute to their subscribers.  Nexstar will also shut down local newsrooms in more than a dozen markets, reducing the amount, variety, and quality of local broadcast news that Americans rely on for trusted information about their communities.  Combining Nexstar and TEGNA will eliminate the current competition between their stations and result in price increases despite reduced variety and quality of their programming.  Those harms from reduced competition are precisely what the antitrust laws are designed to prevent.

4.       DIRECTV brings this action to fully and permanently enjoin this unlawful merger and to fully restore competition to the status quo that existed at the time this action was filed.  DIRECTV is a distributor that purchases, among other things, the rights to retransmit local television broadcast stations to its subscribers.  Nexstar's purpose in acquiring TEGNA is to drive up the price it can extract from DIRECTV and other distributors, which will force them to raise prices to their subscribers.

5.       Despite the proliferation of video streaming services, Americans continue to depend heavily on local broadcast television for access to news about their communities, sporting events, and other local content.  Because broadcast content remains very valuable, the local

2

**AMENDED COMPLAINT**

broadcast television business collects more revenue from its broadcast rights than ever before.

6.      No one knows this better than Nexstar, with its market capitalization of over $7 billion and annual revenues over $4.9 billion in 2025.  Nexstar reports that it owns 164 broadcast stations across 114 markets.  Its stations already reach 70% of American households.  Nexstar describes this as "a massive scale portfolio of broadcast assets unlike any other"[1]—in fact, "~75%+ larger than the other major broadcast network owners."[2]

7.      Nexstar now proposes to fully absorb and integrate TEGNA, which owns 64 local broadcast stations across 51 local markets and is similarly thriving: it has a market capitalization of over $3 billion and annual revenues almost the same figure.

8.      This merger would create a massive concentration of market power.  The acquisition would give Nexstar control of 228 broadcast stations reaching 80% of television households in 132 local markets and increase concentration in dozens of local markets by more than 10 times the amount that is presumptively unlawful under the antitrust laws.  That enormous increase in market power will enable Nexstar to raise prices and reduce the amount, variety, and quality of local news without having to worry about losing business to competition.

A.      **Higher Fees, Higher Prices**

9.      Nexstar and TEGNA's stations operate under licenses to broadcast signals over airwaves that are owned by the American people.  Many of their stations have affiliated themselves with the "Big Four" networks:  ABC, CBS, FOX, and NBC.  Traditionally, Big Four local broadcast television stations have used those public airways to offer (a) their own content, including local news; (b) syndicated content—talk shows, game shows and reruns of prior series that are not in current production; and (c) current content produced by their Big Four network affiliate—like currently produced series, the Olympic Games, and NFL football.  American consumers value all of these kinds of programming.

---

[1] Nexstar Media Group (NXST) Q4 2024 Earnings Call Transcript (Feb. 27, 2025), https://mlq.ai/stocks/NXST/earnings-call-transcript/Q4-2024 (statement of Perry Sook, Nexstar Chairman and CEO).

[2] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 5 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

3

**AMENDED COMPLAINT**

10. Big Four affiliates sell multi-channel video programming distributors ("MVPDs") the rights to retransmit their content to viewers. DIRECTV and other MVPDs must buy those rights to retransmit broadcast content as part of the pay TV packages they offer to subscribers.

11. Since 2010, retransmission license fees charged by broadcasters have increased more than *2,000 percent*. If the price of milk had risen that much during the same period, then it would now cost $50 per gallon. Any increase in retransmission fees raises MVPDs' programming costs and in turn results in higher prices for TV subscribers.

12. This merger will enable Nexstar to increase license fees even further, resulting in even higher prices for DIRECTV and its subscribers. Nexstar has a "Consolidation Playbook" that describes acquisitions as a way to gain "scale" and "leverage," with the ultimate aim of raising prices. Nexstar would gain leverage from this merger not only by significantly increasing the number of stations it owns, from 164 to 228 local stations, but also by acquiring Big Four affiliates in 31 local markets where it owns at least one Big Four affiliate already.

13. A key source of Nexstar's leverage is the ability to threaten and impose blackouts. When DIRECTV or any other MVPD refuses to agree to the increased fees Nexstar demands, Nexstar will black out its stations, or threaten to do so, as a means of coercing the MVPD to agree to its pricing demands. That threat leaves distributors with two very bad options: acquiesce to Nexstar's higher fees, or lose access to these stations, thereby blocking the MVPD's subscribers from accessing the content carried on the blacked-out stations and driving some consumers to switch to other distributors' services where they can find that same content.

14. Blackouts of Big Four networks cause MVPDs significant harm because they cause subscribers to leave the blacked out MVPD for another provider, and in many cases they don't come back. On the other hand, Nexstar suffers relatively limited harm in a blackout because many subscribers who leave a blacked out MVPD switch to another distributor that is paying Nexstar. Thus, in any blackout, Nexstar has far less to lose than DIRECTV or other MVPDs.

15. The merger would make Nexstar's Big Four blackout threats even more coercive. Once Nexstar owns not just one but two or even three Big Four affiliates in a local market—the situation this merger will create in 31 local markets nationwide—any MVPD that refuses

4

AMENDED COMPLAINT

Nexstar's demands will risk leaving its subscribers in that area without multiple sources of live sports and local news, and potentially unable to watch any NFL football on Sunday afternoons, for example. That will make subscribers even more likely to switch to another distributor that is still paying for Nexstar's stations.

16. In short, by making blackouts even more painful for distributors like DIRECTV, the merger will make it even harder for them to resist Nexstar's demands for higher prices.

**B.** **Harm to Local Broadcast News**

17. The merger will also reduce the output, variety, and quality of local broadcast news content. Nexstar has promised that it will "operate 2 television stations off of 1 infrastructure" in markets where Nexstar and TEGNA stations have previously "overlapped."[3] In other words, in dozens of local markets, Nexstar will operate one newsroom instead of two; employ one newsroom staff instead of two; support one team investigating local government and business instead of two; and provide one editorial viewpoint instead of two.

18. Nexstar has done this in the 14 markets where it already owns two Big Four stations. In those markets, Nexstar has "consolidated operations" by laying off news staff, reducing two independent news voices to one. Pursuant to its playbook, Nexstar would do the same in the 31 local areas where the merger would give it additional Big Four affiliates in markets in which it already has at least one Big Four affiliate.

19. Shutting down local newsrooms will reduce the amount, variety, and quality of local news on the stations that Nexstar and TEGNA license to DIRECTV and other MVPDs. All else equal, broadcast stations with less local news—and less varied and lower quality local news—provide less benefit to MVPDs' subscribers and are therefore less valuable to MVPDs. In other words, the merger will enable Nexstar to reduce the quality of the content it sells to DIRECTV and other MVPDs. That, in turn, will reduce the quality of local news available to DIRECTV's subscribers who watch Nexstar's local broadcast stations, and reduce the value of DIRECTV's

---

[3] UBS Global Media and Communications Conference Transcript (Dec. 8, 2025), https://seekingalpha.com/article/4851317-nexstar-media-group-inc-nxst-presents-at-ubs-global-media-and-communications-conference-2025 (statement of Lee Ann Gliha, Nexstar CFO).

**AMENDED COMPLAINT**

service to its subscribers.

20.    In short, by acquiring TEGNA's competing stations, Nexstar will deprive distributors and consumers of the benefits of competition:  lower prices and higher quality. Instead, Nexstar will be able to raise prices and reduce quality.  DIRECTV and its subscribers will end up paying more for less.

### C.    No Procompetitive Benefits

21.    No benefits will offset that harm.  Nexstar does not need this merger to compete. As Nexstar's own statements to its investors make clear, it is already one of the most profitable companies in the S&P 400.  With six consecutive years of dividend increases that place Nexstar "in the top 10% of dividend yields of all S&P 400 companies" and "large & stable cash flows,"[4] it is "well positioned to consistently deliver strong financial results."[5]  Despite the proliferation of streaming services, Nexstar has continued to be highly profitable and has continued to raise prices. Nor is Nexstar (or the broadcast industry) facing an uncertain future; to the contrary, Nexstar has told investors that the "Future TV Ecosystem will Favor Broadcast Television" because its broadcast stations "carry the sports and local news content viewers demand."[6]

### D.    Need for Permanent Relief to Protect and Fully Restore Competition

22.    DIRECTV filed its original Complaint in this action on March 18, 2026, seeking to enjoin the transaction, soon after a coalition of State Attorneys General filed their own complaint, seeking similar relief.  Notwithstanding the initiation of these now-consolidated legal actions, Defendants proceeded to close their transaction and Nexstar commenced steps to integrate with TEGNA before this Court, on March 27, 2026, issued a temporary restraining order requiring that Nexstar hold the TEGNA business unit separate.  After an in-person hearing and consideration of the Parties' briefing and arguments, the Court, on April 17, 2026, issued a preliminary injunction.

---

[4] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 4, 19 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[5] Nexstar Q4 2024 Earnings Release at 1 (Feb. 27, 2025), https://www.nexstar.tv/wp-content/uploads/2025/02/NXST-4Q24-PR-final.pdf.

[6] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 30 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

6

**AMENDED COMPLAINT**

23.    The Court issued a preliminary injunction "to preserve the status quo and prohibit Nexstar and TEGNA from further integration pending adjudication on the merits."  PI Order at 48.  The Clayton Act forbids acquisitions that substantially lessen competition, enabling acquirers to charge more while offering less.  DIRECTV respectfully submits that this Court, having already preliminarily enjoined this unlawful merger, should now permanently enjoin it to prevent significant, widespread anticompetitive effects including price increases to tens of millions of Americans and the shutdown of dozens of local newsrooms around the country.

## II. JURISDICTION AND VENUE

24.    Defendants are subject to the personal jurisdiction of this Court pursuant to 15 U.S.C. § 22 and Federal Rule of Civil Procedure 4(k) and because each of Nexstar and TEGNA transacts business in, has purposeful, continuous, or systematic contacts with, or has sufficient minimum contacts in California and within this District.  Both Nexstar and TEGNA hold licenses to broadcast stations in this District and both Nexstar and TEGNA license to DIRECTV and other distributors the rights to retransmit signals carrying those stations' programming to subscribers in this District.  Nexstar and TEGNA each own a Big Four station located in Sacramento, California, which is retransmitted to DIRECTV subscribers within this District:  Nexstar owns KTXL, a station affiliated with FOX, and TEGNA owns KXTV, a station affiliated with ABC.  Each station engages in local news and other programming operations in this District.  The merger of Nexstar and TEGNA would have a substantial and foreseeable effect on trade, commerce, and consumers in this State and District.

25.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).  Venue also is proper in this District because Defendants have extensive intentional, continuous, and systematic contacts in this District, including through transmission of broadcast signals in this District, the operation of stations in this District and engaging in local news and other programming operations in this District.  The challenged transaction is intended to have, and will continue to have, a foreseeable effect on commerce in California, including in this District.

26.    This Court has subject matter jurisdiction over the federal antitrust claim brought in this action pursuant to 15 U.S.C. § 26; 28 U.S.C. § 1331; and/or 28 U.S.C. § 1337(a).

**AMENDED COMPLAINT**

### III. <u>THE PARTIES AND THE CHALLENGED TRANSACTION</u>

27.    Plaintiff DIRECTV is a Delaware corporation with its headquarters in El Segundo, California.  DIRECTV is an MVPD with millions of subscribers throughout the country, including within this District, all of whom receive multiple channels of digital video programming.

28.    Defendant Nexstar is a Delaware corporation with its headquarters in Irving, Texas. Nexstar reports that it owns 164 full-power local broadcast stations, 129 of which are an affiliate of one or more Big Four networks, in more than 100 U.S. local markets.[7]  Nexstar describes itself as the "Largest Local Television Broadcast Group" in the United States with "Unmatched Local Broadcast Television Scale."[8]  Nexstar owns or operates local television stations that reach about 70% of U.S. households.[9]  In 2025, Nexstar reported $4.9 billion in revenue.[10]

29.    Defendant TEGNA is a Delaware corporation with its headquarters in Tysons, Virginia.  TEGNA owns 64 broadcast stations in 51 markets.[11]  TEGNA describes itself as "one of the largest" broadcasters in the United States and "the largest owner of Big Four affiliates in the top 25 markets among independent station groups," which reaches "approximately 39 percent of all TV households nationwide."[12]  In 2024, TEGNA reported $3.1 billion in revenue.[13]

---

[7] Some of Nexstar's 164 stations are "multicast" stations, broadcasting multiple channels on a single frequency, allowing a single station to be an affiliate of multiple Big Four networks.  For example, in Albuquerque, New Mexico, Nexstar's KRQE is an affiliate station of both CBS, broadcasting on channel 13.1, and FOX, broadcasting on channel 13.2.

[8] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 5 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[9] *Id.*

[10] Nexstar Media Group, Inc., Annual Report (Form 10-K) (Feb. 27, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001142417/000119312526078361/nxst-20251231.htm.

[11] TEGNA, *About TEGNA*, https://www.tegna.com/about/trustworthy-impactful-journalism (last accessed Mar. 18, 2026).

[12] *Id.*

[13] TEGNA, 2024 Annual Report 3 (2025), https://investors.tegna.com/static-files/9c4550ee-5f29-4f43-b59d-a3f23e48ae6e.

**AMENDED COMPLAINT**

## IV.  OVERVIEW OF THE BROADCAST TELEVISION INDUSTRY

### A.    How Broadcasting Works

30.    The four largest national television networks in the United States—commonly known throughout the industry as the "Big Four"—are ABC, CBS, FOX, and NBC.  These networks provide a wide array of popular programming, including prime time dramas and comedies, national and local news, and live professional and college sports.

31.    Each Big Four network generally has one affiliate station in each Designated Market Area ("DMAs"), geographic regions defined by Nielsen Media for measuring television ratings.  There are 210 DMAs throughout the United States.[14]

32.    Some local affiliates are owned by the network itself (these are called "owned and operated" or "O&O" local affiliates).  Many local network affiliates are owned by third parties, such as Nexstar or TEGNA, that license the right to transmit network programming in the DMA from the networks.

33.    Local affiliates also obtain the rights to syndicated programming, such as *Wheel of Fortune* or *The Office*, that is often licensed to multiple stations or networks across DMAs.

34.    Local affiliates also produce their own local news and other public interest/lifestyle programs for distribution in the DMA.  Local news stations provide critical information to American communities across the country, such as local current events, local traffic, local weather predictions, and information about local governance and issues of public importance.  Affiliates owned by different broadcasting groups compete for viewership by providing timely reporting on news content of relevance to each local community.

### B.    MVPD Carriage of Broadcast Programming

35.    Before satellite, cable, and streaming video, Americans watched television exclusively through over-the-air broadcasts from their local television stations.  Anyone with an antenna in range of a broadcast signal could watch—free of charge—broadcast programing that

---

[14] *See Need to Know: What Is a Designated Market Area (DMA®), and Why Does It Matter?*, Nielsen (Mar. 2025), https://www.nielsen.com/insights/2025/what-is-a-designated-market-area-and-why-does-it-matter.

**AMENDED COMPLAINT**

included the most popular sports, news, and entertainment shows from major networks.

36.     Today, only about 20% of Americans view broadcast programming for free over the air.  Most receive programming by subscribing to distributors:  cable operators, satellite carriers, and other MVPDs.

37.     Just as viewers could watch broadcast television over the air for free, for many years MVPDs could carry (*i.e.*, distribute) those signals without paying station owners.  However, in 1992 Congress enacted a statute permitting broadcasters to negotiate payments with MVPDs for the right to retransmit their signals and distribute them to subscribers.  These payments, known as "retransmission consent" or "retrans" fees, are determined by negotiated agreements between broadcast groups and MVPDs.  The contractual rate for Big Four stations negotiated between DIRECTV and a broadcaster typically applies uniformly to all of that broadcaster's Big Four stations across the country.

38.     DIRECTV has retransmission consent agreements with both Nexstar and TEGNA under which Nexstar and TEGNA charge DIRECTV per-subscriber fees for the right to retransmit their signals to DIRECTV subscribers.  Nexstar and TEGNA charge some of the very highest retransmission consent fees to DIRECTV of any broadcasters in the country.

**C.     Broadcast Station Owners Have Consolidated and Raised Prices**

39.     Since the early 2000s, broadcast station owners have increasingly consolidated broadcast station ownership to increase their negotiating leverage in order to increase prices for retransmission consent rights.

40.     Defendant Nexstar has been the primary architect of this consolidation, spending billions of dollars to acquire more than 100 broadcast stations in the last 10 years alone.  The slide below details Nexstar's acquisition track record and other significant events in the company's history.

41.     Nexstar has touted its track record of "Successful, accretive station acquisitions":

10

**AMENDED COMPLAINT**



Source: Nexstar Media Group, Inc., *Acquisition of TEGNA Inc. – August 2025* at 10 (Aug. 2025).

42.    Two of Nexstar's acquisitions—of Media General in 2017 and of Tribune Media in 2020—were challenged on antitrust grounds by the Antitrust Division of the U.S. Department of Justice ("DOJ") because "the combined company would likely charge . . . higher retransmission fees . . . resulting in higher monthly cable and satellite bills for millions of Americans."[15]  Those acquisitions were permitted to proceed only because Nexstar agreed to "restore competition" by divesting stations in DMAs where it already owned Big Four affiliates.  Eleven of those stations, including Big Four stations, were divested to TEGNA, and Nexstar now proposes to reintegrate them.[16]

---

[15] Press Release, U.S. Dep't of Just., Justice Department Requires Structural Relief to Resolve Antitrust Concerns in Nexstar's Merger with Tribune (July 31, 2019), https://www.justice.gov/archives/opa/pr/justice-department-requires-structural-relief-resolve-antitrust-concerns-nexstar-s-merger.

[16] These 11 stations were: KCWI-TV (CW) and WOI-DT (ABC) in Des Moines-Ames, Iowa; KFSM-TV (CBS) in Ft. Smith-Fayetteville-Springvale-Rogers, Ark.; WATN-TV (ABC) and WLMT (CW) in Memphis, Tenn.; WCCT-TV (CW) and WTIC-TV (FOX) in Hartford-New Haven, Conn.; WNEP-TV (ABC) in Wilkes Barre, Pa.; WPMT (FOX) in Harrisburg-Lancaster-Lebanon-York, Pa.; WQAD-TV (ABC) in Davenport, Iowa-Rock Island-Moline, Ill.; and WZDX (FOX) in Huntsville-Decatur-Florence, Ala.  *See* Final Judgment at 7, *United States v. Nexstar Media Grp., Inc.*, No. 1:19-cv-2295 (D.D.C. Feb. 10, 2020).

**AMENDED COMPLAINT**

43.    As the ownership of Big Four affiliates became increasingly consolidated, the largest broadcast station groups (including Nexstar and TEGNA) began to demand substantial and growing fees from MVPDs in exchange for the right to retransmit their stations' signals.

44.    Since 2006, aggregate retransmission fees paid by MVPDs to broadcast station groups have increased a staggering 5,458 percent—from $214.6 million in 2006 to an estimated $11.9 billion in 2025.  MVPDs paid $23.21 in fees per subscriber in 2025, up from $1.04 in 2010—an increase of more than 2,000 percent.[17]

45.    Nexstar itself has precipitously raised prices following prior acquisitions.  After buying Tribune Media in September 2019, DIRECTV's average subscriber-weighted retransmission fee for the acquired Tribune Media Big Four stations rose dramatically between 2019 and 2020.  In 2022, Nexstar again increased fees on DIRECTV substantially for both Big Four stations acquired from Tribune Media and for Nexstar Big Four stations overall.  In the four years following the Tribune Media acquisition, DIRECTV's fees for the Big Four stations that Nexstar acquired from Tribune Media grew significantly faster than DIRECTV's fees for other Big Four stations in the same DMAs.

46.    Roughly a year after closing its acquisition of Tribune Media in September 2019, Nexstar told investors its third-quarter distribution fee revenue rose "***82.6%*** year-over-year" to $538 million, an eye-popping increase that Nexstar attributed in part to its "***Tribune Media transaction***."[18]

47.    The chart below shows that both industry consolidation and retransmission fees have grown together over the last ~15 years.

---

[17] SNL Kagan, *TV station retrans and virtual multichannel sub carriage fee projections, 2006– 2030*, S&P Global Market Intelligence (2025), CIQ Pro: S&P Global Market Intelligence Tech, Media & Telecoms | Kagan Projection.

[18] Nexstar Q3 2020 Earnings Call Transcript (Nov. 5, 2020), https://fintool.com/app/research/companies/NXST/documents/transcripts/q3-2020 (statement of Perry Sook, Nexstar Chairman and CEO).

12

**AMENDED COMPLAINT**



Source: American Television Alliance, Retrans Fees Soar as Broadcast Viewership Falls and Big Broadcast Keeps Getting Bigger (Oct. 16, 2025), https://americantelevisionalliance.org/wp-content/uploads/2025/10/PLUS-ATVA-One-Pager_10.16.25.pdf.

48.     Notably, these price increases have occurred during a time when "virtual MVPDs" (or "vMVPDs") such as YouTube TV, Fubo, or Hulu+Live, that distribute television subscription services over the internet and online streaming video options (*e.g.*, Netflix, Prime Video, Paramount+, Peacock, HBO Max) have become popular among consumers.  Yet, as the above chart shows, the emergence of new ways for consumers to view video has not constrained broadcast station owners' ability to dramatically raise retransmission fees they charge MVPDs that must buy the rights to distribute their content.

49.     Broadcasters' exploding fees are being passed on to American consumers. Retransmission fees are a significant input cost for MVPDs.  Indeed, DOJ has observed in prior broadcast mergers that "[r]etransmission consent fees generally are passed through to an MVPD's subscribers in the form of higher subscription fees or as a line item on their bills."[19]  Accordingly,

---

[19] Competitive Impact Statement at 8, *United States v. Nexstar Media Grp., Inc. & Tribune Media Comp.*, No. 1:19-cv-2295 (D.D.C. Aug. 1, 2019) ("Nexstar/Tribune CIS"); Competitive Impact Statement at 7, *United States v. Gray Television, Inc. & Quincy Media, Inc.*, No. 1:21-cv-02041

**AMENDED COMPLAINT**

as DIRECTV and others have recently confirmed in sworn declarations before the Federal Communications Commission ("FCC"), MVPDs have had no choice but to pass through these increased input costs to subscribers.

### D.   Blackouts

50.   Broadcasters use their market power over MVPDs to coerce agreement to price increases.  If an MVPD and a broadcast station group cannot agree on a new retransmission consent fee when their retransmission agreement expires, then the broadcast station group can withhold its broadcasts from the MVPD—creating a "blackout" of those stations.

51.   During blackouts, an MVPD's subscribers cannot watch stations owned by a broadcaster that has refused to transmit its signals to the MVPD.  FCC regulations and federal law largely prohibit MVPDs from distributing broadcast stations outside of the local DMA where that station is licensed.[20]  Accordingly, MVPD subscribers in a DMA where a local affiliate of a Big Four network has been blacked out cannot watch live sports licensed from that Big Four network through their television subscription.  For example, if the local FOX affiliate in Chicago were blacked out for DIRECTV subscribers, then DIRECTV could not show NFL games on FOX to subscribers in Chicago by transmitting the local FOX affiliate from San Francisco.  In that example, if DIRECTV subscribers in Chicago want to watch NFL games on FOX through their television subscription, then they would have to switch to another cable company or a virtual MVPD like YouTube TV, or subscribe to FOX's own direct-to-consumer streaming service.

52.   Nexstar and TEGNA are some of the most aggressive broadcasters in threatening and executing blackouts.  They have not hesitated to resort to blackouts to exercise their market power over DIRECTV and other MVPDs.  Since December 2015, Nexstar's retransmission consent negotiations have resulted in at least nine blackouts—nearly one per year.  TEGNA has

---

(D.D.C. July 28, 2021) ("Gray/Quincy CIS") (same).

[20] *See* 17 U.S.C. § 122 (limiting statutory copyright license for satellite carriers to in-market carriage); 47 C.F.R. § 76.92, *et seq.* (prohibiting cable operators from importing duplicating distant programming in defined geographic areas through "network nonduplication" and "syndicated exclusivity" rules); 17 U.S.C. § 111 (charging higher statutory royalties for distant signal importation where permitted).

**AMENDED COMPLAINT**

engaged in similar conduct, with at least ten blackouts over the same period.[21] Nexstar blacked out its stations for DIRECTV subscribers for two months in summer of 2019 and more than two months in summer of 2023. TEGNA likewise blacked out its local stations for DIRECTV subscribers for three weeks in November 2020 and six weeks in November 2023.

53. Blackouts have harmed millions of MVPD subscribers. For example, in 2020, Nexstar "force[d] blackout of nearly 5.4 million DISH customers."[22] Nexstar's July 2023 blackout of DIRECTV was the "largest blackout in media history" impacting "several million DIRECTV, DIRECTV STREAM, and U-verse customers who" were "unable to watch approximately 200 local stations that Nexstar owns or controls in more than 100 metro regions that reach 68% of U.S. TV homes."[23] The blackout lasted more than two months. Ultimately, DIRECTV was forced to accept a significant rate increase.

## V. RELEVANT MARKETS

### A. Big Four Retransmission Consent Is a Relevant Product Market

54. One relevant product market in which to analyze the challenged transaction's competitive effects is the market for the distribution rights that Big Four broadcasting stations sell to MVPDs. This is the same relevant product market that the DOJ Antitrust Division has defined in challenging prior broadcast mergers.[24]

55. The sellers in this relevant product market are owners of broadcast stations like

---

[21] *See* American Television Alliance, Retrans Blackouts Overview 2010-Nov. 2025 https://americantelevisionalliance.org/wp-content/uploads/2025/11/Retrans-Blackouts-Overview-2010-Nov-2025.xlsx.

[22] *Nexstar Media Group forces blackout of nearly 5.4 million DISH customers*, PR Newswire, (Dec. 2, 2020), https://www.prnewswire.com/news-releases/nexstar-media-group-forces-blackout-of-nearly-5-4-million-dish-customers-301185222.html.

[23] American Television Alliance, *Nexstar Media Group Incites Largest Blackout in Media History, Impacting Local Television Access for 68% of U.S. Households* (July 3, 2023), https://americantelevisionalliance.org/nexstar-media-group-incites-largest-blackout-in-media-history-impacting-local-television-access-for-68-of-u-s-households.

[24] The DOJ used this exact product market definition in its two most recent broadcast merger cases: *United States v. Gray Television & Quincy Media* (2021) and *United States v. Nexstar Media Group & Tribune Media* (2019).

**AMENDED COMPLAINT**

Nexstar and TEGNA that have licenses to transmit broadcast signals. MVPDs are the buyers in this product market. They license the right to retransmit broadcast signals to their subscribers.

56.    The boundaries of a relevant product market are determined by the "reasonable interchangeability of use . . . between the product itself and substitutes for it."[25] MVPDs do not have reasonable substitutes for Big Four stations. As DOJ has observed, "Big Four broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable networks."[26] As such, they are typically the highest-rated stations in a DMA and thereby the most highly viewed channels by pay TV subscribers. "If an MVPD suffers a blackout of a Big Four station in a given DMA, many of the MVPD's subscribers in that DMA are likely to turn to other Big Four stations in the DMA to watch similar content, such as sports, primetime shows, and local news and weather."[27]

57.    Licenses to non-Big Four broadcast stations (such as The CW, PBS, or Telemundo) are not reasonably close substitutes for licenses to content for Big Four stations because these non-Big Four stations typically do not offer network primetime programming, regular season NFL games, or college football, which are among the most popular content for pay TV subscribers.[28] These in-demand programs are typically exclusively available to MVPDs on Big Four broadcast stations, contributing to Big Four networks' "special appeal" to distributors.

58.    Licenses to non-Big Four broadcast stations, such as PBS or Telemundo affiliates, also are not substitutes for Big Four content because some of these stations offer niche or foreign

---

[25] U.S. Department of Justice & Federal Trade Commission, Merger Guidelines § 4.3 (2023) ("Merger Guidelines") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

[26] Competitive Impact Statement at 4, *United States v. Gray Television, Inc.*, No. 1:21-cv-02041 (D.D.C. July 28, 2021).

[27] *Id.*; *see also* Nexstar/Tribune CIS at 4–7.

[28] *See, e.g.*, Gray/Quincy CIS at 4 ("Big Four stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly-ranked primetime programs. . . . Because of Big Four stations' popular national content and valued local coverage, MVPDs regard Big Four programming as highly desirable for inclusion in the packages they offer subscribers. Non-Big Four broadcast stations are typically not close substitutes for viewers of Big Four stations."); Nexstar/Tribune CIS at 5 (same).

16

**AMENDED COMPLAINT**

language content that appeals only to a fraction of pay TV subscribers.[29]

59.    DIRECTV does not generally pay retransmission fees for the right to distribute non-Big Four broadcast networks, such as the CW, unless the station owner also owns a Big Four station.

60.    Licenses for cable programming are also not a reasonable substitute for licenses for Big Four broadcast programing.  DOJ has explained why:  "[S]ubscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big Four network content.  This is primarily because cable networks offer different content than Big Four stations.  For example, cable networks generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big Four stations."[30]

61.    Nexstar acknowledges that non-broadcast stations are not reasonable substitutes because the sports and local news offered on broadcast stations are uniquely valuable content for subscribers and, thus, for MVPDs.  As Nexstar admits: "Broadcast television content is the <u>most watched</u> content" and "MVPDs/vMVPDs need to carry broadcast stations because they carry the sports and local news content viewers demand."[31]

62.    As DOJ has consistently concluded, because viewers (and thus MVPDs) do not regard non-Big Four broadcast stations or cable networks as close substitutes for the types of programming they can receive by watching Big Four stations, "**these other sources of programming are not sufficient to discipline an increase in the fees charged for Big Four television retransmission consent**."[32]

---

[29] *See* Gray/Quincy CIS at 4 ("Stations that are affiliates of networks other than the Big Four, such as the CW Network, MyNetworkTV, or Telemundo, typically feature niche programming without local news, weather or sports—or, in the case of Telemundo, only offer local news, weather, and sports aimed at a Spanish-speaking audience. Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal."); Nexstar/Tribune CIS at 5 (same).

[30] Gray/Quincy CIS at 5; *see also* Nexstar/Tribune CIS at 5–6 (same).

[31] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 30 (June 2025), available at https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf (emphasis in original).

[32] Gray/Quincy CIS at 5 (emphasis added); *see also* Nexstar/Tribune CIS at 6.

17

**AMENDED COMPLAINT**

63. For MVPDs that are the buyers in the relevant product market, licenses from streaming services also are not a substitute for Big Four programming. To begin with, streaming services like Netflix traditionally have not licensed their content directly to DIRECTV at all. In some cases, the Big Four networks have offered DIRECTV some form of access to their own direct to consumer ("DTC") services (*e.g.*, Peacock, FOX One, Disney+, Paramount+). But the Big Four networks generally make such services available to DIRECTV at prices, terms, and conditions more onerous than they themselves offer to the public. Most notably, networks have generally conditioned access to their DTC streaming services on DIRECTV carrying their affiliated broadcast stations. Accordingly, where a station owner blacks out a station affiliated with a Big Four network in a particular DMA, DIRECTV is subject to restrictions on turning to the network's streaming service to deliver the network's content to its subscribers in the DMA.

64. In addition, from the standpoint of MVPDs, streaming services are also not reasonable substitutes for Big Four stations because they generally do not feature the same mix of live major sports and local news unique to broadcast programming. According to Nexstar, about 90% of sports rights are held by traditional "media" companies, not "tech" companies, and locked up by long-term contracts.[33] Nexstar has told investors that "[a] preponderance of top tier sports rights will remain on linear TV for the foreseeable future with new rights deals—like the NBA—increasing exposure to broadcast."[34]

65. In particular, broadcast television remains a core medium to watch the vast majority of NFL football. Although the NFL has experimented with distributing some games via streaming services, 90% of NFL games remain on broadcast television.[35] As Commissioner Roger Goodell has explained, the NFL is "really committed to broadcast TV."[36] Licenses from streaming services are not substitutes for MVPDs' ability to distribute NFL football to their

---

[33] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 25 (June 2025), available at https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[34] *Id*. at 26.

[35] *Id*. at 27.

[36] *Id*.

18

**AMENDED COMPLAINT**

subscribers.

### B.     DMAs Are Relevant Geographic Markets

66.     Relevant geographic markets in which to analyze the challenged transaction's competitive effects are local DMAs—defined, non-overlapping regions that group counties (sometimes across state lines) based on television viewing areas.  In challenging other broadcast mergers, such as the 2021 merger of Gray and Quincy and Nexstar's 2019 acquisition of Tribune Media, DOJ has also defined relevant geographic markets as local DMAs.

67.     Geographic market definition depends on whether customers (here, MVPDs) can reasonably substitute to suppliers (broadcasters) outside of a particular geographic area, taking into account relevant regulations and local service availability.[37]

68.     Retransmission consent licenses for broadcast stations outside of a local DMA are not reasonable substitutes for broadcast stations in a local DMA because, as noted, MVPDs are generally prohibited from distributing broadcast stations outside of the local DMA where that station is licensed.[38]

69.     As DOJ has explained: "MVPD subscribers in one DMA cannot switch to Big Four programming in another DMA in the face of a blackout.  Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees charged for retransmission consent for broadcast stations in the DMA."[39]

70.     Both Nexstar and TEGNA have recognized that local DMAs are geographic areas relevant to their broadcast businesses.  Nexstar has explained that it operates in "116 local

---

[37] Merger Guidelines § 4.3.D.2.

[38] This is true for a variety of legal reasons.  For satellite carriers, the relevant statutory copyright license is limited to in-market carriage, while the former license for distant carriage has been repealed.  17 U.S.C. § 122 (local), § 119 (former distant).  For cable operators, the relevant statutory copyright license permits distant signal importation, but charges higher statutory royalties for such importation—in some cases, significantly higher.  *See generally* 17 U.S.C. § 111.  The FCC's "network nonduplication" and "syndicated exclusivity" rules also prohibit cable operators from importing duplicate programming from outside of defined geographic areas.  47 C.F.R. § 76.92, *et seq.*  In addition, the network's affiliation agreements with stations generally prohibit such stations from permitting MVPDs to deliver their signals into distant markets.

[39] Gray/Quincy CIS at 6; *see also* Nexstar/Tribune CIS at 6–7 (same).

19

**AMENDED COMPLAINT**

markets" corresponding to 116 DMAs and has said that it enjoys a "Local Revenue Moat."[40] Nexstar's filings with the SEC describe DMAs as "markets."[41]  TEGNA claims that it owns "64 television stations in 51 U.S. markets" corresponding to 51 DMAs.[42]  The National Association of Broadcasters agrees that DMAs are an area of effective competition: "Local stations compete locally."[43]

## VI. ANTICOMPETITIVE EFFECTS OF THE CHALLENGED TRANSACTION

### A.    The Transaction Is Presumptively Unlawful in Over Thirty DMAs

71.    The challenged transaction would make Nexstar the owner of 31 new Big Four stations in DMAs where it already owns at least one Big Four station.  If the two companies integrate, Nexstar will own and control two Big Four affiliates in 27 DMAs where it presently owns only one.  In the broadcast industry, this is known as a Big Four "duopoly" (even though the two other stations may be independently owned).  And after the merger, Nexstar will own three Big Four affiliates in three DMAs.  In the broadcast industry, this is known as a Big Four "triopoly" (and, by definition, a classic duopoly) even though the fourth Big Four station in the market is independently owned.  The following chart shows the new Big Four duopolies and triopolies that the merger would create:[44]

[40] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 6 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[41] Nexstar Media Group, Inc., Annual Report at 3 (Form 10-K) (Feb. 27, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001142417/000119312526078361/nxst-20251231.htm.

[42] TEGNA, Inc., Annual Report at 52 (Form 10-K) (Mar. 2, 2026), https://investors.tegna.com/static-files/c5b27fe3-2033-42ac-bfc1-4f8013c8e640.

[43] Rick Kaplan, *The Anonymous Anti-Broadcast Manifesto: When a White Paper Won't Even Sign Its Own Homework*, NAB Blog (Dec. 5, 2025), https://www.blog.nab.org/2025/12/05/the-anonymous-anti-broadcast-manifesto-when-a-white-paper-wont-even-sign-its-own-homework/.

[44] In a final DMA—Grand Rapids-Kalamazoo-Battle Creek, MI—after the merger Nexstar would increase its consolidation of Big Four affiliates by adding a second ABC affiliate, TEGNA's WZZM [ABC], to the duopoly it already owns of ABC affiliate WOTV [ABC] and WOOD-TV [NBC], increasing local Big Four consolidation, but not creating a new duopoly or triopoly.

20

**AMENDED COMPLAINT**

| Big Four Overlap DMA | Nexstar Big Four Station(s) | TEGNA Big Four Station(s) | Impact of Merger |
|---|---|---|---|
| Ft. Smith-Fayetteville, AR | KNWA-TV [NBC], KFTA-TV [FOX] | KFSM-TV [CBS] | New triopoly |
| Indianapolis, IN | WXIN [FOX], WTTV [CBS] | WTHR(TV) [NBC] | New triopoly |
| Norfolk-Virginia Beach, VA | WAVY-TV [NBC], WVBT [FOX] | WVEC(TV) [ABC] | New triopoly |
| Abilene, TX | KTAB-TV [CBS] | KXVA(TV) [FOX] | New duopoly |
| Austin, TX | KXAN-TV [NBC] | KVUE(TV) [ABC] | New duopoly |
| Buffalo, NY | WIVB-TV [CBS] | WGRZ(TV) [NBC] | New duopoly |
| Charlotte, NC | WJZY [FOX] | WCNC-TV [NBC] | New duopoly |
| Cleveland, OH | WJW [FOX] | WKYC(TV) [NBC] | New duopoly |
| Columbus, OH | WCMH-TV [NBC] | WBNS-TV [CBS] | New duopoly |
| Davenport, IA | WHBF-TV [CBS] | WQAD-TV [ABC] | New duopoly |
| Denver-Aurora, CO | KDVR [FOX] | KUSA(TV) [NBC] | New duopoly |
| Des Moines, IA | WHO-DT [NBC] | WOI-DT [ABC] | New duopoly |
| Greensboro-Winston Salem, NC | WGHP [FOX] | WFMY-TV [CBS] | New duopoly |
| Harrisburg-Lancaster, PA | WHTM-TV [ABC] | WPMT [FOX] | New duopoly |
| Hartford-New Haven, CT | WTNH [ABC] | WTIC-TV [FOX] | New duopoly |
| Huntsville, AL | WHNT-TV [CBS] | WZDX(TV) [FOX] | New duopoly |
| Knoxville, TN | WATE-TV [ABC] | WBIR-TV [NBC] | New duopoly |
| Little Rock, AR | KARK-TV [NBC] | KTHV(TV) [CBS] | New duopoly |
| Memphis, TN | WREG-TV [CBS] | WATN-TV [ABC] | New duopoly |

21

**AMENDED COMPLAINT**

| Big Four Overlap DMA | Nexstar Big Four Station(s) | TEGNA Big Four Station(s) | Impact of Merger |
|---|---|---|---|
| Midland-Odessa, TX | KMID [ABC] | KWES-TV [NBC] | New duopoly |
| New Orleans, LA | WGNO [ABC] | WWL-TV [CBS] | New duopoly |
| Portland, OR | KOIN [CBS] | KGW(TV) [NBC] | New duopoly |
| Sacramento, CA | KTXL [FOX] | KXTV(TV) [ABC] | New duopoly |
| San Angelo, TX | KLST [CBS] | KIDY(TV) [FOX] | New duopoly |
| San Diego, CA | KSWB-TV [FOX] | KFMB-TV [CBS] | New duopoly |
| St. Louis, MO | KTVI [FOX] | KSDK(TV) [NBC) | New duopoly |
| Tampa-St. Petersburg, FL | WFLA-TV [NBC] | WTSP(TV) [CBS] | New duopoly |
| Tyler-Longview, TX | KETK-TV [NBC] | KYTX(TV) [CBS] | New duopoly |
| Waco-Killeen, TX | KWKT-TV [FOX] | KCEN-TV [NBC] | New duopoly |
| Wilkes Barre-Scranton, PA | WBRE-TV [NBC] | WNEP-TV [ABC] | New duopoly |

72.     Under standard and long-accepted market concentration thresholds, the challenged transaction is *presumptively illegal* in each of these 31 DMAs.

73.     For decades, agencies and courts have relied upon the Herfindahl-Hirschman Index ("HHI") to assess the degree to which a merger increases market concentration within a given relevant market.  The HHI of a particular relevant market is calculated by summing the squares of each individual firm's market share.[45]  So, for example, a market consisting of four firms with market shares of 30%, 30%, 20%, and 20%, would have an HHI of 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$).  Courts and antitrust enforcers rely on the market's pre-merger HHI and the increase in concentration, or "delta HHI," resulting from a transaction to determine whether it is presumed

---

[45] Merger Guidelines § 2.1.

22

**AMENDED COMPLAINT**

likely to violate the antitrust laws.

74.     Under the Merger Guidelines and case law, "[m]arkets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase,"[46] and "[a] merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is **presumed to substantially lessen competition or tend to create a monopoly**."[47]

75.     The Merger Guidelines also explain, consistent with longstanding precedent, that "a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points."[48]

76.     For each DMA in which Nexstar and TEGNA own at least one Big Four station, the following table shows the parties' pre- and post-merger market shares of ratings, the pre- and post-merger HHIs, and the increase in HHI resulting from the merger.  Ratings are a good measure of a station's competitive significance in the market for Big Four retransmission consent because a station with higher ratings and more viewers is more valuable to MVPDs.  The blackout of a more popular station would be more likely to induce an MVPD's subscribers to switch to another distributor compared to a blackout of a less popular station.

---

[46] *Id.*

[47] *Id.* (emphasis added and footnote omitted); *see also, e.g.*, *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) ("The extremely high HHI on its own establishes the prima facie case."); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) ("Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive."); *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 458–59 (S.D.N.Y. 2024) (finding presumption of harm based on 2023 Merger Guidelines HHI thresholds); *FTC v. Kroger Co.*, 2024 WL 5053016, at *15 (D. Or. Dec. 10, 2024) (same).

[48] Merger Guidelines § 2.1 (citing *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364–65 (1963) ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.")); *see also, e.g.*, *Kroger Co.*, 2024 WL 5053016, at *15 ("The 2023 Merger Guidelines also presume that a merger substantially lessens competition if the merged firm has a market share greater than thirty percent and the merger involves an increase in HHI greater than 100."); *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 379 (S.D.N.Y. 2024) ("[T]he 30% threshold remains valid as a matter of law. Therefore, the FTC has established a presumption of anticompetitive effects.").

23

**AMENDED COMPLAINT**

| Big Four Overlap DMA | Nexstar Share | TEGNA Share | Merged Firm's Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Abilene-Sweetwater, TX | 35.9% | 11.8% | 47.7% | 2,816 | 3,665 | 849 |
| Austin, TX | 29.0% | 31.3% | 60.3% | 2,631 | 4,445 | 1,814 |
| Buffalo, NY | 37.0% | 32.7% | 69.7% | 2,905 | 5,322 | 2,417 |
| Charlotte, NC | 14.1% | 21.0% | 35.1% | 2,768 | 3,361 | 592 |
| Cleveland-Akron (Canton), OH | 30.3% | 22.9% | 53.2% | 2,541 | 3,927 | 1,387 |
| Columbus, OH | 24.9% | 28.9% | 53.8% | 3,589 | 5,029 | 1,440 |
| Davenport-Rock Island-Moline, IA-IL | 16.3% | 25.2% | 41.5% | 3,262 | 4,083 | 821 |
| Denver, CO | 27.4% | 29.8% | 57.2% | 2,557 | 4,191 | 1,633 |
| Des Moines-Ames, IA | 35.8% | 13.6% | 49.4% | 3,110 | 4,081 | 972 |
| Ft. Smith-Fayetteville-Springdale-Rogers, AR | 27.7% | 39.9% | 67.6% | 3,409 | 5,619 | 2,210 |
| Grand Rapids-Kalamazoo-Battle Creek, MI | 33.7% | 17.1% | 50.7% | 2,664 | 3,813 | 1,149 |
| Greensboro-High Point-Winston Salem, NC | 26.2% | 29.1% | 55.3% | 2,721 | 4,245 | 1,524 |
| Harrisburg-Lancaster-Lebanon-York, PA | 25.6% | 14.2% | 39.8% | 2,810 | 3,537 | 726 |
| Hartford & New Haven, CT | 25.9% | 16.1% | 42.0% | 2,675 | 3,508 | 833 |
| Huntsville-Decatur (Florence), AL | 30.6% | 8.3% | 38.9% | 2,878 | 3,384 | 506 |
| Indianapolis, IN | 51.4% | 33.4% | 84.8% | 3,989 | 7,422 | 3,433 |
| Knoxville, TN | 29.0% | 33.2% | 62.2% | 2,783 | 4,711 | 1,928 |
| Little Rock-Pine Bluff, AR | 25.9% | 23.1% | 49.1% | 2,869 | 4,069 | 1,200 |
| Memphis, TN | 33.8% | 14.4% | 48.2% | 2,692 | 3,667 | 975 |

24

**AMENDED COMPLAINT**

| Big Four Overlap DMA | Nexstar Share | TEGNA Share | Merged Firm's Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| New Orleans, LA | 13.5% | 25.7% | 39.2% | 2,729 | 3,424 | 695 |
| Norfolk-Portsmouth-Newport News, VA | 49.1% | 26.1% | 75.1% | 3,705 | 6,261 | 2,557 |
| Odessa-Midland, TX | 27.1% | 28.4% | 55.5% | 2,685 | 4,223 | 1,538 |
| Portland, OR | 23.3% | 22.4% | 45.8% | 2,524 | 3,571 | 1,046 |
| Sacramento-Stockton-Modesto, CA | 16.2% | 17.3% | 33.5% | 2,943 | 3,503 | 560 |
| San Angelo, TX | 45.1% | 14.9% | 60.0% | 3,057 | 4,401 | 1,344 |
| San Diego, CA | 22.5% | 28.7% | 51.2% | 2,539 | 3,832 | 1,293 |
| St. Louis, MO | 27.3% | 27.6% | 54.9% | 2,837 | 4,344 | 1,507 |
| Tampa-St. Petersburg (Sarasota), FL | 22.2% | 23.1% | 45.3% | 2,401 | 3,427 | 1,026 |
| Tyler-Longview (Lufkin & Nacogdoches), TX | 14.9% | 15.1% | 30.0% | 4,028 | 4,477 | 449 |
| Waco-Temple-Bryan, TX | 9.8% | 21.0% | 30.8% | 3,063 | 3,476 | 413 |
| Wilkes Barre-Scranton-Hazleton, PA | 20.0% | 52.9% | 72.9% | 3,582 | 5,701 | 2,119 |

Source: Ratings per S&P Capital IQ, Comscore TV Station Average Ratings, Q4 2025 (accessed February 24, 2026). The owner of KFXK-TV (FOX) in the Tyler-Longview, TX DMA is changed to White Knight Broadcasting to reflect the ownership reported in the FCC's public inspection files (see https://publicfiles.fcc.gov/tv-profile/KFXK-TV/ownership-reports).

77.     The above table shows that, measuring market shares in terms of Big Four ratings: (1) all of the relevant markets are highly concentrated, with pre-merger HHIs well exceeding 1800; (2) the transaction would give the merged firm a 30% share or greater in each of these markets; and (3) the transaction would greatly increase concentration—often by more than 10 or even 20 times the 100-point threshold—in each of the relevant markets.  Thus, the transaction is presumed to substantially lessen competition or tend to create a monopoly in each of these

25

**AMENDED COMPLAINT**

relevant markets.[49]

78.    The same results are true if one looks at shares of retransmission consent fees, which are also a relevant measure of market share because a firm's share of the revenue it earns in a relevant market often is a good measure of that firm's competitive significance in that market. For each DMA in which Nexstar and TEGNA own at least one Big Four station, the following table shows the parties' existing market shares of retransmission consent fees in the DMA, the combined share, the pre- and post-merger HHIs, and the change in HHI resulting from the merger.

| Big Four Overlap DMA | Nexstar Share | TEGNA Share | Merged Firm's Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Abilene-Sweetwater, TX | 44.1% | 19.0% | 63.1% | 2,988 | 4,664 | 1,676 |
| Austin, TX | 38.0% | 21.9% | 59.8% | 2,846 | 4,507 | 1,661 |
| Buffalo, NY | 39.3% | 20.0% | 59.3% | 2,800 | 4,371 | 1,571 |
| Charlotte, NC | 24.7% | 26.2% | 50.9% | 2,566 | 3,860 | 1,294 |
| Cleveland-Akron (Canton), OH | 28.0% | 24.5% | 52.4% | 2,562 | 3,930 | 1,368 |
| Columbus, OH | 46.1% | 23.8% | 69.9% | 3,597 | 5,793 | 2,196 |
| Davenport-Rock Island-Moline, IA-IL | 44.6% | 11.2% | 55.8% | 3,111 | 4,108 | 997 |
| Denver, CO | 30.9% | 26.2% | 57.1% | 2,562 | 4,182 | 1,620 |
| Des Moines-Ames, IA | 30.5% | 27.0% | 57.4% | 2,619 | 4,263 | 1,644 |
| Ft. Smith-Fayetteville-Springdale-Rogers, AR | 73.0% | 12.9% | 85.9% | 5,694 | 7,578 | 1,883 |
| Grand Rapids-Kalamazoo-Battle Creek, MI | 48.4% | 13.1% | 61.4% | 3,256 | 4,520 | 1,264 |

[49] Merger Guidelines § 2.1 ("A merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly. . . .  [A] merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points." (footnotes omitted)).

26

**AMENDED COMPLAINT**

| Big Four Overlap DMA | Nexstar Share | TEGNA Share | Merged Firm's Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Greensboro-High Point-Winston Salem, NC | 27.2% | 26.0% | 53.2% | 2,541 | 3,957 | 1,416 |
| Harrisburg-Lancaster-Lebanon-York, PA | 30.5% | 23.3% | 53.8% | 2,584 | 4,004 | 1,420 |
| Hartford & New Haven, CT | 38.1% | 25.3% | 63.3% | 2,838 | 4,762 | 1,923 |
| Huntsville-Decatur (Florence), AL | 25.5% | 28.2% | 53.6% | 3,592 | 5,027 | 1,435 |
| Indianapolis, IN | 65.8% | 17.7% | 83.5% | 4,914 | 7,245 | 2,331 |
| Knoxville, TN | 30.4% | 20.8% | 51.3% | 2,602 | 3,870 | 1,268 |
| Little Rock-Pine Bluff, AR | 36.7% | 22.5% | 59.2% | 2,699 | 4,350 | 1,651 |
| Memphis, TN | 26.4% | 31.2% | 57.6% | 2,610 | 4,259 | 1,649 |
| New Orleans, LA | 30.2% | 26.8% | 57.1% | 2,568 | 4,191 | 1,622 |
| Norfolk-Portsmouth-Newport News, VA | 62.2% | 15.7% | 77.9% | 4,607 | 6,556 | 1,949 |
| Odessa-Midland, TX | 38.7% | 16.7% | 55.4% | 2,798 | 4,089 | 1,291 |
| Portland, OR | 39.9% | 15.0% | 54.9% | 2,835 | 4,029 | 1,194 |
| Sacramento-Stockton-Modesto, CA | 39.7% | 22.5% | 62.2% | 2,797 | 4,581 | 1,784 |
| San Angelo, TX | 45.1% | 14.9% | 60.0% | 3,057 | 4,401 | 1,344 |
| San Diego, CA | 41.9% | 22.7% | 64.6% | 2,911 | 4,813 | 1,902 |
| St. Louis, MO | 26.1% | 22.5% | 48.6% | 2,508 | 3,684 | 1,175 |
| Tampa-St. Petersburg (Sarasota), FL | 34.9% | 22.5% | 57.4% | 2,347 | 3,918 | 1,571 |
| Tyler-Longview (Lufkin & Nacogdoches), TX | 36.3% | 21.8% | 58.1% | 2,672 | 4,257 | 1,585 |
| Waco-Temple-Bryan, TX | 22.6% | 23.2% | 45.7% | 2,569 | 3,615 | 1,046 |

27

**AMENDED COMPLAINT**

| Big Four Overlap DMA | Nexstar Share | TEGNA Share | Merged Firm's Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Wilkes Barre-Scranton-Hazleton, PA | 39.8% | 20.6% | 60.5% | 2,796 | 4,440 | 1,644 |

Source: Retransmission revenue figures per S&P Capital IQ, U.S. Broadcast Station Database (accessed February 25, 2026). The owner of KFXK-TV (FOX) in the Tyler-Longview, TX DMA is changed to White Knight Broadcasting to reflect the ownership reported in the FCC's public inspection files (see https://publicfiles.fcc.gov/tv-profile/KFXK-TV/ownership-reports).  For the San Angelo, TX DMA, share and HHI figures are calculated using Big Four ratings data, as Capital IQ does not report 2025 retransmission revenue for the ABC affiliate (KTXE-LD) owned by Sinclair in San Angelo, TX.

**B.    The Challenged Transaction Will Lead to Higher Prices for Retransmission Consent Licenses for MVPDs**

79.    By consolidating more power in Nexstar's hands in markets that are already concentrated, the merger will give Nexstar even more leverage to extract higher prices for retransmission consent licenses.  This will happen because the merger will enable Nexstar to threaten blackouts that are even more damaging to MVPDs' businesses.

80.    Today, a blackout of Nexstar stations would involve approximately 200 stations reaching 70% of U.S. television households, and approximately the same percentage of DIRECTV customers.[50]  Post-merger, a Nexstar blackout would involve 265 local broadcast stations that reach 80% of U.S. television households (and approximately 80% of DIRECTV customers).  A blackout affecting 80% of DIRECTV customers will cause DIRECTV greater disruption and greater customer churn than a blackout affecting 70% of its customers.  The "Nexstar Consolidation Playbook" explains that Nexstar "[b]enefit[s] from leverage" when it gains "Scale" by acquiring other stations.[51]

81.    Nexstar's acquisition of additional Big Four stations in 31 DMAs in which it already has at least one Big Four station will make Nexstar's blackout threats particularly dangerous, because it will increase Nexstar's market power and leverage over the MVPDs that

---

[50] In addition to the 164 stations that Nexstar owns, it operates a further 37 stations pursuant to local service agreements.  *See* Nexstar Media Group, Inc., Annual Report (10-K) at 33 (Feb. 27, 2025), https://www.nexstar.tv/wp-content/uploads/2025/05/Nexstar-2024-Annual-Report.pdf.

[51] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 22 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

28
AMENDED COMPLAINT

negotiate to purchase such licenses.  This will happen because Nexstar knows that MVPDs cannot withstand the significant churn caused by a blackout of two (or three) Big Four stations, especially if such a blackout affects multiple DMAs at a time.

82.    For example, in the Sacramento-Stockton-Modesto DMA, Nexstar currently owns the local FOX affiliate, KTXL, and TEGNA owns the local ABC affiliate, KXTV.  Today, if DIRECTV does not meet Nexstar's demand for higher retransmission consent fees and Nexstar blacks out the local FOX affiliate, then DIRECTV customers have the option to switch to any of the three other Big Four stations carried by DIRECTV (*i.e.*, stations that also have a comparable mix of local news and sporting events), including the local ABC affiliate owned by TEGNA.  In other words, the presence of TEGNA as an alternative source of Big Four programming currently disciplines Nexstar's ability to extract ever-higher retransmission fees.

83.    The merger will eliminate that competitive constraint in Sacramento and 30 other DMAs nationwide.  If DIRECTV does not meet the combined Nexstar's demand for higher retransmission consent fees, then during a blackout DIRECTV customers would lose access to multiple (as many as three) local Big Four affiliate stations instead of just one.  DIRECTV customers could lose access not just to their preferred local news channel, but to their second or third favorite news channel, to which they would otherwise switch.  They could lose access not just to some of the NFL games on Sunday afternoons, but to all of them.  Or they could lose access to other sporting events that might be their second choice.

84.    DIRECTV loses more subscribers during blackouts in DMAs where station owners have Big Four duopolies because consumers who lose two sources of valued programming (*e.g.*, both the FOX and ABC affiliates in Sacramento) are even more likely to seek that content elsewhere than if they lose only one source.  The same logic applies to an even greater degree to Big Four triopolies.

85.    Accordingly, if Nexstar acquires a new Big Four network in 31 DMAs in which it already has at least one Big Four network, then blackouts will become more threatening for MVPDs like DIRECTV because they will be even more likely to lose subscribers to rivals.  But Nexstar will not suffer those losses to the same degree because it will keep earning fees from

29

AMENDED COMPLAINT

selling broadcast rights to distributors whose services subscribers switch to in order to watch the blacked out content.  Thus, the merger will make MVPDs even more vulnerable to Nexstar's demands for higher prices to avoid blackouts.  Nexstar will have the incentive to exploit that leverage to raise prices.

86.    The anticompetitive price effect of Big Four duopolies is not hypothetical. Controlling for other factors, the higher the proportion of DIRECTV subscribers located in DMAs where a broadcast station owner controls more than one Big Four network, the higher the retransmission fees DIRECTV pays to that station owner.

87.    Nexstar itself has recognized the importance of owning two or more local broadcast stations in a DMA, highlighting to investors just last year the number of local markets in which it has "more than 1 owned and/or operated stations."[52]  And when Nexstar announced its acquisition of TEGNA, it boasted that the transaction would create "Enhanced Local Presence" because of the "overlap" between "TEGNA's 51 DMAs" and "Nexstar DMAs."[53]

88.    Even worse, the increased leverage that Nexstar would get from adding a new Big Four network in 31 DMAs in which it already owns at least one Big Four network to its vast portfolio of broadcast stations nationwide will result in higher retransmission fees for all subscribers, not just subscribers in the DMAs where the transaction will create new Big Four duopolies or triopolies.  This is because DIRECTV's and other MVPDs' agreements with broadcast station owner groups nearly always cover all of the group's stations and generally provide for a single, per-subscriber fee for all of a group's Big Four stations.  That single, per-subscriber fee reflects the relative bargaining leverage of the station owner and the MVPD. Because Big Four duopolies and triopolies increase the station owner's leverage, they enable the station owner to demand a higher per-subscriber fee for retransmission consent for all stations in all DMAs, not just the DMAs where it has a Big Four duopoly or triopoly.

---

[52] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 7 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[53] Nexstar Media Group, Inc., *Acquisition of TEGNA Inc. – August 2025* at 6, (Aug. 2025), https://www.nexstar.tv/wp-content/uploads/2025/08/August-2025-TEGNA-Acquisition-Deck.pdf.

30

**AMENDED COMPLAINT**

89.     Consumers' ability to subscribe to supplemental streaming services or "cut the cord" entirely has not constrained and will not constrain Nexstar from raising retransmission consent fees.  Broadcast station owners have been able to increase retransmission consent fees dramatically despite the increasing popularity of streaming services.  Since 2010, retransmission consent fees from major broadcast stations have increased more than 2,000 percent.[54]

90.     As Nexstar's CEO has explained:  "Historically, we've been able to outrun the rate of attrition by those rate increases and deliver positive growth in net retrans growth.  And we think that, again, we'll see a continuation of that trend."[55]  In other words, even if raising retransmission fees results in higher pay TV prices that drive some consumers to cut the cord, Nexstar will still be able to continue increasing retransmission fees.

**C.     The Challenged Transaction Will Lead to Higher Prices for Consumers**

91.     Nexstar's ability, post-merger to force MVPDs to pay higher retransmission consent fees will end up harming tens of millions of American consumers who subscribe to MVPDs.

92.     Retransmission consent fees are a key input cost for MVPDs in distributing programming to MVPD subscribers.  When broadcast groups raise retransmission consent fees, DIRECTV and other MVPDs have little choice but to pass through those increases to subscribers in the form of higher subscription prices.

93.     More than 46 million U.S. households—nearly 35%—subscribe to MVPDs. Higher MVPD prices nationwide will harm tens of millions of consumers.

**D.     The Challenged Transaction Will Reduce the Quantity, Variety, and Quality of Local Broadcast News**

94.     In addition to leading to higher bills for millions of Americans, the transaction will

---

[54] SNL Kagan, *TV station retrans and virtual multichannel sub carriage fee projections, 2006–2030*, S&P Global Market Intelligence (2025), CIQ Pro: S&P Global Market Intelligence Tech, Media & Telecoms | Kagan Projection.

[55] UBS Global Media and Communications Conference Transcript (Dec. 8, 2025), https://seekingalpha.com/article/4851317-nexstar-media-group-inc-nxst-presents-at-ubs-global-media-and-communications-conference-2025 (statement of Perry Sook, Nexstar Chairman and CEO).

**AMENDED COMPLAINT**

reduce the amount, variety, and quality of local broadcast news.

95.     Local broadcast news stations are a critical source of information for Americans about their communities—coverage of natural disasters and other emergencies, timely information about weather, traffic, and crime, and investigative reports about issues of local importance like education, the conduct of public officials, or local business and the economy.

96.     Today, millions of American consumers in the relevant geographic markets can choose between a local news broadcast on a Nexstar-owned station and a local news broadcast on a TEGNA-owned station, among other options.  In those communities, Americans benefit from reporting by multiple independent teams of investigative reporters trying to find a scoop.  Nexstar has acknowledged that "our local stations . . . compete with other stations in their markets to provide exclusive news stories and unique features such as investigative reporting and coverage of community events to their local audiences."[56]  Americans in those communities can choose between editorial approaches to what stories matter and how they should be told.  They can choose between alternative sets of on-air anchors and different news teams with different ideas about whom to interview and what questions to ask.

97.     The merger would take away those choices for millions of Americans because Nexstar will shut down "overlap" newsrooms in their local communities.  Nexstar not only admits this—it has actually touted shutting local newsrooms as a benefit of the merger.  And it has done just that in the Big Four duopoly markets it owns today.

98.     The "Nexstar Consolidation Playbook" explains that, following a merger, Nexstar will "Operate multiple stations with one infrastructure."[57]  Nexstar's CFO similarly explained last November that the markets where Nexstar and TEGNA stations "overlap" (*i.e.*, compete)  is where "we can really operate 2 stations off of 1 infrastructure."[58]  She added that Nexstar saw a

[56] Nexstar Media Group, Inc., Annual Report (Form 10-K) at 14 (Feb. 27, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001142417/000119312526078361/nxst-20251231.htm.

[57] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 22 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[58] Nexstar Q3 2025 Earnings Call Transcript (Nov. 6, 2025),

32

**AMENDED COMPLAINT**

"significant portion of [the transaction] synergies coming out of that" based on "a very deep analysis in terms of looking at line by line, person by person, what these costs could be."[59]

99. Shrinking two newsrooms to one would take away consumers' ability to choose between those newsrooms. Instead of two or three teams of investigative reporters trying to find a scoop, there will be one. Instead of two or three views about what stories matter and how they should be told, there will be one. Instead of two or three anchor teams on air, there will be one.

100. This outcome is not theoretical—it is part of a well-established pattern. In the DMAs where Nexstar or TEGNA currently has a Big Four duopoly, it is common practice for the two commonly owned stations to have shared news directors, on-air talent, and websites, and the two stations often "simulcast" their programming.

101. Thus, when Nexstar owns more than one station in a DMA, consumers get fewer news options. That is exactly what will happen if the challenged merger is not permanently enjoined: distributors will be forced to pay higher prices for retransmission consent licenses yet will get one source of local news content rather than two or three. They will be paying to license one set of investigative reports and interviews rather than two or three. That is a reduction in the quality of the product that MVPDs get in exchange for retransmission fees and, in turn, a reduction in the quality of the product that MVPDs can sell to their subscribers.

102. These harms—higher prices and lower quality—will be compounded because this merger will set off a waterfall of consolidation. Courts and enforcers have long recognized that an industry trend toward consolidation can be an important factor in understanding the risks that a merger creates for competition.[60] Mergers are also more likely to have anticompetitive effect

https://finance.yahoo.com/quote/NXZ.F/earnings/NXZ.F-Q3-2025-earnings_call-372122.html (statement of Lee Gliha, Nexstar Executive VP and CFO). .

[59] *Id.*

[60] 2023 Merger Guidelines § 2.7; *see also, e.g.*, *United States v. Pabst Brewing Co.*, 384 U.S. 546, 552–53 (1966) ("We hold that a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be."); *United States v. Von's Grocery Co.*, 384 U.S. 270, 278 (1966) ("[This merger] is simply the case of two already powerful companies merging in a way which makes them even more powerful than they were before. If ever such a merger would not violate [§] 7, certainly it does when it takes place in a market characterized by a long and continuous trend toward fewer and fewer owner-

33

**AMENDED COMPLAINT**

when they will "trigger other mergers and give impetus to further concentration"[61] including by "signal[ing] to the other firms in the industry that they are free to increase the concentration."[62]

103.    That trend could not be more apparent here.  As described above, the industry already experienced a decade of significant consolidation, with broadcasters growing in scale through serial acquisitions.  The present moment poses an even greater threat:  the nation's largest broadcast station owners have openly signaled that Nexstar/TEGNA is only the beginning of a new trend towards oligopoly.  Gray Media's CEO stated that when the merger closes, "it may put a little impetus on our company to get larger," adding, "I wish Nexstar all the best. They, like we, believe that consolidation is important for the industry . . . ."[63]  Sinclair's CFO was even more direct: "[W]e are looking at an end state in the sector where you have maybe 2 large super groups. Are there maybe 2 large super groups and maybe a few smaller players perhaps?  But I would say that's kind of the end state we are driving towards."[64]  The fact that Nexstar's competitors who should be trying to bring it down to size are instead rooting for it to get bigger suggests that this deal is just the beginning of a new trend of consolidation that will substantially erode competition across the entire marketplace.

## VII. NO PROCOMPETITIVE EFFECTS OR MERGER-SPECIFIC EFFICIENCIES JUSTIFY THE CHALLENGED TRANSACTION

104.    A merger of Nexstar and TEGNA will not generate any meaningful efficiencies or

competitors, which is exactly the sort of trend which Congress, with power to do so, declared must be arrested."); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 12 (D.D.C. 2022) (observing that the defendants had "achieved their market dominance" by "acquiring other publishers, contributing to a trend toward consolidation in the industry" over a more than forty-year period).

[61] *Gen. Foods Corp. v. FTC*, 386 F.2d 936, 946 (3d Cir. 1967) (noting that "the likelihood that a given merger will trigger other mergers and give impetus to further concentration is a relevant factor in assessing the anticompetitive effect of that merger.").

[62] *United States v. Amax, Inc.*, 402 F. Supp. 956, 965 (D. Conn. 1975).

[63] Gray Q4 2025 Earnings Call (Feb. 26, 2026), https://www.fool.com/earnings/call-transcripts/2026/02/26/gray-media-gtn-q4-2025-earnings-call-transcript/.

[64] Sinclair Presentation at J.P. Morgan 2026 Global Leveraged Finance Conference (Mar. 3, 2026), https://seekingalpha.com/article/4877881-sinclair-inc-sbgi-presents-at-j-p-morgan-2026-global-leveraged-finance-conference-transcript.

34

**AMENDED COMPLAINT**

benefits for competition in the relevant markets for retransmission consent licenses.  The challenged transaction also will not reduce prices for retransmission consent or increase output or quality of local news content available from retransmission consent.

105.    To the contrary, the parties admit that the transaction will lead to (1) an immediate price increase, which Nexstar describes as "contractual revenue synergies," and (2) an immediate output and quality reduction, which Nexstar describes as "operating expense reductions."[65] Nexstar's CFO has described the "synergies" resulting from the transaction as follows: "$300 million of synergies is about 45% coming from net retrans, 55% coming from operating expense synergies."[66]  Regarding operating expenses, she stated that the main goal is to reduce infrastructure and overhead, because "you really can operate 2 television stations off of 1 infrastructure" where the "markets are overlapped."[67]  And Nexstar CEO Perry Sook has been clear about "net retrans synergies" being nothing more than "contractual rate increases," saying that, "[h]istorically, we've been able to outrun the rate of attrition by those rate increases and deliver positive growth in net retrans growth.  And we think that, again, *we'll see a continuation of that trend*."[68]  The parties have identified no efficiencies that might purportedly benefit consumers.  All the "synergies" that the parties describe will lead consumers to pay more for less.

106.    The transaction is not justified by any efficiencies or benefits that Defendants may contend it could have on competition between broadcast television and alternative sources of video content, such as streaming services, for consumers.  Those claimed effects are not cognizable efficiencies because, among other things, they would not occur in the relevant market

---

[65] Nexstar Media Group, Inc., *Acquisition of TEGNA Inc. – August 2025* at 5, 8 (Aug. 2025), https://www.nexstar.tv/wp-content/uploads/2025/08/August-2025-TEGNA-Acquisition-Deck.pdf.

[66] UBS Global Media and Communications Conference Transcript (Dec. 8, 2025), https://seekingalpha.com/article/4851317-nexstar-media-group-inc-nxst-presents-at-ubs-global-media-and-communications-conference-2025 (statement of Lee Ann Gliha, Nexstar CFO).

[67] *Id.*

[68] UBS Global Media and Communications Conference Transcript (Dec. 8, 2025), https://seekingalpha.com/article/4851317-nexstar-media-group-inc-nxst-presents-at-ubs-global-media-and-communications-conference-2025 (statement of Perry Sook, Nexstar Chairman and CEO).

**AMENDED COMPLAINT**

for Big Four retransmission consent in DMAs—where MVPDs, not subscribers, are the buyers. As noted, MVPDs cannot choose between broadcast content and streaming service content like their subscribers can.

107. Regardless, the transaction is not reasonably necessary for the merging parties to compete with streaming services. Nexstar has explained that the "Future TV Ecosystem will Favor Broadcast Television" because of a "Broadcast TV *Virtuous Cycle*" driven by the fact that "MVPDs/vMVPDs need to carry broadcast stations because they carry the sports and local news content viewers demand," which broadens the reach of broadcast and in turn makes broadcast a more attractive destination for owners of key content like live sports.[69] Nexstar has told investors that "Broadcast television content is the most watched content"[70] and that "broadcast continues to be the gold standard for sports and news programming."[71]

108. Nexstar's ownership of stations that provide this valuable content has enabled it to achieve massive financial success despite the growth of streaming services. In the last quarter of 2024, Nexstar earned record net revenue and told investors that it was "well positioned to consistently deliver strong financial results."[72] Late last year, Nexstar told investors that "broadcast television remains the bellwether and the most profitable segment of the media ecosystem, delivering the most watched content and most valuable programming."[73] In its most recent earnings call, Nexstar said that "when it comes to delivering scaled audiences for premium live sports and events," "[b]roadcast remains unmatched" and expressed "our confidence in our

[69] Nexstar Media Group, Inc., *Investor Presentation – June 2025* at 30 (June 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[70] *Id.*

[71] Nexstar Q4 2024 Earnings Call Transcript (Feb. 27, 2025), https://mlq.ai/stocks/NXST/earnings-call-transcript/Q4-2024 (statement of Perry Sook, Nexstar Chairman and CEO).

[72] Nexstar Q4 2024 Earnings Release (Feb. 27, 2025), https://www.nexstar.tv/wp-content/uploads/2025/02/NXST-4Q24-PR-final.pdf.

[73] Nexstar Q3 2025 Earnings Call Transcript (Nov. 6, 2025), https://finance.yahoo.com/quote/NXZ.F/earnings/NXZ.F-Q3-2025-earnings_call-372122.html (statement of Perry Sook, Nexstar Chairman and CEO).

36

**AMENDED COMPLAINT**

long-term outlook and the enduring strength of Nexstar's business model."[74]  And, as noted, retransmission consent fees have increased more than 2,000 percent as streaming services have proliferated.

109.    The transaction also is not reasonably necessary to increase the amount or quality of local news content.  To the contrary, as noted, the parties admit that the merger will lead them to convert two newsrooms to one in many local markets, thereby reducing the output, variety, and quality of local news.

## VIII. ANTITRUST INJURY AND HARM TO DIRECTV

110.    The material reduction in competition in the relevant markets for retransmission consent licenses that this transaction would produce will cause direct, substantial, and irreparable harm to DIRECTV and other distributors alike.

111.    Unless the merger is permanently enjoined, DIRECTV will be forced to sit across the negotiating table from a much more powerful merged Nexstar entity with far more leverage to threaten blackouts and command further exorbitant increases in retransmission consent fees.  The next negotiation will occur later this year, when DIRECTV's agreement with Nexstar expires.

112.    Negotiating with the combined firm, DIRECTV will face a painful Hobson's Choice:  either agree to an increase in retransmission consent fees that will force it to raise subscriber prices even higher, or else face blackouts of programming on Nexstar's stations, depriving those same subscribers of access to the blacked-out local broadcast content.  Either way, DIRECTV and its subscribers are harmed, which in turn will irreparably harm DIRECTV's reputation and goodwill.

113.    Blackouts of programming valuable to DIRECTV's subscribers would irreparably harm DIRECTV by damaging its goodwill with its subscribers.  DIRECTV will not be able to restore that loss of goodwill.  And these increased prices will set a higher baseline for follow-on retransmission consent negotiations.

114.    An increase in the price of DIRECTV's services would likewise harm DIRECTV's

---

[74] Nexstar Q4 2025 Earnings Call Transcript (Feb. 26, 2026), https://finance.yahoo.com/quote/NXST/earnings/NXST-Q4-2025-earnings_call-393489.html.

**AMENDED COMPLAINT**

goodwill with consumers and result in DIRECTV losing subscribers to other distributors, including vMVPDs like YouTube TV.

115.    Increased retransmission consent fees would substantially increase DIRECTV's costs of providing its services to subscribers and therefore would leave DIRECTV with no choice other than to increase the price of its services to subscribers.

116.    The merger also will harm DIRECTV's goodwill with its subscribers by degrading the quantity and quality of local news content that Nexstar itself has recognized that "viewers demand" and that MVPDs thus "must carry."

117.    Absent a permanent injunction, that harm will occur imminently after the preliminary injunction is lifted when Nexstar begins to cut newsroom staff and integrate the infrastructure of newsrooms in DMAs where Nexstar would obtain new Big Four duopolies or triopolies.  Once those layoffs and integration begin, they will be very difficult, if not impossible, to reverse.  Consumers and DIRECTV will be harmed because DIRECTV will have to charge its subscribers higher fees for less local news.

## IX. <u>VIOLATION ALLEGED</u>

118.    Nexstar's acquisition of TEGNA, if not permanently enjoined, will substantially and irreversibly lessen competition in interstate trade and commerce for retransmission consent licenses for broadcast stations affiliated with the Big Four networks in dozens of DMAs across the country, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

119.    DIRECTV is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, to protect against the injuries threatened by this violation of the antitrust laws.

120.    Unless permanently enjoined, the acquisition will have the following effects on markets for retransmission consent licenses for broadcast stations affiliated with the Big Four networks:

a.    Actual and potential competition between Nexstar and TEGNA will be eliminated.

b.    Competition for retransmission consent licenses for broadcast stations affiliated with the Big Four networks will be materially lessened.

**AMENDED COMPLAINT**

c.      Negotiated prices for retransmission consent licenses for broadcast stations will be materially increased relative to the prices that would prevail absent the merger.

d.      The quantity and quality of local broadcast content, specifically including local news content, accessible to DIRECTV through its payment for retransmission consent licenses will be materially reduced and impaired.

121.    Unless permanently enjoined, the acquisition is substantially likely to result in reduced competition, higher prices, reduced output, lower quality, and more limited options for DIRECTV and other MVPDs, and for their subscribers.

## **PRAYER FOR RELIEF**

DIRECTV respectfully requests that this Court:

Adjudge and decree that the merger is unlawful because it violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

Enter judgment in favor of DIRECTV against Defendants;

Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from further consummating the challenged merger;

Award DIRECTV its reasonable costs and attorneys' fees, as provided by law, including by 15 U.S.C. § 26;

Enter all necessary injunctive relief to fully remedy the Section 7 violation and to wholly restore competition to the status quo ante; and

Award such other relief as it may deem just and proper.

**AMENDED COMPLAINT**

DATED:  April 30, 2026

MUNGER, TOLLES & OLSON LLP

By: _____ */s/ Glenn D. Pomerantz*

Glenn D. Pomerantz (State Bar No. 112503)
   glenn.pomerantz@mto.com
Kuruvilla J. Olasa(State Bar No. 281509)
   kuruvilla.olasa@mto.com
Robert E. Bowen (State Bar No. 335932)
   robert.bowen@mto.com
Liam Gennari (State Bar No. 350177)
   liam.gennari@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100

Justin P. Raphael (State Bar No. 292380)
   justin.raphael@mto.com
Carson J. Scott (State Bar No. 339868)
   carson.scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:  (415) 512-4000

Xiaonan April Hu (State Bar No. 321354)
   april.hu@mto.com
Brandon H. Thomas (State Bar No. 334240)
   brandon.thomas@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300

KING & SPALDING LLP

McGregor Scott (State Bar No. 142413)
   mscott@kslaw.com
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, California 95814
Telephone:    (916) 321-4800

Olivier N. Antoine (pro hac vice)

40

**AMENDED COMPLAINT**

oantoine@kslaw.com
Laura Harris (pro hac vice)
  lharris@kslaw.com
Joshua Hazan (pro hac vice)
  jhazan@kslaw.com
Sean Murray (pro hac vice)
  smurray@kslaw.com
Arthur B. Schoen (pro hac vice)
  aschoen@kslaw.com
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, New York 10104
Telephone:     (212) 556-2100

M. Sean Royall (pro hac vice)
  sroyall@kslaw.com
Emily Blackburn (pro hac vice)
  eblackburn@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone:     (202) 737-0500

*Attorneys for Plaintiff DIRECTV, LLC*

41

**AMENDED COMPLAINT**