# EXHIBIT A
# PUBLIC REDACTED VERSION

May 22, 2026

**Via E-Mail**

Beth Wilkinson
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor,
Washington, D.C. 20036

Re:    *In re: Nexstar-Tegna Merger Litigation* - 2:26-cv-00976-TLN-CKD

Dear Beth:

During a May 11, 2026, conference regarding the parties' Rule 26(f) Report, Defendants indicated that they intend to comply with the Preliminary Injunction.  Plaintiffs write to better understand how Nexstar is complying with the Preliminary Injunction, ECF No. 172, particularly in light of recent public reports and statements.  These include:

- A report published by Bloomberg on May 8, 2026, attached as Exhibit A.  That report, which is apparently based on conversations with nine Nexstar and TEGNA employees, states that while "[m]embers of Tegna management remain in place," they occupy "limited roles" and do not "have the authority to communicate with employees."  The same article states that Nexstar "must make" decisions giving any direction to TEGNA-owned stations.

- Statements made by Nexstar's CEO, Perry Sook, during Nexstar's Q1 2026 earnings call, held on May 7, 2026, a transcript of which is attached as Exhibit B.  Mr. Sook stated that certain financial transactions TEGNA is interested in undertaking during the hold-separate period "would have to be approved by the **Board of TEGNA**, **which is comprised of Nexstar executives**, **and Nexstar management team**, and that's been approved by the courts."

- A statement made by Mr. Sook on the same earnings call: "I would say there are certain commercial agreements that Mike Biard and I have been talking about that we could enter into on an arm's length basis with TEGNA under the order, which could include and involve Premion."

- Statements made by Nexstar's CFO, Lee Ann Gliha, during the same earnings call that Nexstar "can use excess [TEGNA] cash flow for the combined debt repayment as was our plan, including her further statement, "I say excess free cash flow because there needs to be enough cash at the operating companies to operate.  We have to continue to have an operation.  So I mean, subject to minimum cash balance requirements that have from an operating perspective.  All of the debt obligations of

1

Beth Wilkinson
May 22, 2026
Page 2

> [Nexstar] are joint and several between us and TEGNA.  So excess [TEGNA] cash flow, as we see fit, will be used to repay that debt."

- Nexstar's statements regarding after-acquired clauses. Nexstar told the Court that it



The statements, reports, and conduct outlined above appear to be in tension with the Preliminary Injunction, which requires that "TEGNA personnel must maintain control over TEGNA's decision-making," Order ¶ 4, and "TEGNA shall have separate management that operates TEGNA in the ordinary course consistent with pre-closing practices," Order ¶ 2.  The Preliminary Injunction mandates that "Nexstar must not influence the management of the held-separate TEGNA business unit," Order ¶ 4, and "Nexstar shall not appoint current Nexstar employees, or former employees employed within the prior six months, as TEGNA officers and no TEGNA officer shall be an officer of Nexstar," Order ¶ 11(c) and 11(f).  The Preliminary Injunction further requires Nexstar to "put measures in place to maintain TEGNA as an ongoing, economically viable, and active competitor," Order ¶ 2, and to provide TEGNA "sufficient working capital and lines and sources of credit to continue to maintain the Acquired Stations as economically viable and competitive, ongoing business," Order ¶ 9.  Importantly, although Nexstar can undertake ordinary-course cash management and debt service activities, it cannot do so "as a pretext to undermine TEGNA's viability as a going concern," Order ¶ 11.

In light of the forthgoing public reports and statements, Plaintiffs need to better understand the steps Nexstar is taking to comply with the Preliminary Injunction.  Accordingly, Plaintiffs request that Nexstar provide written responses to the following questions concerning Nexstar's compliance with the Preliminary Injunction by **Friday, May 29, 2026**.

1.    **<u>Management Structure</u>**.  The Preliminary Injunction requires TEGNA to have "separate management that operates TEGNA in the ordinary course consistent with pre-closing practices."  Order ¶ 2.

   a.    Please provide us with the full list of TEGNA officers and directors, including the members of the "Board of TEGNA" identified by Mr. Sook and discussed above, and their respective duties and responsibilities.

Beth Wilkinson
May 22, 2026
Page 3

    c.      Please identify whether any of the individuals described in 1(a) or 1(b) are currently employed by Nexstar or were employed by Nexstar within the last six months, and, if so, state their current or former role and duties and responsibilities at Nexstar.

    d.      Please provide us with a copy of any instructions, guidance, guardrails, etc. provided to TEGNA management regarding their management of TEGNA under the Preliminary Injunction and any operating covenants to which they are required to adhere, including any reports made to Nexstar's board or the "Board of TEGNA" discussing how TEGNA management will comply with this guidance. To the extent there are any operating covenants that are not expressly listed in TEGNA's and Nexstar's merger agreement, please provide those.

    e.      Please provide us with a copy of any instructions, guidance, guardrails, etc. provided to Nexstar management regarding how they should comply with the Preliminary Injunction, including any reports made to Nexstar's board or the "Board of TEGNA" discussing how Nexstar management will comply with this guidance.

2.    **TEGNA Decisionmaking**.  The Preliminary Injunction requires that "TEGNA personnel . . . maintain control over TEGNA's decisionmaking, including with respect to retransmission consent agreements and negotiations, newsroom personnel, operations and programming, product and service offerings, product development, advertisement sales, and personnel."  Order ¶ 4.

    a.      Do TEGNA senior personnel (directors, officers, etc.) have the authority to (i) communicate with TEGNA employees; and (ii) make decisions for and give direction to TEGNA-owned stations, and are they in fact exercising that authority?  If there are any restrictions on the ability of TEGNA senior personnel to communicate with TEGNA employees and stations, please describe these restrictions and provide any documents reflecting those restrictions.  Furthermore, in what circumstances do TEGNA employees have to request approval from anyone at Nexstar for expenditures and/or to enter into contractual commitments? Please provide any document reflecting these requirements.

    b.      What records, if any, are being maintained to document decisions made by TEGNA management about TEGNA operations, agreements, and news programming and whether Nexstar provided any input on those decisions?

3.    **Maintenance of TEGNA**.  The Preliminary Injunction requires Nexstar to "use all reasonable efforts to maintain — at 2025 levels or 2026 levels that were approved prior to the Transaction, whichever are higher — all station operations, staffing, promotional,

Beth Wilkinson
May 22, 2026
Page 4

advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations."  Order ¶ 8.

    a.      Please state what the 2025 levels and pre-closing 2026 levels were for station operations, staffing, promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Acquired Stations, what the current levels for each of these are now, and what steps you have taken to maintain these pre-closing levels.

4.      **Retransmission Consent Agreements**.  What steps is Nexstar taking, if any, to make clear to MVPDs including DIRECTV that, notwithstanding any previous statement by Nexstar, TEGNA stations will continue to be governed by TEGNA's retransmission consent agreements?

5.      **Nexstar TEGNA Agreements**.  Please identify each potential or contemplated agreement between TEGNA and Nexstar that was discussed or entered into after March 19, 2026, the subject matter of the agreement, the individuals at Nexstar and TEGNA involved in the discussions or negotiations, and who at TEGNA approved (or would be expected to approve) any executed agreement.  Please also state whether each transaction is an "arms length" transaction, as Mr. Sook described in the Q1 2026 earnings call, and your basis for considering a transaction to be "arms length."

6.      **Cash Flow**.  Please identify what steps, if any, Nexstar is taking to ensure that its use of TEGNA's excess cash flow complies with the Preliminary Injunction's requirement that TEGNA remain an "ongoing, economically viable, and active competitor."

    a.      Please provide a copy of TEGNA's pre-closing budget and a copy of its current budget.

We appreciate your cooperation with this important request.

Beth Wilkinson
May 22, 2026
Page 5

Very truly yours,

*/s/ Francisco Benzoni*

Francisco Benzoni
Special Deputy Attorney General
Counsel for Plaintiff North Carolina and
on behalf of all Plaintiff States


*/s/ Glenn D. Pomerantz*

Glenn D. Pomerantz
Counsel for DIRECTV

Bloomberg Law News 2026-05-22T16:57:4601860448-04:00

# Nexstar Merger Fight Leaves Largest US TV Station Owner in Limbo

By Kelcee Griffis and Leah Nylen2026-05-08T15:50:37647-04:00

Few executives bother coming into Tegna Inc.'s corporate offices in New York and Tysons, Virginia, very often anymore.

Business plans and staffing decisions have been put on pause. Managers say they're not sure what they're supposed to do. Rank-and-file workers say they don't know who's in charge.

This was not how the largest-ever merger of TV station groups was supposed to go down. Nexstar Media Group Inc. Chief Executive Officer **Perry Sook**, who founded the company with a single Pennsylvania station 30 years ago, envisioned a newly energized local broadcasting business that could take on bigger media rivals when he engineered the $6.2 billion acquisition of competitor Tegna. Sook closed the merger on March 19, the day he got the nod from regulators at the US Department of Justice and Federal Communications Commission.

But the day before Nexstar closed, a group of state attorneys general sued to block the deal, saying it will lead to higher costs and less choice for consumers. Satellite-TV provider DirecTV joined in the litigation, which has since picked up bipartisan support. The result was a judge ordering an injunction preventing the companies from intermingling until a full antitrust trial can take place. A separate challenge to the FCC's deal approval is playing out in Washington.

Now, in one of the stranger twists in corporate acquisition history, Nexstar can't go forward with a merger it already completed, putting the owner of the CW Network, the NewsNation cable channel and 265 local TV stations across the country in a state of limbo. If the courts rule against the company, Nexstar may have to unwind the deal. "The situation that we are dealing with is unusual," Sook said on a Thursday call with analysts. "We're in a bit of an unprecedented place right now," Chief Financial Officer Lee Ann Gliha added.

Exhibit A


© 2026 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service



Tegna Inc. offices in Virginia on March 20.
Photographer: Andrew Harnik/Getty Images

Tegna declined to comment, referring all inquiries to Nexstar. Nexstar also declined to comment for this story, which was based on conversations with nine Nexstar and Tegna employees.

Under the court order, Nexstar can pay down debt and file financial statements on behalf of its Tegna subsidiary. But all other management decisions — distribution agreements, personnel appointments, operations and programing — are to be made by Tegna executives that Nexstar must appoint or reappoint. Those individuals can't be current Nexstar employees or anyone who left the company within the last six months.

With the companies' transformation frozen in place, corporate branding and communication systems are stuck in a holding pattern. Tegna employees are still using their old company's email addresses, although Tegna's website home page refers visitors to Nexstar. Corporate logos that identified Tegna stations on the air as being owned by Nexstar immediately after the merger have since been removed.

**Bloomberg Law**®

© 2026 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

A deal that Nexstar had to provide a 10 p.m. news program for a Tegna station in Houston was rescinded, Sook said on the call. Nexstar now must negotiate the agreement again.

Since a March all-hands meeting with Sook, most Tegna employees haven't received direct communication about the state of affairs at the company, staffers told Bloomberg. After Tegna Chief Executive Officer **Mike Steib** posted a photo of a poolside family vacation on his private Instagram account, some employees grumbled that he had already checked out. Others noticed his Microsoft Teams profile sometimes still appeared active. Steib declined to comment.

Members of Tegna management remain in place with limited roles as part of a customary transition period, but they don't have the authority to communicate with employees, a person familiar with the matter said.

Tegna management's view is that the injunction prevents them from offering any direction to previously owned stations, according to people familiar with their thinking. The dissolution of Tegna's senior leadership team at the close of the merger means that Nexstar must make those decisions, they said.

On the call with analysts, Sook said Nexstar management must approve any large financial transactions. Otherwise, he said, stations should be able to carry on under the status quo.

"We have the ability to appoint management inside of Tegna," Sook said. "And so I think all of those things taken together are the governance that will guide us during this hold-separate period."

So far, Nexstar has not appointed new management for Tegna, however.

After the court order, hiring and contract negotiations for Tegna employees were put on pause, according to multiple people inside the company who requested anonymity to discuss internal matters.

Some employees who were up for contract renewal decided it was time to leave the company, or the industry entirely, due to the uncertainty. Many stations have open positions, but employees in at least one station have been told it doesn't have the budget to fill all of them. According to a person familiar with the matter, that station can only rehire one person despite the recent departure of several newsroom employees.



© 2026 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Nexstar and Tegna are not allowed to reduce headcount while the court's order is effect, Sook said Thursday. Nexstar had appealed to the court to let them undertake "cost reduction initiatives" that Tegna devised before agreeing to the merger. DirecTV and the states opposed that move, saying it would make it harder to successfully spin off Tegna stations if needed later. The judge ruled against Nexstar's request, ordering that Tegna "must maintain status quo staffing levels."

**Jason Bazinet**, a Citigroupanalyst, expressed concern during the Thursday call that Tegna staffers may be distracted by the current state of affairs and that the business could suffer.

"In all my years, I've never really come across a situation where shareholders own an asset and can't manage it," Bazinet said.

Sook responded that the employee attrition rate at the Tegna properties hasn't risen and that the results for Tegna's first quarter were "excellent."

There are some signs of movement. In a late April meeting, Tegna station general managers and news directors were told they could resume hiring decisions, and that Tegna's leadership was being asked to return to work, according to people familiar with the matter. But employees have not seen evidence that has happened, the people said.

Stations must continue managing on their own in the meantime. One employee questioned what the overhanging court case means for their station's streaming show that requires its own set and anchors to operate. The talent pool is uncertain right now, the person said, and there's no way to know which direction Nexstar wants to go.

According to antitrust experts, the speed with which Nexstar closed the Tegna deal created the current problems.

In previous acquisitions challenged by the states, such as T-Mobile US Inc.'s 2020 purchase of Sprint Corp., the companies agreed to hold off on closing while litigation was ongoing. In other cases — like Illumina Inc.'s $7 billion deal for Grail Inc., which was challenged by US and European antitrust authorities, the companies closed the transaction but voluntarily agreed to operate the businesses separately until a decision on the legality. Ultimately, Illumina was ordered to unwind the transaction and Grail was spun off.

Bloomberg Law®

© 2026 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

"Nexstar and Tegna made the choice to start scrambling the eggs," said **John Newman**, an antitrust professor at the University of Memphis School of Law, who served as a top staffer on the Biden-era Federal Trade Commission. "It's not a good look when you are on notice about a lawsuit."

© 2026 Bloomberg L.P. All rights reserved. Used with permission.

To contact the reporters on this story:
Kelcee Griffis in Washington at kgriffis4@bloomberg.net;
**Leah Nylen** in Washington at lnylen2@bloomberg.net

To contact the editors responsible for this story:
**Lucas Shaw** at lshaw31@bloomberg.net

Christopher Palmeri

© 2026 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**S&P Global**
Market Intelligence

# Nexstar Media Group, Inc.
# NasdaqGS:NXST
# FQ1 2026 Earnings Call Transcripts

## Thursday, May 7, 2026 2:00 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ1 2026- | | | -FQ2 2026- | -FY 2026- | -FY 2027- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS (GAAP) | 4.40 | 5.09 | ▲15.68 | 5.21 | 26.75 | 17.16 |
| Revenue (mm) | 1261.83 | 1396.00 | ▲10.63 | 1441.04 | 5739.46 | 5402.21 |

Currency: USD
Consensus as of May-07-2026 2:15 PM GMT



Stock Price [USD] vs. Volume [mm] with earnings surprise annotations

| - EPS (GAAP) - | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| FQ2 2025 | 2.71 | 3.06 | ▲1 12.92 % |
| FQ3 2025 | 2.43 | 2.14 | ▼2 (11.93 %) |
| FQ4 2025 | 3.76 | | |
| FQ1 2026 | 4.40 | | |

Exhibit B

COPYRIGHT © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................................... | 3 |
| Presentation | ................................................................................... | 4 |
| Question and Answer | ................................................................................... | 10 |

COPYRIGHT © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

2

Case 2:26-cv-00976-TLN-CKD    Document 269-2    Filed 07/22/26    Page 14 of 28

# Call Participants

## EXECUTIVES

**Lee Ann Gliha**
*Executive VP & CFO*

**Michael Biard**
*President & COO*

**Perry A. Sook**
*Founder, Chairman & CEO*

## ANALYSTS

**Aaron Lee Watts**
*Deutsche Bank AG, Research Division*

**Benjamin Soff**
*Deutsche Bank AG, Research Division*

**Craig Anthony Huber**
*Huber Research Partners, LLC*

**Daniel Louis Kurnos**
*The Benchmark Company, LLC, Research Division*

**Jason Boisvert Bazinet**
*Citigroup Inc., Research Division*

**Patrick William Sholl**
*Barrington Research Associates, Inc., Research Division*

**Steven Lee Cahall**
*Wells Fargo Securities, LLC, Research Division*

## ATTENDEES

**Joseph N. Jaffoni**
*JCIR*

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 15 of 28

# Presentation

**Operator**

Good day, and welcome to Nexstar Media Group's First Quarter 2026 Conference Call. Today's call is being recorded. I will now turn the conference over to Joe Jaffoni, Investor Relations. Please go ahead.

**Joseph N. Jaffoni**
*JCIR*

Good morning, everyone, and thank you, Stacy. I'll read the safe harbor language, and then we'll get right into the call. All statements and comments made by management during this conference call other than statements of historical fact may be deemed forward-looking statements for purposes of the Private Securities Litigation Reform Act of 1995.

Nexstar cautions that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those reflected by the forward-looking statements made during today's call. For additional details on these risks and uncertainties, please see Nexstar's annual report on Form 10-K for the year ended December 31, 2025, as filed with the Securities and Exchange Commission and Nexstar's subsequent public filings with the SEC. Nexstar undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

It's now my pleasure to turn the conference over to your host, Nexstar Founder, Chairman and Chief Executive Officer, Perry Sook. Perry, please go ahead.

**Perry A. Sook**
*Founder, Chairman & CEO*

Thank you, Joseph, and good morning, everyone. We appreciate you all joining us today. Mike Biard, our Chief Operating Officer; and Lee Ann Gliha, our Chief Financial Officer, are with me on the call here as always. Nexstar hit the ground running in the first quarter of 2026, advancing our strategic priorities across multiple fronts. We closed our landscape -- our landmark acquisition of TEGNA following FCC and DOJ approval, and we continue to build and grow the CW and NewsNation as national networks, and we delivered strong quarterly net revenue, adjusted EBITDA and adjusted free cash flow.

This year marks the 30th anniversary of Nexstar's founding, starting with a single television station in Scranton, Pennsylvania. From the very beginning, Nexstar's growth and success has always been grounded in our steadfast commitment to high-quality local broadcast journalism, which we believe is essential to the communities we serve and to American democracy. While our core mission has not wavered, the competitive landscape has changed dramatically in those 30 years. Big Tech, legacy, big media and distribution companies have grown exponentially.

And despite consolidation within our industry, Nexstar still operates with a fraction of their ubiquitous reach and financial resources, prohibiting us and every other company in our industry from competing on a level playing field. Against this backdrop, our acquisition of TEGNA represents an important step in solidifying our future and our ability to continue providing these valuable services to local communities across the United States.

I'll now spend a few minutes bringing you up to speed on where we are today with the acquisition of TEGNA. I'll start by saying the situation that we are dealing with is unusual, and I would caution against attempting to draw legal conclusions at this stage. We will be as transparent as possible under the circumstances and share what we can at this time. As you know, the transaction closed on March 19 after receiving all required regulatory approvals. As part of that process, we engaged extensively with the FCC and DOJ and provided more than 7 million pages of documentation in response to their inquiries.

We also made meaningful concessions to secure our approvals, including agreeing to increase local news programming in 9 markets, divest stations in 6 markets within 2 years and extend expiring retransmission

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 16 of 28

agreements through November 30 of this year. Under ordinary circumstances, that process with the concessions and the regulatory approvals would allow us to move forward post closing with our integration plans. However, DIRECTV, along with a number of state AGs filed suit seeking to block the transaction.

DIRECTV is a sophisticated company owned by a private equity firm, TPG, with its own commercial interests just as we have ours. That said, the issue before the courts is not the relative commercial negotiating positions of the parties, it is whether this transaction serves the broader public interest, including American consumers and in the preservation of local journalism. As such, we believe we will prevail on the merits of this case. We are confident in our arguments expressed in detail in the FCC's order approving the transaction that a stronger, more financially resilient local broadcast industry is in the public's best interest. We believe this is a fight worth having for us, for our industry and for the future of local journalism.

Nexstar is a company built on localism, and our track record demonstrates that scale and operational strength are critical to sustaining high-quality local news programming. As the company has grown, we've consistently made meaningful investments in our station infrastructure and in expanding local news programming, which is the most viewed and the most valued programming that we offer. This transaction represents an opportunity to further our long-standing commitment to serving the communities of all sizes with high-quality free over-the-air programming, fact-based journalism and innovative digital and marketing solutions for both our viewers and our advertising partners. We're focused on presenting the strongest possible legal arguments to the court.

And to that end, we've engaged Beth Wilkinson of Wilkinson Stekloff to lead our trial and appellate efforts supplementing our formidable antitrust counsel at Morrison Foerster. Beth is one of the nation's most highly regarded trial lawyers having recently led the defense team that secured a victory for the NFL and its 32 member teams in a major antitrust class action suit challenging the Sunday Ticket distribution and related media agreements. With our expanded legal team in place, we move forward now with complete confidence in the merits of our case and our ability to bring this process to a successful conclusion.

As far as next steps are concerned, there are multiple legal proceedings underway. First, we filed our notice of appeal of the preliminary injunction before the Ninth Circuit Court of Appeals. Second, the trial in the U.S. District Court for the Eastern District of California. And finally, there is also a separate challenge to the FCC's approval of the transaction pending before the D.C. Circuit Court. The court has already denied a request for an emergency stay, finding that it lacked jurisdiction at this stage.

Both we and the FCC have been directed to file our responses to the petition by May 11. While we don't have control of the various courts time lines, in the meantime, in compliance with the court order, Nexstar and TEGNA are operating separately, and we are proud of both teams continuing focus on execution and their local community commitments.

Now let's turn to the first quarter highlights, which include 13 days of the results of TEGNA. In the quarter, we delivered record net revenue of $1.4 billion and strong adjusted EBITDA and adjusted free cash flow of $470 million and $420 million, respectively. At our legacy Nexstar business units, we made strong progress towards our goal of achieving additional operating expense savings, driven by further cost reductions at the CW and broader core operating efficiencies. The CW network improved year-over-year profitability in the first quarter and is well on its way to achieving profitability by the fourth quarter of this year.

Launched just 5.5 years ago and featuring Nexstar's enterprise-wide commitment to unbiased and fact-based journalism, NewsNation was the #1 fastest-growing network in prime time across all major broadcast and cable networks in the month of March of 2026, growing 85% in total viewers and 100% among adults 25-54 compared to the prior year. The network now ranked 35th in total household viewing for all of primetime ad-supported cable networks in the first quarter.

As you'll hear more from Lee Ann later, we continue to execute on our capital allocation plan. During the quarter, we returned $56 million to shareholders in the form of dividends and have maintained our $1.86 per share quarterly dividend, which represents a 3.7% yield, placing Nexstar in the top tier of all dividend

payers in the S&P 400. We also remain focused on deleveraging and repaid $182 million in debt through April 30.

In closing, the free universal access offered by local broadcast television is not just convenience, it's an essential public service and central to Nexstar's mission. If local broadcasters are to continue providing these essential services for future generations, we must be allowed to operate our business in a manner that accurately reflects today's market realities.

Now let me turn the call over to Lee Ann to provide a little more color on the transaction and the interim TEGNA operations and our reporting until the court cases are heard. Lee Ann?

**Lee Ann Gliha**
*Executive VP & CFO*

Thank you, Perry, and good morning, everyone. I wanted to jump on the call today a little out of order to provide you some color on what you'll hear from us on the financials and operations given the current situation. Operationally, we're in a bit of an unprecedented place right now with the court order until we can be heard by the appellate court go to trial or settle the case. To be clear, we own TEGNA. It is a subsidiary of Nexstar Media, Inc., our primary operating subsidiary, and we can use excess cash flow for the combined debt repayment as was our plan.

As Perry noted, we repaid $182 million of debt through April 30. We can also execute on whatever actions we need to, to accomplish our financial reporting and internal control oversight. But as described in the court order, we must hold separate the assets of the TEGNA subsidiary. What this effectively means is TEGNA is operating as it did prior to the transaction, including operating under its own retransmission agreement. All of this, however, remains in flux pending the natural progression of the litigation.

In addition, the operations of TEGNA will be under the purview of the team at TEGNA rather than under Nexstar's day-to-day management. So given the number of variables, I'm sure you'll appreciate that for now, forward-looking guidance will be limited. We understand the market does not like uncertainty, so we're going to do our best to keep you up to speed as much as we can given the constraints placed upon us. The good news is TEGNA is a public company, so there's plenty of comparable financial data for you to review along with the longer-term projections they provided in their proxy.

Now I'm going to turn the call over to Mike to provide some color on our results, primarily on the revenue side of the P&L, and then I'll return for some more discussion on expenses and capital allocation. Mike?

**Michael Biard**
*President & COO*

Thank you, Lee Ann, and good morning, everyone. As noted in this morning's press release and Perry's remarks, Nexstar's consolidated financial results for the 3-month period ending March 31, 2026, include 13 days of TEGNA operations, while the comparable 2025 period reflects only Nexstar's legacy business units. The company delivered first quarter net revenue of $1.4 billion, an increase of $162 million or 13.1% compared to the prior year, primarily due to $106 million of revenue from TEGNA and higher advertising and distribution revenue from our legacy business units.

First quarter distribution revenue of $837 million increased $75 million or 9.8% compared to the prior year quarter and primarily reflects $54 million of revenue from TEGNA and 2.8% higher revenue from our legacy business due to increased rates, growth in vMVPD subscribers, the addition of CW affiliations on certain of our stations and our local FOX affiliates participation in the launch of FOX One, offset in part by MVPD subscriber attrition. On a combined basis, assuming we own TEGNA for the entire quarter, distribution revenue increased 1.6% year-over-year.

Given what we are seeing in the numbers reported to us in the publicly reported subscriber counts from distributors, we are feeling more optimistic than our original plan for subscriber attrition for the year. However, as you know, we committed to the FCC in connection with the transaction to offer to extend current retransmission agreements until November 30 for MVPDs renewing with us before that date.

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 18 of 28

Putting it all together, we do not expect a material change from the original distribution guidance we provided for legacy Nexstar.

Advertising revenue of $548 million increased $88 million or 19.1% over the comparable prior year, primarily reflecting $51 million incremental TEGNA advertising revenue and higher political advertising revenue. Excluding TEGNA revenues, legacy Nexstar nonpolitical advertising revenue was flattish and in line with our expectations, growing 0.4% as growth in digital advertising offset declines in nonpolitical television advertising. Top advertising categories in the quarter for legacy Nexstar were department and retail stores, attorneys and gaming and sports betting, while drugstores and medication, packaged goods and radio TV newspaper cable advertisers had the largest declines. However, there were no major category outlier in terms of positive or negative performance.

On a combined basis, nonpolitical advertising was up 1.2% as TEGNA's large portfolio of NBC affiliations benefited from NBC's broadcast of the Super Bowl and the Olympics in the first quarter. In addition, on a combined basis, overall digital advertising revenue increased a mid-single-digit percentage, driven by strong local digital revenues, offset in part by continued declines at TEGNA's Premion segment due primarily to the loss of a major customer in 2025. For the second quarter, including TEGNA on an as-combined basis, nonpolitical advertising is expected to decline mid-single digits due to a weaker advertising environment.

Legacy Nexstar and TEGNA both delivered strong first quarter political advertising revenue, driven by strong primary and early gubernatorial spending. As reported, political advertising was $46 million, but on a combined basis, political advertising in Q1 was $78 million, up 89% versus 2022 and 19% versus 2024, driven by strong spending in key states of Texas, Illinois, California, Michigan, Georgia and Maine. According to AdImpact, industry-wide broadcast political advertising spending was up 79% in the first quarter versus the comparable election cycle in 2022 and up 13% versus 2024, demonstrating the continued importance of broadcast television for candidates and campaigns seeking to reach and engage voters. We anticipate a favorable 2026 political season consistent with our combined historical track records and are prepared at legacy Nexstar to manage any changes regarding access to lowest unit rate by PACs and parties without materially impacting our performance.

Turning to the CW. We continue executing our strategic plan and remain on track to achieve profitability in the fourth quarter with the expectation that we'll improve full year losses by more than 30% in the year. While we are facing some near-term advertising headwinds related to Nielsen's transition to Big Data measurement, improved distribution from our 2025 affiliation renewal cycle will more than offset those impacts. We are also further strengthening the CW's burgeoning sports programming with a multiyear broadcast partnership with the Mountain West Conference beginning this fall and continuing through the 2030, '31 seasons. Under that agreement, the CW will televise 13 football games annually, along with 20 men's and 15 women's basketball games each season.

In addition, we added 6 Banana Ball games to our schedule for May and June, broadening the network's overall appeal and audience reach. With 148 additional hours of programming airing in 2026, nearly half of the CW schedule will be sports or sports adjacent. Importantly, we are continuing to drive strong results from our sports investments. The NASCAR O'Reilly Auto Parts series on the CW has delivered more than 1 million total viewers for each of its first 12 races in the 2026 season.

In addition, ACC Men's and Women's Basketball concluded the 2025, '26 season with record viewership with total audiences increasing 6% for the men's games and 26% for the women's. On the digital front, the marketplace is increasingly endorsing the value of CW programming, and we are strengthening our brand equity by expanding distribution and unlocking new advertising opportunities through groundbreaking partnerships with leading digital platforms. We recently announced a deal with ESPN that will make the ESPN app and website the exclusive streaming home for all CW sports.

Beginning this summer, fans with an ESPN unlimited subscription will be able to stream CW sports live across devices and platforms, complementing our free over-the-air broadcast and MVPD and vMVPD distribution while significantly extending our reach to new audiences and advertisers through ESPN Sports best-in-class platform. We also announced a partnership with Roku, the largest AVOD platform in the United States, which will bring CW entertainment programming to the Roku Channel for next day

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 19 of 28

streaming beginning with the broadcast season this coming fall. This partnership will provide access to more than half of U.S. broadband households through a dedicated CW-branded vertical hub, further enhancing our digital footprint and monetization capabilities.

To close, we are focused on expanding reach and unlocking new monetization opportunities across our portfolio by leveraging our growing sports programming, multi-platform distribution and digital partnerships to drive incremental value. At CW, this includes scaling live sports and extending distribution through partnerships like ESPN and Roku. At NewsNation, we continue to build a differentiated fact-based national news offering that can be monetized across linear, digital and on-demand platforms. Consistent with Nexstar's view that programming must reach audiences wherever they are, we are prioritizing broader distribution, improved ad monetization across platforms and exploiting new revenue streams that position us to compete more effectively in a rapidly evolving media landscape.

And with that, it's my pleasure to turn the call back to Lee Ann for the remainder of the financial review.

**Lee Ann Gliha**
*Executive VP & CFO*

Hello again. Combined first quarter direct operating and SG&A expenses, excluding depreciation and amortization and corporate expenses increased by $76 million, driven primarily by $73 million of recurring incremental expense from the acquisition of TEGNA and $4 million of onetime expenses related to cost reduction initiatives taken at legacy Nexstar. Excluding onetime expenses, first quarter recurring cash operating expenses were lower by $1 million for Nexstar's legacy business unit.

Q1 2026 corporate expense was $106 million, including noncash compensation expense of $20 million compared to $52 million, including noncash compensation expense of $18 million in the first quarter of 2025. The increase of $54 million is primarily due to $38 million of onetime costs associated with our TEGNA acquisition. Q1 2026 amortization of broadcast rights included in our definition of adjusted EBITDA was $72 million, a reduction of $16 million from $88 million in the first quarter of 2025, primarily due to timing of programming at the CW.

Q1 2026 income from equity method investments, which primarily reflects our 31% ownership in TV Food Network, declined by $4 million in the quarter or 50%, primarily related to TV Food Network's lower revenue. Putting it all together, on a consolidated basis, first quarter adjusted EBITDA was $470 million, representing a 33.7% margin and an increase of $89 million from the 2025 first quarter of $381 million. TEGNA operations accounted for $31 million of this difference with the remainder due primarily to the political cycle. Excluding TEGNA, legacy Nexstar generated $439 million of adjusted EBITDA.

Moving to the components of free cash flow and adjusted free cash flow. First quarter CapEx was $22 million, a decrease of $13 million from $35 million in the first quarter of last year, primarily due to delayed spending given the pendency of and plans related to the TEGNA acquisition. First quarter net interest expense was $120 million, an increase of $23 million from the first quarter of 2025 due primarily to $22 million of onetime commitment and funding fees associated with the temporary bridge loans in connection with the acquisition of TEGNA and the refinancing of certain TEGNA indebtedness.

On a recurring cash basis, this compares to $94 million in the first quarter of 2026 versus $95 million in Q1 2025. First quarter operating cash taxes were $1 million as the first quarter cash taxes are related to state taxes. Payments for capitalized software obligations, net of proceeds from disposal of assets and insurance recoveries were $3 million, both in the first quarter of this year and last. In Q1, cash programming amortization costs were greater than cash payments by $10 million as certain programming payments were deferred.

As we received -- we also received an $84 million distribution from Food Network related to the 2025 operating cash flows greater than the $21 million of income from unconsolidated investments reported on our income statement. Putting this all together, consolidated first quarter 2026 adjusted free cash flow was $420 million as compared to $348 million last year. Excluding the impact of TEGNA, legacy Nexstar generated $400 million of adjusted free cash flow.

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 20 of 28

We are currently projecting CapEx in the $45 million range in Q2. Second quarter cash taxes are estimated in the $152 million range. And from an interest perspective, our run rate quarterly interest expense based on our current balances outstanding as of April 30 is about $187.5 million. That amount will fluctuate with SOFR rates and reduce as we repay debt. In Q2 '26, payments for programming are expected to be in excess of amortization by about $5 million.

Turning now to capital allocation and our balance sheet. Together with the cash from operations generated in the quarter and cash on hand, we returned $56 million to shareholders in the form of dividends. We made no repurchases, and we used excess cash to fund the acquisition of TEGNA and repaid $28 million of mandatory amortization payments on our debt. Nexstar's outstanding debt at March 31, 2026, was $12.1 billion, an increase from $6.3 billion at year-end, reflecting the impact of the TEGNA acquisition. Our cash balance at quarter end was $379 million, including $12 million of cash related to the CW.

Because we designated the CW as an unrestricted subsidiary, the losses associated with the CW are not accounted for in our calculation of leverage for purposes of our credit agreement. In addition, our credit agreement allows us to include the adjusted EBITDA of TEGNA as if we acquired the business on the first day of the period presented to add back onetime expenses related to the deal and any operational restructuring and to include the impact of any synergies we expect to realize within 18 months of the close of the transaction, which we continue to expect we will be able to do just on a delayed time frame.

As such, our net first lien covenant ratio at March 31, 2026, for the last 8 quarters annualized was 2.94x, which is well below our first lien and only covenant of 4.75x. Our covenant increased from 4.25 to 4.75x for this quarter and for the next 3 consecutive fiscal quarters after the acquisition as permitted under our credit agreement. Our total net leverage for Nexstar was 3.84x at quarter end using the same calculation methodology.

Subsequent to quarter end, we repaid in full our $150 million short-term, Term Loan A and made $4 million of mandatory amortization payments. We also closed on the refinancing of our 2027 senior notes with new $1.725 billion of 7.25% senior notes due 2034. Our Q2 '26 cash flow will be deployed first to fulfill our mandatory obligations, including debt repayments, pension and defined benefit plan contributions, our dividend and then optionally repay any additional debt with excess cash flow. With that, I'll open up the call for questions. Operator, can you go to the first question?

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 21 of 28

# Question and Answer

**Operator**

[Operator Instructions] Your first question comes from Dan Kurnos with StoneX.

**Daniel Louis Kurnos**
*The Benchmark Company, LLC, Research Division*

First, Perry, I appreciate your willingness to be as open and straightforward with us on the process. I guess first part of the question is, you gave us all of the current existing pieces. Are there any other rulings, actions or events that you foresee in the ecosystem, either from the FCC or others that could influence the trial outside of a settlement or your appeal process? And as Lee Ann mentioned, I think you guys pulled back a little on CapEx. Is there any difference in day-to-day operations or focus on incremental cash preservation while this process unfolds? And then just a quick one for Lee Ann. I totally appreciate that you can't give guidance under the circumstance. I guess you're kind of directing us to look at what you have said publicly around '26 and what TEGNA had put out previously as sort of the yardstick, if that's right, that would just be helpful to get some clarity there.

**Perry A. Sook**
*Founder, Chairman & CEO*

Dan, I'll take the first part and then turn it over to Lee Ann. I think we gave you the complete laundry list of all threatened and pending litigation that we're aware of at this time. We're not aware of anything else that is in the offing. So I think you know everything we know in terms of what's in front of us at this time.

And I'll turn it to Lee Ann on capital preservation and the other aspects of your question.

**Lee Ann Gliha**
*Executive VP & CFO*

Yes. I think, Dan, I think on the CapEx side, we just had a little bit of delay in the CapEx because we had anticipated some different strategies when we combined with TEGNA, but that will all catch up over the course of the year. So I think you can think of Nexstar as continuing to execute on our plan, doing as an excellent operational job as we normally do on a go-forward basis. We're completely dialed in and focused on executing on the Nexstar plan. And I think TEGNA similarly is focused on executing their plan. And we're not going to be providing any sort of longer-term guidance with respect to either company at this point.

**Operator**

Next question, Patrick Sholl with Barrington Research.

**Patrick William Sholl**
*Barrington Research Associates, Inc., Research Division*

Just another follow-up on the M&A or I guess, the litigation. Holding the 2 companies separately, has that provided like any sort of like update on how -- like informing how you would want to approach operating them together and if the litigation is resolved successfully?

**Perry A. Sook**
*Founder, Chairman & CEO*

Well, the Hold Separate Order also requires that TEGNA operate within the interim operating covenants that were in place prior to the closing of the transaction. So we do have those guardrails. And I think we have the ability to have conversations with TEGNA. Obviously, they are required and have done an excellent job of doing so even in the stub period of providing financial information so that we can present consolidated financials for all of the entities that we own. But other than that, I don't think there's any

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 22 of 28

additional read-through in terms of how we'll operate things post Hold Separate Order. I think that plan is pretty well baked and in place.

**Lee Ann Gliha**
*Executive VP & CFO*

Yes. I will just echo that. I think if and when we get this resolved, we will be executing on our plan as we had originally intended. So subject to whatever comes out of the process in the interim.

**Patrick William Sholl**
*Barrington Research Associates, Inc., Research Division*

Okay. And then just in terms of just the general environment, like is there any sort of impact from the resolution of the tariff issue in terms of advertiser enthusiasm? Or has other events kind of offset some of any potential benefit on that side?

**Lee Ann Gliha**
*Executive VP & CFO*

Not in particular, no. I think what we are seeing is a little bit of a weaker advertising environment in the second quarter than we did see in the first quarter. So I wouldn't say there was anything in particular with respect to the tariffs. I would also just remind you that we've got about 60% of our advertising is coming from services-based companies, which were not impacted by the tariffs.

**Operator**

Next question, Aaron Watts with Deutsche Bank.

**Aaron Lee Watts**
*Deutsche Bank AG, Research Division*

Two questions. Just a follow-up on advertising. Dan, where are you seeing the softness amongst your large verticals as you look at 2Q, 3Q? And what's the messaging from your ad partners and how they're thinking about the ad environment right now?

**Lee Ann Gliha**
*Executive VP & CFO*

Yes. So Aaron, there's really not any kind of one category or any major categories to flag. Mike in his comments gave you kind of our top and bottom categories, but there's not any sort of major differential. What I tend to look at is I look at our categories and I look at which ones are increasing versus decreasing on a quarter-to-quarter basis. And last quarter, it was about 50-50. In this quarter, it's about 2/3 decreasing and 1/3 increasing. So I think it's just kind of a general overall weakness. I don't think we have any particular aha moment in terms of any specific category. It's just across the board sort of general trend.

**Perry A. Sook**
*Founder, Chairman & CEO*

Aaron, I would just add to that saying that we have one large home improvement advertiser that has gone silent for a period of time that's affecting our numbers. We have some pharma advertising that has not returned as of yet. And then if the Mets were playing better, our numbers will be better on PIX and our ad sales will be better there. There's a lot of little things, but as Lee Ann said, I don't think there's any one big thing. I will say, as I was driving to the office this morning, and I drove past the gas stations that I pass every day and for the first time, saw a 4 handle to the left of the decimal point in terms of the price per gallon. And I think that is having some effect -- my understanding that people getting tax refunds that are at the lower end of the socioeconomic ladder, that money hasn't flown back into the economy at this point. I think people are holding on to that money longer and perhaps to see how things turn out in terms of oil prices and things of that. So I think there's just a conservatism at this moment in time, but I don't think there's anything overarching beyond that.

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 23 of 28

**Aaron Lee Watts**
*Deutsche Bank AG, Research Division*

Okay. That's helpful context. And if I could get one more in. One question around capital allocation and leverage. At the close of TEGNA, you agreed to sell certain stations in tandem with getting that deal approved, you set synergy targets. You outlined near-term capital allocation policies and laid out pro forma leverage goals. Based on the deal construct, to the extent assumptions that went into all of that were to change, whether it's required station divestitures, synergies, et cetera, how might capital allocation move with it? Appreciating the debt paydown you highlighted today, how important is it to you to maintain the conservative leverage profile you have historically, even if it means delaying other potential outlets for your cash?

**Lee Ann Gliha**
*Executive VP & CFO*

Aaron, we can't really necessarily comment on what might be, what could be. But I think our track record is that we really look to deleverage the business, use our excess cash flow to deleverage to get to -- we don't want to be overlevered. We know the public market appreciates lower leveraged companies. And so our focus is going to be to continue on that plan and with our historical track record of deleveraging post transactions. Clearly, we're still paying down debt in this environment. We've paid down $150 million optionally after the end of the quarter. And that's -- I think you're going to continue to see that, especially as we flow through 2026 as a political year and have a lot of additional cash flow to achieve that.

**Operator**

Next question, Steven Cahall with Wells Fargo & Company.

**Steven Lee Cahall**
*Wells Fargo Securities, LLC, Research Division*

So you outlined some of the ways that you won't be able to integrate TEGNA. Can you talk about some of the things that you can do that are arm's length? I don't know if there's collaborations like through Premion or digital content or news reporting? Or do the terms right now really require it to be almost a beyond arm's length subsidiary? And then, Lee Ann, I just wanted a clarification. You said you have access to TEGNA's excess free cash flow, which you can use for debt repayment. Is that essentially their free cash flow? Or are there any more limitations that get to excess free cash flow as we just think about how much of their cash generation would be available for you to sweep up for debt reduction?

**Lee Ann Gliha**
*Executive VP & CFO*

Yes. I'm going to take that last question first, and then I'll turn it back to Perry on the first question. No, I just say excess free cash flow because we need to keep -- there needs to be enough cash at the operating companies to operate. We obviously have to continue to have an operation. So I just meant subject to a minimum cash balance requirements that we just have from an operating perspective. All of the debt obligations of the company are joint and several between us and TEGNA. So all the debt -- excess cash flow that we see fit will be used to repay that debt.

And I'll turn it back to Perry.

**Perry A. Sook**
*Founder, Chairman & CEO*

Yes. And Steve, I would say there are certain commercial agreements that Mike Biard and I have been talking about that we could enter into on an arm's length basis with TEGNA under the order, which could include and involve Premion. For example, in Houston, we contracted our CW station contracted with a station in the market to produce a 10:00 news, and we sent termination notice of that during the pendency of the TEGNA acquisition. So we could talk to the TEGNA station in Houston and/or our incumbent news producer in terms of establishing another commercial agreement to produce news for

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 24 of 28

that station. So it's -- there are some things like that, that we can do. And I think we'll pursue those where they make sense during this whole separate period.

**Operator**

Next question, Craig Huber with Huber Research Partners.

**Craig Anthony Huber**
*Huber Research Partners, LLC*

My first question about the 39% ownership cap, I personally was very surprised that the FCC did not change the 39% ownership cap first. And then by way of that, your TEGNA acquisition could have gone through as opposed to what they did do was just give you guys a waiver and stuff. And there's certainly, as you know, have been some talk in the trade press, et cetera, about the FCC at the commission level potentially, I don't know, reversing out their approval of the deal and stuff. Can you touch on that at all, the first part about where you think we're at with the 39% ownership cap? Do you think it's ever going to get done? What kind of time line are we on here? And why do you think they didn't just change that first? And who cares for this extra couple of months to get that done first, then do the TEGNA acquisition approval for you guys after that?

**Perry A. Sook**
*Founder, Chairman & CEO*

Sure. Well, the TEGNA acquisition was approved. We do own the assets. So I want to start there, and we feel it went through a fulsome approval process at both the FCC and the DOJ, the 2 expert agencies that regulate this industry as opposed to the state AGs that have shown no real concern or support for local media, local journalism, local television until this election year. But I think that -- and I don't presupposed to be in the mind of Chairman Carr. But if you go back and look at public statements that he's made, since he was a commissioner, whether his party was in power or out of power, he has said these rules are antiquated relative to the past, and they need to go.

So he is consistent in that position, I believe, to this day. And I don't rule out that he will start a proceeding perhaps in this quarter or the next quarter that would be a rulemaking to eliminate the national ownership cap. Imagine if you were Netflix or Google or Amazon and you were told you could only reach 39% of the country with your business. I think there'd be some hue and cry around that. And so why should those rules apply only to broadcast? We are the only part of the media ecosystem that has a government mandated cap on our ability to grow. And I think that Chairman Carr is totally aware of market realities why he's taking the actions that he has taken.

And so I think we are still on a path to regulatory deregulation, and we are very thankful that we were able to make a persuasive case to qualify for a waiver during the pendency of those proceedings. It's not just as simple as putting out a press release and saying the rules have changed. There's a lot of legal work that has to go into that, a lot of wordsmithing, a lot of consultation with advisers. So I don't -- I would not suppose or presume that those actions are off track. It's just there's obviously a lot going on, a lot of M&A in addition to ours, that is under consideration at the FCC and the DOJ. And so I just think it's -- I think these things are moving through the pipeline, but I would not presume that they have stopped or will not move through the pipeline ultimately.

**Craig Anthony Huber**
*Huber Research Partners, LLC*

I appreciate all that, and I certainly agree with that. But again, just -- it just seems like to me personally and things were done backwards here that they should have changed the 39% ownership cap first and then going through all the process to approve your deal as well, but to get that finalized after the 39% ownership cap was done. They didn't do that. And does that put you in a little bit tougher position here with these court cases out there that this thing closed on a waiver as opposed to the regulation changing first and then them doing all the due diligence and then approving it. What's your thought on that, please?

**Michael Biard**

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*President & COO*

Craig, it's Mike Biard. I'll take that. I don't think if you look at the claims that have been made in the litigation that the order with respect to the cap would change anything. The claims being made by the plaintiffs essentially are outside the FCC purview. They come from an antitrust perspective, which is really a different analysis entirely than the FCC. I think the FCC could have yielded a waiver, a complete elimination of the rules in gold and served it up on a platter and the plaintiffs still would have found reason to complain in this case.

**Operator**

Next question, Benjamin Soff with Deutsche Bank.

**Benjamin Soff**
*Deutsche Bank AG, Research Division*

I had 2. First, I wanted to ask about the partnerships with ESPN and Roku. Does this represent a shift in Nexstar's digital strategy? And how are you thinking about balancing growing your digital business versus the opportunity to partner with other platforms? And then on divestitures, I appreciate there's a lot of uncertainty right now, but can you help us think about how a potential divestiture would impact the synergy buckets you've outlined, whether it's retrans, corporate overhead or operational efficiencies?

**Michael Biard**
*President & COO*

I'll take the first question. I don't think it represents a shift in our thinking. I think -- and I'm speaking with respect to the deals that we struck with ESPN and Roku. We look at those as less of a shift and more of an evolution, right? I think when you look at the challenges of trying to build digital platforms in the current environment, they are enormous. And one only needs to look at the balance sheets of major media companies that have launched those digital platforms and look at essentially the long history of losses associated with that. Those businesses are hard to build. They're capital intensive. They require a lot of ongoing maintenance.

And so when we looked at expanding our footprint in a digital environment, we essentially had 3 options available to us, right, build, buy or partner. And I think for obvious reasons, we went with the latter of those options, and we were able to strike deals with essentially the largest platforms available to us in each of those spaces. So particularly with respect to CW and the sports on ESPN, I think where we are in the life cycle of building a sports brand, the opportunity to have our sports available and visible inside the ESPN platform and a dedicated CW vertical environment will reap rewards for us, not just in terms of building the brand equity, but also our ability to monetize viewership on those platforms. We're extremely excited about that.

Similarly, with respect to Roku, trying to build a digital business and really maintain one at a CW-only branded environment is extremely challenging in the current environment. You're going up against behemoths that invest literally billions and billions of dollars every year into their platforms. So being able to tuck into the most popular AVOD platform out there, again, with a CW-branded vertical environment, we think will deliver benefits not just in terms of near-term monetization, but long-term brand equity.

**Lee Ann Gliha**
*Executive VP & CFO*

And then on the divestiture side, Ben, I mean, it's premature. I think if you were to look at our synergies, there were a number of components to that. I think the -- obviously, retrans and in-market synergy type -- synergies would have to be reduced. Corporate, maybe not so much, but we'd have to take a look at it. It's, I think, a little premature to kind of even think about what that impact could be.

**Operator**

Next question, Jason Bazinet with Citi.

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 26 of 28

**Jason Boisvert Bazinet**
*Citigroup Inc., Research Division*

In all my years, I've never really come across a situation where shareholders own an asset and can't manage it. I just had a quick question. Can you elaborate on those guardrails that you talked about earlier? And second, is there any incentives that exist on the part of the TEGNA assets to sort of eat it for their sales force or anything else that sort of minimizes the risk for Nexstar shareholders in this period where we're sort of in limbo or suspended animation?

**Perry A. Sook**
*Founder, Chairman & CEO*

If you go back to the interim operating covenants, and it's now public in the order as well, they're primarily financial transactions above a certain size would have to be approved by the Board of TEGNA, which is comprised of Nexstar executives, and Nexstar management team, and that's been approved by the courts that -- and so -- and we have the ability to appoint management inside of TEGNA. And so I think all of those things taken together are the governance that will guide us during this whole separate period. And so they operate as a subsidiary. We can have conversations with them, the executives running the entity report to the Board.

We just can't basically influence decision-making. But again, decisions beyond a certain level require Board involvement and Board approval. So we were very comfortable in the way TEGNA was operated during the pendency of the transaction from the time of signing to closing. And so it's basically those same covenants, if you will, govern our relationship with TEGNA during the whole separate period. And as to sales, I'm not quite sure I understood that part of the question.

**Jason Boisvert Bazinet**
*Citigroup Inc., Research Division*

Well, I just get nervous about somebody at TEGNA, they don't really know if they have a job or if they're going to get eliminated in some synergy number and they get distracted and so they're not as focused on their core day-to-day job and then the sales numbers fall apart on the TEGNA side of the house. But I guess it sounds like from your answer, the limitation is more around integration, and there's really not a lot of operational day-to-day risk that Nexstar shareholders face on the TEGNA side of the house.

**Perry A. Sook**
*Founder, Chairman & CEO*

I think that's fair. And I think that if you read the judge's Hold Separate Order, we are not and TEGNA is not allowed to reduce headcount during the pendency of this TRO. So at this point, we were comfortable in the results and the performance of TEGNA during the pendency of the transaction when we were operating under the same structure that we're operating under now. And so we have -- and prior to closing is when anxiety is at its highest, right? And I would say that in the overlap markets, would have been on our side of the ledger as well. If there are 2 of me, how -- what assurances do I have?

And I think people are -- look at the environment around them and look at the layoffs at Meta and other companies and going on. And so I think everybody is likely concerned about their job, particularly if they're not doing a good job. And so I don't think that this transaction, this industry or these 2 companies are immune from the world economy. So from that perspective, we track our levels of attrition and did not see any appreciable changes during the pendency of the transaction.

We'll continue to track levels of attrition during this Hold Separate period to determine if there are trends, but we haven't seen it thus far. And I would say that the TEGNA results for the first quarter were very -- were excellent. We only got the benefit of 13 days of them, but we obviously had the financial information for the entire quarter, and they performed very, very well as did Nexstar by the results we reported this morning.

**Lee Ann Gliha**
*Executive VP & CFO*

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 27 of 28

Yes. I would echo that. I would say the first quarter, if there's any expectation or indication that we'd have a problem, you would see it most likely the first quarter number and TEGNA definitely had a stellar first quarter.

**Operator**

I will now turn the floor over to Perry for closing remarks.

**Perry A. Sook**
*Founder, Chairman & CEO*

Well, thank you, everyone, for joining us this morning. We look forward to reporting our Q2 results in early August, which will be our first full quarter of results reporting the combined consolidated results of the new Nexstar. Thanks, everyone, and have a great rest of your day.

**Operator**
This concludes today's teleconference. You may disconnect your lines at this time, and thank you for your participation.

Copyright © 2026 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 2:26-cv-00976-TLN-CKD   Document 269-2   Filed 07/22/26   Page 28 of 28

Copyright © 2026 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2026 S&P Global Market Intelligence.