Beth A. Wilkinson (*pro hac vice*)
Kosta S. Stojilkovic (*pro hac vice*)
Sarah E. Neuman (*pro hac vice*)
Jenna P. Swarbrick (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, D.C. 20036
Telephone: 202.847.4010
bwilkinson@wilkinsonstekloff.com
kstojilkovic@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
jpswarbrick@wilkinsonstekloff.com

Emily A. Clarke (*pro hac vice*)
WILKINSON STEKLOFF LLP
130 W 42nd Street, 24th Floor
New York, NY 10036
Telephone: 212.294.8925
eclarke@wilkinsonstekloff.com

[*Additional Counsel on Signature Page*]

Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Joseph Charles Folio III (*pro hac vice*)
Robert W. Manoso (*pro hac vice)*
Alexa Rae DiCunzolo (*pro hac vice*)
Rita Xia (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
AOkuliar@mofo.com
BLui@mofo.com
JFolio@mofo.com
RManoso@mofo.com
ADiCunzolo@mofo.com
RXia@mofo.com

*Attorneys for Defendants Nexstar Media Group, Inc. and TEGNA Inc.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re Nexstar-TEGNA Merger Litigation | Case No. 2:26-cv-00976-TLN-CKD<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR CLARIFICATION OF PRELIMINARY INJUNCTION ORDER AND OTHER COMPLIANCE RELIEF**<br><br>Judges: Honorable Troy L. Nunley and Honorable Carolyn K. Delaney<br>Action Filed: March 18, 2026<br><br>Hearing Requested |

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................................ 1

**BACKGROUND** ................................................................................................................ 3

    I.      Immediately After the Deal Closed, TEGNA's Board Was Disclosed in SEC Filings ..............................................................................................................3

    II.     The Preliminary Injunction Was Crafted To Permit Defendants To Exercise Necessary Oversight Under SEC Regulations And Nexstar's Debt Agreements ....................................................................................................3

    III.    The TEGNA Board Has Taken Limited Actions To Date ...............................5

    IV.    Defendants Cooperated With Plaintiffs' Inquiries and Demands ......................7

**ARGUMENT** ................................................................................................................... 10

    I.      The TEGNA Board's Composition Comports With The Court's Order ..........11

    II.     Nexstar's CEO And CFO Must Serve On The TEGNA Board To Discharge Nexstar's SEC Reporting And Debt Agreement Obligations..........12

    III.    Every Action The TEGNA Board Has Taken Is An Action The Order Authorizes Nexstar To Take ..............................................................................16

    IV.    The Court Should Appoint A Special Master To Oversee Compliance Discovery ........................................................................................................17

**CONCLUSION** ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Damus v. Nielsen,*
   328 F.R.D. 1 (D.D.C. 2018)..................................................................... 18

*FTC v. Weyerhaeuser Co.,*
   665 F.2d 1072 (D.C. Cir. 1981) .............................................................. 11

*Gluth v. Kangas,*
   951 F.2d 1504 (9th Cir. 1991)................................................................ 20

*SEC v. Jensen,*
   835 F.3d 1100 (9th Cir. 2016)................................................................ 14

*Thomas v. Cnty. of Los Angeles,*
   978 F.2d 504 (9th Cir. 1992)............................................................ 19, 20

*Washington v. Trump,*
   2025 WL 835030 (W.D. Wash. Mar. 17, 2025), *appeal docketed*, No. 25-1922 (9th Cir. Mar.
   24, 2025) ............................................................................................ 18

**Statutes**

15 U.S.C. §§ 7241, 7262 ........................................................................ 13

18 U.S.C. § 1350.................................................................................... 13

**Rules**

Federal Rule of Civil Procedure 53........................................................... 19

**Regulations**

17 C.F.R. § 210.3A-02 ............................................................................ 13

17 C.F.R. §§ 240.13a-14, 240.13a-15 ................................................. 13, 14

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, 9C Federal Practice & Procedure § 2602.1 (3d ed. 2026)
   .......................................................................................................... 19

**INTRODUCTION**

There are two sides to this story. Plaintiffs present a hyperbolic narrative, which omits key facts and information, to inflame the Court and the public. But contrary to that hyperbole, Defendants have complied with the Court's preliminary injunction, including through a TEGNA Board of Directors that respects TEGNA's independence, protects TEGNA's viability, and ensures that Nexstar can exercise the oversight necessary for compliance with its obligations under SEC rules and its debt agreements. Defendants have never tried to hide the facts: TEGNA disclosed its Board composition in a March 2026 8-K report; Nexstar's CEO spoke openly about Nexstar executives' service on TEGNA's Board during a May 2026 earnings call; and Defendants have provided Plaintiffs with detailed, substantive responses to their questions about the Board's composition and operations without objecting or burdening this Court. Indeed, Defendants had even agreed to recommend the appointment of a Special Master for compliance-related disputes—an idea that Plaintiffs originally raised—when Plaintiffs shut down negotiations and filed the present Motion.

The events leading to the instant Motion reveal that Plaintiffs are less interested in practical solutions to their stated concerns than they are in turning preliminary injunction compliance into satellite litigation to attack and distract Defendants. Thus, while the parties have been busy advancing merits discovery on an expedited schedule, Plaintiffs have also propounded dozens of compliance-related requests, insisting that Defendants provide information on a wide range of topics, from retransmission-consent negotiations to station management to interim operating covenants—all on very short deadlines. Defendants answered Plaintiffs' serial questions in good faith, furnishing five letters with detailed information, including disclosing each individual governance decision TEGNA's Board has undertaken and producing TEGNA's budgets and TEGNA's officers' compensation packages. The TEGNA Board meeting minutes from May and

June have been finalized and are being produced with this Opposition. *See* Ryder Decl., Exs. A–E.

After all of this discovery, Plaintiffs cannot dispute that TEGNA and its stations maintain full and exclusive authority over day-to-day decisionmaking, including all decisions relating to retransmission consent negotiations, what stories to cover and how to cover them, and how stations should be funded, staffed, and managed. Nor do Plaintiffs identify a *single step* that Nexstar has taken to diminish TEGNA's competitive position. Indeed, Nexstar's incentive is to preserve and strengthen TEGNA and its stations so that the company remains viable in a future integration (if Defendants prevail) or divestiture (if Plaintiffs prevail). With no evidence of Nexstar's involvement in retransmission-consent negotiations or any other station-level decisions, Plaintiffs argue instead that Nexstar executives' mere presence on TEGNA's Board is incompatible with the preliminary injunction. But as Plaintiffs appear to concede, the preliminary injunction order ("Order") does not actually forbid Nexstar executives from serving on TEGNA's Board. That makes sense because Board presence is critical to ensuring that Nexstar can carry out its SEC reporting requirements and comply with its debt agreements. Moreover, the Order specifically states that Nexstar may carry out these functions and other essential oversight related to TEGNA during the hold-separate period. *See* ECF No. 172, at 50–51 ¶ 11. The Order permits Nexstar to undertake this oversight directly, so it is certainly appropriate for Nexstar officers to do the same through a role on TEGNA's Board. Moreover, Plaintiffs' request is untenable as a matter of securities law, as Nexstar's CEO and CFO must oversee TEGNA's operations to make personal certifications regarding Nexstar and its subsidiaries (including the held-separate TEGNA) required by the Sarbanes-Oxley Act and related regulations. Plaintiffs' request to disallow such oversight would contradict the legal and fiduciary obligations of Nexstar and its executives, and thus should be denied.

Plaintiffs' Motion ignores the relevant facts and context, including information publicly available before the TRO was entered, Plaintiffs' own acknowledgements while litigating the TRO and preliminary injunction, and the substantial effort Defendants have put into voluntarily answering Plaintiffs' inquiries as expeditiously as possible.  Defendants remain committed to finding a solution that addresses Plaintiffs' stated concerns, maintains TEGNA as a viable business, and reflects the business realities of operating TEGNA under the hold-separate order.  Given the significance of the relief requested in Plaintiffs' Motion, Defendants respectfully request that the Court hold a hearing on the Motion prior to ruling.

## BACKGROUND

### I.    Immediately After The Deal Closed, TEGNA's Board Members Were Identified By Name In SEC Filings

As is customary in a merger, when Nexstar acquired TEGNA on March 19, 2026, TEGNA's preexisting Board ceased to exist.  ECF No. 63-4 ("Merger Agreement"), § 2.6.  Under the terms of the Merger Agreement, the prior Board was replaced by the directors of "Teton Merger Sub," the Nexstar subsidiary that was established to merge with TEGNA.  *Id.*  As TEGNA publicly announced in an 8-K filing with the Securities and Exchange Commission on March 20, 2026, the post-close directors of TEGNA were Perry Sook (Chief Executive Officer of Nexstar), Lee Ann Gliha (Chief Financial Officer of Nexstar), and Rachel Morgan (then-General Counsel of Nexstar).[1]  Neuman Decl., Ex. A, Item 5.02.  The composition of TEGNA's Board was thus a matter of public record before the Court issued its initial TRO on March 27, 2026.

### II.    The Preliminary Injunction Was Crafted To Permit Defendants To Exercise Necessary Oversight Under SEC Regulations And Nexstar's Debt Agreements

Shortly after the initial TRO was entered, Defendants filed a motion requesting a set of

---

[1] When Elizabeth Ryder replaced Ms. Morgan as General Counsel of Nexstar, Ms. Ryder assumed the Board position.  Ryder Decl. ¶ 1.

CASE NO. 2:26-CV-00976-TLN-CKD          3          DEFENDANTS' OPPOSITION TO MOTION FOR CLARIFICATION OF PI ORDER AND OTHER COMPLIANCE RELIEF

modifications to the TRO. *See* ECF No. 63. Defendants explained that due to Nexstar's ongoing obligations under SEC regulations and its debt agreements, Nexstar could not "implement certain provisions of the TRO as written." *Id.* at 1. Defendants thus proposed a set of modifications which would allow Nexstar to:

- "take reasonable actions necessary to maintain TEGNA's day-to-day operations, including authorizing routine financial transactions,"

- "take actions necessary to establish a functional governance structure for TEGNA, including appointing or reappointing officers,"

- "provide and implement Sarbanes-Oxley requirements, including setting thresholds for contract approval, expenditure authorization, and other financial limits similar to the interim operating covenants that applied to TEGNA's independent management of the business pre-closing,"

- "take all reasonable steps to perform all obligations required under its debt instruments, SEC reporting requirements, or refinancing transactions," specifically including "required SEC and debt agreement reporting for the combined company within applicable deadlines, oversight by Nexstar management as to the accuracy of the TEGNA financial statements, including compliance with internal controls and procedures, in coordination with TEGNA personnel," and

- enforce "the interim operating covenants set forth in the Merger Agreement."

*Id.* at 6–8. Those modifications were designed to ensure that Nexstar—and in particular Nexstar's CEO and CFO—could exercise necessary oversight of TEGNA's finances to satisfy their obligation to certify the accuracy of Nexstar's consolidated financial reporting and responsibility for any debt that TEGNA incurs. ECF No. 63, at 2–3, 6–8; ECF No. 63-5 ¶ 21; ECF No. 269-1 ("Hu Decl."), Ex. P, at 12–13. In response, DIRECTV noted that it did "not object to most of these proposals—

indeed many are already contemplated by the TRO—subject to minor wording adjustments," which did not materially change Defendants' key provisions noted above. ECF No. 97, at 2. DIRECTV's adjustments specifically contemplated "the sharing of TEGNA's confidential information with certain Nexstar employees" as necessary for Nexstar's reporting requirements. *Id.* at 7. The States agreed with DIRECTV. *See* ECF No. 125, at 7.

The Court adopted the proposed modifications that allowed Nexstar to perform these critical functions in its modified TRO and ultimately included those same modified provisions in its preliminary injunction order. *See* ECF Nos. 145, 172, at 50–51, ¶ 11.

## III.    The TEGNA Board Has Taken Limited Actions To Date

Empowered with that authority, the TEGNA Board's first priority was to fill TEGNA's open CEO role, given that TEGNA's CEO had resigned shortly after closing, and left the company on June 1, 2026. The Board chose respected industry veteran Patrick Paolini, then-Executive Vice President of Advertising Sales for FOX Television Stations. Gliha Decl. ¶ 4; Ryder Decl. ¶ 4; Sook Decl. ¶ 4; Paolini Decl. ¶ 3. Mr. Paolini has never been employed by, nor served as a consultant for, Nexstar. Paolini Decl. ¶ 4.

Mr. Paolini has since named seven TEGNA officers—a Senior Vice President of Content, Head of Sales, Senior Vice President of Human Resources, Senior Vice President of Finance, Controller, Chief Technology and Digital Products Officer, and General Counsel—as well as a Vice President of Technology and Operations to TEGNA's senior leadership. Paolini Decl. ¶ 7. Each of those individuals was promoted internally from TEGNA for continuity of TEGNA's operations. *Id.* As part of ensuring that TEGNA has a functional governance structure in place, the TEGNA Board ratified the appointment of each of Mr. Paolini's selections, but did not interfere with Mr. Paolini's selections. *Id.* Those officers all report directly and exclusively to Mr. Paolini.

*Id.*[2]

The Board's other actions have consisted of the following: *First*, the Board expanded its size from three to five, adding Michael Biard, Chief Operating Officer of Nexstar, and independent director Timothy Busch, a Nexstar consultant ████████████████████████████ ████████████████████████████████████████.[3] Biard Decl. ¶ 3; Busch Decl. ¶¶ 4–5, 8; Gliha Decl. ¶ 4; Ryder Decl. ¶ 4; Sook Decl. ¶ 4. *Second*, the Board approved a revised TEGNA budget for Fiscal Year 2026—███████████████████████████ ███████████████████████—which was prepared by TEGNA personnel. Biard Decl. ¶ 3; Busch Decl. ¶ 9; Gliha Decl. ¶ 4; Paolini Decl. ¶ 8; Ryder Decl. ¶ 4; Sook Decl. ¶ 4. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████. Paolini Decl. ¶ 9.

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Contrary to Plaintiffs' assertion that "Nexstar has refused to say what oversight it exercises or plans to exercise over TEGNA's officers," Plfs.' Br. 2, Defendants informed Plaintiffs that the Board's oversight is "to ensure compliance with Nexstar's own financial reporting requirements and debt agreements," Hu Decl., Ex. G, at 2; *see* Ex. J, at 2. For example, the Board has discussed ████████████████████

---

[2] Plaintiffs misleadingly suggest that "[i]t is unclear how TEGNA operated as a distinct, independent business unit for multiple months prior to these appointments." Plfs.' Br. 6 n.1. That concern is unfounded. While most TEGNA officers announced their resignations shortly after closing, their departure dates were phased at various points in May, June, and July. TEGNA's Chief Revenue Officer, Tim Fagan, remained at the company until July 27, and its Chief Technology and Digital Products Officer, Kurt Rao, has elected to stay on.

[3] Notably, Mr. Busch is not a current employee of Nexstar, nor was he employed by Nexstar within the prior six months. Accordingly, the Court's order would not bar Mr. Busch even from serving as a TEGNA officer rather than director. ECF No. 172, at 50–51 ¶ 11(c), (f).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Gliha Decl. ¶ 5; *see*

Ryder Decl., Exs. A–E.  Relying in part on these types of updates, Nexstar's CEO Perry Sook and CFO Lee Ann Gliha have filed certifications of compliance with the SEC, which must account for TEGNA as a wholly owned subsidiary of Nexstar.  *See, e.g.*, Neuman Decl., Exs. C, E.

Other than what is necessary for those financial obligations and for ensuring that TEGNA has a functional governance structure, TEGNA's Board has no oversight role of TEGNA's officers or employees.  *See* Gliha Decl. ¶¶ 25–26; Paolini Decl. ¶¶ 7, 10.  Indeed, the Board has had no involvement in TEGNA's retransmission consent negotiations, content decisions, station management, or other day-to-day operations—all of which have been independently managed by TEGNA's officers.  *See* Biard Decl. ¶ 4; Busch Decl. ¶ 10; Gliha Decl. ¶ 3; Paolini Decl. ¶¶ 10–11; Ryder Decl. ¶ 3; Sook Decl. ¶ 3.  To date, every Board action has been related to one of the Court's express permissions for Nexstar in Paragraph 11 of the Order.  Should any decision point arise that falls outside those permissions, the Nexstar executives on the TEGNA Board have committed to recuse themselves from such decisions.  Biard Decl. ¶ 5; Gliha Decl. ¶ 6; Ryder Decl. ¶ 5; Sook Decl. ¶ 5.  Defendants disclosed these recusal commitments to Plaintiffs well before the instant Motion was filed.

## IV.    Defendants Cooperated With Plaintiffs' Inquiries and Demands

Since May 22, 2026, Plaintiffs have sent Defendants a web of letters demanding written responses and document productions on a wide range of compliance-related topics.  All told, across 17 single-spaced pages, Defendants answered nearly two dozen interrogatory-style requests— many with multiple subparts—about various facets of TEGNA operations, on accelerated timelines.

Plaintiffs' first letter propounded eleven separate requests, including one request covering eight categories of information across three different time periods for each of TEGNA's 64 stations. Hu Decl., Ex. A.  At a meet and confer on June 1, Defendants explained that some of Plaintiffs' requests were too burdensome to allow for a quick response, and expressed concern about proceeding with one-sided compliance discovery with no structure or process in place.  Neuman Decl. ¶ 2.  The parties agreed that Defendants would provide a written response explaining which requests were especially burdensome and that Plaintiffs would consider narrowing their requests in response. *Id.*

Defendants responded via letter on June 3, identifying the most burdensome requests and committing to provide expedited responses to five other requests, which Defendants understood to be Plaintiffs' priorities based on the meet and confer, within three business days of receiving Plaintiffs' restyled requests.  Hu Decl., Ex. B.  Plaintiffs served their restyled requests on June 9, Hu Decl., Ex. C, and Defendants responded as agreed on June 12, Hu Decl., Ex. D.[4]  Defendants' response addressed in detail the five requests they understood as Plaintiffs' highest priorities— including the names and duties of TEGNA's directors and officers, the reporting structure of TEGNA's station managers, TEGNA's directors' roles and duties at Nexstar, a series of information about the authority of TEGNA employees to carry out their duties, and information about Nexstar's communications with MVPDs—and noted their intent to respond the following week to Plaintiffs' remaining lower-priority requests.  Hu Decl., Ex. D.

In the middle of the following week, on June 16—while Defendants were still compiling responses to Plaintiffs' existing set of requests—Plaintiffs sent another letter with nine additional

---

[4] Plaintiffs assert that Defendants took 20 days to respond to Plaintiffs' initial requests.  Plfs.' Br. 5–6.  As set out above, during that period, the parties were actively negotiating the procedures and potential limits that would govern compliance discovery, including whether such discovery would count toward the merits discovery limits.  After those negotiations, Defendants promptly provided information about the Board and other topics.

requests that asked Defendants to justify Nexstar executives' service on TEGNA's Board. Hu Decl., Ex. F. Plaintiffs demanded a response in three days, on a federal holiday. *Id.* Defendants responded the next day, providing their responses to Plaintiffs' remaining eight requests from June 9, including producing a copy of TEGNA's budget for Fiscal Year 2026, and noted that in light of the holiday and the scope of Plaintiffs' latest requests, Defendants would respond the following week to Plaintiffs' latest letter. Hu Decl., Ex. E.[5] As promised, on June 26, Defendants sent a letter explaining the basis for Nexstar executives' service on TEGNA's Board and describing the limited decisions the TEGNA Board had made to date. Hu Decl., Ex. G. Once more, Defendants committed to providing a prompt further response to Plaintiffs' nine other requests from June 16. *Id.*

Just four days later, on June 30, Plaintiffs sent yet another letter—adding four new requests on top of the nine pending requests that Defendants were already working to address. Hu Decl., Ex. H. Defendants responded on July 7, answering the nine requests and one of the additional requests from June 30. Hu Decl., Ex. J. At that point, Defendants had voluntarily responded to the equivalent of nearly two dozen interrogatories related to preliminary injunction compliance, approaching the 30 interrogatories that each side is allotted for merits discovery under the stipulated discovery protocol, without counting any of them against Plaintiffs' merits discovery limitations. ECF No. 258, at 9. Thus, with that letter, Defendants had hoped to "resolve Plaintiffs' stated compliance-related concerns and put these issues to rest." Hu Decl., Ex. J, at 1. But given the extent of Defendants' responses to date and Plaintiffs' unending demands, Defendants expressed that any "further questions or requests related to these matters" should be "routed through the appropriate and established discovery channels," not used "to end-run the parties' agreed-upon

---

[5] In producing TEGNA's budget, Defendants noted that TEGNA was in the process of making revisions to that budget. Defendants provided TEGNA's revised budget to Plaintiffs the following day, June 18. *See* Hu Decl., Ex. K.

discovery limits." *Id.* at 1–2.

On July 12, Plaintiffs informed Defendants that they intended to seek an order clarifying the preliminary injunction and "appointing a special master to oversee discovery into Defendants' compliance with the preliminary injunction or, alternatively, an order establishing an accelerated, separate schedule for discovery into Defendants' compliance." Hu Decl., Ex. Q, at 13–14. The parties met and conferred the following day, and defense counsel conveyed a willingness to consider jointly seeking appointment of a Special Master and a compliance discovery schedule pending a discussion with their clients. Neuman Decl. ¶ 3. The next morning, Defendants wrote to Plaintiffs reiterating their openness to the concept of a Special Master and asking for a more specific proposal from Plaintiffs. Hu Decl., Ex. Q, at 12–13. Plaintiffs provided a proposal the following day, July 15. Hu Decl., Ex. Q, at 8–10.

Defendants responded on July 17, stating their "agree[ment] in principle to jointly recommend the appointment of a special master to deal with PI compliance discovery" and seeking to align on the Special Master's proposed role and scope of authority. Hu Decl., Ex. Q, at 5–7. To that end, Defendants suggested "that the special master could be empowered to address substantive PI questions and clarifications from the parties" and sketched out a proposed procedure for selecting the Special Master. *Id.* Moreover, Defendants stated that they were "willing to negotiate some accelerated discovery provisions in the context of an agreement to a special master appointment, as well as procedures for appealing special master rulings if necessary." *Id.* at 6–7.

Rather than engage, Plaintiffs declared an impasse, effectively withdrew their own request for a Special Master, and filed this Motion seeking instead to have the Court oversee all compliance discovery disputes in the first instance. *See* Hu Decl., Ex. Q, at 3–4.

## ARGUMENT

Defendants agree with Plaintiffs that the Order's principal aim is to separately maintain

TEGNA and preserve its independence and viability. *See* Plfs.' Br. 11; *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n.7 (D.C. Cir. 1981). Here, as before the transaction, Nexstar and TEGNA have separate officers, separate organizational structures and departments, separate budgets, separate email systems, separate files, separate local broadcast stations, and separate agreements with distributors like DIRECTV. TEGNA has continued to conduct its own operations in its own interest and without influence from Nexstar: producing its own local news specials, ███████ ██████████████████████████████████████████████████████████████ .

*See* Paolini Decl. ¶ 10–13.

Although Plaintiffs assert that Nexstar has "assume[d] governance of TEGNA or otherwise undermine[d] the requirement that TEGNA remain an independently managed competitor," Plfs.' Br. 4, they have not identified a single threat to TEGNA's independence and viability. None exists. Just as the Order requires, TEGNA is "operating as a separate and distinct, independently managed business unit." ECF No. 172, at 48 ¶ 2. And, as before the close of the transaction, TEGNA has "separate management that operates TEGNA in the ordinary course." *Id.* Nothing about the composition of TEGNA's Board or the limited actions taken changes those facts.

## I.    The TEGNA Board's Composition Comports With The Court's Order

The current composition of the TEGNA Board—including Nexstar's CEO Perry Sook, CFO Lee Ann Gliha, General Counsel Elizabeth Ryder, and COO Michael Biard, as well as independent director Timothy Busch—comports with the letter and the spirit of the Order.[6] The Order expressly permits Nexstar to carry out various functions for TEGNA, including appointing officers, taking steps to comply with Nexstar's obligations under the federal securities laws and its

---

[6] As noted above, post-close TEGNA disclosed its Board on March 20, 2026 as consisting of Perry Sook, Lee Ann Gliha, and Rachel Morgan (Elizabeth Ryder's predecessor as Nexstar's General Counsel). Michael Biard and Timothy Busch joined the Board on May 26, 2026. *See* Biard Decl. ¶ 3; Busch Decl. ¶ 8.

debt agreements, and requiring TEGNA's adherence to the Merger Agreement's interim operating covenants. ECF No. 172, at 50–51 ¶ 11. The upshot is that Nexstar must have some mechanism to carry out its authority. TEGNA's Board—which is separate from TEGNA's management and not involved in day-to-day operations—is the natural home for such authority.

It makes sense, therefore, that while the Order specifies that Nexstar employees or officers shall not be "TEGNA *officers*," ECF No. 172, at 50–51 ¶ 11(c), (f) (emphasis added), it contains no similar prohibition on serving as TEGNA *directors*. This is made even more clear by the fact that other provisions of the Order—including the very next paragraph—list "directors" and "officers" as distinct categories. *Id.* at 51. In other words, the Court called out directors in other aspects of the Order, yet it did not include any prohibition on Nexstar personnel serving as TEGNA's directors. That framework is consistent with the fact that, as discussed *infra* Sections II & III, there are critical functional reasons for these Nexstar executives to serve on TEGNA's Board.

## II.    Nexstar's CEO And CFO Must Serve On The TEGNA Board To Discharge Nexstar's SEC Reporting And Debt Agreement Obligations

As a publicly traded company, Nexstar is subject to obligations under federal securities laws and its debt agreements, which require oversight of the finances of all subsidiaries including TEGNA. Recognizing those obligations, the Order expressly permits Nexstar to "provide and implement Sarbanes-Oxley requirements" and to "take all reasonable steps to perform all obligations under its debt instruments, SEC reporting requirements, or refinancing transactions, including coordination with TEGNA personnel as necessary" and "narrowly tailored to complying with reporting requirements and avoiding breaches under debt instruments." ECF No. 172, at 50–51 ¶ 11(d), (e). "[S]uch permissible coordination includes . . . oversight by Nexstar management as to the accuracy of the TEGNA financial statements," so long as TEGNA's confidential information is "maintained separately from Nexstar's files and used solely for those reporting requirements." *Id.* at 51 ¶ 11(e).

Meeting those obligations requires Nexstar to maintain a majority presence on TEGNA's Board—and in particular, requires the presence of CEO Perry Sook and CFO Lee Ann Gliha. The Sarbanes-Oxley Act and related SEC regulations establish a series of interrelated certification provisions regarding Nexstar's publicly filed quarterly, annual, and periodic financial reports, which require Mr. Sook and Ms. Gliha—as, respectively, the "principal executive officer" and "principal financial officer"—to personally attest to the accuracy of Nexstar's financial statements and the sufficiency of Nexstar's internal controls. 15 U.S.C. §§ 7241, 7262; 17 C.F.R. §§ 240.13a-14, 240.13a-15; 18 U.S.C. § 1350; Gliha Decl. ¶¶ 7–15; Sook Decl. ¶¶ 6–7; *see, e.g.*, Neuman Decl., Exs. B–E. Among those provisions is that a given financial report "fairly presents, in all material respects, the financial condition and results of operations." 18 U.S.C. § 1350. As Professor Joel Seligman, a preeminent expert in the area of securities regulation, puts it: "The personal responsibility imposed on the signing officers" are "among the most draconian sections of the Sarbanes-Oxley Act." Seligman Decl. ¶ 9 (quoting 4 Louis Loss, Joel Seligman & Troy Paredes, *Securities Regulation* 361 (7th ed. 2025)). Indeed, a false statement in such a certification exposes Mr. Sook and Ms. Gliha, personally and individually, to criminal liability and up to 20 years' imprisonment. 18 U.S.C. § 1350.

Although TEGNA is held separate as an independently managed business unit, it is a wholly owned subsidiary of Nexstar as a matter of Nexstar's corporate law obligations. As a result, the above certifications include TEGNA's financial condition and internal controls as part of the consolidated picture. *See* 17 C.F.R. § 210.3A-02; Seligman Decl. ¶ 7. Neither Mr. Sook nor Ms. Gliha can lawfully make the required certifications they must, under possible criminal penalties, without visibility into TEGNA's finances and accounting and the ability to course-correct any deficiencies in the controls. Gliha Decl. ¶¶ 7–15; Sook Decl. ¶¶ 6–7.

Plaintiffs' proposed solution—that Mr. Sook and Ms. Gliha rely entirely on "sub-

certifications and representations from finance personnel, business-unit leaders, and other employees," Plfs.' Br. 15—is facially insufficient, irresponsible, and reckless.  Gliha Decl. ¶ 12 ("These obligations are mine, they are non-delegable, and I cannot discharge them by disclaiming knowledge of a subsidiary whose results I am required to certify and to report.").  "[B]y definition, one cannot certify a fact about which one is ignorant."  *SEC v. Jensen*, 835 F.3d 1100, 1113 (9th Cir. 2016) (regarding 17 C.F.R. § 240.13a-14).  Indeed, the only source Plaintiffs provide for their proposed sub-certification alternative *undercuts* their point.  That single-page blurb from 2003 explains that sub-certifications are an "*additional* compliance step" for "other corporate financial professionals to vouch for reported information *as well*" as the CEO and CFO.  Warren, Gorham & Lamont, Thomson Reuters Tax and Accounting, The Trickle-Down Approach to Certification, (Sep. 2003) (emphases added).  In other words, sub-certifications may be used to supplement—not, as Plaintiffs argue, supplant—the CEO and CFO's diligence obligations.  Indeed, as Professor Seligman explains:  "There is no statutory or regulatory authority to substitute a sub-certification for these principal executive and principal financial officers' obligations under [SOX]."  Seligman Decl. ¶ 12; *see also* Wachtell, Lipton, Rosen & Katz, Audit Committee Guide 90 (2024) (noting that sub-certifications are "not a substitute"); Robert J.A. Zito, *SOX 302 Certifications: What Are They Good For?*, N.Y. L.J., Nov. 2007, at 4 ("[I]t is doubtful that a company, or its CEO and CFO, would be able to skirt liability resulting from a restatement of financial statements . . . simply because subcertifications of lower level employees were relied upon.").  Mr. Sook and Ms. Gliha cannot carry out their certification duties without direct, timely oversight of TEGNA's finances. Seligman Decl. ¶ 13.

Ms. Gliha and Mr. Sook's duty to maintain, assess, and report on the effectiveness of Nexstar's internal controls is continuous.  *Id.*; *see also* Gliha Decl. ¶ 14; Sook Decl. ¶ 6.  And it requires not just awareness of TEGNA's actions, but the ability to divert course if needed, which

requires Nexstar to maintain a majority of seats on the Board.  Gliha Decl. ¶ 15; Sook Decl. ¶ 7.[7]

Nexstar's debt agreements require a similar level of oversight of TEGNA's finances because they contain a series of qualitative and quantitative covenants that bind Nexstar as a consolidated entity including TEGNA.  Gliha Decl. ¶¶ 16–17.  In other words, there is no practical distinction between TEGNA's debt and Nexstar's debt—both are joint and several guarantors for all debt of the consolidated entity.  *Id.* ¶ 17.  Nexstar thus cannot develop or implement "an overall financing strategy" without considering TEGNA as part of the picture.  *Id.*  Moreover, if TEGNA were to breach a covenant—based on its incurrence of debt, guarantees, or liens, its investments or restricted payments, or its capital expenditures—*Nexstar* would be in default of its debt agreements.  *Id.* ¶ 19.  Nexstar would bear the consequences, which could include acceleration of its debt payments that impair its liquidity and jeopardize its operations.  *Id.*  Mr. Sook and Ms. Gliha cannot ensure TEGNA's compliance with such covenants, which they likewise must certify, unless they can assess and approve decisions implicating the covenants.  *Id.* ¶¶ 16–21; Sook Decl. ¶¶ 6–7.  Doing so requires the ability to oversee TEGNA management to the extent necessary for compliance.  Gliha Decl. ¶¶ 20–21.  Serving on TEGNA's Board is the only practical way for Ms. Gliha and Mr. Sook to carry out their duties under the Sarbanes-Oxley Act, SEC regulations, and Nexstar's debt agreements, while being separate from TEGNA's management.  *See* Seligman Decl. ¶ 14.

Plaintiffs' concerns on this point are misguided.  As for the Board's approval of TEGNA's revised budget, Plfs.' Br. 12–13, reviewing and ratifying TEGNA's budget is essential to Nexstar's assessment of whether TEGNA planned any expenditures, investments, or financing activities that

---

[7] Moreover, a material weakness in TEGNA's controls could constitute a material weakness in Nexstar's consolidated controls.  Gliha Decl. ¶ 13.  Ms. Gliha and Mr. Sook are required to disclose to Nexstar's auditors and to its audit committee any material weaknesses in the design or operation of internal controls—and they need to understand TEGNA's financial condition and controls to do so.  *Id.*; Sook Decl. ¶¶ 6–7.

CASE NO. 2:26-CV-00976-TLN-CKD          15          DEFENDANTS' OPPOSITION TO MOTION FOR CLARIFICATION OF PI ORDER AND OTHER COMPLIANCE RELIEF

would be inconsistent with Nexstar's reporting obligations or debt agreements, or that would require Nexstar—as TEGNA's sole equityholder—to call on its own resources. Gliha Decl. ¶¶ 21–23. As for Mr. Paolini's updates to the Board, *see* Plfs.' Br. 13, those updates relate to permitted areas of oversight—including the status of Mr. Paolini's selection of additional TEGNA leadership, ██████████████████████████████████████████████████████████████████ ████████████████████████████████. *See* Gliha Decl. ¶ 5; Ryder Decl., Exs. A–E. Those updates similarly ensure that Nexstar executives have the information needed to discharge their obligations under applicable securities laws and Nexstar's debt agreements and to ensure that TEGNA has a functional governance structure in place.

## III.    Every Action The TEGNA Board Has Taken Is An Action The Order Authorizes Nexstar To Take

The TEGNA Board has taken few actions to date, each limited to a function expressly permitted by Paragraph 11 of the Order. *See* ECF No. 172, at 50–51 ¶ 11. Aside from reviewing and approving TEGNA's revised budget, the Board has selected a CEO for TEGNA and ratified the CEO's selection of other officers, including compensation packages of most of those officers. Given that these actions are all ones that the Order authorizes *Nexstar* to take, it cannot be a problem for Nexstar officers to take those actions via their roles on the TEGNA Board.

The Court specifically permitted Nexstar "to establish a functional governance structure for TEGNA, including appointing or reappointing officers, to the extent necessary to permit TEGNA to fulfill its obligations under the Order." ECF No. 172, at 50 ¶ 11(c). Plaintiffs do not dispute that TEGNA's Board has established a functional governance structure that permits TEGNA to fulfill its obligations under the Order. The Board appointed industry veteran Patrick Paolini, who has no ties to Nexstar, as CEO, to fill the role that the prior CEO had voluntarily vacated shortly after closing. Gliha Decl. ¶ 4; Paolini Decl. ¶¶ 3–4; Ryder Decl. ¶ 4; Sook Decl. ¶ 4. The Board empowered Mr. Paolini to select other senior leadership for TEGNA and negotiate their

compensation packages.  Biard Decl. ¶ 4; Busch Decl. ¶ 9; Gliha Decl. ¶ 4; Paolini Decl. ¶ 7; Ryder Decl. ¶ 4; Sook Decl. ¶ 4.  In short order, Mr. Paolini elevated eight TEGNA employees to senior leadership, *see* Paolini Decl. ¶ 7, and the Board ratified those appointments, *see* Biard Decl. ¶ 4; Busch Decl. ¶ 9; Gliha Decl. ¶ 4; Paolini Decl. ¶ 7; Ryder Decl. ¶ 4; Sook Decl. ¶ 4.

Given the limited actions that the TEGNA Board has taken to date, the Board has not yet encountered a scenario where it has been called to decide something outside the specific functions permitted under Paragraph 11 of the Order.  But should that scenario occur, the Nexstar executives serving on the Board would recuse themselves from any such decision.  Biard Decl. ¶ 5; Gliha Decl. ¶ 6; Ryder Decl. ¶ 5; Sook Decl. ¶ 5.  The Board added Timothy Busch as an independent director out of an abundance of caution in the event such a scenario arises, ███████████████████ ███████████████████████████████████████████████.  Busch Decl. ¶ 5. Mr. Busch is not employed by nor controlled by Nexstar.  *Id.*  ¶¶ 1, 4.  To the extent Plaintiffs take issue with this recusal policy, *see* Plfs.' Br. 17, the solution is not to remove the four Nexstar executives from the Board, but to appoint additional independent directors.

## IV.    The Court Should Appoint A Special Master To Oversee Compliance Discovery

Plaintiffs' proposals for compliance discovery going forward would be needlessly burdensome both to this Court and to Defendants.  Defendants respectfully submit that the most efficient approach is for the parties to jointly retain a Special Master to oversee any future compliance discovery and for the Special Master to determine what type of reporting is reasonable under the circumstances.

***Unlimited, Expedited Discovery.***    Shortly after the parties exchanged proposals for appointing a Special Master to oversee compliance discovery, Plaintiffs suddenly declared an impasse and informed Defendants they would instead ask the Court to oversee accelerated compliance discovery.  Plaintiffs cite no case (and Defendants are aware of none) in which a court

has preemptively authorized the open-ended, expedited preliminary injunction compliance discovery for a nearly yearlong period that Plaintiffs seek. The cases Plaintiffs cite underscore this point: each involved a one-off instance of narrow discovery that was "bounded both in temporal scope and substance" and based on a specific showing of "significant questions" about compliance. *Damus v. Nielsen*, 328 F.R.D. 1, 4–5 (D.D.C. 2018); *see Washington v. Trump*, 2025 WL 835030, *8 (W.D. Wash. Mar. 17, 2025), *appeal docketed*, No. 25-1922 (9th Cir. Mar. 24, 2025) (compliance discovery granted "as to the narrow issue"). Indeed, *Washington v. Trump* makes clear that courts typically consider the "breadth of the discovery requests" and "the burden on the defendants to comply with the requests" in deciding whether to authorize expedited discovery, 2025 WL 835030, at *8, which is of course impossible to do in the abstract.

There is no authority for subjecting Nexstar to unbounded, urgent discovery that is untethered to any particularized compliance-related showing.[8] Such an order would fundamentally prejudice Defendants' ability to prepare for trial on the merits, as Plaintiffs (which include DIRECTV and 13 State Attorneys General) have shown a willingness to prolifically propound compliance discovery, without regard to the burdens that such discovery imposes on Defendants who are simultaneously responding to Plaintiffs' merits discovery requests and conducting their own merits discovery from Plaintiffs and from dozens of third parties. Just as merits discovery has metes and bounds, so must any compliance discovery.

***Special Master.*** Federal Rule of Civil Procedure 53 specifically contemplates that a situation like this could arise and codifies a solution: a Special Master. *See* Fed. R. Civ. Proc. 53(a)(1)(C) (allowing appointment of a Special Master to "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge"); Charles

---

[8] It is no answer that Defendants have a right to object under Plaintiffs' proposed process. That process would still require expedited briefing, which may well be equally or more burdensome than the discovery itself.

Alan Wright & Arthur R. Miller, 9C Federal Practice & Procedure § 2602.1 (3d ed. 2026) (noting that a Special Master is appropriate to, among other things, "alleviate the burdens on the district judge"). Defendants respectfully submit that rather than set in stone an accelerated schedule for all compliance-related discovery to be overseen by the Magistrate Judge, the better path is to direct the parties to retain a Special Master.

As noted, Plaintiffs initially proposed the Special Master themselves. Hu Decl., Ex. Q, at 13–14. Plaintiffs offered no explanation for their sudden about-face, except to say that they were concerned about a drawn-out process for selection. *Id.* at 3–4. Defendants have no interest in a protracted selection process and agree that prompt appointment of a Special Master would benefit both sides. Defendants stand ready to move that process forward and have already identified potential candidates with experience serving as a Special Master and a background in corporate governance. Defendants remain willing to work with Plaintiffs and any Special Master to establish a practical process to address compliance discovery as well as a process by which the parties may seek guidance from the Special Master about compliance issues. *Id.* at 2–3, 5–7.

***Reporting.*** Plaintiffs' request for additional, detailed reporting is unwarranted given less burdensome substitutes. *See Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 510 (9th Cir. 1992), as amended (Feb. 12, 1993). Defendants have already offered to provide Plaintiffs ordinary-course documents: TEGNA Board meeting minutes, TEGNA budgets (if the budget changes), and any regular financial reporting presented to the TEGNA Board (which should address Plaintiffs' request for "monthly and quarterly financial" reports). Hu Decl., Ex. Q, 6, 9.[9] Plaintiffs' own cases support this approach of producing ordinary-course documents rather than requiring a party to generate new discovery materials. *See Gluth v. Kangas*, 951 F.2d 1504, 1511 (9th Cir. 1991) (approving order

---

[9] Defendants previously agreed to share minutes of TEGNA Board meetings within three business days of those minutes being finalized, Hu Decl., Ex. Q, at 6, though not within three days of the meeting itself, as Plaintiffs suggest, Plfs' Br. 19.

requiring production of "duplicate reports," citing relative lack of burden).  There is no basis for the additional measures that Plaintiffs propose, such as reports requiring Defendants to describe all "actions they have taken to comply with the preliminary injunction"—which could be read to require an account of a nearly endless number of "actions"—or to catalog every written and oral communication between Nexstar and TEGNA officers.  Hu Decl., Ex. Q, at 9.  Such reporting is not proportional to anything alleged in the case, nor warranted based on any showing by Plaintiffs. *See Thomas*, 978 F.2d at 510 (compliance discovery may be authorized "[p]rovided it is not overly burdensome") (internal quotation marks omitted).  As for TEGNA's "operational reports presented to the TEGNA Board and Chief Executive Officer," TEGNA does not maintain so-titled reports, so no such reports get presented to the TEGNA Board or CEO.  ECF No. 269, at 19.

The Court should therefore deny Plaintiffs' requests for limitless one-sided discovery.  Instead, Defendants respectfully submit that the Court should appoint a Special Master to oversee compliance-related discovery.

## CONCLUSION

Defendants are open to solutions that address any legitimate concerns while also addressing the business realities of properly operating TEGNA under a hold-separate order.  But Plaintiffs' proposed clarification of the Order would effectively eliminate Nexstar's ability to discharge its SEC reporting and debt agreement obligations.  The Court should therefore deny Plaintiffs' Motion, and also appoint a Special Master to oversee compliance-related discovery.  Given the significant ramifications of Plaintiffs' proposals, Defendants respectfully submit that a hearing would assist the Court in resolving this dispute.

Dated: July 28, 2026

By: */s/ Beth A. Wilkinson*
Beth A. Wilkinson (*pro hac vice*)
Kosta S. Stojilkovic (*pro hac vice*)
Sarah E. Neuman (*pro hac vice*)
Jenna P. Swarbrick (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, D.C. 20036
Telephone: 202.847.4010
Email: bwilkinson@wilkinsonstekloff.com
         kstojilkovic@wilkinsonstekloff.com
         sneuman@wilkinsonstekloff.com
         jpswarbrick@wilkinsonstekloff.com


Emily A. Clarke (*pro hac vice*)
WILKINSON STEKLOFF LLP
130 W 42nd Street, 24th Floor
New York, NY 10036
Telephone: 212.294.8925
eclarke@wilkinsonstekloff.com


Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Joseph Charles Folio III (*pro hac vice*)
Robert W. Manoso (*pro hac vice)*
Alexa Rae DiCunzolo (*pro hac vice*)
Rita Xia (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC  20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
Email: AOkuliar@mofo.com
         BLui@mofo.com
         JFolio@mofo.com
         RManoso@mofo.com
         ADiCunzolo@mofo.com
         RXia@mofo.com


Michael B. Miller (*pro hac vice*)
William C. McCaughey (*pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: 212.468.8000
Facsimile: 212.903.3720
Email: MBMiller@mofo.com
         WMcCaughey@mofo.com

Eliot A. Adelson (CA Bar No. 205284)
Daralyn J. Durie (CA Bar No. 169825)
Adam R. Brausa (CA Bar No. 298754)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: EAdelson@mofo.com
DDurie@mofo.com
ABrausa@mofo.com

Nicole K. Serfoss (*pro hac vice*)
MORRISON & FOERSTER LLP
370 Seventeenth Street 4200 Republic Plaza
Denver, CO 80202-5638
Telephone: 303.592.1500
Facsimile: 303.592.1510
Email: nserfoss@mofo.com

*Attorneys for Defendants Nexstar
Media Group, Inc. and TEGNA Inc.*