**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of<br><br>Informal Complaint of<br><br>DIRECTV, LLC,<br><br>Alleging that Nexstar Media Group's Relationship with Stations Owned by Mission Broadcasting, Inc. and White Knight Broadcasting, Inc. Violates the Commission's Local and National Ownership Rules. | MB Docket No. 23-__ |

# INFORMAL COMPLAINT


Stacy Fuller
Brenna Sparks
DIRECTV, LLC
2230 E. Imperial Highway
El Segundo, CA 90245

Michael Nilsson
Kristine Laudadio Devine
HWG LLP
1919 M Street, N.W.
The Eighth Floor
Washington, DC 20036
(202) 730-1300
*Counsel to DIRECTV, LLC*


June 29, 2023

## SUMMARY

Of the hundreds of pages of regulations governing FCC broadcast licensees, three simple rules stand out. First, licensees must maintain control of their licenses. That is, they must at a minimum maintain control of station finances, programming, and personnel. Second, licensees must show candor to the Commission. They cannot, in other words, lie to or mislead the Commission. And third, they cannot violate the Commission's various ownership rules.

Nexstar and its "sidecars" Mission and White Knight have failed on all three accounts. Mission and White Knight have ceded *de facto* control of their broadcast licenses to Nexstar, which operates these stations in every meaningful respect. By assuming control of stations not its own, Nexstar can raise retransmission consent prices, evade the Commission's local ownership rules, and exceed Congress's national ownership cap.

Everybody in the industry knows this. Every MVPD that negotiates with these sidecars believes that Nexstar controls them. Indeed, both Comcast and Charter have filed pleadings urging the Commission to conclude that Nexstar controls Mission's WPIX in New York.

This Informal Complaint raises some of the same indicia of control that Charter and Comcast raised earlier with respect to Mission—including a variety of sharing and financing arrangements among the parties. It also describes Mission and White Knight's conduct in putatively negotiating retransmission consent with DIRECTV. The *combination* of all these things—documents and conduct—leave no doubt that Nexstar, not Mission and White Knight, drives these particular sidecars.

**1. Documentary Evidence of Nexstar's *De Facto* Control of Mission and White Knight Stations.** Nexstar has entered into a variety of "sharing agreements" with Mission and White Knight. Sharing arrangements, of course, *can* be unproblematic and often are, which is

why the Commission does not generally attribute them. Nexstar's agreements with Mission and White Knight, however, are different. In all of Nexstar's agreements with Mission, Nexstar has the right to sell all of the Mission stations' advertising. In many cases, Nexstar can buy some—and sometimes all—of the Mission or White Knight stations' programming.

In addition, Nexstar has guaranteed Mission's financing of new stations—in exchange for an option to purchase the station for no more than the money it had guaranteed in the first place. The interaction of financing and sweetheart options leaves Mission (and its shareholders) with no real economic upside or downside in their stations. They neither reap the reward for good station performance nor pay any penalty for bad station performance. Mission has, in other words, no skin in the game. This, in turn, means that if any of the sharing arrangements *allow* Mission to exercise control over its stations (in FCC-specific boilerplate, for example), Mission nevertheless has no particular *incentive* to do so.

Mission has even guaranteed nearly all of Nexstar's outstanding debt, to the tune of approximately $6.7 billion. That is, if Nexstar's creditors were to seek recourse from Nexstar, they could do so by seizing *Mission's* assets. This is the sort of thing a controlled operating company routinely does for its parent company. But no independent station would put itself in this position.

**2. Behavioral Evidence of Nexstar's *De Facto* Control of Mission and White Knight Stations.** Along with the indicia of control described above, Mission's and White Knight's behavior provides powerful additional evidence on this score. Nexstar, for example, lists Mission and White Knight stations as its own on its website. And it consolidates Mission's and White Knight's results with those of its own stations in SEC filings prepared under generally

accepted accounting principles. In such filings, it says it has a "controlling financial interest" in Mission and White Knight stations.

Other indicia of *de facto* control exist. Nexstar negotiated Mission's affiliation agreements with CBS. On at least one occasion, *Nexstar* pursued a billing issue with DIRECTV for *White Knight* retransmission consent payments. And White Knight—which operates stations in Louisiana and Texas—lists as its headquarters this Virginia home, owned by the Vice President of an unrelated trade association:



Perhaps the most egregious example of Nexstar's control of Mission's and White Knight's stations occurred during recent retransmission consent negotiations with DIRECTV. Mission and White Knight used a single outside consultant, Eric Sahl, for these negotiations. They each then acted in ways that plainly would *not* serve their interests as independent stations—but *would* serve the interest of Nexstar. For example:

- On behalf of each of Mission and White Knight, Mr. Sahl insisted on rates much higher than those commanded by any broadcaster of their respective sizes. DIRECTV would never agree to pay such rates to a broadcaster of Mission's or White Knight's size and Mr. Sahl, an experienced negotiator with many clients, surely knew this. The most

reasonable explanation of Mr. Sahl's behavior is collusion between Mission and Nexstar. We believe that Nexstar ordered Mr. Sahl to insist on such pricing for Mission, perhaps to obtain information or even a "price floor" in advance of its own negotiations with DIRECTV.

- On White Knight's behalf, Mr. Sahl demanded that DIRECTV agree to carry and pay for CW affiliates. *White Knight* had no such affiliates, but *Nexstar* was about to buy the CW Network. Mr. Sahl thus risked negotiations for something that could not have mattered to White Knight but did matter to Nexstar in terms of setting a price floor for its future negotiations.
- Mr. Sahl disappeared completely during a critical point in both negotiations while Nexstar was fighting with Verizon. Here again, he placed carriage of Mission and White Knight at risk while he (presumably) waited for orders from Nexstar, which was distracted by its own negotiations.
- Once Mission and White Knight blacked out DIRECTV, the two broadcasters released nearly identical press releases criticizing DIRECTV. The press releases were also nearly identical—word for word—to one Nexstar released about Verizon the very next day. Plainly, Nexstar provided the substance—if not the wording—of the Mission and White Knight releases.
- Once Mission and White Knight blacked out DIRECTV, DIRECTV sought to speak with Mission and White Knight executives to resolve the issue, as is standard practice in such circumstances. Mission told DIRECTV to speak only with Mr. Sahl. White Knight's "management"—to the extent it exists—never responded at all.

- Even today, the websites of two *Nexstar* stations in New Mexico and Texas bear messages urging viewers to switch providers because DIRECTV no longer carries *Mission* and *White Knight* stations, respectively, in each market. Here is one such message, found on Nexstar's website for KETK in Tyler, TX.




Note that the banner reference on the KETK website is not to KETK. It is to *White Knight's* station in Tyler, KFXK. If you click through, you see this:



# Attention DirecTV Subscribers

**DirecTV Subscribers: KFXK FOX51 has been forced off your line-up, and important programming you pay for has disappeared.**

Call 1-800-531-5000 NOW and DEMAND DirecTV return KFXK.

**Important facts and options you should consider:**

**What's going on?**

KFXK FOX51 has a contract with DirecTV that allows them to deliver our programming to you. That contract has expired and DirecTV has removed KFXK FOX51 from your schedule. KFXK FOX51 has presented a proposal for fair value compensation, based on the importance and value our programming brings our viewers. Despite our tireless efforts, DirecTV has refused our fair offer and is making negotiations very difficult. They will tell you it's for your benefit, but don't believe it. Our offer is fair. And now they hold you the subscriber hostage. It's not right.

**All my programming is lost?**

All of it. NO MLB games, NO World Cup Soccer, NO NFL on FOX, and NO 9-1-1, NO Cleaning Lady, NO The Great North, NO local news. All Gone.

**What can I do?**

We at KFXK FOX51 value your loyalty, and we hate not being available to you, especially since you still pay for our programming, even when DirecTV denies it to you. You have options:

- Call DirecTV at 1-800-531-5000 and demand that KFXK FOX51 be returned to your channel line-up. NO MORE INTERRUPTIONS!
- Consider the attractive offers of other providers by checking your local listings for those available in your community.

> Please note the reference to "deliveri[ng] our programming" in reference to programming that, at least nominally, is not Nexstar's to deliver. Similar messaging can be found for at least two other stations.
>
> In our many years of retransmission consent negotiations, we have never seen one station message about another, independent station's blackout. But that is precisely the point—Mission and White Knight are not now and have never been independent.

These are not the negotiating tactics of independent station groups. They are the negotiating tactics of broadcasters that have ceded control of their stations to someone else. The truth here is that *Nexstar* managed Mission's and White Knight's retransmission consent negotiations with DIRECTV in every material respect.

Nexstar, in other words, exercises *de facto* control over Mission's and White Knight's stations. This, in turn, places Nexstar in violation of the Commission's local and national ownership rules, as well as its duty of candor to the Commission.

* * *

Why would Nexstar go through such legal gymnastics? The answer is simple: control of Mission and White Knight stations enables Nexstar to raise retransmission consent prices to millions of Americans. By controlling stations that it is not allowed to control, Nexstar gains unlawful leverage in two ways. First, it becomes bigger *nationally*. Second, it becomes bigger *locally*, because it controls multiple "Big Four" stations in cities throughout the country. This leverage permits Nexstar to demand higher retransmission consent prices than it could if it obeyed the rules. It must stop. Indeed, if the Commission does not stop it, little can prevent Nexstar from blowing through the ownership limits even further—as it is now seeking to do in Detroit.

Accordingly, DIRECTV asks the Commission to find that Nexstar unlawfully controls Mission and White Knight stations and to take what remedial actions it deems appropriate.

## TABLE OF CONTENTS


I. Legal Background ........ 2

A. Control of Licenses ........ 2

B. Candor ........ 3

C. Ownership Limits ........ 4

II. Documentary Evidence of Nexstar's *De Facto* Control over Mission and White Knight Stations ........ 6

A. SSAs and JSAs ........ 9

B. Financing and Options for Mission Stations ........ 13

C. Mission's Guarantee of Nexstar's Debt ........ 15

III. Behavioral Evidence of Nexstar's *De Facto* Control of Mission and White Knight Stations ........ 16

A. Nexstar's Representations to the Public and the SEC ........ 16

B. Mission's Management ........ 18

C. White Knight's Lack of Independent Leadership ........ 19

D. Nexstar's Negotiation of Mission's CBS Affiliation Agreements ........ 19

E. Nexstar's Handling of White Knight Billing Issues ........ 20

F. Recent Retransmission Consent Negotiations with DIRECTV ........ 20

1. Mr. Sahl's Proposals to DIRECTV Served the Interest of Nexstar Rather than His Putative Clients ........ 21

2. Mr. Sahl Disappeared at a Critical Point in Negotiations ........ 23

3. Mission and White Knight's Principals Refused to Speak with DIRECTV ........ 23

4. Mission, White Knight, and Nexstar Issued Identical Press Releases ........ 24

5. Nexstar Stations Continue to Message about Nexstar and White Knight's Blackout ........ 27

IV. Nexstar's *De Facto* Control of Mission and White Knight Stations is Unlawful ........ 30

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of<br><br>Informal Complaint of<br><br>DIRECTV, LLC,<br><br>Alleging that Nexstar Media Group's Relationship with Stations Owned by Mission Broadcasting, Inc. and White Knight Broadcasting, Inc. Violates the Commission's Local and National Ownership Rules. | MB Docket No. 23-__ |

**INFORMAL COMPLAINT**

Pursuant to Section 1.41 of the Commission's rules, DIRECTV, LLC ("DIRECTV") hereby files an informal complaint asking the Federal Communications Commission ("FCC" or "Commission") find that Mission Broadcasting, Inc. ("Mission") and White Knight Broadcasting, Inc. ("White Knight") have unlawfully ceded *de facto* control over their stations to Nexstar Media Group ("Nexstar"). This unlawful control, in turn, places Nexstar in violation of the Commission's local and national ownership rules, as well as the parties' duty of candor to the Commission.

This Informal Complaint consists of four parts. First, it describes the governing legal standards. Second, it describes documentary evidence of Nexstar's *de facto* control over Mission and White Knight's stations—that is, Nexstar's agreements with Mission and White Knight. Third, it describes behavioral evidence of Nexstar's *de facto* control. This includes its treatment of those stations with the Securities and Exchange Commission ("SEC") as well as evidence

from Mission's and White Knight's retransmission consent negotiations with DIRECTV last fall. Fourth, it explains how Nexstar's unauthorized control of Mission and White Knight stations both violates the parties' duty of candor and places Nexstar in violation of the local and national ownership rules.

## I. LEGAL BACKGROUND

Broadcasters, like other Commission licensees, must comply with numerous provisions of the Communications Act and the Commission's regulations. Some of these are quite complex. The three relevant here are not: the requirement to maintain control of licenses in form *and* substance, the requirement of candor to the Commission, and the local and national ownership rules.

### A. Control of Licenses

The Communications Act prohibits unauthorized transfers or assignments of broadcast licenses.[1] This, in turn, requires broadcast licensees to maintain *de facto* control of their licenses.[2] The Commission has described the "pertinent concern" as whether someone other than the named applicant or licensee is or would be in control.[3] The test for determining whether an entity is a real party in interest in an application is whether that entity "has an ownership interest or is or will be in a position to actually or potentially control the operation of the station."[4] The

1 *See* 47 U.S.C. § 309 (prohibiting transfers of control without Commission authorization).

2 *E.g.*, *Tribune Media Co. and Sinclair Broad. Grp.*, 33 FCC Rcd. 6830, ¶ 15 (2018) ("*Tribune*").

3 *Tribune* ¶ 15. *See Arnold L. Chase and Chase Broad., Inc.*, 5 FCC Rcd. 1642, ¶ 7 n.5 (1990).

4 *High Sierra Broadcasting, Inc.*, 96 F.C.C.2d 423, 435 (Rev. Bd. 1983). The phrase "real party-in-interest" is used in connection with pending applications, while "*de facto* control" is used in connection with a licensed station. *Ronald Brasher*, 15 FCC Rcd. 16326 (2000) ("*Brasher*").

Commission will look beyond legal title and financial interests to determine who holds operational control of the station and/or applicant.[5] In particular, the Commission examines the policies governing station programming, personnel, and finances. A licensee may delegate day-to-day operations without surrendering *de facto* control, so long as the licensee continues to set the policies governing these three indicia of control.[6] Failure to exercise ultimate control over any one of these three categories is sufficient to find that another entity has *de facto* control.[7]

**B. Candor**

The Communications Act provides that the Commission may revoke any license "for false statements knowingly made . . . in the application" or "because of conditions coming to the attention of the Commission which would warrant it in refusing to grant a license or permit on an original application . . . ."[8] Likewise, the Commission's rules state that no person shall, in any written or oral statement of fact, intentionally provide material factual information that is incorrect or intentionally omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading.[9] A misrepresentation is a false

---

5 *See WHDH, Inc.*, 17 F.C.C.2d 856, 863 (1969), *aff'd sub nom.*, *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) ("*WHDH*").

6 *WGPR, Inc. and CBS, Inc.*, 10 FCC Rcd. 8140, ¶¶ 11–15 (1995); *Choctaw Broad. Corp. and New South Commc'ns, Inc.*, 12 FCC Rcd. 8534, ¶¶ 11–13 (1997); *Southwest Texas Broad. Council*, 85 F.C.C.2d 713, 715 (1981).

7 *See Hicks Broad. of Ind., LLC and Pathfinder Commc'ns Corp.*, Order to Show Cause, 13 FCC Rcd. 10662, ¶ 50 (1998) ("Control over any one of the areas of personnel, programming and finances would be sufficient for a finding of *de facto* control."); *see also Terrier Media Buyer, Inc.*, 34 FCC Rcd. 10544, ¶ 15 n.66 (2019) (noting that "the Commission has previously found that control over any one of the areas of personnel, programming, and finances is sufficient for a finding of *de facto* control").

8 47 U.S.C. §§ 312(a)(1)–(2).

9 *See* 47 C.F.R. § 1.17(a)(1).

statement of fact made with the intent to deceive the Commission.[10] Lack of candor is a concealment, evasion, or other failure to be fully informative, accompanied by an intent to deceive the Commission.[11] As the Commission has explained, "a real party in interest issue, by its very nature, is a basic qualifying issue in which the element of deception is necessarily subsumed."[12] So too with the "related" issue of *de facto* control.

### C. Ownership Limits

The Commission's rules generally forbid a single entity from owning, operating, or controlling two top-four-rated television stations in the same market.[13] The Commission's rules permit parties to seek permission on a case-by-case basis to own, operate, or control two or more top-four-rated stations in a market.[14] Nexstar has never sought or obtained permission to own or control multiple stations in any market in which it overlaps with Mission or White Knight stations.

The Commission's national television ownership rule prohibits a "grant, transfer or assignment of [a broadcast TV] license [that] would result in [a station group] or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent."[15]

---

[10] *See Fox River Broadcasting, Inc*., 93 F.C.C.2d 127, 129 (1983) ("Fox River"); *Discussion Radio, Inc.*, Memorandum Opinion and Order and Notice of Apparent Liability, 19 FCC Rcd. 7433, 7435 (2004) ("*Discussion Radio*").

[11] *See Fox River* at 129; *Discussion Radio* at 7435.

[12] *See Maritime Commc'ns/Land Mobile, LLC,* 26 FCC Rcd. 6520, ¶36 (2011) (*citing Fenwick Island Broad. Corp. & Leonard P. Berger*, Decision, 7 FCC Rcd. 2978, ¶7 (Rev. Bd. 1992) (citation omitted)) ("*Maritime Commc'ns/Land Mobile*").

[13] 47 C.F.R. § 73.3555(b)(1)(ii).

[14] *Id.* § 73.3555(b)(2).

[15] *Id*. § 73.3555(e)(1).

The Commission has explained that the broadcast ownership rules "are designed to prevent any party from influencing the broadcasting practices of more than a predetermined number of outlets in various geographic configurations."[16]

The American Television Alliance has calculated that Nexstar stations reach roughly 38 percent of the national audience (including the UHF discount). As a practical matter, this means that Nexstar cannot own a non-overlapping Mission station (like WPIX New York or WADL, Detroit, MI) without violating the national cap.[17]

The Commission uses the concept of "attributable interest" to calculate ownership percentages in the absence of control. Where control exists, of course, attribution exists by definition.[18] Even in the absence of control, then, the Commission could thus find that Nexstar's arrangements with Mission and White Knight "convey a degree of influence . . . sufficient to warrant" attribution of their stations to Nexstar.[19] The Commission has found that even absent a

---

[16] *Multiple Ownership of AM, FM, TV, and Cable TV Stations*, 49 Fed. Reg. 19482, 19496 (1984) ("1984 Attribution Notice"); *see also Amendment of Sections 3.35, 3.240 and 3.636 of the Rules and Regulations Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, 18 F.C.C. 288, ¶ 10 (1953) ("Simply stated, the fundamental purpose of this facet of the multiple ownership rules is to promote diversification of ownership in order to maximize diversification of program and service viewpoints as well as to prevent any undue concentration of economic power contrary to the public interest.").

[17] Nexstar, for its part, seems to concede this when it says that it "owns, operates, programs or provides sales and other services to . . . more than 68 percent of US television households," although Nexstar has not broken out how the UHF discount would apply to the stations to whom it provides such services. Nexstar Media Group, Inc., https://www.nexstar.tv/company/.

[18] 47 C.F.R. § 73.3555 n.1.

[19] *See 2002 Biennial Regulatory Review-Review of the Commission's Broadcast Ownership Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996,* 18 FCC Rcd. 13620, ¶ 318 (2003) (finding that certain radio JSAs convey a level of influence sufficient to warrant attribution but that licensees with stations subject to such agreements do not thereby abdicate control); *Tribune* ¶ 16 (explaining that the Commission's attribution rules "seek to identify those ownership interests that subject the holders to compliance with the multiple and cross-ownership rules because they confer a degree 'of influence or control such that the

bright-line rule, "the panoply of relationships and agreements between" a broker and a licensee could "provide [a broker] with the incentive and means to exert influence over the core operations of [a licensee], which, under Commission precedent, could be the basis for a finding that [the licensee's] stations should be attributed to [the broker] for purposes of determining compliance with [the Commission's] ownership rules."[20] In other words, even if Nexstar did not *control* Mission and White Knight's stations (which it does), it could still have to account for those stations for purposes of the ownership rules.

## II. DOCUMENTARY EVIDENCE OF NEXSTAR'S *DE FACTO* CONTROL OVER MISSION AND WHITE KNIGHT STATIONS

Mission and White Knight began as divestiture vehicles for Nexstar. As described in a recent antitrust complaint brought by DIRECTV,[21] Nexstar acquired a handful of stations in 1998, including one that overlapped in a local market (Wilkes-Barre/Scranton) with an existing Nexstar station.[22] To gain clearance to proceed with the acquisition, Nexstar arranged financing for a retired station manager to buy the overlap station, and Mission was born.[23] As Nexstar has acquired more broadcasters, Mission has grown alongside it by taking ownership of stations that overlapped with Nexstar's existing portfolio. Today, Mission is the fourteenth largest broadcast

---

holders have a realistic potential to affect the programming decisions of licensees or other core operating functions.'").

20 *Tribune* ¶ 26.

21 Complaint, *DIRECTV, LLC v. Nexstar Media Grp.*, No. 1:23-cv-02221-PAC (S.D.N.Y., filed Mar. 14, 2023) ("DIRECTV Complaint").

22 Nexstar Media Grp., Inc., *Form 10-K*, SEC at 4 (Mar. 28, 2003), https://www.sec.gov/Archives/edgar/data/1142125/000095013003002616/d10k.htm; Van Rose, *FCC Approves Sale of TV Stations*, Times Leader (Dec. 19, 1997), https://www.timesleader.com/archive/925164/fcc-approves-sale-of-tv-stations.

23 Bastet Broad., Inc., *Form 10-K*, SEC (June 3, 2003), https://www.sec.gov/Archives/edgar/data/1142413/000095013003003848/d10k.htm#tx077_1.

station group in the country. It owns stations in 26 markets, including "Big Four" stations in 23 DMAs. Nexstar operates every one of them.

Nexstar's relationship with White Knight began in 2013 when Nexstar and Mission jointly acquired Communications Corporation of America ("CCA") and White Knight Broadcasting for $270 million.[24] At the time of the acquisition, CCA operated White Knight in Baton Rouge, Louisiana and Tyler-Longview, Texas. Nexstar inherited CCA's stations and continues to use White Knight under CCA's original local services arrangements with White Knight.[25] White Knight owns two stations, both "Big Four" affiliates, in Baton Rouge, LA (NBC) and Tyler-Longview, TX (FOX). Nexstar operates both of them.

The entire industry views Mission's and White Knight's stations as controlled by Nexstar. Indeed, the industry has coined a term for this setup—Mission and White Knight's stations are Nexstar's *sidecars*. The term suggests that Nexstar, rather than Mission, does the driving. In this case, it is the truth.

It thus came as no surprise to DIRECTV when Comcast filed a Petition for Declaratory Ruling regarding conduct by Nexstar and Mission.[26] As the Petition explains, when Nexstar

---

[24] Nexstar Media Grp., Inc., *Form 10-K*, SEC at 3 (Mar. 2, 2015), https://www.sec.gov/Archives/edgar/data/1142417/000156459015001137/nxst-10k_20141231.htm.

[25] *See id.*; Steven J. Pruett and Anthony J. Malara III, *Advertising Representation Agreement*, FCC (Oct. 4, 2007), https://publicfiles.fcc.gov/api/manager/download/855af49f-14d7-b88c-4760-9422027c1e73/4b6742aa-fd58-2c17-37bb-eb55417c5b16.pdf; Steven J. Pruett and Anthony J. Malara III, *Advertising Representation Agreement*, FCC (Oct. 4, 2007), https://publicfiles.fcc.gov/api/manager/download/0ac17b0e-7f5b-59aa-5422-045227284b3d/444604b6-670e-c1da-e35f-7f900d97c8b9.pdf.

[26] Petition for Declaratory Ruling, MB Docket No. 21-_____ (filed July 1, 2021) ("Comcast PDR"), available at https://ecfsapi.fcc.gov/file/10702278919219/2021.07.01%20AS-FILED%20PUBLIC%20WPIX%20Petition%20for%20Declaratory%20Ruling.pdf. The Commission has treated this Petition as an Informal complaint.

received Commission approval to purchase Tribune in 2019, Nexstar agreed to divest WPIX and two other stations in order to stay under the 39-percent national ownership cap. It then told the Commission that "Nexstar will not be providing ongoing services under sharing agreements . . . to any of the stations that it is divesting" and "no JSA, LMA or SSA is being assumed by Nexstar in the Transaction." Once it received Commission approval to purchase Tribune, however, Nexstar (1) received a purchase option to acquire WPIX, (2) assigned that purchase option to Mission Broadcasting; and (3) entered into a variety of agreements with Mission giving Nexstar the rights to supply all of WPIX's programming, to sell all of the station's advertising time, and to receive 100 percent of the station's revenues.

Comcast explained that these agreements gave Nexstar control over WPIX's programming, programming policies, and personnel. In particular, Nexstar asserted "complete control" over WPIX's retransmission consent negotiations. As Comcast described it, "Mission, the licensee, is now simply an outsider with effectively zero control over the station."[27] Moreover, "[t]hrough its purported control over WPIX's retransmission rights, Nexstar is hoping to force Comcast customers to pay significant new retransmission consent fees for WPIX."[28] Comcast thus argues that Nexstar's divestiture of WPIX was a "sham." Comcast is, of course, right about WPIX. As described below, there is more.

Nexstar has entered into a variety of sharing agreements with each of Mission's and White Knight's stations. These agreements go by a variety of names, although the names do not really tell the story here. Nor, for that matter, do the terms of any single agreement standing alone. It is the *combination* of agreements—how JSAs, SSAs, financing, and options work with

---

[27] *Id.* at 16.

[28] *Id.*

one another—that grants Nexstar so much influence over Mission and White Knight stations. And it is in turn the combination of these agreements and the behavior of the parties, described below, that demonstrates Nexstar's *de facto* control of Mission and White Knight stations.

**A. SSAs and JSAs**

Nexstar has 28 shared service agreements ("SSAs") and joint sales agreements ("JSAs") with its sidecars—two with White Knight and 26 with Mission.[29] In addition to these SSAs and JSAs, Nexstar has the following additional agreements covering Mission stations:

- KFQX – On June 13, 2014, Nexstar assumed a local marketing agreement ("LMA") that this station had been operating under since 1994.[30] The agreement renewed a provision that permits Nexstar to provide "substantially all" of the station's programming.

---

[29] Nexstar Media Grp., Inc., *Form 10-K*, SEC at F-9 (Feb. 28, 2023), https://www.sec.gov/Archives/edgar/data/1142417/000095017023005209/nxst-20221231.htm ("Nexstar 2023 Annual Report"). These agreements encompass the White Knight stations KFXK and WVLA, as well as the following Mission stations: KAMC, KASN, KASY, KCIT, KJTL, KLJB, KLRT, KMSS, KODE, KOLR, KPEJ, KRBC, KRWB, KSAN, KTVE, KWBQ, WAWV, WLAJ, WNAC, WTVO, WTVW, WUTR, WVNY, WXXA, WPIX, and WYOU. *Id.* at F-9.

[30] John Harvey Rees and W. Russel Withers, *Program Services, Purchase Option and Lease Agreement*, FCC (Aug. 23, 1994), https://publicfiles.fcc.gov/api/manager/download/fc866765-94cc-8156-ad9e-6c8220f881f7/5bfb8d92-15a5-44c2-9686-e685856b9d31.pdf; Barry Parker and Elizabeth Ryder, *Amendment to Program Services, Purchase Option and Lease Agreement*, FCC (June 13, 2014), https://publicfiles.fcc.gov/api/manager/download/fc866765-94cc-8156-ad9e-6c8220f881f7/a7b374f6-132d-450e-b7b5-65400dc7cfb1.pdf. We note that LMAs of this sort are attributable. LMAs entered into prior to November 5, 1996, however, were grandfathered in those cases where attribution of a non-grandfathered LMA would have resulted in violation of the local TV ownership rule. *Review of the Commission's Regulations Governing Television Broadcasting*, 14 FCC Rcd 12903, ¶ 133 (1999) ("*Review*"). Grandfathering was conditioned on the outcome of the Commission's 2004 biennial review, at which time the Commission was to reconsider their status. *Review.* On April 2, 2002, the D.C. Court of Appeals held, in part, that the Commission's limited grandfathering of LMAs was permissible. *Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 165-168 (DC Cir. 2002).

- KHMT – On December 1, 2009, Nexstar assumed a time brokerage agreement ("TBA") that the station had been operating under since 1994.[31] The agreement renewed a provision giving Nexstar sole responsibility for the sale of all brokered program and commercial time, and the right to furnish personnel, materials, and programs for broadcast.
- WFXP – On July 17, 2006, Nexstar assumed a TBA that the station had been operating under since 1996.[32] This TBA gave Nexstar 162 hours per week (out of a possible 168 hours) of broadcast time on WFXP.
- WNAC – On June 10, 2022, Nexstar assumed a joint marketing and programming agreement ("JMPA") that the station had been operating under since 1996.[33] The Nexstar/Mission amendment gave Nexstar all revenues of the station.
- WPIX – Nexstar and Mission entered into a local programming and marketing agreement ("LPMA") on December 30, 2020.[34] This LPMA makes all of the station airtime available to Nexstar for programming and entitles Nexstar to all advertising revenues.

---

[31] Mission Broad. Inc., *KHMT – More Public Files*, FCC, https://publicfiles.fcc.gov/tv-profile/KHMT/Time%20Brokerage%20Agreements/b98a1d5a-3e15-34d7-0322-5b4af90b1647.

[32] Shirley Green and Dennis Thatcher, *Amendment to Time Brokerage Agreement*, FCC (July 17, 2006), https://publicfiles.fcc.gov/api/manager/download/50f5c80a-6ef0-76a3-0865-1bb162884339/994e57ad-1746-e2d6-1383-05964e5866f3.pdf.

[33] Clear Channel Television, Inc., WNAC Argyle Television, Inc., and Providence Argyle Television, Inc., *Joint Marketing and Programming Agreement*, FCC (June 10, 1996), https://publicfiles.fcc.gov/api/manager/download/be4b8824-4f8c-ea3e-0449-cd669e28f57c/152e7aa0-f7a3-4d9f-a90e-2030a9d2057b.pdf.

[34] Thomas E. Carter and Dennis Thatcher, *Local Programming and Marketing Agreement*, FCC (Dec. 30, 2020), https://publicfiles.fcc.gov/api/manager/download/3dd386c5-6769-392f-2afa-341d914cfb99/f7ebdc86-4c49-4eaf-99a5-46967f553ec4.pdf. This agreement appears to post-date the grandfathering rules for LMAs.

While JSAs and SSAs often give a broadcast station some input into its sidecar's programming and operations, the Nexstar-Mission and Nexstar-White Knight agreements go much further than most such agreements.

For example, all of the JSAs between Nexstar and White Knight or Mission provide Nexstar the right to sell *all* of the commercial advertising time for each station. Under most of these agreements, Nexstar sells all of the advertising, handles political advertising issues, and assumes all of the advertising contracts for each station. Nexstar "employ[s] and [is] responsible for the salaries, benefits, employer taxes, and related costs of employment of [station advertising] sales staff . . . ." Nexstar sets advertising rates. And Nexstar gains access to station offices and studios.[35]

Most of the Mission SSAs for the stations listed above are "global shared service agreements" that permit Nexstar and Mission to enter into programming agreements with no limitations;[36] the White Knight SSAs have similar provisions.[37] No such programming agreements can be found in those stations' public files.[38] Nexstar is permitted or required to provide services related to: the execution of promotional policies; continuity, traffic support, and

---

35 *See, e.g.*, David S. Smith and Perry Sook, *Agreement for the Sale of Commercial Time*, FCC § 2 (June 30, 2003), https://publicfiles.fcc.gov/api/manager/download/a4ee8b61-5450-9865-4f32-47f3a4080c1b/b753d2a2-1221-43a4-bc27-5e8b6fedebb1.pdf.

36 *See, e.g.*, Dennis Thatcher and Thomas Carter, *Shared Services Agreement*, FCC (July 1, 2017), https://publicfiles.fcc.gov/api/manager/download/a7bc2915-ec09-9bf5-6742-0e0aef1d465d/d252f55e-681e-466c-b3b1-e77e73934414.pdf.

37 *See, e.g.*, Anthony J. Malara and Thomas E. Carter, *Amendment to Shared Services Agreement*, FCC (Sept. 18, 2019), https://publicfiles.fcc.gov/api/manager/download/20e20153-2bf5-8213-601b-ba81c2bc68a6/681834c4-db18-42fa-a80c-2e83d8e6d416.pdf.

38 We do not know whether no such programming agreements exist, or whether they exist in a form that Nexstar and White Knight or Mission have determined are not "joint sales" or "shared service" agreements required to be placed in the public file under 47 C.F.R. § 73.3526.

other such tasks; master control functions; payables support (but not actual payment); preparation of monthly accounting statements and other financial reporting activities; maintenance and repair of the stations' transmission facilities; upon request, and as to be negotiated, support for local news; and reviewing and assisting in the negotiation of "certain contracts related to, or necessary for, the operation of the Station."[39]

One agreement strikes us as particularly curious. Mission acquired KASY, KWBQ, and KRWB, which were (and still are) parties to an SSA with LIN Television Corporation. That SSA specifies that these stations will not engage in joint advertising sales and will instead retain the "ultimate authority to set prices for the advertising sales of the Stations and to conduct and manage such sales."[40] Nexstar presumably acquired this SSA when it acquired LIN in 2017; thus, it appears to be bound by these terms. Nevertheless, in 2021 it executed a JSA with Mission for joint advertising sales on these three stations,[41] under which it may sell all of these stations' advertising time—and set the prices for that time. This, of course, placed the stations in breach of their SSA with LIN. There may be a reasonable explanation for this behavior consistent with Mission's control of this station, but we are aware of none.

---

39 *See, e.g.*, Dennis Thatcher and Thomas Carter, *Shared Services Agreement*, FCC (July 1, 2017), https://publicfiles.fcc.gov/api/manager/download/a7bc2915-ec09-9bf5-6742-0e0aef1d465d/d252f55e-681e-466c-b3b1-e77e73934414.pdf.

40 John Viall and Richard Schmaeling, *Shared Services Agreement*, FCC (Sept. 14, 2018), https://publicfiles.fcc.gov/api/manager/download/bfbc1db9-8465-eda9-09ff-0f01e5421f4f/10178c8c-6826-4e59-8fc8-996cccf27568.pdf.

41 Dennis Thatcher and Thomas Carter, *Agreement for the Sale of Commercial Time*, FCC (July 17, 2021), https://publicfiles.fcc.gov/api/manager/download/81aa7434-b676-da08-c07b-1b9e2be086de/b0ade133-9360-4367-8ae7-d7b7ccd974f3.pdf.

### B. Financing and Options for Mission Stations

The SSAs, JSAs, and other agreements described above do not stand alone. In addition to all this, Nexstar has guaranteed Mission's station acquisition financing in exchange for option rights at sweetheart pricing. According to its most recent 10-K, Nexstar has guaranteed Mission's senior secured credit facility—the credit facility Mission uses to fund its acquisition of stations.[42] In exchange, Mission has granted Nexstar option agreements under which Nexstar may buy any Mission station for the greater of (1) seven times station cash flow during the prior 12 months, minus any indebtedness, or (2) the amount the station still owes on the financing guaranteed by Nexstar.[43] In addition, Mission may not issue stock, nor may its primary stockholders sell or transfer equity in Mission, unless the buyer becomes party to Nexstar's Option Agreement.[44] These option agreements are freely exercisable or assignable by Nexstar without Mission's consent or approval.[45]

---

[42] *See* Nexstar 2023 Annual Report; *see also* Mission Broadcasting, Inc., *Form 10-K*, SEC at 2 (Mar. 30, 2020), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001142412/000156459020013710/mbcc-10k_20191231.htm ("Mission 2019 Annual Report").

[43] *See* Nexstar 2023 Annual Report; Mission 2019 Annual Report; *see also* Option Agreement among Mission Broadcasting, Inc., Nancie Smith, Dennis Thatcher, and Nexstar Media Inc., File No. 0000214896, at Section 6.1(f) (filed May 17, 2023), https://enterpriseefiling.fcc.gov/dataentry/api/download/attachment/25076f9188269b2a01882af6c9a100c2 ("WADL Option Agreement"). This Form of Option Agreement was filed in connection with Mission's application to acquire WADL from Adell Broadcasting, which acquisition has not yet been approved. But the form of option agreement submitted with the WADL application is substantially identical to previous option agreements submitted by Mission to the SEC as exhibits to required reports. *See, e.g.*, Mission Broadcasting, *Form 10-Q*, SEC, at Ex. 10.3 at Section 6.1(f) (Aug. 14, 2003) (option agreement between Mission Broadcasting and Nexstar, dated as of May 9, 2003). And Nexstar's 2023 Annual Report discloses that it holds a purchase option for every Mission station.

[44] *See* WADL Option Agreement at Section 6.1(f).

[45] *See* Nexstar 2023 Annual Report; WADL Option Agreement at Section 10.4.

These option agreements give Nexstar the ability to purchase any Mission station for amounts that it has already guaranteed—that is, for no additional funds. And it can exercise these options if and when it wants to (subject to FCC approval). Mission, on the other hand, cannot sell these stations to any third parties without Nexstar's consent, due to the restriction on sales or issuance of stock.[46] In other words, Mission and its owners have no independent ability to monetize their investment in these stations.

In combination with the SSAs and JSAs described above, these agreements make clear that Mission and White Knight do not possess what might be called "owner's economics." For instance, Nexstar's JSAs with most of the Mission stations specify that Nexstar will collect all of the stations' revenues for the commercial time sold.[47] In some cases, the JSAs require Nexstar to revert some portion of that revenue back to the stations,[48] while others require Nexstar to pay the stations a fee subject to adjustment for the stations' actual expenses.[49] At the same time, though, each of these stations redirects at least some—and possibly all—of these revenues or fees back to Nexstar in the form of monthly service fees under the SSAs.[50] Put another way, Mission and White Knight possess neither the economic upside nor the economic downside of owning their

---

46 *See* WADL Option Agreement at Section 6.1(f).

47 *See, e.g.*, Dennis Thatcher and Thomas Carter, *Agreement for the Sale of Commercial Time*, FCC (July 27, 2021), https://publicfiles.fcc.gov/api/manager/download/81aa7434-b676-da08-c07b-1b9e2be086de/b0ade133-9360-4367-8ae7-d7b7ccd974f3.pdf.

48 *See, e.g.*, *id.*

49 *See, e.g.*, David Smith and Perry Sook, *Agreement for the Sale of Commercial Time*, FCC (Jun. 1, 1999), https://publicfiles.fcc.gov/api/manager/download/48689b10-5faa-deda-016f-6f05be4804c1/f317cab8-3b9b-3030-75fb-a2ed192cce19.pdf.

50 *See, e.g.*, Dennis Thatcher and Thomas Carter, *Shared Services Agreement*, FCC (July 1, 2017), https://publicfiles.fcc.gov/api/manager/download/a7bc2915-ec09-9bf5-6742-0e0aef1d465d/d252f55e-681e-466c-b3b1-e77e73934414.pdf. The exact amount of the fees is redacted.

stations. If the stations do well, Mission and White Knight cannot monetize that success by selling the station to anybody. *Nexstar* can purchase the station (with FCC approval) for no additional investment. On the other hand, if the station does poorly, Mission and White Knight are shielded from losses because Nexstar will cover them.

This is, of course, powerful evidence on its own. It also explains why one can ignore any boilerplate in Mission SSAs and JSAs suggesting that Mission controls its own stations. Even if those agreements permitted Mission to exercise such control nominally, Mission would have absolutely no incentive to do so. It would gain nothing if it tried.

### C. Mission's Guarantee of Nexstar's Debt

Mission guarantees approximately $6.7 billion of outstanding indebtedness under Nexstar's senior secured credit facility, 5.625% Notes, due July 2027, and 4.75% notes, due November 2028.[51] These comprise nearly all of Nexstar's total outstanding indebtedness. So if Nexstar were to default on its loans, its creditors could recover their losses not only by foreclosing on Nexstar's stations, but also by going after *Mission's* stations.

Mission is, of course, a much smaller company than Nexstar. It could not possibly repay a guarantee of this size. It is hard to see why the shareholders of an independent Mission would agree to assume such a risky commitment—especially since Nexstar's Annual Report does not indicate that Mission received any particular consideration for the guarantee.

While no *independent* company would make such a commitment, an operating subsidiary of Nexstar certainly would. Indeed, subsidiary operating companies guarantee parent company

---

[51] Nexstar 2023 Annual Report at 52 & F-28 (Note 8 to the Nexstar 2022 Annual Financial Statements).

debt all the time. Nexstar's creditors clearly view Mission's stations as *Nexstar's* assets. Which, of course, they are.

* * *

Again, the Commission's rules *generally* permit sharing agreements and a variety of financing arrangements. But *these specific* arrangements, when read together, grant Nexstar extraordinary levels of influence over Mission's and White Knight's stations. When combined with the other indicia of control described below, Nexstar's *de facto* control becomes clear.

## III. BEHAVIORAL EVIDENCE OF NEXSTAR'S *DE FACTO* CONTROL OF MISSION AND WHITE KNIGHT STATIONS

The parties' behavior regarding Mission and White Knight stations has been exactly what the documents described above would suggest: Nexstar controls the stations in every respect. Nor is this a secret. Everybody in the industry—and especially every MVPD that negotiates retransmission consent for these stations—understands that they are *Nexstar* stations, whatever name appears on the FCC license.

### A. Nexstar's Representations to the Public and the SEC

Nexstar reports Mission and White Knight stations as its own to everybody *other* than the Commission. Nexstar's website, for example, has a list of television stations. That page lists as Nexstar's "stations" not only the stations it *owns* but also the stations it "operates, programs or provides sales and other services to . . . (including partner stations) . . . ."[52] This includes all of Mission's and White Knight's sidecar stations.

Likewise, Nexstar consolidates Mission's and White Knight's stations with its own to the SEC.[53] In doing so, it follows U.S. Generally Accepted Accounting Principles ("GAAP").

---

[52] *Stations*, Nexstar Media Group, Inc., https://www.nexstar.tv/stations/.

[53] Nexstar 2023 Annual Report at F-9.

Nexstar refers to its sidecars as variable interest entities ("VIEs").[54] It states that it consolidates its VIEs with its own stations because it is "is deemed under accounting purposes generally accepted in the United States . . . to have *controlling financial interest* for financial reporting purposes . . . ."[55] Under GAAP, this means that Nexstar has both "the power to direct the activities of the [VIEs] that most significantly impact [those entities'] economic performance"[56] and the "obligation to absorb losses of the VIE that could potentially be significant to the VIE" and "the right to receive benefits from the VIE that could potentially be significant to the VIE."[57] Nexstar thus informs investors that, under various local service agreements, it has historically "received substantially all of the consolidated VIEs' available cash, after satisfaction of operating costs and debt obligations" and "anticipates it will continue to receive substantially all of the consolidated VIEs' available cash . . . ."[58] This means, among other things, that stockholders value the financial results for Mission and White Knight when they make decisions to buy or sell Nexstar stock.

---

[54] *Id.* ("We do not own the consolidated VIEs or their television stations. However, we are deemed under U.S. GAAP to have controlling financial interests for financial reporting purposes in these entities because of (i) the local service agreements we have with their stations, (ii) our (excluding The CW) guarantee of the obligations incurred under Mission's senior secured credit facility, (iii) our power over significant activities affecting the VIEs' economic performance, including budgeting for advertising revenue, advertising sales and, in some cases, hiring and firing of sales force personnel and (iv) purchase options granted by each consolidated VIE which permit us to acquire the assets and assume the liabilities of each of these VIEs' stations, subject to FCC consent.").

[55] *Id.* (emphasis added).

[56] Financial Accounting Standards Board, Accounting Standards Codification §§ 810-10-25-38A(a)–(b) (2009).

[57] *Id.* 810-10-25-38A(b).

[58] *See, e.g.*, Nexstar Media Grp., Inc., *Form 10-Q*, SEC at 10 (Nov. 9, 2022), https://www.sec.gov/Archives/edgar/data/1142417/000095017022023394/nxst-20220930.htm.

Nexstar might claim that its SEC filings *also* say that Mission, White Knight, and other VIEs each "retains control and responsibility for operation of its station . . . ."[59] Yet this cannot be true in substance if the other parts of its disclosures are accurate. The truth is that this boilerplate language has no meaning—especially in light of the financial incentives provided by the Mission options and financing.

Nexstar might likewise argue that financial statements and GAAP do not always govern "control" for FCC purposes.[60] This may be so, but the analyses in this case run in the same direction. Nexstar's accountants have concluded that it has the power to direct Mission's and White Knight's activities, to absorb the stations' losses, and to receive the stations' benefit. The evidence throughout this complaint demonstrates the same thing. If the FCC engages in its standard "look-beyond-the-title" examination of control in light of the specific documents and behavior here—documents and behavior it has not reviewed before—it can only conclude that *de facto* control exists here.

**B. Mission's Management**

While Mission purports to have an active senior management team, two of its four members are long-time Nexstar employees. As reported on Mission's website, VP Sharon Moser spent "twelve years at the station level and ten years in corporate accounting for the Irving, TX based, Nexstar Media Group, Inc."[61] And VP Lance Carwile worked as "a Group

---

59 *Id.* at 9.

60 *E.g., Nexstar Broad., Inc., & Mission Broad., Inc. c/o Howard M. Liberman, Esq. Ft. Smith 46, Inc. c/o Peter Tannenwald, Esq.*, 23 FCC Rcd. 3528, 3534 (2008).

61 *About*, Mission Broad., Inc. https://missionbroadcastinginc.com/about/.

Program Coordinator and Regional Program Director for . . . Nexstar Broadcasting" and two entities that were ultimately acquired by Nexstar, including LIN Media and Media General.[62]

### C. White Knight's Lack of Independent Leadership

White Knight has channels in Texas and Louisiana. Yet White Knight lists its corporate address as 3316 Willow Glen Drive, Oak Hill, Virginia 20171.[63] This is not an office; it is the residence of Anthony "Toby" J. Malara III, the President, Secretary, and Director of White Knight Holdings, and the CEO of Malara Enterprises, LLC, White Knight's parent company.

Despite ostensibly running a broadcast station group, Mr. Malara has a full-time job as the Vice President of Government Relations for the American Staffing Association. In that role, he "advises on all staffing-related legislation and regulation" and "directs the association's political activities through its political action committee, StaffingPAC."[64] Nor does Mr. Malara appear to have much help in running White Knight. White Knight's most recent license renewal states, "Station WVLA-TV employs fewer than five full-time employees. Accordingly, the station is not required by the FCC's rules to produce EEO public file reports."[65]

### D. Nexstar's Negotiation of Mission's CBS Affiliation Agreements

Further evidence that Mission has ceded control of its stations to Nexstar can be found with respect to affiliation agreements. In January 2022, ViacomCBS and Nexstar renewed

---

[62] *Id.*

[63] *Commercial Broadcast Stations Biennial Ownership Report*, File No. 0000172158, https://enterpriseefiling.fcc.gov/dataentry/public/form323/draftCopyForm323.html?displayType=html&appKey=25076ff37d47a354017d4829a2c503a7&id=25076ff37d47a354017d4829a2c503a7&goBack=N.

[64] *Meet the ASA Legal Team*, American Staffing Association, https://americanstaffing.net/staffing-law-advocacy/asa-lawyers/.

[65] Knight Broad. of Baton Rouge License Corp., *Public Inspection File and EEO Public File Report*, FCC (June 9, 2021), https://enterpriseefiling.fcc.gov/dataentry/api/download/attachment/25076f91776503d90177687dab4d01e9.

multiple affiliation agreements. This renewal included Nexstar-owned stations. It *also* included two CBS stations owned by Mission: KOLR in Springfield, MO and WYOU in Wilkes-Barre, PA.[66] Of course, were Mission truly independent, it and not Nexstar would have negotiated affiliation agreements with CBS.

### E. Nexstar's Handling of White Knight Billing Issues

On at least one occasion in 2022, *Nexstar* emailed DIRECTV with a billing question regarding DIRECTV's retransmission consent payments to *White Knight*.[67] Here again, this suggests that Nexstar held significant influence over station finances.[68]

### F. Recent Retransmission Consent Negotiations with DIRECTV

Mission and White Knight's retransmission consent negotiations with DIRECTV last fall provide powerful additional evidence that Nexstar exercised *de facto* control over Mission's and White Knight's stations. In those negotiations, Mission and White Knight engaged in behavior that would have been inconceivable for parties actually in control of their stations.

Last summer, DIRECTV began negotiations with Mission and White Knight to renew respective retransmission consent agreements. Both Mission and White Knight are represented by the same outside consultant, Eric Sahl. Mr. Sahl represents all Nexstar sidecars with whom we negotiate, and we believe he represents all of Nexstar's sidecars generally. DIRECTV's

---

66 ViacomCBS Inc., *ViacomCBS and Nexstar Media Group Renew Affiliation Agreements*, Cision PR Newswire (Jan. 21, 2022), https://www.prnewswire.com/news-releases/viacomcbs-and-nexstar-media-group-renew-affiliation-agreements-301465580.html.

67 *See* email from Cristy Lunski (Nexstar) to Jennifer Maples (DIRECTV), Sept. 30, 2022 1:28PM (related to an adjustment for bad debt subscribers). We are happy to make this e-mail available to the Commission under an appropriate protective order.

68 Of course, if Nexstar *did not* control White Knight, then this constitutes proof that White Knight shared non-public and competitively sensitive retransmission consent information with Nexstar, in violation of the Commission's prohibition on joint retransmission consent negotiations. 47 C.F.R. § 76.56(b)(1)(viii).

executives conducted extensive negotiations with Mr. Sahl. Mr. Sahl provided advance notice to DIRECTV in July 2022 when he expected to be unavailable on certain days for personal reasons.

As Mission's and White Knight's agreements were set to expire, the parties agreed to extend the expiration date several times to accommodate Mr. Sahl's schedule and allow additional time for negotiations.

### *1. Mr. Sahl's Proposals to DIRECTV Served the Interest of Nexstar Rather than His Putative Clients*

In August 2022, Mr. Sahl provided counterproposals to DIRECTV's terms for Mission and White Knight. These counterproposals were noteworthy in multiple respects.

First, Mr. Sahl requested increases to the retransmission consent fees for both Mission and White Knight that were radically disproportionate to the number of stations owned by Mission and White Knight. One important factor in determining the per-subscriber fees for retransmission consent agreements is the number of "Big Four" station subscribers covered by the agreement. Put simply, broadcast station groups that own a larger number of "Big Four" stations serving a larger number of subscribers generally exert their leverage to obtain higher rates.[69] Yet Mr. Sahl's requested fees were so disproportionate to the size of Mission and White Knight that they seemed intentionally calculated to prevent the parties from reaching an agreement. DIRECTV would never have agreed to such fees with Mission or White Knight, and Mr. Sahl, an experienced negotiator, must have known this. One possible theory is that Nexstar sought to use Mission and White Knight as "stalking horses" for its own later retransmission

---

[69] This, of course, is not the only factor that can lead to higher rates. An even more important factor is that *local* consolidation also results in higher rates. Ample evidence supports this proposition. *See, e.g.*, Further Comments of the American Television Alliance, MB Docket No. 18-349 (filed Sept. 2, 2021) (summarizing evidence). Of course, this complaint alleges that Nexstar has engaged in *local* consolidation through Mission and White Knight, which enables it to raise prices.

consent negotiations. The idea is that Nexstar hoped to set a high price floor with Mission and White Knight so as to set up its own negotiation to obtain even higher prices.

Second, as part of his demands on behalf of White Knight, Mr. Sahl demanded retransmission consent fees for CW-affiliated stations even though White Knight did not own any such stations. This would be a highly unusual demand by an independent broadcaster. Here, however, Nexstar was about to announce that it had agreed to acquire a 75 percent ownership interest in the entire CW network. Mr. Sahl first made this demand on *August 1*, 2022; Nexstar announced it had agreed to acquire the ownership interest on *August 15*, 2022 (and ultimately closed the CW transaction in October 2022).[70] *White Knight* had no economic reason to raise CW stations in negotiations with DIRECTV. Only *Nexstar* had such a reason. DIRECTV pointed this out to Mr. Sahl, noting that it was improper and illegal for White Knight to be coordinating rate negotiations with Nexstar.

Here, too, we can think of a theory for why Mr. Sahl acted in this unusual way: Nexstar directed him to include the CW in the White Knight negotiations because it knew it was going to add CW affiliations to its sidecars and wanted to get paid. It also hoped to ascertain DIRECTV's willingness to pay for CW stations and ultimately inform Nexstar's future negotiations. DIRECTV's contract with White Knight expired on October 7, 2022. White Knight has remained blacked-out from DIRECTV, STREAM, and U-verse systems ever since, despite numerous attempts by DIRECTV to re-engage in negotiations.

---

[70] Here again, if Nexstar did not *control* White Knight, Nexstar appears to have shared with White Knight this confidential and competitively sensitive information.

### *2. Mr. Sahl Disappeared at a Critical Point in Negotiations*

Immediately before Mission's retransmission consent expired, and immediately after White Knight's agreement *had* expired, Mr. Sahl simply stopped responding to DIRECTV without explanation. Such conduct is almost unprecedented in DIRECTV's experience. Indeed, it was unprecedented *in this negotiation*: Mr. Sahl had been unavailable at various times during the negotiations and, each time, he told DIRECTV about the circumstances and the parties made appropriate arrangements, including extending the expiration deadline. Here, much closer to the deadline, Mr. Sahl simply disappeared.

Here again, one must look to Nexstar for explanation of Mr. Sahl's conduct on behalf of Mission. At the time he disappeared, Nexstar was negotiating with Verizon and on the cusp of blacking out its stations. During Mr. Sahl's disappearance, Nexstar went dark on Verizon. Mr. Sahl has never explained his delayed response during this critical period. The most plausible explanation, however, is that he was awaiting instruction from Nexstar on how to respond to DIRECTV's counterproposal—while Nexstar was preoccupied with its Verizon negotiations and wanted to see how that dispute turned out before coordinating with Mission and White Knight to counter DIRECTV's last proposal. Consistent with this hypothesis, DIRECTV's typical real-time negotiation process with Mr. Sahl promptly resumed shortly after the Verizon blackout began. This conduct cannot be explained if Mission and White Knight maintained control of their licenses.

### *3. Mission and White Knight's Principals Refused to Speak with DIRECTV*

On October 21, 2022, Mission's stations went dark on DIRECTV—one week after Nexstar's stations had gone dark on Verizon, and two weeks after White Knight's stations had gone dark on DIRECTV. On October 25, 2022, DIRECTV executives reached out to Mr.

Malara—White Knight's President—to attempt to negotiate a deal and end the blackout. When DIRECTV tried to contact Mr. Malara, however, it received an "out-of-office" email stating that he was unavailable for the rest of the month due to his full-time job with the American Staffing Association.

Aside from this automated email, Mr. Malara never responded to DIRECTV. In DIRECTV's experience, such a refusal to engage is nearly unheard of. These were high-stakes retransmission negotiations that, if unsuccessful, would have resulted in continued material and ongoing revenue losses for White Knight. Principals—at least ones with skin in the game—*never* simply disappear in such circumstances. Mr. Malara's complete absence from these negotiations demonstrates that the negotiations were being directed by Nexstar and not White Knight.

DIRECTV had a similarly unusual experience with Mission's president, Dennis Thatcher. When DIRECTV reached out to Mr. Thatcher to try and reach a resolution with Mission and restore the stations to DIRECTV, Mr. Thatcher refused to negotiate and referred DIRECTV to speak with Mr. Sahl.

Neither principal has engaged with DIRECTV since then. Mission's and White Knight's stations remain blacked-out on DIRECTV.

#### ***4. Mission, White Knight, and Nexstar Issued Identical Press Releases***

Mission, White Knight, and Nexstar all issued nearly identical press releases concerning their respective blackouts. This could not have happened by accident. Rather, it could only have been the product of coordination.

On October 16, 2022, Mission and White Knight issued separate statements with cut-and-pasted talking points about their respective blackouts on DIRECTV. On the following day, Nexstar issued a third statement with the identical talking points about its blackout related to

failed negotiations with Verizon. The three statements containing identical language are shown below:

White Knight's October 16, 2022 statement provides:[71]

**White Knight (Oct 16) Statement re DIRECTV Blackout**

**KFXK FOX 51 has a contract with DirecTV that allows them to deliver our programming to you. That contract has expired and DirecTV has removed KFXK FOX 51 from your schedule. KFXK FOX 51 has presented a proposal for fair value compensation, based on the importance and value our programming brings our viewers. Despite our tireless efforts, DirecTV has refused our fair offer and is making negotiations very difficult. They will tell you it's for your benefit, but don't believe it. Our offer is fair. And now they hold you the subscriber hostage. It's not right.**

Mission issued two statements dated October 16, 2022 and October 30, 2022 containing the same exact talking points.[72]

[71] *Attention DirecTV Subscribers*, KETK (Oct. 16, 2022), www.ketk.com/attention-directv-subscribers/ [https://web.archive.org/web/20221016165200/https:/www.ketk.com/attention-directv-subscribers/].

[72] *DirecTV Subscribers: WNAC Could Be Forced Off Your Line-up, and Important Programming You Pay for Could Disappear!*, WNAC (Oct. 16, 2022), https://keepmystation.com/WNAC [https://web.archive.org/web/20221016015430/https:/keepmystation.com/WNAC]; *DirecTV Subscribers: WNAC Has Been Forced Off Your Line-up, and Important Programming You Pay for Has Disappeared.*, WNAC (Oct. 30, 2022), https://keepmystation.com/WNAC, [https://web.archive.org/web/20221030164330/https:/keepmystation.com/WNAC].

**Mission Statements (Oct 16 & Oct 30) re DIRECTV Blackout**

> **WNAC has a contract with DirecTV that allows them to deliver our programming to you. That contract expires Tuesday, Oct. 18, and if a new agreement is not reached, DirecTV might remove WNAC from your channel line-up. WNAC has presented a proposal for fair value, based on the importance and value our programming brings our viewers. Despite our tireless efforts, DirecTV has refused our fair offer and is making negotiations very difficult. Our offer is fair. And now they may hold you the subscriber hostage. It's not right.**

> **WNAC and DirecTV have a contract that allows them to carry our programming to you. That contract has expired and DirecTV removed WNAC from your schedule. WNAC has presented a proposal for fair value, based on the importance and value our programming brings to our viewers. Despite our tireless efforts, DirecTV has refused our fair offer and is making negotiations very difficult. You might have seen them do this before. They will tell you it's for your benefit, but don't believe it. Our offer is fair. And now they hold you the subscriber hostage. It's not right.**

*Nexstar*'s October 17, 2022 statement regarding its blackout with *Verizon* contains the exact verbiage as White Knight's and Mission's statements:[73]

**Nexstar (Oct 17) Statement re Verizon Blackout**

> **"Verizon Fios has refused our fair offer, and is making negotiations very difficult," a Nexstar spokesperson said in a statement to viewers. "You may have seen them do this before. They will tell you it's for your benefit, but don't believe it. Our offer is fair."**

The identical statements in all three press releases clearly originated from the same source: Nexstar. This suggests that Mission's and White Knight's negotiations with DIRECTV were being orchestrated by Nexstar. Put another way, this simply could not have happened *except* for Nexstar's *de facto* control of Mission and White Knight's stations.

---

73 Matthew Keys, *Nexstar Says Verizon is Lying About Fios Carriage Dispute*, The Desk (Oct. 17, 2022), https://thedesk.net/2022/10/nexstar-says-verizon-lying-about-carriage-dispute/ [https://web.archive.org/web/20221018030833/https://thedesk.net/2022/10/nexstar-says-verizon-lying-about-carriage-dispute/].

### *5. Nexstar Stations Continue to Message about Nexstar and White Knight's Blackout*

Nexstar owns stations in Tyler, TX, where White Knight owns a station; in Albany, where Mission owns a station; and in Albuquerque, where Mission also owns a station. If you go to the website for the Nexstar station in Tyler, Texas, you find the messaging set forth in the introduction.[74] If you go to the website of Nexstar's WTEN in Albany, you see the following banner, referring not to WTEN, but to *Mission's* Albany station, WXXA.[75]




If you click through the banner, you find a longer message, copied below. Please note the reference to "our" DIRECTV subscribers, even though the messaging references a *different* station putatively owned by a *different* party.

[74] Fox51-KETK, https://www.ketk.com/ (last visited Jun. 26, 2023).

[75] News1-ABC, https://www.news10.com/ (last visited Jun. 27, 2023).

**IMPORTANT INFORMATION FOR OUR DIRECTV SUBSCRIBERS:**

Q.: What's going on?
A.: Our FOX station has a contract with DirecTV that allows them to deliver our programming to you. That contract expired last October, and DISH has removed our FOX station from your schedule. We have presented a proposal for fair value compensation, based on the importance and value our programming brings to our viewers. Despite our tireless efforts over the past few months, DirecTV has refused our fair offer and doesn't seem to care how long they deny you our FOX station.

Q.: How do they get away with it?
A.: You may have seen them do this before. They will tell you they're doing this on your behalf, but don't believe it. They plan on holding you the subscriber hostage. It's not right.

Q.: It's been months now, Will I see a rebate on my bill?
A.: Not unless you ask, and then you will likely have to asked each and every month this goes on. So, we urge you to reach out to DirecTV and demand a rebate, and to remind them you have options.

**YOU HAVE OPTIONS**

**TAKE ACTION NOW**

EMAIL DIRECTV | SHARE ON TWITTER | POST ON FACEBOOK | KEEP WATCHING

© 2023 Mission Broadcasting, Inc. – All rights reserved

And if you go to the website of Nexstar's KRQE station in Albuquerque, you find the following banner, referring not to KRQE but to *Mission's* Albuquerque station, KWBQ.[76]

Attention DISH and DirecTV subscribers! Your KWBQ has been off your lineup for weeks now!

Find out why and consider your several good options to get us back!

LEARN MORE

If you click through the banner, you find this message directed at DISH subscribers:

76 The CW—New Mexico, https://www.krqe.com/new-mexicos-cw/ (last visited Jun. 26, 2023).



IMPORTANT INFORMATION FOR DISH SUBSCRIBERS

Q.: What's going on?

A.: Our station has a contract with DISH that allows them to deliver our programming to you. That contract has expired and DISH has removed our station from your schedule. We have presented a proposal for fair value compensation, based on the importance and value our programming brings to our viewers. Despite our tireless efforts, DISH has refused our fair offer and doesn't seem to care how long they deny you our station.

Q.: How do they get away with it?

A.: You may have seen them do this before. They will tell you they're doing this on your behalf, but don't believe it. DISH has a long history of taking stations off their line-up, holding their customers hostage. In fact, as a result of such actions, DISH has lost 2/3rd's of the subscribers that had in 2009. Our offer is fair. And now they hold you the subscriber hostage. It's not right.

Q.: It's been some time now; Will I see a rebate on my bill?

A.: Not unless you ask, and then you will likely have to asked each and every month this goes on. So, we urge you to reach out to DISH and demand a rebate, and to remind them you have options.

YOU HAVE OPTIONS

TAKE ACTION NOW

EMAIL DISH | SHARE ON TWITTER | POST ON FACEBOOK | KEEP WATCHING

© 2023 Mission Broadcasting, Inc. – All rights reserved

In each case, the messaging is unrelated to the Nexstar station on whose website it appears. Rather, each notice is about a *Mission* or *White Knight* station in the same market that has been off DIRECTV since it was pulled last fall.

We have never seen such a thing before. It has, to be candid, never occurred to us that one station might message about another station's blackout. And, of course, if Nexstar did not

control these stations, it would have no reason to post messages about those stations' availability on DIRECTV or DISH.

## IV. NEXSTAR'S *DE FACTO* CONTROL OF MISSION AND WHITE KNIGHT STATIONS IS UNLAWFUL

The evidence above shows beyond doubt that Nexstar now controls Mission's and White Knight's stations. This is unlawful in at least four ways.

- First, and most obviously, Mission and White Knight have transferred control of their stations to Nexstar.[77]
- Second, Mission, White Knight, and Nexstar have engaged in misrepresentation to the Commission. "[A] real party in interest issue, by its very nature, is a basic qualifying issue in which the element of deception is necessarily subsumed."[78] So too with "related" control issues.[79] Mission and White Knight have each represented to the Commission that they control their respective stations. And Nexstar has failed to indicate in its ownership documents and other submissions that it now controls Mission's and White Knight's stations. This is not only unlawful, but it calls into question the qualifications of all three to hold Commission licenses.[80]

---

[77] *See* 47 U.S.C. § 309 (prohibiting transfers of control without Commission authorization).

[78] *See Maritime Commc'ns/Land Mobile* ¶ 36 .

[79] *See WHDH* at 863. The phrase "real party-in-interest" is used in connection with pending applications, while "*de facto* control" is used in connection with a licensed station. *Brasher*.

[80] *See Policy Regarding Character Qualifications in Broadcast Licensing Amendment of Rules of Broadcast Practice and Procedure Relating to Written Responses to Commission Inquiries and the Making of Misrepresentations to the Commission by Permittees and Licensees*, 102 FCC 2d 1179, 1190–91 (1986), *recons. granted in part on other grounds*, 1 FCC Rcd 421 (1986), *appeal dismissed sub nom., Nat. Ass'n. for Better Broad. v. FCC*, No. 86-1179 (D.C. Cir. June 11, 1987), *modified*, 5 FCC Rcd. 3252 (1990), *on reconsideration*, 6 FCC Rcd 3448 (1991), *modified in part*, 7 FCC Rcd. 6564 (1992).

- Third, this places Nexstar in violation of the local ownership rules.[81] Since Nexstar controls them, Mission's and White Knight's stations should be attributed to Nexstar for purposes of the FCC's ownership rules. Mission and White Knight own overlapping "Big Four"[82] stations in 25 local markets. Nexstar has not obtained authorization to acquire these stations, and thus has violated the local ownership rules in each such market. Indeed, if the Commission were not to find *de facto* control here, there would be little to stop Nexstar from using similar arrangements to "operate" two, three, or even all four major networks in every market in which it owns a station.
- Fourth, Nexstar's *de facto* control of Mission and White Knight stations also places it in violation of the 39-percent ownership cap. As Comcast and Charter have pointed out, Mission owns WPIX, a station in New York where Nexstar owns no stations. Because Nexstar controls WPIX, it has exceeded the national ownership cap. Here again, were the Commission to conclude otherwise, there would be little to stop Nexstar from covering the entire United States with stations it "operates." Nothing would remain of the national ownership cap.

---

81 Again, even if the Commission were to determine that Nexstar did not *control* Mission and White Knight's stations, it could determine that "the panoply of relationships and agreements between" a broker and a licensee could "provide [a broker] with the incentive and means to exert influence over the core operations of [a licensee], which, under Commission precedent, could be the basis for a finding that [the licensee's] stations should be attributed to [the broker] for purposes of determining compliance with our ownership rules." *Tribune* ¶ 26.

82 For purposes of this pleading, we will assume that each "Big Four" station is a "top four rated" station for purposes of the Commission's ownership rule, although that may turn out not to be the case in all instances.

## CONCLUSION

The evidence here is overwhelming: Mission and White Knight have ceded *de facto* control of their licenses to Nexstar. DIRECTV asks the Commission to declare this to be so and to take whatever remedial and disciplinary measures it deems appropriate.

Respectfully Submitted,

Michael Nilsson
Kristine Laudadio Devine
HWG LLP
1919 M Street, N.W.
The Eighth Floor
Washington, DC 20036
(202) 730-1300
*Counsel to DIRECTV, LLC*

Stacy Fuller
Brenna Sparks
DIRECTV, LLC
2230 E. Imperial Highway
El Segundo, CA 90245

June 29, 2023