# Exhibit A

Alexander P. Okuliar (*pro hac vice*)
Bradley S. Lui (CA Bar No. 143088)
Robert W. Manoso (*pro hac vice*)
Alexa Rae DiCunzolo (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Telephone: 202.887.1500
Facsimile: 202.912.2329
Email: AOkuliar@mofo.com
BLui@mofo.com
RManoso@mofo.com
ADiCunzolo@mofo.com

Eliot A. Adelson (CA Bar No. 205284)
Daralyn J. Durie (CA Bar No. 169825)
Adam R. Brausa (CA Bar No. 298754)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522
Email: EAdelson@mofo.com
DDurie@mofo.com
ABrausa@mofo.com

Nicole K. Serfoss (*pro hac vice*)
MORRISON & FOERSTER LLP
370 Seventeenth Street 4200 Republic Plaza
Denver, CO 80202-5638
Telephone: 303.592.1500
Facsimile: 303.592.1510
Email: nserfoss@mofo.com

Attorneys for Defendants Nexstar Media Group, Inc. and TEGNA Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re Nexstar-TEGNA Merger Litigation

Case No. 2:26-cv-00976-TLN-CKD

**DEFENDANTS NEXSTAR MEDIA GROUP, INC. AND TEGNA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFF STATES (NOS. 1-31)**

Judges: Honorable Troy L. Nunley and Honorable Carolyn K. Delaney
Action Filed: March 18, 2026

Pursuant to Federal Rule of Civil Procedure 34, Defendants Nexstar Media Group, Inc. and TEGNA Inc. request that within 30 days of service, Plaintiff States produce for inspection and copying the documents and things set forth below that are in their possession, custody, or control at the offices of Morrison & Foerster LLP, 425 Market Street, San Francisco, California, 94105.

**DEFINITIONS**

1. The term "**Action**" means the above-captioned proceeding, *In Re: Nexstar-TEGNA Merger Litigation*, No. 2:26-cv-00976-TLN-CKD, as well as any documents from the pre-consolidation proceedings, *DIRECTV, LLC v. Nexstar Media Group Inc. et al.*, No. 2:26-cv-00976-TLN-CKD, and *State of California, et al. v. Nexstar Media Group Inc. et al.*, 2:26-cv-00978-TLN-CKD.

2. The term "**Big Four**" means the four major broadcast TV networks in the United States: NBC, CBS, ABC, and FOX.

3. The term **"Big Four Affiliate"** means any Local Broadcast Station specifically affiliated with one of the Big Four networks.

4. The term "**Blackout**" means any period during which an MVPD, vMVPD, or DTC Service does not carry or transmit a Local Broadcast Station's signal due to the failure to reach a Retransmission Consent Agreement or the expiration of an existing agreement.

5. The term "**Broadcaster**" means any person that owns, operates, or controls one or more Local Broadcast Stations.

6. The term "**Carriage**" means the transmission or Distribution of a Local Broadcast Station's signal by an MVPD, vMVPD, or DTC Service to its Subscribers.

7. The term "**Complaint**" refers to the individual complaints filed by the Plaintiffs in their respective previous Actions, No. 2:26-cv-00978-TLN-CKD and No. 2:26-cv-00976-TLN-

CKD, as well as any amendments thereto.

8. The term "**Concentration Calculation**" means any calculation, analysis, index, or metric used to measure, estimate, or assess the degree of market concentration in a relevant market or DMA, Including the Herfindahl-Hirschman Index ("HHI") or any other quantitative measure derived from the market shares, revenues, subscriber counts, audience shares, or other indicia of competitive significance of market participants, whether calculated on a pre-Transaction or post-Transaction basis, and whether expressed in absolute terms, as a change or delta, or otherwise.

9. The term "**Consumer**" means a person who watches video or television content provided by any television service provider, Including Local Broadcast Stations, MVPDs, vMVPDs, DTC Services, or Streaming Services.

10. The term "**Cord Cutting**" means the Consumer practice of cancelling MVPD subscriptions in favor of other television content distribution channels Including vMVPDs or Streaming Services.

11. The term "**Defendant**" means Nexstar and/or TEGNA.

12. The term "**Designated Market Area**" ("**DMA**") means any of the 210 proprietary television viewing geographies defined by the Nielsen Company.

13. The term "**DIRECTV**" means DIRECTV, LLC, Including its subsidiary entities, divisions, and all entities acting in joint venture or partnership relationships with DIRECTV, LLC, as well as all of its past or present representatives, employees, consultants, attorneys, and others acting on behalf of DIRECTV, LLC, and all predecessors in interest of DIRECTV, LLC, either directly or indirectly.

14. The term "**Distribution**" means the delivery or transmission of video

programming, Including Local Broadcast Programming or Network Programming, to viewers through any means, Including over-the-air broadcast, cable, satellite, MVPD, vMVPD, DTC Services, Streaming Services, online video platforms, social media platforms, or any other platform.

15. The term "**Distributor**" means a Person that provides Distribution services to Consumers or Subscribers.

16. The term "**Document**" shall be construed in a manner consistent with Rule 34(a) of the Federal Rules of Civil Procedure and shall be interpreted in its broadest sense and shall Include the original or any copy, Including any non-identical copies bearing or having any attachments, notes, or marks which distinguish them from the originals, of any writing, notes, correspondence, memoranda (Including written memoranda of telephone conversations, e-mail, other communications, discussions, agreements and any other acts, Transactions or activities), business records, sound recordings, minutes, diaries, calendars, forms, statements, journals, letters, notices, interoffice and intra-office communications, studies, reports, analyses, messages, comparisons, graphs, charts, summaries, films, photographs, tapes, advertisements, computer disks, electronically stored information, data, databases, printouts, text messages, instant messages, chats, social media, or any other medium for the storage or retrieval of information, and any other written matter of any kind Including any marginal comments appearing on any documents, or any other writing or recording as defined by Rule 1001 of the Federal Rules of Evidence.

17. The term "**DOJ**" means the U.S. Department of Justice, or any of its employees, agents, attorneys, and all other persons acting on its behalf.

18. The term "**DTC Services**" means direct-to-Consumer Streaming Services offered

by various media companies that can be accessed directly by Consumers over the internet, and/or through certain Subscription Packages offered by MVPDs or vMVPDs.

19. The term "**FCC**" means the U.S. Federal Communications Commission, or any of its employees, agents, attorneys, and all other persons acting on its behalf.

20. The term "**Fee**" means any amount, charge, or monetary assessment imposed on or payable by a Subscriber in connection with the provision of video programming or Distribution services.

21. The term "**Herfindahl-Hirschman Index,**" or "**HHI,**" means the metric that measures market concentration by summing the squares of the market shares of all entities that compete in a given market.

22. The term "**Including**" means including but not limited to and shall be construed to be illustrative and not limiting.

23. The term "**Investigation**" means any review, assessment, or analysis of the Transaction, Including any rationale in support of any claim that the Transaction would violate Section 7 of the Clayton Act or any other law.

24. The term "**Investigation Materials**" means correspondence, documents, data, written information or statements, transcripts of testimony, declarations (Including drafts), affidavits (Including drafts) and other materials produced by a Party or a Non-party during any Investigation relating to the Transaction, Including pursuant to any Request for Additional Information and Documentary Material issued under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), 15 U.S.C. § 18a, Including any modifications thereto, any documents produced to any States pursuant to civil investigative demands, subpoenas, or other compulsory process issued under their respective State antitrust and consumer protection

statutes, and any documents or materials produced pursuant to other compulsory process or voluntary production in connection with such investigations.

25. The term "**Local Broadcast Programming**" means programming produced by or for a Local Broadcast Station for Distribution primarily within the DMA in which the Local Broadcast Station is licensed, Including Local News, local sports, local public affairs programming, and locally originated content.

26. The term "**Local Broadcast Station**" means a local television station licensed by the Federal Communications Commission to broadcast over the air in a DMA.

27. The term "**Local News**" means programming primarily produced by, for, or under the editorial control of a local television station or its local news operation for distribution in the station's DMA, Including regularly scheduled local newscasts and locally produced coverage of weather, traffic, crime, politics, elections, public safety, and community events. Local News includes substantially similar digital, streaming, or online news content distributed by the same local news operation.

28. The term "**Market-Share Calculation**" means any calculation, analysis, estimate, or assessment of an entity's share of a relevant market or DMA, whether expressed as a percentage or in absolute terms, and whether measured by revenues, Retransmission Consent Fees, Subscribers, customers, viewers, audience share, ratings, viewership data, unit sales, capacity, or any other metric or indicia of competitive significance, and regardless of the data source, methodology, time period, or assumptions employed in deriving such share.

29. The term "**Merged-Share Calculation**" means any calculation, analysis, estimate, or assessment — whether actual, pro forma, projected, or hypothetical — of the combined share of the post-Transaction merged entity (Including all constituent, successor, or affiliated entities)

in a relevant market or DMA, whether expressed as a percentage or in absolute terms, and whether measured by revenues, Retransmission Consent Fees, Subscribers, customers, viewers, audience share, ratings, viewership data, unit sales, capacity, or any other metric or indicia of competitive significance, and regardless of the data source, methodology, time period, or assumptions employed in deriving such combined share.

30. The term "**MVPD**" means a multi-channel video programming Distributor that provides multiple television channel video programming through cable or satellite Networks.

31. The term "**Network**" means a national broadcast television network, Including ABC, CBS, NBC, FOX, The CW, MyNetworkTV, and any other national broadcast network that provides Network Programming to affiliated Local Broadcast Stations.

32. The term "**Network Programming**" means video programming produced by or for a Network and distributed to affiliated Local Broadcast Stations for broadcast, Including prime-time entertainment, national news, and sports programming.

33. The term "**Nexstar**" refers to Nexstar Media Group, Inc.

34. The term "**Non-party**" refers to all entities and Persons who are not parties to this Action, as well as their officers, directors, employees, agents, representatives, and attorneys.

35. The term "**Overlap DMA**" means any DMA in which both Defendants owned or operated a Local Broadcast Station prior to the Transaction.

36. The term "**Party**" means any party to this action, Including all of its officers, directors, employees, consultants, retained experts, and counsel (and their support staff).

37. The term "**Person**" shall be construed in a manner consistent with the Federal Rules of Civil Procedure and means any natural person or legal entity, Including any individual, corporation, council, firm, governmental entity, joint venture, partnership, trade association,

unincorporated association, or other incorporated or unincorporated entity, or group of individuals or entities, single or plural, as the context may require.

38. The terms "**Plaintiff**," "**You**," and "**Your**" mean DIRECTV or any of the States.

39. The terms "**Relating to**," "**Related to**," "**Relates to,**" "**Concerning**," and "**Regarding**" shall be construed in the broadest sense and mean constituting, containing, supporting, contradicting, concerning, discussing, describing, analyzing, identifying, referring to, stating, summarizing, reflecting, embodying, mentioning, showing, comprising, evidencing, commenting upon, bearing upon, pertaining to, connected with, having any relationship to, tending to prove or disprove, tending to support or undermine, or being in any way logically or factually relevant to the subject matter in question. These terms shall be used interchangeably and shall be construed to have the same meaning.

40. The term "**Relevant Time Period**" means the time period from January 1, 2016 to the present.

41. The term "**Retransmission**" means the transmission of a Local Broadcast Station's over-the-air signal and content by an MVPD or vMVPD to its Subscribers.

42. The term "**Retransmission Consent Agreement**" means any agreement negotiated and entered into between MVPDs and Broadcasters for the Retransmission of Broadcaster signals on the MVPDs' platforms, pursuant to 47 U.S.C. § 325(b).

43. The term "**Retransmission Consent Fees**" means the fees paid by MVPDs or vMVPDs to Broadcasters for Retransmission under any applicable Retransmission Consent Agreements.

44. The term "**Reverse Compensation Fees**" means the fees charged by Networks to Broadcasters to allow for Broadcasters to provide Network Programming on Local Broadcast

Stations.

45. The term "**State**" means any state that is Party to this Action, Including their respective Offices of the Attorney General, and any officer, commissioner, employee, agent, attorney, representative, affiliate, consultant, advisor, successor, predecessor, or any other persons acting or purporting to act on behalf of any of these states.

46. The term "**Streaming Service**" means a video service provided over the internet.

47. The term "**Subscriber**" means a Consumer who subscribes to one or more video services offered by a television service provider, MVPD, vMVPD, DTC Service, or Streaming Service.

48. The term "**Subscription Packages**" means each discrete product offering made available to Consumers or Subscribers by MVPDs, vMVPDs, DTC Services, Networks, or Streaming Services.

49. The term "**TEGNA**" means TEGNA Inc.

50. The term "**Transaction**" means the acquisition of TEGNA by Nexstar on March 19, 2026.

51. The term "**vMVPD**" means a virtual multi-channel video programming Distributor that delivers video and television content over the internet.

**INSTRUCTIONS**

The following instructions incorporate by reference the instructions contained in Local Rules 250.3 and 250.5, and otherwise apply as follows:

1. Produce Documents as they are kept in the usual course of business. The Documents copied shall be copied as they are kept in the normal course of business, and any titles, labels, or other descriptions on any box, folder, binder, file cabinet, or other container shall

be copied as well.

2. These Requests apply to all Documents or information in Your possession, custody, or control.

3. If no Documents or information responsive to a particular Request are in Your possession, custody, or control, You shall so state.

4. If, in responding to these Requests, You find any ambiguity in construing a Request, or in the definition or instruction relevant to a Request, set forth the matter deemed ambiguous and the construction selected or used in answering the Request, and respond on the basis of Your construction.

5. For any responsive Documents or information that have been withheld under claim of privilege or work product protection, identify the Document and state the basis for the privilege or protection, and provide the following information for each Document that You have withheld:

a. The date on which the Document was prepared or the communication occurred, or an estimate thereof if no date appears on the Document;

b. The identity of each author, writer, sender, creator, or initiator of the Document, and each person's title and his or her employer or firm;

c. The identities of all recipients, addressee(s), or parties for whom such Document was intended or to whom the Document was sent;

d. A description of the type of Document and general subject matter of the Document;

e. A description of the basis for withholding of the Document(s) or information sufficient to permit Defendants to assess the applicability of the privilege claimed;

and

f. Produce any non-privileged portion of such Document, with the portion claimed to be privileged redacted.

6. If You are withholding or intend to withhold any Document (or any part of a Document) on the basis of an objection, state so in Your response. If You note an objection but indicate that responsive Documents are nonetheless being produced, we will construe Your statement as a representation that You are producing all Documents responsive to the Request notwithstanding the objection, save for any privileged Documents that are identified on a privilege log. *See* Fed. R. Civ. P. 34(b)(2)(C).

7. Consecutively number each page of all Documents or information produced in response to these Requests. This page numbering must be separate from and must not alter any original numbering on the responsive Documents or information.

8. Each responsive Document or information shall be produced in its entirety, and no portion of any Document or information shall be edited, cut, masked, redacted, or otherwise altered, unless for applicable privilege logged according to the procedures set forth above.

9. All attachments to Documents or information responsive to these Requests shall be produced with, and attached to, the responsive Documents or information.

10. Produce all Documents in electronic format. Convert or process all scanned paper, email, and native file collections to TIFF files, and include fully searchable text (e.g., OCR) and accompanying load files. Databases, Excels, and PowerPoints should also include linked native files. Document images should include tracked changes, where applicable. Load files should include, at a minimum, the following fields: BegBates (Beginning Bates number); EndBates (Ending Bates number); BegAttach (Beginning Bates number of attachment(s)); EndAttach

(Ending Bates number of attachment(s)); Custodian; AllCustodians; From; To; CC; BCC; Subject; Date Sent; Time Sent; File Name; MD5HASH; MsgIndex; FolderLoc; DocType; Title; Native Link; Text Link; Author; Date Created; Time Created; Date Last Modified; Time Last Modified; File Size; File Extension; DateApptStart; DateApptEnd; and Conversation Index.

11. References to any non-natural person (e.g., corporation, partnership, etc.) shall be deemed to include any of that entity's affiliates, agents, assigns, departments, divisions, parents, predecessors, subsidiaries, and successors, and its and their respective current and former employees.

12. The use of the singular of any word includes the plural, and vice versa.

## REQUESTS FOR PRODUCTION

1. All Documents relating to any pre-suit Investigation You conducted concerning the Transaction, Including all Investigation Materials.

2. All Documents relating to any non-governmental sources of funding, reimbursement, or in-kind support You sought, used, or were offered to investigate or challenge the Transaction.

3. All Documents relating to any communications about the Transaction You had internally or with: (a) the DOJ; (b) the FCC; (c) any members of Congress, congressional offices, or congressional committees or subcommittees; (d) the White House; and (e) any other federal or state agencies, legislative bodies, or public officials.

4. All Documents relating to any contention by You that the DOJ's or FCC's review and/or approval of the Transaction was affected by irregular procedure, political influence, or other defect.

5. All Documents relating to any product markets or geographic markets relating to

the Transaction.

6. All Documents relating to sources for content available on Big Four Affiliates that do not require Retransmission Consent Agreements.

7. All Documents relating to any Market-Share, Merged-Share, or Concentration Calculation You reviewed, considered, or relied on relating to the Transaction, Including: (a) the preparation or testing of any such calculation; (b) the use of Retransmission Consent Fee data in any such calculation; (c) the use of ratings, audience, or similar data, Including data from ComScore and Nielsen, in any such calculation; and (d) any assumptions or adjustments used in any such calculation.

8. All Documents relating to any impact the Transaction would have on: (a) Nexstar's bargaining position during negotiations of Retransmission Consent Agreements; (b) Retransmission Consent Fees; and (c) the impact of a single Person owning more than one Big Four Affiliate in a DMA on Retransmission Consent Fees.

9. All Documents relating to any Blackouts during the Relevant Time Period, Including: (a) the frequency, duration, and reason for each Blackout; and (b) any purported harm sustained as a result of any Blackout by Subscribers, Consumers, MVPDs, vMVPDs, Broadcasters, Nexstar, or TEGNA.

10. All Documents relating to any impact the Transaction is likely to have on the duration, extent, or frequency of Blackouts.

11. All Documents relating to the impact on Retransmission Consent Fees of any of the following: (a) Cord Cutting; (b) vMVPDs; (c) Streaming Services; (d) DTC Services; (e) any alternative Distributor to Local Broadcast Stations; and (f) any alternative to Big Four Affiliates.

12. All Documents relating to any geographic variation in Retransmission Consent

Fees.

13. All Documents relating to Consumer demand for Local Broadcast Programming, Including Local News.

14. All Documents relating to factors that affect the quantity, quality, or variety of Local Broadcast Programming, Including Local News.

15. All Documents relating to any impact the Transaction would have on the quantity, quality, or variety of Local Broadcast Programming, Including Local News, as well as any impact on newsroom operations or employment.

16. All Documents relating to the impact of newsroom consolidation or shared infrastructure between two or more Broadcasters on the quantity, quality, or variety of Local Broadcast Programming, Including Local News.

17. All Documents relating to any analyses, studies, or investigations into how many Local News organizations a local geographic market can support.

18. All Documents relating to any allegations by You that Nexstar has: (a) closed any newsroom or terminated operations for producing Local News; or (b) exerted control over the editing or content of Local News from Local Broadcast Stations that it owns.

19. All Documents relating to the factual basis on which each State claims standing, Including any alleged harm to citizens of any State that would result from the Transaction.

20. All Documents relating to communications with Your constituents relating to the Transaction.

21. All Documents relating to the number, share, or categories of citizens in each State allegedly affected by the Transaction.

22. All Documents relating to Local News, competition, or consumer analyses You

conducted relating to the Transaction.

23. All Documents relating to the impact the Transaction would have on Fees charged to citizens of any State for Distribution services.

24. All Documents relating to any communications or coordination with DIRECTV, Newsmax, Christopher Ruddy, or any Non-party about the Transaction, the Investigation, this Action, any expert analyses, any declarations, or any requested relief.

25. All Documents relating to press strategy, media outreach, or public messaging about the Transaction or this Action.

26. All Documents relating to any political campaign contributions, donations, fundraising support, or other political contributions made by DIRECTV or any MVPD in the past 5 years to (a) any special interest groups, Political Action Committees ("PACs"), or similar organizations; (b) Rob Bonta, Phil Weiser, William Tong, Kwame Raoul, Letitia James, Jeff Jackson, Dan Rayfield, or Dave Sunday, or any additional States' Attorney General; (c) any gubernatorial campaign for any gubernatorial candidate or Governor of the States; or (d) any committees or organizations formed to support any of these Persons.

27. All Documents relating to any surveys, consumer research, or market research considered, used, reviewed, or referenced in this Action.

28. All Documents relating to the allegations in Your Complaint about the purported impact of the Transaction on competition, Consumers, and Local News.

29. All Documents relating to the allegations in Your Complaint about Nexstar's purported conduct, strategies, or goals.

30. All Documents relating to the allegations in Your Complaint about the purported causes and impacts of Blackouts.

31. All Documents that You plan to use or admit into evidence at any hearing in this Action.

Dated: April 29, 2026

Respectfully submitted,

By: */s/ Alexander P. Okuliar*
Alexander P. Okuliar (*pro hac vice*)
Eliot A. Adelson (CA Bar No. 205284)
Bradley S. Lui (CA Bar No. 143088)
Daralyn Durie (CA Bar No. 169825)
Adam R. Brausa (CA Bar No. 298754)
Nicole K. Serfoss (*pro hac vice*)
Robert W. Manoso (*pro hac vice)*
Alexa DiCunzolo (*pro hac vice*)

MORRISON & FOERSTER LLP
Attorneys for Defendants Nexstar Media Group, Inc. and TEGNA Inc.