# Exhibit G

MORRISON FOERSTER

2100 L STREET, NW
SUITE 900
WASHINGTON
DC 20037

TELEPHONE: 202.887.1500
FACSIMILE: 202.887.0763

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AMSTERDAM, AUSTIN, BERLIN, BOSTON, BRUSSELS, DENVER, HONG KONG, LONDON, LOS ANGELES, MIAMI, NEW YORK, PALO ALTO, SAN DIEGO, SAN FRANCISCO, SEATTLE, SHANGHAI, SINGAPORE, TOKYO, WASHINGTON, D.C.

August 3, 2026

Writer's Direct Contact
+1 (202) 887-8766
BLui@mofo.com

**CONFIDENTIAL**

***Via Email***

Laura Antonini
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

Re: *In re Nexstar-TEGNA Merger Litigation*, No. 2:26-cv-00976 (E.D. Cal.)

Dear Ms. Antonini:

I write in response to the Plaintiff States' letter dated July 21, 2026 (the "Letter") regarding Defendants' repeated requests for Plaintiff States to produce relevant documents in their possession regardless of whether they are in their investigative files for this litigation. As discussed in this letter, and my letters dated July 1, July 7, and July 13, 2026, relevance does not depend upon the Plaintiff States' file classification of a particular document. Instead, relevance is a matter of substance. We remain willing to meet and confer on this issue in an effort to reach a good faith resolution.

## I. The Substantive Content Of A Document Determines Whether It Is Relevant, Not Where It Is Located.

The Plaintiff States claim that Defendants only have the right to seek documents or information that Plaintiff States considered when bringing this action. According to your letter, even if a document in a Plaintiff State's possession directly addresses an issue in this case, *e.g.* blackouts, its relevance hinges on whether the document is located in that Plaintiff State's investigative file for this litigation. This is not the test for relevance under the Federal Rules of Civil Procedure. Relevance in discovery is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Nguyen v. Lotus by Johnny Dung Inc.*, 2019 WL 3064479, at *1 (C.D. Cal. June 5, 2019) (internal citations and quotation marks omitted). In addition, "Discovery is not limited to the issues raised only in the pleadings, but rather is designed to define and clarify the issues." *Miller v. Pancucci*, 141 F.R.D. 292, 296 (C.D. Cal. 1992). Consequently, any document the Plaintiff States possess that relates to the claims and defenses in this litigation

are relevant, regardless of whether one or more of the Plaintiff States "considered" it in making the decision to bring this action. The substance of a document is what matters for relevance, not where a Plaintiff State may have placed it in its files.

## II. Plaintiff States' Have Asserted Claims In Other Actions That Are Strikingly Similar To The Claims Asserted In This Case - Contradicting Their Argument That Other Investigative Files Do Not Contain Relevant Materials.

Claims that the Plaintiff States' have made in other cases demonstrate that they possess documents and information relevant to this litigation that are not contained in the investigative file for this case. The Plaintiff States' assertions in the Paramount Skydance Corp. and Tribune Media Co. actions illustrate the relevance of documents from other investigations to this litigation.[1]

### A. Paramount Skydance Corporation & Warner Bros. Discovery.

Materials and files from California, Colorado, Connecticut, Masschusetts, New York, and Oregon's litigation against Paramount Skydance Corp. and Warner Bros. Discovery, Inc. are relevant to this action. This letter contains just a few examples to illustrate the relevance of files from the Paramount Action:

- Plaintiff States in the Paramount Action allege that Blackouts affect negotiations between content providers and distributors, MVPDs, or vMVPDs, and affect subscribers and consumers. *State of California, et al. v. Paramount Skydance Corp., et al.*, No. 4:26-cv-07116, ¶ 5 (N.D. Cal.) (the "Paramount Complaint" or the "Paramount Action") ("If a distributor refuses to cave to onerous demands from Paramount, for example, Paramount can withhold its basic cable channels from distribution, resulting in the temporary loss of these channels for subscribers. The existence of alternative sources of basic cable, like Warner Bros., enables the distributor to stand up to the threat of this blackout."). This alleged power dynamic between Paramount and its distributors is also relevant to this action, because it informs the pressures that broadcasters like Nexstar and TEGNA face in negotiating with the likes of CBS (the Big Four Network owned by Paramount) and may illustrate one of the driving reasons for the rise in retransmission fees that local broadcasters charge cable and satellite operators. Accordingly, if Plaintiff States are in possession of any evidence of

[1] Your Letter asserts that the Defendants cannot seek information from other investigations when such documents would be relevant to a "discriminatory enforcement" claim. Even assuming your contention has merit, whether relevant documents may show that the Plaintiff States' action may have been discriminatory is not a shield from discovery of otherwise relevant materials. In other words, if documents in the states' possession as a result of other investigations are relevant to the merits of this action, including because they have a tendency to undermine Plaintiffs' claims or support Nexstar and TEGNA's defenses, Defendants are entitled to discover those documents and seek to use them on the merits, regardless of whether Defendants would ever raise a "discriminatory enforcement" claim.

Paramount and its subsidiaries making onerous demand on broadcasters (such as with respect to network affiliation fees and threats or actions to end affiliation agreements with particular stations), or Paramount and its subsidiaries treating broadcasters unfavorably (such as by moving content from national broadcasts to direct-to-consumer offerings, or using network affiliation fees to fund direct-to-consumer offerings that compete directly with affiliate broadcasts for viewership), such evidence would be directly relevant to this action as it would support why consolidation and scale among broadcasters is needed to resist and counter-act the pressures such broadcasters face from Big Four Networks. Moreover, allegations regarding Blackouts being used in licensing negotiations and Blackouts' impact on subscribers and consumers also feature in this action, where Plaintiffs conspicuously blame such blackouts on broadcasters. *See, e.g.*, Am. Compl. ¶¶ 50-51, 76-77. Accordingly, if Plaintiff States have evidence of blackouts caused or threatened by Paramount or its subsidiaries, that evidence may be relevant to this action as it would help establish that blackouts are not uniquely caused by local broadcasters. And if Plaintiff States possess evidence of the role of MVPDs in triggering blackouts, such evidence would plainly be relevant to this case, as it could establish a pattern by MVPDs of bringing about or risking blackouts to strengthen their bargaining position against various content providers in the linear television ecosystem, be they the likes of Paramount and its subsidiaries or the likes of Nexstar and TEGNA.

- Plaintiff States in the Paramount Action allege that a media company's content portfolio affects its bargaining power over distributors, MVPDs, or vMVPDs with respect to licensing of such content. *See* Paramount Complaint ¶ 11 ("The combined company's essential basic cable content would confer enormous bargaining power. Few distributors could withstand the threat of a blackout of Defendants' more than 50 basic cable channels, leaving them little choice but to accept onerous terms."). Similarly, Plaintiff States in this action allege that the ability to provide access to multiple Big 4 stations in a DMA will increase Defendants' ability to "demand higher fees and to threaten negative consequences to MVPDs." *See* Am. Compl. ¶ 76. Thus, the effect that access to content has on negotiations with distributors, MVPDs, or vMVPDs is a shared issue across the cases. Yet Paramount's content portfolio far exceeds that of Nexstar and TEGNA, and indeed, much of Nexstar and TEGNA's content portfolio comes in the form of Big 4 network content obtained via network affiliation agreements with Paramount subsidiary CBS and other Big 4 Networks. Accordingly, the evidence that Plaintiff States have regarding Paramount's content portfolio and bargaining power is directly relevant to this case, both generally as to Paramount (in that it could inform what kind and how much of a content portfolio is needed to create material leverage in negotiations), and in particular as to Paramount subsidiary CBS and its leverage over local broadcasters like Nexstar and TEGNA.

- Plaintiff States allege a relevant national geographic market for licensing of basic cable channels because, among other things, basic cable licenses are negotiated on a national

basis. *See* Paramount Complaint ¶ 67. Yet, they allege DMA specific relevant geographic markets in this case (Am. Compl. ¶¶ 61-62), even though licenses for retransmission consent are negotiated on a national basis. Accordingly, the documents and information in the possession of Plaintiff States that caused them to allege a national geographic market in the Paramount Complaint are relevant to this action, as they would have a tendency to support Nexstar and TEGNA's contention that media agreements negotiated on a national basis are associated with national relevant markets. For instance, Defendants and their experts could compare evidence of basic cable license negotiations with evidence of retransmission consent negotiations to establish that the both are national in scope and are not meaningfully informed by geographic subdivisions, such that it makes no more sense to find a DMA-specific relevant market for retransmission consent than it would for basic cable licensing.

- The Plaintiff States in the Paramount Action make allegations concerning subscribers' and/or consumers' options to obtain news, general entertainment, kids and family, lifestyle, or other genres of media from sources other than basic cable television. *See* Paramount Complaint ¶ 10 ("The [Paramount-Warner Bros.] merger will also likely harm distributors of basic cable television. After the merger, the combined company would control a portfolio of over 50 basic cable channels, including many of the most popular. The company would own rights to some of the most in-demand television programming, including March Madness and MLB games. Its portfolio would span all major genres: news, sports, general entertainment, kids and family, and lifestyle. No other programmer would possess a portfolio of comparable breadth."). Plaintiff States' allegations in this case also concern consumers' ability to obtain various programming from sources other than MVPDs. *See, e.g.*, Am. Compl. ¶¶ 44, 48, 54. Moreover, evidence regarding what Paramount content is "most popular" is directly relevant to this case, as some of that content features on Paramount's subsidiary CBS and thus is content that local broadcasters like Nexstar and TEGNA must negotiate to acquire via network affiliation fees, which they in turn seek to offset via retransmission consent fees charged to MVPDs.

### B. Nexstar & Tribune Media Co.

Documents and information, obtained from parties other than Nexstar or Tribune Media Co., in the possession of Illinois, Pennsylvania, and Virginia relating to their investigation of an action against the Nexstar and Tribune Media Co. merger (as well as the files of any other Plaintiff State that investigated this transaction) are likewise relevant to Plaintiff States' claims in this case. Again, similar to allegations in this case, Illinois, Pennsylvania, and Virginia alleged that "the proposed merger would eliminate competition between Nexstar and Tribune in the licensing of Big 4 network content ('retransmission consent') to cable, satellite, fiber optic television, and over-the-top providers (referred to collectively as multichannel video programming distributors or 'MVPDs'), for distribution to their subscribers." *See United States et al. v. Nexstar Media Group, Inc.*, No. 1:19-cv-02295,

¶ 5 (D.D.C.) (the "Tribune Action"). They also alleged that, "[C]ompetition from non-Big 4 stations does not typically impose a significant competitive constraint on the retransmission consent fees charged by the owners of Big 4 stations." *Id.* ¶ 21. Plaintiff States make strikingly similar allegations here. *See, e.g.*, Am. Compl. ¶ 10 ("[T]he merger has eliminated competition between Nexstar and TEGNA in the licensing of Big 4 station content to MVPDs for distribution to their subscribers."). As such, documents and information gathered by Plaintiff States during this prior investigation may be directly relevant to showing Nexstar's bargaining position before the Tribune transaction and assessing whether the combination of Nexstar and Tribune impacted the negotiation dynamics of retransmission consent agreements and/or affected the use of blackouts in negotiations. These issues are directly relevant to this case. With such striking overlap in allegations, it is implausible for Plaintiff States to contend that documents or other information in their investigative or litigation files for the Tribune Action are not relevant here.

These examples show that there is no question that the Plaintiff States have documents relevant to the claims and defenses in this litigation that are not in their Nexstar/Tegna investigative files. The above examples are illustrative of the relevant and discoverable materials that the Plaintiff States possess that they are seeking to withhold from discovery. The Plaintiff States, of course, have a complete understanding of what is in their files and where it is reasonably likely that documents and other information responsive to the RFPs is located. They have an obligation to search those files for responsive documents and information.

## III. Plaintiff States' Unsupported Burden Objections.

Plaintiff States cannot hide behind boilerplate burden objections. Plaintiff States' Letter lodges a conclusory objection that "asking Plaintiff States to search through the files of our other investigations is highly burdensome[.]" Plaintiff States have the burden of demonstrating that "the burden of producing responsive documents is disproportionate to the needs of the case." *SGII, Inc. v. Martin*, 2021 WL 1593246, at *4 (C.D. Cal. Mar. 3, 2021). Plaintiff States cannot satisfy this showing through unsubstantiated protests about burden—some level of burden is inherent in any document production; the question is whether that burden is disproportionate. *See A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006). Plaintiff States have provided no substantiation to support their burden claims or explanation as to why that burden is disproportionate, other than it would require them to conduct a search for documents. Plaintiff States cannot resist production of relevant documents by claiming burden without more.

## IV. Plaintiff States' Improper Privilege Objections.

Plaintiff States' objections based on a "multitude of privileges and doctrines," is similarly an improper objection to production. As an initial matter, it is not Defendants' burden to explain how Defendants' RFPs overcome Plaintiff States' claimed privileges and doctrines,

as the Letter contends. *See Dole v. Milonas*, 889 F.2d 885, 889 (9th Cir. 1989) ("[T]he party asserting the privilege has the burden of showing that it applies in the circumstances.").

Regardless, starting with the claimed official information privilege, Plaintiff States' reliance on this privilege is improper because Plaintiff States have not provided an affidavit to support the assertion of this privilege. A party asserting this privilege must make a formal and specific assertion by an official with authority over the governmental interest, after the official personally considers the requested material. *Kerr v. United States District Court*, 511 F.2d 192, 198–99 (9th Cir. 1975), aff'd, 426 U.S. 394 (1976). Further, the party opposing disclosure must provide the supporting affidavit "at the time it files and serves its response to the discovery request." *Kelly v. City of San Jose*, 114 F.R.D. 653, 661 (N.D. Cal. 1987). Plaintiff States have provided no such affirmation and have not made a substantial threshold showing to support their blanket official information privilege claims.

Plaintiff States' assertion of the deliberative process privilege is also improper. The deliberative process privilege exempts information reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which government decisions and policies are formulated from discovery. *Thomas v. Cate*, 715 F.Supp.2d 1012, 1019 (E.D. Cal. 2010) (citing *FTC v. Warner Comm's., Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)). Purely factual information is not generally protected. *Assembly of California v. U.S. Dept. Commerce*, 968 F.2d 916, 920–22 (9th Cir. 1992). And, assertion of the deliberative process privilege requires: (1) a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege based on actual personal consideration by that official; (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege; and (4) a showing that the material for which the privilege is asserted has been kept confidential. *Thomas*, 715 F.Supp.2d at 1019. Plaintiff States have not appropriately substantiated their deliberative process privilege claims, especially where Defendants' RFPs are seeking factual information relevant to Plaintiff States' claims and the need for this information outweighs any alleged, qualified deliberative process privilege.

With regard to Section 7A(h) of the Clayton Act, that is an exemption from disclosure of Hart-Scott-Rodino ("HSR") material from the Freedom of Information Act. It does not apply in this circumstance. First, Section 7A(h) by its plain language permits disclosure where materials "may be relevant to any administrative or judicial action or proceeding." 15 U.S.C. § 18a(h). Second, there is no basis to invoke Section 7A(h) because none of the materials at issue are within its scope. Section 7A(H) only applies to materials produced pursuant to the HSR Act and state Attorneys General do not have access to HSR materials. *See Lieberman v. FTC*, 771 F.2d 32, 37-38 (2d Cir. 1985) (prohibiting disclosure of HSR materials to state law enforcement officials).

To the extent that the RFPs encompass materials protected by the attorney-client privilege and/or the work product doctrine, we are willing to meet and confer to discuss ways to reduce the burdens associated with these privileges and protections.

## V. Supervisory Personnel and State Agency Communications.

We respectfully request that the remaining Plaintiff States, other than California and New York, confirm that they have collected and produced (or will produce) materials from front office personnel and any communications with other state agencies.

## VI. Initial Disclosures.

Plaintiff States did not address Defendants' request for Plaintiff States to ensure that their Initial Disclosures have disclosed, or will be amended to disclose, all state agencies that have information that is relevant to the claims or defenses in this action. We request Plaintiff States address this issue when responding to this letter.

We look forward to your prompt response.

Sincerely,

Bradley S. Lui
Morrison & Foerster LLP